**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

POSTAL POLICE OFFICERS
ASSOCIATION,

     Plaintiff,

vs.

UNITED STATES POSTAL SERVICE,
et al.,

     Defendants.

Case No. 20-cv-2566

**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR A
PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65(a)-(b) and Local Civil Rule 65.1, Plaintiff Postal Police

Officers Association ("PPOA") hereby moves this Court for a temporary restraining order and/or

preliminary injunction that:

(a) requires Defendants United States Postal Service ("USPS") and Postmaster General

Louis DeJoy to rescind the August 25, 2020 National Communication; and

(b) requires Defendants to recognize and acknowledge Postal Police Officers' statutory

jurisdictional authority to protect the U.S. Mail and other postal property away from postal real

estate.

In support of this request, Plaintiff submits the accompanying Memorandum in Support;

the Declarations of James Bjork, Benjamin Lomasang, Eliezer Molina, Daniel Patton, Edna

Sepulveda, Danny Simpson, Lavonn Traylor Jr., Paul White, James Wilhoit, Denise Williams,

Samuel Wister, Brian Renfroe, John Covell, and Arlus Stephens, and the exhibits attached to

them.  We have also filed a Proposed Order.

Dated September 23, 2020   Respectfully submitted,


       s/ Arlus J. Stephens____
       Arlus J. Stephens (478938)
        astephens@murphypllc.com
       Roseann R. Romano (1034895)
        rromano@murphypllc.com
       Charles A. Sinks (888273315)
        csinks@murphypllc.com
       MURPHY ANDERSON PLLC
       1401 K Street NW, Suite 300
       Washington, DC 20005
       tel: (202) 223-2620
       fax: (202) 296-9600

       Counsel for Postal Police Officers
        Association

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

POSTAL POLICE OFFICERS
ASSOCIATION,

     Plaintiff,

vs.

UNITED STATES POSTAL
SERVICE, et al.,

     Defendants.

Case No. 20-cv-2566 (CRC)

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER
AND/OR A PRELIMINARY INJUNCTION**

Arlus J. Stephens (478938)
astephens@murphypllc.com
Roseann R. Romano (1034895)
rromano@murphypllc.com
Charles A. Sinks (888273315)
csinks@murphypllc.com
MURPHY ANDERSON PLLC
1401 K Street NW, Suite 300
Washington, DC 20005
Tel. (202) 223-2620
Fax. (202) 296-9600

Attorneys for Postal Police Officers
Association

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ...........................................................................................1

STATEMENT OF FACTS ........................................................................................................2

    A.    Postal Police Officers and the Postal Inspection Service............................................2

    B.    The Postal Police Officer position before 2006........................................................3

    C.    Changes in 2006: Expansion of PPOs' assigned duties and congressional
         enhancement of their jurisdictional authority ...........................................................6

         1.    Congress enhanced PPOs' legal jurisdiction in the PAEA .........................6

         2.    USPS enhanced PPOs' assigned duties to emphasize law enforcement
            away from postal facilities. ..........................................................................8

         3.    The change in duties included expanded protection of letter carriers on
            their routes and mail security. ....................................................................9

            a.    PPOs performed carrier protection patrols. ...................................9

            b.    PPOs were assigned to perform mail-theft surveillance and
                instructed to focus on mail theft while on patrol on
                public roads...................................................................................11

            c.    PPOs were assigned to perform patrols at
                major airports. ..............................................................................12

    D.    On August 25, 2020, the Postal Inspection Service decreed that PPOs could no
         longer perform mail theft or carrier-protection patrols and now lacked legal
         authority off postal real estate. ...............................................................................13

    E.    The Bowers Memo conflicts with the Postal Service's collective bargaining
         promises, with previous policy and Postal Service testimony, and with a 2014
         MOU. .....................................................................................................................14

         1.    The CBAs between USPS and the Union restrict policy
            changes such as this and require arbitration. ..............................................14

         2.    The Postal Service endorsed a joint labor-management memorandum
            recognizing PPO duties away from postal real property are authorized
            under the statute. ........................................................................................16

i

F.      Aftermath of Bowers Memo for PPOs and Letter Carriers: their concerns and harms imposed. ................................................................................................16

G.      The Postal Service's motives for the August 25 Bowers Memo. ..........................18

      1.      Appearance of hindering mail security .....................................................19

      2.      Retaliation for PPOA's interest arbitration arguments .............................20

      3.      Racial discrimination and retaliation ........................................................21

      4.      Preservation of work for some, while eliminating PPOs ..........................22

ARGUMENT ....................................................................................................................23

A.      Standard for a TRO/Preliminary Injunction. ........................................................23

B.      First element: The PPOA has a substantial likelihood of success on the merits of its claims ............................................................................................24

      1.      The Postal Service's Bowers Memo is an *Ultra Vires* act.........................24

            a.      The plain language of the statute prohibits the Postal Service from curtailing PPOs' inherent duties and powers. .......................26

            b.      The statute's legislative history demonstrates that Postal Service "property" extends to chattel property and mail in transit...................................................................................28

            c.      Court decisions demonstrate that "property" extends to the Postal Service's chattels and mail...................................................29

            d.      The Bowers Memo's attempt to restrict PPO jurisdiction is *ultra vires*. ............................................................................30

      2.      PPOA is likely to prevail on the merits of its grievance-arbitration claim such that the Court should grant an injunction pending arbitration...........31

            a.      The Postal Service's policy change violates the Collective Bargaining Agreement. ................................................................32

            b.      USPS acted in disregard of its handbooks permitting exercise of PPO authority away from postal real property for decades. ..........34

C.      Second element: The Postal Service's policy change threatens irreparable injury to postal police and other postal employees if not enjoined. ..................................35

1.      The Postal Service's policy change threatens irreparable harm to PPOs by undermining their legal authority, increasing exposure to legal liability, discipline, and the inability to stop criminal activity. .................35

2.      The Postal Service's policy change threatens irreparable harm to letter carriers and the U.S. mail. ...........................................................37

3.      The Bowers Memo threatens the entire existence of the Postal Police position and subjects the PPOA to forced diversion of resources. ............38

D.      Third element: a preliminary injunction protects the vital public interest in the integrity of the U.S. mail..........................................................................................40

E.      Fourth element: the balance of equities favors PPOA because an injunction will not harm the Postal Service and only requires adherence to the Agency's statutory obligations and longstanding practice.....................................................42

CONCLUSION..............................................................................................................................43

Plaintiff Postal Police Officers Association respectfully submits this memorandum of law in support of its motion for a temporary restraining order and/or a preliminary injunction. The Court should enjoin the Postal Service to rescind its August 25, 2020 National Communication and to recognize and acknowledge Postal Police Officers' statutory jurisdictional authority to protect the U.S. mail and other postal property away from postal real estate.

## INTRODUCTION AND SUMMARY

For decades the Postal Service has employed uniformed police officers to protect its most important assets: its property, its personnel, and the mail itself. Congress intended that the protection of the mails be entrusted to specialized postal law enforcement, critically including career Postal Police officers who Congress gave them broad authority anywhere connected with postal property, whether at mail-processing facilities, public roads used to transport mail, or letter carriers' routes.

Plaintiff Postal Police Officers Association now challenges the Postal Service's sudden unilateral action to restrict Postal Police Officers' law-enforcement jurisdiction solely to postal real estate, effectively confining them to the Post office buildings with no authority to follow and protect the mail or its carriers once it leaves the Post Office. This change is unlawful under the operative statute. It is also a violation of the Collective Bargaining Agreement with the Plaintiff Postal Police Officers Association. It threatens the integrity of the mails on the eve of a national election that will be heavily dependent on mail security and when millions of Americans are home-bound and dependent on the mail. *See Washington v. Trump*, -- F.Supp.3d --, No. 1:20-CV-03127-SAB, 2020 WL 5568557, at *4 (E.D. Wash. Sept. 17, 2020) (enjoining other recent policy changes by the Postal Service that threatened to cause "voter disenfranchisement" and

interference with essential government functions); *Jones v. United States Postal Service*, -- F.Supp.3d --, 2020 WL 5627002 at \*20-25 (S.D.N.Y. Sept. 21, 2020) (same).

The Postal Police Officers Association seeks temporary and preliminary injunctive relief to bar the change. The Union has filed a grievance pursuant to its Collective Bargaining Agreement with the Postal Service. By the time grievance arbitration or this litigation can be finalized, however, it will be too late to remedy harms to police officers' day-to-day working conditions, the safety of letter carriers, and the integrity of the U.S. mail.

As described more fully below, the circumstances of this case warrant an injunction requiring the Postal Service to rescind its policy change restricting Postal Police Officers' jurisdictional authority and recognize the police officers' authority to protect the mail away from postal real estate.

## STATEMENT OF FACTS

### A.    Postal Police Officers and the Postal Inspection Service

PPOA is a labor union that serves as the collective bargaining representative of a nationwide unit of uniformed postal police officers ("PPOs") employed by the U.S. Postal Service ("USPS"). Bjork Decl. ¶ 3.

PPOs are part of USPS's Inspection Service, its law-enforcement branch. The Inspection Service also employs approximately 1,200 postal inspectors, who are akin to detectives. Bjork Decl. ¶ 8.  In 2016 trial testimony before the U.S. District Court for the District of Massachusetts, the Inspection Service testified as follows:

> [T]he U.S. Postal Inspection Service . . . is composed of postal inspectors who are the agents, Postal Police Officers who are uniformed officers, and support staff . . . .
>
>  \* \* \*  Think of them as a fully functioning police department whose responsibilities are security for postal facilities, protection of postal employees, protection of mail in transit,

preventing the use of mails for illegitimate purposes, mailing child pornography, mailing

drugs through the mail.

Stephens Decl. ¶ 5, Exh. F, Tr. 128:10-17 (trial testimony of Charles Zekan on December 14,

2016 in *Anderson vs. Brennan*, No. 14-cv-13380-PBS (D. Mass.)).

