## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

POSTAL POLICE OFFICERS
ASSOCIATION,

        Plaintiff,

vs.

UNITED STATES POSTAL SERVICE,
et al.,

        Defendants.

Case No. 20-cv-2566 (CRC)

---

## DECLARATION OF JAMES BJORK

I, James Bjork, declare and state that I have personal knowledge of the following facts
and could and would competently testify as follows:

1.      I am a National Business Agent of the Postal Police Officers Association
("PPOA"). From September 1, 2014 to August 31, 2020, I served as the elected president of the
PPOA.

2.      I was employed by the Postal Service as a Postal Police Officer ("PPO") in the
Chicago division from 1996 until my retirement in 2017. Prior to that, I worked as a letter carrier
from 1984 to 1996.

3.      The PPOA represents approximately 450 uniformed postal police officers for
purposes of collective bargaining with the Postal Service. PPOs are located in 20 major
metropolitan areas across the United States.  The locations where PPOs are currently stationed
are: Boston, MA; Atlanta, GA; Memphis, TN; Chicago, IL; St. Louis, MO; Detroit, MI; Dallas,
TX; Houston, TX; New Orleans, LA; Los Angeles, CA; Miami, FL; Newark, NJ; San Juan, PR;

New York City, NY; Philadelphia, PA; Pittsburgh, PA; Cleveland, OH; San Francisco, CA; Baltimore, MD; and Washington, DC.

4.     PPOA is party to a collective bargaining agreement with the Postal Service. The parties continue to operate under their 2012 to 2017 agreement, pending the award of a new contract from an interest arbitration panel. A true and correct copy of the operative collective bargaining agreement is attached as Exhibit A. A hearing was held in February 2020 for the replacement contract but the panel has not yet issued its decision on changed terms.

5.     At the February 2020 hearing, the Union presented testimony from PPOs around the country about the work they performed. All of the work was police-related and much of it occurred away from postal real estate.

6.     In my capacity as National Business Agent and former president of the PPOA, I have knowledge about the history of the PPO position, as well as the policies and practices currently governing PPOs. I receive reports and documentation about incidents and other events from PPOA members and management.

7.     The PPO position was created in 1971, pursuant to the Postal Reorganization Act. PPOs are part of the Postal Service's Inspection Service. They are uniformed police officers tasked with protecting the mail and Postal Service property and personnel. PPOs are assigned to shifts so that they are available to respond to incidents any time of the day or night, 24 hours a day, 7 days a week. Responding to incidents often involves interstate travel.

8.     The Inspection Service also includes Postal Inspectors, who are white-collar federal agents. They perform in-depth investigations of mail-related criminal activity. They are generally paid six-figure salaries. They also receive lucrative benefits including locality-based compensation, availability pay, and law-enforcement retirement, allowing retirement after 20

2

years.  Besides PPOs, Postal Inspectors are the only other Inspection Service law-enforcement officers with authority relating to the mail and postal property.  Inspectors generally work business hours but are supposed to be available around the clock and are paid as such.  In practice, it often takes an hour or more to get an Inspector to physically respond to a crime scene after hours.

9.      From 1971 until 2006, PPOs were authorized to perform law enforcement activity pursuant to the "special police officer" provisions of Title 40 of the United States Code. During this time, PPOs mostly provided building and perimeter security at postal facilities. They responded to burglar alarms at postal buildings. They also provided security for high-value mail and remittance deliveries on public roads. They responded to accidents involving postal vehicles away from postal property, including protecting mail spilled due to the accident.

10.     The 1971 job descriptions for PPOs provided for duties that were performed away from postal real estate, specifically including safeguarding the mail. A true and correct copy of the job descriptions is attached as Exhibit B.

11.     The 1990 job description for PPOs provided for duties that were performed away from postal real estate and specifically included responsibility over mail in transit. A true and correct copy of the job description is attached as Exhibit C.

12.     PPOs have always been trained at accredited law enforcement academies alongside other federal law-enforcement officers. They carry firearms. They are trained to identify themselves as police to the general public.

13.     In 1990, a postal police officer arrested a suspected terrorist outside a Marriott in Manhattan. The Postal Service awarded the officer its highest honor, the Meritorious Service Award.

14.     The Handbook IS-702 is the Postal Police Officer's Guide. It was last updated in 2002. A true and correct copy of Handbook IS-702 is attached as Exhibit E.

15.     Since 2006, the Postal Service has greatly expanded the role of PPOs. At the same time, the Postal Service reduced the PPO complement by contracting out to security guards many of the fixed-post and perimeter security duties that PPOs previously performed. As a result, PPOs are assigned to conduct more mobile patrols in law-enforcement vehicles. They respond to dangerous incidents, including active-shooter situations, assaults, and burglary alarms.

16.     The Inspection Service Manual sets forth policies relating to Postal Police Officers and Postal Inspectors. Chapter 7 provides information relating to legal authority and policies. A true and correct copy of Chapter 7 of the Inspection Service Manual is attached as Exhibit F.

17.     During this time, the Postal Service began assigning PPOs to perform mobile carrier-protection patrols to provide a physical police presence and security on mail-delivery routes.  Letter carriers are often targeted by criminals because of the value of the mail and packages they carry for delivery or that they retrieve while on their routes.

18.     In Chicago, carrier-protection patrols require a PPO to leave the postal facility and travel in marked law enforcement vehicles to areas identified as "hot spots" for mail theft and assaults on letter carriers. PPOs then make contact with carriers to gather information about threats they are facing and let them know that we are available to assist with any problems. Based on reports I gathered from other divisions, I understand that carrier protect patrols operate in a similar manner in all divisions. Some divisions have had PPOs who are dedicated to carrier-protection patrols on a full-time basis. The Inspection Service frequently lauded the effects of these patrols.

4

19.     Recently, the Postal Service has also used Postal Inspectors to conduct some carrier-protection patrols.

20.     In 2014, the Postal Inspection Service's then-Deputy Chief Counsel Terrence McKeown signed onto a labor-management committee's recommendation that recognize that mobile letter carrier protection patrols and other duties that take place away from postal real estate are "consistent with the jurisdiction restrictions set forth in Title 18, United States Code, Section 3061(c)." A true and correct copy of this document is attached as Exhibit G. Mr. McKeown went on to serve as the Postal Service's Chief Counsel.

21.     How PPOs are used is generally a decision left to divisional offices. Historically, some divisions have used PPOs expansively, while other divisions have used PPOs less expansively. When PPOs are not used for expanded tasks, those tasks are either not performed or they are performed by Postal Inspectors.

22.     In my capacity as PPOA President, I received a copy of a New York Division Standard Operating Procedure for PPOs carrying out duties at John F. Kennedy Airport. A true and correct copy of the document is attached as Exhibit H.

23.     In my capacity as PPOA President, I received a copy of a New York Division Standard Operating Procedure for PPOs conducting patrols of collection boxes. A true and correct copy of the document is attached as Exhibit I.

24.     In my capacity as PPOA President, I received a copy of a New York Division Roll Call Training relating to mail theft in January 2020. A true and correct copy of the training is attached as Exhibit J.

25.     Roll Call Trainings are prepared by local or national management to educate the PPO workforce about policies and practices that govern their day-to-day work. Some trainings

cover new policies, while others simply draw focus to a particular issue or initiative. They are communicated to PPOs orally or in writing at the beginning of shifts.

26.     In my capacity as the Union's National Business Agent, I received a copy of the August 25, 2020 National Management Communication issued by Deputy Chief Inspector David Bowers. A true and correct copy of the Communication is attached as Exhibit K.

27.     Since the policy change, previous PPO duties have gone unfulfilled. If the Postal Service assigns Postal Inspectors to carry out carrier-protection patrols and other duties PPOs used to perform, it will have an effect on Postal Inspector's normal duties. Specifically, Postal Inspectors will not have capacity to carry out the work they normally perform, typically in-depth investigations relating to mail crimes like mail fraud.

28.     The policy change has had an immediate effect on the safety letter carriers. Letter carriers face increasing danger. There have been a number of shootings and assaults against letter carriers reported.

29.     This month has seen many incidents of shootings and assaults. Recently a letter carrier in Chicago was shot four times while delivering the mail at 11:30 a.m. Chicago's NBC 5 news outlet covered the incident on September 10, 2020. The coverage is available at https://www.nbcchicago.com/news/local/police-respond-to-reports-of-letter-carrier-shot-on-chicagos-south-side/2337001/ (last accessed Sept. 21, 2020).

30.     On September 15, 2020, a letter carrier in Woodbridge, Virginia, was shot while delivering the mail at 4:50 p.m. Washington's NBC 4 news outlet covered the incident. The coverage is available at https://www.nbcwashington.com/news/ local/mail-carrier-shot-in-virginia/2419167/ (last accessed Sept. 21, 2020).

31.     As a result of the increasing dangers, letter carriers in Chicago have threatened to stop delivering the mail if the violence is not addressed. The Daily Wire published an article by Emily Zanotti about the threatened strike on September 20, 2020. The article is available at https://www.dailywire.com/news/ chicago-mail-carriers-threaten-to-stop-delivering-mail-if-city-fails-to-control-violence (last accessed Sept. 21, 2020).

32.     The PPOA uses U.S. Mail to conduct its union business, including electing national and regional officers. The safety of the mail and the individuals who deliver the mail is important to ensuring that PPOA is able to operate and represent its members.

33.     Under the August 2020 policy change, it is likely that PPOA will have to dedicate its limited resources to mutual aid and job training as PPOs face likely layoffs or other disruptions to their jobs.

34.     The sudden change in policy means that PPOs are not able to provide protection for letter carriers and the mail in the same way that letter carriers and other law enforcement agencies have become accustomed.

35.     On September 8, PPOA filed a grievance challenging the Bowers memo, pursuant to Article 15 of the collective bargaining agreement. The Postal Service has not yet responded to the grievance. A true and correct copy of the grievance is attached as Exhibit L.

36.     For years, the Postal Service has consistently argued to interest arbitration panels that PPOs are security guards and should be paid as such. The Postal Service invariably proposes bottom-basement wages. Most arbitration panels have been content to award more in salary than the Postal Service has proposed but the low starting point has led to PPO wages being very low. Currently the Postal Service pays a higher top-step salary to its custodians than it pays to its police officers.

37.     The PPO complement has always been mostly not white. The Postal Service recently produced data showing that 74% of PPOs were African American, Hispanic, or Asian. Only 24% were white. A true and correct copy of this data is attached as Exhibit M. By contrast, postal inspectors are overwhelmingly white, well over 70% white.

38.     In 2017, nearly 100 PPOs filed EEOC charges alleging the Postal Service systemically discriminated and retaliated against them because they are overwhelmingly not white. PPO Eric Freeman serves as class representative in the case. Among other allegations, the PPOs complained that the Postal Service had been solicitous to the concerns of its predominately white employees, including Postal Inspectors, but had retaliated against PPOs when they similarly sought to raise concerns about their working conditions. They also complain that the Postal Service's refusal to pay wages and benefits commensurate with other police forces, while paying the mostly white Postal Inspectors above market-rate, constitutes race discrimination. The case is *Freeman v. Brennan*, EEOC Case No. 570-2018-00116X.

39.     The Postal Service sought to dismiss the case in 2018. Nearly two years later in May 2020, an administrative judge recommended that the Postal Service dismiss the complaints. The judge ignored or misinterpreted important facts and failed to conduct a proper analysis of the case. In July, PPO Freeman appealed the dismissal of the class's claims to the EEOC's Office of Federal Operations.

40.     The Bowers Memo may be the result of racial discrimination by some at the Inspection Service, retaliation against postal police for pursuing the EEOC case, and/or retaliation for the arguments they advanced at interest arbitration. The Postal Service has not told the Union why it made the change on August 25.

8

41.    Postal Inspectors face declining workload because of a general decline in the use of first-class mail for communicating and for deliveries.  The policy change may be an attempt to preserve Postal Inspector jobs. If PPOs are allegedly unable to perform law-enforcement duties away from postal real estate, Postal Inspectors may have a monopoly over those tasks within the Postal Service.  David Bowers and other Postal Inspection Service leadership are former postal inspectors. It is possible they want to prioritize preserving the jobs of postal inspectors over preserving the jobs of PPOs.

I declare under penalty of perjury that the foregoing facts are true and correct.

_September 22, 2020_
Date

JAMES BJORK

# Exhibit A

# AGREEMENT

between
United States Postal Service
and
Postal Police Officers Association

2012-2017

Handbook EL-906

  

# AGREEMENT

between
United States Postal Service
and
Postal Police Officers Association

## 2012-2017

Handbook EL-906

**TABLE OF CONTENTS**

| **Article** | **Subject** | **Page No.** |
|---|---|---|
| | PREAMBLE .......................................................................xv | |
| 1 | UNION RECOGNITION ............................................ 1 | |
| | Section 1.01. Recognition .......................................... 1 | |
| | Section 1.02. Performance of Bargaining Unit Work ............................................ 1 | |
| | Section 1.03. Staffed Security at Postal Service Facilities ................................... 2 | |
| 2 | NONDISCRIMINATION AND CIVIL RIGHTS .............. 3 | |
| | Section 2.01. Nondiscrimination and Civil Rights ................................................. 3 | |
| | Section 2.02. Labor-Management Committees ........ 3 | |
| | Section 2.03. Grievances ........................................... 3 | |
| | Section 2.04. Dual Filing ........................................... 4 | |
| 3 | MANAGEMENT RIGHTS ........................................... 5 | |
| | Section 3.01. Employer Rights .................................. 5 | |
| | Section 3.02. Emergency Situation ........................... 5 | |
| 4 | TECHNOLOGICAL AND MECHANIZATION CHANGES.................................................................... 6 | |
| | Section 4.01. Advance Notice ................................... 6 | |
| | Section 4.02. New Jobs ............................................. 6 | |
| | Section 4.03. Eliminated Jobs .................................. 6 | |
| | Section 4.04. Training ............................................... 7 | |
| 5 | PROHIBITION OF UNILATERAL ACTION ................. 8 | |
| | Section 5.01. Unilateral Action ................................. 8 | |
| 6 | POSTAL POLICE OFFICER RIGHTS AND RESPONSIBILITIES .................................................. 9 | |
| | Section 6.01. Basic Principles .................................. 9 | |
| | Section 6.02. PPO Conduct ...................................... 9 | |
| | Section 6.03. PPO Disciplinary Interviews ................ 9 | |

| **Article** | **Subject** | **Page No.** |
|---|---|---|
| 7 | EMPLOYEE CLASSIFICATIONS ............................ 11 | |
| | Section 7.01. Definition ........................................... 11 | |
| 8 | HOURS OF WORK .................................................. 12 | |
| | Section 8.01. Work Week ....................................... 12 | |
| | Section 8.02. Work Schedule ................................. 12 | |
| | Section 8.03. Exceptions ........................................ 13 | |
| | Section 8.04. Overtime Work .................................. 13 | |
| | Section 8.05. Overtime Assignments ...................... 13 | |
| | Section 8.06. Temporary Changes in Schedule ...... 14 | |
| | Section 8.07. Night Shift Differential ...................... 14 | |
| | Section 8.08. Sunday Premium Payment ............... 14 | |
| | Section 8.09. Guarantees ....................................... 15 | |
| 9 | SALARY AND WAGES ........................................... 16 | |
| | Section 9.01. Basic Annual Salary .......................... 16 | |
| | Section 9.02. Salary Schedules .............................. 16 | |
| | Section 9.03. Employment Cost Index Periodic Adjustments ........................ 16 | |
| | Section 9.04. Application of Salary Rates ............... 17 | |
| | Section 9.05. Granting Step Increases ................... 17 | |
| | Section 9.06. Protected Salary Rates ..................... 17 | |
| | Table 1 PPO Schedule for Employees hired before April 5, 2014 ........................... 18 | |
| | Table 2 PPO Schedule for Employees hired on or after April 5, 2014 ......................... 19 | |
| 10 | LEAVE ................................................................... 20 | |
| | Section 10.01. Funding ........................................... 20 | |
| | Section 10.02. Choice Vacation Period .................. 20 | |
| | Section 10.03. Vacation Planning ........................... 21 | |
| | Section 10.04. Sick Leave ...................................... 24 | |

| **Article** | **Subject** | **Page No.** |
|---|---|---|
| 11 | HOLIDAYS | 25 |
| | Section 11.01. Holidays Observed | 25 |
| | Section 11.02. Eligibility | 25 |
| | Section 11.03. Holiday Leave Pay | 25 |
| | Section 11.04. Holiday Worked Pay | 26 |
| | Section 11.05. Holiday on Nonworkday | 26 |
| | Section 11.06. Holiday Schedule | 27 |
| | Section 11.07. Part-Time PPOs | 28 |
| 12 | PROBATIONARY PERIOD AND SENIORITY | 29 |
| | Section 12.01. Probationary Period | 29 |
| | Section 12.02. Seniority | 29 |
| | Section 12.03. Coverage | 30 |
| | Section 12.04. Responsibility | 30 |
| | Section 12.05. Definitions | 30 |
| | Section 12.06. Changes in Which Seniority Is Retained, Regained or Restored | 31 |
| | Section 12.07. New Period of Seniority | 32 |
| 13 | ASSIGNMENT OF ILL OR INJURED PPOs | 33 |
| | Section 13.01. Introduction | 33 |
| | Section 13.02. Nonoccupational Illness or Injury | 33 |
| | Section 13.03. Temporary Assignments | 33 |
| | Section 13.04. Out-of-Schedule Pay | 34 |
| | Section 13.05. Permanent Reassignment | 34 |
| | Section 13.06. Disagreement Concerning PPO's Physical Condition | 34 |
| | Section 13.07. Occupational Illness or Injury | 35 |
| 14 | SAFETY AND HEALTH | 36 |
| | Section 14.01. Responsibilities | 36 |
| | Section 14.02. Health Service | 36 |
| | Section 14.03. Cooperation | 36 |
| | Section 14.04. Reporting Unsafe Conditions | 37 |
| | Section 14.05. Labor-Management Meetings | 37 |
| | Section 14.06. Special Conditions | 37 |
| | Section 14.07. Equipment | 38 |
| | Section 14.08. Safety Committees | 38 |

| **Article** | **Subject** | **Page No.** |
|---|---|---|
| 15 | GRIEVANCE-ARBITRATION PROCEDURE ............. 39 | |
| | Section 15.01. Definition ........................................... 39 | |
| | Section 15.02. General Policy .................................. 39 | |
| | Section 15.03. Grievance Procedure ....................... 40 | |
| | Section 15.04. Grievance Procedure — General ..... 44 | |
| | Section 15.05. Arbitration ........................................ 45 | |
| 16 | CORRECTIVE ACTION ........................................... 48 | |
| | Section 16.01. Administration .................................. 48 | |
| | Section 16.02. Discussions ...................................... 48 | |
| | Section 16.03. Formal Counseling ........................... 49 | |
| | Section 16.04. Letter of Warning ............................. 49 | |
| | Section 16.05. Suspensions of 14 Days or Less ..... 49 | |
| | Section 16.06. Suspensions of More Than 14 Days or Discharge ......................... 50 | |
| | Section 16.07. Arrest or Indictment for a Crime ...... 50 | |
| | Section 16.08. Emergency Suspension ................... 51 | |
| | Section 16.09. Veterans' Preference ....................... 51 | |
| | Section 16.10. Review of Discipline ......................... 52 | |
| 17 | REPRESENTATION ................................................. 53 | |
| | Section 17.01. Stewards .......................................... 53 | |
| | Section 17.02. Appointment of Stewards ................ 53 | |
| | Section 17.03. The Rights of Stewards ................... 53 | |
| | Section 17.04. Labor-Management Committee Meetings ............................................ 56 | |
| | Section 17.05. Dues Checkoff ................................. 56 | |
| | Section 17.06. Authorization Form .......................... 57 | |
| | Section 17.07. Union Participation in New PPO Orientation ................................. 59 | |
| | Section 17.08. Polygraph Examinations .................. 59 | |
| 18 | NO STRIKE ............................................................ 60 | |
| | Section 18.01. Union Responsibility ........................ 60 | |
| | Section 18.02. Work Stoppage by Others ............... 60 | |

vi

| **Article** | **Subject** | **Page No.** |
|---|---|---|
| 19 | HANDBOOKS AND MANUALS ................................ 61 | |
| | Section 19.01. Intent ............................................... 61 | |
| | Section 19.02. Union Notification ........................... 61 | |
| | Section 19.03. Copies to Union .............................. 62 | |
| 20 | PARKING ............................................................... 63 | |
| | Section 20.01. Existing Program ............................ 63 | |
| 21 | BENEFIT PLANS ..................................................... 64 | |
| | Section 21.01. Health Benefits .............................. 64 | |
| | Section 21.02. Life Insurance ................................. 65 | |
| | Section 21.03. Retirement ....................................... 65 | |
| | Section 21.04. Injury Compensation ....................... 65 | |
| | Section 21.05. Health Benefit Brochures ................ 66 | |
| 22 | BULLETIN BOARDS .............................................. 67 | |
| | Section 22.01. Separate Bulletin Boards ................ 67 | |
| | Section 22.02. Suitable Postings ............................ 67 | |
| 23 | RIGHTS OF UNION OFFICIALS TO ENTER WORK FACILITIES ............................... 68 | |
| | Section 23.01. Notice to Employer ......................... 68 | |
| 24 | EMPLOYEES ON LEAVE WITH REGARD TO UNION BUSINESS ................................................. 69 | |
| | Section 24.01. Determination of Continuation of Benefits .................... 69 | |
| | Section 24.02. Leave for Union Conventions .......... 69 | |
| | Section 24.03. Leave Prior to Choice Vacation Schedule ............................. 69 | |
| | Section 24.04. Requests for Leave Without Pay ..... 70 | |

| **Article** | **Subject** | **Page No.** |
|---|---|---|
| 25 | HIGHER LEVEL AND SPECIAL ASSIGNMENTS | 71 |
| | Section 25.01. Pay Administration | 71 |
| | Section 25.02. Leave Pay | 71 |
| | Section 25.03. Application for Assignment | 71 |
| | Section 25.04. Other Employer Assignments | 72 |
| | Section 25.05. Special Assignments | 72 |
| | Section 25.06. Temporary Assignments to Higher Level Positions Outside the Bargaining Unit | 73 |
| 26 | UNIFORMS | 74 |
| | Section 26.01. Uniform Allowance | 74 |
| | Section 26.02. Uniform Program | 74 |
| | Section 26.03. Postal Police Retired Credentials | 74 |
| 27 | EMPLOYEE CLAIMS | 75 |
| | Section 27.01. Procedure | 75 |
| | Section 27.02. Submitting Claims | 75 |
| 28 | MONEY CLAIMS BY THE EMPLOYER | 76 |
| | Section 28.01. Intent | 76 |
| | Section 28.02. Damage to USPS Property | 76 |
| | Section 28.03. Collection Procedures | 76 |
| 29 | LIMITATION ON REVOCATION OF DRIVING PRIVILEGES | 77 |
| | Section 29.01. Revocation or Suspension of Driving Privileges | 77 |
| | Section 29.02. On Duty Record | 77 |
| | Section 29.03. Factors to be Considered | 77 |
| | Section 29.04. PPO's Responsibility | 78 |
| 30 | REIMBURSEMENT FOR AUTHORIZED TRANSPORTATION | 79 |
| | Section 30.01. Travel, Subsistence and Transportation | 79 |
| | Section 30.02. Travel Between Work Sites | 79 |

| **Article** | **Subject** | **Page No.** |
|---|---|---|
| 31 | UNION-MANAGEMENT COOPERATION ............... | 81 |
| | Section 31.01. Membership Solicitation ................. | 81 |
| | Section 31.02. Information Provided by the Employer ............................................ | 81 |
| | Section 31.03. Union Information Requests ........... | 81 |
| 32 | SCHEDULES (TOURS AND DAYS OFF) ................. | 83 |
| | Section 32.01. The Nature and Scope of Security Coverage Required ............. | 83 |
| | Section 32.02. Temporary Assignments ................. | 83 |
| | Section 32.03. Reassignment of Existing Preferred Schedules .......................... | 83 |
| | Section 32.04. Assignment of Least Senior PPO ........................................ | 84 |
| | Section 32.05. Individual Preferred Schedule ......... | 84 |
| | Section 32.06. Posting or Reverting Vacant and New Individual Preferred Schedules ........................................ | 84 |
| | Section 32.07. Posting and Selection ..................... | 85 |
| | Section 32.08. Bidding Procedures ........................ | 85 |
| 33 | REASSIGNMENTS ................................................ | 87 |
| | Section 33.01. Principles of Reassignments .......... | 87 |
| | Section 33.02. Excessing and Relocation .............. | 87 |
| | Section 33.03. Reassignment of Least Senior PPO ........................................ | 88 |
| | Section 33.04. Voluntary Reassignment ................. | 88 |
| | Section 33.05. Request for Return Reassignment .................................... | 89 |
| | Section 33.06. Reassignments in Certain Work Facilities .................................... | 90 |
| | Section 33.07. Failure to Qualify with a Firearm ...... | 90 |
| | Section 33.08. Employment Protection .................. | 91 |

ix

| **Article** | **Subject** | **Page No.** |
|---|---|---|
| 34 | TRAINING .............................................. 92 | |
| | Section 34.01. Training ........................... 92 | |
| 35 | EMPLOYEE ASSISTANCE PROGRAM .................... 93 | |
| | Section 35.01. Employee Assistance Program (EAP) .................................... 93 | |
| | Section 35.02. PPO's Participation .......................... 93 | |
| | Section 35.03. National Labor-Management Committee ......................................... 93 | |
| 36 | SEPARABILITY ........................................ 94 | |
| | Section 36.01. Separability ..................................... 94 | |
| | Section 36.02. Savings ........................................... 94 | |
| 37 | DURATION ............................................ 95 | |
| | Section 37.01. Effective Date and Duration ............. 95 | |

x

| **Article** | **Page No.** |
|---|---|
| MEMORANDA OF UNDERSTANDING AND LETTERS OF INTENT | 96 |
| **Committee for the Transformation of the Postal Security Force** | 96 |
| Exercise of Authority | 100 |
| Schedule Changes | 101 |
| Alternative Work Schedules | 102 |
| Overtime Assignments | 104 |
| Leave Carryover | 108 |
| Leave Sharing | 109 |
| Annual Leave Exchange Option | 111 |
| Sick Leave for Dependent Care | 112 |
| Rules for National Days of Observance | 113 |
| Detail to Nonbargaining Unit Assignments Due to Temporary Nonoccupational Illness or Injury | 116 |
| Safety and Health | 118 |
| Contract Administration | 119 |
| Grievance Time **Extensions** | **121** |
| Discipline Records | 122 |
| Purge of Warning Letters | 124 |
| Corrective Action | 125 |
| Interest on Back Pay | 128 |
| Labor-Management in the Inspection Service | 129 |

| **Article** | **Page No.** |
| --- | --- |
| New York Security Force Facility Work Rules | 131 |
| **Michael Healy** | 132 |
| Bulletin Boards; File Cabinets; Telephone Policy | 133 |
| Office Space | 135 |
| Access to and Use of Physical Fitness Equipment | 136 |
| Release Statement for the Use of Inspection Service Fitness Equipment | 138 |
| Bargaining Information | 140 |
| Union Notification | 142 |
| Security Force Facilities and Worksites | 143 |
| Employment Protection | 147 |
| Time Limitations Concerning Bone Marrow, Stem Cell, Blood Platelet, and Organ Donations | 148 |
| BDU Style Uniform Apparel | 149 |
| Corporal Stripes | 150 |
| Leave for Bereavement | 151 |

**Notes:**

1.  Bold Face Type in the text indicates revised or new language. Bold Face Type in headings does not necessarily indicate change.

2.  Cross references to relevant Memoranda of Understanding and Letters of Intent are included in the text of the Agreement. The location of the cross references is for the convenience of the reader, and in no way affects the content or intent of the Agreement, the Memoranda of Understanding, or the Letters of Intent.

This page intentionally left blank

# PREAMBLE

This Agreement referred to as the 20**12**-20**17** USPS-**PPOA National** Agreement is entered into by and between the United States Postal Service (hereinafter referred to as the "Employer") and the **Postal Police Officers Association** (hereinafter referred to as the "Union") with respect to the bargaining unit of postal police officers represented by the Union and employed by the United States Postal Service, pursuant to an arbitration award issued **April 1, 2014**. The term "Area" as used in this Agreement means that area that was formerly defined a "Region" for purposes of this Agreement (see 52 Fed. Reg. 47002) and not what the term "Area" means concerning current organization of Postal Service field management. The terms of this Agreement are effective **April 5, 2014,** unless otherwise provided in the aforementioned arbitration award of **April 1, 2014**.

This page intentionally left blank

## ARTICLE 1
## UNION RECOGNITION

### Section 1.01. Recognition.

The Union having been certified by the National Labor Relations Board in Case No. 5-RC-13548(P) is recognized by the Employer as the exclusive bargaining representative of all postal police officers (hereinafter referred to as "PPOs") (uniformed personnel of the Inspection Service as defined in the Postal Reorganization Act (P.R.A.)**)**, Title 39, United States Code, Sections 1201 and 1202 who have such authority as conferred by Title 18, United States Code, Section 3061(c)(2) employed by the United States Postal Service in the Inspection Service, but excluding all other employees, maintenance employees, any employee engaged in personnel work, other than in a purely non-confidential clerical capacity, official clerical employees, professional employees, management officials, and supervisors as defined in the National Labor Relations Act (N.L.R.A.) and the P.R.A.

(See Memo, Page **100**.)

### Section 1.02. Performance of Bargaining Unit Work.

Security Force supervisory personnel may substitute for bargaining unit PPOs where the efficiency of the operation requires such duties.  However, this right does not permit the Employer to involuntarily reassign a PPO to another facility as a result of the use of Security Force supervisory personnel.  The local Union will be informed of the reason(s) for such substitutions.  Utilization of supervisory personnel is a proper subject for discussion at the regularly scheduled local labor-management meeting.  An individual grievance concerning the use of supervisory personnel shall not be made the subject of discussion during the local labor-management meeting.

1

### Section 1.03. Staffed Security at Postal Service Facilities.

The Postal Inspection Service is responsible for the protection of mails, enforcement of postal laws and facility and personnel security. The authority for utilization and deployment of staffed security, whether by Inspection Service personnel or otherwise, rests solely with the Chief Postal Inspector in the role of Security Officer of the U.S. Postal Service. The Union, at the national level, shall be given notice of any deployment or utilization or alteration of any staffed security at postal facilities within 30 days of the effective date of the decision on such actions. At postal facilities where PPOs are deployed, any decision to subcontract security work shall be promptly communicated in writing to the Union, at the national level, and such communication shall be given, if practicable, prior to the effective date of the deployment of contract personnel. The Union may request that the subject of the above referenced notice be discussed at a national level labor-management meeting.

## ARTICLE 2
## NONDISCRIMINATION AND CIVIL RIGHTS

### Section 2.01. Nondiscrimination and Civil Rights.

The Employer and the Union agree that there shall be no discrimination by the Employer or the Union against PPOs because of race, color, creed, religion, national origin, sex, age, or marital status or because of a disability, as prohibited by the Rehabilitation Act, with respect to a position the duties of which can be performed efficiently by an individual with such a disability without danger to the health or safety of the disabled person and without diminishing the protection and safety of property, the mail, or persons on the premises.

### Section 2.02. Labor-Management Committees.

The labor-management committees established under Article 17, Section 17.04 may discuss matters arising under this Article. The committees may discuss affirmative action proposals on all matters affecting minority groups.

The committees will also be advised of the location of new facilities, where PPOs covered by this Agreement will be employed, and will review the availability of adequate housing and public transportation in the area of such facilities. Matters which are the subject of a grievance in process under either Article 15 of this Agreement or the Equal Employment Opportunity complaint procedure may not be the subject of these meetings.

### Section 2.03. Grievances.

Grievances arising under this Article may be filed at Step 2 of the grievance procedure within fourteen (14) calendar days of when the PPO or the union has first learned or may reasonably have been expected to have first learned of the alleged discrimination. Nothing in this provision shall preclude the

filing of a grievance at Step 1, under the provisions of Article 15, Grievance-Arbitration Procedure.

### Section 2.04. Dual Filing.

**2.04(a).** The parties recognize that the Grievance-Arbitration Procedure is the proper appeals forum for a dispute which is essentially contractual in nature. The parties further recognize that the EEO complaint procedure is the proper forum for presenting a discrimination issue and that dual filing of both a grievance and an EEO complaint on a dispute which is essentially contractual in nature both circumvents that negotiated procedure and serves as a disservice to the integrity of the EEO complaint process. The parties acknowledge the special expertise required in non-contractual discriminatory issues and give deference to the EEO complaint procedures and remedies for the redress of such discrimination.

**2.04(b).** If a PPO appeals an EEO complaint as defined in Subsection 2.04(c) to the Merit Systems Protection Board (MSPB), that appeal to MSPB will constitute a waiver of any further access to the Grievance-Arbitration Procedure pursuant to Article 16.09. An arbitrator will not have any jurisdiction to hear or render a decision on any grievance after an appeal is made to the MSPB.

**2.04(c).** For the purposes of this section, the term "EEO complaint" includes the following: EEO complaint and mixed case complaint.

**2.04(d).** The Union, at the national and local levels, will take steps to ensure that bargaining unit PPOs are informed that essentially contractual matters should be pursued under the Grievance-Arbitration Procedure.

4

# ARTICLE 3
## MANAGEMENT RIGHTS

### Section 3.01. Employer Rights.

The Employer shall have the exclusive right, subject to the provisions of this Agreement and consistent with applicable laws and regulations:

**3.01(a).** to direct PPOs of the Employer in the performance of official duties;

**3.01(b).** to hire, promote, transfer, assign, and retain PPOs in positions within the Postal Service and to suspend, demote, discharge or take other disciplinary action against such PPOs;

**3.01(c).** to maintain the efficiency of the operations entrusted to it;

**3.01(d).** to relieve PPOs from duties because of lack of work, subject to the provisions of Article 33, Section 33.08;

**3.01(e).** to determine the methods, means, and personnel by which such operations are to be conducted;

**3.01(f).** to prescribe a uniform dress to be worn by designated PPOs; and

**3.01(g).** to take whatever actions may be necessary to carry out its mission in emergency situations.

### Section 3.02. Emergency Situation.

An emergency situation is an unforeseen circumstance or a combination of circumstances which calls for immediate action in a situation which is not expected to be of a recurring nature. Whenever such emergency situations occur, the Union may request a meeting with the Employer to discuss the matter.

5

## ARTICLE 4
## TECHNOLOGICAL AND MECHANIZATION CHANGES

### Section 4.01. Advance Notice.

Both parties recognize the continuing need for improvement of postal security. The Union will be informed in advance of implementation of technological changes which affect wages, hours, or working conditions of PPOs covered by this Agreement at regularly scheduled labor-management meetings as provided for in Article 17.  When major new mechanization or equipment is to be purchased and installed, the Union at the national level will be informed as far in advance as practicable, but no less than sixty (60) days in advance. The views and suggestions of the Union, including those related to safety issues and other matters affecting PPOs, will be considered prior to implementation of such changes. The Union may also raise any such safety issues pursuant to the provisions of Article 14.

### Section 4.02. New Jobs.

Any new job or jobs created by technological or mechanization changes shall be offered to present PPOs capable of being trained by the Employer to perform the new or changed job. During training the PPO will maintain the PPO's rate. It is understood that the training herein referred to is on the job and not to exceed sixty (60) days. Certain specialized training may be required by the Employer and extend beyond sixty (60) days and/or be provided off-site.

### Section 4.03. Eliminated Jobs.

A PPO, whose job is eliminated as a result of a technological and mechanization change and who cannot be placed in a job

of equal grade, will receive salary rate protection pursuant to Article 9.07.

### Section 4.04. Training.

The obligation herein above set forth shall not be considered to abridge in any way the right of the Employer to make such a change. Under no circumstances shall the Employer be required to select more person(s) for training than the number of new position(s) available.

## ARTICLE 5
## PROHIBITION OF UNILATERAL ACTION

### Section 5.01. Unilateral Action.

The Employer will not take any actions affecting wages, hours and other terms and conditions of employment as defined in Section 8(d) of the National Labor Relations Act (29 USC § 158(d)) which violate the terms of this Agreement or are otherwise inconsistent with its obligations under law.

## ARTICLE 6
## POSTAL POLICE OFFICER RIGHTS AND
## RESPONSIBILITIES

### Section 6.01. Basic Principles.

Every employee of the Postal Service should be treated at all times with dignity, respect, and fairness in order for the Postal Service to serve the public efficiently and productively and for employees to perform their duties.

### Section 6.02. PPO Conduct.

The Employer and the Union jointly agree that PPOs shall discharge their assigned duties conscientiously and effectively. Further, they jointly recognize that the nature of the positions covered under this contract imposes a high degree of public trust and requires the highest standards of conduct, honesty, and integrity. PPOs are expected to conduct themselves during and after working hours in a manner which will reflect favorably upon the U.S. Postal Service. Off-duty conduct shall be considered a basis for discipline only if there is a nexus to the PPO's ability to perform the PPO's job duties and/or command the necessary respect from fellow employees and the public.

### Section 6.03. PPO Disciplinary Interviews.

When a PPO is to be interviewed regarding conduct for which discipline could be imposed, the PPO will be advised of the purpose of the interview at the outset of the interview. Normally, such disciplinary interviews will be conducted during the PPO's regularly scheduled tour, and if the PPO makes the request, the PPO shall have the right to have a steward or union representative present before the interview begins. If a PPO requests Union representation and a Union representative is not available, the Employer may request that the PPO

continue with the interview without Union representation,
postpone the interview until Union representation is available,
or cancel the interview.

## ARTICLE 7
## EMPLOYEE CLASSIFICATIONS

### Section 7.01. Definition.

The following shall constitute the regular bargaining unit work force of the United States Postal Service Security Force:

**7.01(a). Full-Time —** Persons in this category shall be hired pursuant to such procedures as management may establish and shall be assigned to work schedules consisting of five 8-hour days in a service week.

**7.01(b). Part-Time —** The Employer may hire persons pursuant to such procedures as management may establish, and assign them to work weeks of less than forty (40) hours. Such PPOs will not be utilized solely to avoid the payment of overtime to full-time PPOs, nor assigned in lieu of full-time PPOs where full-time positions are established. The utilization of such part-time PPOs will be a proper subject for discussion at labor-management committee meetings.

### ARTICLE 8
### HOURS OF WORK

## Section 8.01. Work Week.

The work week for full-time PPOs shall be forty (40) hours per week, eight (8) hours per day within nine (9) consecutive hours, except when a PPO is assigned to mobile or protective duty, in which case the PPO shall be on duty as is required to complete the assignment. Such PPO shall be eligible for overtime as set forth in Section 8.04.

## Section 8.02. Work Schedule.

**8.02(a). Service Week.** The PPO's service week shall be a calendar week beginning at 0001 hours Saturday and ending at 0000 hours the following Friday.

**8.02(b). Service Day.** The PPO's service day is the calendar day on which the majority of work is scheduled.

Where the work schedule is distributed evenly over two calendar days, the service day is the calendar day on which such work schedule begins.

**8.02(c). Basic Work Week.** The full-time PPO's basic work week is five (5) days each consisting of eight (8) hours within nine (9) consecutive hours. As far as practicable, the five (5) days shall be consecutive days within the service week.

(See Memos, Pages **101** and **102**.)

**8.02(d). Recall from Lunch Break.** The time remaining in the lunch period, when a PPO is called back to duty from the lunch period, will be rescheduled at another time during the PPO's scheduled tour of duty, if practicable. If the rescheduling is not practicable, such PPO shall be eligible for overtime pay as

provided in Section 8.04(a) below.

### Section 8.03. Exceptions.

Exceptions to Sections 8.01 and 8.02(a), (b) and (c).

**8.03(a). Application.** The above shall not apply to part-time PPOs.

**8.03(b). Part-Time Schedules.** Part-time PPOs may be scheduled for less than eight (8) hours per service day and less than forty (40) hours per basic work week.

### Section 8.04. Overtime Work.

**8.04(a). Overtime Rate.** Overtime work is to be paid at the rate of one and one-half (1-1/2) times the base hourly straight time rate.

**8.04(b). Overtime Payment**. Overtime pay shall be paid to PPOs only for work performed after eight (8) hours on duty in any one service day or forty (40) hours in any one service week.

**8.04(c). Pyramiding of Overtime or Premium Rates.** Wherever two or more overtime rates may appear applicable to the same hour or hours of work by a PPO, there shall be no pyramiding or adding together of such overtime or premium rate and only the higher of the PPO's applicable rates shall apply.

### Section 8.05. Overtime Assignments.

Overtime shall be required on the basis of need, where needed and when needed as determined by the Employer. PPOs shall be subject to the assignment of overtime at the direction of the Employer. In those instances where the Employer determines overtime is needed, the Employer shall attempt to distribute such overtime opportunities among available, qualified PPOs at the work facility where the overtime is required.

(See Memo, Page **104**.)

13

**Section 8.06. Temporary Changes in Schedule.**

Temporary changes in schedule (tours and days off) shall be kept to a minimum consistent with operational needs. Out-of-schedule pay at the rate of one and one-half (1-1/2) times the base hourly straight time rate shall be paid to full-time PPOs for the time worked outside of their regularly scheduled workday or work week. Nothing contained in this section shall require the payment of such out-of-schedule pay for temporary schedule changes made for the purpose of training, e.g., including first aid, firearms training and in-service training, for PPOs' personal convenience or at PPOs' own request. Pursuant to ELM 434.622, a request for a schedule change for the employee's personal convenience requires written approval by the employee's supervisor and shop steward or other collective bargaining representative.  The Employer will provide the local Union with a copy of the completed PS Form 3189 when a PPO's request for a temporary schedule change is approved.

**Section 8.07. Night Shift Differential.**

For time worked between the hours of 1800 hours and 0600 hours, PPOs shall be paid additional compensation at the rate of 10 percent of their base hourly straight time rate.

**Section 8.08. Sunday Premium Payment.**

Each PPO whose regular work schedule includes a period of service, any part of which is within the period commencing at

14

0000 hours (midnight) Saturday and ending at 0000 hours (midnight) Sunday, shall be paid extra compensation at the rate of 25 percent of the PPO's base hourly straight time rate for each hour of work performed during that period of service.

**Section 8.09. Guarantees.**

**8.09(a). Minimum Guarantees.** A full-time PPO who is scheduled or called in to work on the PPO's scheduled day off (SDO) shall be guaranteed a minimum of eight (8) hours work or pay in lieu thereof. Such guarantee shall not apply to a PPO who works overtime on one of the PPO's regularly scheduled work days either before or after the PPO's regularly scheduled shift. If a PPO's request for annual leave for an entire regularly scheduled work day is approved and such annual leave is cancelled subsequently and the PPO reports for duty as scheduled, the PPO is guaranteed eight hours work or pay in lieu thereof.

**8.09(b). Early Release.** A PPO may request an early release during a guarantee period by completing and submitting a PS Form 3971, with the type of absence marked as "LWOP." If the request is approved, the PPO will be released and be paid only for the actual time worked.

## ARTICLE 9
## SALARY AND WAGES

### Section 9.01. Basic Annual Salary.

For those grades and steps in effect during the term of the **2012** Agreement, the basic annual salary schedule**s**, with proportional application to hourly rate PPOs, for those PPOs covered under the terms and conditions of this Agreement shall be increased as described in Sections 9.02 and 9.03.

### Section 9.02. Salary Schedules.

**Employees with career appointments before April 5, 2014 shall be paid and earn step increases according to the rates and waiting periods outlined in Table One.**

**Employees appointed to career positions on or after April 5, 2014 shall be paid and earn step increases according to the rates and waiting periods outlined in Table Two.**

**(See Pay Tables, Pages 18 and 19.)**

### Section 9.03. Employment Cost Index Periodic Adjustments.

**9.03(a).** As used herein, the Employment Cost Index (ECI) is a measure of the change in the cost of labor for private industry workers (wages and salaries index) as published by the United States Department of Labor's Bureau of Labor Statistics (December 2005 = 100).

**9.03(b). Effective the second full pay period after the release of the March 2014 ECI, the basic annual salary for each step shall be increased by an amount equal to 3.2% of the basic annual salary for the grades and steps in effect on April 5, 2014.**

**9.03(c). Effective the second full pay period after the release of the March 2015 ECI, each PPO covered by this Agreement shall receive an ECI derived adjustment to**

16

**basic wages. The basic annual salary for each step shall be increased by a percentage amount equal to the percentage change in the March 2015 ECI over the March 2014 ECI. The resulting percentage will be the basic wage increase applied to the salary in effect on April 5, 2014.**

**9.03(d).** Effective the second full pay period after the release of the March 2016 ECI, each PPO covered by this Agreement shall receive an ECI derived adjustment to basic wages. The basic annual salary for each step shall be increased by a percentage amount equal to the percentage change in the March 2016 ECI over the March 2015 ECI. The resulting percentage will be the general basic wage increase applied to the salary in effect on **April 5, 2014**.

### Section 9.04. Application of Salary Rates.

Except as provided in this Article, the Employer shall continue the current application of salary rates for the duration of this Agreement.

### Section 9.05. Granting Step Increases.

Except as provided in this Article, the Employer will continue the program on granting step increases for the duration of this Agreement.

### Section 9.06. Protected Salary Rates.

The Employer shall continue the current salary rate protection program for the duration of this Agreement.

17

**Postal Police Officers' (PPO) Schedule**
Full-Time Annual Basic Rates
For employees hired before April 5, 2014

RSC Y (FON)

PPO

| Grade | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | MPS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 34,154 | 38,609 | 40,915 | 42,468 | 45,658 | 46,066 | 46,473 | 46,884 | 47,292 | 47,701 | 48,111 | 48,517 | 48,925 | 49,338 | 49,743 | 50,154 | 50,561 | 50,972 | 51,380 | 51,790 | 52,608 | 53,425 | 53,833 | 408 |

Part-Time Employees - Hourly Basic Rates

| Grade | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 17.08 | 19.30 | 20.46 | 21.23 | 22.83 | 23.03 | 23.24 | 23.44 | 23.65 | 23.85 | 24.06 | 24.26 | 24.46 | 24.67 | 24.87 | 25.08 | 25.28 | 25.49 | 25.69 | 25.90 | 26.30 | 26.71 | 26.92 | |

Step Increase Waiting Periods (In Weeks)

| Steps (From-To) | 1-2 | 2-3 | 3-4 | 4-5 | 5-6 | 6-7 | 7-8 | 8-9 | 9-10 | 10-11 | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21 | 21-22 | 22-23 | Years |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grade 6 | 78 | 42 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 52 | 52 | 26 | 14.5 |

18

**Postal Police Officers' (PPO) Schedule**
**Full-Time Annual Basic Rates**
**For employees hired on or after April 5, 2014**

RSC Y7 (FOP)

PPO

| Grade | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Step |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 31,517 | 33,111 | 34,705 | 36,299 | 37,893 | 39,487 | 41,081 | 42,675 | 44,269 | 45,863 | 47,457 | 49,051 | 50,645 | 52,239 | 53,833 | 1,594 |

Part-Time Employees - Hourly Basic Rates

| Grade | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 15.76 | 16.56 | 17.35 | 18.15 | 18.95 | 19.74 | 20.54 | 21.34 | 22.13 | 22.93 | 23.73 | 24.53 | 25.32 | 26.12 | 26.92 | |

Step Increase Waiting Periods (In Weeks)

| Steps (From-To) | 1-2 | 2-3 | 3-4 | 4-5 | 5-6 | 6-7 | 7-8 | 8-9 | 9-10 | 10-11 | 11-12 | 12-13 | 13-14 | 14-15 | Years |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grade 6 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 14 |

## ARTICLE 10
### LEAVE

### Section 10.01. Funding.

The Employer will continue funding the Leave Program so as to continue the current leave earning level for the duration of this Agreement.

(See Memos, Pages **108** and **109**.)

### Section 10.02. Choice Vacation Period.

**10.02(a). Vacation Program.** It is agreed to establish a program for vacation planning for PPOs in the regular work force with emphasis upon the choice vacation period. Choice vacation period will be on seniority basis only. The choice vacation period will be the entire leave year.

**10.02(b). Forfeiture of Annual Leave.** Care will be exercised to assure that no PPO is required to forfeit any part of the PPO's annual leave.

**10.02(c). Start of Vacation Period.** The vacation period will start on the first day of the PPO's basic work week. Exceptions may be granted by agreement among the PPO, the Union representative and Employer.

**10.02(d). Jury Duty or Attendance at Convention.** A PPO who is called for jury duty during a scheduled choice vacation period or who attends a National Convention during the choice vacation period is eligible for another available period provided this does not deprive any other PPO of that PPO's first choice for scheduled vacation.

### Section 10.03. Vacation Planning.

The following rules will be observed in implementing the vacation planning program:

**10.03(a). Leave Year.** The Employer will, no later than November 1, publicize on bulletin boards and by other appropriate means the beginning date of the new leave year, which will begin with the first day of the first full pay period of the new calendar year.

**10.03(a)(1)** Selection During Choice Period. Choice vacation selections will be made from November 1 through November 30, inclusive. Choice vacation selections will be made by seniority and by tour. The Manager, Postal Police Division, will designate a manager or supervisor at each work facility to coordinate choice vacation selections. Management will record on a calendar the number of choice vacation selections available during each week of the choice period. Starting with the senior PPO on the tour and proceeding through the tour in seniority order, PPOs will each be given an opportunity to make their selections as provided in Subsection 10.03(a)(2).

**10.03(a)(2) Annual Leave Options.** Subject to the provisions above, annual leave during the choice vacation period will be granted in accordance with one (1) of the options listed below:

a.  PPOs who earn thirteen (13) days annual leave per year will be granted leave as follows:

Option 1. A single selection of up to ten (10) days of continuous annual leave (two consecutive weeks). The number of days of annual leave, not to exceed ten (10), will be at the option of the PPO; or

21

Option 2. Two selections of five (5) days of continuous annual leave (each of one week).

b.   PPOs who earn twenty (20) or twenty-six (26) days of annual leave per year will be granted leave as follows:

Option 1. A single selection of up to fifteen (15) days of continuous annual leave (three consecutive weeks). The number of days of annual leave, not to exceed fifteen (15), will be at the option of the PPO; or

Option 2. One selection of five (5) days of continuous annual leave and an additional selection of either five (5) or ten (10) days of continuous annual leave (two consecutive weeks); or

Option 3. Three selections of five (5) days of continuous annual leave (any available three weeks during the choice period).

**10.03(a)(3)**. After the above selection process is completed, management will make available, subject to the options above and advance submission of PS Form 3971, on a seniority basis, those choice period selection slots (choice period vacation weeks) that were not taken during the selection process. PPOs who choose successfully from these remaining choice vacation slots must have sufficient annual leave to cover the selection(s) at the time the leave is to be used.

(See Memo, Page **111**.)

**10.03(a)(4).** Failure to Select a Choice Leave Period. Individual PPOs who do not select leave pursuant to the above procedures will be assigned an annual leave use period during the choice leave period for those hours of leave which are in

the "use or lose category", in accordance with Subsection 10.03(a)(2).

**10.03(b). Meeting with Union Representative.** The designated Inspection Service manager in charge of the Security Force at the work facility will meet with the representatives of the Union to review local service needs as soon after October 15 as practical, but not later than November 1. The designated Inspection Service manager will then:

**10.03(b)(1).** Determine the amount of annual leave accrued to each PPO's credit including that for the current leave year and the amount the PPO is expected to earn in the next leave year.

**10.03(b)(2).** Provide official notice to each PPO of the Security Force of the vacation schedule approved for that PPO. The leave schedule for the work facility will be posted as soon as possible but not later than December 15.

**10.03(c). Selection of Annual Leave other than Choice Period.** A procedure in each office for submission of applications for annual leave for periods other than the choice period may be established pursuant to the implementation procedures established in the work facility.

**10.03(d). Advance Leave Commitment.** All advance commitments for granted annual leave must be honored except in serious emergency situations.

**10.03(e). Completion of Probationary Period.** After the completion of the probationary period, a PPO will be given an opportunity to make a vacation selection in accordance with Section 10.03.

### Section 10.04. Sick Leave.

The Employer agrees to continue the administration of the present sick leave program which will include the following specific terms.

**10.04(a). Earned Credits.** Credit PPOs with sick leave as earned.

**10.04(b). Leave Options.** Charge to annual leave or leave without pay (at PPO's option) approved absence for which the PPO has insufficient sick leave.

**10.04(c). Change of Leave Status.** PPOs becoming ill while on annual leave may have leave charged to sick leave upon request.

**10.04(d). Employee's Certification.** For period of absence of three (3) days or less, a supervisor may accept a PPO's certification as reason for absence.

(See Memo, Page **112**.)

## ARTICLE 11
## HOLIDAYS

### Section 11.01. Holidays Observed.

The following ten (10) days shall be considered holidays for full-time PPOs:

New Year's Day
Martin Luther King, Jr.'s Birthday
Presidents' Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veterans Day
Thanksgiving Day
Christmas Day
(See Memo, Page **113**.)

### Section 11.02. Eligibility.

To be eligible for holiday leave pay, a PPO must be in a pay status the last hour of the scheduled workday prior to or the first hour of the scheduled workday after the holiday.

### Section 11.03. Holiday Leave Pay.

**11.03(a).** A PPO shall receive holiday leave pay at the PPO's base hourly straight time rate for a number of hours equal to the PPO's regular daily working schedule, not to exceed eight (8) hours. PPOs who work their holiday, at their option, may elect to have their annual leave balance credited with up to eight (8) hours of annual leave in lieu of holiday leave pay.

**11.03(b).** Holiday leave pay is in lieu of other paid leave to which a PPO might otherwise be entitled on a holiday.

### Section 11.04. Holiday Worked Pay.

**11.04(a).** A PPO required to work on a holiday other than Christmas shall be paid the base hourly straight time rate for each hour worked up to eight (8) hours. PPOs who work their holiday, at their option, may elect to have their annual leave balance credited with up to eight (8) hours of annual leave or receive holiday leave pay to which the PPO is entitled as above described.

**11.04(b).** A PPO required to work on Christmas shall be paid one and one-half (1-1/2) times the base hourly straight time rate for each hour worked. PPOs who work their holiday, at their option, may elect to have their annual leave balance credited with up to eight (8) hours of annual leave or receive holiday leave pay to which the PPO is entitled as above described.

**11.04(c).** Deferred holiday leave credited in accordance with 11.04(a) or 11.04(b) above, will be subject to all applicable rules for requesting and scheduling annual leave and shall be combined with annual leave and counted as annual leave for purposes of annual leave carryover.

### Section 11.05. Holiday on Nonworkday.

**11.05(a). General Rule.** When a PPO's scheduled nonworkday falls on a day observed as a holiday, the scheduled workday preceding the holiday will be that PPO's designated holiday except as stated in Subsection 11.05(b).

**11.05(b). For PPOs Having Nonworkdays of Saturday and/ or Sunday.** When a holiday falls on Sunday, the next scheduled workday will be observed as the designated holiday for PPOs whose nonworkday is Sunday. When a holiday falls on Saturday, the last preceding workday shall be observed as the designated holiday for PPOs whose nonworkday is Saturday.

## Section 11.06. Holiday Schedule.

The Employer will determine the need for holiday coverage and shall post a schedule as of the Tuesday preceding the service week in which the holiday falls. To the extent special qualifications are not needed to meet service needs, PPOs who normally work on the day on which a holiday (or designated holiday) falls will be offered the first opportunity to work on the holiday on a voluntary basis by seniority.  In situations where holiday work needs are not satisfied by the voluntary procedure described above, the Employer will make assignments of PPOs who normally work on that holiday (or designated holiday) by inverse order of seniority.  Management will not require a bargaining unit PPO to work on a holiday or day designated as a holiday involuntarily in order to excuse a supervisor who does not wish to work the holiday or day designated as a holiday.  Absent exigent or unanticipated circumstances, management will not require a bargaining unit PPO to work on a holiday or day designated as a holiday involuntarily due to absence of a supervisor.  Management will inform the local Union representative of the reason(s) why management believes there is/are exigent or unanticipated circumstance(s).  A PPO scheduled to work on a holiday who does not work shall not receive holiday leave pay, unless such absence is based on an extreme emergency situation and is excused by the Employer.

### Section 11.07. Part-Time PPOs.

A PPO assigned to a work week of less than 40 hours shall not receive holiday leave pay as such. The PPO shall be compensated for the ten (10) holidays by basing the PPO's regular straight time hourly rate on the annual rate divided by 2000 hours. For work performed on December 25, such PPO shall be paid in addition to the PPO's regular straight time hourly rate, one-half (1/2) times the PPO's regular straight time hourly rate for each hour worked up to eight (8) hours.

## ARTICLE 12
## PROBATIONARY PERIOD AND SENIORITY

### Section 12.01. Probationary Period.

**12.01(a). Length of Probationary Period.** The probationary period for a PPO shall be one hundred eighty (180) calendar days after the successful completion of the Postal Police Officer Basic Training Course. The probationary period shall be extended by one work day for each work day the PPO is absent from work due to illness, injury, or other causes. The Employer shall have the right to separate from its employ any probationary PPO at any time during the probationary period and those probationary PPOs shall not be granted access to the grievance procedure in relation thereto.

**12.01(b). Falsification of Employment Application.** The parties recognize that the failure of the Employer to discover a falsification or omission by any PPO in the employment application prior to the expiration of the probationary period shall not bar the use of such falsification or omission as a reason for discharge.

**12.01(c). Rehire.** When a PPO, who was separated from the Postal Service for any reason, is rehired the PPO shall serve a new probationary period.

**12.01(d). Seniority Accrual.** When a PPO completes the probationary period, the PPO shall be granted seniority rights as established in this Article.

### Section 12.02. Seniority.

The Employer and the Union agree to the following seniority principles. These principles will establish the relative seniority standing among PPOs covered by this Agreement.

29

### Section 12.03. Coverage.

These seniority rules apply to all PPOs for the purposes specifically enumerated in this Agreement.

### Section 12.04. Responsibility.

Where practicable, an updated seniority list will be posted at each work facility every six (6) months indicating the relative seniority standing among PPOs permanently assigned to that work facility. If not practicable, such information will be made available to the Union, upon request.

### Section 12.05. Definitions.

Seniority is computed from date of appointment to the position of a postal police officer (or its predecessor position) and continues to accrue so long as service is uninterrupted in such position(s). Seniority will be maintained on a Nation-wide basis.

**12.05(a). Relative Standing.** Relative standing on the seniority roster will be determined in the following order:

1.  U.S.P.S. Security Force seniority;
2.  Total career Postal Service time;
3.  Other creditable Federal Service including military service;
4.  10 Point veteran; 5 Point veteran
5.  Last four digits in PPO's social security number, whichever is lowest.

30

### Section 12.06. Changes in Which Seniority Is Retained, Regained or Restored.

**12.06(a). Reemployment After Disability Separation.** On reinstatement or reemployment after separation caused by disability, retirement or resignation because of personal illness and the PPO so stated in the resignation and furnished satisfactory evidence for inclusion in the PPO's personnel folder, the PPO receives seniority credit for past service in a position covered by this Agreement for time on the disability retirement or for illness if reinstatement or reemployment is made within six months from the date of recovery.

**12.06(b). Restoration.** On restoration to a position covered by this Agreement after return from military service, or unjust removal, a PPO shall regain the same seniority rights as if the PPO had not been separated.

**12.06(c). Returning PPOs.** Return from any position in the Postal Service not covered by this Agreement on or after December 6, 1975 to a position covered by this Agreement and returns to the division the PPO left.

**12.06(c)(1).** Such PPO will begin a new period of seniority if the PPO returns from a position within the Postal Service except as provided in Subsection 12.06(c)(2) below.

**12.06(c)(2).** Upon involuntary reassignment of a Postal Service employee from a position not covered by this Agreement, except for disciplinary reasons, the PPO shall have seniority established after reassignment as the PPO's former seniority plus seniority for service in positions not covered by this Agreement. Seniority for service in positions not covered by this Agreement shall be included only if the PPO is reassigned

31

back to the bargaining unit within two (2) years.

**12.06(c)(3).** Upon involuntary assignment of a PPO to another Security Force facility such PPO shall not begin a new period of seniority.

### Section 12.07. New Period of Seniority.

Except as specifically provided elsewhere in this Agreement, a PPO begins a new period of seniority:

**12.07(a). Voluntary Transfers.** When a PPO is voluntarily transferred from one Area to another, such PPO shall not begin a new period of seniority in such Area. In the event such PPO is voluntarily transferred back to the Area from which the PPO was transferred, effective the date of such transfer back, the PPO shall maintain seniority.

**12.07(b). Reinstatement or Reemployment.** Upon reinstatement or reemployment.

**12.07(c). Transfer into Bargaining Unit Position.** Upon transfer into a position covered by this Agreement.

# ARTICLE 13
## ASSIGNMENT OF ILL OR INJURED PPOs

### Section 13.01. Introduction.

The Employer and the Union, recognizing the responsibility to aid and assist PPOs who, through a nonoccupational illness or injury, are unable to perform their regularly assigned duties, agree to the following provisions and conditions for reassignment to temporary positions within the bargaining unit for a period not to exceed 120 calendar days, which require duties the PPO is capable of performing effectively.

### Section 13.02. Nonoccupational Illness or Injury.

A PPO, who as a result of a nonoccupational illness or injury is unable to perform the PPO's assigned duties, may voluntarily submit a request to be temporarily assigned to duties that the PPO is capable of performing. Such request shall be supported by a statement from a licensed physician, stating the PPO's specific medical limitations and the anticipated duration of the convalescence period. The Employer may request a further medical examination.

### Section 13.03. Temporary Assignments.

The Employer will make a reasonable effort to honor such request based upon the availability of duties which the PPO is capable of performing effectively without injury or danger to the PPO or others and without diminishing the protection and safety of property, mail, or persons on the premises. The PPO must be able to wear the full uniform, use the assigned firearm and be able to respond to defend self and others. Nothing in this Article is intended to remove the Employer's right to determine the scheduling and feasibility of any temporary assignment within a work facility.

(See Memo, Page **116**.)

33

### Section 13.04. Out-of-Schedule Pay.

In no case will the placement of an ill or injured PPO in a temporary assignment result in out-of-schedule pay.

### Section 13.05. Permanent Reassignment.

If a PPO's nonoccupational illness or injury results in permanent inability to effectively perform assigned duties, the Employer will make a reasonable effort to honor a request for reassignment to another position in the Postal Service, the duties of which the PPO is capable of performing effectively without injury or danger to self or others.

### Section 13.06. Disagreement Concerning PPO's Physical Condition.

The following procedures shall not apply to cases where the PPO's medical condition arose out of an occupational illness or injury. When there is a disagreement between the PPO's physician and the physician designated by the Employer concerning the PPO's medical condition and permanent inability to perform assigned duties of a postal police officer, the Employer and the Union agree to the following procedures. On the written request of the local union which must be received by the Employer within 30 days after the decision of the physician designated by the Employer, a third physician will be selected from a list of five Board Certified Specialists in the medical field for the condition in question, the list to be supplied by the local Medical Society. The physician will be selected by the alternate striking of names by the Union and the Employer.

The Employer will provide the selected physician with all relevant facts including the job description and occupational requirements. The decision of the third physician shall be final as to the PPO's medical condition and permanent ability or inability to perform the assigned duties of a postal police officer. The costs of the services of the third physician shall be shared by the Union and the Employer.

### Section 13.07. Occupational Illness or Injury.

A PPO who is partially disabled as a result of an occupational illness or injury shall be accorded such rights as are established pursuant to the Federal Employees' Compensation Act, and applicable regulations, including the provisions of the Employee and Labor Relations Manual.

## ARTICLE 14
## SAFETY AND HEALTH

### Section 14.01. Responsibilities.

It is the responsibility of the Employer to provide safe working conditions and to develop a safe working force. The Union will cooperate with and assist management to live up to this responsibility.

### Section 14.02. Health Service.

The Employer will make health services available for the treatment of a job related injury or illness where it determines they are needed. This health service will be available from any of the following sources: independent or private medical facilities or services that can be contracted for; or in the event funds, spaces, and personnel are available for such purposes, they may be staffed at the work facility.

### Section 14.03. Cooperation.

The Employer and the Union insist on the observance of safety rules and safe procedures by PPOs and insist on correction of unsafe conditions. Machines, vehicles and vehicle equipment, and the workplace must be maintained in a safe condition. The Employer shall make available at each work site forms to be used by PPOs reporting unsafe and unhealthful conditions. Any grievance which has as its subject a safety or health issue affecting a PPO or PPOs and which is subsequently properly appealed to arbitration in accordance with the provisions of Article 15, may be placed at the head of the appropriate arbitration docket of contract grievances, at the request of the Union.

### Section 14.04. Reporting Unsafe Conditions.

If a PPO believes the PPO is being required to work under unsafe conditions, which are of a purely local nature, the PPO may: a) notify the PPO's supervisor who will immediately investigate the condition and take corrective action if necessary; b) file a grievance (the affected PPO may have the local Union representative authorized to appeal grievances to Step 2 initiate such a grievance at Step 2 of the grievance procedure); and/or c) make a written report to the local labor-management committee. If the Union believes PPOs are being required to work under unsafe conditions, which are purely local in nature, the union may a) notify the affected PPOs' supervisor(s) who will immediately investigate the condition and take corrective action if necessary; b) file a class grievance, as defined in Article 15.03(a)(1), at Step 2 of the grievance procedure; and/or make a written report to the local labor-management committee.

### Section 14.05. Labor-Management Meetings.

Safety and health are proper subjects for discussion at the regularly scheduled local labor-management committee meetings. Individual grievances concerning safety or health shall not be made the subject of discussion during the local labor-management committee meetings.

(See Memo, Page **118**.)

### Section 14.06. Special Conditions.

Whenever a health or safety condition of an urgent nature arises, the local Union representative will inform the Employer at the local facility of such a condition. If the Employer agrees that the condition is of an urgent nature, then the Employer will have the condition investigated as soon as possible. The report

of the Employer will be made available to the Union.

### Section 14.07. Equipment.

It is the responsibility of the Employer to provide all PPOs with the equipment necessary to adequately perform their duties without endangering themselves or others.

### Section 14.08. Safety Committees.

The Union may designate one representative to each local safety committee, or local Inspection Service safety committee, where PPOs are deployed and the designated PPO will be paid for time within assigned tour of duty.

# ARTICLE 15
# GRIEVANCE-ARBITRATION PROCEDURE

## Section 15.01. Definition.

A grievance is defined as a dispute, difference, disagreement or complaint between the parties related to wages, hours, and conditions of employment within the terms and provisions of this Agreement. When a PPO covered by the terms of this Agreement or the Union believes that the Employer has violated the terms of this Agreement and that by reason of such violation the PPO's or the Union's rights arising out of this Agreement have been adversely affected, the PPO or the Union shall be required to follow the procedure set forth below in presenting the grievance.

## Section 15.02. General Policy.

Grievances which are filed pursuant to this Article are to be processed and adjudicated based on the principle of resolving such grievances at the lowest possible level in an expeditious manner, insuring that all facts and issues are identified and considered by both parties. In the event that a grievance is processed beyond Step 1, the parties are responsible to insure all facts, issues and documentation are provided to their respective representatives at the next higher level of the grievance procedure. The parties further agree that, at any step in the grievance procedure, the steward or other Union representative shall have full authority to settle or withdraw the grievance in whole or in part. The Employer's representative, likewise, shall have full authority to grant, settle or deny the grievance in whole or in part.

**Section 15.03. Grievance Procedure.**

**Step 1:**

**15.03(a)(1).** The aggrieved PPO must discuss the grievance with the PPO's immediate supervisor or the replacement supervisor within fourteen (14) calendar days of when the PPO or the Union has learned or may reasonably have been expected to have learned of its cause. The PPO, if he or she so desires, may be accompanied by the PPO's steward. The PPOs' steward, certified as provided in Article 17, Section 17.02 of this Agreement, may also initiate a class grievance at Step 1 when the grievance concerns the complaint of more than one PPO. However, the aggrieved PPOs must be identified at the time the grievance is initiated. In a class grievance, the participation of the individual grievants is not required. A resolution reached as the result of a discussion at this step shall not be a precedent for any purpose.

**15.03(a)(2).** The supervisor shall render an oral decision stating the reason(s) therefor within ten (10) calendar days. The Union shall be entitled to appeal an adverse decision to Step 2 of the grievance procedure within ten (10) calendar days after receipt of the supervisor's decision. Such appeal shall be in writing, to the designated Inspection Service manager in charge of the work facility. That appeal shall be made by completing a standard grievance form developed by agreement of the parties, which shall include appropriate space for at least the following:

a.    Detailed statement of facts;

b.    Contentions of the grievant;

c.    Particular contractual provisions involved; and

d.    Remedy sought.

**Step 2:**

**15.03(b)(1).** The Inspection Service designated manager will meet with the steward or a union representative, designated in writing pursuant to Article 17.02, as expeditiously as possible, but not later than seven (7) calendar days after receipt of the appeal.

**15.03(b)(2).** At the meeting the steward or the Union representative will make a full and detailed statement of facts relied upon, contractual provisions involved, and remedy sought. The steward or the Union representative may also furnish written statements from witnesses or other individuals, if applicable. The Employer representative will also make a full and detailed statement of facts and contractual provisions relied upon. The parties' representative will also cooperate fully in the effort to develop necessary facts, including the exchange of copies of all relevant papers or documents.

**15.03(b)(3).** A decision by the Employer's representative shall be rendered within ten (10) calendar days after the Step 2 meeting. Any settlement or withdrawal of a grievance at Step 2 shall be in writing or shall be noted on the standard grievance form, but shall not be a precedent for any purpose. Where agreement is not reached the Employer's decision shall be in writing. It will include a full statement of the Employer's understanding of (a) all relevant facts, (b) the contractual provisions involved, and (c) the detailed reasons for denial of the grievance. If the parties are unable to resolve the grievance, the National President of the Union or designee shall be entitled to appeal in writing an adverse decision to Step 3 of the grievance procedure within twenty-one (21) calendar days after receipt of the Employer's decision. Any appeal of an adverse Step 2 decision shall be in writing to the designated Management representative at the designated

41

Grievance/Arbitration Processing Center. If the Union sends its Step 3 appeal to a Processing Center other than the designated Processing Center, this will not be considered a procedural defect. Such written appeal should include a copy of the Union's written appeal to Step 2. Omission of the written appeal to Step 2 when the Union appeals to Step 3 will not be considered a procedural defect.

**Step 3:**

**15.03(c)(1).** The Union's designee shall meet with the Employer's Area Labor Relations designee within twenty-one (21) calendar days of such appeal in an attempt to resolve the grievance. If the parties' designees meet in person, the parties will alternate designation of meeting sites, or the parties may agree to meet telephonically.

**15.03(c)(2).** A decision by the Employer shall be rendered within twenty-one (21) calendar days following this meeting. Such decision shall be in writing and state the reason(s) therefor. If the parties are unable to resolve the grievance, the National President of the Union or designee shall be entitled to certify in writing to the Employer at the designated Grievance/ Arbitration Processing Center within thirty (30) calendar days after receipt of the Employer's decision any case the Union wants scheduled for arbitration. If the Union sends its arbitration appeal to a Processing Center other than the designated Processing Center, this will not be considered a procedural defect.

**15.03(c)(3).** If either party's Step 3 representative believes that a dispute between the Union and the Employer as to the interpretation of a provision of this Agreement is involved in the grievance, the parties at the national level will discuss the

42

alleged interpretive issue. If, after this discussion, either party's national representative determines the issue to be interpretive, a written notice detailing the specific contractual language in dispute, and the moving party's interpretation of that language will be sent to the designated Grievance/Arbitration Processing Center as notification of an appeal to Step 4 within fourteen (14) days of either party's decision to refer the dispute to Step 4. The grievance will be held in abeyance at Step 3 pending discussion at the national level or outcome of a national arbitration award on the interpretive issue in the grievance.

**Step 4:**

**15.03(d).** In any dispute filed at the national level or referred to this step properly pursuant to Article 15.03(c)(3), the parties at the national level will arrange to meet within thirty (30) days after such dispute is received at the national level to review the precise issue(s) involved and in an effort to reach agreement. The Union representative shall have authority to settle or withdraw the dispute in whole or in part and the Employer's representative shall have authority to grant or settle the dispute in whole or in part. The parties' Step 4 representatives may, by mutual agreement, return any dispute to Step 3 appealed to Step 4 from Step 3 where the parties agree no national interpretive issue is fairly presented. In such event, the Step 3 parties will meet within fifteen (15) days after the dispute is returned to Step 3. Thereafter, the time limits and procedures applicable to Step 3 grievances shall apply. If the Step 4 parties are unable to reach agreement, each will provide the other with a detailed written statement of its understanding of the specific issue(s) involved, and its views on interpretation/ general application of the specific contract language in question. The Union may appeal the dispute to national arbitration within thirty days of the date the parties exchange their written statements. Any local grievances filed involving

43

the specific interpretive issue shall be held in abeyance at their current step pending outcome of the national interpretive dispute.

### Section 15.04. Grievance Procedure — General

(See Letter, Page **119**.)

**15.04(a).** Failure by the Employer to render a decision in any of the steps of this procedure within the time herein provided for (including mutually agreed to extension periods) shall be deemed to move the grievance to the next step of the grievance procedure.

**15.04(b).** The failure of the aggrieved PPO or Union in Step 1, or the Union thereafter, to meet the prescribed time limits of the steps of this procedure, including arbitration, shall be considered as a withdrawal of the grievance. Such withdrawal shall be without precedential value with respect to other grievances and/or arbitration proceedings.  However, if the Employer fails to raise the issue of timeliness by Step 2, or at the step thereafter at which the Union fails to meet the prescribed time limits, such objection to processing of the grievance is waived. Once raised at the appropriate step, that timeliness issue need not be addressed again at subsequent steps.

(See Letter, Page **121**.)

**15.04(c).** It is agreed that in the event of a dispute between the Union and the Employer as to the interpretation of this Agreement, or a dispute concerning an issue of general application, such dispute may be initiated as a grievance at Step 4 by the National President.

### Section 15.05. Arbitration.

**15.05(a).** A request for arbitration must be submitted within the time limit for appeal as specified in subsection 15.03(c), Step 3, above.

**15.05(b).** The arbitrator's decision shall be final and binding. The arbitrator, if possible, shall render the award within thirty (30) days of the date of the hearing. All decisions of the arbitrator shall be limited to the terms and provisions of this Agreement, and in no event may the terms and provisions of this Agreement be altered, amended or modified by the arbitrator.

**15.05(c).** All costs, fees and expenses charged by the arbitrator, including the cost of a transcript if requested by the arbitrator, will be shared equally by the parties.

**15.05(d).** Arbitration hearings shall be held during working hours. PPO witnesses shall be on Employer time when appearing at the hearing provided the time spent as a witness is part of the PPO's regular working hours. Requests from PPOs for voluntary temporary schedule changes for this purpose will not be denied unreasonably.

**15.05(e).** Any dispute as to arbitrability may be submitted to the arbitrator and be determined by the arbitrator. That determination shall be final and binding.

**15.05(f).** Contract Interpretation Cases.

**15.05(f)(1).** The parties shall select two arbitrators who shall serve as permanent arbitrators for the life of this Agreement, unless otherwise agreed by the parties. The permanent arbitrators shall decide all cases concerning contract interpretation disputes. The arbitrators should be selected as follows: The parties shall jointly request from the Federal

45

Mediation & Conciliation Service a panel of 6 arbitrators, who are National Academy of Arbitrator members, in the Washington, D.C. Metropolitan area. Each party shall additionally identify a list of 5 arbitrators. The arbitrators will be chosen by the alternate striking from this list of 16 arbitrators. The last two arbitrators remaining after each side has had seven strikes shall be the arbitrators. Following selection of the permanent arbitrators, the parties shall jointly notify the arbitrators in writing of their selection and appointment.

**15.05(f)(2).** Unless otherwise mutually agreed by the parties, contract interpretation cases shall be scheduled for hearing on a "first in-first out" basis. A contract interpretation case filed by the Union at the national level, alleging a violation of either Article 14, Article 19, or Article 33.01, will have priority scheduling for an arbitration hearing. Article 19 grievances may be scheduled, to the extent possible, so as to be heard prior to the implementation of the proposed change(s). Upon certification of a case for arbitration, the parties shall request the permanent arbitrators to submit to them a list of available hearing dates. Upon receipt of the list of available hearing dates, the parties shall mutually agree upon a date and advise the arbitrator in writing of the date selected. The arbitrator shall then set the matter for hearing on the date selected and shall so notify the Employer and the Union in writing.

**15.05(g).** Disciplinary and Contract Application Cases.

**15.05(g)(1).** The parties shall select a 3-member arbitration panel for each Area from a list of 15 names provided by the Federal Mediation & Conciliation Service for each Area. Such arbitrators shall be selected by the alternate striking from the list. In each case certified for arbitration, the

parties shall assign the case on a rotating basis to an arbitrator on the parties' panel of arbitrators within the Area in which the grievance arose.  Unless otherwise mutually agreed, removal actions will be the first cases scheduled for hearing by the parties. Other cases will be scheduled on a "first in first out" basis and on the basis of the availability of the arbitrator and mutually acceptable dates, except that the union may designate three contract application cases per year for priority hearing by each panel.

**15.05(g)(2).** Following selection of an arbitrator, the parties shall jointly notify the arbitrator of the selection and appointment and request that the arbitrator submit to them a list of available hearing dates. Upon receipt of the list of available hearing dates, the parties shall mutually agree upon a date and advise the arbitrator in writing of the date selected. The arbitrator shall then set the matter for hearing on the date selected and shall so notify the Employer and the Union in writing.  Arbitration of discipline and contract application grievances will be conducted onsite at the affected facility, to the extent physically possible.

## ARTICLE 16
## CORRECTIVE ACTION

### Section 16.01. Administration.

In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive. Except for serious misconduct which may warrant termination for the first offense (e.g., sale, possession or use of illegal drugs or assault on a superior), corrective action will be progressive. No PPO may be disciplined or discharged except for just cause such as, but not limited to, sale, possession, or use of illegal drugs or alcohol, insubordination, theft, intoxication (drugs or alcohol), incompetence, failure to perform work as requested, violation of the terms of this Agreement, or failure to observe safety rules and regulations. Any such discipline or discharge shall be subject to the Grievance-Arbitration Procedure provided for in this Agreement, which could result in reinstatement and restitution, including back pay.

The Employer will not accept a resignation in lieu of termination without notifying a PPO of their right to consult with a Union representative.

(See Memo, Page **122**.)

### Section 16.02. Discussions.

For minor infractions of work rules by a PPO, management has a responsibility to discuss such matters with the PPO. Discussions of this type shall be held in private between the PPO and the supervisor. Such discussions are not considered discipline and are not grievable. Following such discussions, there is no prohibition against the supervisor and/or the PPO

48

making a personal notation of the date and subject matter for their own personal record(s). However, no notation or other information pertaining to such discussion shall be included in the PPO's personnel folder. While such discussions may not be cited as an element of a prior adverse record in any subsequent disciplinary action against a PPO, they may be, where relevant and timely, relied upon to establish that PPOs have been made aware of their obligations and responsibilities.

### Section 16.03. Formal Counseling.

For a minor offense, counseling in private shall be the method of dealing with that offense. Counseling is a private matter between the supervisor and the PPO. The supervisor and the PPO shall sign and date a written statement which acknowledges that the PPO was given a counseling and the reason(s) therefor. Grievances involving a formal counseling shall not be appealed beyond step 2 of the Grievance-Arbitration Procedure.

### Section 16.04. Letter of Warning.

A letter of warning is a disciplinary notice in writing, identified as an official disciplinary letter of warning, which shall include an explanation of a deficiency or misconduct to be corrected.

(See Memo, Page **124**.)

### Section 16.05. Suspensions of 14 Days or Less.

In the case of discipline involving suspensions of fourteen (14) days or less, the PPO against whom disciplinary action is sought to be initiated shall be served with a written notice of the charges against the PPO. The PPO shall be further informed that the PPO will be suspended after not less than two (2) or more than twenty-one (21) working days. During

that period the PPO shall remain on-the-job or on-the-clock (in pay status) at the option of the Employer.

(See Memo, Page **125**.)

### Section 16.06. Suspensions of More Than 14 Days or Discharge.

In the case of suspensions of more than fourteen (14) days, or of discharge, any PPO shall, unless otherwise provided herein, be entitled to an advance written notice of the charges against the PPO and shall remain either on-the-job or on-the-clock at the option of the Employer for a period of thirty (30) days. Thereafter, the PPO shall remain on the rolls (non-pay status) until disposition of the PPO's case has been made either by settlement with the Union or through exhaustion of the Grievance-Arbitration Procedure. A preference eligible who chooses to appeal a suspension of more than fourteen (14) days or a discharge to the Merit Systems Protection Board (MSPB) rather than through the Grievance-Arbitration Procedure shall remain on the rolls (non-pay status) until disposition of the case has been made either by settlement or through exhaustion of the PPO's MSPB appeal.

(See Memo, Page **128**.)

### Section 16.07. Arrest or Indictment for a Crime.

When there is reasonable cause to believe a PPO is guilty of a crime for which a sentence of imprisonment can be imposed, except as provided in Section 16.09, the advance notice requirement shall not apply and such a PPO may be immediately removed from pay status. If after further investigation or after resolution of the criminal charges against the employee, the Employer determines to return the employee to pay status, the employee shall be entitled to back pay for

50

the period that the indefinite suspension exceeded seventy (70) days, if the employee was otherwise available for duty, and without prejudice to any grievance filed pursuant to this Section.

### Section 16.08. Emergency Suspension.

A PPO, except as provided in Section 16.09, may be immediately placed in an off-duty status (without pay) by the Employer, but remain on the rolls where the allegation involves intoxication, sale, possession or use of illegal drugs or alcohol, theft, or failure to observe safety rules and the Security Force regulations, or in cases where retaining the PPO on duty may result in damage to or loss of U.S. Postal Service property, loss of mail or funds, or where the PPO may be injurious to self or others. The PPO shall remain on the rolls (non-pay status) until disposition of the case has been made. If it is proposed to suspend such a PPO for more than fourteen (14) days or discharge the PPO, the emergency action taken under this section may be made the subject of a separate grievance.

### Section 16.09. Veterans' Preference.

A preference eligible is not hereunder deprived of whatever rights of appeal such PPO may have under the Veterans' Preference Act; however, if the PPO appeals under the Veterans' Preference Act, the PPO will be deemed to have waived further access to the grievance-arbitration procedure beyond Step 3 under any of the following circumstances:

a.   If an MSPB settlement agreement is reached.
b.   If the MSPB has not yet issued a decision on the merits, but a hearing on the merits before the MSPB has begun.
c.   If the MSPB issues a decision on the merits of the appeal.

In the event the grievance of a preference eligible is due to be scheduled in accordance with Article 15.05 and the preference eligible has a live MSPB appeal on the same action, the parties

51

will not schedule the grievance for arbitration until a final determination is reached in the MSPB procedure. If the grievance is not waived under Section 16.09(a), (b), or (c) above, the case will be scheduled promptly for arbitration. Should the grievance ultimately be sustained or modified in arbitration, the preference eligible employee will have no entitlement to back pay under the National Agreement for the period from the date the case would have been scheduled for arbitration and the date it is actually scheduled for arbitration.

### Section 16.10. Review of Discipline.

In no case may an immediate supervisor impose suspension or discharge upon a PPO unless the proposed disciplinary action by the immediate supervisor has first been reviewed and concurred in by the next higher level of supervision or designee.

## ARTICLE 17
## REPRESENTATION

### Section 17.01. Stewards.

Stewards, who must be members of the bargaining unit at the individual work facility, may be designated for the purpose of investigating, presenting and adjusting grievances.

### Section 17.02. Appointment of Stewards.

The union shall certify, by the local representative to the Inspector-in-Charge of the division in which the work facility is located, in writing, a steward or stewards and alternates for each work facility in accordance with the following guidelines:

**17.02(a). Steward Formula.** The number of stewards certified shall not exceed, but may be less than, the number provided by the following formula. In each facility there will be one steward authorized on each tour plus an additional steward for each 25 additional PPOs in a facility over the base number of 30 PPOs.

**17.02(b). Alternate Stewards.** The number of alternate stewards certified must not exceed the total number of stewards authorized for that work facility and those alternate stewards shall serve only in the absence of a certified steward or when the certified steward is not available to meet.

### Section 17.03. The Rights of Stewards.

**17.03(a). Investigate and Adjust Grievances.** A steward shall be permitted, during the steward's regular tour, with the permission of the steward's immediate supervisor and

subject to business conditions, to leave the work assignment to investigate and adjust grievances or to investigate a specific problem to determine whether to file a grievance, within the confines of the work facility. Such requests shall not be unreasonably denied. The steward shall have the right to interview the aggrieved PPO(s), supervisors, and witnesses. In the event this necessitates the steward leaving the area of employment and entering another area of the work facility, the steward shall request and, shall not be unreasonably denied authorization from the supervisor in such other area the steward wishes to enter. When a grievant requests a union steward for grievance representation at a facility where there are no stewards, or the steward will not be available for more than a two-week period, the grievant may contact their Area National Union Representative and arrange for the Step 1 and/ or Step 2 meeting to be conducted telephonically. The Area National Union representative will contact the appropriate management official to coordinate the time, date, and logistics for the telephonic meeting.

**17.03(b). Request Information.** The steward may request and shall not be unreasonably denied files and other records necessary for processing a grievance wherein it is determined by the supervisor that the requested records are not restricted within the regulations of the Postal Service, subject to business conditions concerning the time, place and manner of review.

**17.03(c). Involuntary Transfer.** The Employer will, subject to operational needs, make every reasonable effort to insure that a PPO certified as a steward shall not be involuntarily transferred to another tour or another work facility.

**17.03(d). Pay for Grievance Processing.** The Employer will authorize payment to a steward for time reasonably necessary, during the steward's regular workday and with the permission of the steward's immediate supervisor, to review the documents, files, and other records necessary for processing a grievance or determining if a grievance exists and to write a grievance.

**17.03(e). Pay for Grievance Meetings.** The Employer will authorize payment for the aggrieved PPO and one Union steward, at the Step 1 level and for one Union representative or a designee for time actually spent in meetings with the Employer at Step 2 of the Grievance-Arbitration Procedure. Payment, when applicable, will be limited to straight time rate, providing the time spent is part of the individuals' regular workday. The Union representative meeting at the Step 3 national grievance meeting will be authorized payment at the straight time rate for time actually spent at the meeting, if the meeting is held on the Union representative's regular work day. In no circumstances shall the PPO or steward, Union representative or a designee be paid time and one-half pursuant to this provision. Schedule changes for PPOs or Union representatives to attend grievance meetings shall not be unreasonably denied.

**17.03(f). Inspection of Lockers.** The Employer agrees that, except in matters where there is reasonable cause to suspect criminal activity, the PPO (if available), or a Union representative (if available), or a PPO and a Union representative if requested by the PPO, shall be given an opportunity to be present at any inspection of the PPO's locker. For a general inspection where PPOs have had prior notification of at least a week, the above is not applicable.

### Section 17.04. Labor-Management Committee Meetings.

**17.04(a). National Labor-Management Meetings.** The Union shall be entitled to meet, at times mutually agreed to by the parties, with the designee of the Employer at the national level. The purpose of such meeting shall be to discuss with the Employer matters of mutual concern, provided that neither party shall attempt to change, add to, or vary the terms of this Agreement. The Employer will compensate one designated representative of the Union for time actually spent at the meeting at the applicable straight time rate, providing the time spent at such meeting is part of the PPO's regularly scheduled workday. Under no circumstances shall the PPO be paid time and one-half pursuant to this provision.

**17.04(b). Local Labor-Management Meetings.** The Union shall be entitled to meet quarterly at the local level with the Inspector-in-Charge or designee. The purpose of such meeting shall be to discuss with the Employer matters of mutual concern, provided neither party shall attempt to change, add to, or vary the terms of this Agreement. Payment to one designated representative of the Union, from each facility within a division, shall be made in accordance with Subsection 17.04(a) of this Article.

(See Memos, Pages **129** and **131**.)

### Section 17.05. Dues Checkoff.

In conformity with Section 2 of the Act, 39 U.S.C. 1205, without cost to the Union, the Employer shall deduct and remit to the Union the regular and periodic Union dues from the pay of PPOs who are members of the Union, provided that the Employer has received a written assignment which shall be

irrevocable for a period of not more than one year, from each PPO on whose account such deductions are to be made. The Employer agrees to remit to the Union all deductions to which it is entitled fourteen (14) days after the pay period for which such deductions are made. Deductions shall be in such amounts as are designated to the Employer in writing by the Union.

### Section 17.06. Authorization Form.

The authorization of such deductions shall be in the following form:

UNITED STATES POSTAL SERVICE

Date:_____

I hereby assign to **Postal Police Officers Association**, Alpha Code "C", from any salary or wages earned or to be earned by me as your employee (in my present or any future employment by you) such regular and periodic membership dues as the Union may certify as due and owing from me, as may be established from time to time by said Union. I authorize and direct you to deduct such amounts from my pay and to remit same to said Union at such times and in such manner as may be agreed upon between you and the Union at any time while this authorization is in effect.

This assignment, authorization and direction shall be irrevocable for a period of one (1) year from the date of delivery hereof to you, and I agree and direct that this assignment, authorization and direction shall be automatically renewed, and shall be irrevocable for successive periods of one (1) year, unless written notice is given by me to you and the Union not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one (1) year.

This assignment is freely made pursuant to the provisions of the Postal Reorganization Act and is not contingent upon the existence of any agreement between you and my Union.

_____

Signature of Employee                                                    Date
_____

Name of Employee                              Social Security Number

(Print last, first, middle)

_____

Home Address              (City and State)              (Zip Code)

(Street Address)

_____

Postal Installation                          Installation Finance Number

I Hereby certify that the regular dues of this organization for the above named member are currently established at $_____ per biweekly pay period (based on 26 biweekly pay periods).

_____

Signature and Title                                                      Date

of Authorized Union Official

_____

Date of Delivery to Employer

_____

Signature and Title of Employer Representative

Contributions of gifts (including dues) to the labor organization shown above are not tax deductible as charitable contributions. However, they may be tax deductible under other provisions of the Internal Revenue Code. (Form to be revised to conform to P.S. Machine requirements as on SF 1187)**.**

### Section 17.07. Union Participation in New PPO Orientation.

During the course of employment orientation for new PPOs at the facilities, a representative of the Union will be afforded no more than 30 minutes to address new PPOs, provided that this provision does not preclude the Employer from addressing PPOs concerning the same subject.

### Section 17.08. Polygraph Examinations.

Polygraph examinations will continue to be on a voluntary basis.

## ARTICLE 18
## NO STRIKE

### Section 18.01. Union Responsibility.

The Union, on behalf of its members, agrees that it will not call a strike or sanction a strike or slowdown. The Union and its locals will take reasonable action to avoid such activity and where such activity occurs, immediately inform striking PPOs they are in violation of this Agreement and order said PPOs back to work. It is agreed that the Union and its locals which comply with the requirements of this Article shall not be liable for the unauthorized action of their members or other postal employees.

### Section 18.02. Work Stoppage by Others.

Further, in recognition of the responsibilities of PPOs covered by this Agreement, PPOs will not refuse to perform their services due to the presence of or threat of any work stoppage or slowdown by any other employee of the U.S. Postal Service, its suppliers or contractors. Further, all PPOs will recognize their primary obligation to the Postal Service as the Employer and will carry out and perform all duties pertaining to the mission of the Security Force as directed by the Employer if there is any work stoppage or slowdown, either by employees of the U.S. Postal Service, its suppliers or contractors. All PPOs will perform their duties where there are picket lines for whatever purpose called or by whomever called, whether such picketing, including handbilling, is formal or informal.

## ARTICLE 19
## HANDBOOKS AND MANUALS

### Section 19.01. Intent.

Those parts of all handbooks, manuals and published regulations of the Postal Service that directly relate to wages, hours or working conditions, as they apply to PPOs covered by this Agreement, shall contain nothing that conflicts with this Agreement and shall be continued in effect except that the Employer shall have the right to make changes that are not inconsistent with this Agreement and that are fair, reasonable, and equitable.

### Section 19.02. Union Notification.

Notice of such proposed changes that directly relate to wages, hours or working conditions shall be furnished to the Union at the national level at least sixty (60) days prior to issuance. Such proposed changes will be furnished to the Union in hard copy and, if available, electronically. At the request of the Union, the parties shall meet concerning such changes. Such a meeting may include management representative(s) knowledgeable about the proposed change(s) and possible impact(s) on the PPOs. If the Union, after the meeting, believes the proposed changes violate this Agreement, it may then submit the issue to arbitration in accordance with the arbitration procedure within sixty (60) days after receipt of the notice of proposed change or changes.

### Section 19.03. Copies to Union.

Copies of those parts of all new handbooks, manuals and regulations that directly relate to wages, hours or working conditions, as they apply to PPOs covered by this Agreement, shall be furnished the Union, at the national level, upon issuance.

(See Memo, Page **132**.)

62

## ARTICLE 20
## PARKING

### Section 20.01. Existing Program.

The existing parking program will remain in effect.

## ARTICLE 21
## BENEFIT PLANS

### Section 21.01. Health Benefits.

The method for determining the Employer bi-weekly contributions to the cost of employee health insurance programs under the Federal Employees Health Benefits Program (FEHBP) will be as follows:

A.   The Office of Personnel Management shall calculate the subscription charges under the FEHBP that will be in effect the following January with respect to self only enrollments and self and family enrollments.

B.   **For career employees on the rolls prior to April 5, 2014, t**he bi-weekly Employer contribution for self only and self and family plans is adjusted to an amount equal to 8**0**% in 20**13 and 2014**, **77**% in 20**15**, **76**% in 20**16**, and **76**% in 20**17** of the weighted average bi-weekly premiums under the FEHBP as determined by the Office of Personnel Management. **For career employees hired on or subsequent to April 5, 2014, the bi-weekly Employer contribution for self only and self and family plans is adjusted to an amount equal to 77% in years 2013 through 2015,** and **76% in 2016 and 2017, of the weighted average bi-weekly premiums under the FEHBP as determined by the Office of Personnel Management.** The adjustment begins on the effective date determined by the Office of Personnel Management in January 20**13**, January 20**14**, January 20**15**, January 20**16**, and January 20**17**.

C.   The weight to be given to a particular subscription charge for each FEHB plan and option will be based on the number of enrollees in each such plan and option for whom contributions have been received from employers covered by the FEHBP as determined by the Office of Personnel Management.

D.   The amount necessary to pay the total charge for
enrollment after the Employer's contribution is deducted
shall be withheld from the pay of each enrolled
employee. To the extent permitted by law, the Employer
shall permit employees covered by this Agreement to
make their premium contributions to the cost of each
plan on a pre-tax basis, and shall extend eligibility to
such employees for the U.S. Postal Service's flexible
spending account plans for unreimbursed health care
expenses and work-related dependent child care and
elder care expenses as authorized under Section 125 of
the Internal Revenue Code.

E.   **For career employees on the rolls prior to April 5,
2014, t**he limitation upon the Employer's contribution
towards any individual employee shall be **83.**5% in 20**13
and 2014**, **80.2**5% in 20**15**, **79.25**% in 201**6 and 2017** of
the subscription charge under the FEHBP in 20**13**, 20**14**,
20**15**, 20**16**, and 20**17**. **For career employees hired on
or subsequent to April 5, 2014, the limitation shall be
80.25% for years 2013 through 2015,** and **79.25% for
2016 and 2017.**

#### Section 21.02. Life Insurance.

The Employer shall maintain the current life insurance program
in effect during the term of this Agreement.

#### Section 21.03. Retirement.

The provisions of Chapter 83 or 84 of Title 5 U.S. Code, and
any amendments thereto, shall continue to apply to employees
covered by this Agreement.

#### Section 21.04. Injury Compensation.

PPOs covered by this Agreement shall be covered by
Subchapter I of Chapter 81 of Title 5, and any amendments
thereto, relating to compensation for work injuries. The
Employer will promulgate appropriate regulations which

comply with applicable regulations of the Office of Workers' Compensation Programs and any amendments thereto.

### Section 21.05. Health Benefit Brochures.

When a new employee who is eligible for enrollment in the Federal Employee's Health Benefit Program enters the Postal Service, the employee shall be furnished a copy of the Health Benefit brochure of the Union signatory to this Agreement which represents the craft in which the employee is to be employed.

## ARTICLE 22
## BULLETIN BOARDS

### Section 22.01. Separate Bulletin Boards.

At each work site under control of the Employer where PPOs covered by this Agreement are employed, the Employer shall furnish a separate bulletin board for the exclusive use of the Union, if space is available. The Employer will determine the location of the bulletin board. The location of the bulletin board is a proper subject for discussion at local labor-management meetings. In addition, the Union may place their literature racks, which have been approved by the Employer at the national level, in swing rooms, if space is available.

(See Memo, Page **133** and Letter, Page **135**.)

### Section 22.02. Suitable Postings.

Only suitable notices and literature may be posted on the bulletin board. There shall be no posting of notices or literature on such bulletin board except upon authority of officially designated representatives of the Union.

## ARTICLE 23
### RIGHTS OF UNION OFFICIALS
### TO ENTER WORK FACILITIES

### Section 23.01. Notice to Employer.

Upon reasonable notice to the relevant Manager Postal Police
Division/Manager Postal Police Facility, duly authorized
representatives of the Union shall be permitted to enter postal
facilities and Security Force swing room/locker room areas for
the purpose of performing and engaging in official Union duties
and business related to the Collective Bargaining Agreement.
There shall be no interruption of the work of employees due to
such visits and representatives shall adhere to established
security regulations.

## ARTICLE 24
## EMPLOYEES ON LEAVE WITH REGARD TO
## UNION BUSINESS

### Section 24.01. Determination of Continuation of Benefits.

Any PPO on leave without pay to devote full-time or part-time service to the Union signatory to this Agreement shall be credited with step increases as if the PPO had been in a pay status. Retirement benefits will accrue on the basis of the PPO's step so attained, provided the PPO makes contributions to the retirement fund in accordance with current procedure. Annual and sick leave will be earned in accordance with existing procedures based on hours worked.

### Section 24.02. Leave for Union Conventions.

Full-time PPOs in the Security Force will be granted annual leave or leave without pay at the election of the PPO to attend a National Convention provided that a request for leave has been submitted by the PPO to the designated Inspection Service manager in charge of the Security Force at that work facility thirty (30) days in advance and provided that approval of such leave does not seriously adversely affect the service needs of the work facility. National level union officials/ representatives shall not be denied leave for Union Conventions.

### Section 24.03. Leave Prior to Choice Vacation Schedule.

If the request is submitted prior to the determination of the vacation schedule, it will be granted prior to making commitments for vacations and will be considered part of the total vacation plan for the work facility. Where the specific

delegates to the Convention have not been determined, upon the request of the Union, the Employer will make provision for leave for these delegates prior to making commitments for vacations.

### Section 24.04. Requests for Leave Without Pay.

A PPO may request leave without pay to devote full-time or part-time service to the Union signatory to this Agreement by submitting to the PPO's immediate supervisor a fully completed PS Form 3971, including the number of hours requested and the month, day and hour that the leave would start and end. Such requests shall be submitted a minimum of twenty-four (24) hours in advance of the start of the requested period of leave without pay. The Employer recognizes that in exceptional circumstances a Union official may make an oral request for the above-described leave less than twenty-four (24) hours in advance of the start of such leave. The Employer will make every reasonable effort to grant such exceptional requests.

## ARTICLE 25
## HIGHER LEVEL AND SPECIAL
## ASSIGNMENTS

### Section 25.01. Pay Administration.

When a bargaining unit PPO is assigned to a ranked higher level non-bargaining unit position, the PPO shall be paid at the higher level for time actually spent on such job. Under no circumstances will a PPO suffer loss of pay as a result of such higher level assignment.

### Section 25.02. Leave Pay.

Annual leave or sick leave for a PPO who has been assigned to a higher level position for a period of 30 consecutive workdays or longer at the time the leave is taken, and who resumes that assignment upon return to work, will be paid at the higher level rate.

### Section 25.03. Application for Assignment.

The Employer will solicit applications from PPOs at each work facility who are interested in serving in higher level assignments. The Employer shall select the applicants deemed qualified and establish a list of such PPOs at each work facility. The number of PPOs selected at each work facility will be determined by the Employer based on the anticipated need to assign PPOs to higher level positions. The Employer will make a reasonable effort to make higher level assignments on an equitable basis.  The Employer will not require bargaining unit PPOs to cover higher level supervisory assignments involuntarily except as provided in Article 25.04 below.

### Section 25.04. Other Employer Assignments.

When it is necessary, the Employer may assign a bargaining unit PPO to a ranked higher level non-bargaining position, notwithstanding the above procedure. The Employer will not require bargaining unit PPOs to cover higher-level supervisory vacancies involuntarily absent exigent circumstances. Such circumstances will be explained to the local Union representative in the event the Employer determines there is a need to require a bargaining unit PPO to cover a higher level supervisory assignment involuntarily.

### Section 25.05. Special Assignments.

When the Employer identifies the need for the establishment of an assignment which requires certain special skills, qualifications or training, the following principles will be used:

a.   Announcement of such special assignment shall be posted in accordance with the requirements of Article 32.08(a).

b.   Selection will be made on the basis of the best qualified applicant. Where there is no appreciable difference in the qualifications of the best qualified applicants and the Employer selects from among such applicants, seniority shall be the determining factor.

c.   There may be on-the-clock training for the senior qualified PPO when there are no otherwise qualified PPO currently possessing these skills.

d.   The Union, at the local level, shall be advised of the special assignment and its recommendations concerning the special qualifications will be considered prior to the announcement of the special assignment.

### Section 25.06. Temporary Assignments to Higher Level Positions Outside the Bargaining Unit.

Temporary assignments to higher level positions outside the bargaining unit shall be in accord with the applicable provisions of *Employee and Labor Relations Manual,* Chapter 4, Pay Administration.

## ARTICLE 26
## UNIFORMS

### Section 26.01. Uniform Allowance.

**26.01(a). New Eligible PPOs.** Effective **April 5, 2014**, a new eligible PPO entering the Uniform Program will receive a credit to the PPO's allowance in the amount of $**747**.

**26.01(b). All Other PPOs.** Effective **April 5, 2014,** the annual allowance for all other eligible PPOs shall be in the amount of $3**96** per annum.

### Section 26.02. Uniform Program.

The administration of the uniform program will be continued. The Union may make recommendations concerning uniforms only at regularly scheduled national level labor-management meetings. The Employer will take such recommendations into consideration when making changes to the uniforms.

### Section 26.03. Postal Police Retired Credentials.

Upon the retirement of a PPO with a minimum of five years in the PPO craft, in recognition of service provided to the Postal Service, the PPO shall be provided with the identification portion of his/her credentials with the word "RETIRED" perforated or otherwise marked on the identification portion of the credentials.

## ARTICLE 27
## EMPLOYEE CLAIMS

### Section 27.01. Procedure.

Subject to a ten dollar ($10) deduction, a PPO may file a claim within fourteen (14) days of the date of loss or damage or the discovery of the loss or damage and be reimbursed for loss or damage to the PPO's personal property, except for motor vehicles and the contents thereof, taking into consideration depreciation where the loss or damage was suffered in connection with or incident to the PPO's employment while on duty or on postal premises. The possession of the lost or damaged property must be reasonable or proper under the circumstances, and damage or loss was not caused by a negligent or wrongful act of the PPO. Loss or damage will not be compensated because of normal wear or tear associated with day-to-day working conditions. Claims for damage to a privately owned motor vehicle caused by an act of the Postal Service may be filed in accordance with the procedures of the Federal Tort Claims Act, as set forth in Part 250 of the *Administrative Support Manual* (ASM).

### Section 27.02. Submitting Claims.

Claims (other than those filed by a PPO under the Federal Tort Claims Act) should be documented and submitted by the Union steward to the Employer at the local level. The Employer will submit the claim, with the Employer's and the steward's recommendations, to the designated office for determination. An adverse determination may be appealed through the Grievance-Arbitration Procedure.

# ARTICLE 28
## MONEY CLAIMS BY THE EMPLOYER

### Section 28.01. Intent.

The parties agree that continued public confidence in the Postal Service requires the proper care and protection of Postal Service property, funds, and the mails. Within fourteen (14) days of the date of any loss or damage or the discovery of any loss or damage to Postal Service property, funds or the mails, the PPO will be informed in writing of the Employer's intent to determine if the PPO will be held financially liable for any loss or damage. When such a determination is made, the PPO will be informed in writing and the demand must include the reasons therefor.

### Section 28.02. Damage to USPS Property.

A PPO shall be financially liable for any loss or damage to property of the Employer including leased property and vehicles when the loss or damage was the result of the gross negligence of such PPO.

### Section 28.03. Collection Procedures.

Any amount due the Employer may be collected through payroll deductions not to exceed 15% of the PPO's bi-weekly disposable pay unless the Employer and the PPO agree to another method of payment.

## ARTICLE 29
## LIMITATION ON REVOCATION OF DRIVING PRIVILEGES

### Section 29.01. Revocation or Suspension of Driving Privileges.

A PPO's driving privileges may be revoked or suspended when the on-duty record shows that the PPO is an unsafe driver.

### Section 29.02. On Duty Record.

Elements of a PPO's on-duty record which may be used to determine whether the PPO is an unsafe driver include, but are not limited to, traffic law violations, accidents or failure to meet required physical or operational standards.

### Section 29.03. Factors to be Considered.

When revocation or suspension of a PPO's driving privileges is under consideration, based on the PPO's on-duty period, the PPO's off-duty driving record may be considered in making a final determination. A PPO's driving privileges will be automatically revoked or suspended concurrently with any revocation or suspension of the state driver's license and restored upon reinstatement. Reasonable effort will be made to reassign such PPO to non-driving duties in positions covered by this Agreement. In the event such revocation or suspension of the state driver's license is with the condition that the PPO may operate a vehicle for employment purposes, the PPO's driving privileges will not be automatically revoked.

77

### Section 29.04. PPO's Responsibility.

A PPO must inform the PPO's supervisor immediately of the revocation or suspension of the state driver's license.

## ARTICLE 30
## REIMBURSEMENT FOR AUTHORIZED
## TRANSPORTATION

### Section 30.01. Travel, Subsistence and Transportation.

The Employer shall continue the applicable current travel and subsistence program. PPOs will be paid a mileage allowance at the rate provided by the USPS Methods Handbook F-15, **Travel and Relocation,** for use of privately owned automobiles for travel on official business when authorized by the Employer.

### Section 30.02. Travel Between Work Sites.

Provided such travel between work facilities or between work sites within a work facility has been duly authorized by the Employer, a PPO will be entitled to necessary travel time on-the-clock on a no gain, no loss basis, and to reimbursement for transportation expenses in accordance with the Handbook F-15, **Travel and Relocation,** if transportation is not provided by the Employer, when:

**30.02(a).** The PPO is regularly scheduled to work at more than one work facility or work site within a work facility during a single tour of duty without a break in duty status, except for normal lunch periods, or,

**30.02(b).** The PPO reports to a work site as scheduled and is directed to report to another work facility or work site within a work facility during a single tour of duty. If transportation is not provided by the Employer, such PPO is only entitled to reimbursement for transportation expenses in accordance with the Handbook F-15, **Travel and Relocation,** to return to the PPO's original reporting work facility or work site within a work facility at the completion of the tour, or to the PPO's residence, whichever is

less. This provision is not applicable if the PPO is regularly
scheduled to the different work facility or work site within a
work facility.

## ARTICLE 31
## UNION-MANAGEMENT COOPERATION

### Section 31.01. Membership Solicitation.

The Union, through PPOs employed by the Employer at a work facility, may solicit PPOs for membership in the Union and receive Union dues from PPOs in non-work areas of that facility, provided such activity is carried out in a manner which does not interfere with the performance of assigned duties and responsibilities.

### Section 31.02. Information Provided by the Employer.

The Employer shall furnish the Union at the national level, on an accounting period basis, the information set forth in the Memorandum of Understanding containing information regarding Article 31.

(See Memo, Page **140**.)

### Section 31.03. Union Information Requests.

Requests for information relating to purely local matters should be submitted by the local Union representative or the Area National Representative to the designated manager at the local facility. All other requests for information shall be directed by the National President of the Union or designated member(s) of the Union's Executive Board to the Vice President of Labor Relations or designee.

The Employer will make available for inspection by the Union all relevant information necessary for collective bargaining or the enforcement, administration or interpretation of this Agreement, including information necessary to determine whether to file or to continue the processing of a grievance

under this Agreement. Upon the request of the Union, the Employer will furnish such information, provided, however, that the Employer may require the Union to reimburse the USPS for any costs reasonably incurred in obtaining the information. The Union's step 3 representative may make information requests, dealing with a pending grievance, in writing, to the appropriate local management officials where the information is necessary to determine whether to continue to process the pending grievance.

(See Memo, Page **142**.)

## ARTICLE 32
## SCHEDULES (TOURS AND DAYS OFF)

### Section 32.01. The Nature and Scope of Security Coverage Required.

The complement and number of assignments by tour and work facility, and the schedules needed will be determined by the Employer. In order to fulfill the primary mission of providing security for the mail, postal employees, customers, and postal facilities, the parties recognize the need of the Employer to retain mobility of personnel.

### Section 32.02. Temporary Assignments.

As operational needs require, a PPO may be temporarily assigned to another schedule or work facility. Such temporary assignments should be kept to a minimum consistent with operational needs. In no event should an individual PPO's temporary assignment be continued for more than ninety (90) calendar days. Where the Employer determines a choice of preferred schedules is available, the Employer will assign the least senior PPO(s) within this group of preferred schedules to the temporary assignment. The Employer may also consider volunteer(s) for temporary assignments.

### Section 32.03. Reassignment of Existing Preferred Schedules.

Should operational needs require permanent assignment to another individual preferred schedule (IPS), such assignment shall be of the least senior PPO having the affected IPS. If the PPO with the affected IPS is senior to another PPO on the affected tour, the affected PPO shall have the right to assume the least senior PPO's IPS. If the senior PPO elects to assume

83

the least senior PPO's IPS, the least senior PPO on the affected tour will assume the permanent assignment (replacement IPS) to the other schedule.

Reassignments as provided in this Section to a replacement IPS will not require posting of the schedules.

The views of the Union will be considered prior to the reversion of an encumbered IPS.

### Section 32.04. Assignment of Least Senior PPO.

Should operational needs require assignment to another work facility, such assignment shall be of the least senior PPO in the affected work facility.

### Section 32.05. Individual Preferred Schedule.

Full-time PPOs permanently assigned to a work facility may bid for an individual preferred schedule (IPS) at that work facility. An IPS shall be defined as a particular tour within a particular work facility with regularly scheduled days off or a regularly recurring cycle of days off which is preferred by a PPO eligible to bid.

### Section 32.06. Posting or Reverting Vacant and New Individual Preferred Schedules.

**32.06(a). Vacant Individual Preferred Schedule.** When a vacancy occurs on an existing individual preferred schedule (IPS), the vacant IPS shall be posted at that work facility, unless it is reverted. The decision as to whether to revert should be made as soon as possible, but not later than twenty-eight (28) days after the vacancy occurs. The local Union representative may provide input before a decision

is made.  If the vacant IPS is reverted, the Union shall be so informed.

**32.06(b). New Individual Preferred Schedule.** When a new individual preferred schedule (IPS) is created, the IPS shall be posted.

**32.06(c). Exception.** The provisions of this Section are not applicable to reassignments under provisions of Section 32.03 above.

### Section 32.07. Posting and Selection.

A notice stating the individual preferred schedule (IPS) and soliciting bids for such IPS shall be posted for seven (7) days. The senior qualified PPO bidding for the IPS shall be designated the successful bidder within five (5) days after the close of bids, and the PPO will normally assume the new IPS no later than the start of the second pay period after it was awarded. Normally, the successful bidder shall work the IPS as posted. A PPO may be designated as the successful bidder no more than five (5) times during the duration of this Agreement, except this number will not include successful bids when a PPO's IPS is reverted. A PPO not having an IPS will be assigned a schedule by the Employer.

### Section 32.08. Bidding Procedures.

**32.08(a). Information on Notices.** A notice soliciting bids for an individual preferred schedule will contain the following information:

1.  The work facility.
2.  Tour.
3.  Hours of duty.
4.  Fixed days off.
5.  Closing date for acceptance of bids.

**32.08(b). Standard Bid Form.** The Employer shall provide a standard form to be used by bidders (**PS Form** 1717 or equivalent). Posted notices shall inform bidders of convenient locations from which to obtain bid forms.

**32.08(c). Worksite Information.** The worksite for the preferred schedule, as of the date of posting, will be added by the Employer for informational purposes only.

## ARTICLE 33
## REASSIGNMENTS

### Section 33.01. Principles of Reassignments.

A primary principle in effecting reassignments will be that dislocation and inconvenience to PPOs in the work force shall be kept to a minimum consistent with the needs of the Employer. Reassignments will be made in accordance with this Article. The Union, at the national level, will be given advance notice at least ninety (90) days prior to the closing of any Security Force facility or worksite (as currently defined by the Employer). The views of the Union shall be given consideration prior to the final decision to close any Security Force worksite or facility.

(See Page **143**.)

### Section 33.02. Excessing and Relocation.

Where excess PPO(s) are determined to exist at a work facility, the Employer shall offer to all PPO(s) assigned to that work facility the opportunity to voluntarily transfer to vacant positions in such other work facility(s) within the Area, or elsewhere within the bargaining unit if necessary, as the Employer designates, if any such vacant positions exist. After exhausting such voluntary reassignments, should excess PPO(s) still exist, permanent reassignment to another work facility(s) where vacant positions exist, shall be by the senior excess PPO(s) in the affected work facility in order to offer excess PPO an opportunity for continued employment. The Employer will pay the expenses of relocation in accordance with the **Handbook F-12,** and the PPO will be reassigned at present grade level and without loss of seniority.

### Section 33.03. Reassignment of Least Senior PPO.

Should operational needs require permanent reassignment to another work facility, such reassignment shall be of the least senior PPO in the affected work facility. The Employer will pay the expenses of relocation in accordance with the **Handbook F-12,** and the PPO will be reassigned at present grade level and without loss of seniority.

### Section 33.04. Voluntary Reassignment.

**33.04(a). Transfer Request.**  Any PPO may request voluntary reassignment to any work facility within the bargaining unit where vacant positions exist. If the requesting PPO has a satisfactory work record (including work performance, attendance and safety record) and meets the qualifications for the position such requests shall be granted before the consideration of new hires subject to operational needs at both facilities. When vacant positions exist within an Area which are not designated for excess PPO(s) nor scheduled for reversion, the Employer may post such vacant positions for a fifteen (15) day period throughout the bargaining unit for eligible PPO(s) to apply for such vacant positions. If selection among PPOs requesting voluntary reassignment is necessary, seniority will be used. Voluntary transfers will be at the PPO's own expense.

**33.04(b). Mutual Exchange Request.**  PPOs from different Security Force facilities may request mutual exchanges.  A PPO who wishes a mutual exchange is responsible to find another PPO interested in exchanging facilities.  Mutual exchanges will be at the PPOs' own expense.  Both PPOs will retain their respective bargaining unit seniority dates.  Work record and qualification requirements applicable to transfer requests apply to mutual exchange requests.

Mutual exchange requests meeting these requirements will not be unreasonably denied.  The requesting PPOs and their respective Managers, Postal Police will determine mutually the PPOs' reporting date at their new facilities.  A mutual exchange shall not be considered the filling of a vacancy.

## Section 33.05. Request for Return Reassignment.

**33.05(a). Retreat.**  A PPO excessed from a work facility may submit a request for voluntary reassignment back to that work facility. Such request shall receive first consideration, for two years from the date of the reassignment prior to filling of any future vacancies at that work facility.

**33.05(b) Recall.**  Subject to the provisions of the preceding subsection (a) and to the provisions of this Agreement governing seniority, schedules, and bidding, any PPO who has left the bargaining unit because of excessing from a security force work facility during the life of this Agreement shall be placed on a recall list for their former security force work facility and shall be entitled to remain on such list for two years after leaving the bargaining unit.  Such employees shall keep the Employer informed of their current address.  Employees on the list shall be notified in order of their former PPO seniority of any vacant assignments in their former security force work facility.  A preference-eligible will be accorded no recall rights greater than non-preference-eligible employees except as required by law.  Notice of vacant assignments shall be given by certified mail, return receipt requested, and a copy of such notice shall be furnished to the Union's National President.  An employee so notified must acknowledge receipt of the notice and advise the Employer

of his or her intentions within five business days after receipt of the notice.  If the employee accepts the position offered, he or she must report for work within 28 days after receipt of notice. If the employee fails to reply to the notice within five business days after the notice is received or delivery cannot be accomplished, the Employer shall offer the vacancy to the next employee on the list.  If an employee declines the offer of a vacant assignment or does not have a satisfactory reason for failure to reply to a notice, the employee shall be removed from the recall list.

**33.05(c). Priority.**  The provisions of this section shall be applied prior to the consideration of requests for voluntary reassignment.

### Section 33.06. Reassignments in Certain Work Facilities.

For the purpose of reassigning PPOs excess to the needs of a work facility, all work facilities in the New York Division will be treated as a single "Work Facility."

### Section 33.07. Failure to Qualify with a Firearm.

**33.07(a).** PPOs are required to qualify with authorized weapons as specified in the **Handbook IS-135,** *Threat Management.* The authorized carriage of the firearm while on duty is an essential element of the position and failure to qualify will result in disqualification from employment as a PPO. The Employer recognizes the need to assist qualified PPOs who fail to qualify by offering the PPO the opportunity for continued employment in the Postal Service.

**33.07(b).** The Employer will place qualified PPOs into positions within the Postal Service, within the commuting area of the PPOs, assigned facility, provided (1) the PPO has not been suspended from duty for attendance or disciplinary reasons within the two year period preceding the disqualification date, and (2) the PPO is qualified for the postal position offered to the PPO at the postal facility.

**33.07(c).** Reassignment to a position in another bargaining unit shall be consistent with appropriate postal regulations and under the terms and conditions of the current collective bargaining agreement governing the offered position.

### Section 33.08. Employment Protection.

**33.08(a). Coverage.** No full-time PPO employed in the bargaining unit prior to April 9, 1999, will be involuntarily removed from employment within the Postal Service because of a reduction of security service during the life of this Agreement.

**33.08(b). Procedure.** Pursuant to Subsection 33.08(a), the Employer may reassign a PPO employed in the bargaining unit prior to April 9, 1999, within the bargaining unit, or if no appropriate vacancies exist within the bargaining unit, such PPO(s) will be assigned to positions within the Postal Service, for which the PPO is qualified. Reassignments within the bargaining unit will be in accordance with Sections 33.02 and 33.03 of this Article. Reassignments to other positions within the Postal Service, for which the PPO is qualified, will be made in the inverse order of bargaining unit seniority, subject to the applicable Veterans' Preference regulations, and consistent with appropriate postal regulations and the terms and conditions of the current collective bargaining agreements governing those positions. The salary rate protection program will apply to these PPOs.

(See Memo, Page **147**.)

## ARTICLE 34
## TRAINING

### Section 34.01. Training.

The Employer and the Union recognize the benefits derived from in-service refresher training courses for PPOs and the Employer will endeavor to provide such training, as appropriate, with due consideration for operational requirements. The Union shall have the right to submit its views and opinions regarding the types of training programs at labor-management meetings.

# ARTICLE 35
# EMPLOYEE ASSISTANCE PROGRAM

## Section 35.01. Employee Assistance Program (EAP).

Program of Self-Help. The Employer and the Union express strong support for the program of self-help. The Employer shall provide and maintain a program which shall encompass the education, identification, referral, guidance and follow-up of those PPOs afflicted by the disease of alcoholism and/or drug abuse. When a PPO is referred to EAP by the Employer, the EAP counselor will have a reasonable period of time to evaluate the PPO's progress in the program. Consistent with the provisions of the ELM, Section 870, communications between a PPO and an EAP counselor shall be confidential.

## Section 35.02. PPO's Participation.

A PPO's participation in such program will be considered favorably in disciplinary action proceedings, if the disciplinary action occurred after the date when the PPO began voluntary participation in the program. The EAP counselor must also certify that the PPO has been cooperating and following the agreed upon program of self-help.

## Section 35.03. National Labor-Management Committee.

The existing EAP program and new programs may be the subject of discussion at the national labor-management meetings.

## ARTICLE 36
## SEPARABILITY

### Section 36.01. Separability.

Should any part of this Agreement or any provisions contained herein be rendered or declared invalid by reason of any existing or subsequently enacted legislation or by a court of competent jurisdiction, such invalidation of such part or provision of this Agreement shall not invalidate the remaining portions of this Agreement, and they shall remain in full force and effect.

### Section 36.02. Savings.

By entering into this Agreement the Employer does not in any way accept any concept or express any view regarding internal Union procedures which are not properly determined by collective bargaining and are matters properly regulated by methods outside of that process.

## ARTICLE 37
## DURATION

### Section 37.01. Effective Date and Duration.

The Agreement, effective **April 5, 2014**, unless otherwise provided in the **April 1, 2014** interest arbitration award referenced in the Preamble to this Agreement, shall remain in full force and effect to and including 0000 hours (midnight), **April 14, 2017**, and unless either party desires to terminate or modify this Agreement, for successive annual periods. The party demanding termination or modification of this Agreement must serve written notice of such intent to the other party not less than ninety (90) nor more than one hundred twenty (120) days before the expiration date of this Agreement.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND**
**POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Committee for the Transformation of the Postal Security Force**

**It is critical for both parties to resolve a fundamental disagreement over the status and duties of the existing PPO force, all members of which serve in one job description and a single pay grade. The Inspection Service claims that the PPO's principal responsibility is building security so that private sector pay comparability should be based on security guard status. The PPOA takes the position that PPOs conduct police duties similar to those of their federal uniformed counterparts, many of whom are considered Police (0083 Series) as defined in the OPM Grade Evaluation Guide, and thus argues for pay comparability to federal police personnel. There are elements of truth in both positions.**

**Over time, three distinct roles within the postal security spectrum have emerged: strictly fixed post building security work limited to a particular facility (duties previously performed by PPOs and now largely performed by unarmed contract security guards), traditional PPO duties that include emergency responses and fixed, mobile, and foot posts at urban, airport, and other high-value Postal Service locations, and finally, more mobility, emergency response, community policing, and carrier patrol functions in higher-crime areas. The parties have expressed a fundamental disagreement over where PPOs fall on this spectrum.**

The current PPO force performs a mixture of both building security and police duties, with some PPOs devoted predominantly to building security and others to broader street patrol and carrier protection. The PPOA has asserted that, more frequently, Postal Police are expected to perform the latter category of duties, without commensurate compensation or federal police status. The Panel believes that the underlying dispute between the parties cannot be resolved without the parties engaging in a frank and honest dialogue as to the kind of security force the Inspection Service needs going forward. This will necessitate a delineation and forecast of duties that are and will be needed, particularly as the Postal Service enters ever more deeply into the parcel and package delivery business.

Simultaneously, the Postal Inspection Service has experienced pressure to explore consolidation of the Inspection Service with the Office of the Inspector General and the contracting out of the entire postal police function, given its cost. The two-tier wage structure endorsed by the Board of Interest Arbitration is a suggested or possible first step in eventually reducing unit labor costs in the overall PPO unit. However, it is largely meaningless so long as PPOs are hired internally.

It is in the best interest of both parties to resolve these issues as they work toward a cost-effective Postal Police force that best meets the varied security needs of the Postal Service. To that end, the parties have agreed to jointly create a Committee to explore these issues, in accordance with these terms:

1. The USPIS and the PPOA will each appoint up to four members within 30 days of the date of the Opinion and Award to which this Memorandum of Understanding is attached.

97

2.   The Committee will issue recommendations on the below-listed issues to the parties within six (6) months of the date of the Opinion and Award. The parties may extend this deadline by mutual agreement.

3.   The Committee will consider and make recommendations on the following issues (and any other relevant considerations that may arise):

   a.   The creation of a new position and grade within the PPOA bargaining unit to encompass more expanded duties;

   b.   The exploration of ways to expand duties within the existing grade;

   c.   If the Committee finds a new position and grade appropriate or finds it appropriate to reevaluate or expand duties within the existing grade and position:

      (1)   The duties, work rules, and responsibilities of the new position, and/ or any expanded duties and applicable work rules for the existing position;

      (2)   Job qualifications;

      (3)   Training; and

      (4)   Compensation.

   d.   The appropriateness of internal versus external hiring for the current Grade 6 PPO position in light of the two-tier wage structure awarded by the Board of Interest Arbitration.

4.   If the Committee is unable to agree on recommendations or agree to extend the six-month deadline, the parties will enlist the services of the Chairman of the Board of Interest Arbitration, James Oldham, for mediation. As the Panel noted in its decision, in the end, it cannot dictate to the

**Inspection Service the kind of security force it needs or wants going forward nor can it dictate to the union a division of the bargaining unit. Ultimately, the decision rests with the parties and the formation of this Committee is simply to foster a thorough discussion of the issues for purposes of making a recommendation to the Inspection Service.**

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: Exercise of Authority**

It is hereby agreed between the United States Postal Service and the **Postal Police Officers Association** that applicable references to "employee" or "employees" shall be "Postal Police Officers" (hereinafter referred to as "PPO(s)").

It is also agreed that in order to provide an additional safety factor for the PPOs, the Postal Service will continue to provide new decals for the Security Force vehicle doors and offices, which will be changed to indicate "Postal Police," rather than "Security Force."

In addition, the parties to this Agreement mutually agree that none of the changes to the language of this Agreement, including the changes from "employee(s)" to "PPO(s)" and the change in the vehicle and office decal from "Security Force" to "Postal Police," shall be construed as a modification or increase or decrease in the PPOs' authority as conferred by statute and regulations.

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: Schedule Changes**

The parties agree that for the life of this Agreement, notwithstanding Article 8.02(c), the Employer will retain the existing consecutive work hours for the permanent schedule of full-time PPOs (for example, 8 within 8-1/2 hours), unless the Employer, at the local level, provides the local Union with operational justification for any proposed change (except in emergency circumstances). Such justification shall be in writing and shall be provided at least 45 days prior to the start of the proposed change, and a copy of the notice and justification shall be provided simultaneously to the representative of the Inspection Service at the national level, who will forward a copy to the National Union President.

After receiving the Employer's operational justification, the Union may then request a labor-management meeting at the divisional level to discuss the impact of the proposed schedule change on the PPOs. The parties will meet within 15 days of the date of the notice. If the Union, after the divisional level labor-management meeting, still believes that the proposed schedule change is not for justifiable operational needs it may request that the proposed schedule change be discussed at the national level labor-management meeting.

This Memorandum of Understanding expires at 12 midnight on April 1**4,** 20**17**.

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: Alternative Work Schedules**

The USPS and the **Postal Police Officers Association** agree to **continue to** explore the implementation of a pilot program utilizing an alternative work schedule (AWS).

The implementation of an alternative work schedule is contingent upon the **PPOA** first establishing the feasibility of operating an alternative schedule at the chosen facility in an acceptable manner to the Employer. Specifically the Union must demonstrate that the alternate work schedule will not cause the USPS to incur any additional costs with respect to PPO salaries, salary premiums (i.e., night differential and/or Sunday premium pay) and overtime. Incursion of minimal costs by the USPS will not be the basis for a determination that AWS is not feasible. The USPS claim that the costs are more than minimal is not grievable. It will ensure the existing posts and normal level of coverage are maintained at that facility.

**Union representatives at all work sites may submit alternative schedules to a joint committee, consisting of member(s) from the Union and the Employer, at the National level, for consideration. Implementation or discontinuance of an AWS is at the sole discretion of the employer and is not a grievable action.** The alternate schedule, if implemented at a work site, would remain in existence for a period of six months, at which time the employer will assess the feasibility of continuing its existence. The Employer will discontinue the pilot at an earlier time if requested to do so by the Union or if it is determined its personnel costs are increasing. The discontinuance of the

102

alternative schedule would not be a grievable action.

The Employer will provide the **U**nion with the staffing and related salary information to assist the Union in preparing its proposal as outlined above. **All expenses incurred by the bargaining unit in development of alternative schedules and in meeting(s) with the Employer will be the responsibility of the Union.**

At the selected site where the pilot program is implemented, the Union will waive any **postal** overtime premium or out of schedule pay a PPO would otherwise be entitled to pursuant to the terms of the Agreement but for the implementation of the alternate schedule. Each PPO at the selected pilot site must participate in the program.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND
POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Overtime Assignments**

Overtime shall be scheduled as needed by the Employer based on operational need. Where the operational needs require special qualifications, the Employer reserves the right to select and assign those individuals with the required knowledge, skills and abilities, notwithstanding the procedures set forth below. Special qualifications include an officer needing time to finish an assignment.

Overtime Desired List. PPOs will have an opportunity to indicate their desire to work overtime on a quarterly basis. Overtime desired lists will be established by tours. Management in each work facility will make the overtime-desired list (ODL) available for PPOs who wish to sign the list and indicate their desire to work overtime during the next quarter. This sign-up opportunity will be available during a two-week period immediately preceding the start of each calendar quarter. PPOs will provide a current telephone number on each quarterly list. New PPOs may sign-up on the ODL when they report for duty at their work facility after completion of basic PPO training.

PPOs may remove their name from the ODL by submitting written notification to their supervisor. Removal from the ODL will be effective the day after the supervisor receives such notification, provided a notice does not relieve an officer from previously assigned overtime.

PPOs who sign-up on the ODL during the two-week opportunity may also indicate their desire to be telephoned if an opportunity to work rest day (non-scheduled day) overtime occurs while the PPO is on annual leave. If the PPO is not reached or chooses not to work this rest day overtime, he/she will be bypassed and will not be assigned overtime.

Overtime opportunities will be distributed to available PPOs as follows:

If a need for overtime is for four hours or more see subsection A. If a need for overtime is for less than four hours, see subsection B.

a.   When a need for overtime is for four hours or more, ODL PPOs from the affected tour will be assigned overtime on a rotating basis from most to least senior. In those situations where overtime needs are not satisfied by available PPOs on the affected tour, overtime will then be assigned to available ODL PPOs from other than the affected tour on a rotating basis from most to least senior. If the ODL does not meet the overtime need, qualified PPOs not on the list may be required to work overtime on a rotating basis with the first opportunity assigned to the junior PPO; or at the option of management, the overtime may be offered to non-ODL PPOs on a rotating basis from most to least senior. Such overtime will first be offered/assigned to the affected tour non-ODL PPOs prior to being offered/ assigned to other than affected tours.

b.   If a need for overtime is less than four hours in duration, ODL PPOs from other tours will be assigned overtime on a rotating basis from most to least senior. If the ODL does not meet the overtime need, qualified PPOs not on

> the list may be required to work overtime on a rotating
> basis with the first opportunity assigned to the junior
> PPO; or at the option of management, the overtime may
> be offered to non-ODL PPOs on a rotating basis from
> most to least senior. Such overtime will be offered/
> assigned to other than affected tours.

The rotations described in these subsections, as to both ODL
and non-ODL PPOs, reset each quarter.

If an ODL PPO is not available to work the overtime
opportunity, this shall be recorded as an opportunity to work
and the next available PPO on the ODL will be assigned the
overtime opportunity.

For purposes of this memorandum, "available" means that the
PPO is able to be contacted by the supervisor immediately
either at work or by telephone. Except as otherwise provided
by this memorandum, PPOs who are on annual leave, sick
leave, leave without pay, on a non-bargaining unit assignment,
in a non-pay status, or that the PPO Supervisor is unable to
immediately contact by telephone will be considered not
available for overtime opportunities.

For purposes of this memorandum, "affected tour" means the
operational duty tour within which hours the overtime will be
worked.

If a PPO and/or the Union demonstrate at any step of the
grievance procedure that overtime was not distributed to the
grievant in a manner pursuant to the procedures contained in
Article 8.05 and this Memorandum, the grievant shall be
assigned an equal overtime opportunity within 60 days after an
appropriate decision in the grievance process. Such an
assignment shall not constitute a further violation. If the

overtime opportunity is not assigned within 60 days, that PPO shall be paid for the number of hours missed at the overtime rate.

The parties to this Memorandum of Understanding agree that the above procedures shall be implemented as a pilot program during the life of this Agreement as an attempt to simplify the procedures for the assignment of overtime opportunities.

This Memorandum of Understanding expires at 12 midnight on April 1**4**, 20**17.**

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND**
**POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Leave Carryover**

Regular work force PPOs covered by this Agreement may continue to carry over 440 hours of accumulated annual leave from one leave year to the next leave year.

PPOs who fall under the provisions of Public Law 83-102 and who have maintained a carryover of more than 440 hours cannot increase their present ceiling.

The parties agree that pursuant to ELM 512.**321** a PPO covered by the USPS-**PPOA** Agreement is not paid for annual leave in excess of 55 days. In all other respects, the ELM provisions for payment of accumulated leave are not changed because of this Memorandum.

This Memorandum of Understanding expires at 12 midnight on April 1**4**, 20**17**.

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: Leave Sharing**

The Postal Service will establish a Leave Sharing Program under which career postal employees will be able to donate annual leave from their earned annual leave account to another career postal employee. Single donations must be of 8 or more whole hours and may not exceed half of the amount of annual leave earned each year, based on the leave earnings category of the donor at the time of donation. Sick leave, unearned annual leave, and annual leave hours subject to forfeiture (leave in excess of the maximum carryover which the PPO would not be permitted to use before the end of the leave year) may not be donated, and PPOs may not donate leave to their immediate supervisors.

To be eligible to receive donated leave, a career employee (a) must be incapacitated for available postal duties due to serious personal health conditions and (b) must be known or expected to miss at least 80 more hours from work than the career employee's own annual leave and/or sick leave balance(s), as applicable, will cover, and (c) must have the PPO's absence approved pursuant to standard attendance policies.

For purposes other than pay and legally required payroll deductions, employees using donated leave will be subject to regulations applicable to employees in LWOP status and will not earn any type of leave while using donated leave.

Donated leave may be carried over from one leave year to the next without limitation.

Donated leave not actually used remains in the recipient's account (i.e., is not restored to donors). Such residual donated leave at any time may be applied against negative leave balances caused by a medical exigency. At separation, any remaining donated leave balance will be paid in a lump sum.

This Memorandum of Understanding expires at 12 midnight on April 14, 2017.

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: Annual Leave Exchange Option**

The parties agree that **PPOA** career employees will be allowed to sell back a maximum of forty (40) hours of annual leave prior to the beginning of the leave year provided the following two (2) criteria are met:

The employee must be at the maximum leave carry-over ceiling at the start of the leave year, and

The employee must have used fewer than 75 sick leave hours in the leave year immediately preceding the year for which the leave is being exchanged.

This Memorandum of Understanding expires on the expiration date of the 20**12** Agreement.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND**
**POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Sick Leave for Dependent Care**

The parties agree that, during the term of the **2012** Agreement, sick leave may be used by an employee to give care or otherwise attend to a family member having an illness, injury or other condition which, if an employee had such condition, would justify the use of sick leave by that employee. Family members shall include son or daughter, parent and spouse as defined in ELM Section 515.2. Up to eighty (80) hours of sick leave may be used for dependent care in any leave year. Approval of sick leave for dependent care will be subject to normal procedures for leave approval.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND
POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Rules for National Days of Observance**

The parties agree that the following procedures will apply to affected bargaining unit postal police officers (PPOs) if the Postmaster General or designee determines that the Postal Service will participate in a National Day of Observance (e.g., a National Day of Mourning) subsequent to the declaration of a National Day of Observance by Executive Order of the President of the United States.

1.   Full-time PPOs whose basic work week includes the National Day of Observance as a scheduled work day, but who are not directed to report for work, will be granted administrative leave for that day.

2.   Full-time PPOs whose basic work week includes the National Day of Observance as a scheduled work day, and who perform service, will be granted a day of administrative leave at a future date, not to exceed eight hours.

3.   Full-time PPOs whose basic work week includes the National Day of Observance as a non-scheduled day, and are not directed to report for work, will be granted a day of administrative leave at a future date.

4.   If the National Day of Observance is a full-time PPO's non-scheduled day and the PPO is scheduled to work, the PPO will receive overtime pay, plus future administrative leave equal to the number of hours worked, not to exceed eight hours.

5. Part-time PPOs should be scheduled based on operational needs. Part-time PPOs who work will be granted a day of administrative leave at a later date. The day of administrative leave will be based on the number of hours actually worked on the National Day of Observance, not to exceed eight hours. Part-time PPOs who are not directed to work on the National Day of Observance will be granted administrative leave at a future date equal to the average number of daily paid hours during the service week previous to the service week in which the National Day of Observance occurs, not to exceed eight hours.

6. If a PPO is on leave or Continuation of Pay on the National Day of Observance, the PPO will be granted a day of administrative leave at a future date, not to exceed eight hours.

7. A PPO on OWCP, AWOL, suspension, or pending removal on the National Day of Observance will not be granted administrative leave. If the PPO on AWOL, suspension or pending removal is returned to duty and made whole for the period of AWOL, suspension, or removal, the PPO will be eligible for administrative leave for the National Day of Observance if the period of suspension or removal for which the employee is considered to have been made whole includes the National Day of Observance. Such determination will be made by counting back consecutive days from the last day of the suspension or removal to determine whether the PPO's make-whole period includes the National Day of Observance.

114

8. Where provisions in this Memorandum of Agreement provide for a day of administrative leave to be taken at a future date, such leave must be granted and used within six months of the National Day of Observance or by the end of the Fiscal Year, whichever is later. However, administrative leave will not be granted to PPOs who are on extended leave for the entire period between the Day of Observance and six months from that date, or between the Day of Observance and the end of the Fiscal Year, whichever is later.

9. Administrative leave taken at a future date must be taken at one time.

10. Administrative leave to be taken at a future date may, at the PPO's option, be substituted for previously scheduled but not used annual leave.

11. Requests for administrative leave to be taken at a future date will be submitted for approval per the same procedures that govern the request and approval of annual leave.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND
POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Detail to Nonbargaining Unit Assignments Due to
Temporary Nonoccupational Illness or Injury**

It is hereby agreed between the Employer and the Union that subject to certain conditions and procedures, as listed below, PPOs suffering from a temporary nonoccupational illness or injury may be temporarily detailed, one time during the life of this Agreement, to a nonbargaining unit assignment within the Postal Inspection Service. These provisions will not require that a PPO meet the requirements contained in Section 13.03 (full uniform, use of assigned firearm and response) to be eligible for a temporary detail under this provision. These provisions for temporary details are not intended to supersede or alter the temporary assignment provisions in Section 13.02 and 13.03. The following conditions and requirements must be met:

1.      The PPO is unable to perform the duties necessary for a temporary assignment under Section 13.02 and 13.03.

2.      The PPO must request the temporary detail and must provide medical documentation certifying the medical limitations and the tasks the PPO can perform.

3.      In order to qualify for a temporary detail, a PPO must not have been placed on sick leave restriction or identified as an abuser of sick leave during the preceding three years, and must not have been suspended from duty for attendance deficiencies, or suspended for any other disciplinary reasons, during the preceding two years.

4.   The Employer will determine if there is useful nonbargaining unit work the PPO can perform within the certified medical limitations.

5.   Each request will be considered on a case-by-case basis by the Employer.

6.   Any temporary detail approved under these procedures will last for the duration of the useful work, not to exceed one hundred twenty (120) days.

7.   The Employer has the exclusive right to grant or deny the request for a temporary detail and nothing in this provision guarantees any PPO the absolute right to a temporary detail.

The parties agree that the concept of temporary detail and the above provisions for temporary detail will be continued for a trial basis for the term of this Agreement. The parties further agree that any grievance arising from a temporary detail or the denial of temporary detail under this Memorandum of Understanding shall not be appealed beyond Step 3 of the Grievance-Arbitration procedure set forth in Article 15 of this Agreement.

This Memorandum of Understanding expires at 12 midnight on April 1**4,** 20**17**.

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: Safety and Health**

The parties agree that local safety issues and equipment, other than weaponry, which is appropriate for local Security Force operations, are proper subjects, as agenda items, for discussion during local labor-management committee meetings.

This Memorandum of Understanding expires at 12 midnight on April 1**4**, 20**17**.

**Doug A. Tulino**
VICE PRESIDENT, LABOR RELATIONS


**April 5, 2014**


**Mr. Christopher Vitolo**
National President
**Postal Police Officers Association
PO Box 5522
Willowick, OH  44095-5522**

Re: Contract Administration

Dear Mr. **Vitolo**:

This is to confirm the commitment of the Employer to provide appropriate training to supervisory personnel who have the responsibility to respond to grievances and otherwise administer the 20**12** Agreement. In particular, the Employer will stress the importance of responding to grievances within the contractual time frames or any mutually agreed to extension.

It is the understanding of the Employer that the Union will likewise provide appropriate training to its stewards and Union representatives who have the responsibility to investigate and process grievances.

Both parties mutually agree that the timely processing of grievances is in the best interests of both parties.

The parties have also agreed to cooperate with each other in providing relevant information with respect to grievances and contract administration. In addition, the Employer agree**s** to **provide** the Union access to relevant Postal Service handbooks and manuals that are maintained at many Security Force facility libraries.

Sincerely,

**Doug A. Tulino**

This letter remains in effect for the duration of the **2012** collective bargaining agreement.

**Doug A. Tulino**
VICE PRESIDENT, LABOR RELATIONS


**April 5, 2014**


**Re: Grievance Time Extensions**


**Mr. Christopher Vitolo**
National President
**Postal Police Officers Association**
**PO Box 5522**
**Willowick, OH  44095-5522**

Dear Mr. **Vitolo**:

The parties recognize that there may be circumstances that may warrant an extension of the grievance time limits in Article 15. For grievances pending in the grievance process at the time of the execution of this Agreement (excluding, however, pending grievances where the issue of timeliness has already been addressed), the parties agree that requested extensions of time limits will be considered on a case by case basis.

For grievances filed during the term of the **2012-2017** USPS-**PPOA** Agreement, written requests for extensions of time made before the applicable contractual deadline will not be unreasonably denied.

Sincerely,


**Doug A. Tulino**


This letter remains in effect for the duration of the **2012** collective bargaining agreement.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND**
**POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Discipline Records**

The parties agree that upon the effective date of the **2012** USPS-**PPOA** Agreement a formal counseling shall not be considered in any subsequent disciplinary action if there has been no disciplinary action initiated against the PPO for a period of one year. Upon the PPO's written request, any formal counseling will be removed from the PPO's level two folder after one year if there has been no disciplinary action initiated against the PPO in that one-year period.

The parties agree that upon the effective date of the **2012** USPS-**PPOA** Agreement an official disciplinary letter of warning shall not be considered in any subsequent disciplinary action if there has been no disciplinary action initiated against the PPO for a period of two years. Upon the PPO's written request, any letter of warning will be removed from the PPO's **official personnel folder (OPF)** after two years if there has been no disciplinary action initiated against the PPO in that two-year period.

The parties agree that upon the effective date of the **2012** USPS-**PPOA** Agreement an official letter of suspension shall not be considered in any subsequent disciplinary action if there has been no disciplinary action initiated against the PPO for a period of **two** years. Upon the PPO's written request, any letter of suspension will be removed from the PPO's **official personnel folder (OPF)** after **two** years if there has

been no disciplinary action initiated against the PPO in that **two**-year period.

This Memorandum of Understanding expires at 12 midnight on April 1**4**, 20**17**.

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: Purge of Warning Letters**

The parties agree there will be a one-time purge of Official Disciplinary Letters of Warning from the official personnel folder of all PPOs represented by the **Postal Police Officers Association**. To qualify to be purged, a Letter of Warning must meet the following conditions:

1.   An issue date prior to the effective date of the USPS-**PPOA 2012** Agreement.

2.   The Letter of Warning has been in effect for 6 months and has not been cited as an element of prior discipline in any subsequent disciplinary action.

3.   The Letter of Warning was not issued in lieu of a suspension or a removal action.

4.   All grievances associated with discipline that are purged as a result of this Memorandum, shall be withdrawn.

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: Corrective Action**

The U.S. Postal Service and the **Postal Police Officers Association** agree, as general principles, that the purpose and intent of corrective action suspensions as set forth in Article 16, Section 05 of the USPS-**PPOA** Agreement is to correct deficiencies and misconduct pursuant to Article 16.01; to impress upon the PPO the seriousness of the PPOs employment situation; and to provide written notice that the next infraction may warrant removal from the Postal Service.

**T**he parties have agreed to modify the usual pattern of progressive corrective action that has evolved pursuant to Article 16. While Article 16 does not specify the precise steps that constitute progressive corrective action, and the appropriate steps may differ according to the severity of the offense, it is generally the case for those offenses that warrant progressive corrective action, PPOs receive: letter of warning, seven-day suspension, fourteen-day suspension, and removal.

The parties have agreed that a paper suspension shall replace actual time-off suspensions. Paper suspensions shall indicate the length of the suspension being replaced and shall be considered to be the same degree of seriousness and will satisfy the same step in the pattern of corrective action as the

time-off suspension being replaced. As such, paper suspensions are equivalent to time-off suspensions as an element of past corrective action and may be cited as such in subsequent corrective action.

**A PPO who has received a fourteen (14) day paper suspension will be given a day of reflection, provided it is agreeable to the Union. The day of reflection will not be served until disposition of a timely filed grievance, if one is filed. If the PPO is directed to take the day of reflection, he or she will be placed in an unpaid, non-duty status for one (1) scheduled work day. The purpose of the day of reflection is for the PPO to reflect upon the seriousness of the factors which led to the discipline, to consider that should the deficiency not be corrected, the PPO can normally expect that the next step of progressive discipline will be removal, and to resolve to correct his or her behavior to conform to the standards necessary for the PPO to remain with the Postal Service.**

**Prior to the PPO being directed to take a day of reflection, the PPO's Union representative and the Employer will conduct a mandatory session with the PPO. During this session, both the Union representative and the Employer will discuss with the PPO the seriousness of his or her deficiency and attempt to reach an understanding and commitment by the PPO to use the day of reflection on how to correct his or her deficiency and avoid further corrective action.**

Failure to grant a PPO a "day of reflection" will not be considered a denial of due process or be considered a procedural or substantive defense if the PPO is subsequently removed.

Nothing contained in this Memorandum of Understanding (MOU) shall be construed to preclude the Employer from placing a PPO in a non-pay status in accordance with

Article 16.07 or 16.08 of the USPS-**PPOA** Agreement or to affect the procedure for allegations of misconduct that are considered appropriate for immediate removal.

This Memorandum of Understanding expires at the expiration of the **2012** Agreement.

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: Interest on Back Pay**

Where an arbitration award specifies that a PPO is entitled to back pay in a case involving disciplinary suspension or removal, the Employer shall pay interest on such back pay at the Federal Judgment Rate. This shall apply to cases heard in arbitration after the effective date of the 2007 USPS-**PPOA** Agreement. With respect to pending grievances under the prior Agreement, this Memorandum shall not be construed to prevent the award of interest where, under the circumstances, such an award may be appropriate.

This Memorandum of Understanding expires at 12 midnight on April 1**4**, 20**17**.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND
POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Labor-Management in the Inspection Service**

The new **2012** USPS-**PPOA** labor Agreement has been reached between the Postal Service and the **Postal Police Officers Association**. It is the result of a long negotiation process, in which the parties expressed their views, concerns, and needs about and for PPOs and the Postal Service.

Both the Employer and the Union are committed to improving the labor-management relationship at the division and national levels. We expect our managers, supervisors, Union representatives and stewards to be familiar with the contents of the Agreement and to administer it fairly and in the best interest of our PPOs and the Postal Service. We also expect that our mutual representatives will be respectful of each other and their positions and that our interactions will be professional and courteous.

Communication is the key element to achieving an improvement in our labor relations. Therefore, we emphasize the need for holding regularly scheduled labor-management meetings because they are, in our opinion, the best means to maintain an on-going dialogue on the issues that affect our people and our mission. Besides having these meetings, there is a need to report the results of the meetings, and the Employer agrees that it will continue to submit to the Union a

written summary of the issues discussed and their resolution.

The Agreement maintains the Employer's authority to deploy, control and direct PPOs as necessary to provide the appropriate level of security for postal facilities and to carry out the mission of the Inspection Service. Security requires flexibility, and a PPO's worksite, work schedule or work hours may be changed to make a more efficient use of available PPO resources to meet changes in Postal or Inspection Service operations.

The Employer recognizes that the exercise of its authority must be done responsibly. It cannot be abused, and its abuse will not be tolerated. This authority cannot be used for punitive reasons, for frivolous reasons, or for harassment of our PPOs.

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: New York Security Force Facility Work Rules**

The parties agree that the Union and the New York Division Inspection Service Management may discuss the provisions of the **collective bargaining agreement and outline modifications that would be specific to the New York Security Force Work Facility.** The parties **will be allowed thirty (30) days after the signing of the 2012 collective bargaining agreement to submit a proposal to the Inspector-in-Charge Security and Crime Prevention Group or designee for final approval.** Any agreement between the local parties as a result of these discussions will be in writing. This memorandum of understanding applies only to the New York Security Force Facility. Absent agreement between the local parties, the terms of the **2012-2017** USPS-**PPOA** collective bargaining agreement will govern. The union will not have access to the grievance-arbitration procedure or any other appeal forum based on any disagreement between the local parties resulting from any discussion conducted pursuant to this memorandum. This memorandum does not establish any bargaining obligation or right to appeal any impasse that may result from the local discussion referenced above. The parties agree that this memorandum establishes no precedent and may not be cited for any purpose other than permitting the local discussion referenced above. This memorandum and any resulting local procedures will expire at midnight on the date the **2012-2017** USPS-**PPOA** collective bargaining agreement expires.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND**
**POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Michael Healy**

The Postal Service agrees that, when it publishes documents depicting a Postal Police Officer's badge, the badge will bear number 3972, which was worn by Michael Healy, a Postal Police Officer (PPO) killed in the line of duty. In honor of Postal Police Officer Healy, no other PPO will be issued that badge number and, if any PPO currently has that badge number, a new badge number will be issued to that PPO.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND
POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Bulletin Boards; File Cabinets; Telephone Policy**

The Employer agrees to provide, during the life of this Agreement, a locked bulletin board, if one has not already been provided, to the Union at each work site where PPOs under this Agreement are employed. The Employer may maintain a duplicate key for the bulletin board(s).

It is agreed that the Employer further agrees to provide a space for a four drawer file cabinet within the area already occupied by the Security Force. The Employer will provide a file cabinet, if one is available during the life of this Agreement, for use by the Union at each work site where PPOs under this Agreement are employed. The Employer is not required to purchase new file cabinets for this purpose.

The parties recognize that telephones are for official USPS business. However, the Employer at the local level shall establish a policy for use of telephones for local calls within the division by designated local Union representatives for legitimate business related to the administration of this Agreement, subject to sound business judgment and practices.

The Employer will provide office space, desk, and file cabinet for Union use at New York and Baltimore and will make every reasonable effort to provide the same at the facility where the Union's national president is employed.

This Memorandum of Understanding expires at 12 midnight on
April 1**4**, 20**17**.

**Guy J. Cottrell**
CHIEF POSTAL INSPECTOR


**April 5, 2014**


**Re: Office Space**


**Mr. Christopher Vitolo**
National President
**Postal Police Officers Association**
**PO Box 5522**
**Willowick, OH  44095-5522**

Dear Mr. **Vitolo:**

Based on discussions during negotiations, the Employer agrees that Inspection Service management may, at their discretion, permit a Union steward or Union representative the use of office space, desk, or office equipment, if available, on an ad hoc or other basis, for grievance processing. There is no policy that prohibits other postal managers from authorizing the use of a desk, office space, or office equipment by the Union on an ad hoc basis.

Sincerely,



**Guy J. Cottrell**


This letter remains in effect for the duration of the **2012** collective bargaining agreement.

**Guy J. Cottrell**
CHIEF POSTAL INSPECTOR

April 5, 2014

**Mr. Christopher Vitolo**
National President
**Postal Police Officers Association**
**PO Box 5522**
**Willowick, OH  44095-5522**

Re: Access to and Use of Physical Fitness Equipment

Dear Mr. **Vitolo:**

The Employer agrees that bargaining unit PPOs may use the physical fitness equipment which is presently located in the Inspection Service division. The Union agrees that the PPOs will comply with all national and local postal safety and health policies and procedures.

Before a PPO receives authorization to use the physical fitness equipment, the PPO must sign the enclosed Inspection Service waiver form, releasing the Employer of any liability. Further, the PPO must receive a medical clearance from the PPO's physician, at no cost to the Employer. After the waiver form is signed and the completed medical clearance form has been received by the Employer, the PPO will be authorized to use the available physical fitness equipment.

The use of the physical fitness equipment is strictly voluntary and can only be used by PPOs while in an off-duty status.

Sincerely,

**Guy J. Cottrell**

Enclosure

This letter remains in effect for the duration of the **2012** collective bargaining agreement.

## RELEASE STATEMENT
## FOR THE USE OF
## INSPECTION SERVICE FITNESS EQUIPMENT

In consideration of the permission granted to me to use the physical fitness equipment located in the facility of the Postal Inspection Service located at _____, I do hereby, for myself, my heirs, executors, and administrators, release and forever discharge the United States Postal Service, the Postal Inspection Service, and all of their officers, agents and employees, acting officially or otherwise, from any and all claims, demands, actions, or causes of action, costs, charges, and liabilities of any kind, on account of my death or on account of any injury to me which may occur from any cause during my use of said facility, and all equipment contained therein. This release is intended to cover all injuries, fatal or non-fatal, and illness of every name, type, kind of nature, and personal property damage, if any, which may be sustained or suffered from any cause whatsoever, connected with or arising out of or by reason of participating in the aforementioned activities.

I know the risks and dangers involved in said activities and that unanticipated and unexpected dangers may arise during such activities, and I assume all risks of injury to my person and property that may be sustained in connection with the stated and associated activities, in and about the facility.

I further agree that I will indemnify and will hold harmless the United States Postal Service and the Postal Inspection Service and all of their officers, agents and employees, from any and all costs, charges, claims, demands and liabilities of any kind arising from the improper or negligent actions of the

undersigned while participating in the activities on said property.

Nothing in this Release shall be deemed to abrogate or release my rights to Workers' Compensation benefits under Title 5, United States Code, Chapter 81.

I have read and understand the foregoing Release and certify that my attendance and participation in the stated activities is voluntary.


DATE: _____


PRINT NAME: _____


SIGNATURE: _____


WITNESS: _____

139

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Bargaining Information**

Pursuant to the provisions of Article 31 of the 20**12**
USPS-**PPOA** Agreement, and as soon as practicable after the
ratification of that Agreement, the Employer shall, on a monthly
reporting period basis, provide the Union, through an email
attachment (the attachment will be password protected to
protect sensitive information about individual employees) to
the national Union representative designated by the Union,
with the following information on PPOs in the bargaining units:

1.  SSN or **EIN**
2.  Last Name
3.  First Name (Full)
4.  Middle Initial
5.  Address
6.  City
7.  State
8.  ZIP Code
9.  Post Office Name
10. PO State
11. PO ZIP
12. PO Finance Number
13. PO CAG
14. Rate Schedule
15. Nature of Action
16. Effective Date
17. Pay Grade
18. Pay Step
19. Health Benefit Plan
20. Designation Activity
21. Enter on Duty Date
22. Retire on Date
23. Layoff
24. Occupation Code
25. Pay Location

140

The Postal Service will provide the Union with the information above without charge.

This Memorandum of Understanding expires at 12 midnight on April 1**4**, 20**17**.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Union Notification**

The employer agrees to provide a copy of the Quarterly Security Force Activity Reports to the President of the Union on a semi-annual basis.

The Employer further agrees to notify the President of the Union as soon as practicable in the event of the death of a PPO in the line of duty, and in the event a PPO discharges their weapon while officially employed.

This Memorandum of Understanding expires at 12 midnight on April 1**4**, 20**17**.

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Security Force Facilities and Worksites**

**The following is a list of all Security Force Facilities and Worksites as of April 1, 2014.**

| IS Division | S/F Work Facility | S/F Worksite Name | Address |
|---|---|---|---|
| **Boston** | Boston | Boston P&DC | 25 Dorchester Ave Boston MA 02205 |
| **Charlotte** | Atlanta | Atlanta P&DC | 3900 Crown Rd SW Atlanta GA 30304 |
| | Memphis | Memphis P&DC | 555 S Third St Memphis TN 38101 |
| **Chicago** | Chicago | Cardiss Collins P&DC | 433 W Harrison St Chicago IL 60669 |
| | St Louis | St Louis P&DC | 1720 Market St St Louis MO 63155 |
| **Detroit** | Detroit | George W Young P&DC | 1401 W Fort St Detroit MI 48233 |
| **Ft Worth** | Dallas | Dallas P&DC | 401 DFW Tpke Dallas TX 75260 |
| **Houston** | Houston | No. Houston P&DC | 4600 Aldine Bender Rd Houston TX 77315 |
| | New Orleans | New Orleans P&DC | 701 Loyola Ave New Orleans LA 70113 |

| IS Division | S/F Work Facility | S/F Worksite Name | Address |
|---|---|---|---|
| **Los Angeles** | Los Angeles | Los Angeles P&DC & Warehouse | 7001 S Central Ave Los Angeles CA 90052 |
| **Miami** | Miami | Miami MPO | 2200 NW 72nd Ave Miami  FL 33152 |
| **NHQ Security** | National Headquarters | L'Enfant Plaza | 475 L'Enfant Plz SW Washington DC 20260 |
| **New Jersey** | Newark | Newark Main Post Office | 2 Federal Square Newark NJ 07102 |
| | | New Jersey Int'l NDC | 80 County Rd Jersey City NJ 07097 |
| | | Dominick V Daniels P&DC | 850 Newark Tpke Kearny NJ 07099 |
| | San Juan | San Juan GPO | 585 Franklin D Roosevelt Ave San Juan PR 00936 |

| IS Division | S/F Work Facility | S/F Worksite Name | Address |
|---|---|---|---|
| **New York** | New York (= 1 facility) | Morgan P&DC | 341 9th Ave<br>New York NY 10199 |
| | ("Manhattan District") | Farley (James A) P&DC | 421 8th Ave<br>New York NY 10001 |
| | | FDR Station | 909 3rd Ave<br>New York NY 10022 |
| | | Church St Station | 90 Church St<br>New York NY 10007 |
| | | Grand Central Station | 450 Lexington Ave<br>New York NY 10017 |
| | | Times Square Station | 340 W 42nd St<br>New York NY 10036 |
| | ("Queens-Bronx District") | Queens P&DC | 14202 20th Ave<br>Flushing NY 11351 |
| | | Bronx P&DC | 558 Grand Concourse<br>Bronx NY 10451 |
| | | Jamaica GPO | 8840 164th St<br>Jamaica NY 11432 |
| | ("Brooklyn-JFK District") | Brooklyn P&DC | 1050 Forbell St<br>Brooklyn NY 11256 |
| | | JFK ISC | Building 250<br>Jamaica NY 11430 |

| IS Division | S/F Work Facility | S/F Worksite Name | Address |
|---|---|---|---|
| **Philadelphia** | Philadelphia | Philadelphia P&DC | 7500 Lindbergh Blvd Philadelphia PA 19176 |
| **Pittsburgh** | Pittsburgh | Pittsburgh P&DC | 1001 California Ave Pittsburgh PA 15290 |
| | Cleveland | Cleveland P&DC | 2400 Orange Ave Cleveland OH 44101 |
| **San Francisco** | San Francisco | San Francisco P&DC | 1300 Evans Ave San Francisco CA 94188 |
| | | Oakland P&DC | 1675 7th St Oakland CA 94615 |
| **Washington** | Washington DC | Curseen & Morris P&DC | 900 Brentwood Road NE Washington DC 20066 |
| | | Washington NDC | 9201 Edgeworth Dr Capitol Heights MD 20790 |
| | Baltimore | Baltimore P&DC | 900 East Fayette St Baltimore MD 21233 |

146

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND THE**
**POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Employment Protection**

The parties agree that no full-time non-probationary PPO employed prior to April 1**4**, 20**17**, who has not acquired the protection provided under Article 33.08, will be involuntarily removed from employment within the Postal Service because of a reduction of security service during the life of this 20**12** USPS-**PPOA** Agreement.

During the life of the 20**12** USPS-**PPOA** Agreement, PPOs afforded the employment protection in Article 33.08 may select from among vacant assignments within the bargaining unit in order to exercise the employment protection provided in Article 33.08 or this MOU.  During the life of the 20**12** USPS-**PPOA** Agreement, PPOs excess to the needs of a work facility pursuant to Article 33.02 may select from vacant assignments in the bargaining unit for purposes of voluntary reassignment under Article 33.02.  Both of these selection options will be based on relative seniority in the bargaining unit.  The Employer will not revert vacancies for the sole purpose of ensuring that such vacancies are not available for PPOs who may select such vacancies pursuant to Article 33.02 or Article 33.08.

This Memorandum of Understanding expires at 12 midnight on April 1**4**, 20**17**.

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**UNITED STATES POSTAL SERVICE**
**AND**
**POSTAL POLICE OFFICERS ASSOCIATION**

**Re: Time Limitations Concerning Bone Marrow,**
   **Stem Cell, Blood Platelet, and Organ Donations**

As to the time limitations applicable to bone marrow, stem cell, blood platelet, and organ donations, the parties agree the maximum administrative leave that can be granted per leave year to cover qualification and donation is limited to the following:

a.   A full- or part-time bargaining unit PPO is limited to:

   (1)   For bone marrow, up to 7 days;

   (2)   For stem cells, up to 7 days;

   (3)   For blood platelets, up to 7 days; and

   (4)   For organs, up to 30 days.

b.   A part-time PPO may be granted leave up to the limits set forth above. The amount of leave that may be granted will be based on the employee's average daily work hours in the preceding 26 weeks, but not to exceed 8 hours per day.

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: BDU Style Uniform Apparel**

PPOs may wear BDU (battle dress utility) style uniform trousers and shirts only in the following circumstances:

- While in training
- While at the shooting range for firearm qualification
- While engaged in armed escort duty (escorting remittance runs or high value mail movements)

The Union may raise the topic of possible additional circumstances in which PPOs could be authorized to wear BDU style uniform apparel on duty for consideration at a national labor-management meeting.

149

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: Corporal Stripes**

PPOs covered by this Agreement are authorized to wear corporal stripes after three years of service from the date the PPO graduated basic training.  These stripes will not result in any increase in pay or authority.

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
### UNITED STATES POSTAL SERVICE
### AND
### POSTAL POLICE OFFICERS ASSOCIATION

**Re: Leave for Bereavement**

Employees covered by this agreement may use a total of up to three workdays of annual leave, sick leave or leave without pay, to make arrangements necessitated by the death of a family member or attend the funeral of a family member. Authorization of leave beyond three workdays is subject to the conditions and requirements of Article 10 of the collective bargaining agreement and Subsection 510 of the Employee and Labor Relations Manual.

Definition of Family Member.

"Family member" is defined as a:

(a)  Son or daughter – a biological or adopted child, stepchild, daughter-in-law or son-in-law;

(b)  Spouse;

(c)  Parent;

(d)  Sibling – brother, sister, brother-in-law or sister in-law; or

(e)  Grandparent.

151

Use of Sick Leave.  For employees opting to use available sick leave, the leave will be charged to sick leave for dependent care, if eligible.

Documentation.

Documentation evidencing the death of the employee's family member is required only when the supervisor deems documentation desirable for the protection of the interest of the Postal Service.

# Exhibit B

*Exh. 13*

REQUEST FOR RANKING OF POSITION

2335-24

INSTRUCTION: *Forward original and 2 copies to Reviewing Office.*

| 1. NAME OF OFFICE OR ORGANIZATION | (FOR DEPARTMENTAL USE ONLY) | |
|---|---|---|
| Philadelphia Post Office | APPROVED TITLE<br>Security Technician | |
| 2. SUGGESTED TITLE OF POSITION<br>Security Technician | POSITION IDENTIFICATION<br>IP 20-5730 | APPROVED PFS LEVEL<br>PFS—6 |
| 3. RECOMMENDED SALARY LEVEL *(From item 6D below)*<br>PFS—6 | KEY POSITION USED FOR RANKING<br>Claims Clerk, Paying Office | KEY POSITION NO.<br>KP-17 |
| 4A. DATE OF SUBMISSION<br>1/6/70 | 4B. REASON FOR THIS REQUEST<br>New Position | SIGNATURE OF APPROVING OFFICER<br>*Rene P Flay* | DATE OF APPROVAL<br>1/8/70 |

5. POSITION DESCRIPTION   *(Attach continuation sheet if additional space is needed)*

A. BASIC FUNCTION

After instruction in work methods, procedures and techniques appropriate to investigations of postal and other offenses performs a combination of investigative duties relating to security of mails and to the protection of postal property and personnel.

B. DUTIES AND RESPONSIBILITIES

(A) Performs investigative assignments constituting less than a complete investigation in serious postal crimes involving previously learned techniques in cooperation with Postal Inspectors.

(B) Performs complete investigations of reported misdemeanors and minor crimes such as petty larceny, soliciting and loitering.

(C) Maintains surveillance over suspicious persons and areas experiencing a high incidence of crime. Cooperates and works with other Federal and local law enforcement personnel in the investigation of major crimes.

(D) Prepares reports, makes recommendations and assists in preparing cases for prosecution and testifies in court when called upon to do so.

(E) Makes regular fire protection inspections and regularly contacts operating officials and employees in promoting cooperative relations and obtaining their ready compliance with fire prevention measures.

(F) Recommends or makes changes in fire protection measures, procedures, or regulations after approval by higher authority.

(Continued)

C. ORGANIZATIONAL RELATIONSHIPS

Reports to a Security Supervisor and through him to higher authority; gives technical guidance and instruction to assigned security aide or aides.

POD FORM 820
MAR. 1965

POST OFFICE DEPARTMENT
**REQUEST FOR RANKING OF POSITION**

RUCTION: Forward original and 2 copies to Reviewing Office.

| NAME OF OFFICE OR ORGANIZATION | FOR DEPARTMENTAL USE ONLY |
| --- | --- |
| Chief Inspector's Department | APPROVED TITLE Security Aide |

| SUGGESTED TITLE OF POSITION | POSITION IDENTIFICATION | APPROVED PFS LEVEL |
| --- | --- | --- |
| SECURITY AIDE | $IP$ 80-66 -SP-8-18 | PS 5 |

| RECOMMENDED SALARY LEVEL (from item 6D below) | KEY POSITION USED FOR RANKING | KEY POSITION NO. |
| --- | --- | --- |
| PFS 5 | City Carrier | KP 11 |

| DATE OF SUBMISSION | A. REASON FOR THIS REQUEST | SIGNATURE OF APPROVING OFFICER | DATE OF APPROV |
| --- | --- | --- | --- |
| 4/14/71 | New Position | | 4/15/71 |

b. POSITION DESCRIPTION  (Attach continuation sheet if additional space is needed)

**BASIC FUNCTION:**

After training in preventive security techniques performs a combination of duties in preventing mail loss and depredations and protecting life and property on postal premises.

**DUTIES AND RESPONSIBILITIES**

(A)  Provides basic security for life and property in an assigned area by anticipating and, as necessary, stopping altercations.

(B)  Exercises surveillance to keep out loiterers and prevent passage of drugs and alcohol to employees; confiscates such items brought on the premises.

(C)  Prevents loss and depredation of mails, having high potential value, by acquainting employees with desirable handling practices and by observing a myriad of operations in a busy and expansive work area.

(D)  Evaluates actions of workers "on the clock" to prevent unauthorized congregating or leaving work areas.

(E)  Watches for surreptitious moves of contractor's employees, while parking trucks and loading and unloading mail. Is alert to report suspicious actions.

(F)  Intercepts and detains for questioning by Postal Inspector(s) unauthorized persons found in postal areas.

(G)  Controls access to postal premises generally and to restricted areas of
(Continued)

**ORGANIZATIONAL RELATIONSHIPS**

Works with Security Technician when assigned; Reports to a Security Supervisor or other designated supervisor.

DUTIES AN. RESPONSIBILITIES (Continued)

postal facilities in accordance with instructions governing both personnel and vehicles.

(H) Immediately responds to emergent situations such as accidents, illness, fire and unrest. Renders emergency first aid, as required.

(I) Cooperates with Postal Inspectors in the course of official investigations and emergencies, including riots, demonstrations, and similar activities affecting postal property or personnel.

(J) Maintains fire patrols and instructs postal employees in responding to fires and in reporting safety hazards.

(K) Directs traffic on and entering postal facilities and property and provides security in parking and staging areas.

(L) Provides special protection for and convoys valuable registry shipments, as required.

(M) Assumes patrol functions, assigned, on foot and in cars with authority to make civilian arrests when detention is indicated. Where granted by statute, exercises arrest authority consistent with a commissioned status of "Special Policeman",

# Exhibit C

**STD JOB DESCRIPTION**                                    U.S.Postal Service

## POSTAL POLICE OFFICER (B) (Y7-06)
## OCCUPATION CODE: 2335-24XX

**FUNCTIONAL PURPOSE:**

Performs a variety of duties pertaining to the security of postal buildings, personnel, property, mail, and mail-in-transit in support of the postal security program.

**DUTIES AND RESPONSIBILITIES:**

1.  Performs a variety of duties pertaining to the security of postal buildings, personnel, property, mail, and mail-in-transit.

2.  Carries a firearm and exercises standard care required by the Inspection Service on firearms and use of reasonable force. Maintains assigned firearms in good condition.

3.  Maintains a log of all incidents reported and a daily log of orders and basic information for the security force.

4.  Answers the office telephone and responds to reports and inquiries.

5.  Performs patrol duty, as assigned, on foot or by motor vehicle to maintain order and safeguard the facility, property, and personnel; ensures the application of security measures in mailhandling areas.

6.  Maintains contact with other security force personnel; responds to emergencies and other conditions, including burglaries and hold-ups, requiring immediate attention.

7.  Controls access to building at an assigned post; enforces the regulations requiring identification.

8.  Makes arrests and testifies in court on law violations within assigned authority.

9.  Performs other job related tasks in support of the primary duties.

**SUPERVISION:**

Security Supervisor, Security Supervisor-in-Charge, or Security Officer-in-Charge

**SELECTION METHOD:**

Senior Qualified

**BARGAINING UNIT:**

SECURITY FORCE

**KEY POSITION REFERENCE:**

KP-0017

**Doc Date: 02/08/1990**                                    **Occ Code: 2335-24XX**

Exhibit C-6

**QUALIFICATIONS**                                                U.S.Postal Service

## POSTAL POLICE OFFICER (B) (Y7-06)
## OCCUPATION CODE: 2335-24XX

1. This position requires a High Risk (BI) security clearance. Applicants offered employment in this position will be required to provide fingerprints and complete the appropriate documents to obtain the clearance prior to placement.

2. Applicants must pass written Examination 630.

3. Applicants must possess a valid state driver license issued in the state in which they reside and have a safe driving record for two (2) years or more.

4. Applicants must be at least 21 years of age by the closing date of the announcement.

5. Applicants must be citizens of the United States of America. Verification is required.

6. Applicants (if not currently an Inspection Service employee) must pass a drug screening test. Applicants who qualify on Examination 630 and are in the area of consideration for employment will be scheduled for a drug test and applicants offered employment will be scheduled for a medical examination.

7. Applicants must be physically able to effectively perform the duties of the position.

8. Applicants must successfully complete an extensive training course which includes qualification in the use of firearms.

**Doc Date: 10/14/2014**                                    **Occ Code: 2335-24XX**

# Exhibit E


**UNITED STATES**
**POSTAL SERVICE**®

# Postal Police Officer's Guide

Handbook IS-702                                           July 2002
                                                Transmittal Letter 3

*Restricted Information*

1.  **Explanation.** This complete revision of Handbook IS-702, *Postal Police Officer's Guide,* updates policies and procedures. Previous transmittals are obsolete.

2.  **Distribution.** Distribution of this handbook is restricted to U.S. Postal Inspection Service personnel. A hard copy of the handbook is distributed to Headquarters and field divisions.

3.  **Effective Date.** These instructions are effective as of July 2002.

4.  **Compliance.** Any deviations from these policies and procedures must be communicated at the national level to the Fraternal Order of Police, National Labor Council, USPS #2, and must be in compliance with the collective bargaining agreement.

5.  **Comments and Questions.** Address any comments or questions to:

    INSPECTOR IN CHARGE
    SECURITY GROUP
    US POSTAL INSPECTION SERVICE
    475 L'ENFANT PLAZA SW RM 3301
    WASHINGTON DC  20260-2186

*James J. Rowan, Jr.*
*Acting Chief Postal Inspector*
*U.S. Postal Inspection Service*

# Contents

**Page**

**1    Administration** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **1**

1-1      Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

   1-1.1      Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

   1-1.2      Scope  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

1-2      Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

   1-2.1      History of the Postal Inspection Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

   1-2.2      History of the Postal Service Security Force  . . . . . . . . . . . . . . . . . . . . . . . . . .    2

   1-2.3      Accomplishments of the Security Force  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

1-3      Organization  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

   1-3.1      Chief Postal Inspector  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

   1-3.2      Headquarters Security Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

   1-3.3      Inspector in Charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

   1-3.4      Manager Postal Police Division and Facility . . . . . . . . . . . . . . . . . . . . . . . . . .    3

   1-3.5      Tour Supervisor Postal Police . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

   1-3.6      Supervisor Postal Police  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

   1-3.7      Postal Police Officer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

   1-3.8      Security Force Functions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

      1-3.8.1      General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

         1-3.8.1.1      Relationship to Postal Inspectors . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

         1-3.8.1.2      Basic Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

         1-3.8.1.3      Investigative Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

         1-3.8.1.4      Postal Police Officer Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

         1-3.8.1.5      Liaison Postal Inspector . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

         1-3.8.1.6      Presence of Postal Inspector . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

      1-3.8.2      Primary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

      1-3.8.3      Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

1-4      Statutory Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

   1-4.1      Special Police Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

   1-4.2      Postal Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

   1-4.3      Title 40, United States Code, Section 318  . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

   1-4.4      Powers Not Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

1-5      Labor Management Relations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

   1-5.1      Standards of Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

   1-5.2      Personal Appearance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

   1-5.3      Arrests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

1-5.4     Equal Employment Opportunity  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

1-5.5     Labor Organizations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

1-5.6     Transfers, Reassignments, Relocation, andTemporary Assignments  . . . . . . . . . . . .     8

1-5.7     Prohibited Conduct  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

1-5.8     Corrective Action  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

1-6        Time, Attendance, and Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

1-6.1     General  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

1-6.2     Duty Schedules  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

1-6.3     Roll Call and Inspection  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

1-6.4     Recording Time  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

1-6.4.1     General  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

1-6.4.2     Overtime  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

1-6.4.3     Tardiness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

1-6.5     Availability In Emergencies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

1-6.6     Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

1-6.6.1     General  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

1-6.6.2     Annual  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

1-6.6.3     Sick  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

1-6.6.4     Other  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12

1-6.7     Military Obligations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12

2        Duties and Responsibilities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13

2-1        Duties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13

2-1.1     Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13

2-1.2     Assignments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13

2-1.3     Assistance to Other Law Enforcement Agencies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

2-1.4     Mail Security — Sanctity of the Seal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

2-1.5     Multiple Personnel Response  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

2-2        References and Definitions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

2-2.1     Committed in Presence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

2-2.2     Probable Cause  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

2-2.3     Felony  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15

2-2.4     Misdemeanor  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15

2-2.5     Police/Citizen Encounters  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15

2-2.5.1     General  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15

2-2.5.2     Voluntary Response  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15

2-2.5.3     Investigative Detention  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15

2-2.5.4     Arrests  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15

2-3        Arrest Procedures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     16

2-3.1     General  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     16

2-3.2     Arrests with Warrant  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     16

Contents

| | | | |
|---|---|---|---|
| 2-3.3 | Arrests Without Warrant | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| 2-3.4 | Exercise of Nonstatutory Authority | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| 2-3.5 | Use of Handcuffs | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| 2-3.6 | Right Against Self-Incrimination | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| 2-3.7 | Searches | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| 2-3.7.1 | Incident to Arrest | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| 2-3.7.2 | Stop and Frisk | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| 2-3.7.3 | Conduct of Body Searches | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
| 2-3.8 | Disposition of Persons Arrested | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
| 2-4 | Use of Force | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
| 2-4.1 | General | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
| 2-4.2 | Firearms | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
| 2-5 | Criminal Investigations | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| 2-5.1 | General | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| 2-5.2 | Internal Intelligence | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| 2-5.3 | Wanted Circulars | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| **3** | **Appearance and Uniforms** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **21** |
| 3-1 | General | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 |
| 3-2 | Male | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 |
| 3-3 | Female | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 |
| 3-4 | Uniform | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| 3-4.1 | General | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| 3-4.2 | Neatness of Uniform | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| 3-4.3 | When Uniform Worn | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| 3-4.3.1 | General | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| 3-4.3.2 | Traveling to and From Work | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| 3-4.3.3 | Funerals | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| **4** | **Equipment** | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **23** |
| 4-1 | Accountability | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| 4-1.1 | Protection | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| 4-1.2 | Accountability Record, Form 5311 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| 4-1.3 | Familiarity with Equipment | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| 4-1.4 | Report of Loss or Theft of Property | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| 4-1.5 | Removal of Property or Equipment | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| 4-1.6 | Postal Service Identification | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| 4-1.6.1 | Postal Police Officer Credentials | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| 4-1.6.2 | Security Force Badges | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| 4-1.6.3 | Valid State Driver's License | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| 4-1.6.4 | Requirement | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |

4-1.6.5      Revocation/Suspension of Driving Privileges ............................ 24

4-2      Firearms ....................................................................... 25

4-2.1      General ................................................................. 25

4-2.2      Qualification and Training ............................................... 25

4-2.3      Authority to Carry Firearms ............................................. 25

4-2.4      Service Weapons and Ammunition ...................................... 25

4-2.5      Security of Firearms ..................................................... 25

4-2.6      Safety of Firearms ...................................................... 26

4-2.6.1      Accountability ................................................. 26

4-2.6.2      Loading and Unloading ........................................ 26

4-2.6.3      Use of Firearms ............................................... 26

4-2.7      Use and Assignment of Shotguns ....................................... 26

4-3      Two-Way Radio ................................................................ 27

4-3.1      Use .................................................................... 27

4-3.2      Radio Communications .................................................. 27

4-3.3      Ten-Signal Code ........................................................ 28

4-4      Emergency Warning Equipment .................................................. 30

4-4.1      Conditions ............................................................. 30

4-4.2      Safety ................................................................. 30

4-4.3      Responsibility .......................................................... 30

4-4.4      Liability ................................................................ 31

4-4.5      Federal Tort Claims Act .................................................. 31

**5      Special Instructions ...............................................  33**

5-1      Postal Crimes and Other Incidents ............................................. 33

5-1.1      Robbery ................................................................ 33

5-1.2      Burglary ............................................................... 33

5-1.3      Theft of Mail ........................................................... 33

5-1.4      Assaults and Altercations ............................................... 34

5-2      Safety and Health ............................................................. 34

5-2.1      Emergency Medical Aid .................................................. 34

5-2.1.1      Definition ..................................................... 34

5-2.1.2      Security Force Responsibility .................................. 34

5-2.1.3      General Rules ................................................. 34

5-2.2      General Safety And Health .............................................. 35

5-2.2.1      General ....................................................... 35

5-2.2.2      Exterior Areas ................................................. 35

5-2.2.3      Interior ....................................................... 36

5-2.2.3.1      Floors .................................................. 36

5-2.2.3.2      Aisles .................................................. 36

5-2.2.3.3      Stairways ............................................... 36

Contents

| 5-2.2.3.4 | Storage Areas | 36 |
| 5-2.2.3.5 | Toilets | 36 |
| 5-2.2.3.6 | Doorways and Exits | 36 |
| 5-2.2.4 | Fire Safety | 37 |
| 5-2.2.4.1 | Smoking Regulations | 37 |
| 5-2.2.4.2 | Fire Extinguishing Equipment | 37 |
| 5-2.2.5 | Electrical, Mechanical, and Safety Equipment | 37 |
| 5-2.2.6 | Uncorrected Hazards | 37 |
| 5-2.3 | Slip and Fall Accidents | 38 |
| 5-2.4 | Motor Vehicle Accidents | 38 |
| 5-2.5 | Accident Prevention | 38 |
| 5-2.5.1 | General | 38 |
| 5-2.5.2 | PS Form 1767 | 38 |
| 5-2.5.2.1 | Completion | 38 |
| 5-2.5.2.2 | Content | 39 |
| 5-2.5.2.3 | Distribution | 39 |
| 5-3 | Emergency Planning | 39 |
| 5-3.1 | Responsibilities | 39 |
| 5-3.2 | General | 39 |
| 5-3.3 | Bomb Threats and Bombings | 40 |
| 5-3.3.1 | General | 40 |
| 5-3.3.2 | Receipt of Telephone Calls or Reports | 40 |
| 5-3.3.3 | Notification | 40 |
| 5-3.3.4 | Evacuation | 41 |
| 5-3.3.5 | Search | 41 |
| 5-3.3.5.1 | General | 41 |
| 5-3.3.5.2 | Discovery | 41 |
| 5-3.3.6 | Explosion | 41 |
| 5-3.3.7 | Suspected Bomb Devices in the Mailstream | 42 |
| 5-3.4 | Fires | 42 |
| 5-3.4.1 | General | 42 |
| 5-3.4.2 | Actions | 42 |
| 5-3.5 | Hazardous Materials | 42 |

# Exhibits

**Page**

Exhibit 2-3.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
IS Form 1067 — Warning and Waiver of Rights

# 1 Administration

## 1-1 Introduction

### 1-1.1 Purpose

This handbook serves as a basic rule book for postal police officers (PPOs) and supervisory personnel. However, all instructions applicable to security force personnel are not included in this manual. Other instructions are included in, but not limited to, the following documents:

a. Handbook IS-701, *Security Force Operations.*

b. *Administrative Support Manua*l.

c. *Domestic Mail Manual.*

d. *Employee and Labor Relations Manual.*

e. *Postal Operations Manual.*

f. Handbook, IS-135, *Firearms.*

g. Fiscal Handbook, Series F-21, *Time and Attendance.*

h. Postal Laws (Title 18 and Title 39, *United States Code*).

i. Division circulars.

j. *Postal Bulletin.*

k. Publication 159, *Contingency Planning.*

l. Publication 118, *FLSA Policy and Instructions.*

m. Handbook F-15, *Travel and Relocation.*

n. Handbook EL-801, *Supervisor's Safety Handbook.*

o. A first aid manual.

p. A burglary response plan.

A library of these publications will be maintained at each work facility and site where practical. All PPOs will have ready access to all publications needed for the performance of their duties and responsibilities. Each officer should be knowledgeable in the content of these publications.

1-1.2  **Scope**

All PPOs must become thoroughly familiar with the contents of this handbook, as well as postal laws and regulations pertaining to the security of mails and the protection of postal customers, employees, and property. Officers will be provided official duty time to do so. By accepting employment in the security force, PPOs assume the obligation to know their job and to faithfully perform their duties. In any matter involving corrective action against a PPO, it will be presumed that the officer was familiar with the law, rule, and regulation or instruction in question. Any questions concerning content of this manual should be referred to a supervisor for clarification. The position, manager postal police (MPP), where mentioned in this manual, also pertains to the position of supervisor postal police (SPP) and tour supervisor postal police (TSPP) when the SPP or TSPP is the senior security official at the facility. This manual must not be exposed to non-Inspection Service personnel unless authorized by the Inspector in Charge (INC).

# 1-2   Background

### 1-2.1  History of the Postal Inspection Service

The Postal Inspection Service is the oldest federal law enforcement agency in the United States, tracing its origin to the year 1737. It has jurisdiction in all criminal matters involving the integrity and security of the mail, and has responsibility for the security of all postal valuables, personnel, and property.

### 1-2.2  History of the Postal Service Security Force

The Postal Service security force is an integral part of the Postal Inspection Service. The first unit of security officers was activated during December 1970 in Philadelphia, Pennsylvania. On January 18, 1971, the Postmaster General transferred the administrative and functional responsibility for the security force to the Chief Postal Inspector. PPOs perform a valuable and necessary function. As members of the Inspection Service team, they have a proud heritage.

### 1-2.3  Accomplishments of the Security Force

The postal security force is involved primarily in the ongoing protection of postal personnel and property. Its foremost objectives are to deter and prevent postal violations and to protect life and property at selected postal installations. Since its implementation, the security force has contributed greatly in key cities as a deterrent to depredations and assaults; in establishing a more businesslike environment conducive to the safety and well-being of postal employees, postal customers, and tenants of postal buildings; and in improving service to postal customers.

# 1-3   Organization

### 1-3.1   Chief Postal Inspector

The Chief Postal Inspector is responsible for the protection of the mails, enforcement of postal laws, and physical and personnel security. The Chief Postal Inspector also serves as security officer for the Postal Service, and in this capacity, is responsible for the issuance of regulations, instructions, and guidelines pertaining to all security requirements within the Postal Service.

### 1-3.2   Headquarters Security Group

The Headquarters Security Group is responsible for approving and establishing security force contingents at each designated facility and for overall program management of the security force.

### 1-3.3   Inspector in Charge

The INCs are responsible for administering all security force programs assigned to their divisions. In each division, the INC generally assigns this responsibility to another individual, usually the liaison postal inspector (see section 1-3.8.1.5).

### 1-3.4   Manager Postal Police Division and Facility

The manager postal police division (MPPD) or manager postal police facility (MPPF) is responsible for the direct supervision of the security force at an Inspection Service division (or postal police work facility).The MPPD is administratively and functionally accountable to the INC, either directly or through the liaison postal inspector or other official designated by the INC. The MPPF, if assigned, reports to the MPPD.

### 1-3.5   Tour Supervisor Postal Police

When the TSPP is the senior security force official at a facility, he or she will perform the same responsibilities as an MPP. At facilities having an MPP, the TSPP is responsible for the direct supervision of a tour or worksite. The TSPP is then administratively and functionally accountable to the MPP.

### 1-3.6   Supervisor Postal Police

The SPP is responsible for the direct supervision of PPOs in an assigned area. The SPP is normally under the direct supervision of the MPP. The SPP is accountable for his/her tour operation. In larger divisions, the SPP may report to a TSPP or MPP.

### 1-3.7   Postal Police Officer

The PPO is responsible for the protection of mail, postal property, employees, customers, and other authorized persons within an assigned area. PPOs are normally under the direct supervision of SPPs. A divisional organization charge outlining the chain of command can be found in Handbook IS-701, *Security Force Operations,* Exhibit 111.4.

### 1-3.8   Security Force Functions

#### 1-3.8.1   General

##### 1-3.8.1.1   Relationship to Postal Inspectors

PPOs often work closely with postal inspectors in various situations.

##### 1-3.8.1.2   Basic Responsibilities

The basic responsibility for investigating violations of postal laws rests with postal inspectors. Security force personnel have the responsibility at designated facilities to protect persons, mail, and property; to prevent breaches of the peace; and to enforce the rules and regulations governing conduct on postal property. See, for example, Poster 7, *Rules and Regulations Governing Conduct on Postal Property,* and Poster 158, *Possession of Firearms and Other Dangerous Weapons on Postal Property is Prohibited by Law.*

##### 1-3.8.1.3   Investigative Efforts

Security force personnel are not authorized to extend their investigative efforts on their own beyond preliminary fact finding in any given situation. Under normal conditions, security force personnel will not assist in criminal investigations unless such assistance can be rendered within the scope of their assigned duties. Inspectors requiring the assistance of security force personnel in the course of criminal investigations will coordinate such requests in advance, with the appropriate security force supervisor, through the MPP. In emergency situations, where immediate action is required, inspectors are authorized to deal directly with PPOs, but must advise the appropriate SPP and MPP of their action as soon as possible. The MPP is required to report all requests for assistance in criminal investigations to the INC through the liaison inspector or other designated official but shall not withhold assistance pending such notification.

##### 1-3.8.1.4   Postal Police Officer Actions

Security force personnel shall immediately report to their supervisor any known or suspected criminal violations occurring within their jurisdiction for attention by postal inspectors. This matter will generally be reported in an incident report under the appropriate category. In those cases where available facts indicate immediate action is necessary to protect postal personnel, customers, mail, or property, security force personnel shall stop and detain suspected violators pending the arrival of inspectors. If conditions warrant, the offender will be placed under arrest by security force personnel.

Security force personnel will be available to present such testimony as may be required at administrative proceedings or criminal prosecutions.

### 1-3.8.1.5  Liaison Postal Inspector

The liaison postal inspector for each location where there are security force personnel will be available to all security force personnel for consultation about significant matters relating to the Inspection Service or to the Postal Service. Since inspectors and PPOs have common interest and responsibilities, a close working relationship should be developed and maintained between them. Security force personnel, through their supervisor, should contact the liaison inspector to report matters requiring further attention by postal inspectors. Security force personnel are not administratively responsible to the liaison inspector.

### 1-3.8.1.6  Presence of Postal Inspector

Investigative efforts of postal inspectors sometimes require their identity and position to remain unknown; therefore, greeting them by name and/or title could jeopardize their personal safety, the investigation, or both. Security force personnel should not acknowledge the presence of a postal inspector until the inspector initiates such acknowledgment. Notification of an inspector's presence to other persons, even other security force officers, by any means unless specifically requested by the inspector, is prohibited. These restrictions also apply to other federal law enforcement agencies and officers, to the extent prescribed by good judgment.

### 1-3.8.2  Primary

The primary functions of the security force may include:

a.   Assuring the security of Postal Service employees, as well as visitors, on or within facilities under the charge and control of the Postal Service.

b.   Protecting government property, including property of the Postal Service, as well as other property within the postal system.

c.   Protecting all mail in the custody of the U. S. Postal Service.

d.   Enforcing duly authorized rules and regulations as may be established by the installation head or other Postal Service authority, including Poster 7 and Poster 158.

### 1-3.8.3  Other

Other functions of the security force may include:

a.   Provide access control at entrances and exits of Postal Service facilities.

b.   Provide security in parking and staging areas.

c.   Provide vehicle and foot patrols of Postal Service property as required.

d.   Intercept and detain unauthorized persons found in Postal Service facilities.

e.   Collect and preserve evidence, record names of witnesses, etc., in civil and criminal matters, as required in cooperation with local management and authorized inspection service personnel.

f.   Respond to emergency situations such as assaults, unruly or disruptive persons, illnesses, fires, and other conditions requiring immediate attention, so as to maintain order and prevent injuries and damage to property.

g.   Render first aid in emergency situations, as needed.

h.   Perform fire fighting and other emergency duties, as required.

i.   Provide convoys and escorts for shipments of high-value mail in transit, as required.

j.   Monitor and respond to burglar, holdup, and duress alarm activations when required.

# 1-4   Statutory Authority

### 1-4.1   Special Police Authority

The Postal Service is authorized to employ PPOs as special policemen by Title IV of the Treasury, Postal Service, and General Government Appropriations Act, 1973, (Public Law 92–351, July 13, 1982). Since 1972, this authority has been continued in riders to annual appropriations acts. These annual riders have made Title 40, *United States Code,* Section 318, applicable to the Postal Service, thereby conferring on PPOs the powers of special policemen, while on property owned, leased, or under the control of the Postal Service.

### 1-4.2   Postal Authority

In addition, the Postal Service is authorized to issue its own rules and regulations necessary for the management of its property and to establish reasonable penalties for violations of these rules and regulations. The rules and regulations applicable to conduct on Postal Service property are contained in Title 39, *Code of Federal Regulations,* Section 232.1. (They may also be found, in part, in section 124, *Postal Operations Manual.*) USPS Poster 7 is a reprint of this section. This poster must be conspicuously displayed on all postal property.

### 1-4.3   Title 40, United States Code, Section 318

This federal statute grants to PPOs the powers of special policemen as follows:

a.   To enforce Postal Service rules and regulations on Postal Service controlled property.

b.   To enforce all laws (including local ordinances) enacted for the protection of persons and property, e.g., assaults, thefts, and vandalism, occurring on Postal Service controlled property.

c.    To prevent breaches of the peace occurring on Postal Service controlled property.

d.    To control unlawful assemblies occurring on Postal Service controlled property.

The circumstances of all arrests made by PPOs under this special police authority shall be immediately reported to the appropriate security force supervisor.

### 1-4.4  Powers Not Granted

The jurisdiction and policing powers of the security force do not extend to the service of civil process. The policing powers of the security force are restricted to Postal Service controlled property (*Exceptions:* "hot pursuit" and "citizen's arrests." See section 2-3.4 of this manual). The term "hot pursuit" refers only to a chase on foot. PPOs and postal police supervisory or management personnel are not authorized to perform high-speed pursuit (i.e., in excess of posted speed limits) in a vehicle.

# 1-5   Labor Management Relations

### 1-5.1  Standards of Conduct

Part 660 of the *Employee and Labor Relations Manual* (ELM) outlines the Code of Ethical Conduct for Postal Employees. It is designed to instruct and guide employees entering the Postal Service and to remind all employees of the conduct expected and required of them in performing their official duties and in their general conduct. All security force personnel must read and become familiar with this code. PPOs should also refer to section 6.02 of the USPS-FOP collective bargaining agreement.

### 1-5.2  Personal Appearance

A uniformed PPO must present a neat, professional appearance. PPOs will make every effort to keep physically fit.

### 1-5.3  Arrests

All employees of the Inspection Service, including members of the security force, are to advise their immediate supervisor promptly, in writing, if they have been taken into custody, held for investigation or questioning, been arrested, or if charges have been brought against them by any law enforcement agency. All incidents are to be reported. An officer must inform the officer's supervisor immediately of the revocation or suspension of the state driver's license. When a delay of more than one week is expected between the date of arrest or citation and the final disposition, a separate report is to be submitted concerning each stage of the proceedings.

## 1-5.4 Equal Employment Opportunity

It is the policy of the Postal Service to provide equal opportunities for all employees in employment, training, promotion, assignment, and job security, without discrimination because of race, color, sex, religion, age, national origin, political affiliation, marital status, or physical impairment (if the position may be efficiently performed by a person with the physical impairment).

## 1-5.5 Labor Organizations

Each postal employee has the right freely and without fear of penalty or reprisal, to form, join, and assist a labor organization, or to refrain from any such activity. Each employee shall be protected in the exercise of this right.

## 1-5.6 Transfers, Reassignments, Relocation, andTemporary Assignments

See Handbook IS-701, *Security Force Operations,* sections 131 and 132, and the collective bargaining agreement.

## 1-5.7 Prohibited Conduct

Actions or conduct for which corrective action (including discharge) may be taken against an officer encompass, but are not limited to:

a.   Disobedience or violation of any security force rule, regulation, or instruction; or refusal or failure to obey the lawful order of a superior officer. When an order conflicts with any previous order or instruction, the officer should advise the person issuing the second order that the order is in conflict with a previous order or instruction. Responsibility for countermanding the original order or instruction then rests with the superior officer. This does not lessen the requirement for obedience.

b.   Commission of a crime under any statute, law, or ordinance (local, state, or federal); failure to report an arrest, etc., as set forth in section 1-5.3 of this manual.

c.   Any conduct which tends to embarrass or bring disrepute to the Postal Service.

d.   Making a false statement in connection with any official matter.

e.   Failure to promptly and officially report the loss or theft of official equipment.

f.   Illegal possession or use of any drug defined as a controlled substance.

g.   Consumption of any intoxicating beverage while on duty or in uniform, including rest breaks and lunch periods; reporting for duty under the influence of any intoxicating beverage.

h.   Any display of disrespect between officers or malicious statements regarding an officer.

i.   Solicitation for or acceptance of any gifts, gratuity, favor, entertainment, loan, or other thing of value from any person by virtue of the officer's official position.

j.    Violation of the Code of Ethical Conduct for Postal Employees as contained in ELM 660 and Inspection Service Code of Ethics. Refer to Article 6 of the collective bargaining agreement between the USPS and the postal police bargaining unit.

k.    Willful mistreatment of, or unnecessary violence or indignity to, a person in custody or to others in any official matter.

l.    Inattentiveness, inefficiency, carelessness, incompetence, or negligence in the discharge of assigned duties.

m.    Use of indecent, profane, or unnecessarily harsh or loud language while on duty or in uniform.

n.    Gambling while on duty or in uniform, as outlined in USPS Poster 7.

o.    Eating while on post, except as may be authorized to meet unusual working conditions or situations.

p.    Smoking or chewing tobacco while on duty, except where such behavior would be acceptable under local situations and the MPP approves. The MPP will designate in writing approved specific areas or conditions where smoking and/or chewing tobacco is permitted.

q.    Sleeping, loitering, recreational reading, watching commercial or public television, or any unauthorized activity which lessens full attention required while on duty (lunch periods and authorized rest breaks excepted).

r.    Conducting private business while on duty, except during lunch periods and authorized rest breaks.

s.    Leaving an assigned post prior to being properly relieved or dismissed, except in an emergency.

t.    Misuse of an official vehicle including deviation from the normal or shortest line of travel between authorized points of duty for other than official purposes, failure to promptly and officially report damage to an official vehicle or equipment, failure to promptly and officially report revocation of your state driver's license.

u.    Failure to account for Postal Service property officially entrusted to, or coming under the officer's care, custody, or control in the course of official duties.

v.    Negligence in the care or handling of postal property, resulting in its abuse, misuse, waste, destruction or loss; and personal use of official vehicles, equipment, or supplies.

w.    Giving or allowing unauthorized persons access to privileged information or material belonging to the Postal Service.

x.    Unauthorized handling, display, or discharge of a firearm; or illegal possession of weapons or dangerous articles on postal property.

y.    Failure to observe safety rules and regulations.

z.    Any other act or omission which is contrary to good order and efficient operation.

1-5.8 ## Corrective Action

Postal officials and supervisors have been instructed to establish and maintain discipline through positive supervisory practices. Corrective action shall develop, in postal employees, an attitude which motivates them to perform their duties in an acceptable manner, and helps to prevent situations requiring further corrective action. If it becomes necessary to take corrective measures against any security force employee, a basic principle shall be that such measures should be corrective rather than punitive. Corrective action given to PPOs will be administered in accordance with the applicable collective bargaining agreements and, for supervisory personnel, in accordance with ELM 650.

# 1-6  Time, Attendance, and Leave

1-6.1 ## General

The administration of matters regarding time, attendance, and leave will be handled in accordance with applicable Postal Service instructions and regulations. Information regarding promotions, higher-level pay, and other benefits is outlined in the ELM. The following information is intended to acquaint the officer with some of the basic principles.

1-6.2 ## Duty Schedules

Duty schedules will be established, changed, or modified to provide that degree of coverage deemed necessary and appropriate for each work facility. Personal problems and needs will be given consideration whenever possible. However, the operational needs of the Inspection Service must prevail.

1-6.3 ## Roll Call and Inspection

The SPP will normally inspect all security force personnel prior to assigning them to their respective duty posts. At this time, officers will be briefed on any special orders pertaining to their assignments. It is essential that each officer be punctual and attentive at roll call.

1-6.4 ## Recording Time

1-6.4.1 ### General

Security force personnel must maintain their time cards in the manner prescribed at each work facility. No officer may record entries on another officer's time card, except as may be required in the course of official duty. False entries on timecards may subject the officer to prosecutive as well as disciplinary action.

1-6.4.2 **Overtime**

Administrative approval is required for the use of overtime. It will be used only when operational needs dictate as determined by the MPP.

1-6.4.3 **Tardiness**

The duties and responsibilities of a PPO require a degree of reliability above that expected of employees engaged in less critical endeavors. The need for continuous coverage on established posts makes it essential that each PPO report for duty on time. Tardiness will not be tolerated and will be considered just cause for corrective action.

## 1-6.5 Availability In Emergencies

In emergency situations, as defined in the applicable collective bargaining agreements, it may be necessary to call upon off-duty PPOs to report for duty prior to their next regularly scheduled tour. All PPOs shall maintain a telephone at their residence, or shall provide a telephone number through which they may be contacted after normal duty hours. A record of that telephone number and any subsequent changes must be filed with the MPP.

## 1-6.6 Leave

1-6.6.1 **General**

The leave program will be administered on an equitable basis with due regard for the needs of the Inspection Service and the welfare of individual employees in accordance with the applicable collective bargaining agreement and chapter 5 of the ELM.

1-6.6.2 **Annual**

Except for emergencies, annual leave for all employees must be requested by submitting a Form 3971, *Request for Notification of Absence,* and approved in advance by the appropriate supervisor.

1-6.6.3 **Sick**

It is important that PPOs give notice of illness as soon as possible. Form 3971 must be completed by the officer upon return to duty. Employees on sick leave for extended periods may be required to submit, at appropriate intervals, satisfactory evidence of continued incapacity for work. Application for sick leave for medical, dental, or optical examinations or treatment must be submitted in advance, except in case of emergency. All requests for an advance of sick leave must be supported by documentation (see ELM 513.5). For periods of absence of 3 days or less, a supervisor may accept an employee's certification as reason for absence. A medical certificate or other acceptable evidence of incapacity for duty must be furnished to cover absences of more than 3 days. A PPO who has been out on sick leave for more than 21 days or who has been hospitalized must provide documentation to support his or her ability to return to duty. See USPS

Publication 71 (Part VI), *Notice for Employees Requesting Leave for Conditions Covered by Family and Medical Leave Policies,* for a description of the necessary documentation.

### 1-6.6.4  Other

In addition to annual and sick leave, officers may qualify for other types of leave. Included in this category are court leave, military leave, holiday leave, and leave without pay (LWOP).

## 1-6.7  Military Obligations

Each PPO or supervisor must file a statement with the INC if the employee is liable for military service in the event of a national emergency because of Armed Forces Reserve or National Guard obligations. The statement should outline:

a.   The military department or branch.

b.   The type of reserve (ready or standby, inactive or retired).

c.   The arm of the service to which assigned (infantry, Adjutant General's corps, artillery, etc.).

d.   Present military grade or rank.

e.   Military occupation specialty code and title of specialty.

If the individual is in the active Reserve, National Guard, or Air National Guard, the name and location of the unit, mobility assignment, and mobility availability category should be stated.

# 2 Duties and Responsibilities

## 2-1 Duties

### 2-1.1 Purpose

The purpose of the security force at any facility is security and protection. Security force personnel should restrict their activities in all postal workroom areas to routine patrols, as specified in post instructions, and specific emergency requests by postal supervisors. All instances of security force personnel being in postal workroom areas, other than routine patrols called for by duty assignments and emergency situations, should be at the direction of the supervisor postal police (SPP). Various detailed instructions and responsibilities that apply to specific assignments (local conditions may vary) are outlined in chapter 2 of Handbook IS-701, *Security Force Operations.*

### 2-1.2 Assignments

Duty assignments will be made by the manager postal police (MPP) or SPP, as appropriate. A priority of posts will be established to identify those that can be vacated in the event of an emergency. Types of assignments will differ at various security force facilities. The general duties and responsibilities of postal police officers (PPOs) include, but are not limited to, the following:

a.   To protect life, mail, and property within their prescribed area of authority.

b.   To obey the lawful orders of their supervisors.

c.   To be familiar with all laws, statutes, and regulations (local, state, and federal) which pertain to their duties and responsibilities.

d.   To report all unusual incidents occurring within their area of responsibility. Matters pertaining to internal affairs should be reported to a supervisor or a postal inspector, as appropriate.

e.   To enforce duly authorized security regulations.

f.   To perform their assigned duties in a timely and efficient manner.

g.   To consistently maintain and exhibit professional bearing and deportment.

h.   To employ good human relations skills in all encounters with other people while on duty.

### 2-1.3 Assistance to Other Law Enforcement Agencies

Full assistance should be rendered to properly identified law enforcement agents, consistent with facility rules, proper security measures, and good judgment. Poster 7 states that "no person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal property except for official purposes." Properly identified, armed law enforcement agents (federal, state, or local) or armed guards, should be allowed entry into lobby and dock areas if they are on official business. However, even if properly identified, law enforcement officers should not be allowed access to workroom areas except in an extreme emergency. When authorized persons request to serve a warrant or process on on-duty personnel, good judgment should prevail as to whether or not to wait until the completion of the employee's tour. Except in extreme emergencies, the employee's supervisor should be notified and the employee escorted to the security force control center by the PPO/supervisor, where the warrant or process can be served.

### 2-1.4 Mail Security — Sanctity of the Seal

The Postal Service must provide security for all mail in its custody from unauthorized opening, inspection, or reading of contents or covers, tampering, delay, or other unauthorized acts. Any requests to examine mail in the custody of the Postal Service must be referred to a postal inspector.

### 2-1.5 Multiple Personnel Response

In any situation where a belligerent person is involved, or where the nature of the known situation is such that there is real or potential danger to life and property, more than one PPO should respond. An officer who initially responds to or discovers such a situation should immediately request assistance by the most expeditious means of communication possible.

## 2-2   References and Definitions

### 2-2.1 Committed in Presence

It has been held by courts that an offense is committed "in the presence of an officer" when the officer can detect its commission by the use of his or her senses.

### 2-2.2 Probable Cause

Probable cause means personal knowledge of facts, or of information from reliable sources, which would cause a reasonable person to believe that a crime has been committed by the person being arrested. Mere suspicion is not probable cause.

### 2-2.3 Felony

A serious crime punishable under federal law by death or by imprisonment in a penitentiary for a period in excess of one year.

### 2-2.4 Misdemeanor

An offense lesser than a felony and punishable under federal law by a fine or confinement in an institution for a period of 1 year or less.

### 2-2.5 Police/Citizen Encounters

#### 2-2.5.1 General

The courts recognize three types of police/citizen encounters. The rights of the individual, as well as the officer's authority, will vary greatly depending on this designation.

#### 2-2.5.2 Voluntary Response

This is the first level of police/citizen encounters recognized by the courts. In this situation, the officer does not have reason to suspect the individual of a crime. The subject can completely ignore the officer if he/she chooses and is free to leave at any time.

#### 2-2.5.3 Investigative Detention

An articulable set of facts which would cause a reasonably prudent person with the officer's training and experience to suspect that someone has either committed a crime, is about to commit a crime, or is armed with a dangerous weapon. To meet the "reasonable suspicion" standard, officers must point to specific and articulable facts, together with rational inferences drawn from these facts that reasonably suggest criminal activity has occurred or is imminent. Inarticulable hunches or generalized suspicions are insufficient.

For postal-related crimes committed on postal property, based upon reasonable suspicion that criminal activity is taking place, PPOs may stop an individual and temporarily detain them to confirm or dispel their suspicions. Weapons pat-downs or "frisks" are allowed during investigative detentions if the officer has reasonable suspicion that the subject is armed. This detention is sometimes referred to as a "terry stop."

#### 2-2.5.4 Arrests

An arrest takes place when a person is intentionally restrained for criminal law enforcement purposes. It is necessary that a person being arrested understand that he/she is being placed under arrest by a person authorized to make an arrest.

Any detention that exceeds the boundaries of an investigative detention becomes an arrest and must be supported by probable cause. In making the decision as to whether an arrest has occurred, courts consider the diligence of police in resolving the reasonable suspicion as quickly as possible, the scope and nature of the restraints placed on the individual's liberty, and whether police transported the detainee.

# 2-3   Arrest Procedures

### 2-3.1 General

Refer to section 1-4 of this manual which outlines the statutory powers of PPOs. PPOs have the responsibility to make every effort to prevent offenses of all types on postal property. Officers must be on the alert for incidents which appear to indicate an illegal activity, and to take steps to prevent offenses if possible. To do this successfully, they must use tact and good judgment, remain calm, and act firmly, without hesitation. Care should be exercised so as not to interfere with or prevent a successful investigation by postal inspectors.

### 2-3.2 Arrests with Warrant

In exercising their powers as special policemen, PPOs may make arrests on postal property on the basis of a valid arrest warrant.

### 2-3.3 Arrests Without Warrant

In the absence of an arrest warrant, PPOs may make arrests while on postal property, or following continuous "hot pursuit" (See section 1-4.4 for definition) from postal property when:

a.   A felony is committed on postal property in the officer's presence, or the officer has probable cause to believe that a felony has been committed on postal property and the person to be arrested committed the offense.

b.   The offense is a misdemeanor and is committed on postal property in the officer's presence.

### 2-3.4 Exercise of Nonstatutory Authority

PPOs while on official duty may find it necessary to place persons under arrest for violations of the law which do not occur on postal property; or arrest persons who at the time of arrest are not on postal property. Except for "hot pursuit" provisions, the officer is generally making the arrest as a private citizen. Some states do not recognize citizen's arrests. PPOs should be guided by state law regarding citizen's arrests, as well as division policy. Due care must be exercised in making a citizen's arrest.

2-3.5  ## Use of Handcuffs

All persons arrested will be handcuffed, with hands behind the back to prevent injury to themselves and/or the arresting officer. Handcuffs will be double-locked when placed on all persons arrested by PPOs.

2-3.6  ## Right Against Self-Incrimination

Immediately after a person has been arrested, the arrested person must be advised of his/her constitutional rights against self-incrimination and to the presence of counsel. Each officer must determine that every arrested person fully understands such rights and must be able to discern whether the person knowingly and intelligently waives these rights; otherwise, anything the arrested person says cannot be used in court. A copy of Form 1067, *Warning and Waiver of Rights,* appears as Exhibit 2-3.6 on the following page, and instructions for its use are found in section 223.21 of Handbook IS-701, *Security Force Operations.*

2-3.7  ## Searches

2-3.7.1  ### Incident to Arrest

The Fourth Amendment to the U.S. Constitution protects every citizen against unreasonable search and seizure. The search of a person in connection with a lawful arrest has long been established as reasonable and not in violation of an individual's Fourth Amendment rights. Security force personnel should conduct a search of each person arrested in order to protect themselves, to prevent escape or suicide, and to prevent the destruction of evidence. This search must be conducted as soon as possible after the arrest has been effected and includes all containers, locked and unlocked, within reach of the subject.

2-3.7.2  ### Stop and Frisk

In addition to searches conducted incident to lawful arrests, there is established legal precedent for limited search without arrest. In a stop and frisk situation, officers may frisk or "pat down" a person, but only for the purpose of protecting oneself and others from harm. This is the sole justification for a frisk in such circumstances. The use of force to make a "pat down" must therefore be limited to that objective. The procedures contained in section 2-3.7.3 of this manual are applicable to all body searches including "stop and frisk."

Postal Police Officer's Guide

Exhibit 2-3.6
**IS Form 1067 – Warning and Waiver of Rights**

---

U.S. Postal Inspection Service
**WARNING AND WAIVER OF RIGHTS**

**Place:** _____

_____

**Date:** _____   **Time:** _____

## WARNING

**BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.**

- **You have a right to remain silent.**
- **Anything you say can be used against you in court.**
- **You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.**
- **If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.**
- **If you decide to answer questions now without a lawyer present, you will still have the right to stop answering questions at any time. You have the right to stop answering questions at any time until you talk to a lawyer.**

**I have read this statement of my rights (This statement of my rights has been read to me) and I understand what my rights are.**

_____   _____   _____
**(Date)**   **(Time)**   **(Signature)**

## WAIVER

**I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.**

_____   _____   _____
**(Date)**   **(Time)**   **(Signature)**

**Witnessed by:** _____

**Title:** _____

**Witnessed by:** _____

**Title:** _____

IS Form **1067** November 2000 (20260-3117)

### 2-3.7.3  Conduct of Body Searches

Because of the potential danger and need to document any evidence obtained during a body search, two or more officers should be present for both an arrest and body search if possible. A body search must be conducted by an officer of the same sex as the subject to be searched. If such an officer is not available, the search should be limited to what is absolutely necessary for the self-protection of the arresting officer, including a search of any purse. A body search should be conducted as soon as an appropriate officer and appropriate facilities are available.

### 2-3.8  Disposition of Persons Arrested

PPOs must contact the SPP as soon as possible when any arrest is made. The supervisor will in turn contact the appropriate postal inspector for further instructions. Until those instructions are received, the officer is to follow locally established custody and communications procedures and take the actions described in section 2-3.7, Searches, and section 5-2.1, *Emergency Medical Aid,* of this handbook.

## 2-4   Use of Force

### 2-4.1  General

Only such force as is necessary to effect an arrest may be used. The use of excessive force or treating a prisoner with abuse is never justified. In all cases, the standard of conduct to be applied is that which an ordinary, reasonable person would apply under the same circumstances. Tact and good judgment should be used to avoid unnecessary, excessive, or abusive actions. Officers will not engage in arguments with employees. Generally, an officer is justified in using only such force as is necessary to:

a.   Secure and detain an offender.

b.   Overcome a prisoner's resistance.

c.   Prevent a prisoner's escape.

d.   Recapture a prisoner after escape.

e.   Protect oneself and others from bodily harm.

### 2-4.2  Firearms

Due care should be exercised by PPOs to protect their weapons while effecting arrests. Review Handbook IS-135, *Firearms,* section 131, for Inspection Service firearms policy.

# 2-5   Criminal Investigations

### 2-5.1   General

Members of the security force who receive information regarding the commission of postal crimes or any planned criminal activities, shall immediately report such information to the SPP for referral to a postal inspector.

### 2-5.2   Internal Intelligence

Security force personnel should not discuss their assignments with anyone other than those individuals directly involved with their work. Extreme care must be used to prevent unauthorized persons from becoming aware of or familiar with security force procedures and information. The PPO bears a large responsibility towards seeing that such information is not available to, overheard, or read by outsiders.

### 2-5.3   Wanted Circulars

Postal wanted circulars will be distributed to each security force worksite and posted where they can be reviewed easily by security force personnel before assuming their posts.

# 3   Appearance and Uniforms

## 3-1   General

A professional image is one of the major assets of the security force. This image is formed to a large degree by the appearance of the postal police officer (PPO) in uniform. A complete uniform will be worn during all tours of duty. Only authorized uniform items and insignia, as specified in chapter 9 of the *Employee and Labor Relations Manual,* will be worn. There will be no variations (seasonal or otherwise) without authorization by the Inspector in Charge (INC).

## 3-2   Male

All male security force personnel will be clean-shaven except that sideburns and mustaches are permissible. Beards will not be worn, unless an exception has been given an individual PPO by the INC. If worn, sideburns must be neatly trimmed, not more than one inch wide, and not extend below the bottom of the ear. Mustaches must be neat, trimmed, and shall not extend beyond or below the corners of the mouth. Hair will be neatly combed and trimmed at all times. The hair must not cover the ears or extend below the collar line. With the hat in place, exposed hair will not be excessively long, bushy, or straggly (see Exhibit 311 of Handbook IS-701, *Security Force Operations).*

## 3-3   Female

Female hair styles shall be neatly combed and styled in such a manner as to permit the wearing of the hat at all times. The hair must not extend below the top of the collar. With the hat in place, exposed hair will not be excessively long, bushy, or straggly. The skirt or culottes for female uniforms shall extend to the middle of the knee. Earrings, if worn, must not extend beyond or over the outer edges of the ear (see Exhibit 312 of Handbook IS-701, *Security Force Operations*).

# 3-4   Uniform

### 3-4.1   General

Instructions regarding the purchase and wearing of uniforms are contained in chapter 3 of Handbook IS-701.

### 3-4.2   Neatness of Uniform

Each member of the security force shall maintain high standards of personal appearance. The uniform will be neat, clean, and well-pressed at all times. Belts, shoes, leather accessories, and metal buttons will be cleaned and well-polished.

### 3-4.3   When Uniform Worn

#### 3-4.3.1   General

The uniform will be worn only when in a duty status or with specific authorization of the MPP or the INC. Issued body armor must be worn while on duty and in uniform unless an exception is granted.

#### 3-4.3.2   Traveling to and From Work

Generally, the uniform will not be worn while traveling to and from work. At locations where the wearing of the uniform while traveling to and from work is not authorized, security force personnel must change into and out of the uniform during their normal tour of duty (on the clock). At facilities where locker room space is not available for the security force or where other extenuating conditions exist, wearing of the uniform to and from work may be authorized by the INC. Security force personnel should bear in mind that when wearing the uniform under these circumstances, they have no authority off the facility premises.

#### 3-4.3.3   Funerals

The INC or designee may allow security force personnel to attend funeral services as guided by local instructions. It is the discretion of the INC or designee to allow security force personnel to wear the uniform, with or without the firearm, at funeral services for Inspection Service personnel. Security force personnel shall be granted annual leave, consistent with the operational requirements of the unit, to attend such funerals. Security force personnel attending such a funeral from a distant point will not wear the official uniform enroute between locations. Changing facilities will be provided at the nearest Inspection Service domicile to the extent possible. See section 344 of Handbook IS-701, *Security Force Operations.*

# 4 Equipment

## 4-1 Accountability

### 4-1.1 Protection

It is the duty of all security force employees to properly protect all equipment assigned for their use. This includes equipment which may be assigned permanently (during each 8-hour tour), such as a firearm, as well as equipment which will be assigned on a temporary basis.

### 4-1.2 Accountability Record, Form 5311

The Form 5311, *Equipment Accountability Record,* is to be prepared by the manager postal police (MPP) or supervisor postal police (SPP), and initialed by the postal police officer (PPO) upon receipt of a piece of equipment. The dates of issuance and return of the equipment are to be entered on the form. The supervisor to whom the piece of equipment is returned will also initial the form.

### 4-1.3 Familiarity with Equipment

All equipment will be inspected prior to issuance to ensure it is in proper working order. If a piece of equipment is found to be unsuitable for use, it will be reported immediately to the SPP on duty. It is important for each officer to be well acquainted with the proper use of the equipment before using it on the job. Officers must also be familiar with any maintenance which may be required with the use of such equipment.

### 4-1.4 Report of Loss or Theft of Property

If any piece of Postal Service property assigned to the security force is lost or stolen, it will be reported immediately to the SPP on duty, who will record the loss and forward the information to the Inspector in Charge (INC) through the manager postal police division (MPPD).

### 4-1.5 Removal of Property or Equipment

The removal of postal property or equipment from the facility is not authorized unless it is cleared with the MPP. Use of postal equipment and supplies for other than official use must comply with Postal Service policy on such use, or else it is prohibited. This includes, but is not limited to: telephone lines, computers, office supplies, typewriters, duplicating, and other office machines.

### 4-1.6 Postal Service Identification

#### 4-1.6.1 Postal Police Officer Credentials

All members of the security force are issued a photo-identification card. This credential should be carried in the credential case. It is issued and controlled by the Inspection Service and may not be displayed off duty, except that PPOs may display the credential to civilian emergency authorities to prove the PPO's status as an emergency employee who needs to travel to postal duty stations.

#### 4-1.6.2 Security Force Badges

Each security force member is issued a cap and breast badge. The purpose of the badge is to clearly identify PPOs while on duty, and should not be removed from the security force facility. The badge will not be used for identification purposes when the officer is in an off-duty status.

#### 4-1.6.3 Valid State Driver's License

#### 4-1.6.4 Requirement

PPOs are required to have a valid state driver's license. If for any reason the state license is suspended, revoked, expires or becomes invalid at any time, the officer must report this immediately to the SPP.

#### 4-1.6.5 Revocation/Suspension of Driving Privileges

It is the PPO's privilege and job requirement to be able to drive postal vehicles. In addition to the requirement of having a valid state driver's license, the following disqualifying factors can remove that ability. Refer also to the applicable collective bargaining agreement.

a.  Physical condition of the driver (driver no longer meets physical fitness requirements as specified in chapter 7 of the *Postal Operations Manual*).

b.  Unsafe driving (driver fails to observe safety rules/regulations).

c.  Accident in which driver is injured or which indicates it is not safe to allow the employee to drive.

d.  Driver involved in two at-fault accidents (while on duty) within a 12-month period.

e.  Driver convicted by civil authority of moving traffic violations (while on duty) more than once in a 12-month period.

# 4-2    Firearms

### 4-2.1    General

Members of the security force are required to carry firearms during the performance of their official duties. Refer to Inspection Service Handbooks IS-135, *Firearms,* and IS 701, *Security Force Operations,* section 41, Firearms.

### 4-2.2    Qualification and Training

Security force personnel must be qualified before they are issued firearms. They must requalify periodically as set forth in Inspection Service Handbook, IS-135, *Firearms.* Failure to qualify will result in adverse action proceedings (see section 414.3, Handbook IS-701, *Security Force Operations*).

### 4-2.3    Authority to Carry Firearms

The security force credential authorizes PPOs to carry service-owned firearms in the performance of their official duties while employed by the Postal Service. The credential must be carried while on duty. It may not be used as a means of establishing personal identity, nor to justify the carrying of personal weapons when off duty.

### 4-2.4    Service Weapons and Ammunition

Security force personnel are issued a Berretta Model 92-D Centurion 9 mm semiautomatic pistol. No modifications to the firing mechanism of the pistol will be made. Personal weapons will not, under any circumstances, be carried by security force personnel while on duty. Except when stored, the service weapon will be fully loaded with issued ammunition. Other types of ammunition will not be used. Ammunition more than 1 year old will not be carried.

### 4-2.5    Security of Firearms

The service weapon will be carried only while on duty and will not be carried to and from the officer's residence. The only exception will be those instances where a security force member begins or ends a tour of duty at the officer's residence in a travel status (see section 412.1, Handbook IS-701, *Security Force Operations*). Each member of the security force is responsible for an issued firearm. The loss or theft of a weapon must be reported immediately to the INC through the SPP. The loss or theft of a weapon from a security force member while it is under the officer's control may be cause for corrective action. Do not permit any person to handle your assigned firearm except as necessary in the performance of official duties.

4-2.6 ## Safety of Firearms

4-2.6.1 ### Accountability

Do not needlessly display a firearm or handle it in a careless manner. At all times, treat every firearm as if it were loaded. Whenever the firearm changes hands or is being stored, it must be unloaded. Using Form 4701, *U.S. Postal Service Firearms Assignment,* or a locally approved identification card which will establish PPO accountability, the Service weapon will be checked out at the beginning of the tour of duty and checked in at the end of the tour. When individual lockboxes are provided, use of Form 4701 is not necessary. In either situation, the return of the service weapon at the end of the tour must be verified by a supervisor or the supervisor's designee.

4-2.6.2 ### Loading and Unloading

There will be no "dry firing" of a service firearm except under direct supervision during a scheduled firearms training or qualification session. At each facility where weapons are issued and checked in, the MPP will designate, in writing, a safety area for loading and unloading weapons. The written instructions will provide that, for reasons of safety, only one PPO will be in this area at any given time.

4-2.6.3 ### Use of Firearms

Firearms are instruments which have the potential for inflicting deadly physical force. A firearm shall be used only when such use is necessary for self defense or to defend another persons(s) from the use or imminent use of deadly physical force. Warning shots are strictly prohibited and shall never be fired under any circumstances. The unjust use of deadly physical force may subject the user to criminal or civil penalties. When danger is imminent, do not take undue risk with your personal safety. The firearm will never be used as a threat, either by taking it from the holster or giving the impression that it will be used in a situation other than when its use is authorized as above. However, if you must use your firearm, you must exercise all possible caution to avoid endangering innocent bystanders. The INC, through the SPP, must be notified immediately when a firearm is discharged (except in a scheduled training or qualification session at a scheduled location) by a security force member, regardless of the circumstances (see Inspection Service Handbook IS-135, *Firearms*).

4-2.7 ## Use and Assignment of Shotguns

Based upon need, various security force worksites may have 12-gauge, pump-action shotguns assigned. They will be assigned only for specific job assignments, such as escort duty. They will be checked out to the PPO immediately prior to undertaking a special assignment and checked in upon completion of the assignment. Form 4701 may be utilized for this purpose. All PPOs who are to be assigned a shotgun must have qualified with the weapon and be thoroughly familiar with its operation. Refer to Inspection Service Handbook IS-135, *Firearms,* for additional information. All shotguns are to be

unloaded when turned in at the end of an assignment. The SPP on duty should verify that the shotgun is unloaded.

# 4-3   Two-Way Radio

### 4-3.1   Use

Personal messages shall not be transmitted by radio at any time. Radio equipment is for official duty only and the assigned frequency must be kept clear at all times except when actually in use to receive or transmit official messages. All official messages should be as brief as practical to avoid tying up the radio frequency unnecessarily. The Federal Communications Commission (FCC) has also established a strict prohibition against the use of profanity on the radio.

### 4-3.2   Radio Communications

A security force radio communications network with a standard frequency has been established nationwide. It is also desirable to have a uniform "language-code" which will be readily understood by the PPO no matter where assigned. The alpha code has been adopted and will be used in spelling names and conveying license registrations, street addresses, etc., by radio. The alpha code is as follows:

| Letter | Word | Letter | Word |
|--------|---------|--------|---------|
| A | Adam | N | Nora |
| B | Boy | O | Ocean |
| C | Charles | P | Paul |
| D | David | Q | Queen |
| E | Edward | R | Robert |
| F | Frank | S | Sam |
| G | George | T | Tom |
| H | Henry | U | Union |
| I | Ida | V | Victor |
| J | John | W | William |
| K | King | X | X–Ray |
| L | Lincoln | Y | Young |
| M | Mary | Z | Zebra |

### 4-3.3 Ten-Signal Code

The 10-signal code commonly used by law enforcement agencies is intended to speed transmission of information and limit disclosure of confidential information. The following cede numbers should be used as indicated.

***Note:*** Many of the standard 10-signal codes are not applicable to normal Inspection Service operations. They are included for possible use and understanding in joint operations or monitoring of local police transmissions:

10–0    Caution
10–1    Unable to copy–change location
10–2    Signal good
10–3    Stop transmitting
10–4    Acknowledgment (OK)
10–5    Relay
10–6    Busy unless urgent
10–7    Out of service
10–8    In service
10–9    Repeal
10–10   Fight in progress
10–11   Dog case
10–12   Stand by (stop)
10–13   Weather/road report
10–14   Prowler report
10–15   Civil disturbance
10–16   Domestic problem
10–17   Meet complainant
10–18   Quickly
10–19   Return to…
10–20   Location
10–21   Call…by telephone
10–22   Disregard
10–23   Arrived at scene
10–24   Assignment completed
10–25   Report in person (meet)
10–26   Detained subject, expedite
10–27   (Driver's) license info
10–28   Vehicle registration info
10–29   Check for wanted
10–30   Unnecessary use of radio
10–31   Crime in progress
10–32   Man with gun
10–33   Emergency
10–34   Riot
10–35   Major crime alert
10–36   Correct time
10–37   (Investigate) suspicious vehicle

10–39  Urgent, use light, siren
10–40  Silent run, no light, siren
10–41  Beginning tour of duty
10–42  Ending tour of duty
10–43  Information
10–44  Permission to leave for…
10–45  Animal carcass at…
10–46  Assist motorist
10–47  Emergency road repair at…
10–48  Traffic standard repair at…
10–49  Traffic light, out at…
10–50  Accident (F, PI, PD)
10–51  Wrecker needed
10–52  Ambulance needed at…
10–53  Road blocked at…
10–54  Livestock on highway
10–55  Intoxicated driver
10–56  Intoxicated pedestrian
10–57  Hit and run (F, PI, PO)
10–58  Direct traffic
10–59  Convoy or escort
10–60  Squad in vicinity
10–61  Personnel in area
10–62  Reply to message
10–63  Prepare, make written copy
10–64  Message for local delivery
10–65  Net message assignment
10–66  Message cancellation
10–67  Clear for net message
10–68  Dispatch information
10–69  Message received
10–70  Fire alarm
10–71  Advise nature of fire
10–72  Report progress of fire
10–73  Smoke report
10–74  Negative
10–75  In contact with
10–76  En route…
10–77  ETA (Estimated time of arrival)
10–78  Need assistance
10–79  Notify coroner
10–80  Chase in progress
10–81  Breathalyzer report
10–82  Reserve lodging
10–83  Work school crossing at…
10–84  In meeting…advise ETA

10–85 Delayed due to…

10–86 Officer/operator on duty

10–87 Pick–up/distribute checks

10–88 Present telephone number of…

10–89 Bomb threat

10–90 Bank alarm at…

10–91 Pick up prisoner at…

10–92 Improperly parked vehicle

10–93 Blockade

10–94 Drag racing

10–95 Prisoner/subject in custody

10–96 Mental subject

10–97 Check (test) signal

10–98 Prisoner/jail break

10–99 Wanted/stolen indicated

# 4-4   Emergency Warning Equipment

### 4-4.1   Conditions

Emergency lights and sirens will only be used under the following conditions:

a.   Life in danger: Situations wherein a PPO believes there is imminent risk of death or personal injury and where he reasonably believes his actions as a law enforcement officer would prevent this from occurring.

b.   Stopping the vehicle driven by an actual or suspected postal violator.

***Note:***  In all cases, all traffic laws must be obeyed. High-speed pursuit is *never* authorized.

### 4-4.2   Safety

These warning devices are activated to facilitate the movement of the emergency vehicle through traffic only as provided above.

In no instance will a PPO undertake high-speed pursuit.

### 4-4.3   Responsibility

a.   The driver of an emergency vehicle is not relieved from the responsibility to drive with due regard for the safety of all persons, nor is he/she protected from the consequences of an arbitrary exercise of these privileges.

b.   The operator must never assume that a vehicle will yield the right-of-way, and he/she must be ready to yield if it becomes necessary.

c.   The driver must obey all traffic laws.

### 4-4.4 Liability

a. In situations involving the use of emergency equipment, i.e., red or blue flashing police lights and sirens, where an employee is determined by the courts to be legally responsible for an accident with a pedestrian or second vehicle, justification for the use of the emergency equipment would be one factor used in the determination of liability and, almost assuredly, in the determination of damages. All of the circumstances of an accident would also be subject to consideration, e.g., speed of vehicle, right-of-way, weather conditions, traffic conditions, driver impairments, etc.

b. Unauthorized, arbitrary, or indiscriminate use of emergency equipment would be a significant factor used in evaluating the employee's conduct and could be construed as acting outside the scope of the employee's employment. In this situation, there is a strong possibility that representation by the government would not be afforded the driver if sued in his/her individual capacity.

### 4-4.5 Federal Tort Claims Act

a. At present, the Federal Tort Claims Act makes the government liable for tort claims based on the negligent or wrongful act or omission of any government employee while acting within the scope of his/her office or employment.

b. Such liability is to be determined "in the same manner and to the same extent as a private individual under like circumstances in accordance with the law of the place where the act or omission occurred." Thus, the negligent driver of a government vehicle is shielded from suit except as noted above. However, he/she may be liable to the government administratively based upon agency policy.

c. Corrective action could be taken against the employee including letter of warning, suspension, or discharge. In addition, collection from him/her may be made for the damage to the government property and loss to the Postal Service from the accident.

This page intentionally left blank

# 5 Special Instructions

## 5-1 Postal Crimes and Other Incidents

### 5-1.1 Robbery

When an armed robbery occurs in an officer's presence, or when an officer is notified that an armed robbery is in progress, the officer shall, if it appears reasonable and prudent under the circumstances, attempt to prevent the robbery and apprehend the offender(s). In deciding the proper course of action, primary consideration must be given the safety of postal personnel, customers, and bystanders. As soon as conditions permit, a postal inspector shall be notified. If an inspector is not immediately available, agencies' assistance should be requested from local law enforcement agencies. Local robbery plans must be followed as applicable.

### 5-1.2 Burglary

Security force personnel at some locations have responsibility for monitoring and responding to burglar alarms. At all locations, security force personnel have responsibility to be alert to any evidence of a burglary at a facility for which they have protection responsibility. Prompt and planned action should be taken in accordance with predetermined instructions furnished by the manager postal police (MPP) and/or the Inspector in Charge (INC).

### 5-1.3 Theft of Mail

If, in the presence of a postal police officer (PPO), an attempt is made to remove mail from a postal facility in an unauthorized manner or by unauthorized personnel, the PPO shall detain the person(s) for questioning by a postal inspector. The officer shall notify the supervisor postal police (SPP) and secure the mail pending arrival of a postal inspector. If the PPO merely suspects that a theft of mail has occurred, the officer will report the suspicion to the SPP, who will immediately notify a postal inspector. A postal inspector will assume responsibility for conducting the investigation.

### 5-1.4   Assaults and Altercations

When a PPO observes or is notified of an assault or altercation taking place on postal property, the officer shall:

a.   Assist in ending the assault, using no more force than is reasonably necessary.

b.   Render first aid and/or summon emergency and medical assistance, as appropriate.

c.   Notify the SPP.

d.   Record all necessary information concerning the incident, including the name, address and telephone number of each witness.

e.   Remain on the scene until relieved by the SPP.

f.   Take statements from all witnesses when requested to do so by the SPP.

g.   Render such assistance as may be required by the investigating inspector.

h.   Prepare a written incident report and forward it to the SPP after the incident.

# 5-2   Safety and Health

## 5-2.1   Emergency Medical Aid

### 5-2.1.1   Definition

First aid is the immediate and temporary care given to the victims of accidents, injuries, and sudden illnesses until medical help is available. The person administering first aid need not be a trained medical technician, but should know the proper emergency measures needed to have the victim in a better condition to receive treatment when trained personnel arrive.

### 5-2.1.2   Security Force Responsibility

PPOs are often among the first to arrive at the scene of an accident or other emergency. The action taken in the first few minutes may be more beneficial to the victim's recovery than the treatment given by skilled medical help an hour or so later. Saving a life may well depend upon a PPO's knowledge and ability to apply first aid. The officer should know what first aid is, when to administer it, and how to apply it. All PPOs should be able to apply first aid quickly, efficiently and correctly. A first aid publication will be on hand in the facility library.

### 5-2.1.3   General Rules

When administering first aid, it is just as important to know what not to do as it is to know what to do. The "do's and don'ts" listed below are actions to be taken, precautions to be observed, and limitations which apply when first aid is necessary: PPOs should take necessary precautions when assisting an

injured person that is bleeding. Officers should wear rubber gloves and any other protective equipment assigned to them.

a.   Examine the victim for signs of breathing. If the victim is not breathing, begin artificial respiration or cardiopulmonary resuscitation (CPR) immediately. Application of CPR should only be conducted by an officer who is properly certified.

b.   Examine the victim for signs of bleeding, broken bones, shock, and/or poisoning.

c.   Stop the bleeding, prevent or care for shock, and protect the wound.

d.   Make the victim as comfortable as possible.

e.   Send for competent medical aid.

f.   Keep the injured person warm.

g.   Avoid unnecessary movement of the victim.

h.   Be calm — the scene of an accident or other emergency is no place for an excited person.

i.   Reassure the victim. Inform the victim that immediate measures are being taken to help.

j.   Determine if the victim has any identification (bracelet, medallion, wallet card, etc.) indicating a medical condition such as diabetes, heart condition, etc.

k.   Do not attempt first aid measures that are beyond your capabilities. A person unskilled in first aid, no matter how sincere the intentions, is apt to do more harm than good.

When a customer or postal employee is injured on postal property, the safety officer at the site should be notified immediately.

## 5-2.2   General Safety And Health

### 5-2.2.1   General

While no list of such hazards can be all inclusive, the following will provide a general guide to areas of concern. Only a genuine interest in improving job safety, coupled with sound judgment, will suggest the total range of deficiencies which should be reported.

### 5-2.2.2   Exterior Areas

Give attention to:

a.   Outdoor stairways, walks, driveways, and parking areas not properly maintained.

b.   Signs, collection boxes, etc., not secured to the ground, and/or not properly maintained.

c.   Vehicular safety not practiced by employees and/or not enforced by postal supervisors.

d.   Exterior lighting insufficient to prevent nighttime injuries and depredations.

e.   Policing of debris from external areas neglected for unreasonable periods.

f.   Compactors or waste dumpsters not covered and/or not routinely emptied before overflowing.

### 5-2.2.3   Interior

Give attention to:

### 5-2.2.3.1   Floors

a.   Spillage and/or debris not cleaned or removed in a reasonable time.

b.   Wet or recently mopped areas not posted with caution signs.

c.   Floors not maintained in good repair.

d.   Where practical, rugs, carpets or other floor coverings not secured to prevent tripping and/or slipping.

e.   Floor openings (hatchways, ladder-wells, etc.) not guarded by rails or holecovers.

### 5-2.2.3.2   Aisles

a.   Permanent aisles not marked.

b.   Aisles obstructed by storage of materials.

c.   Unguarded cords, wires, hoses, etc., across aisles.

### 5-2.2.3.3   Stairways

a.   Stairways obstructed.

b.   Handrails loose or in poor repair.

c.   Steps in poor or unsafe condition.

d.   Loitering or unsafe conduct on stairways.

### 5-2.2.3.4   Storage Areas

a.   Areas not kept clean and orderly.

b.   Heavy materials not stored in stable and secure manner.

c.   Combustibles not stored in covered containers and/or not properly marked.

### 5-2.2.3.5   Toilets

Toilets not maintained in clean and sanitary condition.

### 5-2.2.3.6   Doorways and Exits

a.   Emergency and other authorized exits not clearly marked, blocked, or obstructed.

b.   Lookout gallery door obstruction(s).

5-2.2.4  **Fire Safety**

Give attention to:

5-2.2.4.1  **Smoking Regulations**

***Note:*** Smoking is not permitted in postal facilities.

a.  Smoking outside designated smoking areas.

b.  Ashtrays not provided in smoking areas.

c.  Papers and other flammable items not removed from sand urns and ashtrays.

d.  "No smoking" signs not posted in hazardous areas.

5-2.2.4.2  **Fire Extinguishing Equipment**

a.  Fire extinguishing equipment blocked to preclude ready access in emergencies.

b.  Extinguishers and/or fire alarms not clearly visible.

c.  Fire extinguishers not tagged and/or inspected regularly.

5-2.2.5  **Electrical, Mechanical, and Safety Equipment**

Give attention to:

a.  Overheating of electrical equipment.

b.  Live parts of electrical equipment not guarded against accidental contact.

c.  Stop buttons on power-driven equipment not kept accessible and in plain view.

d.  Extension cords and auxiliary plugs overused or in poor or frayed condition.

e.  Makeshift or temporary wiring allowed to continue in use for an unreasonable period.

f.  Emergency lighting inoperable.

g.  Equipment positioned so that protruding parts endanger personnel.

h.  Handtrucks, gurneys, and platform trucks not maintained in good repair.

i.  Conveyors not free of combustibles and debris.

j.  Employees riding on conveyor belts or handtrucks.

k.  Employees generally performing in an unsafe manner when using electrical or mechanical equipment.

5-2.2.6  **Uncorrected Hazards**

Give attention to common safety deficiencies reported more than 30 days previously but not yet corrected.

### 5-2.3 Slip and Fall Accidents

If a slip and fall type accident occurs, give assistance to the victim by rendering first aid if appropriate. If it appears that the party has been injured seriously, take immediate action to obtain competent medical assistance in accordance with local guidelines. The SPP should be summoned to the scene to provide assistance and to obtain the name, address, and telephone number of any witnesses for referral to the appropriate postal official and/or postal inspector.

### 5-2.4 Motor Vehicle Accidents

Any PPO who witnesses a motor vehicle accident occurring on postal property or involving a postal vehicle shall:

a. Render first aid and/or summon emergency medical assistance as appropriate.

b. Notify the SPP, who in turn shall notify the installation supervisor. In the event of serious injury or death to any of the accident victims, a postal inspector must be immediately notified.

c. Record the names, addresses, and telephone numbers of any witnesses to the accident.

d. Remain on the scene until relieved by the SPP.

### 5-2.5 Accident Prevention

#### 5-2.5.1 General

Many accidents could have been avoided if proper attention had been given to the potential causes of accidents. It is important for every security force employee to be alert to potential causes of accidents, and to report potential causes to the SPP by means of Form 1767, *Report of Hazard, Unsafe Condition or Practice.* Reports are to be confined to obvious deficiencies or hazards. Sound judgment is to be exercised in reporting only those matters which are of reasonable significance. Do not admonish postal employees for hazards created by them. Confine your corrective action to submission of the Form 1767. The on-duty conduct of PPOs is to be such that they are not subject to criticism for addressing safety and health violations.

#### 5-2.5.2 PS Form 1767

##### 5-2.5.2.1 Completion

Form 1767, *Report of Hazard, Unsafe Condition or Practice,* should be completed in triplicate. The PPO should complete only the top half of the form. He/she should then submit it to the SPP, who will make an entry into the security force blotter, in the same manner as incident reports. The SPP will record the blotter number on the top right corner of the form, and sign and date the form after making notations in the "Specific Action Taken" and "Recommendation" blocks (in most instances, the "Special Action Taken" block will be noted "Report reviewed and forwarded to installation head.").

When Form 1767 is used, it is not necessary to also complete a Form 5309, *Incident Report,* unless the situation requires further action, such as the handling of a medical or other emergency.

5-2.5.2.2   **Content**

Only a statement of condition is required to be outlined on Form 1767. Do not indulge in speculation as to the seriousness of the condition or admonition as to the urgency of corrective action.

5-2.5.2.3   **Distribution**

The supervisor will distribute the original directly to the installation head of the facility where the deficiency or hazard was found. The first carbon will be filed in the incident report file.

# 5-3   Emergency Planning

5-3.1   **Responsibilities**

The Chief Postal Inspector has been designated by the Postmaster General as emergency coordinator for the Postal Service. The INCs have been designated as the coordinators emergency response activities in each postal Area. Area vice presidents are responsible for development of standby plans for all emergency Postal Service and related activities at installations under their jurisdiction. Installation heads of postal facilities are responsible for emergency planning at various installations. MPPs are responsible for reporting to the installation head and to the INC all information bearing on emergency planning.

5-3.2   **General**

Emergency planning encompasses a broad variety of situations. Emergencies arise without notice and can quickly assume major proportions. In an emergency, security force personnel must never lose sight of their basic objectives which include:

a.   Assuring the safety of Postal Service employees, as well as visitors, on or within facilities under the charge and control of the Postal Service.

b.   Protecting government property, including property of the Postal Service, as well as other property within the postal system.

c.   Maintaining operation of the postal system.

d.   Protecting all mail in the custody of the U.S. Postal Service.

PPOs' status as emergency employees is defined in section 217 of Handbook IS-701, *Security Force Operations.*

### 5-3.3 Bomb Threats and Bombings

#### 5-3.3.1 General

A bomb threat is information received that a device will detonate to cause explosion, fire or release of gases resulting in potential injury to personnel or damage to a postal facility. All bomb threats must be accepted as authentic, and a systematic response to the threat must be initiated, including the immediate notification of the senior management official at the affected establishment. Postal Service Publication 159-C, *Contingency Planning for Bombs and Bomb Threats,* furnishes guidance for handling bombings, bomb threats, and bomb scares. This publication should be reviewed by security force personnel.

#### 5-3.3.2 Receipt of Telephone Calls or Reports

The receipt of bomb threat messages may occur at telephone switchboards, internal telephone extensions, through the mail or by a note left in a conspicuous place. The officer who receives a telephone call reporting the placement of an explosive device shall:

a. If possible, get another person on an extension telephone to get the exact language of the message and elicit as much information as possible from the caller.

b. Keep the caller on the line as long as possible.

c. Ask the caller's name, address, telephone number, etc.

d. Ask the caller to repeat the message.

e. Record, if possible, every word spoken by the person making the call.

f. Record the time the call was received and terminated.

g. If the caller does not indicate the location of the bomb or the time of possible detonation, ask the caller to provide this information. It is advisable to inform the caller that the building is occupied and that detonation of a bomb could result in death or serious injury to innocent people.

h. Complete as soon as possible a memo of the threatening phone call. A copy of a form for this purpose should be readily available at each telephone at all security force worksites. Upon completion, the original is given to the inspector who conducts the investigation. If more than one security force employee hears the telephone call, each employee should complete and submit a form.

#### 5-3.3.3 Notification

All bomb threats should be promptly reported to the immediate supervisor who shall, by the most expeditious means available, notify the operational head of the facility and the local postal inspector designated to conduct bomb investigations. In the event the local inspector is not available, notify the security force liaison inspector, the assistant INC, the duty inspector, or the INC.

5-3.3.4   **Evacuation**

The final decision for partial or complete evacuation of a facility will be made by the operational head of the facility after all available information has been evaluated. The primary consideration in any decision to evacuate personnel shall be the safety of Postal Service employees and authorized visitors or customers.

5-3.3.5   **Search**

5-3.3.5.1   **General**

A search shall be conducted within postal facilities in accordance with the provisions of the Facility Contingency Plan. The designated inspector and the immediate supervisor shall cooperate with the installation head and coordinate the activities of the security force. The security force shall assist in conducting a search, which will normally include the following predesignated areas:

a.   All lobbies.

b.   Restrooms available to visitors in lobby or free-access areas.

c.   Elevators.

d.   All exterior areas.

e.   Other predesignated areas.

5-3.3.5.2   **Discovery**

If a suspect device or actual bomb device is located, the discovery should be reported immediately to the Search Control Center and a postal inspector. The suspect device or actual bomb device should not be moved. Radio communication equipment should not be used as the signal may activate the device. A postal inspector, if available, or the SPP will give a description of the suspect device to the bomb squad of the nearest military facility or law enforcement agency capable of handling such matters. As warranted, a request for assistance will be made to the military authorities or law enforcement agency. All areas immediately adjacent to, as well as above and below, the location of the suspect device will be evacuated. The decision to evacuate the entire facility will be made by the operation head of the facility.

5-3.3.6   **Explosion**

In the event of an explosion, immediately call for the necessary emergency assistance from the fire department, rescue squad and local law enforcement officials. The INC shall be notified immediately, as well as the inspector designated to conduct investigations of bombs in the mails or directed against postal property. Security force personnel shall:

a.   Render first aid as required.

b.   Isolate the explosion area.

c.  Protect the scene from unauthorized personnel. Do not permit the removal of any material from the scene, except by emergency units for safety purposes, until authorized by the INC or inspector conducting the investigation.

d.  Prepare a report of the incident.

e.  Perform all other duties as assigned.

### 5-3.3.7  Suspected Bomb Devices in the Mailstream

Mail which emits buzzing or ticking noises should be isolated and treated as a possible bomb. A postal inspector should be notified immediately. Any other suspicious object should be treated with utmost caution, as the object may be extremely sensitive. It should not be handled or disturbed. A postal inspector should be notified immediately. A complete description of the object or piece of mail, including the names and addresses of both the sender and addressee, the postmark, etc., should be noted and furnished the postal inspector.

## 5-3.4  Fires

### 5-3.4.1  General

Postal inspectors have primary responsibility for investigating the cause and origin of any fire occurring within a postal facility, including suspected arson. In the event of a fire, the PPO shall comply with any established facility procedures, sound the alarm, and notify the SPP.

### 5-3.4.2  Actions

Prior to the arrival of fire-fighting units, security force personnel shall ensure the safety of postal employees and customers on postal property in accordance with facility fire evacuation plans; attempt to limit the spread of fires in their initial stage; and protect and salvage postal property and mail without undue risk of life. After arrival of fire-fighting units, the security force personnel shall direct fire-fighting personnel to the location of the fire; direct fire-fighting personnel to the nearest fire hydrant and/or standpipe; and control pedestrian and vehicular traffic.

## 5-3.5  Hazardous Materials

In the event of spillage of hazardous materials, the PPO will provide perimeter security to the spill area, will evacuate the area, and notify appropriate officials. A postal inspector shall be notified immediately, as well as the SPP. The security force employee will not place himself/herself in undue danger in fulfilling this responsibility.

Special Instructions

This page intentionally left blank

This page intentionally left blank

# Exhibit F

# 7   Legal

## 7-1   General

### 7-1.1   Legal Advice

Inspector attorneys are available to provide legal advice and assistance. If assistance is needed contact the inspector attorney responsible for that field division or functional area. The duty assignments for inspector attorneys may be found on the [Office of Counsel](#) -intranet site.

### 7-1.2   Applicability of 18 United States Code 13

In cases where there is no federal offense but a state offense is occurring on Postal Service property, 18 U.S.C. 13 may be cited as the federal offense, with the state offense, only if the state offense is occurring on property for which the Postal Service has exclusive or concurrent legislative jurisdiction.

The Postal Service has only a proprietorial interest in most of its properties. The practice of requesting exclusive or concurrent jurisdiction from state legislatures was discontinued in 1961. Postal inspectors who have questions about a specific facility and its jurisdictional status should contact the Office of Counsel.

### 7-1.3   Definitions

#### 7-1.3.1   Probable Cause

Probable cause are the specific and articulable facts which would lead a reasonably prudent person of the law enforcement officer's training and experience to believe that a specific individual committed a crime or that fruits, instrumentalities or evidence of criminal conduct may be found at a specific location.

Probable cause can be established through physical evidence, documentary evidence, circumstantial evidence, personal knowledge, or information obtained from a previously reliable informant. The existence of probable cause will be evaluated by the courts based on the totality of the circumstances.

Arrests, searches, and seizures must generally be supported by probable cause.

#### 7-1.3.2   Reasonable Suspicion

Reasonable suspicion is defined as the specific facts and circumstances that would lead a reasonably prudent person of the law enforcement officer's training and experience to suspect that a crime has been, is being or is about to be committed.

The existence of reasonable suspicion will be evaluated by the courts based on the totality of the circumstances.

### 7-1.3.3   Terry Stop/Frisk

A Terry Stop is an investigative detention when there is reasonable suspicion the person has committed, is committing or is about to commit a crime. A Terry Frisk is a pat down of a person or vehicle for weapons. Terry stops and frisks are based on a U.S. Supreme Court decision, Terry v. Ohio, 392 U.S. 1,20 L. Ed. 2d 889, 88 S. Ct. 1868 (1969).

#### 7-1.3.3.1   Terry Stops/Investigative Detention

Postal Inspection Service law enforcement officers may stop and detain a person when there is reasonable suspicion the person has committed, is committing or is about to commit a crime or stop and detain a vehicle when there is reasonable suspicion a person in the vehicle has committed, is committing or is about to commit a crime.

Postal Inspection Service law enforcement officers must act diligently during Terry stops to confirm or dispel their suspicion of criminal conduct. Postal Inspection Service law enforcement officers may use reasonable force when conducting a Terry stop.

A Terry stop which exceeds the limits allowed by law will be considered a de facto arrest. Postal Inspection Service law enforcement officers should document Terry stops as soon as possible after the stop.

#### 7-1.3.3.2   Terry Frisk of a Person or Vehicle

Postal Inspection Service law enforcement officers may conduct a pat down for weapons (Terry frisk) when there is reasonable suspicion the person the officers are dealing with is either armed or dangerous.

Postal Inspection Service law enforcement officers may pat down the clothing of the person and any articles the person may have in their possession. The decision to allow a pat down does not authorize Postal Inspection Service law enforcement officers to open closed containers, or the pockets of the individuals clothing, unless the officer can articulate that an object which could be a weapon was felt or the officer immediately knows the item felt is contraband.

Postal Inspection Service law enforcement officers may conduct a Terry frisk of a vehicle when there is reasonable suspicion an occupant of the vehicle which the officers have lawfully stopped is either armed or dangerous.

Postal Inspection Service law enforcement officers may pat down the interior of the vehicle and look anywhere a weapon may be hidden. The decision to allow a pat down does not authorize Postal Inspection Service law enforcement officers to open locked containers, or search anywhere outside the lungeable area, which will generally be limited to the passenger compartment.

7-1.3.4   **Use of Force**

7-1.3.4.1   **Reasonable Force**

Reasonable force is defined as the minimum amount of force required to accomplish the necessary and proper functions of law enforcement. Use of force must be objectively reasonable based on the totality of the circumstances the officer was confronted with. Objective reasonableness considers what another law enforcement officer with similar training and experience would have done if confronted with a similar circumstance. The force used by the law enforcement officer must be proportional to the gravity of the offense under investigation and the nature of the interaction between the law enforcement officer and the citizen.

7-1.3.4.1.1   **Reasonable Force Policy**

Postal Inspection Service law enforcement officers may use reasonable force when necessary to do the following:

a.   Make arrests.

b.   Conduct investigative detentions

c.   Conduct entries and searches.

d.   Safeguard the lives of enforcement officers, witnesses, and to the extent practicable, any other persons present.

e.   Protect property.

7-1.3.4.2   **Use of Force Policy**

Postal inspectors and postal police officers (PPOs) may use deadly force only when necessary, that is, when the postal inspector or PPO has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person.

If other force than deadly force reasonably appears to be sufficient to accomplish an arrest or otherwise accomplish the law enforcement purpose, deadly force is not necessary.

Deadly force may be used to prevent the escape of a fleeing subject if there is probable cause to believe:

a.   The subject has committed a felony involving the infliction or threatened infliction of serious physical injury or death, and

b.   The escape of the subject would pose an imminent danger of death or serious physical injury to the officer or to another person.

7-1.3.4.3   **Verbal Warning**

If feasible and if to do so would not increase the danger to the postal inspector, PPO or others, a verbal warning to submit to the authority of the officer shall be given prior to the use of deadly force.

7-1.3.4.4   **Warning Shots**

Warning shots are not permitted.

7-1.3.4.5   **Vehicles**

Weapons may not be fired solely to disable moving vehicles. Weapons may be fired at the driver or other occupant of a moving motor vehicle only when:

a. The postal inspector or PPO has a reasonable belief that the subject poses an imminent danger of death or serious physical injury to the postal inspector or PPO or another; and

b. The public safety benefits of using such force outweigh the risks to the safety of the postal inspector or PPO or other persons.

### 7-1.3.5 Arrest

An arrest occurs when a law enforcement officer places a person in custody for the purpose of having that person answer to a criminal charge or when a person is subjected to a de facto arrest.

A de facto arrest occurs when the legal boundaries of an investigative detention are exceeded. In determining whether or not a de facto arrest occurred courts consider the length of time the person was held, the diligence with which the law enforcement officer acted to confirm or dispel the suspicion of criminal conduct, the amount of force employed, the nature and scope of any restraints on the subject's movement, and the transportation of the suspect from the area in which the suspect was initial encountered by the law enforcement officer.

The subjective intent of the arresting officer during the encounter, namely whether or not the officer intended to make a formal arrest, is irrelevant.

### 7-1.3.6 Restraints

Restraints are devices designed to limit the ability of an individual to move limbs or have effective use of their hands. Restraints for purposes of this policy include but are not limited to: handcuffs, leg irons, belly chains, restraint belts, soft restraints, and flex cuffs. All Postal Inspection Service law enforcement officers will be furnished handcuffs.

The use of restraints must be objectively reasonable and proportional to the resistance encountered, the severity of the crime and/or the potential for escape attempts.

Restraints may be used during the arrest of a suspect and whenever a law enforcement officer can articulate objectively reasonable justifications for the use of the restraints in order to maintain control or to protect the law enforcement officer, the individual or third parties from injury.

Absent some compelling circumstances the general policy of the Postal Inspection Service is to handcuff all persons arrested. Discretion in the use of handcuffs may be used in the case of juveniles, the elderly, physically impaired individuals and those arrested for minor offenses after they have been thoroughly searched.

The arresting law enforcement officer assumes responsibility for the safety and security of all people who the law enforcement officer has placed in restraints.

### 7-1.3.7 Nolle Prosequi Decision

A decision by a prosecuting attorney not to prosecute a case is referred to as a nolle prosequi decision. This decision may be made during the initial presentation of the case or anytime during the investigation or prosecution of

the case. For reporting purposes, a nolle prosequi decision will be considered as a dismissal of the criminal case.

### 7-1.3.8 Nolo Contendere Plea

A plea of nolo contendere means the defendant chooses not to contest the charge but does not admit guilt. For reporting purposes a nolo contendere plea will be reported as conviction.

# 7-2   Criminal Procedure

## 7-2.1 Arrest

### 7-2.1.1 Arrests With or Without a Warrant

Postal Inspection Service law enforcement officers shall, whenever possible, obtain an arrest warrant before making an arrest. All arrests must be based on probable cause and, while a warrant is preferred, may be made with or without a warrant.

#### 7-2.1.1.1 Entry into a Suspect's Residence

Postal Inspection Service law enforcement officers may not enter a suspect's residence to make an arrest unless they have consent, a search or arrest warrant or the entry is required based on the exigent circumstances confronting the law enforcement officers.

If officers have an arrest warrant they may enter the suspect's residence if they reasonably believe the suspect is present.

#### 7-2.1.1.2 Entry into Third Party Residences

Postal Inspection Service law enforcement officers may not enter a third party's residence unless they have consent, a warrant or the entry is required based on the exigent circumstances confronting the law enforcement officers.

### 7-2.1.2 Arrest Assistance

Postal Inspection Service law enforcement officers should not make arrests without assistance. If the situation arises where the law enforcement officer is not able to obtain arrest assistance, the officer may make the arrest provided they do not take unnecessary risks which would compromise his or her safety.

#### 7-2.1.2.1 Arrest Assistance from Another Division

Postal Inspection Service law enforcement officers may seek assistance from other divisions to make arrests. Send requests for assistance through channels to the inspector in charge (INC) of the division where the suspect is believed to be located. Include as much information as possible to assist in the arrest of the offender in the request. At a minimum include a physical description of the suspect, a description of the charges, a statement of any known criminal history of the suspect and the information concerning the warrant, if one has been issued, to include the court case caption, case number, date of issue and the name of the issuing judge as well as any requested bond.

Forward additional information such as certified copies of an indictment or complaint, copy of the warrant, if a warrant has been issued, photographs, wanted posters and other available information to the assisting division.

### 7-2.1.2.2   Arrest of Postal Offender by another Law Enforcement Agency

Postal Inspection Service law enforcement officers will serve their own arrest warrants whenever possible. If it becomes necessary to request another law enforcement agency to arrest a postal offender based on a Postal Inspection affected divisions must be obtained.

### 7-2.1.3   Arrest Procedures

Postal Inspection Service law enforcement officers will clearly identity themselves and the nature of the charges when arresting an individual. Officers shall provide proof of their identity and authority as soon as practical when requested by the arrestee and provide a copy of the warrant to the arrestee, if requested, as soon as practical. There is no requirement to have a copy of the warrant at the time of arrest.

### 7-2.1.3.1   Constitutional Rights Against Self-Incrimination

A person in custody, namely under arrest or subject to a de facto arrest, must be advised of his or her Miranda rights prior to being subjected to questioning or being subjected to any actions which would reasonably result in eliciting incriminating information from the suspect.

The constitutional protections do not apply to routine booking questions which seek to identify the person.

### 7-2.1.3.2   Search of Arrestee Incident to an Arrest

Postal Inspection Service law enforcement officers will search persons arrested as soon as practicable for weapons, fruits and instrumentalities of crime, contraband, and evidence. This search is to ensure the safety of the law enforcement officers present and the arrestee, as well as ensure evidence is not lost or destroyed. In order for the search to be lawful the arrest must be lawful and the search must be contemporaneous with the arrest.

The search will include a complete search of the person, as well as containers or items the person has in their possession and the lungeable area immediately surrounding the person at the time of their arrest.

### 7-2.1.3.3   Vehicular Search Incident to Arrest

Postal Inspection Service law enforcement officers may search a vehicle incident to the lawful arrest of an occupant or recent occupant of the vehicle. In order for the search to be valid the search must be contemporaneous with the arrest.

The search of the vehicle will include the entire passenger compartment of the vehicle and containers found in the passenger compartment. The search will not generally extend to the truck of the vehicle unless the trunk could be accessed Search of Arrestee by Postal Inspector of Same Gender

Whenever possible, arrestees will be searched by a law enforcement officer of the same gender. Postal Inspection Service law enforcement officers may deviate from this policy only if there is an emergent need to conduct the

search in order to protect the officers or others from harm, and evidence from destruction.

7-2.1.3.4   **Notes of the Arrest and List of Seized Items**

Postal Inspection Service law enforcement officers will prepare and preserve complete investigative notes of the circumstances surrounding an arrest. The notes will include the names and addresses of the persons involved, the force by the officers or resistance met by the officers.

Postal Inspection Service law enforcement officers will prepare a detailed list of items seized as evidence, property seized for forfeiture and property which comes into the possession of the officers during the course of their official duties. The list will be signed and dated by accompanying officers or witnesses.

7-2.1.4   **Post-Arrest Procedures**

Postal Inspection Service law enforcement officers should obtain fingerprints, palm prints, photographs, criminal history, and the personal history of an arrestee as soon as practicable.

7-2.1.4.1   **Initial Appearance Arrest with a Warrant**

Postal Inspection Service law enforcement officers will bring any person arrested based on a warrant before the nearest available magistrate judge.

The nearest magistrate judge will generally be in the judicial district where the arrest was made. If the arrest was made in a judicial district that is contiguous with the judicial district where the warrant was issued, the person may be brought before a magistrate judge in the judicial district where the warrant was issued.

7-2.1.4.2   **Initial Appearance Arrest without a Warrant**

Postal Inspection Service law enforcement officers will bring a person arrested without a warrant before the nearest magistrate judge if criminal charges are to be filed. If the arrest was made without a warrant, a warrant must be obtained in the judicial district where the offense is alleged to have been committed before any preliminary examination.

This rule does not prohibit a law enforcement officer from releasing an arrested subject without bring them before a magistrate judge provided the arrest was based on probable cause, no warrant was issued and a criminal complaint was not filed.

7-2.1.5   **Subsequent Proceedings**

Postal Inspection Service law enforcement officers will be prepared to produce required documentation at proceedings which may be required in judicial districts other than the district which issued an arrest warrant. These documents may include: the original indictment, warrant or information, or a certified copy of the requested document.

7-2.1.6   **Juvenile Offenders Processing**

7-2.1.6.1   **Definition of a Juvenile Offender**

Under federal law anyone who has not reached their 18th birthday is a juvenile. The definition of a juvenile will vary under state law. Postal Inspection Service law enforcement officers must be aware of the state laws concerning juveniles in the state(s) they are assigned.

7-2.1.6.2   **Advisement of Rights**

Whenever a juvenile is arrested on federal charges Inspection Service law enforcement officers will immediately advise the juvenile of their legal rights in a language they can understand.

7-2.1.6.3   **Notifications**

When a juvenile is arrested on federal charges Postal Inspection Service law enforcement officers will immediately notify the U.S. Attorney's office of the arrest and notify the juvenile's parents or guardian of the arrest, the nature of the offense and the rights of the juvenile.

7-2.1.6.4   **Magistrate Appearance**

When a juvenile is arrested on federal charges Postal Inspection Service law enforcement officers will immediately take juveniles before a magistrate judge.

7-2.1.6.5   **Handwriting and Fingerprints**

Handwriting samples or fingerprints of juveniles will not be obtained by Postal Inspection Service law enforcement officers unless they are found guilty of committing an act that, if committed by an adult, would be a felony that is a crime of violence or an offense described in 21 U.S.C 841, 952(a), 955, or 959.

7-2.1.6.6   **Report of Conviction to FBI Prohibited**

Postal Inspection Service law enforcement officers will not forward conviction information concerning juvenile offenders to the FBI. Records concerning the conviction of a juvenile offender may only be sent to the FBI by the court.

7-2.2   **Interview and Interrogation**

7-2.2.1   **Constitutional Rights**

Postal Inspection Service law enforcement officers conducting custodial interrogations of persons must give such persons a warning and explanation of their constitutional rights against self-incrimination.

Individuals must be warned of their rights before being interviewed about a crime when any of the following is true:

a.   The suspect is in a custodial situation. When the interviewing postal inspector is uncertain as to whether a custodial situation has occurred, give the warning and secure the waiver prior to committing any actions which would reasonably result in eliciting incriminating information from the suspect.

b.   Whether in custody or not, the suspect has been previously arrested or otherwise formally charged, prosecution is pending, and the subject matter of the interview concerns the pending charge.

c.   Whether in custody or not, the suspect has been previously arrested or otherwise formally charged, prosecution is pending, and the subject matter of the interview concerns a different statutory violation but which is considered the "same offense." "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Non-custodial questioning on matters totally unrelated to the charged offense need not be preceded by warnings.

d.   If there is any question as to whether the suspect's right to counsel has attached, give the warning and secure the waiver prior to committing any actions which would reasonably result in eliciting incriminating information from the suspect.

### 7-2.2.2   PS Form 1067, Warning and Waiver of Rights

#### 7-2.2.2.1   Heading

Complete the Place, Date, and Time sections at the beginning of PS Form 1067, Warning and Waiver of Rights, or 1067-S (Spanish version). Enter the time when the Postal Inspection Service law enforcement official begins reading and explaining the subject's rights.

#### 7-2.2.2.2   The Warning

The warning and explanation of the person's constitutional rights against self-incrimination must be as follows:

a.   Before you are asked any questions, you must understand your rights.

b.   You have a right to remain silent.

c.   Anything you say can be used against you in court.

d.   You have the right to talk to a lawyer for advice before being asked any questions and to have the lawyer with you during questioning.

e.   e.1317 Neskola Ct., Naperville, IL 60564If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.

f.   If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

#### 7-2.2.2.3   Acknowledgment

Request interviewees acknowledge the advisement of their constitutional rights against self-incrimination by signing immediately below the Warning section of PS Forms 1067 or 1067-S (Spanish version). Enter the time the subject acknowledges their rights under the Warning section.

#### 7-2.2.2.4   Procedure for Obtaining Appointed Counsel

If a subject, after being given the warning, asks about the procedure for obtaining appointed counsel, apprise him or her of the provisions of federal

law whereby counsel is appointed upon his or her appearance before the magistrate or the district court, as appropriate.

### 7-2.2.2.5 The Waiver

Ask individuals who have been informed of their constitutional rights and indicate a willingness to respond to questioning to sign a waiver as follows:

I have read this statement of my rights (this statement of my rights has been read to me), and I understand what my rights are. I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Enter the time the person agrees to waive his or her constitutional rights under the Waiver section

### 7-2.2.2.6 Refusal to Sign Warning and/or Waiver

If the person agrees to answer questions after being advised of his or her rights but refuses to sign the form, note on the form that the individual was advised of his rights but refused to sign the waiver. The form in any case should be signed and dated by witnesses.

### 7-2.2.3 Intelligent Waiver of Rights

The postal inspector conducting interrogations must be satisfied the person to be interrogated understands the warnings and must be prepared to demonstrate the suspect knowingly and intelligently waived his or her constitutional rights.

### 7-2.2.4 Requests for Counsel

Do not subject an accused, having invoked the right to have counsel present during custodial interrogation, to further interrogation until counsel has been made available to him, unless the accused initiates further communication.

### 7-2.2.5 Use Immunity

Use immunity guarantees the individual that his or her statements and any evidence derived from those statements will not be used against him or her in a criminal prosecution. Thus, subsequent criminal prosecution of the individual based upon evidence other than that derived from the interview is possible, but the prosecution must be able to prove that such evidence was discovered totally independent of the interview.

### 7-2.2.6 Interviews of Federally Sentenced Prisoners

Inmate interviews are permitted by the warden or superintendent of a federal institution provided he or she is satisfied the interview will promote law enforcement and will not interfere with the maintenance of discipline. Permission for interviews is given by the Bureau of Prisons under the following circumstances:

a.   When the inmate is held as the result of an investigation by the FBI; and/or

b.    When a private interview without the presence of a prison official is desired.

If the conditions in (a) or (b) are present, the postal inspector shall inform the warden of the necessity for the interview and await his reply. Depending on the purpose of the interview, warning and waiver of rights under Miranda might be applicable.

### 7-2.2.7   Non-testimonial Evidence

The constitutional privilege against self-incrimination does not apply to physical identification evidence. The following are examples of physical identification evidence:

a.    Fingerprints.

b.    Photographs.

c.    Handwriting exemplars (non-dictated).

d.    Voice samples.

e.    Body weight and measurements.

### 7-2.2.7.1   Biological Evidence

Postal Inspection Service law enforcement officers may obtain specimens of blood, saliva, urine, or hair with Grand Jury subpoena, court order, or the consent of the individual.

### 7-2.2.7.2   Obtaining Non-testimonial or Biological Evidence

Postal Inspection Service law enforcement officers should seek guidance from the U.S. Attorney's Office in the preparation of legal process requiring the defendant to produce non-testimonial physical or biological evidence. If a defendant refuses to comply they may be held in contempt for refusal to provide the required evidence.

### 7-2.2.7.3   Line-up

A line-up is conducted for the purpose of having witnesses attempt to identify suspect(s).

### 7-2.2.7.3.1   Right of Counsel

A person who is in custody and has had formal charges filed against them is entitled to have a lawyer present at a line-up. When the defendant is denied an opportunity to have legal representation at the line-up, the identification may be invalidated and future testimony of the identifying witnesses may be suppressed. The constitutional privilege against self-incrimination does not apply to a line-up, and participants may be asked to speak words including those spoken at the time of the offense.

### 7-2.2.7.3.2   Where the Accused Has No Counsel

If the suspect is not represented by counsel, Postal Inspection Service law enforcement officers will advise the individual of their Miranda rights. Postal Inspection Service law enforcement officers will only conduct a line-up without the presence of counsel when the suspect waives their right to have counsel present in writing and includes in that written statement they have been advised of their right to have counsel present.

##### 7-2.2.7.3.3 Notification to Counsel for the Accused

Postal Inspection Service law enforcement officers will ensure the suspect's attorney is notified of the time and place of the line-up. If the attorney does not wish to attend, a written waiver signed by the attorney and his or her client should be obtained.

##### 7-2.2.7.3.4 Where Counsel Declines to Attend and Does Not Furnish a Written Waiver

If, after being notified of the line up, the attorney declines to attend and does not provide a signed waiver, Postal Inspection Service law enforcement officers will ask the defendant if they are willing to waive their right to the presence of counsel. If the defendant wishes to waive their right to counsel, the waiver must be in writing and indicate the defendant is aware of their right to have counsel present and waive that right. If the defendant declines to waive their right to counsel they will be advised they may request court appointed counsel for the purpose of representing them during the line-up.

## 7-2.3 Search and Seizure

### 7-2.3.1 Authority

Postal Inspectors are authorized by the Attorney General to request issuance of a search warrant (see 28 FRCrP 60.3(a)(8)) and to execute warrants under 18 U.S.C. 3061.

### 7-2.3.2 Policy

Postal inspectors will conduct searches and seizures in a professional manner in compliance with applicable law and agency policy. Postal inspectors will show consideration for the privacy and dignity of the person being searched or whose property is subject to search. Conduct all warrant services and building searches in a manner which minimizes risk to participants.

Advise the Office of Counsel of any problems encountered with obtaining Rule 41, FRCrP warrants which relate to policies, procedures or the authority of postal inspectors to seek and serve warrants.

#### 7-2.3.2.1 Service and Notice Requirements for Rule 41 Warrant

Rule 41(e), FRCrP, provides that the federal law enforcement officer who takes property under a warrant will give a copy of the warrant to the person from whom or from whose premises the property was taken.

#### 7-2.3.2.2 Prior Planning and Risk Assessment

Prior to engaging in a warrant service or building search, conduct a risk assessment and develop an operational plan.

##### 7-2.3.2.2.1 Risk Assessment

The risk assessment will generally result in classifying the operation one of three categories:

a.  Level One. Minimal risk; suspects are likely to be cooperative; a nonviolent crime was involved; small likelihood of weapons being present at site or on suspects; suspects have no history of prior violent acts; and easy access to structure.

b.  Level Two. Greater risk probability or unknown risks; potentially uncooperative suspects; violent or nonviolent crime involved; likelihood of weapons being present at site or on suspect; and possible structural fortification.

c.  Level Three. Extremely high-risk situations requiring deployment of specially trained and equipped tactical units (e.g., paramilitary type suspects, multitude of semiautomatic and assault type weapons present at the site, heavily fortified structure requiring special equipment, hostage situations, and barricaded suspects).

7-2.3.2.2.2   **Required Actions Based on Risk Assessment**

a.  Level One operations require an operations plan.

b.  Level Two operations require a written operations plan which will become a permanent part of the investigative case file. Written operations plans must be approved by INCs or their designees. INCs may delegate the approval authority in writing to AICs, team leaders, or task force leaders. Exceptions to the requirement for a written operations plan may be approved on an individual case basis.

c.  Level Three entries are not approved or conducted by Postal Inspection Service personnel. Special tactical operations units (e.g., SWAT and FBI hostage rescue teams) are used in those situations. The INC must approve all warrant service and building entry operations using special tactical operations units where the Postal Inspection Service is the lead agency.

## 7-2.3.3   Telephone Warrants

Postal inspectors may, when necessary, obtain warrants from magistrate judges based on sworn testimony by telephone or other reliable electronic means under Rule 41(d)(3)(A). Each judicial district may adopt local rules concerning the procedure to obtain a warrant without appearing before a judicial officer. Postal inspectors should consult with the local U.S. Attorney's Office concerning the local court rules and policies of the U.S. Attorney's Office regarding warrants issued based on testimony from telephone calls or other reliable electronic means.

## 7-2.3.4   Warrantless Searches

Postal Inspectors will obtain the concurrence of the U.S. Attorney's Office when securing a search warrant unless confronted with truly emergent circumstances and it is not possible to consult with the U.S. Attorney's office. Postal inspectors should avoid warrantless searches, whenever possible.

Postal Inspection Service law enforcement personnel may conduct warrantless searches in emergency situations such as during the hot pursuit of an escaping suspect, or where there is probable cause to believe contraband or other evidence of a crime would otherwise be destroyed.

If possible Postal Inspection Service law enforcement officers will freeze the scene, ensuring the evidence is not destroyed and/or the suspect does not escape, and seek a warrant.

7-2.3.5     **Consent Searches**

Individuals may consent to warrantless searches of their person or property provided they knowingly, intelligently and voluntarily waive their right to have law enforcement officers obtain a warrant supported by probable cause. In determining whether consent was valid the court will examine the totality of the circumstances. The court will consider relevant factors concerning the person giving consent. Such as:

a.   Age.

b.   Education and intelligence.

c.   Mental and physical condition at the time.

d.   Whether the person is under arrest.

e.   Length and nature of an interrogation.

f.   Whether they have been advised of the right to refuse to consent.

g.   The dominion and control they have over the property to be searched.

7-2.3.5.1     **Documentation of Consent**

Postal Inspection Service law enforcement officers will document consent searches by use of PS Form 8193, Consent to Search, PS Form 8193-S (Spanish version), or by documenting the information required on PS Form 8193 in writing or with a comparable form.

7-2.3.5.2     **Vehicular Searches**

Postal Inspection Service law enforcement officers may search a motor vehicle without a warrant when they are not able, based on the circumstances, to obtain a warrant in advance, provided the officers have probable cause to search the vehicle and the vehicle is readily mobile.

7-2.3.5.3     **Administrative Inspections of Vehicles**

The United States Postal Service has reserved the right to conduct administrative inspections of vehicles and persons which enter onto non-public restricted access areas of Postal Service property where conspicuous notice is given that persons and vehicles entering the non-public restricted access area are subject to inspection.

The authority to conduct these inspections has been vested with the Postal Inspection Service. Postal Inspection Service law enforcement officers are the only Postal Inspection Service employees authorized to conduct administrative inspections.

Postal Inspection Service law enforcement officers conducting a valid administrative inspection may inspect vehicles entering, remaining on or exiting from non-public restricted access areas.

Administrative inspections of vehicles are conducted to enforce the property regulations and to ensure employee safety and security. Administrative inspections of vehicles may be used:

a.   To ensure compliance and enforcement of regulations related to prohibited items, including narcotics and weapons, on Postal Service property.

b.    To prevent the unauthorized removal of Postal Service property and mail.

Administrative inspections do not replace the requirement to obtain a warrant in conjunction with a search as part of a criminal investigation.

7-2.3.5.3.1    **Scope**

During an administrative vehicle inspection, Postal Inspection Service law enforcement officers may look in any location where prohibited items could be concealed. This will include containers, locked or unlocked, which may contain a prohibited item. The administrative inspection will be a cursory examination of the vehicle and its contents not a comprehensive evidentiary search.

Postal Inspection Service law enforcement officers may utilize the services of trained detection canine units and screening equipment when conducting administrative inspections.

7-2.3.5.3.2    **Approval**

Inspectors in charge will review requests to establish an administrative inspection program at a facility. If approved, the INC will coordinate the institution of an administrative inspection program with the facility head. An area case may be jacketed to record activities related to administrative inspections.

7-2.3.5.3.3    **Use of Force**

Postal Inspection Service law enforcement officers may use reasonable force to detain individuals during an administrative inspection.

7-2.3.5.3.4    **Reporting Requirements**

Postal Inspection Service law enforcement officers will notify the INC or his designee of the results of any short term administrative inspection program. For long term administrative inspection programs, notification is only required when circumstances warrant. Notification will be required when prohibited items are located, force is used or damage occurs during the course of the administrative inspection. The notification will include:

a.    Case number.

b.    Description of vehicle inspected.

c.    Owner of vehicle.

d.    Operator of vehicle.

e.    Consensual or non-consensual inspection.

f.    Location where inspection occurred.

g.    Date and time of inspection.

h.    Names of Postal Inspection Service and other law enforcement officers conducting inspection.

i.    Description of any use of force needed to accomplish the inspection.

j.    Circumstances warranting the inspection or search.

k.    Prohibited items discovered.

l.    Description of damage, if any.

### 7-2.3.6 Warrantless Searches of Employee Lockers

Postal Inspection Service law enforcement officers may, under the authority recognized in the ASM and Postal Service union contracts, search employee lockers. In a criminal investigation Postal Inspection Service law enforcement officers may search an employee's Postal Service locker for evidence, fruits of a crime, or contraband. Supervisory personnel and the employee or union representative should also be present during such searches. During the search of the locker Postal Inspection Service law enforcement officers may examine and inspect the contents of the locker (including open and closed containers whether opened or locked) under the provisions of ASM 271.5-. Postal Inspection Service law enforcement officers will provide the employee with a receipt and inventory of any items seized during the search.

### 7-2.3.7 Inventory Searches

Postal Inspection Service law enforcement officers will conduct inventory searches of all property which comes into their possession as a result of their official duties. Inventory inspections will be documented in writing.

### 7-2.3.7.1 Inventory of Personal Property

Postal Inspection Service law enforcement officers will conduct an inventory of all personal property which is seized or held for safekeeping. The inventory should include a description of the item, the contents, if any, of the item, whether or not the item being inventoried or any containers contained therein are locked or sealed. If Postal Inspection Service law enforcement officers locate containers that are locked or sealed, they may open those containers to conduct the inventory. Postal Inspection Service law enforcement officers will take precaution to minimize damage to the container or its contents while gaining access.

Postal Inspection Service law enforcement officers will provide a copy of the inventory and receipt to the owner of the property seized or held for safekeeping.

### 7-2.3.7.2 Vehicles

Postal Inspection Service law enforcement officers have a legal duty to arrange for temporary storage of any vehicle which comes into the custody of the Postal Inspection Service. Postal Inspection Service law enforcement officers will arrange for the temporary storage of the vehicle to protect it and its contents when the owner or operator of the vehicle is unable to safeguard the vehicle and the vehicle would otherwise be exposed to damage or the vehicle is being seized as a result of law enforcement action.

A minimum of two law enforcement officers will conduct the inventory the vehicle and its contents. Whenever possible, the Postal Inspection Service law enforcement officers will photograph the interior and exterior of the vehicle prior to conducting the inventory of the vehicle.

The make, model, license plate number, vehicle identification number, owner's information and operator's information will be recorded on the vehicle inventory. In addition, any damage to the vehicle or its contents, both pre-existing or caused during the inventory, will be noted and described on the

inventory. Also include names and identifying information of any occupants and the reason the vehicle is being impounded.

Postal Inspection Service law enforcement officers conducting an inventory of the vehicle will open, search and inventory the glove box, console, trunk, and all containers found in the vehicle. If the doors, glove box, console, trunk, or any containers are locked or otherwise sealed and the key is not readily available Postal Inspection Service law enforcement officers will make every effort to minimize the damage to the property while gaining access to conduct the inventory.

Postal Inspection Service law enforcement officers will document the inventory completely and in writing noting the specific items in the vehicle and any items which are removed prior to the vehicle being stored. Postal Inspection Service law enforcement officers will remove items of significant value for safekeeping and security and will remove contraband or dangerous articles. The owner or legal custodian of the vehicle will be provided a copy of the vehicle inventory as well as a receipt for the vehicle and its contents noting any items removed from the vehicle.

### 7-2.3.8  Mail

#### 7-2.3.8.1  General

Mail may not be seized, searched, detained, or withdrawn from Postal Service custody unless done in accordance with 39 U.S.C. 3623 (d) and mail security regulations (see ASM 274-). A properly executed federal search warrant issued under Rule 41 FRCrP is the only warrant that may be used to search and seize mail in the custody of the Postal Service.

##### 7-2.3.8.1.1  Counsel Referral

Postal Inspection Service personnel will immediately report any problems encountered with searches and seizure of mail by federal or state agencies to the Office of Counsel.

##### 7-2.3.8.1.2  Recovery of Mail Matter

Whenever live mail is recovered from an offender, promptly notify the sender or addressee of the recovery and request their authorization to retain the mail as evidence. When only envelopes and wrappers are needed for laboratory and court purposes; the contents of the mail can be delivered to the addressees. If a large volume of mail is involved, it may be necessary to retain only a representative number of pieces and have the rest delivered. If the sender or addressee does not consent to the detention of the mail, obtain a federal search warrant as expeditiously as possible. Otherwise, the entire mail piece must be delivered to the addressee.

Consult with the U.S. Attorney's Office whenever mail will be detained as evidence and sender or addressee consent has not been obtained. Immediately report problems encountered with the detention of mail for evidentiary purposes to an inspector attorney.

#### 7-2.3.8.2  Postal Inspector Presence Requirement

Postal inspectors must be present whenever other law enforcement officers are provided access to the mail. The only exceptions to this policy are:

a.     Law enforcement officers executing a Rule 41 warrant for the mail.

   b.   Federal or state agencies with federal statutory authority to examine the mail for customs, agriculture, or wildlife purposes.

   c.   When the INC determines extraordinary circumstances exist.

### 7-2.3.8.3   Permissible Detention of Mail

Postal Inspection Service law enforcement officers may delay and detain mail in accordance with Postal Service regulations regarding suspected criminal activity (see ASM 274-), when the sender or addressee has given his or her consent, or under the authority of a properly executed Rule 41 search warrant.

### 7-2.3.8.4   Mail Seized Pursuant to a Rule 41 Warrant

When mail is seized pursuant to a Rule 41 warrant, notice will be given to the postmaster at the Postal Service facility from which the mail is taken. In some federal judicial districts, local guidelines or rules may require that notice be given to the sender and/or addressee of the seized mail. Postal inspectors should obtain guidance from the U.S. Attorney's Office regarding any notice requirements that are in force in a particular judicial district. Postal inspectors should also notify the Office of Counsel when local notice rules are encountered regarding the seizure of mail.

### 7-2.3.8.5   Sealed Classes of Mail

Mail sealed against inspection is afforded the full protection of the "sanctity of the seal." First-Class Mail, including Priority Mail, and Express Mail, are sealed against inspection. Mail which is sealed against inspection may only be opened under the authority of a Rule 41 warrant, the consent of the sender or addressee, by employees in Mail Recovery Centers, or in emergent circumstances where it is reasonable believed that the mail piece poses an immediate danger to persons or property and then only to the extent needed to determine and eliminate the danger (See ASM 274.42-).

### 7-2.3.8.6   Unsealed Classes of Mail

Periodicals, Standard Mail, and Package Services are not sealed against inspection. Postal Inspection Service personnel may open and inspect unsealed mail without a warrant for the administrative purpose of determining the mailability of contents or whether the correct postage has been paid.

Approval of the INC must be obtained prior to opening and inspecting unsealed mail for the purpose of determining the mailability of the contents or the payment of proper postage. Approvals must be in writing and will be for a period of no more than six months unless renewed for subsequent terms of not more than six months. The authorization must be based on a legitimate investigative need. If mail or contents are to be seized and withdrawn from the mails for use as evidence postal inspectors will obtain a search warrant.

### 7-2.3.8.7   Mail Suspected of Being Hazardous

ASM Section 274.42 -authorizes Postal Inspection Service law enforcement officers to detain, open, inspect, remove from postal custody, and process or treat any mail, sealed or unsealed, which is reasonably suspected of posing an immediate danger to life or limb or an immediate and substantial danger to property without a search warrant but only to the extent necessary to

determine and eliminate the danger and only if a complete written and sworn statement of the detention, opening, removal, or treatment, and the circumstances that prompted it, signed by the person purporting to act under this subsection, is promptly forwarded to the Chief Postal Inspector.

7-2.3.8.8    **Damaged Mail, Exposed Contents**

Postal Inspection Service law enforcement officers may not subject the exposed contents of damaged sealed mail to further inspection or examination, including a field test or other analysis, without a search warrant unless such action is taken to determine and eliminate a hazard as authorized in ASM 274.42. -

Postal Inspection Service law enforcement officers may subject the exposed contents of unsealed mail to inspection and examination.

7-2.3.8.9    **Customs Examination of Mail**

Officers and agents of Customs and Border Protection may open and subject mail originating outside of the Customs Territory of the United States (CTUS) and intended for delivery within CTUS to a customs inspection. Additionally, officers and agents of Customs and Border Protection may subject mail which originates within the CTUS and is intended for delivery outside CTUS to a customs inspection. The authority of officers and agents of Customs and Border Protection to exercise this authority under Postal Service regulation is addressed in ASM 174.91. -

The Postal Inspection Service recognizes the authority of officers and agents of Customs and Border Protection to conduct customs inspections under the following conditions:

a.    The inspection must occur at a facility designated as a point of entry for incoming international mail or as a point of departure of outgoing international mail. The Postal Inspection Service does not recognize the extended border search authority for customs inspection of mail. Any customs inspection of mail must be conducted at the designated facility. Once Customs and Border Protection officer or agents have been afforded the opportunity to examine the mail, whether actually examined or not, any subsequent seizure or opening requires a federal warrant.

b.    Foreign incoming mail in the custody of the Postal Service is afforded the same protection as domestic mail. It can be seized or searched only with a federal warrant or in accordance with Postal Service regulations.

c.    Foreign mail sealed against inspection may not be returned for a customs inspection once it is in the custody of the Postal Service. Any subsequent search will require a search warrant.

d.    Foreign mail unsealed against inspection found in the custody of the Postal Service and which does not bear any markings indicating that it has been subject to a customs inspection may be returned to the appropriate inspection facility for processing.

### 7-2.3.9  Forfeiture and Disposition of Property Acquired as Evidence

#### 7-2.3.9.1  Authority

The Postal Inspection Service authority for forfeiture is 39 CFR 233.7. The assets obtained through the forfeiture process are redirected to augment Postal Inspection Service law enforcement efforts.

The Postal Inspection Service authority and related procedures to dispose of evidence and unclaimed property is 39 CFR 946. Return property obtained by the Postal Inspection Service to its rightful owner, after the property is no longer needed. When a rightful owner cannot be identified, or if the owner of the property does not claim the property, title to the property is vested to the Postal Service and disposed of according to these procedures.

The Asset Forfeiture Handbook -contains guidelines for initiating and conducting forfeitures and property disposition. Refer to the Asset Forfeiture page on the Postal Service intranet.

#### 7-2.3.9.2  Program Management

The forfeiture program is managed by the Inspector in Charge, Financial Crimes. The Asset Forfeiture Unit (AFU) oversees the administration of the Postal Inspection Service's forfeitures and disposition of property, and ensures compliance with the law and established procedures.

#### 7-2.3.9.3  Official Use Policy

Property seized by the Postal Inspection Service through asset forfeiture under authority of federal criminal statutes may not be placed in general use by Postal Inspection Service personnel. Such property may be placed in official use only to augment Postal Inspection Service resources used in conducting criminal investigations and in training Postal Inspection Service personnel in criminal law enforcement.

#### 7-2.3.9.4  Equitable Sharing Program

All federal, state, and local law enforcement agencies that directly participate in a federal seizure or forfeiture may request an equitable share of the forfeited property commensurate with their direct participation. Unclaimed property processed under property disposition procedures can also be shared with other agencies.

#### 7-2.3.9.5  Forfeiture Funds

The Postal Service Consumer Fraud Fund is administered by the Asset Forfeiture Unit, and the monies deposited into it will be used to pay expenses incurred incident to forfeiture-related training, travel, and other program-related expenses.

The Seized Asset Deposit Fund (SADF) is administered by the U.S. Marshals Service. Department of Justice component agencies with forfeiture authority participate in regulating the fund's usage and draw appropriations from it to defray the cost of their forfeiture activity. The Asset Forfeiture Unit is responsible for coordinating the Postal Inspection Service's participation incident to judicial forfeitures.

The Treasury Asset Forfeiture Fund is administered by the Treasury's Executive Office of Asset Forfeiture (TEOAF). Department of Treasury agencies with forfeiture authority participate in regulating the fund's usage and draw appropriations from it to defray the cost of their forfeiture activity.

## 7-2.4 Grand Jury information

Grand jury information includes both physical items obtained through subpoena, or other grand jury action, as well as the knowledge and information gained by the postal inspector which would tend to identify witnesses, targets, the scope of the investigation or any other matters coming before the grand jury. Rules regarding grand jury information are contained in section 6(e) of the Federal Rules of Criminal Procedure (FRCrP).

### 7-2.4.1 Disclosure of Grand Jury Information

Rule 6(e), FRCrP, permits disclosure by a government attorney of matters before the grand jury to such government personnel as "are necessary...to assist...in the performance of such attorney's duty...." No court order is required for such disclosure, but each disclosure must be reported by the government attorney to the court before which the grand jury was impaneled.

Do not make disclosure of any information obtained during the course of a grand jury investigation which would tend to identify witnesses, targets, the scope of the investigation or other matters coming before the grand jury without the consultation and concurrence of the appropriate AUSA. This includes disclosure made by physical transfer of documents, granting access to review documents or oral recitation of information.

Do not disclose any grand jury information to individuals who have not been approved to receive the information. Refer requests by an outside agency for access to grand jury information to the appropriate U.S. Attorney's Office for consideration.

Make disclosures of grand jury information in person when possible. Where the disclosure cannot be made in person, communicate the disclosure as required for restricted or confidential information. Document disclosures of grand jury information and maintain the documentation in the case file.

### 7-2.4.2 Exempt Disclosures

Disclosures of information secured from documents and other evidence before it is presented to a grand jury does not violate Rule 6(e). Document how and when investigative notes, memorandums of interview, reports, and other evidence-handling procedures came into possession or knowledge of the disclosing postal inspector.

## 7-2.5 Discovery

### 7-2.5.1 Law Enforcement Evidentiary Privilege

#### 7-2.5.1.1 Purpose and Scope

The law enforcement evidentiary privilege is used to protect confidential or sensitive investigative information from civil discovery. Types of information that may be protected include the following:

a.   The identity of a confidential informant.

b.   Evidence provided by an informant.

c.   Sensitive investigative techniques.

d.   Information about ongoing investigations or agency memoranda containing policy-making opinions or recommendations.

### 7-2.5.1.2   Burden of Proof

The Postal Inspection Service will bear the burden of proving the privilege applies for each document it seeks to have protected. A general statement that the information is confidential, related to a criminal investigation, or potentially harmful, will not satisfy this requirement.

### 7-2.5.1.3   Discovery in U.S. Merit System Protection Board Cases

The Chief Postal Inspector must submit an affidavit setting forth a formal claim of the privilege after personally considering the documents. In addition, the affidavit must specifically describe the document, but not its content, and state the specific reason for preserving confidentiality. Failure to claim the privilege in the manner prescribed by the U.S. Merit Systems Protection Board (MSPB) will result in the privilege being deemed waived, and an order for discovery will be issued.

a.   "In camera" proceedings. The law enforcement evidentiary privilege is a qualified rather than an absolute privilege. The administrative hearing officer will conduct an in camera review of the document to determine if the privilege applies. A refusal to comply with the discovery order will result in a range of sanctions against the agency, which may include summary judgment for the appellant.

b.   Procedures. Upon receipt of the discovery request, determine if there is information that should not be disclosed. Forward these documents to an inspector attorney, along with a statement concerning the confidential nature of the information or describing the potential harm disclosure of such information would have on the informant, investigative techniques and investigative policy. The inspector attorney will determine if the privilege applies and prepare the required affidavit for the Chief Postal Inspector's signature. The draft affidavit and documents will be forwarded through the Office of Counsel to the Chief Postal Inspector.

c.   Discovery in other administrative proceedings. The privilege may be asserted in response to discovery requests filed in other administrative proceedings, such as EEO hearings, arbitrations, and National Labor Relations Board proceedings. There is no requirement that the privilege be invoked by the Chief Postal Inspector. Inspectors in charge, team leaders, or case inspectors can claim the privilege for those documents that are deemed sensitive or confidential. The affiant must articulate the basis of the privilege for each document to be protected. An inspector attorney will review the documents and prepare the necessary affidavit.

### 7-2.5.1.4   Defense Attorney Requests (Henthorn/Giglio)

Defense attorneys can request a review of official personnel files of Postal Inspection Service employees who will be witnesses in criminal prosecutions.

The review will seek to obtain information regarding the employee's integrity or credibility for impeachment purposes. The request is made by the defense attorney to the Assistant United States Attorney (AUSA) during the discovery process and is called a "Henthorn Request" or "Giglio Request."

In addition to a defense initiated review, some U.S. Attorney's Offices will request a review of personnel files to ensure there are no integrity, credibility or bias issues which could be used to impeach a Postal Inspection Service Witness.

7-2.5.1.4.1    **Procedure for Henthorn/Giglio Requests**

a.    The U.S. Attorney's Office will prepare a written request specifying the names of the employees whose records must be reviewed.

b.    If the request is given to the testifying employee or to the case inspector, the individual must notify their supervisor or division manager of the request.

c.    Postal Inspection Service supervisors or managers will forward requests received to the Office of Counsel.

7-2.5.1.4.2    **Inspector Attorney Responsibility**

The inspector attorney responsible for processing Henthorn/Giglio requests will ensure the official personnel file, the supervisor's personnel file, and any internal investigative files that may exist, are reviewed for potential impeachment material. The inspector attorney will give consideration to the rules of disclosure in the district in which the criminal action is pending, especially with respect to disclosing dated discipline letters or unsubstantiated allegations which are pending against the employee at the time the request is made.

7-2.5.1.4.3    **Disclosure**

The reviewing inspector attorney will disclose the following information:

a.    Any substantiated allegation of misconduct which indicates that the employee may be biased toward the defendant or which reflects adversely upon the truthfulness of the employee.

b.    Any pending allegation of misconduct that reflects adversely upon the employee's truthfulness or possible bias toward the defendant.

The reviewing inspector attorney is responsible for preparing the disclosure to the requesting AUSA. The inspector attorney will advise an employee of information that will be disclosed before disclosure is made to the AUSA.

7-2.5.1.4.4    **In Camera Review**

The inspector attorney will confer with the AUSA when it is unclear whether the information contained in the personnel record is Henthorn/Giglio material. In consultation with the AUSA, the inspector attorney will request a private, in-chambers review by the judge of material which is not clearly subject to disclosure.

7-2.5.1.4.5    **Employee Responsibilities**

Postal Inspection Service personnel who may be called as witnesses must disclose to prosecutors the existence of any impeachment material in their personnel files whether or not a formal request has been filed.

Postal Inspection Service personnel must bring additional information, which may be subject to disclosure and which comes to their attention before the end of the trial, to the prosecutor's attention.

### 7-2.5.2  Brady Material

a.  Description. Brady material is synonymous with 18 U.S.C. 3500 "Demands for production of statements and reports of witnesses." In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that irrespective of good or bad faith, suppression by the prosecution of evidence favorable to a defendant who has requested it violates due process where such evidence is material to either guilt or punishment. The Brady decision imposes an affirmative duty on the prosecution to produce at the appropriate time requested evidence that is materially favorable to the accused either as direct or impeaching evidence. Brady is not a rule of discovery; it is a rule of fairness and minimum prosecutorial obligations.

b.  Categories of Material. There are two general categories of material required to be disclosed under the Brady rule: (1) material which tends to be exculpatory, and (2) material which may be used to impeach or discredit government witnesses.

### 7-2.5.3  Jencks Material

The Jencks Act (18 U.S.C. 3500) is the exclusive means for a defendant to obtain statements of government witnesses. Index Jencks material for ready reference as needed. If those statements also contain exculpatory information, disclosure is required by the Brady decision.Post-Conviction Proceedings

Executive clemency is a power reserved to the chief executive of a state or territory and with President of the United States.

Violators of federal law may be granted executive clemency in one of the following forms:

a.  A conditional or unconditional commutation of sentence.

b.  A remission of fine.

c.  A pardon enabling the recipient to recover his civil rights.

d.  A full pardon.

State level executive clemency is subject to state law. Postal Inspection Service personnel will treat state levelpetitions, request or grants of executive clemency in the same manner as their federal counterpart.

Postal Inspection Service personnel will not volunteer opinions concerning any petition, request or grant of executive clemency. Postal Inspection Service personnel will not take any independent action with respect to any petition, request or grant of executive clemency. Postal Inspection Service personnel will only submit reports on executive clemency when requested to do so and in consultation with division management and the Office of Counsel.

# 7-3   Postal Service Employees

### 7-3.1   Cooperation

All Postal Service employees are required to cooperate in Postal Service investigations (see ELM -665.3). This includes investigations conducted by postal inspectors and PPOs in the performance of their duties.

### 7-3.2   Representation

#### 7-3.2.1   Constitutional Rights

In criminal investigations, employees are entitled to exercise their constitutional rights against self-incrimination by remaining silent or refusing to answer questions. Before conducting a custodial interrogation of an employee during a criminal investigation, the employee must be advised of his constitutional rights regarding self-incrimination.

#### 7-3.2.2   Right to Union Representation-Bargaining Employee

In addition to the employee's constitutional right against self-incrimination and right to counsel, the employee has a right to have a steward or representative present during certain interviews, if the employee so requests. The right to representation is separate from, and in addition to, any constitutional rights, including the right to counsel, that the employee may be entitled to exercise. As the right to counsel and the right to representation are separate, the employee is not required to decide between having an attorney or representative present. Should the employee decide to proceed in the interview with only the steward or representative present, ensure the employee understands that he or she is waiving the right to have an attorney present.

##### 7-3.2.2.1   Legal Basis of Rights

A craft employee's right to request union representation as a condition of participation in an investigatory interview is contained in Section 7 of the National Labor Relations Act, which guarantees employees the right to act in concert for "mutual aid and protection." NLRB v. J. Weingarten, Inc., 420 US 251 (1975). This right is reinforced in the agreements between the Postal Service and the several postal unions providing that if an employee requests a steward or union representative to be present during the course of an interrogation by the Postal Inspection Service, such request will be granted.

##### 7-3.2.2.2   Right to Union Representation-NonBargaining Employee

A nonbargaining employee's right to representation is provided by Postal Service policy (see ELM -651.2) but is otherwise similar to that of a craft employee. However, a nonbargaining employee may not be represented by a non-employee, a craft employee, or any employee whose representation would conflict with the faithful performance of his or her duties. The Office of Counsel should be consulted if the interviewing and interrogating postal inspector believes a requested representative might present any conflict of interest or position.

7-3.2.2.3    **When the Right to Representation May Be Exercised**

An employee's right to request representation in an investigatory interview is limited to situations where the employee reasonably believes the interview will result in disciplinary action. This includes all criminal investigations of employees by postal inspectors. It also includes non-criminal investigatory interviews that the employee reasonably believes will result in disciplinary action. It does not include witness interviews in criminal investigations unless there is a reasonable basis for the employee to believe that the interview or discussion will result in disciplinary action.

7-3.2.2.4    **When the Right to Representation Arises**

The right arises only in situations where the employee requests representation. In the absence of such a request, the postal inspector is not required to advise the employee of his representation rights. The employee may forego the right and participate in the interview unaccompanied by the representative.

If the postal inspector is made aware, by statements or inquiries made by the employee, the employee wants a representative, the postal inspector should honor the request. For example, an inquiry as to whether a representative might be available should put a postal inspector on notice as to the employee's desire for representation.

7-3.2.2.5    **Pre-interview Consultation**

In any investigatory interview that qualifies for the presence of a representative, the employee must be permitted to consult privately with the representative before the interview. This right for a pre-interview consultation arises only when the employee will be interviewed, has requested a representative, and the representative will be present during the interview. The employee or the representative must ask for a pre-interview consultation. If the employee is arrested before the interview, the postal inspector should maintain control of the prisoner but should attempt to accommodate a request for privacy to the extent possible.

7-3.2.2.6    **Response to the Request**

In response to a valid request for representation, the postal inspector has three options:

a.    Grant the request.

b.    Deny the request and discontinue the interview.

c.    Deny the request and offer the employee the choice of either of the following options:

    (1)    Continuing the interview without representation.

    (2)    Having no interview and foregoing any benefits that might be derived from an interview.

Any denial of the request for representation must be based upon legitimate investigative considerations, such as when the presence of a representative could seriously impede the investigation. In the event of denial of a valid request for union representation, the postal inspector need not offer any explanation or otherwise justify the denial to the employee.

7-3.2.2.7   **Absence of a Particular Representative**

The postal inspector is not required to postpone an interview with an employee because a particular union representative is unavailable, when another representative is available. Under such circumstances, the postal inspector may proceed with the interview even though the employee insists on postponement but refuses to request the presence of the other representative. The postal inspector is not obligated to suggest or secure alternative representation for the employees.

7-3.2.2.8   **Representative's Role at the Interview**

The representative's purpose at the interview or interrogation is to safeguard the interest of the individual employee who perceives a threat to job security and to protect the interests of the entire bargaining unit (or organization of represented non-bargaining employees). For the employee, the representative may attempt to clarify the facts, suggest other sources of information, and assist the employee to articulate his or her explanation. Exercise of the employee's right to representation may not interfere with legitimate investigative prerogatives, and the postal inspector has no duty to bargain with any representative. The postal inspector may properly insist upon hearing only the employee's own account of the matter under investigation and need not listen to the representative's version of what has transpired. The postal inspector may properly determine and limit the subject matter of the interview and need not justify the relevance of questions or explain the sources of information. Make every effort to deal fairly and reasonably with the representative and do not restrict his participation in the inquiry unless the representative attempts to impede the investigation or otherwise interfere with the ability to obtain information from the employee.

7-3.2.3   **Interview of Union Representative**

If, following consultation with a union representative, the bargaining unit employee declines to be interviewed, interview the representative to ascertain the advice given the employee to cause the declination. Attempt to determine whether the representative was instructed by or followed a union policy to dissuade the employee from cooperating with the interviewing postal inspector.

Communications between employees and non-attorney representatives are not privileged and therefore are not protected from inquiry by postal inspectors. Conduct the interview of the representative in an area separate from the employee, or at a later time. The union representative's comments should be sent, in writing, to the Chief Counsel.

7-3.2.4   **Union Representation to Facilitate Certain Investigations**

Though the right to union representation may not apply to a particular interview, it is sometimes helpful, and better serves the investigation, to allow a union representative to be present. In all such instances, the employee and the union representative should fully understand the employee is not entitled by law or contract to the representation and that a precedent is not being set.

7-3.2.5    **Arguments with Union Representatives**

In all cases, avoid arguments and confrontations with union representatives. When questions arise, explain Postal Inspection Service policy fairly but firmly, but do not argue or bargain. If representatives are not satisfied with the explanation, refer them to the INC. Report all incidents involving union matters promptly to the INC.

7-3.2.6    **Administrative Interviews**

7-3.2.6.1    **General**

This section contains instructions for the interrogation of a Postal Service employee who is under investigation for alleged misconduct but either because of the known attitude of federal and local prosecutors or the nature of the alleged misconduct, it is not anticipated that the investigation will lead to criminal prosecution of the employee. The procedures in this section should not be employed when the purpose of the interrogation is to obtain a statement or develop information that will be used in a criminal prosecution.

7-3.2.6.2    **Cooperation of Employees**

ELM -665.3 states, "Employees must cooperate in any postal investigation, including Office of Inspector General investigations."

Postal inspectors must not advise a Postal Service employee of the duty to cooperate in a postal investigation if the interview is intended to obtain evidence for the criminal prosecution of the employee.

When it has become apparent an investigation of a Postal Service employee will not result in criminal prosecution of the employee, advise the employee that they are required to cooperate in a Postal Service investigation and refusal to answer job-related questions may result in discipline. Advise the employee his or her answers or any information derived from those answers cannot be used in a criminal prosecution of the employee because such use would violate the employee's constitutional rights. Be prepared to testify regarding what the employee was advised concerning his or her rights. The employee still has the right to request union representation during the interview.

7-3.2.6.3    **Legal Guidelines**

The U.S. Supreme Court has held that an admission by a public employee (federal or state) resulting from an explicit threat to the employee's job will not be admissible in a subsequent criminal proceeding. Further, the Court has held a government employer may not fire a public employee for refusing to answer self-incriminating questions. However, the court clearly indicated that a government employer has a right to demand answers (or impose discipline for a refusal to answer) from an employee concerning his or her job, if the employee is assured that his or her answers (or the fruits thereof) will not be used against him or her in a criminal prosecution.

7-3.2.6.4    **Immunity**

Federal appellate court decisions have determined there need not be a specific statute authorizing the interviewing government official to grant

immunity from prosecution since the Fifth Amendment automatically confers such immunity once the official tells the employee that his or her answers cannot be used against him or her in any criminal proceeding. There is also no need to advise the employee of the right to remain silent or the right to counsel, since the employee's answers or their fruits may not be used against him in a criminal proceeding.

### 7-3.2.7 Pre-Arbitration Interview of Postal Inspectors by Union Stewards

#### 7-3.2.7.1 Inspectors May Be Interviewed

Pursuant to the National Labor Relations Act, the Postal Service has agreed a union steward who is processing and investigating a grievance shall not be unreasonably denied the opportunity to interview management witnesses, including postal inspectors, before arbitration. Union requests to interview postal inspectors must be made through Labor Relations.

#### 7-3.2.7.2 Approval

There are certain time aspects in processing a grievance that must be considered. Make every effort to operate within the time constraints outlined in the appropriate labor agreement. If the INC determines an interview should be conducted and there is considerable distance between the union steward and the postal inspector, the interview may be conducted by telephone.

### 7-3.2.8 Pre-Arbitration Requests for Information by Union Representatives

#### 7-3.2.8.1 Complying with National Agreements

Pursuant to the various collective bargaining agreements between the Postal Service and the labor unions, the Postal Service has agreed to make relevant information available to the unions to assist them in investigating and processing a grievance. In addition, the union officials must be able to obtain access to documents, files, and other records that are relevant and material to the grievance being investigated.

#### 7-3.2.8.2 Sensitive Postal Inspection Service Information

The Postal Service must comply with the relevant information requests of the unions when the union is processing a grievance. However, often the duties and obligations of the Postal Inspection Service as a law enforcement agency will not allow full disclosure of all information. Complete disclosure of investigative files, sensitive investigative techniques, and other information could jeopardize the continuation of an investigation or future investigations. Consider each request for information to ensure the Postal Inspection Service's dual roles as administrative and law enforcement agents are performed proficiently. Address requests for guidance through official channels to the Chief Counsel.

7-3.2.8.3   **Privacy Act Considerations**

Employee consent to disclosure of Postal Service records requested by the union is not required. The general policy is provided in <u>Handbook AS-353-</u>, to Privacy and the Freedom of Information Act.

7-3.2.8.4   **Pre-Arbitration Requests for Information by Union Officials**

The following guidelines are for pre-arbitration requests for information by union officials:

a.   Coordinate requests with the management advocate.

b.   The union is entitled to any written memoranda or documents that have been furnished to Postal Service management by the Postal Inspection Service. These documents may be released to the union by the Postal Service advocate representing management in the grievance.

c.   The union is entitled to review or obtain copies of any material or evidence including videotapes, photographs, laboratory reports, that management intends to introduce or rely on at the arbitration hearing

d.   Refer any requests for physical records or for documents not covered in items a and b (e.g., requests for records in other investigations, personnel records of postal inspectors or Postal Service employees, internal Postal Inspection Service documents) to Chief Counsel for processing under the Freedom of Information Act or Privacy Act.

e.   Disclosure of any information under items a, b, c, or d above that would jeopardize a continuing investigation or contain grand jury material under FRCrP Rule 6(e) is prohibited. The Postal Inspection Service must be prepared to articulate the specific reasons for the nondisclosure of the information.

f.   Contact the U.S. Attorney's Office or local prosecutors for guidance on item e above. If the prosecuting authority feels disclosure is not appropriate, a written declaration should be furnished to that effect. Any unique or special problems encountered with disclosures in this area may be addressed to Chief Counsel.

# 7-4   Victim and Witness Assistance Program

7-4.1   ## Background

Legislation passed since 1982 mandates certain responsibilities for all Federal law enforcement agencies in the area of victim and witness assistance. Congress established a list of victims' rights and directed the Justice Department and other departments and agencies of the Federal Government engaged in the detection, investigation, or prosecution of crime, including the Postal Inspection Service, to make their "best efforts" to ensure crime victims are accorded those rights. The list of rights, commonly referred to as the "victims' bill of rights," is codified at 18 U.S.C. 3771(a). Congress also defined a group of services that Federal agencies have the responsibility to provide to crime victims. The basic list of responsibilities appears in

42 U.S.C. 10607. A crime victim has the following rights under 18 U.S.C. 3771(a):

a.  The right to be reasonably protected from the accused.

b.  The right to reasonable, accurate, and timely notice of any public court proceeding or any parole proceeding involving the crime or any release or escape of the accused.

c.  The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

d.  The right to be reasonably heard at any public hearing in the district court involving release, plea, sentencing, or any parole proceeding.

e.  The reasonable right to confer with the attorney for the Government in the case.

f.  The right to full and timely restitution as provided by the law.

g.  The right to proceedings free from unreasonable delay.

h.  The right to be treated with fairness and respect for the victim's dignity and privacy.

## 7-4.2   Policy

The Postal Inspection Service will do all that is possible, within the limits of available resources, to assist victims and witnesses of crimes without infringing on the constitutional rights of defendants. Postal Inspection Service employees will make their best efforts to ensure that innocent victims of crime have their rights upheld. Victims and witnesses of federal crimes (whether prosecuted federally or locally) who have suffered physical, financial or emotional harm, shall receive the assistance and protection to which they are entitled by law.

The identity of victims and witnesses is sensitive information and precautions should be taken to protect their identities and contact information. Victim and witness identifying information must be kept in a secure location. Victim and witness identifying information should never be sent via the Internet or unsecured networks. If electronic files are sent via email, the media should be password protected.

## 7-4.3   Definitions

### 7-4.3.1   Victim

A victim is a person or entity directly and proximately harmed as the result of the commission of a federal offense or an offense in the District of Columbia if the offense is charged in federal district court. The "victim" may not be a knowing participant in the crime.

In the case of a victim who is a minor, incompetent, or deceased, the term victim extends to a legal guardian or designated caregiver of the victim. A victim may be a corporation, company, association, firm, partnership, society, or joint stock company. In the case of an institutional entity, an authorized representative of the entity is recognized as the victim. Federal, state, and

local government agencies should not be considered victims for the purposes of notification. The United States Postal Service is considered a government agency and should  not be considered a victim for notification purposes. This does not preclude the Postal Service from recovering fines or restitution when directed by the courts.

### 7-4.3.2  Witness

A witness is a person who has information or evidence concerning a crime and provides it to the Postal Inspection Service. If the witness is a minor, the term witness includes a designated family member or legal guardian. The term witness does not include defense witnesses or those involved in the crime as a perpetrator or accomplice. It also does not include a confidential informant (CI), unless the CI is called to testify at trial.

A key witness is a witness who is deemed essential for the successful prosecution of a case.

## 7-4.4  Responsibilities for Services to Victims and Witnesses

Victim rights are mandated for each component of the criminal justice system including investigatory, prosecutorial, and correctional agencies. The Postal Inspection Service is responsible for identifying victims, notifying victims of their rights and advising all identified victims of available services. This becomes a responsibility when the investigating postal inspectordetermines a crime has been committed, jackets a criminal case and the Postal Inspection Service is the lead investigative agency whether the case is prosecuted federally or by the state.

Services to victims are limited to jacketed investigations. Identification, notification, or other services should not be provided in instances where complaints of possible crimes are received but no case is jacketed, even if attention is provided under an area case.

When the U.S. Attorney's office or other prosecutor files charges in a case, that office will be responsible for continuing to fulfill these responsibilities. Postal Inspection Service personnel will provide additional assistance as requested by the prosecutor, when necessary. Once formal charges have been filed, the case Inspector must contact the U.S. Attorney's Office to obtain permission before entering the victims into ISIIS.

If prosecution is declined, or charges are not filed, the responsibilities remain with the Postal Inspection Service. In these circumstances, the Postal Inspection Service is responsible to notify all previously notified victims of the case that prosecution was declined, or charges were not filed, and that the case is formally closed.

## 7-4.5  Responsible Officials

### 7-4.5.1  Chief Postal Inspector

The Chief Postal Inspector designates the inspectors in charge as responsible officials for identifying the victims of crime and performing victim witness services.

### 7-4.5.2 Inspector in Charge, Criminal Investigations

The Inspector in Charge, Criminal Investigations will designate a National Victim Witness Coordinator and a National Victim Notification System Coordinator.

### 7-4.5.3 Field Inspector in Charge

Inspectors in Charge in each division shall designate an individual as their Division Victim Witness Coordinator. The Victim Witness Coordinator will work with the other general analysts to assist Postal Inspectors in the victim notification process based on each division's internal policy.

### 7-4.5.4 Case Postal Inspector

The case inspector, or other individual(s) as designated by the INC, will ensure Postal Inspection Service obligations to victims and witnesses are fulfilled and that support, if necessary, is provided to the prosecutor to continue that assistance. In multi-agency or task force investigations, the responsibility is assigned to the lead agency or as otherwise designated. The lead or designated agency will be responsible for all notifications and reporting in accordance with the Attorney General Guidelines.

### 7-4.5.5 US Attorney's Office

The Victim Witness Coordinator in each U.S. Attorney's Office can be contacted for additional guidance in complying with victim and witness related legislation and the Attorney General Guidelines for Victim and Witness Assistance.

## 7-4.6 Services to Victims and Witnesses

The Postal Inspection Service, at the earliest opportunity, should contact and notify victims of their rights and of information regarding available services. This will be accomplished through letters generated in the Victim Notification System (VNS) and through Publication 308-, Know Your Rights: A Guide for Victims & Witnesses of Crime. Victim records entered into ISIIS are extracted and loaded into the VNS.

Victims who need emotional assistance, physical assistance, or compensation of any sort should receive a Publication 308 or equivalent at the time of the initial interview. Because of the nature of many Postal Inspection Service cases, there may be large numbers of victims or victims that are difficult to identify. In these cases, mass notification mailings, well-publicized town meetings, media, private interest groups or toll-free telephone numbers may be used to provide notice and assistance to victims. Appropriate decisions will be made as to the range of victim services and assistance provided. A victim may consent, in writing, to the disclosure of information to any person.

Case inspectors or their designees are responsible for identifying victims and key witnesses in their jacketed cases, and entering this information in ISIIS. Victims must be entered into ISIIS within seven days of case jacketing or within seven days of being identified. Fields must be sufficiently completed to

allow for victim notification through VNS., including a victim's full address and zip code

A witness that is also a victim should be entered into the system as a victim. All victim-related fields must be completed if the information is readily available. The case inspector must indicate in the attributes section of ISIIS that they entered all known victims in ISIIS.

a.    If the victim is a minor, provide guardian alternate contact information in ISIIS to ensure minors are not the recipients of notifications.

b.    If the victim is incompetent, provide caretaker contact information in ISIIS.

If notification would interfere with the investigation, the case inspector should advise the GA assigned to their case that notification should not be sent. This decision will be made by the case inspector after consulting with the AUSA or Inspector Attorney. In cases in which a victim or witness is being utilized as a confidential informant, or is otherwise protected, consideration should be given to determine if notification is appropriate.

Victims may be represented by an attorney. In such cases, obtain a right to representation form from the attorney.

## 7-4.7    Reporting Suspected Cases of Child Abuse

It is the policy of the Postal Inspection Service that all employees will report suspected instances of child abuse, including neglect, to the proper authorities. Refer to the appropriate state child abuse reporting laws to determine the scope of obligation, where State jurisdiction may apply.

## 7-4.8    Witnesses

### 7-4.8.1    Professionalism

Postal Inspection Service personnel will maintain an attitude of professionalism and fairness toward all witnesses.

### 7-4.8.2    Responsibility to Witnesses

Postal Inspection Service personnel will provide witnesses as much notice as possible if they are expected to testify in a case. Postal Inspection Service personnel will coordinate with the U.S. Attorney's Office on matters related to witness travel and fees. Postal Inspection Service personnel will assist U.S. Attorney's Office personnel in the preparation of witness travel itineraries, hotel reservations and other related expenses as well as notifying the witnesses of the time and place of their appearance.

### 7-4.8.3    Statements Influencing Testimony

Postal Inspection Service personnel will avoid making statements to a witness that could be construed as an attempt to influence the witness's testimony.

### 7-4.8.4    Special Witness Problems

Postal Inspection Service personnel will promptly notify witnesses of any postponement, continuance, change of venue, or mistrial which could create delay in testifying or a need for the witness to testify again. Postal Inspection

Service personnel will maintain contact with the witness to ensure their continued cooperation and availability. Inspection Service personnel will notify the U.S. Attorney's Office and the INC immediately if a witness:

a. Indicates they, or a member of their family, believe they are in danger.

b. Cannot be located.

c. Indicates they will change their testimony.

d. Asks to be granted immunity as a condition for testifying.

### 7-4.8.5  Obstruction of Justice

Postal Inspection Service personnel will immediately notify the U.S. Attorney's Office and the INC if they learn a witness has been harmed, intimidated, urged, or paid to remain silent or to leave the jurisdiction of a court to avoid testifying. A person interfering with a witness may be prosecuted for obstruction of justice.

## 7-4.9  Mandatory Reporting Requirements and Mandatory Training

### 7-4.9.1  Mandatory Reporting Requirements

a. The Chief Postal Inspector must report annually to the Attorney General, through the Director, Office for Victims of Crime, by February 15th of each year, on the best efforts made during the preceding calendar year, to ensure victims of crime are accorded the rights set out under federal law.

b. The case inspector or designee is responsible for entering information of all victims and witnesses for each case in ISIIS for transfer to the Victim Notification System.

c. The case inspector and general analyst assigned to the case are responsible for entering victim information including known dollar loss into ISIIS and for documenting all victim notification activitiy and victim service referrals into the Victim Notifications and Services Tab.

d. The Division Victim Witness Coordinator will use the ISIIS entries of the case inspector and general analyst by submitting the ISIIS automated Division Victim Witness Coordinator Monthly Accomplishment Report. This report is submitted through the Division's Inspector in Charge to the National Victim Witness Coordinator, Criminal Investigations.

e. Upon case closing, team leaders will review the ISIIS Victim Listing and Witness Listing, and review the victim attributes question to ensure compliance with policy.

### 7-4.9.2  Mandatory Training

All employees who come into contact with victims and witnesses must receive training. At a minimum, this will include:

a. Initial training concerning the Attorney General Guidelines and victims' and witnesses' rights, and

b. b.Additional training within a reasonable time after any subsequent legislation that substantially alters these rights.

In addition, all employees of the Postal Inspection Service engaged in the investigation or prosecution of Federal crimes involving sexual abuse and/or domestic violence should receive special victim assistance training in those areas.

# 7-5   IRS Annual Safeguard Activity Report

## 7-5.1   General

The Chief Postal Inspector is required to submit an Annual Safeguard Activity Report to the Internal Revenue Service (IRS) in JULY on all IRS taxpayer return information received by the Postal Inspection Service during the previous calendar year. Each INC will complete an Annual Safeguard Report for their division. Submit the report to Chief Counsel.

### 7-5.1.1   Report of Receipt and Disposition

By January 10 of each year, postal inspectors must advise the INC of each instance in which tax return information was received from the IRS for use in a Postal Inspection Service case. The Report of Postal Inspector should contain in the subject block: IRS INFORMATION REPORT. The report will include the basis of the request (without identifying the taxpayer), dates the material was received from IRS, method of safeguarding, and disposition of the material and the dates.

If copies were made of the material, advise as to the disposition of the copies. If destroyed, advise of the method of destruction and the date. Report the disposition of IRS taxpayer return information reported during a previous calendar year if the tax information was or still is being retained for further use.

Destroy all copies of the Report of Postal Inspector contained in the case file concerning the receipt and disposition of taxpayer information when the tax information is destroyed or returned. Send the original final Report of Postal Inspector detailing the destruction to Chief Counsel as part of the Annual Safeguard Activity Report.

### 7-5.1.2   Annual Report of Security Measures

The INC must forward the reports through channels to Chief Counsel with an annual report of the domicile inspection of the safeguarding of the IRS tax information. Furnish the annual inspection report in Investigative Memorandum format titled: "Inspection Report of Security Measures Afforded Federal IRS Taxpayer Return Information." The inspection report should address:

a.   The storage and handling of federal tax information.

b.   A review of how access to federal tax information is granted to employees.

c.   An assessment of facility security features.

d.   Verification that federal tax information has not been commingled with other information in such a way that its confidentiality could be inadvertently compromised.

e.   After hours security.

f.   Review of who has access to combination safes and changing of combinations.

g.   Analysis of security procedures and instructions to employees.

h.   Audit of the file room, if applicable.

i.   If applicable, comment on any planned organizational changes or physical moves that could affect these security considerations.

j.   A review of procedures and records when disposing of or destroying tax information no longer needed by the recipient.

k.   If the taxpayer return information was received subsequent to the annual security inspection, state this in the inspection report covering that particular taxpayer information.

### 7-5.1.3   Due Date

The IRS Annual Safeguard Activity Report and Annual Report of Security Measures reports should reach Chief Counsel no later than January 17 of each year.

## 7-5.2   Federal Tax Information (FTI)

### 7-5.2.1   Definitions

a.   Federal Tax Information is any tax return or information derived directly from a tax return received from the Internal Revenue Service (IRS) or from a secondary governmental source, such as an Assistant United States Attorney, which derived the information from the IRS. FTI does not include information provided directly by the taxpayer or third parties. If the taxpayer or third party subsequently provides returns, return information, or other Personally Identifiable Information independently, the information is not FTI as long as the IRS source information is replaced with the newly provided information.

b.   b. Destroy – means physically destroying FTI by means of burning or shredding. Destruction of FTI contained on electronic media includes overwriting data tracks a minimum of three times or running a magnetic strip over and under each surface a minimum of three times.

### 7-5.2.2   Restrictions

a.   FTI may not be received or sent electronically (e.g., fax, e-mail, etc.), copied using a multi-function copier, placed on a workstation or other electronic device (except as noted below), or transcribed from a return into an electronic database.

b.   FTI must only be received via paper hardcopy.

### 7-5.2.3   Protections

a.   Storage

(1)   Upon receipt, FTI must be logged into PEAP as low value evidence.

(2)   FTI must be stored separate from other documents and materials. Where physical separation is impractical, FTI must be clearly labeled and the file must be safeguarded.

(3)   FTI must be stored in a Division's evidence room or in the responsible Inspector's office within a locked cabinet or similarly protected location.

(4)   Files and file folders containing FTI must be clearly labeled "Federal Tax Information."

(5)   Removable media containing FTI must be labeled as FTI.

(6)   When FTI is not in use, it must be returned to its proper storage area/container.

b.   Access

(1)   Access to FTI should be limited to the responsible Inspector

(2)   When access to FTI is necessary by other individuals, this action must be noted on an IS Form 719, Custodian Access Control Log

c.   Movement

(1)   If FTI is moved to another location or if custody is otherwise transferred to another individual, this action must be entered into PEAP.

(2)   FTI being transferred must be maintained in a locked container or otherwise kept in the immediate possession of the responsible Inspector.

### 7-5.2.4   Disposal

a.   At the close of a case, or when FTI is no longer needed for an investigation, it must be destroyed or returned to the originating source, e.g., IRS or Assistant United States Attorney

b.   When FTI is destroyed, a final *Report of Postal Inspector* must be submitted to the Inspection Service Chief Counsel

c.   All other copies of *Reports of Postal Inspector* contained within the file regarding the FTI must be destroyed

d.   An IS Form 716, Destruction Certificate, must be placed in the case file for all FTI that has been destroyed.

# 7-6   Right to Financial Privacy Act of 1978

## 7-6.1   General

### 7-6.1.1   Impact on the Postal Inspection Service

The provisions of the Right to Financial Privacy Act of 1978, 12 U.S.C. 3401 et. seq, affect how postal inspectors collect, report, retain, and disseminate certain records or information obtained from financial institutions.

### 7-6.1.2 Protection of Citizens

The Act bars the federal government from gaining access to, or receiving records from, a financial institution concerning its customers unless there is a legitimate law enforcement inquiry and the specific methods set forth in the act are followed.

### 7-6.1.3 Responsibilities of Financial Institutions

The Act prohibits financial institutions from providing financial records to the federal government unless access is accomplished either by a method prescribed by the Act or by a method accepted by the Act.

Notwithstanding any state or local law to the contrary, financial institutions are permitted to notify government authorities, including the Postal Inspection Service, of possible violations of law reflected in their records. In reporting a suspected criminal violation, a financial institution may disclose the following information:

a.   The name and address of the person suspected and the relationship with the financial institution, if any.

b.   The identity of the financial institution or office involved.

c.   The specific offense suspected.

d.   The name and address of the account holder and the account number and type of account in which evidence of the suspected offense is located.

e.   Dates and any suspicious circumstances of the transaction involved in the suspected offense.

f.   Any other pertinent information which will assist in investigating the suspected offense.

The financial institutions are not required to comply with a formal written request by a government agency or a customer authorization to release financial records.

There are no express sanctions to prevent an institution from notifying its customers of release of records in those instances where the government obtains financial records by grand jury subpoena. However, a federal court may issue an order prohibiting such notification.

## 7-6.2 Definitions

### 7-6.2.1 Financial Institutions Covered by the Act

All banking and banking-type institutions, as well as credit card issuers and consumer finance companies are covered by the Act. A consumer finance company may be any business whose principal function is to extend credit or loans to customers and maintain finance records on their purchases. Businesses which use credit cards to facilitate sales, e.g., oil companies and department stores, are "financial institutions" only with respect to records related to credit card use.

Institutions not covered by the Act are bonding companies, credit bureaus, small business investment companies, real estate firms, and government lending agencies.

### 7-6.2.2  Financial Records Covered by the Act

Any original copies of or information extracted from records pertaining to present or past relationships with a financial institution by a customer or covered partnership are within the provisions of the Act.

#### 7-6.2.2.1  Exceptions

Exceptions include the following:

a. Forged or counterfeit financial instruments.

b. Records relating to an account established under a fictitious name.

c. Financial records in the possession of an institution other than the institution at which the person maintains an account, e.g., a check or money order cashed for a non-customer.

d. Bank surveillance photographs.

e. Contents of a safe deposit box obtained by a search warrant.

f. Records pertaining to functions not involving an account relationship, e.g., sale of stock, computer service, or other activities not involving a debtor-creditor relationship.

### 7-6.2.3  Customer

A customer is any natural person or partnership of five or fewer individuals. It does not include corporations, associations, large partnerships, or other legal entities.

### 7-6.2.4  Law Enforcement Inquiry

Law enforcement inquiry is defined as any lawful investigation or official inquiry into a violation or failure to comply with criminal or civil statute, regulation, rule, or order. Law enforcement inquiry is defined as any lawful investigation or official inquiry into a violation or failure to comply with criminal or civil statute, regulation, rule, or order.

### 7-6.2.5  Supervisory Official

For the Postal Inspection Service, supervisory official is defined and limited to Headquarters, Service Center, or division manager and team leaders.

## 7-6.3  Description of Access Methods

The Act prescribes specific methods for access including the following:

a. Customer authorization.

b. Search warrants.

c. Judicial subpoenas.

d. Formal written requests.

e. Administrative subpoenas.

### 7-6.3.1  Certification of Compliance (Form A)

#### 7-6.3.1.1  Purpose

Before records may be obtained under any provisions of the Act, a supervisory official must submit to the financial institution a certificate (see

Exhibit 7-6.3.1.1) stating that all applicable provisions of the Act have been complied with. Good-faith reliance by the employees and agents of the financial institution on the certification absolves the institution from civil liability for any improper disclosure.

7-6.3.1.2   **Exception**

This certification does not apply when customer records are sought pursuant to a federal grand jury subpoena.

7-6.3.1.3   **Presentation of Certificate**

Present the certificate to the financial institution when all requirements of the Act have been satisfied. When customer notice is used, present the certificate after the challenge or after the court has dismissed the customer challenge. When no customer notice is required, or when a delay order is obtained, deliver the certificate of compliance when demand is made on the financial institution.

7-6.3.2   **Customer Authorization for Access to Records (Forms B and B1)**

7-6.3.2.1   **Description**

A customer may authorize access to identified records by giving approval in writing for a period of no more than three months; such authorization can be revoked at any time before the records are disclosed (see Exhibit 7-6.3.2.1).

7-6.3.2.2   **Delivery of Authorization**

Although the statute implies the customer must give authorization directly to the financial institution, practical necessity dictates the postal inspector may obtain the authorization and deliver it to the financial institution.

7-6.3.2.3   **Content of Authorization**

For maximum efficiency, customer authorizations should specify all federal agencies anticipated to require access. Also, the investigatory purpose should be stated broadly. Before authorizing access to financial records, a customer must be provided with a Statement of Customer Rights (see Exhibit 7-6.3.2.3. For accounts held in joint names, either spouse or a partner may authorize access to the account.

7-6.3.2.4   **Target of Investigation**

If the customer whose financial records are being sought is not the target of the investigation, advise the customer, if doing so will enhance cooperation without impeding the investigation. However, if at a later date the customer becomes a target, give Customer Notice, before the records are used.

7-6.3.3   **Records Obtained by Search Warrant (Forms I and J)**

A search warrant may be used to obtain records. Notice of the search warrant must be given to the customer within 90 days after the warrant's execution (see Exhibit 7-6.3.3aand Exhibit 7-6.3.3b; however, delays up to 90 days may be granted by a court when it is shown that customer notification would seriously jeopardize a continuing investigation.

7-6.3.3.1    **Judicial and Administrative Subpoenas**

7-6.3.3.1.1    **Judicial Subpoenas**

A judicial subpoena is any court order to produce records other than a grand jury subpoena. The most common judicial subpoena is the trial subpoena. When used, a copy of the subpoena, together with the customer notice and customer challenge, is served on or mailed to the customer. This notice informs the customer that his records are being sought and the nature of the inquiry.

7-6.3.3.1.2    **Administrative Subpoenas**

The Postal Inspection Service may issue administrative subpoenas under the Program Fraud Civil Remedies Act. When used, a copy of the subpoena, customer notice, and customer challenge forms are served or mailed to the customer. Such notice may be delayed.

7-6.3.4    **Formal Written Request (Form C)**

7-6.3.4.1    **Description**

Since the Postal Inspection Service possesses only limited administrative subpoena power, this method of access has been authorized by postal regulations. A postal inspector may obtain financial records from a financial institution through a formal written request in the form of a letter addressed to an appropriate official of the financial institution (see Exhibit 7-6.3.4.1). The financial institution is not compelled to comply with a formal written request.

7-6.3.4.2    **Content of Formal Written Request**

The following should be included in the formal written request:

a.    Signature of the supervising postal inspector and the postal inspector's name, title, business address, and business phone number.

b.    Identity of the customer to whom the records pertain.

c.    A reasonable description of the records sought.

d.    The date when the customer challenge rights expire.

e.    If a court order delay is obtained, attach a copy to the request.

7-6.3.5    **Grand Jury Subpoena**

A grand jury subpoena is not covered by the Act. There is no requirement for a certificate of compliance or customer notice.

7-6.3.6    **Emergency Access to Financial Records**

In those instances where notice and challenge delays could create imminent danger or physical injury, serious property damage, or flight from prosecution, access may be obtained immediately merely by presenting the financial institution with the certificate of compliance; however, notice to the customer is still required and within five days after obtaining access, a supervisory official must file in court a signed, sworn statement setting forth the grounds for the emergency access.

7-6.3.7    **Account Identification Only (Form O)**

Use this procedure when seeking information from the financial institution in which an individual has an account. The notice and challenge provisions do

not apply when only name, address, type of account, and account number is needed. This information may be provided notwithstanding any state or local law to the contrary. In addition to account identification information, more specific inquiries, such as the account number associated with a particular transaction or class of transactions, may also be obtained; however, once the existence and identification of a customer account is established, one of the prescribed access methods must be used (see Exhibit 7-6.3.7).

## 7-6.4  Customer Notice and Challenge

### 7-6.4.1  Customer Notice (Form D)

#### 7-6.4.1.1  Required Customer Notice

This is required for administrative or judicial subpoenas, search warrants, and formal written requests. It is not required for grand jury subpoenas. The customer must be notified before the Inspector can obtain the records, unless a delay of notice order is obtained from the court. A sample of Form D appears as Exhibit 7-6.4.1.1.

#### 7-6.4.1.2  Statement of Purpose

The notice must state the purpose of the law enforcement inquiry, using generic terms such as fraud, theft, or embezzlement rather than a specific federal statute. Notice is served either by personally giving the document to the customer or by mailing it to the customer's last known address. For joint accounts, service to any holder constitutes notice to all joint holders; however, when the investigation is directed at one spouse or one or more partners, direct the notice to the subject of the investigation.

### 7-6.4.2  Customer Challenge (Forms E and F)

#### 7-6.4.2.1  Purpose

When access is sought by administrative or judicial subpoena or formal written request, along with the customer notice, provide a copy of the forms "Customer Motion to Challenge Government Access to Financial Records" (see Exhibit 7-6.4.2.1a) and "Customer Sworn Statement for Filing a Challenge" (see Exhibit 7-6.4.2.1b) to the customer. Instructions for completing and filing these forms must be included (see Exhibit 7-6.4.2.1c and Exhibit 7-6.4.1.1).

#### 7-6.4.2.2  Procedure

A customer who has received notice may challenge a judicial subpoena or a formal written request. The customer has ten days following personal service or 14 days following mail service within which to file a motion in U.S. district court to quash a judicial subpoena or to make application to enjoin the government from pursuing a formal written request.

### 7-6.5 Delay of Customer Notice (Forms G and H)

#### 7-6.5.1 Areas of Application

Delays of customer notice may be obtained for access sought through grand jury and judicial subpoenas, formal written request, search warrants, and interagency transfers (see Exhibit 7-6.5.1).

#### 7-6.5.2 Conditions for Granting a Delay

A court may grant a delay of customer notice when there is reason to believe notice will result in danger to life, flight from prosecution, destruction of evidence, intimidation of a witness, jeopardy to an investigation, or delay to a trial.

#### 7-6.5.3 Obtaining the Delay

To obtain a delay notice, present a sworn written statement to a judge or magistrate in the jurisdiction where the financial institution having the records is located. See Exhibit 7-6.5.1

#### 7-6.5.4 Disclosure to Customer by Financial Institution

In addition to delaying the government's notification to the customer, the court order may prohibit the financial institution from disclosing to the customer that records are being sought.

#### 7-6.5.5 Post-Notification Requirements (Forms K and L)

Where customer notice has been delayed by court order or where access has been obtained pursuant to a search warrant or the emergency exception, the following are required:

a. Search Warrant (Form I) (see Exhibit 7-6.3.3a).

b. Search Warrant with Court-Ordered Delay (Form J) (see Exhibit 7-6.3.3b).

c. Court-Ordered Delay (Form K) (see Exhibit 7-6.5.5a).

d. Following Emergency Access (Form L) (see Exhibit 7-6.5.5b.

#### 7-6.5.6 Termination of the Investigation (Form M)

If, after obtaining access following a customer challenge, no prosecution or other proceedings are to be brought against the customer, the customer must be notified by either the postal inspector or the U.S. Attorney's Office. Such notice does not preclude a later investigation based in whole or in part on newly obtained evidence (see Exhibit 7-6.5.6).

### 7-6.6 Exemptions to the Act

#### 7-6.6.1 Records

The following records are exempt from the Act:

a. Records that are not identifiable with a particular customer.

b. Records required to be reported under federal statute or rule.

c. Records sought in pending litigation involving the customer.

d.   Access to financial records by grand jury subpoena is also exempt, but the records obtained must be presented to the grand jury for consideration.

### 7-6.6.2  Records Not Identifiable With Customer

The Act does not directly protect records of a customer that appear in the account of a third person, such as check endorsements or items drawn by an individual and deposited into the account of a corporation, if the item is obtained from a corporation's records. The Act also does not cover financial records obtained from third parties other than financial institutions or federal agencies.

### 7-6.6.3  Parties in Litigation

The Act does not apply when the federal government and the customer are litigants and financial records are sought through the FRCrP or through other rules in connection with a judicial proceeding. When issuing a trial subpoena for financial records of a criminal defendant pursuant to Rule 17(c), FRCrP, the notice, challenge, reporting, and other requirements of the Act do not apply. If a financial institution insists upon the issuance of a certificate of compliance on serving a trial subpoena for records of a criminal defendant, the U.S. Attorney may issue a certificate that the Act is not applicable by virtue of the litigation exception.

### 7-6.6.4  Financial Institution Is the Target

Investigations directed at corporations or other legal entities are not protected by the Act. If customer records are required in connection with an investigation of the financial institution, no customer notice is required. Any customer record so obtained may not be used in any way against an individual customer unless access provisions of the Act are employed; however, the postal inspector must still submit a certificate of compliance with the Act before he can obtain access to the institution's records.

### 7-6.6.5  Transfer of Records (Forms N and N1)

Financial records may be transferred to another federal agency only if an official of the transferring agency certifies in writing that there is reason to believe that the records are relevant to a legitimate law enforcement inquiry of the receiving agency (see Exhibit 7-6.6.5a). Within 14 days after the transfer, notify the customer (see Exhibit 7-6.6.5b) unless the government has obtained a court order delaying the notice. This procedure can be avoided if the customer notice specifies all agencies anticipated to require access to financial records. The Act does not restrict transfers of financial records between state or local law enforcement agencies and the Postal Inspection Service. Avoid an appearance of impropriety by the use of state or local agencies as surrogates for the Postal Inspection Service to obtain financial records.

### 7-6.7 Reimbursement to the Financial Institution

#### 7-6.7.1 Amount

The Act requires federal law enforcement agencies to reimburse financial institutions for the reasonable costs directly incurred in assembling and providing customer's financial records. The financial institution is also entitled to be reimbursed for all transportation costs necessary to locate and retrieve documents and to convey them to the requester. If itemized separately, the financial institution can be reimbursed for the actual costs of obtaining records stored in a computer. Rates may be found in 12 FRCrP 219.3, Appendix A.

#### 7-6.7.2 Reimbursement Responsibility

The Department of Justice will be the agency responsible for records obtained by formal written request or customer authorization.

#### 7-6.7.3 Where Reimbursement Is Not Required

a. The records are not identifiable to a particular customer.

b. The records are sought under the FRCrP in connection with litigation to which the government and the customer are parties.

c. The information sought is limited to the name, address, account number and type of account of any customer or group of customers associated with a financial transaction.

d. The financial records sought are part of a legal proceeding directed at the financial institution and not the customer.

A supervisory official must approve all requests for financial records where the Postal Inspection Service will be obligated to reimburse the financial institution. Reimbursement will not be made until an itemized invoice is received from the institution. Make payments by postal money order and charge as an investigative expense. When the Postal Inspection Service reimburses a financial institution, a special report containing a brief description of the investigation, the reason for obtaining the financial records, and any significant problems will be sent to the attention of the Deputy Chief Inspector, Headquarters Operations. Attach a copy of the invoice. Prepare a special report when there is a declination to prosecute by the U.S. Attorney's Office because of the expense of obtaining financial records. Include a reasonable estimate of the reimbursement costs in the report.

### 7-6.8 Penalties for Violation of the Act

#### 7-6.8.1 Civil

Any federal agency or financial institution is liable to the customer for violation of the Act as follows:

a. Payment of $100 without regard to the volume of records involved.

b. Actual damages.

c. Punitive damages.

d. Court costs and reasonable attorney fees.

7-6.8.2 **Criminal**

Even though the Act has no criminal sanctions, customer records covered by the Act may also be covered by the Privacy Act of 1974, which does provide for criminal penalties.

7-6.8.3 **Disciplinary Action**

If a court determines that a violation may have been willful, the Office of Special Counsel, Merit Systems Protection Board (successor agency to the Civil Service Commission), must conduct a proceeding to establish whether a government employee is primarily responsible and, therefore, subject to disciplinary action.

7-6.9 ## Reporting Requirements

7-6.9.1 **Content**

The Act requires, on a calendar year basis, the following statistics only with respect to customer records sought from financial institutions:

a.     Number of customer authorizations.

b.     Number of administrative subpoenas.

c.     Number of search warrants.

d.     Number of judicial subpoenas (does not include grand jury).

e.     Number of formal written requests.

f.     Number of delayed notices.

g.     Number of emergency access requests. h.Number of customer challenges.

7-6.9.2 **Submission**

Each division will furnish this report to Chief Counsel, by the third week of February of each year.

# 7-7   Civil Suits

7-7.1 ## Overview

This section applies to civil litigation in which postal inspectors are parties, are called upon by the USPS Law Department or U.S. Attorney's Office for assistance or are served with subpoenas to provide testimony or evidence.

7-7.2 ## Exposure to Suit

All Postal Inspection Service personnel must recognize that they may be subject to a lawsuit being filed in federal, state or local court for their actions during the performance of their duties. These lawsuits can be the results of allegations of misconduct, negligence or to order the Postal Inspection Service, the employee or the Government to refrain from some activity.

### 7-7.3   Employee Responsibilities

#### 7-7.3.1   Summons

Postal Inspection Service personnel served with a summons must notify their direct supervisor, the division management team, the Deputy Counsel, Headquarters, and the division Inspector Attorney immediately. Provide the nature of the action, the case number, the name of the plaintiff, the names of any other defendants, a summary of the facts which gave rise to the suit, and any related case numbers. This initial communication may be made by telephone or electronic mail.

Following initial notification the employee must forward to the Deputy Counsel, Headquarters, and the Inspector Attorney assigned to the division a copy of the complaint and summons within two days of receipt by the employee. The Deputy Counsel, Headquarters, and the division Inspector Attorney will coordinate notification to the U.S. Attorney's Office.

#### 7-7.3.2   Civil Suit Filed — Federal, State, or Local Court

Any civil suit filed against the United States, the Postal Service, or any Postal Inspection Service employee in a federal, state, or local court, based in any way upon official acts of the defendant(s) should immediately be brought to the attention of the Deputy Counsel, Headquarters, and the Inspector Attorney assigned to that division.

The handling of suits filed in state or local courts require special attention because of the short time allowed for removing suits to federal court. All reports submitted after a case has been removed from a state or local court to Federal court should show the new court and docket number.

#### 7-7.3.3   Attorney-Client Relationship

When it is known that a person is represented by counsel in either a civil suit or a claim against the Postal Service, an employee should not communicate directly with that person without the knowledge and approval of the attorney.

### 7-7.4   Representation by Counsel

Employees may elect to hire private counsel of their own choice and at their own expense. However, representation by a Department of Justice attorney (an AUSA in the local U.S. Attorney's Office) is available to represent present and former Postal Inspection Service employees who are personally sued or subpoenaed because of actions taken within the scope of their Postal Service employment. All representation decisions are made on a case-by case basis.

Before representation can be authorized, the Department of Justice must determine that 1) the employee's actions which are the subject of the suit appear to have been performed within the scope of employment, and 2) it is in the interest of the United States to provide the requested representation.

#### 7-7.4.1   Employee Responsibility

Postal Inspection Service employees are customarily but not automatically represented by the Department of Justice. Each employee who wishes to have Department of Justice representation must submit a written request it in

duplicate through the division's Inspector Attorney (see Exhibit 7-7.4.1).
Address requests to:

> ASSISTANT ATTORNEY GENERAL CIVIL DIVISION
> DEPARTMENT OF JUSTICE
> TENTH ST AND PENNSYLVANIA AVE
> WASHINGTON DC 20530-0001

Copies of the summons and complaint must be enclosed, along with the employee's request. The request should address the following:

a.   When, where, and by whom the summons was served, and name of the person who accepted service, if not the writer.

b.   He/she is a defendant (or the person intended by the plaintiff in the designation, "John (Jane) Doe" or "Postal Inspector, Name unknown)."

c.   The complaint has been read, and its allegations relate to acts within the scope of the writer's official duties, performed in the good faith belief that they were reasonable, necessary and lawful.

d.   The employee understands the following conditions:

   (1)   The individual can obtain private counsel at his or her own expense for advice or defense.

   (2)   There is no provision for automatic payment of a money judgment entered against the employee in an individual capacity.

   (3)   Representation by the Department of Justice provides no payment in the employee's behalf or indemnification for payment of any judgment or settlement of the case.

   (4)   The employee may be required to pay any settlements or judgments in the case from personal funds.

### 7-7.4.2   Inspector/Employee's Declaration

a.   The Postal Inspection Service employee shall prepare and sign a declaration (see Exhibit 7-7.4.2) and submit a copy of the declaration, along with a copy of the summons and complaint, to the INC and the division's Inspector Attorney for review. The declaration will also serve as written documentation for the U.S. Attorney's Office of the employee's statement, if the case is tried.

b.   The employee must include in their declaration the facts that will establish that their acts relating to the case were within the scope of their duties, were performed with probable cause, in good faith, and with reasonable belief that they were legal, proper, and necessary. If the employee's actions were in keeping with existing instructions, policy, custom, or practice, the employee should so state.

c.   Upon review of the employee's declaration by the Inspector Attorney, the employee will mail the original documents to the Inspector Attorney, with a copy to the INC. The Inspector Attorney will forward the employee's declaration to the U.S. Attorney's Office. The following documents shall be included with the letter: the original request for representation, the signed declaration, and a copy of the summons and complaint.

Note: To expedite this process, the employee may paperport, e-mail, and/or fax the Inspector Attorney and the INC his/her request for representation and a draft of the declaration. The Inspector Attorney must also be able to review the summons and complaint before approving the declaration.

### 7-7.4.3 Supervisor's Responsibility

The employee's current INC or in case of a retired Postal Inspection Service employee, the current INC of the division the employee worked at the time of the incident, must prepare a sworn affidavit stating as follows:

a. The INC has reviewed the complaint and the employee or former employee's statement.

b. The acts alleged were within the scope of the employee's official duties. If there is any doubt, the INC shall submit an independent investigative report to National Headquarters.

c. The INC shall forward his or her affidavit to the Inspector Attorney as soon as possible for filing with the employee's declaration and the summons and complaint.

Exhibit 7-7.4.3 contains a sample sworn affidavit.

### 7-7.4.4 Inspector Attorney's Responsibility

The Inspector Attorney shall review each document submitted by the employee and the INC and send the request for representation, the declaration, the affidavit of the INC and a copy of the summons and complaint to the appropriate U.S. Postal Service Tort Claim Center, with a copy to the Deputy Counsel, Headquarters.

## 7-7.5 Evidence

Unless all of the facts needed to defend a suit are already well documented, immediate steps must be taken to obtain all relevant records. Names, titles, permanent address, and present whereabouts of persons to be called as witnesses should be determined. If the plaintiff or any other party named in a civil suit is not known to the employee who is served, immediate efforts must be made to identify that party, with special attention given to any possible prior dealings with the Postal or Inspection Service.

## 7-7.6 Subpoenas

### 7-7.6.1 Discovery Proceeding

Upon receiving a subpoena to give a deposition, a Postal Inspection Service employee should prepare as thoroughly for it as for testimony at trial. Employees should never consent to be deposed without first having been served with a legal order to do so, or without advice and presence of counsel. They must inform attorneys that it is contrary to the policy of the Postal Inspection Service to waive signatures of deponents to the transcripts of their depositions. The transcript is to be scrutinized carefully and any errors corrected before it is signed.

7-7.6.2   **Party in Interest**

The Postal Service may well be a party in interest in cases where it is not a named litigant, such as in the following instances:

a.   A state parole board revocation hearing, occasioned by an arrest of the parolee by the Postal Inspection Service.

b.   A suit against a state or local enforcement officer whose alleged acts occurred during a joint investigation with the Postal Inspection Service.

c.   A civil action by an individual Postal Service employee against a private party for personal injuries sustained while on duty. An award to the employee can be set off against the compensation payments the employee has received from the government.

7-7.6.3   **Other Subpoenas**

When Postal Inspection Service employees are served with subpoenas commanding their appearance to testify or produce Postal Inspection Service records in any case in which the United States is not a party in interest, take the following steps:

a.   Employees must promptly notify their INC and forward a copy of the subpoena to division headquarters. In addition, employees will provide all relevant background information and make recommendations regarding compliance with the subpoena.

b.   The INC will consult with the division Inspector Attorney as to the advisability of asserting any available privileges or complying with the subpoena.

c.   The Inspector Attorney will ensure that the provisions of 39 C.F.R.265.13 are complied with.

d.   The employee will be advised of the decision whether or not to assert a privilege is reached.

e.   When a decision is made to assert a privilege, the U.S. Attorney's Office should be notified by the Inspector Attorney. The Inspector Attorney will consult with the U.S. Attorney's Office and advise the employee of actions which will be taken. An employee who has claimed privilege may be compelled to testify by a judge despite a claim of privilege.

7-7.7   **Using Civil Litigation to the Advantage of the Postal Service**

7-7.7.1   **Recover Funds due Postal Service**

Postal inspectors should recommend civil suits to recover funds due the Postal Service when other collection efforts have failed, the debtor is financially able to pay, and the debt can be proven. All relevant facts should be reported to National Headquarters for consideration. When civil action appears to be indicated, the facts will be referred to the Law Department for review and presentation to the Department of Justice. In most instances, the postal inspector should ascertain the views of the U.S. Attorney's Office in the district where suit would be brought and include this information in his report.

7-7.7.2 **As Assistance in Criminal Cases**

When a civil suit is filed against the Postal Service by the subject of a pending criminal investigation, careful consideration should be given to making use of the opportunity thus presented to secure information from the plaintiff through the discovery process (interrogatories) which may be helpful in the criminal case. In any civil action where plaintiff serves interrogatories upon the Postal Inspection Service, consideration should be given to serving them in turn upon the plaintiff. Thorough discussion of the advantages and disadvantages should be held with the U.S. Attorney's Office.

7-7.8 ## Control

Employees must keep themselves informed of the status of litigation that involves them in any way. If they do not receive advance notice of events from the U.S. Attorney's Office, should consult the clerk of the court.

Immediately upon learning a case has been removed or dismissed, or that a scheduled proceeding has been postponed, notify the INC and make certain government parties and witnesses have been advised. If requested, obtain copies of all motions, answers, and orders of court and forward in duplicate to Chief Counsel.

# 7-8   Professional Liability Insurance

Postal Inspectors, and qualified supervisors and management officials, as defined in 5 U.S.C. § 7103(a), electing to purchase Professional Liability Insurance will be reimbursed up to one-half of the cost, not to exceed $150.00, of the yearly policy premium.

Professional Liability Insurance is insurance which provides coverage for:

(1) legal liability for damages due to injuries to other persons, damage to their property, or damage or loss to such other persons (including the cost of litigation and settlement) resulting from or arising out of any tortious act, error or omission of the covered individual while in the performance of their official duties, and the cost of legal representation for the covered individual in connection with any administrative or judicial proceeding, relating to any act, error, or omission of the covered individual while in the performance of their official duties, and

(2) the cost of legal representation for the covered individual in connection with any administrative or judicial proceeding (including any investigation or disciplinary proceeding) relating to any act, error, or omission of the covered individual while in the performance of such individual's official duties, and other legal costs and fees relating to any such administrative or judicial proceeding.

Questions and information regarding qualification and reimbursement should be directed to the Business Operations Manager, Budget and Finance, at National Headquarters

# Exhibit G

## MEMORANDUM OF UNDERSTANDING
## BETWEEN THE
## UNITED STATES POSTAL SERVICE
## AND
## POSTAL POLICE OFFICERS ASSOCIATION

**Re: Committee for the Transformation of the Postal Security Force**

It is critical for both parties to resolve a fundamental disagreement over the status and duties of the existing PPO force, all members of which serve in one job description and a single pay grade. The Inspection Service claims that the PPO's principal responsibility is building security so that private sector pay comparability should be based on security guard status. The PPOA takes the position that PPOs conduct police duties similar to those of their federal uniformed counterparts, many of whom are considered Police (0083 Series) as defined in the OPM Grade Evaluation Guide, and thus argues for pay comparability to federal police personnel. There are elements of truth in both positions.

Over time, three distinct roles within the postal security spectrum have emerged: strictly fixed post building security work limited to a particular facility (duties previously performed by PPOs and now largely performed by unarmed contract security guards), traditional PPO duties that include emergency responses and fixed, mobile, and foot posts at urban, airport, and other high-value Postal Service locations, and finally, more mobility, emergency response, community policing, and carrier patrol functions in higher-crime areas. The parties have expressed a fundamental disagreement over where PPOs fall on this spectrum.

The current PPO force performs a mixture of both building security and police duties, with some PPOs devoted predominantly to building security and others to broader street patrol and carrier protection. The PPOA has asserted that, more frequently, Postal Police are expected to perform the latter category of duties, without commensurate compensation or federal police status. The Panel believes that the underlying dispute between the parties cannot be resolved without the parties engaging in a frank and honest dialogue as to the kind of security force the Inspection Service needs going forward. This will necessitate a delineation and forecast of duties that are and will be needed, particularly as the Postal Service enters ever more deeply into the parcel and package delivery business.

Simultaneously, the Postal Inspection Service has experienced pressure to explore consolidation of the Inspection Service with the Office of the Inspector General and the contracting out of the entire postal police function, given its cost. The two-tier wage structure endorsed by the Board of Interest Arbitration is a suggested or possible first step in eventually reducing unit labor costs in the overall PPO unit. However, it is largely meaningless so long as PPOs are hired internally.

It is in the best interest of both parties to resolve these issues as they work toward a cost-effective Postal Police force that best meets the varied security needs of the Postal Service. To that end, the parties have agreed to jointly create a Committee to explore these issues, in accordance with these terms:

1.      The USPIS and the PPOA will each appoint up to four members within 30 days of the date of the Opinion and Award to which this Memorandum of Understanding is attached.

2.  The Committee will issue recommendations on the below-listed issues to the parties within six (6) months of the date of the Opinion and Award. The parties may extend this deadline by mutual agreement.

3.  The Committee will consider and make recommendations on the following issues (and any other relevant considerations that may arise):

   a.  The creation of a new position and grade within the PPOA bargaining unit to encompass more expanded duties;

   b.  The exploration of ways to expand duties within the existing grade;

   c.  If the Committee finds a new position and grade appropriate or finds it appropriate to reevaluate or expand duties within the existing grade and position:

      (1)  The duties, work rules, and responsibilities of the new position, and/or any expanded duties and applicable work rules for the existing position;

      (2)  Job qualifications;

      (3)  Training; and

      (4)  Compensation.

   d.  The appropriateness of internal versus external hiring for the current Grade 6 PPO position in light of the two-tier wage structure awarded by the Board of Interest Arbitration.

4.  If the Committee is unable to agree on recommendations or agree to extend the six-month deadline, the parties will enlist the services of the Chairman of the Board of Interest Arbitration, James Oldham, for mediation. As the Panel noted in its decision, in the end, it cannot dictate to the

Inspection Service the kind of security force it needs or wants going forward nor can it dictate to the union a division of the bargaining unit. Ultimately, the decision rests with the parties and the formation of this Committee is simply to foster a thorough discussion of the issues for purposes of making a recommendation to the Inspection Service.

## Recommendation of the Committee for the Transformation of the Postal Security Force

As set forth in the Memorandum of Understanding (MOU) Between the United States Postal Service (USPS) and Postal Police Officers Association (PPOA), as part of the April 1, 2014 Award of the Board of Interest Arbitration, a Committee for the Transformation of the Postal Security Force (the Committee) was formed to meet and make recommendations consistent with the MOU. It is understood by the Committee that this document is an initial step in the possible future realization of such recommendations.

As set forth in the MOU, it is in the best interest of the USPS and the PPOA to work toward a cost-effective Postal Police force that best meets the varied security needs of the Postal Service. The formation of the Committee was simply to foster a thorough discussion of the issues for purposes of making a recommendation to the Inspection Service. These recommendations in no way modify the collective bargaining agreement between the USPS and the PPOA. Any such change would require collective bargaining. The Committee was not formed for the purpose of collective bargaining.

The Committee jointly explored the following issues:

1. The creation of a new position and grade within the PPOA bargaining unit to encompass more expanded duties;

2. The exploration of ways to expand duties within the existing grade;

3. If the Committee found a new position and grade appropriate or finds it appropriate to reevaluate or expand duties within the existing grade and position;

   a. The duties, work rules , and responsibilities of the new position, and/or any expanded duties and applicable work rules for the existing position;
   b. Job qualifications;
   c. Training; and
   d. Compensation.

The Committee hereby makes the following recommendations:

1. The Committee recommends the creation of a new position and grade within the Postal Police Officers Association (PPOA) bargaining unit to encompass more expanded duties.

2. The Committee does not recommend an expansion of duties within the existing grade.

3. The Committee recommends the following expanded duties for a new position:

   a. Mobile letter carrier protection;
   b. Mail theft prevention;
   c. Postal Service community policing;
   d. Mail Transportation Equipment (MTE) protection and recovery;
   e. Protection of Postal Inspection Service property and personnel during Postal Inspector search warrant operations;

      f.   Deployment to protect Postal Service property and personnel at times of natural disasters and other significant events;

      g.  Deployment to protect Postal Service property and personnel during protests;

      h.  Limited dangerous mail containment activities;

      i.   Limited prohibited mail narcotics interdiction activities;

      j.   Limited prisoner transport, under the direct supervision and jurisdiction of a Postal Inspector;

      k.  Enhanced active shooter response (National Headquarters);

      l.   Enhanced incident command (National Headquarters);

      m.  Enhanced medical incident response (National Headquarters);

      n.  Limited, uniformed executive protection duties (National Headquarters).

Such duties will be consistent with the jurisdiction restrictions set forth in Title 18, United States Code, Section 3061(c). The Postal Service has not previously expanded the powers of Postal Police Officers under Title 18, United States Code, Section 3061(c)(3), and it is not recommended that expanded duties in this section expand the powers of Postal Police Officers under that section. Absent a legislative change in this regard, the recommended position will not be eligible for federal law enforcement retirement benefits, as the duties of the recommended position will not comprise the duties of a criminal investigator.

4.  The Committee recommends that because additional work rules will be dependent on what duties become part of a new position, new work rules should not be developed at this time. Any necessary work rule changes will be made consistent with the provisions of the collective bargaining agreement.

5.  The Committee recommends that candidates should be selected for a new position on a best qualified basis.

6.  The Committee recommends that a new training course be developed by the Career Development Unit to encompass the expanded duties of the new position. The Committee further recommends that members of the PPOA take part in the development of such a training course. In developing the training, special consideration should be given to the following:

      a.  Jurisdiction, liability and use of force;

      b.  Defensive tactics related to operating in a vehicle;

      c.  Postal Service community policing.

7.  Though it is understood by the Committee that compensation cannot be set by the terms of this document, the Committee recommends that the pay grade for a new position should be higher, commensurate with the additional training and skills associated with expanded duties.

Signed this 9th day of December, 2014

_____
James Bjork

_____
Joshua Pierce

_____
Andre McCamey

_____
Christine Taylor

_____
Eric Freeman

_____
Michael Plaugher

_____
Terrence McKeown

# Exhibit H



UNITED STATES POSTAL INSPECTION SERVICE

# INSPECTOR IN CHARGE - NEW YORK DIVISION

October 1, 2017

**STANDARD OPERATING PROCEDURE**

**<u>JFK Airfield Mobile Patrols</u>**

**Objective**

Officers assigned to JFK Airfield Mobile Patrols will conduct high visibility ramp patrols at the JFK AMF, including hard stands, airline holding areas, mail storage areas and ramp roadways.

PPOs must conform to all airport regulations while conducting patrol activities on Port Authority designated property, including visibly displaying their Security Identification Display Area (SIDA) badge, and ensuring the LEV is equipped with a PANYNJ license plates.

These patrols will occur every day on every tour (24/7) and will include, but are not limited to the following:

- Provide security for Ramp Clerks at planeside for foreign and domestic flights, coded shipments, MISCA's and other high valued mail.

- Respond to emergent occurrences on the Ramp that are within our jurisdiction.

- Retrieve unsecured mail, report all mail irregularities, and serve to deter crimes against the mail by maintaining a strong visual presence.

Officers participating in the JFK high visibility patrols will:

- Maintain and complete a patrol sheet, which will document the Officer's activity during the Ramp patrol;

- Document any irregularities, including recovered mail on a PPO Incident Report as well as the PPO Daily Report;

- Mishandled or recovered mail requires a completed PS Form 2759 (Report of Irregular Handling of Mail) which is sent to Air Transportation Office;

1

- Recovered rifled mail is provided to the JFK Mail Theft Team for investigative attention. A completed PS Form 2759 and a PPO incident report is required.

**Professional Demeanor**

- Officers will follow all the Port Authority SIDA rules governing conduct on the airfield;

- Officers report for duty in a complete uniform; wearing clean and pressed uniforms while on duty;

- Officers may not participate in any of the following activities while conducting JFK high visibility ramp patrols, unless exigent circumstances exist;
    - eating
    - drinking
    - reading
    - cell phone use
    - smoking

**Discretion**

- Use discretion in the enforcement of postal rules and regulations.

- At all times, Officers must attempt to obtain voluntary compliance from both postal employees and customers.

Edward Gallashaw
Assistant Inspector in Charge

Michael A. Connors                 Joy Dillard                       Andres Gomera
Colonel                            Captain                          Captain

# Exhibit I



UNITED STATES POSTAL INSPECTION SERVICE

NEW YORK DIVISION

**August 2014**

**SOP**    STATION & BRANCH/COLLECTION BOX  PATROL(S) SOP

**HOURS OF OPERATION:**    2400-0600 Hours (7 Days)

As part of the New York Division's on-going Community Policing Program and in conjunction with the Robbery & Violence Prevention Program; a series of patrols involving Postal Police Officers and Sergeants will conduct patrols of collection boxes in and around designated Station & Branch sectors. These patrols will be conducted from _____ hours to _____ hours, 7 days a week, staffing levels permitting.  Overtime is not authorized for these patrols.

The purpose of these patrols is to provide a highly visible presence to deter criminal attacks, such as "Fishing" mail thefts against the designated collection boxes and to obtain descriptions of individuals or vehicles engaged in suspicious activity near the boxes.  The designated areas of patrol have been the subject of recent collection box break-ins.

**CIRCUMSTANCES PERMITTING, POSTAL POLICE PERSONNEL WILL OBSERVE A PURSUIT OF ANY SUSPICIOUS VEHICLE(S) OR PERSON(S) DISCOVERED IN THE AREA OF THESE COLLECTION BOXES.**

It should be understood that Postal Police personnel may have to engage in limited pursuit of suspicious individuals or vehicles found near or at a collection box and attempting to steal mail. If the patrol does encounter an actual felony in progress such as an attempted break-in of or "fishing" mail theft from the collection box, the patrol will Arrest the individuals and notify Communications Center personnel. Additionally extreme caution should be used when detaining any suspects. In the event that apprehension of the offenders is not possible or operationally advised; an accurate description of the individuals, a description their vehicle (if any) with plate number, and the direction of flight from the scene is required.

In all probability you will be dealing with local gang members. Postal Police personnel should exercise extreme caution as the number of suspects in this area, and the type of weapons they may possess is not known at this time.

Each patrol will be assigned specific collection boxes to check.  Any suspicious activity or criminal acts involving these collection boxes will be the subject of an Incident Report.

The following patrol locations will be assigned by the Tour Sergeant: (Locations must be rotated from night to night).

PO Box 555
NEW YORK, NY 10116-0555
TELEPHONE:  212-330-3844
FAX;  212-330-2720

- 2 -



E.S. Gaston, Colonel
Manager – Postal Police
New York Division

cc:     Maynard, Jr., S.M., Lieutenant
        Yan, W., Lieutenant
        Dillard, J.A., Lieutenant
        Gomera, A., Captain
        Connors, M.A., Captain
        Bartlett, P.R., Inspector in Charge

ESG/

# Exhibit J

# Roll Call Training
# Theft or Receipt of Stolen Mail




We have noted a significant increase in satchel cart attacks in the Manhattan and Triboro Districts during Q1. The perps are walking past satchel carts and grabbing either a parcel or a bundle of letter mail from the cart.

## Scenario

**You and your partner are on mobile patrol and are stopped at a traffic light. You observe a male subject take a bundle of letter mail from an unattended satchel cart and walk south on Broadway.**

**What's the violation?**                *Theft of U.S. Mail*

**What's the title, code and section?**        *Title 18    United States Code    Section 1708   (Felony)*

**Should you Arrest?**                *Absolutely*

**What Next?**  *Conduct* a *search of subject, recover letter mail, contact the control center, contact the Manhattan Mail Theft Team and coordinate with them before transport of subject back to DHQ.*

# Exhibit K



# U.S. Postal Inspection Service
# MANAGEMENT COMMUNICATION

| | | | |
|---|---|---|---|
| Date: | 8/25/2020 | Contact Name: | Deputy Chief Inspector David Bowers |
| Group: | DCI HQ ANALYT/FORENS/DEV | Contact Phone: | 202-268-2655 |
| Due Date: | 8/25/2020 | | |
| Subject: | Postal Police Utilization | | |

- Per 18 U.S.C. § 3061(c)(1)-(2). Postal Police Officers (PPOs) may exercise certain law enforcement authority (i.e., enforce certain Federal laws and regulations, carry firearms, and make arrests for specified offenses) on real property owned, occupied, or otherwise controlled by the Postal Service; or in the immediate areas outside postal owned real property (sidewalks and walkways) to the extent necessary to protect the property and people on postal owned real property. PPOs may not exercise this law enforcement authority in contexts unrelated to Postal Service premises.

- **Effective immediately any off property utilization of PPOs requires prior approval of the DCI over the Division with concurrence of the DCI over the Security Group.**

- DCI approval is not required for PPOs to travel off premises in order to get to a duty assignment or incident at another Postal Service location. However, during this travel they are not to be placed into situations in which it would be reasonably likely that they would be compelled to exercise law enforcement activity (e.g., carrier protection patrols, community policing patrols, and fishing patrols).

# Exhibit L

# POSTAL POLICE OFFICERS ASSOCIATION

September 8, 2020

Janet Peterson
Labor Relations Policy and Programs
475 L'Enfant Plaza, Room 9248
Washington, DC 20260-4101

Dear Janet:

Pursuant to Article 15, Section 15.04(c) of the Collective Bargaining Agreement, the Union hereby initiates the following dispute—an issue of general application—as a Step 4 grievance. At issue is the U.S.Postal Inspection Service's Management Communication, dated August 25, 2020 by Deputy Chief Inspector David Bowers. It states, in full:

> *"Per 18 U.S.C. § 3061(c)(1)-(2). Postal Police Officers (PPOs) may exercise certain law enforcement authority (i.e., enforce certain Federal laws and regulations, carry firearms, and make arrests for specified offenses) on real property owned, occupied, or otherwise controlled by the Postal Service; or in the immediate areas outside postal owned real property (sidewalks and walkways) to the extent necessary to protect the property and people on postal owned real property. PPOs may not exercise this law enforcement authority in contexts unrelated to Postal Service premises.*
>
> *Effective immediately any off property utilization of PPOs requires prior approval of the DCI over the Division with concurrence of the DCI over the Security Group.*
>
> *DCI approval is not required for PPOs to travel off premises in order to get to a duty assignment or incident at another Postal Service location. However, during this travel they are not to be placed into situations in which it would be reasonably likely that they would be compelled to exercise law enforcement activity (e,g., carrier protection patrols, community policing patrols, and fishing patrols)."*

The Employer violated Articles 5, 6, 14, and 19 of the National Agreement when it issued the August 25, 2020 revision to the policing powers of Postal Police Officers as found in 18 U.S.C. §3061(c). Such powers are further codified in USPS Handbook IS-701, Security Force Operations (See USPIS "Policy Update" dated May 22, 2007).

Plainly stated, the August 25, 2020 "Management Communication" issued by the Employer is a drastic change to the working conditions of PPOs. Jurisdictional authority and the policing powers found therein are critically important to the working environment and safety of Postal Police Officers. The Inspection Service communique essentially rewrites Title 18, Section 3061(c) by reinterpreting the word "property" to mean "real property" which Congress clearly did not intend. Moreover, the Employer has unilaterally overturned nearly 50 years of long-standing past practice. Such managerial authoritarianism violates the Article 5 prohibition against unilateral action; the fairness proviso in Article 6; and the responsibility of the Employer to provide safe working conditions and to develop a safe working force mandated by Article 14. Additionally, such unilateral changes to Handbook IS-701, incorporated into the CBA via Article 19, are inconsistent with the National Agreement and are certainly not fair, reasonable, and equitable.

# POSTAL POLICE OFFICERS ASSOCIATION

## I. **Postal Police Law Enforcement Authority: A Brief History**

1. The Postal Reorganization Act, Job Descriptions and USPS Handbooks
The Postal Reorganization Act of 1970 (PRA), effective July 1, 1971, authorized the newly created Postal Service to employ "security guards" pursuant to 39 U.S.C., Sections 1201 and 1202. The security force was a component of the Postal Inspection Service and were comprised of armed, uniformed personnel employed for the protection of postal premises. In lieu of a provision for the specific police powers of such guards in permanent legislation, their powers were provided through a general provision in annual appropriations acts, beginning with that of 1973 (Pub. L. 92–351, 86 Stat. 471, section 612). Such general provisions uniformly incorporated by reference the powers given to "special policemen" by Title 40, United States Code. The last time the annual appropriations act applied to the postal police force was 2006 (Pub. L. 109–115, 119 Stat. 2396, section 811).

Under the PRA the 1971 job description of a "Security Technician" (a precursor to the PPO position) stated:

*"After instruction in work methods, procedures and techniques appropriate to investigations of postal and other offenses performs a combination of investigative duties relating to security of mails and to the protection of postal property and personnel."*

Also under the PRA, the 1990 PPO job description stated:

*"Performs a variety of duties pertaining to the security of postal buildings, personnel, property, mail, and mail-in-transit."*

Moreover, Handbook IS-701[1] at Section 111.2 states the "*purpose*" of the Postal Police Force is "to protect the Postal Service, its employees, and customers; secure the nation's mail system; and ensure the American public's continued trust in the U.S. Mail." Similarly, Handbook IS-702[2] at Section 1-3.8.2 states, "The primary functions of the security force may include: b. Protecting government property, including property of the Postal Service, as well as other property within the postal system; and c. Protecting all mail in the custody of the U. S. Postal Service."

It is readily apparent that former Postal Police Officer job descriptions and USPS Handbook IS-701 and USPS Handbook IS-702 include the protection of all "*property*" and "*mail-in-transit*" within the "*postal system.*"

2. PPOs exercised law-enforcement authority apart from postal real estate before 2006

- United States v. Rahman, 189 F.3d 88, 105 (2d Cir. 1999)
  PPO arrested conspirator in first World Trade Center bombing on the street in New York.[3]
- United States v. Watson, 244 Fed. Appx. 484, 486 (3d Cir. 2007)
  Postal Police Officer investigated mail shipment of cocaine in a vacuum package.

---

[1] Dated June 1, 2006

[2] Dated July, 2002

[3] "Outside the hotel Nosair encountered uniformed postal police officer Carlos Acosta. Acosta tried to draw his weapon and identify himself, but before he could fire, Nosair fired two shots at him. The first of these shots hit Acosta in the chest but was deflected into his shoulder by a bullet-proof vest he was wearing, and the second just missed Acosta's head. Despite being shot, Acosta returned fire, hitting Nosair in the neck. Acosta recovered the weapon and detained Nosair."

**POSTAL POLICE OFFICERS ASSOCIATION**

---

- United States v. Gill, 280 F.3d 923, 925-927 (9th Cir. 2002)
  Postal Police Officer in Los Angeles had probable cause to investigate suspicious mail
  containing PCP, by running license plate checks, drafting search warrants, and coordinating
  with U.S. Attorney.

3. The Postal Accountability and Enhancement Act

   The Postal Accountability and Enhancement Act (PAEA) (Pub. L. 109–435, 120 Stat. 3198,
   section 1001) was signed into law on December 20, 2006. The PAEA contains a permanent
   provision for the law enforcement authority of "police officers," codified in new subsection (c) of
   18 U.S.C. 3061. As amended, 18 U.S.C. 3061 provides the fundamental powers of "police
   officers" to "enforce Federal laws and regulations for the protection of persons and property."[4]

   It is clear that Congress did not intend to maintain the status quo with regard to the powers of
   the Postal Police Force. In accordance with the Congressional intent of amended 18 U.S.C.
   §3061, the Postal Service issued a "Policy Update" to Handbook IS-701 (ATTACHMENT 1)
   revising the jurisdictional authority of Postal Police Officers. It sates, in pertinent part:

   *Limitations: The jurisdiction in policing powers of the security force do not extend to the service
   of civil process. The policing powers of the security force are restricted to postal service
   controlled property, except for "hot pursuit" and in situations requiring **mobile patrol or escort
   protection**.*[5]

   The Postal Service's "Policy Update" issued by the Chief Postal Inspector further empowered
   PPOs to conduct street patrols as federal police officers for employee and asset protection and
   mail transport equipment (MTE) retrieval, and when appropriate, to effect arrests if the officer
   had probable cause to believe a crime against postal employees or postal assets was
   committed. In order to effect such an arrest, PPOs must conduct an investigation in order to
   establish probable cause.[6]

4. What is USPS "Property"?

   In order to justify its preposterous position, the Postal Service imposes an arbitrary criteria on
   the term "property" by restricting its meaning to real property only—which Congress clearly did
   not enact. The interest of the Postal Service in protecting all of its property, real or personal,

---

[4] Title 18 U.S.C. §3061(c) states:

(1) The Postal Service may employ police officers for duty in connection with the protection of property owned or occupied by the Postal
Service or under the charge and control of the Postal Service, and persons on that property, including duty in areas outside the property
to the extent necessary to protect the property and persons on the property.
(2) With respect to such property, such officers shall have the power to—

    (A) enforce Federal laws and regulations for the protection of persons and property;

    (B) carry firearms; and

    (C) make arrests without a warrant for any offense against the United States committed in the presence of the officer or for any
    felony cognizable under the laws of the United States if the officer has reasonable grounds to believe that the person to be
    arrested has committed or is committing a felony.

(3) With respect to such property, such officers may have, to such extent as the Postal Service may by regulations prescribe,
the power to—

    (A) serve warrants and subpoenas issued under the authority of the United States; and

    (B) conduct investigations, on and off the property in question, of offenses that may have been

    committed against property owned or occupied by the Postal Service or persons on the property.

[5] **Emphasis supplied**.

[6] 18 U.S. Code §3061 is titled "Investigative powers of Postal Service personnel."

**POSTAL POLICE OFFICERS ASSOCIATION**

tangible or intangible—wherever located—is served by interpreting the term "property" broadly to assume its proper meaning, and by PPO's exercising law enforcement authority off-premises to effect the mandated mission to protect such property. PPO's not only have the right but the responsibility to take proper steps, off-premises to protect, preserve and maintain all postal property "under the charge and control of the Postal Service." Nothing in the statute embraces the proposition that the investigatory authority of PPO's is limited to the postal facility to which a PPO is assigned. PPOs exercise law enforcement authority off-premises as an incident of protection mandated by statute.

In fact, (as evidenced by voluminous incident reports and Quarterly Actvity Reports) for the past decade the Postal Service has utilized PPO's to protect and defend property owned by, or in the custody of the Postal Service, off postal real estate. For an even longer period (several decades) the Postal Service has long utilized PPO's to secure postal property on high-value property escorts. (The New York Remittance program being a prime example.) These protection details all take place off postal property on public roads and highways. A striking example of such an off property postal police escort function is the Newark Division's Carrier Protection Program (CPP). Indeed, the Newark Division has Postal Police Officers assigned to Individual Preferred Schedules (IPS)[7] which were solely committed to CPP.

Simply put, PPO's, as sworn police officers, have law enforcement authority to protect any postal "property" away from real estate owned, occupied, or controlled by the Postal Service. Quite frankly, it would be shocking if the Congressional intent of Title 18, §3061(c) was for an on-duty Postal "Police Officer" to witness a deadly assault against a letter carrier while on her route and for that "Police Officer" to have absolutely no police power to take any action against the deadly assault.

5. <u>Postal Service "property" includes mail, money orders, postal vehicles, and mailboxes.</u>

Courts have interpreted Postal Service "property" broadly. For instance,

- United States v. Pinkney, 15 F.3d 825, 826 (9th Cir. 1994) (Postal Service truck and mail were "Postal Service property")
- United States v. Deggs, 632 F.2d 829, 831 (9th Cir. 1980) (Postal Service van was "Postal Service property")
- United States v. Stemmons, 89 Fed. Appx. 601, 603 (9th Cir. 2004) (Mail and mailbox were items under charge or control of Postal Service)
- United States v. Dittrich, 204 F.3d 819, 821 (8th Cir. 2000) (Mail orders property of U.S.)
- United States v. Jenkin, 89 F.3d 851 (10th Cir. 1996) (Money order property of U.S.)
- O'Brien v. United States, 411 F.2d 522 (5th Cir. 1969) (same).

Courts routinely interpret the term "property" to include both "real" property and "personal" property. For instance:

- United States v. Bonanno Organized Crime Family, 683 F. Supp.1411, 1459 (E.D.N.Y. 1988) (Interpreting definition of "property" in federal criminal statute to include both real and personal property.)

---

[7] CBA, Section 32.05, states, "Individual Preferred Schedule. Full-time PPOs permanently assigned to a work facility may bid for an individual preferred schedule (IPS) at that work facility. An IPS shall be defined as a particular tour within a particular work facility with regularly scheduled days off or a regularly recurring cycle of days off which is preferred by a PPO eligible to bid."

**POSTAL POLICE OFFICERS ASSOCIATION**

---

- United States v. Various Denominations of Currency and Coin, 628 F.Supp. 4, 5  (S.D.  W.Va. 1984) (Holding that criminal statute's reference to "property"—without  limitation to "real property" or "personal property"— required application to both.)
- In re Aiken, 133 B.R. 258, 259 (D. Me. 1991) ("In common usage, 'property' encompasses both real and personal property.")

## II.   **Statutory Interpretation**

"The function of the courts" in cases of statutory interpretation "is to construe the language so as to give effect to the intent of Congress."  American Trucking Associations, 310 U.S. 534 (1940)

### 1.  Ordinary Meaning

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37 (1979)

"Property" is defined as "a thing or things belonging to someone; possessions collectively."[8] Obviously, placing the word "real" before the word "property" changes its ordinary meaning.

### 2.  Avoid results that are absurd

Do not interpret a statute to yield absurd results. United States v. Kirby, 74 U.S. 7 Wall. 482 482 (1868)

In "Kirby" — a unanimous Supreme Court ruled, "that all laws should receive a sensible construction," and that literal interpretations which "lead to injustice, oppression, or an absurd consequence" should be avoided.

The Court concluded that "[t]he reason of the law in such cases should prevail over its letter" and  "[a]ll laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence, and it will always be presumed that the legislature intended exceptions to its language which would avoid results of this character."[9]

The August 25, 2020, USPIS "Management Communication" is seriously suggesting that Congress would have Postal Police Officers—in a police cruiser conspicuously marked with Postal Inspection Service insignia and indicia—drive by rather than stop a postal employee from being brutally attacked or stop election ballots and prescription drugs from being stolen or destroyed. Such an interpretation is utterly absurd. Again, it is unreasonable to think that Congress intended that a Postal Police Officer could not protect postal assets including employees away from postal real estate.

---

[8] Taken from Oxford Languages. "Oxford Languages is the world's leading dictionary publisher, with over 150 years of experience creating and delivering authoritative dictionaries globally in more than 50 languages. Oxford's English dictionaries are widely regarded as the world's most authoritative sources on current English." https://languages.oup.com/google-dictionary-en
[9] https://supreme.justia.com/cases/federal/us/74/482/

**POSTAL POLICE OFFICERS ASSOCIATION**

3. Pari Passu[10]

Presume a term has the same meaning in other statutes on the same subject. W. Va. Univ. Hosps. v. Casey - 499 U.S. 83, 111 S. Ct. 1138 (1991) When two statutes use similar language, it is generally appropriate to read that as "a strong indication that [they] should be interpreted pari passu [side by side]." Northcross v. Board of Ed. of Memphis City Schools, 412 U.S. 427 (1973)

In the instant matter, however, the Postal Service gives the word "property" two different and distinct meanings within the *same statute*. The term "property" in §3061, when applied to Postal Inspectors apparently means ALL postal property, whereas "property" as applied to PPOs only means "real property."

**III.    The Postal Service's Jurisdictional Authority Conundrum**

In December of 2017 during a National Labor Management Meeting the PPOA raised the issue of PPO legal jurisdiction. The Postal Service claimed not to know what it was:

*"The determination of Postal Police jurisdiction is an ongoing legal research issue for the Postal Service. No final determination has yet been made. The Union will be provided the Postal Service's position on jurisdiction once a determination has been made. While, PPOA interprets the statutory authority of PPOs broadly, the Postal Service has to review the matter from a legal perspective (statutory intent and case law). The Postal Service's obligation is to apply the statute in a legally defensible manner that serves the Postal Service's interests but also protects both the agency and the individual officer."*

Remarkably, the PPOA has never received "the Postal Service's position on jurisdiction." In fact, the only clearly articulated position on postal police jurisdictional authority is the August 25, 2020, USPIS communique. Most importantly, the PPOA was never officially notified of any revision to postal policy regarding postal police jurisdictional authority, Indeed, the PPOA only confirmed the authenticity of the August 25, 2020, USPIS "Management Communication" when it was read to the President and 1st Vice President of the PPOA during a New York Division local labor management meeting on September 1, 2020.

The August 25, 2020, communique merely demonstrates that the Postal Service's position regarding postal police jurisdictional authority remains inchoate. In fact, the Employer's position in the instant matter is incoherent. The CBA explicitly references "Carrier Protection":

*"The current PPO force performs a mixture of both building security and police duties, with some PPOs devoted predominantly to building security and others to broader street patrol and carrier protection."* (CBA, Pg. 97)

Needless to say, it would be extremely bizarre if a function that appears in the parties' CBA was somehow unauthorized, beyond the scope of employment or otherwise unsanctioned.

---

[10] Pari Passu is defined as "Side by side; at the same rate or on an equal footing." Taken from Oxford Languages.

## IV.  Testimony of High-ranking Inspection Service Officials

In 2008, Deputy Chief Inspector (DCI) Zane Hill testified at an arbitration hearing that PPOs can effect arrests as police officers—off of postal real property—if circumstances warrant such an arrest. (ATTACHMENT 2, 2008 Interest Arbitration Transcript)

Then again in 2014, DCI Keith Milke testified at an arbitration hearing that PPOs can effect arrests as police officers—off of postal real property—if circumstances warrant such an arrest. (ATTACHMENT 3, 2014 Interest Arbitration Transcript)

In December of 2016 in a Bench Trial in U.S. District Court for the District of Massachusetts, Charles Zekan, Postal Police Program Manager testified that the Postal Police Force is a "fully functioning police department whose responsibilities are security for postal facilities, protection of postal employees, protection of the mail in transit, preventing the use of mails for illegitimate purposes, mailing child pornography, mailing drugs through the mail." (ATTACHMENT 4)

Mr. Zekan continued:

*"We [USPIS] have increasingly used them [Postal Police Officers] as mobile agents in the street as attacks on our carriers have increased, and crimes like mail fishing, for example, would be a -- our blue collection boxes, folks are finding ways to stick lines with glue, with hooks, with other implements, and pull mail out of the boxes." (IBID)*

## V.  Conclusion:

It is indisputable that PPOs have exercised law enforcement authority apart from USPS real property since 1971, including in many significant criminal cases reported in West publications. Congress enacted PAEA with explicit awareness that PPOs exercise authority offsite with respect to property under control of the Postal Service. 18 U.S. Code §3061 refers to postal "property," not "real property" and nowhere does Congress limit postal police authority to real property. Courts recognize that PPOs operate off real property and they treat Postal Service "property" broadly to include chattel property, mail, etc.

Moreover, the entirely novel claim that postal police jurisdictional authority is unknown or restricted to postal real estate contradicts the way the Postal Service has historically utilized PPOs. This novel claim also contradicts DCI Zane Hill's testimony from 2008, DCI Milke's testimony in 2014, and Assistant Inspector in Charge, Office of Counsel, Terrance McKeown's recommendation regarding postal police duties and responsibilities made in 2014.[11] (ATTACHMENT 5)

Finally, the legal doctrine of preemption refers to "the idea that a higher authority of law will displace the law of a lower authority of law when the two authorities come into conflict."[12]  In other words, the Postal Service cannot by executive decision alone detract from the statutory power given to PPOs by Congress.

---

[11] Inspector Attorney McKeown wrote, "Such duties [mobile letter carrier protection; mail theft prevention; and Postal Service community policing] will be consistent with the jurisdiction restrictions set forth in Title 18, United States Code. Section 3061(c).
[12] https://www.law.cornell.edu/wex/preemption

# POSTAL POLICE OFFICERS ASSOCIATION

In closing, the Postal Service's unilateral action in the instant dispute has drastically changed the working conditions of PPOs while simultaneously vastly increasing the personal liability of PPOs. Such a circumstance egregiously violates the National Agreement.

Sincerely,

Frank Albergo
Postal Police Officers Association
P.O. Box 60
Point Lookout, NY 11569
fnalbergo@gmail.com



# U.S. POSTAL INSPECTION SERVICE
# POLICY UPDATE

| | | | |
|---|---|---|---|
| Date: | 5/22/2007 | Contact Name: | Covell, John S |
| From: | Chief Postal Inspector | Contact Phone: | 202-268-3381 |
| Change # | 2007-07 | | |
| Subject: | Security Force Operations; statutory authority | | |

Handbook IS-701, *Security Force Operations*, is hereby revised. Public Law 109-435, effective December 20, 2006, amended Title 18, U.S. Code, section 3061 to provide in permanent law the powers of police officers whom the Postal Service may employ. These powers were formerly provided through general provisions in annual appropriations bills that by reference incorporated relevant sections of Title 40, U.S. Code. Postal Police Officers' jobs and duties have not changed, but the legislation rendered certain statutory references and descriptions in the handbook obsolete. These revisions correct the obsolete references and align the description of PPOs' powers in conformance with the new statute. The subsections have also been reordered for logical clarity.

## 112    Authority

### 112.1    Federal Law

### 112.11    Statutes

The Postal Service was originally authorized to employ special police by Title IV of the Treasury, Postal Service, and General Government Appropriations Act of 1973 (Public Law 92–351). Until 2007, general provisions in annual appropriations acts and other legislation continued to make relevant provisions of Title 40, U.S. Code, applicable to the U.S. Postal Service. In 2006, the Postal Accountability and Enhancement Act (Public Law 109–435) established specific postal police powers in permanent law by amending Title 18, U.S. Code, section 3061, supplementing the Postal Service's general and specific powers under Title 39, U.S. Code.

### 112.12 Regulations

The U.S. Postal Service is authorized by statute to issue its own rules and regulations for managing property and establishing reasonable penalties for violations. These regulations are contained in 39 CFR § 232.1, which are substantially reprinted on Poster 7, *Rules and Regulations Governing Conduct on Postal Property*. Poster 7, along with Poster 158, *Possession of Firearms and Other Dangerous Weapons on Postal Property is Prohibited by Law*, must be conspicuously displayed on all U.S. Postal Service-controlled property (see also POM 124, Conduct on Postal Property).

## 112.2 Postal Police Powers

The Postal Service is authorized to employ PPOs for duty in connection with the protection of property owned or occupied by the Postal Service or under its charge and control, and persons on that property, including duty in areas outside the property to the extent necessary to protect the property and persons thereon. With respect to such property, PPOs are empowered to enforce federal laws and regulations for the protection of persons and property, to carry firearms, and to make arrests without a warrant for any offense against the United States committed in their presence or for any felony cognizable under the laws of the United States if the PPO has reasonable grounds to believe the person to be arrested has committed or is committing a felony. Arrests made under this authority must be immediately reported to the SPP. The SPP will notify the MPP and duty Inspector.

*Limitations:* The jurisdiction and policing powers of the Security Force do not extend to the service of civil process. The policing powers of the Security Force are restricted to Postal Service-controlled property, except for "hot pursuit" and in situations requiring mobile patrol or escort protection. "Hot pursuit" means a chase on foot; Security Force personnel are not authorized to perform high-speed pursuit (i.e., in excess of posted speed limits) in a vehicle. In some states, members of the Security Force may be able to exercise state law enforcement authority. The extent that this state authority may be exercised in the performance of official duties will be determined by written division policy. Otherwise, PPOs have only the authority of citizens.

UNITED STATES OF AMERICA

+ + + + +

UNITED STATES POSTAL SERVICE

+ + + + +

----------------------------------------
IN THE MATTER OF                          :
                                          :

THE INTEREST ARBITRATION OF:              :
                                          :
Fraternal Order of Police,                :
National Labor Council USPS No. 2         :
                                          :
        Union                             :
                                          :

and                                       :
                                          :
United States Postal Service,             :
                                          :
        Agency.                           :
----------------------------------------


                Wednesday
                March 26, 2008

                United States Postal Service
                Room 1-P-410
                475 L'Enfant Plaza, SW
                Washington, D.C. 20260


        The above-entitled matter came on for
arbitration, pursuant to notice, at
9:30 a.m.

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

BEFORE THE PANEL:

      HERBERT FISHGOLD, Chair
      2300 M Street, NW
      Suite 800

      Washington, D.C. 20037
      202-416-1837
      202-293-3083 (fax)

      RICHARD S. EDELMAN, Arbitrator
      O'Donnell, Schwartz, & Anderson, P.C.
      1300 L Street, NW

      Suite 1200
      Washington, D.C. 20005
      202-898-1707
      202-682-9276 (fax)
      REDELMAN@ODSALAW.com

      KEVIN B. RACHEL, Arbitrator

      Manager, Collective Bargaining &
          Arbitration
      Labor Relations
      United States Postal Service
      Room 9416
      475 L'Enfant Plaza, SW
      Washington, D.C. 20260
      202-268-3812

APPEARANCES:

      On Behalf of the Union:

          JOSEPH V. KAPLAN, ESQ.

          Passman & Kaplan, P.C.
          1090 Vermont Avenue, NW
          Suite 500
          Washington, D.C. 20005
          202-789-0100 ext. 105
          202-789-0101 (fax)
          Jkaplan@passmanandkaplan.com

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

On Behalf of the Agency:

STEPHAN J. BOARDMAN, ESQ.
Chief Counsel, Labor Relations
Appellate Counsel

United States Postal Service
475 L'Enfant Plaza, SW
Washington, D.C. 20260
202-268-7114
202-268-4997 (fax)
Stephan@.j.boardman@usps.gov


BRIAN REIMER, ESQ.
Labor Counsel
United States Postal Service
Room 6446
475 L'Enfant Plaza, SW
Washington, D.C. 20260
202-268-3037


ROBERT L. SAWICKI, ESQ.

Deputy Managing Counsel

Law Department-Philadelphia

Field Office

United States Postal Service

P.O. Box 40595

Philadelphia, PA 19197


215-931-5070

215-931-5092 (fax)

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

I-N-D-E-X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| Peter Bernstein | 419 | 474 | | |
| Zane Hill, Jr. | 491 | 509 | 551 | 556 |
| Albert Jenkins | 582 | | | |

E-X-H-I-B-I-T-S

Union

| Exhibit No./Document | MARK | RECD |
|----------------------|------|------|
| 1    U.S. Postal Inspection Service Locality Pay 2007 | 544 | 544 |

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

1          situation where a carrier is on route and a

2          postal police officer is directed to report to

3          the carrier.  They would leave their station,

4          get in the patrol car, drive whatever the

5          distance is and meet up with the carrier or do

6          whatever needs to be done?

7               A     If they were directed to do so,

8          yes.

9               Q     Okay.

10                    CHAIRMAN FISHGOLD:  Can I just

11          give an example?  I want to think on the

12          ladder if I could to try to flesh this out a

13          little bit more.

14                    Assume for the moment that a PPO

15          is directed to respond to a call from a

16          carrier who feels threatened or being

17          assaulted, or whatever, and upon arrive, PPO's

18          arrival, the individual or individuals who

19          caused this carrier to make that phone call

20          are still there.  What authority does the PPO

21          have vis-a-vis those individuals?

22                    THE WITNESS:  The people that are

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

1        there in his presence?

2                    CHAIRMAN FISHGOLD:  Yes.

3                    THE WITNESS:  He could apprehend

4        them.

5                    CHAIRMAN FISHGOLD:  Okay.

6                    THE WITNESS:  In fact, the carrier

7        says, that's the one that assaulted me, then

8        he can make that apprehension.

9                    CHAIRMAN FISHGOLD:  So he could

10       restrain him and, in effect, initiate an

11       arrest if it were?

12                   THE WITNESS:  He would contain him

13       there and then it would be a 911 response or

14       postal inspectors would respond at that point.

15       It's control the situation --

16                   CHAIRMAN FISHGOLD:  Until someone

17       else arrives?

18                   THE WITNESS:  Secure and control,

19       yes, sir.

20                   CHAIRMAN FISHGOLD:  Okay.

21                   BY MR. KAPLAN:

22            Q       And the postal police officers,

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

1      within the scope of their duties, can be

2      responsible for transporting suspects to local

3      jail facilities, correct?

4           A     At the direction of the inspectors

5      that would be with them, yes.

6           Q     To your knowledge, are there

7      situations when postal police officers arrive

8      on a scene before an inspector does?

9           A     Yes.  There are situations where

10     that does occur.

11          Q     And the postal police officer

12     would be expected to subdue a violent

13     situation if that was going on?

14          A     Based on their training, they

15     could most certainly do that, yes.

16          Q     And that would include, for

17     example, having restrain a suspect by

18     handcuffing them?

19          A     By handcuffing them, yes.

20          Q     Effecting an arrest as well?

21          A     As necessary, yes.

22          Q     And that would also involve

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

774

```
    BEFORE THE BOARD OF INTEREST ARBITRATION

-------------------------------:
In the Matter of:                :
                                 :
UNITED STATES POSTAL SERVICE :
                                 : Volume 5
            and                  : (Pgs. 774 to 1069)
                                 :
POSTAL POLICE OFFICERS           :
    ASSOCIATION                  :
-------------------------------:
```

                                Washington, D.C.

                        Thursday, January 30, 2014

The following pages constitute the proceedings

held in the above-captioned matter at the

United States Postal Service, 475 L'Enfant Plaza,

Southwest, Washington, D.C. before Erick M.

Thacker, RPR, of Capital Reporting Company, a

Notary Public in and for the District of Columbia,

commencing at 9:31 a.m., when were present on

behalf of the respective parties:

775

```
1      APPEARANCES
2   Before Arbitrators:
3      James C. Oldham, Impartial Chair
4      Robert A. Dufek, USPS Member
5      James Bjork, PPOA Member
6   On behalf of the PPOA:
7      ARLUS J. STEPHENS, ESQUIRE
       DONNA MCKINNON, ESQUIRE
8      MURPHY ANDERSON, PLLC
       1701 K Street, Northwest
9      Suite 210
       Washington, D.C. 20006
10     (202) 223-2620
11  On behalf of the U.S. Postal Service:
12     TERESA A. GONSALVES, ESQUIRE
       JULIENNE BRAMESCO, ESQUIRE
13     United States Postal Service
       475 L'Enfant Plaza, Southwest
14     Washington, D.C. 20260
       (202) 268-6704
15
    ALSO PRESENT:
16
       Chris Vitolo, PPOA
17     Eric Freeman, PPOA
       Joshua Pierce, PPOA
18     Mike Plaugher, PPOA
       Shawn Fletcher, PPOA
19     Joe Alexandrovich, USPS
       Sonya J. Penn, USPS
20     Katherine P. Sullivan, USPS
       Janet Peterson, USPS
21
22       * * * * *
```

776

```
1              CONTENTS
2   WITNESS:        DIRECT CROSS REDIRECT RECROSS
3   CURTIS WHITEMAN    779  818    838    --
4   KEITH MILKE     846  944    --      --
5
6
7
8
9
10
11
12
13
14
15   (Exhibit books were tendered to the arbitrator.)
16
17
18
19
20
21
22
```

777

```
1              PROCEEDINGS
2       ARBITRATOR OLDHAM: Okay. Folks,
3   everyone's here right on time. Thank you very
4   much. I think we're ready to start. Teresa, I
5   think the ball is with you now.
6       MS. GONSALVES: It is indeed. Good
7   morning, everyone. I just wanted to quickly
8   provide an overview of today's testimony as a
9   road map. We're going to begin with Curtis
10  Whiteman. Curtis is the Postal Service manager
11  of Business Planning & Analysis, and he's going
12  to provide an overview of the Postal Service's
13  financial crisis and financial situation
14  generally.
15      His testimony will be followed by a
16  series of Inspection Service witnesses, beginning
17  with Keith Milke, M-I-L-K-E. He's the deputy
18  chief inspector of the Postal Inspection Service,
19  and Dave Bowers, who's the Postal Inspector in
20  Charge. And they will explain how the Postal
21  Police Officers fit into the U.S. Postal Service
22  Inspection Service generally, and they're going
```

778

```
1   to also discuss how they fit into various
2   classification systems.
3       Jennifer McDaniel, who's the Assistant
4   Inspector in Charge of the Career Development
5   Unit -- that's the training facility -- will
6   testify next about PPO training, and she will
7   compare it on a general level to the training of
8   inspectors.
9       And, finally, time permitting, Larry
10  Katz -- that's K-A-T-Z, not like the meows --
11  he's the former chief counsel for the Inspection
12  Service. He'll testify about various legal
13  matters that have been raised during the hearing,
14  including Section 1003(c)of Title 39, the Law
15  Enforcement Officer Safety Act of 2004 and postal
16  transformation.
17      So we'd like to call Curtis Whiteman.
18      ARBITRATOR OLDHAM: Mr. Whiteman, you
19  know we do have to swear in the witnesses, and
20  the reporter will do that for you, if you'd raise
21  your right hand.
22
```

907

1    A   So as you can see, fixed posts -- there
2    was very minimal change in fixed posts, foot
3    patrols, mobile posts.
4        Q   Okay. All right. So moving now to
5    Slide 9, let's talk about some of the things that
6    PPOs do not do.
7        A   Okay. So PPOs do not serve arrest or
8    search warrants. Their arrest authority for PPOs
9    is limited to postal property.
10       Q   And what does that mean?
11       A   Well, again, going back to 3061 and
12   what they're -- they're limited to -- to arrests
13   that are -- that are, again, limited. It's -- by
14   the statute. It's limited to crimes that are
15   committed in their presence on a postal property
16   committed against persons or committed against
17   the actual -- against the property. So -- so
18   it's -- that's why it's limited postal property
19   for the rest of those.
20       Q   Do they have any authority -- arrest
21   authority off postal property?
22       A   Not unless it's the actual -- if you

909

1    actually have to place handcuffs on an individual
2    for the safety of yourself or -- or them. That
3    doesn't necessarily mean that they're placed
4    under arrest in a legal definition. But that is
5    something that the Postal Police Officers have in
6    their job description, and their authority allows
7    them to do that.
8        We try to capture that, and the way we
9    capture it is actually arrests and -- and
10   detentions. So much of what the Postal Police
11   Officers do are detentions. They detain folks
12   until such time -- and if -- and if it's
13   determined that -- that a crime has been
14   committed and someone needs to then -- then be
15   processed and booked, they're generally turned
16   over either to the Postal Inspectors or to local
17   law enforcement, depending on the nature of the
18   incident.
19       Q   Does --
20       ARBITRATOR OLDHAM: If I may ask a
21   question, if a postal -- if a PPO was on mobile
22   patrol and got radio notification that a letter

908

1    have to a postal employee -- they actually witness
2    an employee, some crime being committed against
3    an employee in the Postal Police Officer's
4    presence, they have some limited authority there
5    as well.
6        Q   And when you talk about arrests, what
7    are you really -- what are you talking about?
8    What do you mean by that?
9        A   Well, I mean, they have the authority
10   to actually arrest -- when we talk about arrests,
11   we tend to think it's automatically handcuffs,
12   Miranda rights, and they're taken off to jail.
13   That's not necessarily, as we know, I think --
14   most of us know that's not always the case. In
15   many cases, it's detention. And so it's the
16   opportunity to -- you -- they witness something.
17   They can can detain someone. We've heard some
18   testimony about the Terry stop, the investigative
19   stop. Some people could consider that an arrest.
20   I'm sure the person that's being stopped may
21   think they're under arrest.
22       But there also could be times where you

910

1    carrier had been assaulted and was the first
2    responder there and if that PPO should
3    fortuitously be able to apprehend the suspect,
4    would the PPO be able to -- to arrest that
5    suspect?
6        THE WITNESS: It would be -- if they --
7    if they got the radio, they arrive on the scene
8    and the suspect is still pounding or beating or
9    assaulting the employee, then they have the
10   authority to be able to arrest at that point.
11       If the employee -- if the suspect has
12   taken off and they arrive, their only -- their
13   only responsibility and their only authority is
14   to make sure that that individual is -- that the
15   postal employee is safe, secure. And then they
16   need to -- to call either the local -- 911, you
17   know, the local police department, as well as the
18   inspectors. They're not -- they do not have the
19   authority to pursue, to apprehend, to arrest. So
20   it has to be in their presence that they actually
21   witness it.
22       ARBITRATOR OLDHAM: So not even if --

```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
2

3    DIPING Y. ANDERSON,                    )
                                            )
4              Plaintiff                    )
                                            )
5         -VS-                              )  CA No. 14-13380-PBS
                                            )  Pages 1 - 30
6    MEGAN BRENNAN, Postmaster              )
     General of the United States,          )
7                                           )
                Defendant                   )
8

9

10                   BENCH TRIAL - DAY THREE

11                        -EXCERPT-

                  TESTIMONY of CHARLES J. ZEKAN
12
            BEFORE THE HONORABLE PATTI B. SARIS
13          UNITED STATES CHIEF DISTRICT JUDGE

14

15

16

17
                           United States District Court
18                         1 Courthouse Way, Courtroom 19
                           Boston, Massachusetts  02210
19                         December 14, 2016

20

21

22
                    LEE A. MARZILLI
23              OFFICIAL COURT REPORTER
              United States District Court
24            1 Courthouse Way, Room 7200
                 Boston, MA  02210
25                  (617)345-6787
```

1  A P P E A R A N C E S:

2       JAMES P. BRADY, ESQ., 149 High Street, Hingham,
   Massachusetts, 02043, for the Plaintiff.

3

       SHELBEY D. WRIGHT, ESQ. and JASON C. WEIDA, ESQ.,
4  Assistant United States Attorneys, United States Attorney's
   Office, 1 Courthouse Way, Suite 9200, Boston, Massachusetts,
5  02210, for the Defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  request that it be expunged, but the general practice is that a
2  supervisor or manager would not be able to cite that letter of
3  warning even if the officer didn't request that it be removed.
4  So for all intents and practical purposes, it's expunged.
5     Q.   And if that officer had another piece of discipline within
6  those two years, then the prior discipline would remain in the
7  OPF?
8     A.   It would remain active.
9     Q.   Does the CBA allow for a last chance as a proposed option?
10    A.   No.   The last-chance agreement is not a named element
11  within the agreement.
12              THE COURT:   Where does it come from?
13              THE WITNESS:   I imagine arbitration labor history has
14  a long history of using last-chance agreements, but it's an
15  understanding between the parties.   Similarly, settlements from
16  MSPB cases may not be named in the agreement, but when the
17  parties can come to an agreement, it's accepted, tolerated, and
18  appropriate.
19    Q.   Can you briefly explain for the Court what the difference
20  is between United States Postal inspectors and Postal Police
21  officers.
22    A.   The most appropriate way to describe it would be to
23  consider that the U.S. Postal Inspection Service, which is
24  composed of postal inspectors who are the agents, Postal Police
25  officers who are uniformed officer and support staff, to think

```
 1   of them as a fully functioning police department whose
 2   responsibilities are security for postal facilities, protection
 3   of postal employees, protection of the mail in transit,
 4   preventing the use of mails for illegitimate purposes, mailing
 5   child pornography, mailing drugs through the mail.
 6        The PPOs' responsibility doesn't touch the investigative
 7   side, which is one of the primary responsibilities of the
 8   postal inspectors.  PPOs are responsible for providing a
 9   visible uniformed law enforcement presence at our primary
10   facilities.  We have increasingly used them as mobile agents in
11   the street as attacks on our carriers have increased, and
12   crimes like mail fishing, for example, would be a -- our blue
13   collection boxes, folks are finding ways to stick lines with
14   glue, with hooks, with other implements, and pull mail out of
15   the boxes.
16             THE COURT:  That's one I haven't seen yet.
17             THE WITNESS:  Oh, it's a very significant problem.
18   Having that visible uniformed presence on the street is very
19   effective in combatting that.  So PPOs' role is to respond to
20   emergency and contain those situations until additional
21   resources, postal inspectors, local P.D., fire department can
22   respond to the events with a postal nexus.  Does that address
23   your question?
24             MS. WRIGHT:  It does.
25             THE COURT:  So we're going to try and get him on this
```

## Recommendation of the Committee for the Transformation of the Postal Security Force

As set forth in the Memorandum of Understanding (MOU) Between the United States Postal Service (USPS) and Postal Police Officers Association (PPOA), as part of the April 1, 2014 Award of the Board of Interest Arbitration, a Committee for the Transformation of the Postal Security Force (the Committee) was formed to meet and make recommendations consistent with the MOU. It is understood by the Committee that this document is an initial step in the possible future realization of such recommendations.

As set forth in the MOU, it is in the best interest of the USPS and the PPOA to work toward a cost-effective Postal Police force that best meets the varied security needs of the Postal Service. The formation of the Committee was simply to foster a thorough discussion of the issues for purposes of making a recommendation to the Inspection Service. These recommendations in no way modify the collective bargaining agreement between the USPS and the PPOA. Any such change would require collective bargaining. The Committee was not formed for the purpose of collective bargaining.

The Committee jointly explored the following issues:

1. The creation of a new position and grade within the PPOA bargaining unit to encompass more expanded duties;

2. The exploration of ways to expand duties within the existing grade;

3. If the Committee found a new position and grade appropriate or finds it appropriate to reevaluate or expand duties within the existing grade and position;

   a. The duties, work rules , and responsibilities of the new position, and/or any expanded duties and applicable work rules for the existing position;
   b. Job qualifications;
   c. Training; and
   d. Compensation.

The Committee hereby makes the following recommendations:

1. The Committee recommends the creation of a new position and grade within the Postal Police Officers Association (PPOA) bargaining unit to encompass more expanded duties.

2. The Committee does not recommend an expansion of duties within the existing grade.

3. The Committee recommends the following expanded duties for a new position:

   a. Mobile letter carrier protection;
   b. Mail theft prevention;
   c. Postal Service community policing;
   d. Mail Transportation Equipment (MTE) protection and recovery;
   e. Protection of Postal Inspection Service property and personnel during Postal Inspector search warrant operations;

f. Deployment to protect Postal Service property and personnel at times of natural disasters and other significant events;
g. Deployment to protect Postal Service property and personnel during protests;
h. Limited dangerous mail containment activities;
i. Limited prohibited mail narcotics interdiction activities;
j. Limited prisoner transport, under the direct supervision and jurisdiction of a Postal Inspector;
k. Enhanced active shooter response (National Headquarters);
l. Enhanced incident command (National Headquarters);
m. Enhanced medical incident response (National Headquarters);
n. Limited, uniformed executive protection duties (National Headquarters).

Such duties will be consistent with the jurisdiction restrictions set forth in Title 18, United States Code, Section 3061(c). The Postal Service has not previously expanded the powers of Postal Police Officers under Title 18, United States Code, Section 3061(c)(3), and it is not recommended that expanded duties in this section expand the powers of Postal Police Officers under that section. Absent a legislative change in this regard, the recommended position will not be eligible for federal law enforcement retirement benefits, as the duties of the recommended position will not comprise the duties of a criminal investigator.

4. The Committee recommends that because additional work rules will be dependent on what duties become part of a new position, new work rules should not be developed at this time. Any necessary work rule changes will be made consistent with the provisions of the collective bargaining agreement.

5. The Committee recommends that candidates should be selected for a new position on a best qualified basis.

6. The Committee recommends that a new training course be developed by the Career Development Unit to encompass the expanded duties of the new position. The Committee further recommends that members of the PPOA take part in the development of such a training course. In developing the training, special consideration should be given to the following:

   a. Jurisdiction, liability and use of force;
   b. Defensive tactics related to operating in a vehicle;
   c. Postal Service community policing.

7. Though it is understood by the Committee that compensation cannot be set by the terms of this document, the Committee recommends that the pay grade for a new position should be higher, commensurate with the additional training and skills associated with expanded duties.

///

Signed this 9th day of December, 2014

_____
James Bjork

_____
Joshua Pierce

_____
Andre McCamey

_____
Christine Taylor

_____
Eric Freeman

_____
Michael Plaugher

_____
Terrence McKeown

# Exhibit M

# **All Career**

 **Employees**   **454**

 **Diversity**   **43%** African American
**24%** Caucasian
**20%** Hispanic
**11%** Asian
 **2%** Other

 **19%** Female
**81%** Male

 **47** Age Avg
**17** Tenure Avg

Source: Teradata
as of 2020

3