In that same lawsuit, the Inspection Service representative testified to the duties currently

assigned to postal police officers:

PPOs are responsible for providing a visible uniformed law enforcement presence at our

primary facilities. We have increasingly used them as mobile agents in the street as

attacks on our carriers have increased, and crimes like mail fishing, for example, [where]

folks are finding ways to stick lines with glue, with hooks, with other implements, and

pull mail out of the boxes. . . .  Having that visible uniformed presence on the street is

very effective in combatting that. So PPOs' role is to respond to emergency and contain

those situations until additional resources, postal inspectors, local P.D., fire department

can respond to the events with a postal nexus.

Stephens Decl. ¶ 5, Exh. F, Tr. 128:20-25–129:1-9 (Zekan testimony).

The Postal Service employs postal inspectors nationwide but currently employs only

approximately 450 postal police officers in 20 metropolitan areas. Bjork Decl. ¶ 3.

**B.      The Postal Police Officer position before 2006**

The Postal Service created the PPO position in 1971. Bjork Decl. ¶ 7. From their

inception, the Postal Service tasked PPOs with duties that included "security" and "loss

prevention" with respect to the mail and postal property. Bjork Decl. ¶ 10, Exh. B. These early

postal police officers were expected to conduct "surveillance" and "investigative assignments,"

including "complete investigation of reported misdemeanors and minor crimes." Bjork Decl.

¶ 10, Exh. B. They performed "duties pertaining to the security of postal building, personnel, property, mail, and mail-in-transit." Bjork Decl. ¶ 11, Exh. C.

They were trained as police at federal law-enforcement training academies alongside other federal law-enforcement officers. Covell Decl. ¶ 4. They carried firearms and were trained to identify themselves as police. Bjork Decl. ¶ 11.

Prior to 2006, Congress provided law-enforcement authority to PPOs as "special police officers" under Title 40 of the United States Code through annual appropriations bills. Covell Decl. ¶ 3. Based on that grant of authority, the Postal Service recognized PPOs' law-enforcement authority in all the following situations:

- Matters arising in a postal facility;

- Matters arising adjacent to or flowing from a postal facility;

- Situations requiring PPOs to conduct mobile patrols away from postal facilities; and

- Authority over postal property (including mail and money) that was traveling on public roads and to train stations or airports.

Covell Decl. ¶ 5. In sum, the Inspection Service recognized that PPOs had law-enforcement jurisdiction with respect to USPS property, both real property and chattel property, regardless of physical location. Covell Decl. ¶ 5.

The Postal Service memorialized its position regarding PPO jurisdiction in Inspection Service Handbook 701, published in June 2006. Covell Decl. ¶ 6, Exh. A.

Prior to 2006, the USPS used PPOs mostly to perform security functions at and around its facilities and to protect high-value shipments of mail and money on public roads. PPOs' security functions consisted of maintaining order and security at and around postal buildings and responding to burglar alarms at post offices.

USPS used its police officers to protect and escort deliveries of USPS monies and high-value mail on public roads to and from postal facilities and airports and train stations. Bjork Decl. ¶ 9. Indeed, PPOs' authority over certain high-value mail shipments was once guaranteed to postal customers in postal regulations. *Fazi v. United States*, 935 F.2d 535, 536 (2d Cir. 1991) (referencing postal regulation that required "that shipments via surface transportation receive an escort by a postal police officer").

Based on the Inspection Service's published description of PPOs' jurisdiction, PPOs unquestionably had law-enforcement authority away from postal facilities. Covell Decl. ¶ 7. For example, on November 5, 1990 postal police officer Carlos Acosta arrested El Sayyid Nosair on the sidewalk outside a hotel on Lexington Avenue in Manhattan, away from any postal facility. Nosair was prosecuted for the killing of Meir Kahane in the Southern District of New York. *United States v. Rahman*, 189 F.3d 88, 105 (2d Cir. 1999); *see also Acosta v. Islamic Rep. of Iran*, 574 F. Supp. 2d 15, 20 (D.D.C. 2008) ("Outside the hotel, Nosair encountered plaintiff Carlos Acosta, a uniformed United States Postal police officer. Nosair fired his weapon at Acosta, striking him in his chest and shoulder. Acosta, who was wearing a bulletproof vest, returned fire hitting Nosair in the neck. After which, Acosta secured Nosair's weapon and detained him.") (cit. om.).

The Postal Service awarded Officer Acosta its highest honor, the Meritorious Service Award. Bjork Decl. ¶ 13. To our knowledge, no one has ever claimed that Officer Acosta lacked law-enforcement authority to make the arrest.

C.      **Changes in 2006: Expansion of PPOs' assigned duties and congressional enhancement of their jurisdictional authority**

1.      **Congress enhanced PPOs' legal jurisdiction in the PAEA.**

In 2006, Congress passed the Postal Accountability and Enhancement Act ("PAEA"). This law was intended to "reform postal operations and mitigate the Postal Service's financial difficulties." *American Postal Workers Union v. Postal Regulatory Comm'n*, 842 F.3d 711, 712 (D.C. Cir. 2016).

The PAEA addressed the role of the Postal Service's police officers by providing a new permanent source of jurisdictional authority at 18 U.S.C. § 3061(c).  Section 3061 previously provided law-enforcement authority only for postal inspectors. The PAEA amendment, adding subsection (c), permanently expanded PPO jurisdiction by authorizing police officers employed by USPS to perform law enforcement duties as follows:

(1) The Postal Service may employ police officers for duty in connection with the protection of property owned or occupied by the Postal Service or under the charge and control of the Postal Service, and persons on that property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property.

(2) With respect to such property, such officer shall have the power to— (A) enforce Federal laws and regulations for the protection of persons and property; (B) carry firearms; and (C) make arrests without a warrant for any offense against the Unites [sic] States committed in the presence of the officer or for any felony cognizable under the laws of the United States if the officer has reasonable grounds to believe that the person to be arrested has committed or is committing a felony.

6

(3) With respect to such property, such officers may have, to such extent

as the Postal Service may by regulations prescribe, the power to—(A) serve

warrants and subpoenas issued under the authority of the United States; and (B)

conduct investigations, on and off the property in question, of offenses that may

have been committed against property owned or occupied by the Postal Service or

persons on the property.

18 U.S.C. §§ 3061(c)(1)-(3).

The legislative history of the PAEA confirms that Congress was aware that Postal Police

performed law-enforcement functions both <u>on</u> postal real estate and <u>away</u> from postal real estate.

The House report expressly recognized that PPOs "provide perimeter security, escort high-value

mail shipments, and perform other essential protective functions." H.R. REP. 108-672(I), H.R.

Rep. No. 672(I), 108th Cong., 2d Sess. 2004, 2004 WL 2026451 (Leg. Hist.) *24.  Nothing in

the legislative history suggests that Congress intended to impose new limits to the scope of

postal police officers' legal authority.

In making this legislative change, Congress sought to help reduce the Postal Service's

financial expenditures on law enforcement. The change allowed the Postal Service to utilize a

less-costly form of law-enforcement officers to address many types of postal criminal activity.

The employment cost of uniformed postal police officers is far less than the employment cost of

postal inspectors. Bjork Decl. ¶ 8.

The Postal Service did not understand the PAEA to somehow reduce the preexisting legal

jurisdiction for PPOs.  It memorialized this position in a May 2007 policy update to Inspection

Service Handbook 701.  Covell Decl. ¶ 9.  The policy update reiterated that the Inspection

Service may use postal police officers to exercise law-enforcement jurisdiction away from postal real estate with respect to postal property and postal personnel. Covell Decl. ¶ 9, Exh. B.

In 2008, Deputy Chief Postal Inspector Zane Hill testified in an interest-arbitration hearing about PPOs' duties, including the scope of their jurisdiction.  Hill testified that PPOs had law-enforcement authority over postal-related crimes against letter carriers away from postal property. Stephens Decl. ¶ 8, Exh. I, Tr. 524 (Hill testimony). Hill explained that PPOs had the legal authority to intervene in an assault of a letter carrier on a public street, to subdue the perpetrator of the assault, to place the individual under arrest, and to transport the individual to jail.  Stephens Decl. ¶ 8, Exh. I, Tr. 525-26.

### 2.   USPS enhanced PPOs' assigned duties to emphasize law enforcement away from postal facilities.

 In the years following the enactment of the PAEA, the Postal Service dramatically changed and expanded the assigned duties of PPOs. Bjork Decl. ¶ 15. At the same time, the USPS eliminated most of PPOs' previous building-security functions by hiring contract security guards to do that work.  *Id.*  Consequently, the Postal Service considerably reduced the national complement of PPOs. Bjork Decl. ¶ 15.

The Postal Service has testified, and successfully argued in court documents, that these changes fundamentally transformed the PPO position.  In the aforementioned Massachusetts case that was tried before Judge Patti Saris in 2016, the Postal Service described the changes to PPOs' duties and responsibilities as "drastic" and as constituting a "paradigm shift."  Stephens Decl. ¶ 4, Exh. E at 14-15 (describing "drastic changes to the duties and responsibilities of PPOs" and arguing that "the more intense and dangerous duties of PPOs, meant that life as a PPO [in 2011-2013] was far different from life as a PPO than it had been [in 1999 or 2000].");  Stephens Decl. ¶ 6, Exh. G at 19 (describing "paradigm shift in PPO expectations"). *See also* Stephens decl. ¶ 7,

Exh. H at 32 (USPS's brief to the First Circuit described a "paradigm shift in PPO responsibilities" starting in the mid-2000s).

The District Court credited the sworn testimony of the Inspection Service representatives regarding the changes to the PPO position and made the following findings of fact:

> The Postal Police are a uniformed police force whose responsibilities include providing security for postal facilities and employees, protecting mail while in transit, and preventing the use of mails for illegitimate purposes.
>
> The role of the Postal Police has evolved somewhat over time. Previously, PPOs were mainly responsible for security watches at entry posts and guard posts. Beginning around 2001, the Postal Police began to contract with private security to handle some of the security work previously carried out by PPOs. A greater portion of PPO work became street patrol and emergency response in marked cruisers. As a result, the work of PPOs became more challenging.

Findings of Fact and Conclusions of Law, *Anderson v. Brennan*, No. 14-CV-13380 (PBS), 2017 WL 1032502 at 2-3 (D. Mass., March 16, 2017)*, affirmed*, 911 F.3d 1 (1st Cir. 2018).

### 3. The change in duties included expanded protection of letter carriers on their routes and mail security.

During this time, USPS increasingly instructed PPOs to carry out duties away from postal facilities, including mobile patrols to protect letter carriers, stop mail theft, and to ensure the safety of mail at airports.

### a. PPOs performed carrier-protection patrols.

USPS began using PPOs to perform mobile letter carrier-protection patrols to provide a physical police presence and security on mail-delivery routes. Bjork Decl. ¶ 17. During carrier-protection patrols, PPOs patrol city streets to provide law-enforcement support for mail delivery

and the letter carriers who are responsible for retrieving and delivering mail on their routes. Bjork Decl. ¶ 17.

Letter carriers are among the most visible and accessible employees of the Postal Service, given their daily presence on the streets of every neighborhood. As a result, they are often at risk of violent crime, including assaults, robberies, and shootings. Renfroe Decl. ¶¶ 4-5.

The Postal Service has acknowledged that crimes against letter carriers have been increasing. Stephens Decl. ¶ 5, Exh. F, Tr. 128:22-23 (Zekan: "We have increasingly used [PPOs] as mobile agent in the street as attacks on our carriers have increased."). These crimes present a danger not only to the personal safety of letter carriers but also to the mail. Letter carriers and their vehicles are typically targeted because of their job, i.e., because of the mail and packages they are carrying and delivering.  Bjork Decl. ¶ 17.

The presence of PPOs in marked law-enforcement vehicles deters criminal activity. Renfroe Decl. ¶ 7. Letter carriers trust PPOs to respond to incidents along their route, to provide assistance, and secure the mail. Renfroe Decl. ¶ 7.

Given the importance of carrier protection, the Postal Service assigned many officers to be entirely dedicated to carrier-protection duty. Bjork Decl. ¶ 18; Lomasang Decl. ¶ 5; Loveless Decl. ¶ 5. PPOs across the country performed carrier-protection patrols. Bjork Decl. ¶ 18; Lomasang Decl. ¶ 2 (Newark division); Patton Decl. ¶¶ 2-4 (Chicago division); Molina Decl. ¶¶ 2-4 (Fort Worth division); White Decl. ¶¶ 2-4 (Detroit division); Wilhoit Decl. ¶¶ 2-4 (Pittsburgh division); Wister Decl. ¶¶ 2-4 (Philadelphia division).

The Postal Service has also assigned PPO on patrols to prevent mail theft and crimes against carriers to other states to respond to crimes against letter carriers or the mail.  For example, the Postal Service assigned Chicago division PPOs to perform carrier-protection patrols

in Janesville, Wisconsin, during a manhunt for a suspect in a gun store robbery. Patton Decl. ¶ 5. Chicago division PPOs also traveled to Milwaukee, Wisconsin in an effort to reduce threats to letter carriers. Williams Decl. ¶ 5. Pittsburgh division PPOs travel to Canton, Ohio, to provide security due to increased gang violence. Wilhoit Decl. ¶ 5. The Office of the Chief Postal Inspector authorized these out-of-state patrols. Wilhoit Decl. ¶ 8.

> **b.    PPOs were assigned to perform mail-theft surveillance and instructed to focus on mail theft while on patrol on public roads.**

PPOs have played an important role in preventing and prosecuting mail theft. The Postal Service assigned PPOs to conduct surveillance in areas where mail theft and mailbox fishing are common. Sepulveda Decl. ¶ 7; Simpson Decl. ¶ 3. PPOs have played an active role in gathering evidence and apprehending mail theft suspects.

The Inspection Service's New York Division (its largest) emphasized mail theft from carriers on their routes. For example, a January 27, 2020 roll call training[1] provided scenario training, where PPOs on a mobile patrol observe individuals taking mail from an unattended carrier cart, a violation of 18 U.S.C. § 1708. Simpson Decl. ¶ 4; Bjork Decl. ¶ 27, Exh. J. Analyzing the incident, the training documents states: "Should you Arrest? Absolutely." Bjork Decl. ¶ 27, Exh. J. It further instructs that PPOs should "conduct a search of subject, recover letter mail, . . . [and] transport of subject back to DHQ." Bjork Decl. ¶ 27, Exh. J; Simpson Decl. ¶ 4.

---

[1] A roll call training is a presentation prepared by local or national management to educate the PPO workforce about policies and practices that govern their day-to-day work. They are communicated to PPOs orally or in writing at the beginning of shifts. Bjork Decl. ¶ 25.

PPOs on street patrols arrested suspects for criminal mail theft, based on PPOs' surveillance and preliminary investigations. Sepulveda Decl. ¶ 7. These arrests led to criminal convictions based on evidence PPOs obtained pursuant to law-enforcement searches. *Id.*

Some divisions targeted mail theft from USPS collection boxes. Miami PPOs were assigned to watch for evidence of criminal activity around collection boxes while on mobile street patrols and to engage in undercover surveillance. Officer Edna Sepulveda alone arrested several individuals who were subsequently prosecuted and convicted of mail theft in federal court. Sepulveda Decl. ¶¶ 8-16; Stephens Decl. ¶¶ 2-3, Exhs. A-D.

For example, during the early morning hours of December 31, 2017, Officer Sepulveda observed what she believed to be mailbox "fishing" while on patrol, i.e., the use of a device to "fish" mail out of a blue collection box and theft of that mail. Sepulveda Decl. ¶ 8 & 12. The collection box was not located on postal real estate. *Id.* She stopped the suspects' vehicle, conducted a search of the vehicle, and discovered stolen first-class mail and criminal tools. Sepulveda Decl. ¶ 9. The tools connected the individuals with mail theft incidents at multiple collection boxes. Sepulveda Decl. ¶ 10. She arrested the suspects and turned them over to a postal inspector who arrived 1½ hours later. Sepulveda Decl. ¶¶ 11-12. The federal government charged these individuals with mail theft and they were convicted and sentenced to prison based on the evidence she obtained. Stephens Decl. ¶¶ 2-3, Exhs. A-B.

### c.    PPOs were assigned to perform patrols at major airports.

The Postal Service also assigned PPOs to patrol at major airports to ensure the safety of mail being transported to and from planes. Bjork Decl. ¶ 22, Exh. H. In this capacity, PPOs performed patrols throughout airport facilities including the tarmac and buildings searching for evidence of mail theft and trying to deter such conduct. Sepulveda Decl. ¶ 5.

PPOs on airport patrols were charged with locating and taking custody of lost mail, responding to suspicious packages, including those containing weapons and narcotics, and assisting with investigating incidents of mail theft at the airport. Sepulveda Decl. ¶ 5; see also Bjork Decl. ¶ 22, Exh. H. PPOs are trained to secure postal equipment and mail and ensure that mail is delivered timely. Stephens Decl. ¶ 9, Exh. J at Tr. 535 (testimony of PPO Eric Jordan on January 16, 2014).

The role of PPOs at airports was particularly significant because mail traveling through airports is increasingly handled by airline contractors, whose employees are often careless and sometimes steal valuable pieces of mail. Stephens Decl. ¶ 9, Exh. J, Tr. 536-37. Working at John F. Kennedy Airport in New York in 2014, Officer Eric Jordan located or responded to "two to three incidents a day of recovered intact mail, recovered rifled mail, delayed Express Mail." Stephens Decl. ¶ 9, Exh. J, Tr. 544. In some cases, Officer Jordan located mail in dumpsters or abandoned airport buildings where, without his patrol, it likely never would have been recovered. Stephens Decl. ¶ 9, Exh. J, Tr. 541. This email included registered mail, among the most important mail that the Postal Service carries. Stephens Decl. ¶ 9, Exh. J, Tr. 546.

**D.     On August 25, 2020, the Postal Inspection Service decreed that PPOs could no longer perform mail theft or carrier-protection patrols and now lacked legal authority off postal real estate.**

Despite the long history of PPOs performing duties away from postal real estate, particularly since the PAEA's expansion of jurisdiction, the USPS recently declared it was nullifying this grant of statutory jurisdiction.

On August 25, 2020, the USPS—through Deputy Chief Inspector David Bowers—issued a National Management Communication to all divisions regarding postal police utilization. The memorandum stated that PPO jurisdiction, pursuant to 18 U.S.C. § 3061, is limited to "***real***

property owned, occupied, or otherwise controlled by the Postal Service." Bjork Decl. ¶ 26, Exh. K. (emphasis added).

The Bowers Memo ordered all divisions to immediately cease and desist from deploying PPOs on assignment away from postal real estate. Bjork Decl. ¶ 26, Exh. K. During travel between facilities, it directed that PPOs "are not to be placed into situations in which it would be reasonably likely that they would be compelled to exercise law enforcement activity (e.g., carrier protection patrols, community policing patrols, and fishing patrols)." Bjork Decl. ¶ 26, Exh. K.

In this way, the Postal Service decreed that PPOs have been stripped of their congressionally authorized authority except when physically on postal real estate.

> **E.    The Bowers Memo conflicts with the Postal Service's collective bargaining promises, with previous policy and Postal Service testimony, and with a 2014 MOU.**

The Union believes the Postal Service's insertion of the word "real" to modify the word "property" in 18 U.S.C. § 3061 is unwarranted and unlawful. The Union also maintains that the change is impermissible for other reasons.

> **1.    The CBAs between USPS and the Union restrict policy changes such as this and require arbitration.**

PPOA and the Postal Service have been parties to successive Collective Bargaining Agreements governing the wages and working conditions of PPOs. The parties continue to operate under their 2012 to 2017 agreement, pending the award of a new contract from an interest arbitration panel. Bjork Decl. ¶ 4, Exh. A.

Article 5 of the CBA prohibits the Postal Service from making unilateral changes "affecting wages, hours and other terms and conditions of employment." Bjork Decl. ¶ 4, Exh. A., § 5.01.

Article 19 of the CBA addresses postal handbooks, manuals, and other published regulations of the Postal Service. Section 19.01 provides:

> Those parts of all handbooks, manuals and published regulations of the Postal service that directly relate to wages, hours or working conditions, as they apply to PPOs covered by this Agreement, shall contain nothing that conflicts with this Agreement and shall be continued in effect expect that the Employer shall have the right to make changes that are not inconsistent with this Agreement and that are fair, reasonable, and equitable.

Bjork Decl. ¶ 4, Exh. A., § 19.01. Section 19.02 provides, in pertinent part:

> Notice of such proposed changes that directly relate to wages, hours or working conditions shall be furnished to the Union at the national level at least sixty (60) days prior to issuance. Such proposed changes will be furnished to the Union in hard copy and, if available, electronically. At the request of the Union, the parties shall meet concerning such changes.

Bjork Decl. ¶ 4, Exh. A., § 19.02.

The CBA provides a grievance-arbitration procedure to resolve disputes between the parties. Bjork Decl. ¶ 4, Exh. A, Article 15. Section 15.04 allows PPOA to file a national-level grievance regarding the interpretation of the CBA. Absent mutual resolution of the dispute, a neutral arbitrator will decide the dispute. Bjork Decl. ¶ 4, Exh. A, Article 15.

PPOA filed a national-level grievance on September 8, 2020 to challenge the Bowers Memo. Bjork Decl. ¶ 35, Exh. L. The grievance argues that the Bowers Memo constitutes an unlawful unilateral change to a long-standing past practice and an impermissible change to Inspection Service Handbook 701 in violation of Article 19. Bjork Decl. ¶ 35, Exh. L. The Postal Service has not yet responded to the grievance. Bjork Decl. ¶ 35.

15

  **2. The Postal Service endorsed a joint labor-management memorandum recognizing PPO duties away from postal real property are authorized under the statute.**

  In 2014, representatives of PPOA and the Postal Service signed on to a joint memorandum resulting from a labor-management committee for PPO duties and compensation. The parties' 2012-2017 CBA called for the creation of the committee to address matters of pay due to the increased duties and responsibilities assigned to many PPOs. Bjork Decl. ¶ 20, Exh. A at 96.

  The Inspection Service was represented on the labor-management committee by then-Deputy Chief Counsel Terrence McKeown, who signed the memorandum on behalf of the Postal Service. The memorandum recognized PPOs' duties and authority away from postal real estate. Bjork Decl. ¶ 20, Exh. G. The memorandum noted that carrier-protection patrols and other duties that take PPOs away from postal real estate are "consistent with the jurisdiction restrictions set forth in Title 18, United States Code, Section 3061(c)." Bjork Decl. ¶ 20, Exh. G.

  **F. Aftermath of Bowers Memo for PPOs and Letter Carriers: their concerns and the harms imposed.**

  The contents of the Bowers Memo were communicated to PPOs throughout the country in the week or so following its issuance. Sepulveda Decl. ¶ 18; Simpson Decl. ¶ 5. As a result of the Bowers directive, PPOs have been mostly limited to duties inside postal facilities. Sepulveda Decl. ¶ 20. All carrier-protection patrols and mail-theft patrols have been canceled. Sepulveda Decl. ¶ 20.

  The USPS has continued to assign some PPOs to duties that require them to travel between postal facilities, but they now face uncertainty regarding how the Bowers Memo affects their ability to lawfully carry out law-enforcement duties. Sepulveda Decl. ¶ 21. PPOs are uncertain about boundaries of postal real estate and their legal status. Traylor Decl. ¶¶ 6-7. They

16

are fearful that the Postal Service will not support them if they encounter criminal activity or engage in law-enforcement duties. Simpson Decl. ¶¶ 6-7; Traylor Decl. ¶ 5; Sepulveda Decl. ¶ 22.

In other words, if PPOs exercise law-enforcement authority, they are apprehensive the Postal Service will insist they did so without legal authority and thus put them at risk for criminal or civil liability for acting without authority. Sepulveda Decl. ¶ 22; Traylor Decl. ¶ 6. On the other hand, they are also concerned the Postal Service will retaliate against them if they do not intervene to stop criminal activity they encounter. Simpson Decl. ¶ 6.

Moreover, many of the PPOs' previous duties are going unfulfilled. Postal Inspectors are the only other postal law-enforcement officers with authority relating to the mail and postal property. Bjork Decl. ¶ 27. However, the Postal Service generally utilizes inspectors on a normal business-day schedule, meaning they are not readily available around the clock. Bjork Decl. ¶ 8; Sepulveda Decl. ¶ 17 (testifying that Inspectors often respond to crime scenes over an hour after PPOs). Thus, postal inspectors are less able to provide a 24-hour presence to deter mail theft and carrier assaults or robberies and apprehend suspects at the scene of the crime. Bjork Decl. ¶ 8.

Furthermore, if the Postal Service pulls postal inspectors away from their other duties to perform PPO work, that has an effect on their own work. Bjork Decl. ¶ 27. Postal inspectors are supposed to be engaged in in-depth investigative tasks; if they are instead conducting street patrols, those investigations are being left untended. Bjork Decl. ¶ 8.

Without the presence of PPOs on patrol, there is an increased risk of attacks on letter carriers and theft of mail. Renfroe Decl. ¶ 8. Indeed, in just the past few days, news reports indicate shootings of at least two carriers, in areas where PPOs are assigned and could otherwise have been on patrol. Bjork Decl. ¶¶ 29-30.

17

PPOA and the officers it represents are also participants in the mail stream. For example, the PPOA conducts its officer elections using mail ballots. Bjork Decl. ¶ 32.

**G.      The Postal Service's motives for the August 25 Bowers Memo.**

The Postal Service has not disclosed the reason for the sudden issuance of the Bowers Memo on August 25.

News outlets have observed that the Postal Service waited to issue the Bowers Memo until the day after the Postmaster General testified before the House Oversight and Reform Committee about controversial postal changes on August 24.[2]  In his committee testimony, Postmaster DeJoy committed to suspend other Postal Service policy changes "to avoid even the appearance of any impact on election mail."[3]

For the same reasons that other recent Postal Service policy changes had the "appearance of" impacting election mail, it certainly does not make sense for the Postal Service to choose this time to reduce the number of uniformed law-enforcement agents on the street to address mail theft and other postal offenses. The change will also require reassigning postal inspectors from mail theft and mail fraud investigations to cover patrols. Bjork Decl. ¶ 27.

The Postal Service has not stated a rationale for this election-eve change. The public record suggests the following explanations.

---

[2] *See, e.g.,* Kyle Cheney, Postal police union sues USPS, DeJoy over limits to mail theft enforcement authority, *POLITICO* (Sep. 14, 2020) ("USPS implemented the change on Aug. 25, a day after DeJoy testified to Congress amid mounting concerns that policy changes he implemented were delaying mail service and could jeopardize record numbers of mail-in ballots expected in the presidential election."), *available at*: https://www.politico.com/news/2020/09/14/postal-service-police-union-sues-dejoy-414537 (last accessed: 9/21/2020).

[3] *See* Statement of Postmaster General Louis DeJoy at 14 (Aug. 24, 2020), *available at:* https://www.congress.gov/116/meeting/house/110969/witnesses/HHRG-116-GO00-Wstate-DeJoyL-20200824.pdf (last accessed: 9/21/2020).

### 1.    Appearance of hindering mail security

Two district courts in the last week have found ample basis to enjoin the Postal Service from planned election-eve changes that threaten the security and timely delivery of mail ballots and medicine and other essentials. *See Washington v. Trump*, -- F.Supp.3d --, No. 1:20-CV-03127-SAB, 2020 WL 5568557, at *5 (E.D. Wash. Sept. 17, 2020) (enjoining other recent policy changes by the Postal Service that threatened to cause "voter disenfranchisement" and threatening other essential government services including tax collection and opioid overdose prevention).  The court wrote:

> [Postmaster] DeJoy's actions fly in the face of Congress's intent to insulate the management of the Postal Service from partisan politics and political influence and acknowledgement that free and fair elections depend on a reliable mail service. They have not provided trusted assurance and comfort that citizens will be able to cast ballots with full confidence that their votes would be timely collected and counted. Rather, as detailed below, their actions have given rise to management and operational confusion, to directives that tend to generate uncertainty as to who is in charge of policies that ultimately could affect the reliability of absentee ballots, thus potentially discouraging voting by mail. Conflicting, vague, and ambivalent managerial signals could also sow substantial doubt about whether the USPS is up to the task, whether it possesses the institutional will power and commitment to its historical mission, and so to handle the exceptional burden associated with a profoundly critical task in our democratic system, that of collecting and delivering election mail a few weeks from now.

*State of Washington*, 2020 WL 5568557 at *5.

19

In *Jones v. United States Postal Service*,  -- F.Supp.3d --, 2020 WL 5627002 *23

(S.D.N.Y. Sept. 21, 2020), Judge Marrero held as follows:

> USPS has offered no satisfactory explanation for failing to set clear, uniform policies for
> the handling of Election Mail. It has given no persuasive assurances that the "practices" it
> touts to ensure the delivery of Election Mail will be uniformly applied. USPS's purported
> rollback of "nearly all" policies linked to mail delays is either incompletely implemented,
> inadequately communicated throughout the organization, or unreliable. The institutional
> confusion in Postal Service communications, operations, and practices that Plaintiffs have
> identified can serve no legitimate purpose.

*Jones v. United States Postal Service*, 2020 WL 5627002 at *23.

The Court cannot blind itself to the reality that this unprecedented hobbling of uniformed

career Postal Police officers comes in the midst of the Postal Service's other improper

degradations of mail delivery and security.

### 2.      Retaliation for PPOA's interest arbitration arguments.

As mentioned above, the parties engaged in an interest-arbitration hearing in February

2020 to determine the successor Collective Bargaining Agreement for the 2012-2017 agreement.

For decades, including this year, the Postal Service has argued to interest arbitrators that its

police officers are only security guards and thus should be paid as such. Bjork Decl. ¶ 36. In

keeping with this, the Postal Service consistently proposes bottom-basement wages.  Bjork Decl.

¶ 36. Accordingly, pay for PPOs has fallen so low that the Postal Service currently pays career

custodians higher salaries than it pays to its police officers. Bjork Decl. ¶ 36.

In the interest-arbitration hearing, David Bowers testified for the Inspection Service about

PPOs' duties and responsibilities. Stephens Decl. ¶ 10, Exh. K. Bowers testified that the duties

and responsibilities of PPOs were relatively menial and that they have not changed since the 1990s. Stephens Decl. ¶ 10, Exh. K, Tr. 350, 431. On cross-examination, the Union confronted Bowers with the fact that the Postal Service had stated the exact opposite to the U.S. District Court in Massachusetts and that Inspection Service witnesses testified to that fact. Stephens Decl. ¶ 10, Exh. K, Tr. 432-35.  Bowers professed no knowledge of that testimony.  *Id.*

During the Union's case-in-chief, testimony was introduced from PPOs around the country about the work they performed, all of it police-related, and that much of it occurred away from postal real estate.  Bjork Decl. ¶ 5.

George Washington University law professor Stephen Saltzburg testified on the Union's behalf about PPOs' law-enforcement jurisdiction under 18 U.S.C. § 3061 and their authority under the Fourth Amendment. Stephens Decl. ¶ 11, Exhs. L & M.

The interest-arbitration panel has not yet issued its award but it is expected sometime soon.  Bjork Decl. ¶ 4. The sudden, unilateral restriction of PPO jurisdiction affects the background against which the pending interest arbitration will award relief.

### 3.      Racial discrimination and retaliation

The Postal Service's treatment of PPOs may be attributable to the fact that PPOs are overwhelmingly not white.  Postal Service data shows that 74 percent of PPOs are not white. Bjork Decl. ¶ 37, Exh. M.  By contrast, postal inspectors are overwhelming white.  Bjork Decl. ¶ 37.  For years, the majority non-white PPOs have faced what they believe is differential treatment by the Postal Service and many believe this is explained by racial discrimination and preference for the predominantly white parts of the Inspection Service workforce.

In 2017, nearly 100 PPOs—almost one-quarter of the entire workforce—filed charges against the Postal Service alleging systemic racial discrimination and retaliation against PPOs.

*Freeman v. Brennan*, EEOC Case No. 570-2018-00116X (October 6, 2017). In particular, the PPOs complained that the Postal Service had been solicitous to the concerns of its predominately white employees, including Postal Inspectors, but had retaliated against PPOs when they similarly sought to raise concerns about their working conditions. Bjork Decl. ¶ 38.

Earlier this year, the Postal Service adopted an Administrative Judge's sparsely reasoned recommendation to dismiss the complaint, on the ground that the pay and benefits should be resolved in collective bargaining. *Freeman v. Brennan*, EEOC Case No. 570-2018-00116X (May 10, 2020). The class representative, Eric Freeman, has appealed the dismissal. *Freeman v. DeJoy*, *appeal docketed*: EEOC Docket No. 2020003752.

### 4.    Preservation of work for Inspectors, while eliminating PPOs

Congress granted the Postal Service the authority to employ postal police officers and described their jurisdiction when they are employed. 18 U.S.C. § 3061(c). While the Postal Service may not restrict the statute's grant of Postal Police jurisdiction, it does have discretion in how it chooses to use Postal Police. That decision is often left to divisional offices. Bjork Decl. ¶ 21.

Historically, some divisions have used PPOs expansively, while other divisions have used PPOs less expansively. Bjork Decl. ¶ 21. When PPOs are not used for particular law-enforcement tasks, those tasks are either not performed or they are performed by postal inspectors, who also have law-enforcement authority over these matters. Bjork Decl. ¶ 21.

While postal inspectors historically worked on mail-fraud investigations and similar cases concerning misuse of the mails, the decline in first-class mail and increased use of email and other means of communication has reduced those cases. Bjork Decl. ¶ 41.

The Bowers Memo may be interpreted as a job-preservation tool.  If postal police officers' law-enforcement authority can be limited—as a matter of law—to postal real estate, all the work they were performing off site must be performed by postal inspectors (if it is performed at all).  Bowers, like most all Inspection Service leadership, was or is still is employed as a postal inspector.  Bjork Decl. ¶ 41.  In an era of reduced need for mail-fraud investigations and the like, the purported elimination of PPO's jurisdiction in the Bowers Memo would give postal inspectors a monopoly within the Postal Service over postal-related law enforcement.

In sum, the Postal Service would be replacing its mostly black and other minority law-enforcement agents on street-level law enforcement with mostly white agents. And it will be replacing men and women who currently receive top-step pay of only $58,140 with agents whom the Postal Service pays in the six figures and pays for federal retirement after 20 years. Stated this way, that result is appalling. To get around the appalling nature of the outcome, however, it helps if one can claim the law compelled this result, as the Bowers Memo asserts.

## ARGUMENT

PPOA asks this Court for an injunction on two grounds. First, PPOA seeks an injunction based on the Postal Service's *ultra vires* action to constrict PPO jurisdiction. The Postal Service's abrupt change is impermissible and barred. Second, in the alternative, PPOA seeks an injunction pending arbitration to prevent irreparable harm to the bargaining unit and the union and protect the integrity of the labor-arbitration process.

### A.      Standard for a TRO and a Preliminary Injunction

Courts should grant a TRO or a preliminary injunction where the movant can show: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

injunction is in the public interest." *Center for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5, 9 (D.D.C. 2019) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)).

Courts are authorized to issue an injunction to maintain the status quo pending a labor arbitration to protect the integrity of the arbitration process. *Boys Mkts. Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 253-54 (1970). As with a traditional injunction, the union must show "whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the [union], and whether the [union] will suffer more from the denial of an injunction that will the [employer] from its issuance." *Am. Postal Workers Union v. U.S. Postal Service*, 372 F. Supp. 2d 83, 87 (D.D.C. 2005) (quoting *Boys Mkts.*, 398 U.S. at 254). *See also Nat'l Ass'n of Letter Carriers v. U.S. Postal Service*, 419 F. Supp. 2d 127, 136 (D.D.C. 2019) (recognizing availability of injunctive relief but finding that harm was not irreparable); *Columbia Typographical Union v. Evening Star Newspaper*, No. 78-2473, 1978 WL 1740 (D.D.C., Dec. 31, 1978) (issuing injunction).

    **B.**    **First element: The PPOA has a substantial likelihood of success on the merits of its claims.**

The Union has a substantial likelihood of success on the merits of its claims that the Postal Service's August 25 policy change was an *ultra vires* act and also on its claim the change violated the CBA.

    **1.**    **The Postal Service's Bowers Memo is an *Ultra Vires* act.**

The D.C. Circuit has held that courts may review improper Postal Service actions under the *ultra vires* doctrine, which constrains executive action in excess of statutory authority. *Aid Ass'n for Lutherans v. U.S. Postal Service*, 321 F.3d 1166, 1173 (D.C. Cir. 2003). When the Postal Service "acts *ultra vires,* courts are normally available to reestablish the limits on [its] authority." *Id.* (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

An agency acts *ultra vires* where its construction of a statute exceeds the agency's authority, either because the agency's interpretation "defies the plain language of a statute" or because the agency's construction is "utterly unreasonable and thus impermissible." *Lutherans*, 321 F.3d at 1174. In determining the meaning of a statute for purposes of *ultra vires* review, courts consider a statute's text and legislative history. *See Lutherans*, 321 F.3d at 1175-78.

Here, the statute is clear: where the Postal Service chooses to employ Postal Police Officers, **Congress** has determined the scope of those officers' legal authority. That authority is over "property." Moreover, the structure and legislative history of the statute make clear that the term "property" must be construed to include chattel property as well as real property. The Bowers Memo's rewrite of PPOs' law enforcement authority under 18 U.S.C. § 3061(c) is therefore *ultra vires* because it defies the plain language of the statute and is unreasonable.

Furthermore, the nationwide restriction of longstanding PPO authority, and restriction of duties, without approval by the Postal Regulatory Commission seems to violate 39 U.S.C. § 3661. Section 3661(b) requires the Postal Service to obtain approval from the Postal Regulatory Commission for significant changes in postal services: "When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."

The injunction in *Washington v. Trump*, ___ F.Supp.3d ____, No. 1:20-CV-03127-SAB, 2020 WL 5568557, at *4-5 (E.D. Wash. Sept. 17, 2020) turned on the Court's finding that the changes in postal operations were *ultra vires* because they were enacted in contravention of statute: "The Postal Service is required under § 3661(b) to present such sweeping nationwide

changes to the Postal Regulatory Commission prior to implementing such changes, and the failure to do so suggests that the Postal Service acted ultra vires."

        **a.**      **The plain language of the statute prohibits the Postal Service from curtailing PPOs' inherent duties and powers.**

The statute authorizes the Postal Service to "employ police officers for duty in connection with the protection of property owned or occupied by the Postal Service *or under the charge and control of the Postal Service* and persons on that property, *including duty in areas outside the property* to the extent necessary to protect the property and persons on the property." 18 U.S.C. § 3061(c)(1) (emphases added).

Congress intended the scope of authority to be broad. The language contains no limitation relating to the type of property PPOs are duty-bound to protect, e.g., "real property" or "chattel property." It uses the term "property" to refer to an item under "the charge and control of the Postal Service, like mail. It refers to authority over "property" that is also located on other "property," meaning real property. That is, it uses the term "property" to refer to both chattels and real estate.

The structure of the statute confirms that the term "property" must be given a capacious reading. Subsection (c)(1) describes PPOs' duties as relating to both: (a) "the protection of property owned or occupied by the Postal Service" and to (b) "the protection of property . . . under the charge and control of the Postal Service." 18 U.S.C. § 3061(c)(1). If property in both of these clauses were interpreted to mean "real property occupied by the Postal Service," then the latter of the two descriptions of PPO duties would become redundant, devoid of any independent meaning.

Courts must "give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). They should be "'reluctan[t] to treat statutory terms

26

as surplusage' in any setting." *Id.* (quoting *Babbitt v. Sweet Home Chapter, Communities for Great Ore.,* 515 U.S. 687, 698 (1995)).

If the Postal Service employs "police officers," it must afford them certain powers "with respect to" Postal Service property. Subsection (c)(2) delineates the officers' inherent powers to enforce federal laws and regulations for the protection of persons and "property," to carry firearms, and to make arrests without a warrant for offenses committed in the officers' presence. 18 U.S.C. § 3061(c)(2). Thus, the statute grants Postal Police Officers broad inherent law-enforcement authority.

Subsection (c)(3) provides additional law-enforcement authority if the Postal Service makes regulations to employ it. It permits the Postal Service to make regulations giving officers the additional powers to serve warrants and subpoenas and to conduct "investigations" in any location for offenses committed against Postal Service property. 18 U.S.C. § 3061(c)(3).

The Postal Service has issued many regulations providing for Postal Police duties and powers over postal property, including mail, without regard to location.[4] Among the regulations are USPS Handbooks 701 and 702 and the Inspection Service Manual, which all prescribe law-enforcement authority for PPOs to conduct protective and preliminary-investigatory duties over postal property without regard to physical location. For example, the May 2007 policy update to Inspection Service Handbook 701 stated that Postal Police Officers have law-enforcement jurisdiction away from postal real estate with respect to postal property and postal personnel. Covell Decl., Exh. B.  The Inspection Service Handbook 701 sets forth procedures for PPO's to

---

[4] The Postal Service considers its labor and employment manuals, handbooks, and similar documents to be "regulations." *See* 29 CFR § 211.2(a). Pursuant to Section 211.2(a), courts construe USPS employment handbooks and the Inspection Service Manual to be "regulations*." See, e.g., Carreiro v. Frank*, 789 F. Supp. 465, 467 (D. Mass. 1992) (finding USPS employment handbooks to be "regulations"); *United States v. Long*, 803 F. Supp. 1086, 1090 (D.S.C. 1992) (finding the USPS Inspection Service Manual is a "regulation").

conduct preliminary fact-finding investigations in the field, and authority over escorts of registered mail at airports and to and from designated processing and distribution centers.  Covell Decl. ¶ 6, Exh. A at 23.  Similarly, the IS 702 Handbook states that "[p]rotecting all mail in the custody of the U.S. Postal Service" is a primary function of Postal Police, without any stated limitation as to its location, and explains that other functions include providing "convoys and escorts for shipments of high-value mail in transit, as required." Bjork Decl. ¶ 14, Exh. E at 5-6. And the Inspection Service Manual recites that Postal Police have authority to make arrests for federal felonies committed in their presence, without any stated location restriction.  Bjork Decl. ¶ 16, Exh. F at 1.[5]

The statute does not permit the Postal Service to curtail the grant of PPOs' authority under subsections (c)(1) and (c)(2). Its attempt to do so is therefore *ultra vires*.[6]

> **b.    The statute's legislative history demonstrates that Postal Service "property" extends to chattel property and mail in transit.**

The legislative history of the PAEA demonstrates that Congress was expressly aware of the law-enforcement duties of Postal Police with respect to mail away from postal real estate and there is no indication it tried to limit that traditional authority. The statute's grant of authority to

---

[5]   The Postal Service has stated that these responsibilities are already authorized by subsection (c)(2), and Plaintiff agrees. Bjork Decl. ¶ 20, Exh. G (joint labor-management position reciting that carrier-protection patrols and other duties that take PPOs away from postal real estate are "consistent with the jurisdiction restrictions set forth in Title 18, United States Code, Section 3061(c)." If somehow now <u>not</u> authorized by (c)(2), they would be authorized by (c)(3).

[6]   Moreover, 39 U.S.C. §3661(b) requires that significant postal changes obtain the review of the Postal Regulatory Commission.  The unilateral change to its mail security occasioned by the removal of all postal police officers from major American cities would seem to qualify as significant.  Despite this, the Postal Service has neither undone its regulations or obtained any review that we are aware of.  The failure to obtain required review is an ultra vires act that may be enjoined for the same reasons given in *Washington v. Trump*, -- F.Supp.3d --, No. 1:20-CV-03127-SAB, 2020 WL 5568557, at *4-5  (E.D. Wash. Sept. 17, 2020).

PPOs in connection to property "under the charge and control of the Postal Service" clearly extends to chattel property, including U.S. mail in transit.

The committee report for the PAEA confirmed that the statute intended to make permanent the PPOs' jurisdiction, rather than make it subject to annual appropriations bills as had been done previously. The House report explained:

> "[Postal Police] officers provide perimeter security, escort high-value mail shipments, and perform other essential protective functions. To date, Congress has provided temporary authority for such officers each year in appropriations bills."

H.R. REP. 108-672(I), 2004 WL 2026451 (Leg. Hist.) *24 (emphasis added).

In other words, Congress expressly recognized that PPOs already performed law-enforcement tasks with respect to U.S. mail away from postal facilities, on public roads. Nothing in the legislative history shows any intent to ***reduce*** their authority. To the contrary, the entire thrust of the statutory language change was to enlarge their possible duties, as evidenced by the new authority in subsection (c)(2) and even more legal authority under (c)(3).

Therefore, the term "property" in the statute must be construed to give effect to Congress's purpose: that PPOs' duties not be limited to mere protection of ***real*** property. Rather, the term "property" should be read to encompass all forms of "property," including postal chattels like mail, vehicles, etc.

### c. Court decisions demonstrate that "property" extends to the Postal Service's chattels and mail.

Courts deem Congress to be aware of the interpretations courts have adopted for "key phrases." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). When "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as

well." *Id*. Thus, when Congress elects to use terminology that has become commonplace in court decisions, the rules of statutory construction call for courts to define the statute's terms in harmony with that accepted judicial meaning absent express statutory language to the contrary. *See Evans v. United States*, 504 U.S. 255, 259-60 (1992).

Courts have long considered property "under the charge and control of the Postal Service," 18 U.S.C. § 3061(c), to include mail in transit, money orders, vehicles, mailboxes and other elements of property that are **not** real estate. *See United States v. Pinkney*, 15 F.3d 825, 826 (9th Cir. 1994) (postal truck and mail were "Postal Service property"); *United States v. Deggs*, 632 F.2d 829, 831 (9th Cir. 1980) (van); *United States v. Stemmons*, 89 Fed. App'x 601, 603 (9th Cir. 2004) (mailbox); *United States v. Dittrich*, 204 F.3d 819, 821 (8th Cir. 2000) (money orders were property under the control or custody of the United States) *United States v. Jenkin*, 89 F.3d 851 (10th Cir. 1996) (same); *O'Brien v. United States*, 411 F.2d 522 (5th Cir. 1969) (same).[7]

It follows that the 2006 Congress, in authorizing "police officers for duty in connection with the protection of property owned or occupied by the Postal Service or under the charge and control of the Postal Service" intended for "property" to include more than just *real* property.

### d. The Bowers Memo's attempt to restrict PPO jurisdiction is *ultra vires*.

The plain language of 18 U.S.C. § 3061(c) makes clear that the Postal Service and Postmaster General are without power to unilaterally restrict the grant of law-enforcement

---

[7] Likewise, courts routinely interpret the term "property" to include both "real" property and "personal" property. *See United States v. Bonanno Organized Crime Family*, 683 F. Supp. 1411, 1459 (E.D.N.Y. 1988) (interpreting definition of "property" in federal criminal statute to include both real and personal property); *United States v. Various Denominations of Currency & Coin*, 628 F. Supp. 4, 5 (S.D. W.Va. 1984) (holding that criminal statute's reference to "property"—without limitation to "real property" or "personal property"—required application to both); *In re Aiken*, 133 B.R. 258, 259 (D. Me. 1991) ("In common usage, 'property' encompasses both real and personal property.").

authority Congress granted to PPOs. Moreover, the legislative history and structure of subsection (c)(1) demonstrate that the term "property" as used in the statute to define PPOs' jurisdiction must be construed to include both real property and chattels, including U.S. mail in transit. The Postal Service's August 2020 reinterpretation unreasonably rewrites the term "property" to mean only *real* property, a crabbed reading contrary to Congress's intent informed by past judicial usage.

Accordingly, the Postal Service's August 25 Bowers Memo purporting to restrict the lawful authority of Postal Police Officers is an *ultra vires* act. It exceeds the authority of the Postal Service and attempts to invade the province of the Congress. The Court should therefore enjoin this unlawful act and "reestablish the limits on [Postal Service] authority." *Lutherans*, 321 F.3d at 1173.

> ## 2. PPOA is likely to prevail on the merits of its grievance-arbitration claim such that the Court should grant an injunction pending arbitration.

The policy change relating to PPO jurisdiction also violates several articles of the parties' Collective Bargaining Agreement. In particular, the Postal Service's unilateral action to constrict PPO jurisdiction violates Article 5 (prohibiting unilateral actions affecting terms and conditions of employment), Article 6 (providing PPO rights and responsibilities), Article 14 (providing USPS safety and health requirements), and Article 19 (restricting USPS's authority to change handbooks, manuals, and other published regulations that affect working conditions or conflict with the Collective Bargaining Agreement). As described herein, PPOA will very likely prevail

on the merits of its claims at arbitration. The Court should grant an injunction pending arbitration.

> a.     **The Postal Service's policy change violates the Collective Bargaining Agreement.**

PPOA is likely to prevail on this claim at arbitration for at least four reasons, arising just from Article 19: (1) the Bowers Memo conflicts with "handbooks, manuals, and published regulations of the Postal Service that directly relate to wages, hours or working conditions" of PPOs; (2) it is not "fair, reasonable, or equitable" as required by Article 19; (3) it was issued without notice; and (4) it is inconsistent with the CBA. *See Am. Postal Workers Union v. U.S. Postal Service*, 789 F.2d 1, 4 n.3 (D.C. Cir. 1986) (affirming arbitration award issued under similar Article 19); *Postal Police Officers Ass'n v. U.S. Postal Service*, 368 F. Supp. 2d 1136, 1150 (E.D. Mich. 2019) (granting summary judgment against Postal Service and rejecting its Article 19 argument that it was privileged to vacate an arbitration award).

First, the Bowers Memo enacts a policy change to restrict PPO authority to postal real estate. On its face, this conflicts with manuals and handbooks that describe PPO working conditions. For example, Inspection Service Handbook 701 recognizes that PPOs lawfully exercise jurisdiction away from postal real estate when they are on mobile patrols. It also expressly provides that PPOs' duties include protecting high-value U.S. mail shipments on public roads. Inspection Service Handbook 702 similarly provides that PPOs properly exercise authority to protect and secure mail shipments on public roads. It lists among PPOs' primary functions: "Protecting government property, including property of the Postal Service, as well as other property within the postal system" and "Protecting all mail in the custody of the U.S. Postal Service."

Second, the policy change is not "fair, reasonable, or equitable." The Bowers Memo places PPOs in an untenable position—they are duty-bound to protect postal assets and the mail, but the Postal Service claims they do so at their own risk while away from postal real estate. The policy change permits management to assign tasks during which PPOs may observe crimes against the Postal Service and the mail, but it denies PPOs the essential legal protection to carry out their law-enforcement duties.

The change is also unreasonable and unfair because USPS has failed to inform PPOs as to the real-property boundaries of the postal facilities in which they may work. PPOs are assigned to work at a wide variety of postal facilities, from large distribution and processing centers to smaller post offices. Because the Bowers Memo ties PPOs' law-enforcement authority to the physical property line or USPS property interest, knowledge of the scope of such property is essential. For example, does the Postal Service own the land on which a facility is built? And, if so, what are the property lines? What is the USPS interest in its leased office spaces? Are airport facilities designated for mail transit included in Postal Service property? Without such information, PPOs have no idea when or where they may act as police versus where they risk civil liability for carrying out previously lawful duties. *See* Traylor Decl. ¶ 7.

Thus, until the Postal Service provides full and complete training and maps to PPOs in every division, it is entirely unreasonable and unfair to make PPOs guess whether they are actually on USPS real property or not. The Postal Service has been quite clear that PPOs risk their jobs and place themselves in personal jeopardy if they guess wrong.

Third, the Postal Service provided the PPOA no advanced notice prior to issuing the Bowers Memo. Bjork Decl. ¶ 35, Exh. L. Such unilateral action violates Article 5 of the parties'

Collective Bargaining Agreement, as well as Article 19's requirement that changes to handbooks, manuals, or regulations be noticed to PPOA at least 60 days in advance.

Finally, the Bowers Memo also conflicts with Articles 6 and 14, which require that PPOs carry out their duties "conscientiously and effectively" and that the Postal Service ensure the safety and health of the PPO workforce. Restricting PPOs jurisdictional authority to postal real property undermines PPOs' ability to effectively carry out their duties. Similarly, it creates risk of physical harm to PPOs because it limits their ability to react to and neutralize threats while away from postal real estate.

> **b.    USPS acted in disregard of its handbooks permitting exercise of PPO authority away from postal real property for decades.**

Even prior to the PAEA, the Postal Service recognized and permitted exercise of PPO authority with regard to both real property and chattel property owned, controlled by, or under the charge of the Postal Service. For example, early job descriptions for the modern PPO position provide for duties "relating to security of mails and to the protection of postal property and personnel" and "pertaining to the security of postal buildings, personnel, property, mail, and mail-in-transit." Bjork Decl. ¶¶ 10-11; Exhs. B & C.

Inspection Service Handbooks 701 and 702, as described above, explicitly permit PPOs to lawfully engage in law-enforcement activities away from postal real property. The Handbooks, most recently updated in 2006 and 2007, respectively, have governed PPO working conditions for decades. The Postal Service has utilized PPOs to carry out law-enforcement duties away from postal real estate, in accordance with the Handbooks. Sepulveda Decl. ¶¶ 5, 7; Simpson Decl. ¶¶ 2-3; Lomasang Decl. ¶¶ 2-4; Molina Decl. ¶¶ 2-4; White Decl. ¶¶ 2-4; Wilhoit Decl. ¶¶ 2-4; Wister Decl. ¶¶ 2-4.

The Postal Service may not abandon decades of policy and practice permitting PPOs to exercise jurisdiction away from postal real property. As such, PPOA is likely to prevail on its claim at arbitration.

> **C.    Second element: The Postal Service's policy change threatens irreparable injury to postal police and other postal employees if not enjoined.**

A moving party shows that they are likely to suffer irreparable harm where the injury is likely to be imminent and beyond remediation. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). By attempting to restrict the duties and powers of Postal Police, the Postal Service has threatened to cause irreparable harm to Postal Police Officers and other postal employees in several ways.

*First*, it puts Postal Police at increased risk of physical harm, discipline, and legal liability.

*Second*, it places Postal Service letter carriers at increased risk of harm and the U.S. mail at increased risk of theft and tampering.

*Third*, it increases the likelihood that the Postal Service will eliminate all or most Postal Police positions, causing PPOA members permanent job loss and requiring PPOA to divert resources from collective bargaining activities to provide mutual aid.

For these reasons, the Postal Service's attempt to restrict PPOs' jurisdiction is likely to cause irreparable harm and should be enjoined.

> **1.    The Postal Service's policy change threatens irreparable harm to PPOs by undermining their legal authority, increasing exposure to legal liability, discipline, and the inability to stop criminal activity.**

Postal Police have traditionally performed a variety of protective functions away from postal facilities. These duties have ranged from protecting mail carriers during periods of increased criminal activity (Patton Decl. ¶ 5; Williams Decl. ¶ 5; Wilhoit Decl. ¶ 5), preventing

and prosecuting mail theft (Simpson Decl. ¶ 3; Sepulveda Decl. ¶¶ 7-16), and patrolling major airports to ensure the safety of mail travelling by plane (Sepulveda Decl. ¶¶ 5-6). The Postal Service's purported restriction of Postal Police jurisdiction to conduct these activities puts Postal Police Officers at risk, creating uncertainty regarding how their now-limited jurisdiction affects their ability to lawfully carry out law-enforcement duties. They are fearful that the Postal Service will not support them if they encounter criminal activity or engage in law-enforcement duties on their patrol. Sepulveda Decl. ¶ 22; Simpson Decl. ¶¶ 6-7.

The Bowers Memo's definition of Postal Police jurisdiction also calls into question the ability of PPOs to respond to incidents that might occur on the exterior of postal facilities. Postal Police are not surveyors and are unlikely to know the exact contours of the Postal Service's real property. Traylor Decl. ¶ 7. If Postal Police were to respond to vandalism on the exterior of a Post Office and attempt to arrest the perpetrator, they might be subject to civil or criminal penalties for acting without legal authority. At the same time, if Postal Police fail to respond for fear the incident exceeds their authority, they might be subject to Postal Service discipline for their failure to act.

By undermining the ability of PPOs to respond to criminal activity, the restriction of Postal Police jurisdiction announced in the Bowers Memo constitutes an irreparable injury meriting an injunction. *See, e.g., Open Communities v. Carson*, 286 F. Supp. 3d 148, 175–76 (D.D.C. 2017) ("Irreparable harm can flow not only from actual criminal victimization, but also from 'continued exposure to [a] high crime rate . . . and unsafe conditions.'") (quoting *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148, 153 (S.D.N.Y. 1989)); *A.B.-B. v. Morgan*, No. 20-CV-846 (RJL), 2020 WL 5107548, at *8 (D.D.C. Aug. 31, 2020) (finding irreparable harm based on the risk of victimization by gangs and drug cartels).

**2.     The Postal Service's policy change threatens irreparable harm to letter carriers and the U.S. mail.**

Letter carriers face criminal danger on their delivery routes, including physical assaults, beatings, and shootings. Renfroe Decl. ¶ 4. They are also vulnerable to theft and robbery. Renfroe Decl. ¶ 5. Letter carriers have been robbed while on their routes, either of the mail they are carrying or keys to mailboxes. Renfroe Decl. ¶ 5.

Letter carriers also regularly encounter threats to postal property and the U.S. mail, including break-ins of postal vehicles, and theft of mail from mailboxes and mail trucks. Renfroe Decl. ¶ 5. The presence of visible, uniformed police officers in marked law enforcement vehicles deters criminal activity and reduces the threat to letter carriers and the mail. Renfroe Decl. ¶ 8. Postal Police Officers give letter carriers peace of mind, secure in the knowledge that they can count on PPOs to protect them and the mail they carry. Renfroe Decl. ¶ 8.

One need not look to the distant past for evidence of the dangers of the letter carrier position. On September 10, 2020, a letter carrier in Chicago was shot four times at 11:30 a.m. while she was delivering mail. Renfroe Decl. ¶ 4; Bjork Decl. ¶ 29. And on September 15, 2020, a letter carrier in a suburb of Washington, D.C., was shot while delivering mail. Bjork Decl. ¶ 30.

The Bowers Memo's effort to change PPOs' legal jurisdiction, and thus immobilize them, therefore threatens irreparable harm to letter carriers by putting them at greater risk of violent crime. Renfroe Decl. ¶ 8. Courts have recognized this to constitute irreparable harm; *Morgan*, 2020 WL 5107548, at *8; *Open Communities*, 286 F. Supp. 3d at 175–76; *League of Women Voters*, 838 F.3d at 9.

Moreover, restricting the authority of Postal Police to conduct patrols and other law enforcement activity puts the U.S. mail at greater risk of tampering and theft. Renfroe Decl. ¶ 8. Thus, the policy change announced in the Bowers Memo threatens irreparable harm by putting at

risk a vital public interest: the U.S. mail. This has recently been held to constitute irreparable harm. *Washington v. Trump*, No. 1:20-CV-03127-SAB, 2020 WL 5568557, at *4 (E.D. Wash. Sept. 17, 2020) (finding that recent Postal Service policy changes risked irreparable harm by causing "voter disenfranchisement" and threatening other essential government services including tax collection and opioid overdose prevention).

Courts in this circuit have frequently found that agency conduct constitutes an irreparable harm where it threatens or undermines a vital public interest or governmental function. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 43 (D.D.C. 2020) (finding changes to SNAP benefit requirements created the risk of irreparable harm because "[g]oing without food is an irreparable harm"); *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 527 (D.C. Cir. 2019) (observing that a student's exclusion from an appropriate public education is an irreparable harm); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding changes to voter eligibility requirements posed a likelihood of irreparable harm where they created a risk that eligible voters would be unable to register before an election).

For these reasons, the Postal Service's sudden policy change announced in the Bowers Memo threatens irreparable harm to the safety of letter carriers and to the integrity of the U.S. mail. It should be enjoined.

3.     **The Bowers Memo threatens the entire existence of the Postal Police position and subjects the PPOA to forced diversion of resources.**

Plaintiffs have good reason to fear that the Bowers Memo threatens the very existence of the Postal Police. If the Postal Service is permitted to restrict PPOs' legal authority only to Postal Service buildings, the PPO position is likely to be eliminated entirely. The Postal Service has already removed PPOs from building security functions, replacing them with contracted security

guards after 2006. Bjork Decl. ¶ 15. If PPOs are limited to building security functions, their jobs are almost certain to be eliminated.

This threat of permanent loss of employment and benefits constitutes an irreparable injury to the PPOs. *See, e.g., Columbia Typographical Union, No. 101 v. Evening Star Newspaper Co.*, No. 78-2473, 1978 WL 1740, at *1 (D.D.C. Dec. 31, 1978) (finding permanent loss of employment was an irreparable injury); *Graphic Commc'ns Conference--Int'l Bhd. of Teamsters Local 404M v. Bakersfield Californian*, 541 F. Supp. 2d 1117, 1124 (E.D. Cal. 2008) ("Permanent loss of employment which an arbitrator can not reverse clearly constitutes irreparable injury."); *Food Drivers, Helpers, & Warehousemen Employees, Local 500 v. Samuel Zuckerman Co.*, Civ. A. No. 89-2313, 1989 WL 73771, at *3 (E.D. Pa. June 30, 1987) (finding permanent job loss is an irreparable injury); *Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002) (finding permanent loss of employer-provided health insurance is an irreparable injury).

Moreover, by putting at risk the viability of PPOA members' employment, the August 2020 policy change threatens to force PPOA to divert its resources from representing members' interests in their collective bargaining relationship with the Postal Service to providing mutual aid and job training to members once layoffs occur. Thus, the policy change announced in the Bowers Memo would cause irreparable harm through a forced diversion of resources. Bjork Decl. ¶ 33.

Courts have held that such a forced diversion can constitute an irreparable harm. *See District of Columbia. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 41 (D.D.C. 2020) (finding irreparable harm where changes to SNAP eligibility forced a nonprofit to divert resources from other activities to meet increased demand for food assistance and help with benefits

applications); *Open Communities*, 286 F. Supp. 3d at 178 (finding irreparable harm because plaintiff had "changed its activities" and "diverted scarce resources away from previously planned projects" as a result of agency inaction); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018) ("Organizations 'have established a likelihood of irreparable harm' based on their showing of serious 'ongoing harms to their organizational missions,' including diversion of resources and the non-speculative loss of substantial funding from others sources." (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

Accordingly, the Bowers Memo threatens to cause irreparable harm by eliminating the PPO position agency-wide and by forcing PPOA to transfer resources to deal with the fallout from such layoffs.

> **D.     Third element: a preliminary injunction protects the vital public interest in the integrity of the U.S. mail.**

The safety and security of U.S. mail has since the nation's founding been a vital public interest. The power to establish the Postal Service was among the enumerated powers the framers granted to the Congress. *See* U.S. Const. art. I, § 8, cl. 7. James Madison referred to the Constitution's postal clauses as holding the promise of "great public conveniency" and "tend[ing] to facilitate the intercourse between the States." Federalist 42.

Congress has evinced its concern for the integrity and efficiency of the U.S. mail by, among other things, enacting several provisions in the U.S. criminal code aimed at protecting the mail. *See* 18 U.S.C. § 1701 (making obstruction of the mail a federal crime); 18 U.S.C. § 1702 (obstruction of correspondence); 18 U.S.C. § 1705 (destruction of letter boxes or mail); 18 U.S.C. § 1708 (theft or receipt of stolen mail).

While the public interest in the integrity of the U.S. mail is always high, it is now greater than ever. In the midst of a global pandemic, many Americans rely on the U.S. mail to deliver the their everyday necessities, including prescriptions.[8] Moreover, 2020 is an election year and an unprecedented number of Americans plan to vote by mail,[9] with many jurisdictions mailing ballots to every registered voter.[10] In light of the importance of mail-in ballots this year, it is fair to say that the integrity the U.S. Mail will in many ways determine the integrity of the election and with it Americans' faith in the legitimacy of our democracy.

At a time when Americans need to be able to trust the U.S. mail more than ever, the Postal Service is attempting to reduce protection for the mail by withdrawing jurisdiction from Postal Police, the only postal law enforcement who regularly patrol streets and who work a 24/7 schedule. Bjork Decl. ¶ 7. This sudden change of policy threatens the integrity of the mail by increasing the risk that mail will not be delivered or theft will go undetected. Bjork Decl. ¶ 27; Renfroe Decl. ¶ 8.

The public interest in the integrity of the mail therefore weighs in favor of granting a preliminary injunction. *See Washington v. Trump*, No. 1:20-CV-03127-SAB, 2020 WL 5568557,

---

[8] *See, e.g.*, Letter from Congressman DeFazio, et. al (Aug. 14, 2020) (explaining that approximately 80 percent of Department of Veterans Affairs prescriptions are filled by mail), *available at*: https://defazio.house.gov/sites/defazio.house.gov/files/Congressional%20Letter%20-%20reported%20delays%20in%20Veteran%20Rx%20USPS.pdf (last accessed: 9/17/2020).

[9] *See, e.g.*, Washington Post-University of Maryland Poll (September 10, 2020) (reporting that roughly one-third of voters intends to vote by mail this year), *available at*: https://context-cdn.washingtonpost.com/notes/prod/default/documents/6ec50c81-6686-4033-a04f-1582841b2ac8/note/3d7caee3-20e5-40df-a6d5-45e61791bc2b (last accessed: 9/17/2020).

[10] *See* Absentee and Mail Voting Policies in Effect for the 2020 Election, National Conference of State Legislatures (September 14, 2020), *available at*: https://www.ncsl.org/research/elections-and-campaigns/absentee-and-mail-voting-policies-in-effect-for-the-2020-election.aspx (last accessed: 9/17/2020).

at *4 (E.D. Wash. Sept. 17, 2020) (enjoining other recent policy changes by the Postal Service

that threatened to cause "voter disenfranchisement" and interference with essential government

functions); *Jones v. United States Postal Service*,  -- F.Supp.3d --, 2020 WL 5627002 at 20-25

(S.D.N.Y. Sept. 21, 2020) (same).

> **E.      Fourth element: the balance of equities favors PPOA because an injunction will not harm the Postal Service and only requires adherence to the Agency's statutory obligations and longstanding practice.**

The injunction imposes no hardship on the Postal Service. Since 1971, the Postal Service

has tasked Postal Police Officers with protection of the U.S. mail, including as law-enforcement

protection to high-value mail shipments, shipments of money orders and postal remittances that

travel on public roads, and protection of letter carriers and other postal personnel. *See, e.g., Fazi*

*v. United States*, 935 F.2d 535, 536 (2d Cir. 1991) (referencing postal regulation that "require[d]

that shipments via surface transportation receive an escort by a postal police officer"). The Postal

Service will not be prejudiced by having to continue to abide by the broad definition of Postal

Police authority it has followed for decades.

Further, the government "cannot suffer harm from an injunction that merely ends an

unlawful practice," and the balance of equities therefore favors granting a preliminary injunction

where a plaintiff has shown that it would otherwise suffer an irreparable harm and that the

injunction is in the public interest. *Guffey v. Duff*, No. 18-CV-1271 (CRC), 2020 WL 2065274,

at *19 (D.D.C. Apr. 29, 2020). "[A]n agency's compliance with a mandatory statutory regime is

presumably always in the public interest." *Protect Democracy Project Inc. v. U.S. Dep't of Def.*,

263 F. Supp. 3d 293, 301 (D.D.C. 2017) (citing *Jacksonville Port Auth. v. Adams*, 556 F.2d 52,

59 (D.C. Cir. 1977)).

Indeed, courts have frequently found that where a government agency jettisons a

longstanding practice to adopt a new and unlawful one, the harm to the government of having to

abide by the law "pales in comparison to the injuries" caused by "the implementation of an illegal policy" that would harm vital public interests like the integrity of the U.S. mail. *D.C. v. U.S. Dep't of Agric.,* 444 F. Supp. 3d 1, 45 (D.D.C. 2020) (enjoining the adoption of SNAP rules that departed from longstanding agency practice and "could result in hundreds of thousands of people going hungry"); *see also e.g. Saget v. Trump*, 375 F. Supp. 3d 280, 378 (E.D.N.Y. 2019) (finding that the balance of equities favored granting an injunction where change to an immigration policy and deviation from longstanding agency practice created the strong likelihood that the plaintiffs would suffer irreparable harm); *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 159 (D.D.C. 2018) (finding an injunction to comply with an agency's statutory obligations under SNAP "imposes no burden . . . beyond what the statute already requires" and that as a result "the balance of equities tilts in favor of granting injunctive relief"), *preliminary injunction vacated after discovery*, 2020 WL 5411295 (D.D.C., Sept. 9, 2020).

Finally, if the Court elects to impose a *Boys Market* injunction preserving matters for the arbitrator, the injunction will be a temporary measure and will only remain in place until an arbitrator can hear the case and issue a final ruling. Therefore, any burden on the Postal Service is insignificant.

Accordingly, any hardship imposed on the Postal Service "pales in comparison" to the irreparable injuries likely to be sustained by the Postal Police, letter carriers and other postal personnel, and the public interest in the integrity of the mail. The Court should therefore grant the injunction.

## CONCLUSION

For all these reasons, the Court should grant the Postal Police Officers Association's motion for a temporary restraining order and preliminary injunction.

Dated September 23, 2020                    Respectfully submitted,


                                            s/ Arlus J. Stephens____
                                            Arlus J. Stephens (478938)
                                             astephens@murphypllc.com
                                            Roseann R. Romano (1034895)
                                             rromano@murphypllc.com
                                            Charles A. Sinks (888273315)
                                             csinks@murphypllc.com
                                            MURPHY ANDERSON PLLC
                                            1401 K Street NW, Suite 300
                                            Washington, DC 20005
                                            tel: (202) 223-2620
                                            fax: (202) 296-9600

                                            Counsel for Postal Police Officers
                                            Association