**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

POSTAL POLICE OFFICERS
ASSOCIATION,

     Plaintiff,

vs.

UNITED STATES POSTAL SERVICE,
et al.,

     Defendants.

Case No. 20-cv-2566

**DECLARATION OF ARLUS J. STEPHENS**

     I, Arlus J. Stephens, declare and state that I have personal knowledge of the following facts and could and would competently testify as follows:

     1.     I am a partner at the law firm of Murphy Anderson PLLC. I have served as counsel for the Postal Police Officers Association since 2008. I am lead counsel in the instant case.

     2.     I located and downloaded from the Public Access to Court Electronic Records ("PACER") system federal court documents relating to the criminal case of *United States v. Ricardo Fong Brito*, No. 18-cr-20022-JEM (S.D. Fla. 2018). The criminal complaint and supporting affidavit are attached as Exhibit A. The judgment of conviction is attached as Exhibit B.

     3.     I located and downloaded from the PACER system federal court documents relating to the criminal case of *United States v. Brian Anibal Toscano-Perez*, No. 17-cr-20411 (S.D. Fla. 2017). Defendant Toscano-Perez pleaded guilty to mail theft, in violation of 18 U.S.C.

1

§ 1708, and conspiracy against the United States. The criminal complaint and supporting affidavit are attached as Exhibit C. The judgment of conviction is attached as Exhibit D.

4.      In *Anderson v. Brennan*, No. 14-cv-13380-PBS (D. Mass.), the Postal Service argued that PPOs' responsibility had greatly increased in the mid-2000s to include "more dangerous patrol and first-responder duties." An excerpt of the Postal Service's Post-Trial Proposed Findings of Fact and Conclusions of Law is attached as Exhibit E.

5.      Charles Zekan has served as the Postal Inspection Service's director of postal police operations at postal headquarters.  He served as the Postal Service's 30(b)(6) representative in the *Anderson* lawsuit.  On December 14, 2016, Charles Zekan testified as a representative of the Inspection Service in the bench trial in *Anderson v. Brennan*. An excerpt of his trial testimony is attached as Exhibit F.

6.      An excerpt of the Postal Service's brief for reconsideration pursuant to Federal Rule of Civil Procedure 59(e) in *Anderson vs. Brennan* is attached as Exhibit G.

7.      An excerpt of the Postal Service's Brief on Appeal to the First Circuit in *Anderson v. Brennan* is attached as Exhibit H.

8.      On March 26, 2008, Deputy Chief Postal Inspector Zane Hill testified in the parties' interest arbitration proceeding regarding PPO duties and expectations, including the exercise of jurisdiction away from postal real property. Excerpts of his testimony are attached as Exhibit I.

9.      On January 16, 2014, Postal Police Officer Eric Jordan testified during the parties' interest arbitration hearing. A true and correct copy of a transcript of his testimony is attached as Exhibit J.

10.     In February 2020, the PPOA and the Postal Service participated in interest arbitration proceedings to determine a new collective bargaining agreement.  The Postal Service presented sworn testimony from Deputy Chief Postal Inspector David Bowers. Excerpts of his testimony are attached as Exhibit K.

11.     The Union presented expert testimony from George Washington University Law School Professor Stephen Saltzburg relating to the jurisdiction and authority of postal police officers under 18 U.S.C. § 3061(c). A true and correct copy of a transcript of his testimony and Powerpoint presentation are attached as Exhibits L and M, respectively.


I declare under penalty of perjury that the foregoing facts are true and correct.


September 21, 2020                               s/ Arlus J. Stephens
Date                                            ARLUS J. STEPHENS

3

# Exhibit A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

No.  _18 -mj - 02001 -JG_

UNITED STATES OF AMERICA

vs.

**RICARDO OSORIO FONG BRITO,**

      **Defendant.**

_____/

## CRIMINAL COVER SHEET

1.    Did this matter originate from a matter pending in the Northern Region of the United States
Attorney's Office prior to October 14, 2003?   _____ Yes   __x__ No

Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

BY: _____
TRINITY JORDAN
ASSISTANT UNITED STATES ATTORNEY
Court ID No. A5502340
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9202
FAX (305) 530-7976

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 18-MJ-02001-JG |
| RICARDO OSORIO FONG BRITO, | ) |
| | ) |
| | ) |
| _Defendant(s)_ | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ December 31, 2017 _____ in the county of _____ Miami-Dade _____ in the _____ Southern _____ District of _____ Florida _____ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| Title 18, United States Code, Section 1708. | Theft or receipt of stolen mail matter. |

This criminal complaint is based on these facts:

  SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

LUIS F. GOMEZ, USPI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: _____ 01/02/2018 _____

_____
_Judge's signature_

City and state: _____ Miami, Florida _____

JONATHAN GOODMAN, U.S. MAGISTRATE JUDGE
_Printed name and title_

# AFFIDAVIT

I, Luis F. Gomez, being duly sworn, depose, and state,

1.      I am employed as a United States Postal Inspector with the United States Postal Inspection Service ("USPIS"), assigned to the Miami Division.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is an officer of the United States who is empowered by law to conduct investigations of, and/or to make arrests for offenses enumerated in Title 18, United States Code, Section 2516, including Section 1543.  I have been a postal inspector for approximately four years and have been assigned to the Miami Division since December 2017.  Prior to being assigned to the Miami Division, I was assigned to the Newark Division, San Juan Field Office.

2.      The information in this Affidavit is based on my personal knowledge and information provided to me by others, including other law enforcement personnel.  Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, it does not include every fact known by me and others in connection with this investigation.  Rather, this Affidavit only contains facts sufficient to establish probable cause that RICARDO OSORIO FONG BRITO, "FONG" stole from a letter box, mail receptacle, and other authorized depository for mail matter, any letter and mail, in violation of Title 18, United States Code, Section 1708.

3.      On December 31, 2017, at approximately 3:12 A.M., United States Postal Service Police Officers observed a subject, later identified as FONG, "fishing" mail from a United States Postal Service ("USPS") blue collection box, located at 6901 Miami Lakeway South, Miami Lakes, Florida 33014.  FONG was observed pulling what appeared to be a cord out of the USPS

collection box. Several minutes later, FONG walked back to a 1999 silver Honda Accord parked nearby. FONG entered rear seat, and the vehicle drove away.

4.      Postal Police Officers followed the Honda and conducted a vehicle stop at the intersection of NW 67th Ave. and Miami Lakeway South. Officers approached the vehicle and observed a roll of duct tape in plain view, inside the vehicle, underneath the front passenger seat. Based on my training and experience I know that duct tape is used as a "fishing" device to extract mail matter from USPS collection boxes.

5.      In addition to FONG, there were three additional individuals inside the Honda. All four occupants were detained. The driver of the vehicle gave verbal consent to search the Honda. During the search, Postal Police officers found two "fishing" devices. The "fishing" devices were shoestrings with a weighted ball at one end surrounded by duct tape. The duct tape was reversed to stick to mail matter. Based on my training and experience I know that these devices are used to extract mail matter from USPS collection boxes. One was located in the glove compartment and the other was located in the rear passenger seat pocket. Additionally, officers located a piece of mail and duct tape during the search.

6.      Postal Police officers also searched the trunk of the vehicle and found four pieces of First Class mail, unopened, sealed, and stuck to duct tape. Located under the floorboard of the trunk, officers discovered a large yellow pry bar with blue paint scuff markings. The blue paint was similar to the kind of paint found on USPS collection boxes. Later on, Postal Police officers returned to the USPS blue collection box located at 6901 Miami Lakeway South, Miami Lakes, Florida 33014 and observed that the box appeared to have markings consistent with someone trying to pry it open with a metal object.

7.    USPIS officers interviewed the occupants of the vehicle.  Two of the occupants identified FONG as the individual who was "fishing" out of the USPS blue collection box.

8.    Further investigation revealed that the mail that was recovered in the vehicle was originated from the USPS blue collection box located at 6901 Miami Lakeway South, Miami Lakes, FL 33014.

9.    WHEREFORE, based on the foregoing, I respectfully submit that there is probable cause to believe that RICARDO OSORIO FONG BRITO stole from a letter box, mail receptacle, and other authorized depository for mail matter, any letter and mail, in violation of Title 18, United States Code, Section 1708.


FURTHER YOUR AFFIANT SAYETH NAUGHT

LUIS F. GOMEZ
UNITED STATES POSTAL INSPECTOR


Sworn and subscribed before me this 2nd day of January 2018.

HONORABLE JONATHAN GOODMAN
UNITED STATES MAGISTRATE JUDGE

3

# Exhibit B

# UNITED STATES DISTRICT COURT

## Southern District of Florida
### Miami Division

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>v.<br><br>**RICARDO OSORIO FONG BRITO** | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number: **18-20022-CR-MARTINEZ**<br>USM Number: **15224-104**<br><br>Counsel For Defendant: **Ramon Sarmiento**<br>Counsel For The United States: **Trinity Jordan**<br>Court Reporter: **Dawn Whitmarsh** |

**The defendant pleaded guilty to count(s) 2 of the Indictment.**

The defendant is adjudicated guilty of these offenses:

| TITLE & SECTION | NATURE OF OFFENSE | OFFENSE ENDED | COUNT |
|---|---|---|---|
| 18 U.S.C.§ 1708 | theft of mail | 12/31/2017 | 2 |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**Upon the motion of the government the remaining counts of the Indictment shall be dismissed as to this defendant.**

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Date of Imposition of Sentence: **5/29/2018**

_____

**Jose E. Martinez**
**United States District Judge**

Date: _____5/3r/18_____

DEFENDANT: **RICARDO OSORIO FONG BRITO**
CASE NUMBER: **18-20022-CR-MARTINEZ**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of **3 months** as to Count Two.

**The court makes the following recommendations to the Bureau of Prisons:** Defendant shall be assigned to a facility as close to South Florida as possible commensurate with his background and the offense of which he stands convicted.

**The defendant shall self-surrender for service of sentence at the U.S. Marshal Service at 400 N. Miami Ave, Miami, Florida 6th Floor on 5-29-2018.**

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.


_____
UNITED STATES MARSHAL


_____
DEPUTY UNITED STATES MARSHAL

DEFENDANT: **RICARDO OSORIO FONG BRITO**
CASE NUMBER: **18-20022-CR-MARTINEZ**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **3 years** as to Count 2.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

**The defendant shall cooperate in the collection of DNA as directed by the probation officer.**

**The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.**

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1. The defendant shall not leave the judicial district without the permission of the court or probation officer;
2. The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first fifteen days of each month;
3. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4. The defendant shall support his or her dependents and meet other family responsibilities;
5. The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6. The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7. The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9. The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11. The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT: **RICARDO OSORIO FONG BRITO**
CASE NUMBER: **18-20022-CR-MARTINEZ**

## SPECIAL CONDITIONS OF SUPERVISION

**Cooperating with Immigration during Removal Proceedings** - The defendant shall cooperate in any removal proceedings initiated or pending by the U.S. Immigration and Customs Enforcement consistent with the Immigration and Nationality Act. If removed, the defendant shall not reenter the United States without the prior written permission of the Undersecretary for Border and Transportation Security. The term of supervised release shall be non-reporting while the defendant is residing outside the United States. If the defendant reenters the United States within the term of probation, the defendant is to report to the nearest U.S. Probation Office within 72 hours of the defendant's arrival.

**Financial Disclosure Requirement** - The defendant shall provide complete access to financial information, including disclosure of all business and personal finances, to the U.S. Probation Officer.

**Related Concern Restriction** - The defendant shall not own, operate, act as a consultant, be employed in, or participate in any manner, in any employment, which permits him access to customers or other individuals' personal identifiers or credit card information during the period of supervision.

**Substance Abuse Treatment** - The defendant shall participate in an approved treatment program for drug and/or alcohol abuse and abide by all supplemental conditions of treatment. Participation may include inpatient/outpatient treatment. The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

**Unpaid Restitution, Fines, or Special Assessments** - If the defendant has any unpaid amount of restitution, fines, or special assessments, the defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay.

**Probation shall surrender Defendant's Cuban passport to U.S. Immigration and Custom Enforcement.

DEFENDANT: **RICARDO OSORIO FONG BRITO**
CASE NUMBER: **18-20022-CR-MARTINEZ**

### CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $100.00 | $0.00 | $0.00 |

**If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.**

| NAME OF PAYEE | TOTAL LOSS* | RESTITUTION ORDERED | PRIORITY OR PERCENTAGE |
|---|---|---|---|
|  |  |  |  |

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**Assessment due immediately unless otherwise ordered by the Court.

DEFENDANT: **RICARDO OSORIO FONG BRITO**
CASE NUMBER: **18-20022-CR-MARTINEZ**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A. Lump sum payment of $100.00 due immediately.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

This assessment/fine/restitution is payable to the CLERK, UNITED STATES COURTS and is to be addressed to:

**U.S. CLERK'S OFFICE**
**ATTN: FINANCIAL SECTION**
**400 NORTH MIAMI AVENUE, ROOM 08N09**
**MIAMI, FLORIDA 33128-7716**

The assessment/fine/restitution is payable immediately. The U.S. Bureau of Prisons, U.S. Probation Office and the U.S. Attorney's Office are responsible for the enforcement of this order.

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

| CASE NUMBER DEFENDANT AND CO-DEFENDANT NAMES (INCLUDING DEFENDANT NUMBER) | TOTAL AMOUNT | JOINT AND SEVERAL AMOUNT |
|---|---|---|

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No.  12 - 2795 JJO

UNITED STATES OF AMERICA

vs.

BRIAN ANIBAL TOSCANO-PEREZ and
CRISTHIAN ALEJANDRO VARGAS,

Defendants.
_____/

CRIMINAL COVER SHEET

1.    Did this matter originate from a matter pending in the Northern Region of the United
       States Attorney's Office prior to October 14, 2003?  _____ Yes   _X_  No

2.    Did this matter originate from a matter pending in the Central Region of the United States
       Attorney's Office prior to September 1, 2007?  _____ Yes   _X_  No

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

By:    _____
        Jon M. Juenger
        Assistant United States Attorney
        Florida Bar No. 56108
        99 Northeast 4th Street
        Miami, Florida 33132-2111
        Tel: (305) 961-9450
        Fax: (305) 530-7976
        Email: jon.juenger@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Brian Anibal Toscano-Perez and | ) | Case No. 17- 2795 JJO |
| Cristhian Alejandro Vargas | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____June 3, 2017_____ in the county of _____Miami-Dade_____ in the
___Southern___ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1708 | Possession of Stolen Mail Matter |

This criminal complaint is based on these facts:

### SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

JaLeesa Osborne, Postal Inspector, USPIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____06/03/2017_____

_____
*Judge's signature*

City and state: _____Miami, Florida_____

John J. O'Sullivan, United States Magistrate Judge
*Printed name and title*

Case 1:20-cv-23566-CRC Document 7-15 Filed 08/23/20 Page 20 of 171

## AFFIDAVIT

I, JaLeesa Osborne, being duly sworn, depose and state the following:

1.      I am employed as a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since May 2015. I am currently assigned to the Miami Division of the USPIS, specifically, to the Mail Theft/External Crimes Team. As a Postal Inspector, I investigate crimes involving the United States Postal Service ("USPS"), including theft of mail and assaults against USPS employees.  In my capacity as a Postal Inspector, I have received training in criminal investigation procedures and criminal law and have conducted numerous criminal investigations involving the theft of mail.

2.      This affidavit is based upon my own personal knowledge, as well as information and documents provided to me in my official capacity. This affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging BRIAN ANIBAL TOSCANO-PEREZ ("TOSCANO-PEREZ") and CRISTHIAN ALEJANDRO VARGAS ("VARGAS") with unlawfully possessing any letter and mail, and any article and thing contained therein, which had been stolen, taken, and abstracted from and out of any letter box, mail receptacle, and other authorized depository for mail matter, knowing the same to have been stolen, taken, and abstracted, in violation of Title 18, United States Code, Section 1708. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation.

3.      On June 3, 2017, at approximately 1:15 a.m., United States Postal Service (USPS) Postal Police Officers (PPOs) D. Turnoff and E. Sepulveda were completing a perimeter security check at the Opa-Locka Post Office, located at 550 Fisherman Street, Opa-Locka, Florida 33054. Their perimeter security check included observing the outside areas of the Post Office, observing

the gated areas of the Post Office, and observing if the USPS blue collection box had been tampered with. At that time, PPO Turnoff observed no suspicious activity and noted mail inside of the USPS collection box. PPOs Turnoff and Sepulveda then travelled in an unmarked law enforcement vehicle to a collection box less than a quarter of a mile away serviced by the Opa-Locka Post Office. There, they found tape inside of the collection box but no mail inside. Due to observing tape in the box, the PPOs continued to monitor the immediate area for suspicious activity.

4.      At approximately 2:30 a.m., PPOs Turnoff and Sepulveda observed a dark gray Toyota Corolla bearing paper tag "BYI0705" driving around the vicinity in a suspicious manner for that hour. The vehicle was observed driving around the block with the headlights turned off as if the individuals inside were looking around for other vehicles. When other vehicles passed by, the individuals in the vehicle would turn on the headlights and drive away. Eventually, the vehicle parked near the collection box located at 550 Fisherman Street. TOSCANO-PEREZ was observed exiting the vehicle from the driver seat. TOSCANO-PEREZ approached the collection box and began to steal mail from the box utilizing a string with tape attached at the end. Based on your Affiant's training and experience, I know that this type of device is commonly used to "fish" mail out of mail collection boxes. The mail is then rifled, and checks and/or cash in the mail is stolen. Upon observing this fishing conduct, the PPOs approached the individuals and found VARGAS in the passenger seat with a knife in his lap.

5.      Upon contact, TOSCANO-PEREZ gave verbal consent for the PPOs to search the vehicle. A search of the vehicle revealed a BB gun, Taser, fishing device, a roll of heavy duty

tape, and individual pieces of tape.  Additionally, mail from the following individuals was found
in the vehicle:  "F.B.", "B.J.", "R.P.", "Y.R.", "E.G.", "W.W.", "P.F." and "B.W."

6.     At approximately 3:45 a.m., your Affiant arrived on scene and was presented with
an Estrella Insurance & Vehicle Documents folder that the PPOs found inside the vehicle. Your
Affiant noted approximately fifty (50) checks and three money orders within the folder. Of the
fifty (50) checks, none were made payable to TOSCANO-PEREZ or VARGAS but a few
appeared to have been washed (i.e., the named payee appeared to have been removed from the
check). One money order appeared to have been washed with the payee altered to the name of
VARGAS.  Along with these items were personal information belonging to TOSCANO-PEREZ
and a hand written letter in Spanish discussing an incident involving cashing stolen checks. The
author of the letter is unknown.

7.     At approximately 4:00 a.m., VARGAS was read *Miranda* and refused to be
interviewed regarding the incident.  A few minutes later, TOSCANO-PEREZ was read *Miranda*
and also refused to be interviewed regarding the incident.


[this space intentionally blank]


3

8.      Based on the foregoing, your Affiant submits that there is probable cause to believe that on or about June 3, 2017, BRIAN ANIBAL TOSCANO PEREZ and CRISTHIAN ALEJANDRO VARGAS did unlawfully possess any letter and mail, and any article and thing contained therein, which had been stolen, taken, and abstracted from and out of any letter box, mail receptacle, and other authorized depository for mail matter, knowing the same to have been stolen, taken, and abstracted, in violation of Title 18, United States Code, Section 1708.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

JaLeesa Osborne, Postal Inspector
U.S. Postal Inspection Service

Sworn to and subscribed before me
this 3rd day of June 2017.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

4

# Exhibit D

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Southern District of Florida
### Miami Division

| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
|---|---|
| v. | Case Number: **17-20411-CR-SCOLA-1** |
| **BRIAN ANIBAL TOSCANO-PEREZ** | USM Number: **14798-104** |

Counsel For Defendant: Dustin M. Tischler, Esquire
Counsel For The United States:
AUSA Daniel Marcet for AUSA Frederic Shadley.
Court Reporter: Carleen Horenkamp

The defendant pleaded guilty to counts 1 and 2 of the indictment.

The defendant is adjudicated guilty of these offenses:

| TITLE & SECTION | NATURE OF OFFENSE | OFFENSE ENDED | COUNT |
|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy to commit an offense against the United States. | 06/03/2017 | 1 |
| 18 U.S.C. § 1708 | Theft of mail. | 06/03/2017 | 2 |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

Count 3 is dismissed on the motion of the Government.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Date of Imposition of Sentence: 08/07/2017

ROBERT N. SCOLA, Jr.
United States District Judge

Date: 08/07/2017

DEFENDANT: **BRIAN ANIBAL TOSCANO-PEREZ**
CASE NUMBER: **17-20411-CR-SCOLA-1**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for concurrent terms of **time served** as to each of Counts 1 and 2.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

_____
DEPUTY UNITED STATES MARSHAL

DEFENDANT: **BRIAN ANIBAL TOSCANO-PEREZ**
CASE NUMBER: **17-20411-CR-SCOLA-1**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **one year**. This term consists of one year as to each of Counts 1 and 2, all such terms to run concurrently.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

**The defendant shall cooperate in the collection of DNA as directed by the probation officer.**

**The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.**

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1. The defendant shall not leave the judicial district without the permission of the court or probation officer;
2. The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first fifteen days of each month;
3. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4. The defendant shall support his or her dependents and meet other family responsibilities;
5. The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6. The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7. The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9. The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11. The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT: **BRIAN ANIBAL TOSCANO-PEREZ**
CASE NUMBER: **17-20411-CR-SCOLA-1**

### SPECIAL CONDITIONS OF SUPERVISION

Surrendering to Immigration for Removal After Imprisonment - At the completion of the defendant's term of imprisonment, the defendant shall be surrendered to the custody of the U.S. Immigration and Customs Enforcement for removal proceedings consistent with the Immigration and Nationality Act. If removed, the defendant shall not reenter the United States without the prior written permission of the Undersecretary for Border and Transportation Security. The term of supervised release shall be non-reporting while the defendant is residing outside the United States. If the defendant reenters the United States within the term of supervised release, the defendant is to report to the nearest U.S. Probation Office within 72 hours of the defendant's arrival.

DEFENDANT: **BRIAN ANIBAL TOSCANO-PEREZ**
CASE NUMBER: **17-20411-CR-SCOLA-1**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $200.00 | $0.00 | $0.00 |

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **NAME OF PAYEE** | **TOTAL LOSS\*** | **RESTITUTION ORDERED** | **PRIORITY OR PERCENTAGE** |
|---|---|---|---|

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

\*\*Assessment due immediately unless otherwise ordered by the Court.

DEFENDANT: **BRIAN ANIBAL TOSCANO-PEREZ**
CASE NUMBER: **17-20411-CR-SCOLA-1**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A. Lump sum payment of $200.00 due immediately.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

This assessment/fine/restitution is payable to the CLERK, UNITED STATES COURTS and is to be addressed to:

**U.S. CLERK'S OFFICE**
**ATTN: FINANCIAL SECTION**
**400 NORTH MIAMI AVENUE, ROOM 08N09**
**MIAMI, FLORIDA 33128-7716**

The assessment/fine/restitution is payable immediately. The U.S. Bureau of Prisons, U.S. Probation Office and the U.S. Attorney's Office are responsible for the enforcement of this order.

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

| **CASE NUMBER** **DEFENDANT AND CO-DEFENDANT NAMES** **(INCLUDING DEFENDANT NUMBER)** | **TOTAL AMOUNT** | **JOINT AND SEVERAL AMOUNT** |
|---|---|---|

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# Exhibit E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DIPING ANDERSON,                            )
                                            )
                        Plaintiff,          )
                                            )     C.A. No. 14-13380-PBS
v.                                          )
                                            )
MEGAN BRENNAN,                              )
*Postmaster General of the United States*,  )
                                            )
                        Defendant.          )

## DEFENDANT'S POST-TRIAL PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM D. WEINREB
Acting U.S. Attorney

SHELBEY D. WRIGHT
Assistant U.S. Attorney

JASON C. WEIDA
Assistant U.S. Attorney

United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
Shelbey.Wright@usdoj.gov
Jason.Weida@usdoj.gov

*Attorneys For Defendant Megan J. Brennan,*
*Postmaster General of the US Postal Service*

Dated: January 18, 2017

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

LIABILITY ................................................................................................................... 1

I.     THERE WAS NO ACTIONABLE DISCRIMINATION (COUNT I) ............................. 1

     A.    The Legal Framework ........................................................................... 1

     B.    Motrucinski Removed Plaintiff For Legitimate,
              Nondiscriminatory Reasons .................................................................. 2

     C.    Plaintiff Failed To Satisfy Her Burden To Prove That
              Discriminatory Animus Motivated Motrucinski's Decision To
              Removed Her ......................................................................................... 7

           1.    McGee Never Used Racial Epithets Or Watched
                      Pornography In The Rollcall Room, And In All Events
                      That Testimony Is Irrelevant ...................................................... 8

           2.    Two Stray Remarks Do Not Satisfy Plaintiff's Burden To
                      Prove Discrimintaory Animus ................................................... 9

           3.    Plaintiff's Purported Comparators Do Not Justify An
                      Inference of Discriminatory Animus ....................................... 10

II.    THERE WAS NO ACTIONABLE RETALIATION (COUNT II)................................. 17

DAMAGES .................................................................................................................. 19

     A.    Plaintiff Is Not Entitled To Reinstatement........................................... 19

     B.    Plaintiff Is Not Entitled To Monetary Recovery.................................. 20

CONCLUSION ............................................................................................................ 23

rather than punitive." *Id.* § 16.01. Supervisors need the flexibility to determine, in their own discretion, what level of discipline will prompt a particular PPO under the particular circumstances of a given case to conform to expectations.[11]

23. In addition, trial testimony established that Motrucinski was different from his predecessor (and even his peer) supervisors. Motrucinski testified that the inattentiveness and carelessness of other PPOs was one of the reasons he decided to apply to become a supervisor. When Motrucinski was promoted to the rank of sergeant in 2011, and then captain in 2013, he was determined to correct the laxities of the past. Indeed, Barris herself testified that, after Motrucinski became a supervisor, PPOs across the board were required to fill out incident reports for lost keys, when prior supervisors might not have required them.

24. Moreover, the testimony at trial established that Motrucinski's elevation to supervisor coincided with drastic changes to the duties and responsibilities of PPOs. When Motrucinski and Plaintiff started as PPOs in 1999 and 2000, respectively, a common duty assignment was sitting at the guard shack. That changed in the mid-2000s when contract security began fulfilling those duties and PPOs began handling more dangerous patrol and first-responder duties. At the same time, there were dramatic reductions in the size of the Postal Police force. In the 2011 to 2013 timeframe, the Postal Police force was operating at about 50% of its size in the 1999/2000 timeframe. Multiple witnesses (Motrucinski, McGee, and Zekan) testified that this dramatic reduction in force, coupled with the more intense and dangerous duties of PPOs, meant

---

[11] This is demonstrated by the discipline issued to two of Plaintiff's purported comparators. *See infra* ¶ 25. Motrucinski's first (and only) piece of corrective action was a letter of warning. Similarly, Sergeant Kevin Rheault's first (and only) piece of discipline was a formal counseling. If the Collective Bargaining Agreement mandated perfectly progressive discipline, as Plaintiff contends (Doc. # 120-2 ¶¶ 133-35), both Motrucinski and Rheault would have to have been issued lower levels of discipline than what they each in fact received.

that life as a PPO in the 2011 to 2013 timeframe was far different from life as a PPO than it had been before.

25.    Based on the above circumstances, Plaintiff's comparators are not similarly situated, first, because none (save Rheault) dealt with Motrucinski.  Above and beyond that factor, there are additional differentiating and/or mitigating factors that render all of Plaintiff's comparators (including Rheault) not similarly situated, as discussed below.

| **Purported Comparator** | **Why S/He Is Not Similarly Situated** |
|---|---|
| PPO Bernice Blaise | Blaise, who retired in 1991, allegedly drank on duty in the 1980s, more than a decade before Motrucinski began at the Postal Police (he testified he was in middle school at the time).  Motrucinski was not Blaise's supervisor; indeed, the purported incident occurred so long ago that her supervisor is unknown. |
| PPOs Pasquale and Healy | Pasquale and Healey allegedly fell asleep while on duty, but those incidents (if true) occurred more than four years before Motrucinski became a supervisor (Healey retired in 2004 and Pasquale retired in 2007).  Motrucinski was never Pasquale's or Healy's supervisor.  Moreover, their actual supervisor, Pare, testified that, although he had heard rumors, he never observed either sleeping on duty.[12] |
| PPO Sue Pederson | Pederson allegedly left her gun in the changing room.  The date of that purported incident is unknown, but it predates Motrucinski's elevation to supervisor.  Motrucinski was not Pederson's supervisor. |

---

[12] Unlike Pasquale or Healey, Pare did find Plaintiff asleep on duty in her cruiser when she worked the overnight shift in the mid-2000s.  Pare gave Plaintiff a verbal warning not to fall asleep on duty again.

15

Dated: January 18, 2017   Respectfully submitted,

         MEGAN J. BRENNAN
         Postmaster General of the U.S. Postal Service

         By her attorneys,

         WILLIAM D. WEINREB
         Acting U.S. Attorney

By:  */s/ Jason C. Weida*
         Shelbey D. Wright (BBO No. 562180)
         Assistant U.S. Attorney
         Jason C. Weida (BBO No. 663097)
         Assistant U.S. Attorney
         United States Attorney's Office
         John Joseph Moakley U.S. Courthouse
         1 Courthouse Way, Suite 9200
         Boston, MA 02210
         (617) 748-3100
         Shelbey.Wright@usdoj.gov
         Jason.Weida@usdoj.gov

## CERTIFICATE OF SERVICE

   I hereby certify that, on January 18, 2017, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

         */s/ Jason C. Weida*
         Jason C. Weida
         Assistant U.S. Attorney

# Exhibit F

Case 1:20-cv-02566-CRC  Document 7-15  Filed 08/28/20  Page 38 of 184
Case 1:14-cv-13380-PBS  Document 171  Filed 08/09/17  Page 1 of 148

3-1

1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MASSACHUSETTS
2

3      DIPING Y. ANDERSON,                    )
                                              )
4                 Plaintiff                   )
                                              )
5           -VS-                              ) CA No. 14-13380-PBS
                                              ) Pages 3-1 - 3-145
6      PATRICK R. DONAHOE, Postmaster         )
       General of the United States,          )
7                                             )
                  Defendant                   )
8

9

10                      **BENCH TRIAL - DAY THREE**

11               BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES CHIEF DISTRICT JUDGE

12

13

14

15

16                               United States District Court
                                 1 Courthouse Way, Courtroom 19
                                 Boston, Massachusetts  02210
17                               December 14, 2016, 9:11 a.m.

18

19

20

21

22

23                         LEE A. MARZILLI
                        OFFICIAL COURT REPORTER
24                    United States District Court
                      1 Courthouse Way, Room 7200
25                         Boston, MA  02210
                            (617)345-6787

Case 1:20-cv-02566-CRC Document 7-15 Filed 09/23/20 Page 39 of 194
Case 1:14-cv-13980-PBS Document 171 Filed 08/09/17 Page 2 of 148

3-2

1    A P P E A R A N C E S:

2        JAMES P. BRADY, ESQ., 149 High Street, Hingham,
     Massachusetts, 02043, for the Plaintiff.

3

         SHELBEY D. WRIGHT, ESQ. and JASON C. WEIDA, ESQ.,
4    Assistant United States Attorneys, United States Attorney's
     Office, 1 Courthouse Way, Suite 9200, Boston, Massachusetts,
5    02210, for the Defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:20-cv-02566-CBS Document 175 Filed 08/08/19 Page 40 of 194
Case 1:14-cv-13580-PBS Document 171 Filed 08/09/17 Page 3 of 184

3-3

1                    I N D E X

2   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3   JOSEPH T. MOTRUCINSKI

4       By Ms. Wright:             3-4
        By Mr. Brady:                      3-33
5
    STUART GRASSIAN, M.D.
6
        By Mr. Brady:     3-55
7       By Ms. Wright:             3-76
        By Mr. Brady:                      3-104
8       By Ms. Wright:                               3-108

9   CHARLES J. ZEKAN

10      By Mr. Brady:     3-111
        By Ms. Wright:             3-120
11      By Mr. Brady:                      3-134
        By Ms. Wright:                               3-138
12

13
    EXHIBITS                    RECEIVED IN EVIDENCE
14
    Defendant:
15
    15                              3-20
16

17

18

19

20

21

22

23

24

25

1  would not call him in our case.

2          THE COURT:  But was he going to be your expert?

3          MS. WRIGHT:  He's not a disciplinary expert, but he

4  would have testified in our case regarding the policy of the

5  CBA.

6          THE COURT:  Well, I've now got it all, so I don't know

7  how long it needs to be, right?  I have the CBA.  I have the

8  various rules.  But let's call him in.  Let's see what we can

9  do.  See if you can do it in 15 and 15.  I'm completely booked

10  this afternoon, so I do not want to make this man come back if

11  I don't need to.

12          MR. BRADY:  I understand, your Honor.  I'll try to be

13  as brief as possible.

14                       CHARLES J. ZEKAN

15  having been first duly sworn, was examined and testified as

16  follows:

17          THE CLERK:  State your full name for the record and

18  spell your last name.

19          THE WITNESS:  Charles John Zekan.  The last name is

20  spelled Z-e-k-a-n.

21          THE COURT:  Okay, great.  Thank you for coming up.

22  I'm sorry you had to wait.

23          MR. BRADY:  I'm sorry for the inconvenience.

24  DIRECT EXAMINATION BY MR. BRADY:

25  Q.   You previously testified in a deposition in this case on

1    February 26, 2016?

2    A.    Yes, I believe so.

3    Q.    When, if at all, have you reviewed the transcript of your

4    deposition?

5    A.    I'm sorry?

6    Q.    Have you reviewed the transcript of your deposition from

7    that deposition?

8    A.    Yes.

9    Q.    Okay.  Is there anything in there you want to correct as

10   inaccurate or misleading?

11   A.    There were some slight corrections, misspellings, but

12   nothing substantive.

13   Q.    Well, we can't blame you for the misspellings, can we?

14   All right, you testified at that time as defendant's

15   representative in response to plaintiff's 30(b)(6) deposition

16   notice; is that correct?

17   A.    Yes.

18         MR. BRADY:  I've provided a copy of this notice to

19   opposing counsel.  Could I have the witness look at it, please?

20   It's not entered as an exhibit.

21         THE COURT:  Why do you need him to look at it?

22         MR. BRADY:  I would like to admit it as an exhibit.

23         MS. WRIGHT:  Your Honor, I don't see the relevance of

24   the --

25         THE COURT:  I don't see it either.  I'll look at it

1   and see why it's relevant.  It's already part of the docket,

2   isn't it?

3           MR. BRADY:  Part of the docket?  I'm not sure if it's

4   part of the dock, your Honor.

5           THE COURT:  Anyway, let's just keep going.  Let's have

6   a good clip here.

7   Q.   Were you asked to testify at that deposition about

8   disciplinary matters involving Boston PPOs at the general mail

9   facility, if you turn to Page 7 and 8 of that notice?

10          (Witness examining document.)

11  A.   Your question?

12  Q.   Well, under "Matters for Inquiry" -- do you see that

13  section?

14  A.   Matters for -- on Page 7.

15  Q.   Yes, do you see that?

16  A.   And where on the page?

17  Q.   Okay, do you see Nos. 1, 3, and 5 under "Matters for

18  Inquiry"?

19  A.   I see on Page 7, I see enumerated 1, 2, and 3, and on

20  Page 8, 4 and 5.

21  Q.   Right.  So I'm drawing your attention to 1, 3, and 5.

22  A.   1, 3, and 5.

23  Q.   You're asked to identify any PPO under Section 1 subjected

24  to discipline by the Postal Service for sleeping on duty?

25  A.   My recollection is, the first time I saw the matter for

1    inquiry was that very morning.

2    Q.   And you'd never seen the deposition notice before that

3    day?

4    A.   That's correct.

5    Q.   Have you been designated by the defendant as an expert

6    witness in this case?

7    A.   I'm not sure how I've been designated.

8    Q.   Have they informed you that you're a defense expert in

9    this case?

10   A.   I don't believe that's how I've been identified, as a

11   subject matter expert, no.

12        THE COURT:  Are you a representative of the Postal

13   Service on these matters?

14        THE WITNESS:  Yes, I am.

15        THE COURT:  All right, so let's ask questions.

16   Q.   Are you still the security force operations program

17   manager for the Postal Service?

18   A.   Yes.

19   Q.   And does that encompass both PPOs and postal inspectors?

20   A.   Not as postal inspectors.

21   Q.   But it does encompass PPOs?

22   A.   Postal Police officers, the bargaining unit, and EAS, the

23   supervisory and managerial Postal Police.

24   Q.   Okay.  You testified in February that in that capacity,

25   you advised Postal Service managers on disciplinary matters

1  involving PPOs across the country.  Is that true?

2  A.    Yes.

3  Q.    And how long have you held that position?

4  A.    Since 2010.

5  Q.    And prior to that, you were for five years manager of

6  Postal Police at the national headquarters in Washington, D.C.?

7  A.    Yes.

8  Q.    It's fair to say that you're the top national executive on

9  disciplinary matters for the Postal Service?

10  A.    No.

11  Q.    Are you the top national advisor on disciplinary matters

12  for the Postal Service?

13  A.    No.

14  Q.    Well, when you're advising Postal Service managers around

15  the country on disciplinary matters involving PPOs, aren't you

16  doing that on behalf of the National Postal Service?

17  A.    Yes, I am.

18  Q.    Okay.  Didn't you testify on February 25 --

19        THE COURT:  So what are you objecting to, the word

20  "top"?

21        THE WITNESS:  Yes.

22        THE COURT:  So are you -- who's on top of you?

23        THE WITNESS:  On top of me would be an assistant

24  inspector in charge who has very little role in advising on

25  labor relations matters, but there are various different

1    avenues for our Postal Police managers to seek advice, I being

2    one of them; postal inspector attorneys are another, as well as

3    area district labor relations specialists that are spread

4    throughout the country.  Now --

5            THE COURT:  Are you the top guy in D.C.?

6            THE WITNESS:  Well, the program responsibility extends

7    to both operations, training, and labor relations.  So it's a

8    fairly broad scope which requires at least a minimal level of

9    understanding for all those three phases.

10            THE COURT:  And that's you?

11            THE WITNESS:  That's me.

12            THE COURT:  All right.

13            MR. BRADY:  All right, well, we're happy to have you

14    here, and I'll proceed.  I appreciate your explaining your

15    role.

16    Q.   You testified, I believe on February 25, that a key

17    consideration, policy consideration in disciplinary matters is,

18    quote, "whether the work rule is equitably enforced, whether

19    the penalty is commensurate with the offense," is that correct?

20    A.   I do recollect testifying to that.

21    Q.   To that.  Is equitable enforcement and imposition of

22    penalties a key to fair disciplinary practices in any postal

23    facility?

24    A.   Would you restate your question.

25    Q.   Is treating all employees the same an important

1    consideration, policy consideration for the Postal Service?

2    A.    In the spirit of fairness, yes.

3    Q.    And is imposing penalties that are proportional to the

4    offense by a particular PPO, is that an important National

5    Postal Service policy?

6    A.    Generally, yes, it is.

7    Q.    I'd like you to turn to Page -- well --

8           THE COURT:  Just ask him straight up.

9           MR. BRADY:  All right.

10    Q.    Do you believe that a more serious offense should be

11    treated more severely than a minor offense, regardless as to

12    who committed the infraction?

13    A.    It's difficult to abstract without all the facts, but

14    generally that would be true.

15    Q.    Did you testify at your previous deposition that, and I

16    quote, "A general principle of Postal Service management as

17    well as the more specific application of corrective action is

18    that all employees are treated equitably, equally.  So that

19    implies that penalties are for the action and not waged as a

20    personal vendetta against a given employee"?

21    A.    I don't see that in front of me, but that is my

22    recollection of what I testified to.

23           THE COURT:  Can you just ask.  Don't ask him what he

24    said in his deposition.  Just ask him.

25           MR. BRADY:  I'll ask him, okay.

Case 1:20-cv-02566-PBS Document 1715 Filed 08/09/20 Page 48 of 124
Case 1:14-cv-23388-PBS Document 171 Filed 08/09/17 Page 118 of 146

3-118

1          THE COURT:  So were you consulted on this case?

2          THE WITNESS:  Not specifically, but I was aware of

3    some general fact patterns related to the case.

4          THE COURT:  But no one called you up and said, "Hey,

5    what should I do here?"

6          THE WITNESS:  No one called me asking for specific

7    advice in this case, no.

8          THE COURT:  So you weren't involved personally?

9          THE WITNESS:  I was not involved in deliberation on

10   what would be appropriate discipline and did not provide direct

11   advice to the supervisor or manager involved.

12   Q.   Do you believe that wrongfully disparate treatment can

13   have a very negative impact on discipline that will cause

14   workers to lose faith in management?

15   A.   Would you restate that, please.

16         THE COURT:  Excuse me.  This isn't helpful to me.

17   This is too general.  Just hone in on this case.

18   Q.   With respect to punishments at issue in this case, did you

19   testify that in your eleven years in an executive position in

20   the Post Office that we discussed, that you do not recall

21   discipline being issued for the loss of gun room keys?

22   A.   Yes, I believe that was my testimony.

23   Q.   You don't recall that from all of your contacts with

24   postal managers in facilities across the country?  You never

25   heard a report of PPOs being disciplined for that?

```
 1   A.   As far as recalling the entire fact pattern for any
 2   individual case, I do believe I commented that I was aware that
 3   keys had been lost.  There may have been discipline in those
 4   cases, but I could not cite any case with absolute certainty.
 5   But that loss of keys goes to negligence, and that is a citable
 6   offense.
 7          THE COURT:  That's not the question.  Do you remember
 8   anyone being formally punished for losing keys in the Boston
 9   facility?
10          THE WITNESS:  No.
11          THE COURT:  What's the next question?
12          How about in the country?
13          THE WITNESS:  I'm reasonably certain that it has
14   occurred, but I could not go to my files and pull out a record
15   of it.
16          THE COURT:  But you don't personally as you sit here
17   remember it?
18          THE WITNESS:  Vaguely.  I know there have been lost
19   keys, and I know actions have been taken, but I can't recall
20   any of the specific facts.
21   Q.   Do you know of any cases anywhere in the country where
22   PPOs have been disciplined for sleeping on duty?
23   A.   Yes.
24   Q.   How often has that been reported to you?
25   A.   Maybe a few, a few instances over time.
```

```
 1            THE COURT:  Fewer than ten?
 2            THE WITNESS:  I would say fewer than ten, yes.
 3   Q.   And that's over the eleven years you've been in that
 4   position?
 5   A.   Yes.
 6   Q.   How many instances do you know of across the country where
 7   officers were disciplined for putting their gun in their
 8   changing room locker instead of in the gun room locker at the
 9   end of their shift?
10   A.    I have more of a specific but not full recollection of
11   that having occurred at the facility where I worked when I was
12   a bargaining unit officer.
13   Q.   But in the eleven years that you've been in the position,
14   you are advising postal managers across the country, how many
15   instances have you heard of somebody receiving a formal
16   punishment for that?
17   A.   I did not recall any.
18   Q.   None?  You don't recall any?
19   A.   Yes.
20            MR. BRADY:  That's all my direct, your Honor.
21   CROSS-EXAMINATION BY MS. WRIGHT:
22   Q.   Mr. Zekan, would you clarify for the Court what your
23   actual role is for the Postal Service.
24   A.   I have three primary functions or four that I'm involved
25   with.  With respect to Postal Police operations, the actual
```

```
 1   day-to-day operations to insure consistency with policy and
 2   national directives; to insure that the training for our
 3   personnel are adequate; to provide advice to managers on labor
 4   relations issues, whether EAS or bargaining, when requested.
 5   And in that instance, I'm one of three avenues where folks
 6   might pursue that.  In most cases, the applications in labor
 7   relations have to do with collective bargaining implementation.
 8   The Postal Service bargains for work rules with the bargaining
 9   unit Postal Police officers, and those rules extend everything
10   from overtime to vacation to holiday selection.  And what's
11   more typical for my advice on labor relations has less to do
12   with discipline and more with the application of these other
13   work rules.  The more typical avenue for labor relations
14   consultation goes, when a manager reaches out to an inspector
15   attorney, usually once that privilege is established, I have a
16   much diminished likelihood of being pulled into the case.
17        Additionally, I'm responsible --
18        THE COURT:  But did you specifically look into Boston,
19   though?  I understand that typically you're in a somewhat
20   different nook of the Postal Service, but when you were asked
21   during the deposition, did you personally reach out and look at
22   what was happening in Boston?
23        THE WITNESS:  No.  After the court proceeding had
24   initiated, unless directed by counsel, I took no independent
25   inquiry.
```

Case 1:20-cv-02566-PBS  Document 1715  Filed 08/03/20  Page 52 of 194
Case 1:14-cv-02386-PBS  Document 171  Filed 08/09/17  Page 122 of 146

3-122

 1          THE COURT:  When you came up to do the deposition, you

 2     didn't sort of look into what was going on in Boston as far as

 3     past discipline?

 4          THE WITNESS:  Following the deposition?

 5          THE COURT:  No, before it.

 6          THE WITNESS:  No.

 7     Q.   Would nationwide discipline be typically part of your

 8     day-to-day duties?

 9     A.   I would say, probably during the period of a week, that

10     discipline issues would come to my attention.

11     Q.   Would you be notified about any discipline issued to PPOs

12     in a general mail facility across the country when it happened

13     as a matter of course?

14     A.   As a matter of course, in most of those instances, I would

15     become aware of them.

16     Q.   Now, you mentioned the collective --

17          THE COURT:  Can I ask, how many removals a year would

18     you say there are --

19          THE WITNESS:  There are not many.

20          THE COURT:  -- in the country?

21          THE WITNESS:  Ballpark figure, probably five or six in

22     the last three years.

23          THE COURT:  A year or just over the course of the

24     three years?

25          THE WITNESS:  Over the course of three years.

     1          THE COURT:  Were there any -- were they primarily --

     2   well, what did they involve mostly?

     3          THE WITNESS:  One instance was, we auction off lost

     4   mail at one of our facilities.  One of our PPOs gave one of the

     5   bidders a prime seat in the auction and was removed for that

     6   offense.  We've had allegations of plagiarism, falsifying

     7   reports.  We've had instances of folks sleeping on duty.

     8          THE COURT:  Who are terminated?

     9          THE WITNESS:  Who were terminated.

    10          THE COURT:  All right, so of those five, one of them

    11   was someone sleeping on duty?

    12          THE WITNESS:  Yes.

    13          THE COURT:  And what were the circumstances there?

    14   Where was that, by the way?

    15          THE WITNESS:  That was in Baltimore.  And the

    16   instance, this was actually part of a last-chance agreement for

    17   someone who had various infractions, who the terms of the

    18   last-chance agreement was that any infraction.

    19          THE COURT:  I see.

    20          THE WITNESS:  And in fact I believe it was a sleeping

    21   incident that led to the last-chance agreement.  Forgive me.

    22   Are you familiar with collective bargaining last-chance

    23   agreements?

    24          THE COURT:  I can guess what it is.  It sounds

    25   probably like what it is, right?

1          THE WITNESS:  So there was a pending separation, which

2     I believe was based upon a sleeping incident, that the parties

3     negotiated a last-chance in which any infraction would have led

4     to separation.

5          THE COURT:  Is that commonly done if somebody's got a

6     disciplinary set of problems?

7          THE WITNESS:  Last chance agreements, no, it's

8     atypical.  In some cases it's appropriate, but what's more

9     typical is the "three strikes and you're out" policy, is that a

10    series of infractions should reasonably predict separation.

11    And allowing continued additional chances is more than likely

12    to weaken morale and discipline in the workplace by giving

13    employees the feeling that they will always get another chance,

14    managers will always bend over backwards for them.  And having

15    been a working supervisor and manager, it's very important to

16    have your officers be attentive to their duties, understand the

17    importance of their function, and be held to the highest

18    standards and conduct.

19         THE COURT:  Sure.  Suppose you had somebody with three

20    relatively minor infractions, is that one possibility in your

21    tool kit, which is a last-chance agreement?

22         THE WITNESS:  Well, relatively minor infractions might

23    be something as insignificant as reporting five minutes or

24    slightly more late for work.  That might be --

25         THE COURT:  Things like lost keys, that kind of thing.

1    Suppose you had three relatively minor infractions which were

2    infractions, and you got various things like letters of

3    warning, that kind of thing, is it an option for a supervisor

4    to give a last chance, or what did you call it, the one last

5    chance?

6            THE WITNESS:  Generally the term is "last-chance

7    agreement," but I would suggest that the loss of keys to a bin

8    locker or to a building are not insignificant --

9            THE COURT:  But what if it wasn't lost, you left them

10   on the counter, or you put one in your locker, that kind of

11   thing, instead of taking it on your key chain?

12           THE WITNESS:  Now --

13           THE COURT:  That's this case, right?  And so you have

14   a series of infractions that don't involve stealing the mail or

15   plagiarizing or giving someone one-up on an auction in a

16   fraudulent way.  If someone has a series of negligent actions,

17   would one option be to say, you know, "This isn't looking good,

18   but we'll give you one chance here"?

19           THE WITNESS:  The principle of postal discipline

20   enables the supervisor to make that determination, so there is

21   that latitude.

22           THE COURT:  There is latitude.  Thank you.

23   BY MS. WRIGHT:

24   Q.   Would you agree that the misplacement of gun locker keys

25   or weapons room keys is a minor infraction?

Case 1:20-cv-02566-PBS   Document 1715   Filed 08/03/20   Page 56 of 194
Case 1:14-cv-02396-PBS   Document 171   Filed 08/09/17   Page 126 of 146

3-126

1   A.   No, I would not agree with that.

2   Q.   Is the progressive discipline or corrective action, is

3   that governed by the collective bargaining agreement?

4   A.   I would not say it's governed.  It's a general principle

5   of postal discipline, which is further enshrined in the

6   collective bargaining agreement.

7   Q.   So you could find the progressive action steps in the

8   collective bargaining agreement?

9   A.   Yes, you can.

10  Q.   Is there ever a time when disciplinary action is removed

11  or expunged from an official personnel file?

12  A.   Yes.  Within the collective bargaining agreement, the life

13  of any given discipline is spelled out.  And after the life of

14  a discipline letter -- for example, a letter of warning -- the

15  officer can petition and have that letter removed from their

16  official personnel file; but, in addition, that a supervisor

17  would not cite a letter, even if it remained in the EOPF, is an

18  element in progressive discipline once it's lived its useful

19  life.

20        THE COURT:  Which is what, how long?

21        THE WITNESS:  I believe it's two years.  There was a

22  contract change in the 2012-2017 agreement.

23        THE COURT:  So once a letter of warning is two years

24  old, it's generally not used?

25        THE WITNESS:  It's generally not used as a progressive

1    step, a citable element in progressive discipline.

2    Q.    Is there an exception to that rule with respect to

3    continuing disciplinary actions?

4    A.    Yes.  If there is an additional infraction within the life

5    of any corrective action, that will be extended.

6    Q.    So as I understand it, if there's a disciplinary action

7    and there's no further disciplinary action within, say, the two

8    years that you cited --

9    A.    Yes.

10   Q.    -- then that disciplinary action would be expunged from

11   the OPF?

12   A.    There's an affirmative response required by the officer to

13   request that it be expunged, but the general practice is that a

14   supervisor or manager would not be able to cite that letter of

15   warning even if the officer didn't request that it be removed.

16   So for all intents and practical purposes, it's expunged.

17   Q.    And if that officer had another piece of discipline within

18   those two years, then the prior discipline would remain in the

19   OPF?

20   A.    It would remain active.

21   Q.    Does the CBA allow for a last chance as a proposed option?

22   A.    No.  The last-chance agreement is not a named element

23   within the agreement.

24            THE COURT:  Where does it come from?

25            THE WITNESS:  I imagine arbitration labor history has

Case 1:20-cv-02566-CRC   Document 1715   Filed 08/03/20   Page 58 of 194
Case 1:14-cv-02386-PBS   Document 171   Filed 08/09/17   Page 128 of 146

3-128

1      a long history of using last-chance agreements, but it's an

2      understanding between the parties.  Similarly, settlements from

3      MSPB cases may not be named in the agreement, but when the

4      parties can come to an agreement, it's accepted, tolerated, and

5      appropriate.

6      Q.   Can you briefly explain for the Court what the difference

7      is between United States Postal inspectors and Postal Police

8      officers.

9      A.   The most appropriate way to describe it would be to

10     consider that the U.S. Postal Inspection Service, which is

11     composed of postal inspectors who are the agents, Postal Police

12     officers who are uniformed officer and support staff, to think

13     of them as a fully functioning police department whose

14     responsibilities are security for postal facilities, protection

15     of postal employees, protection of the mail in transit,

16     preventing the use of mails for illegitimate purposes, mailing

17     child pornography, mailing drugs through the mail.

18          The PPOs' responsibility doesn't touch the investigative

19     side, which is one of the primary responsibilities of the

20     postal inspectors.  PPOs are responsible for providing a

21     visible uniformed law enforcement presence at our primary

22     facilities.  We have increasingly used them as mobile agents in

23     the street as attacks on our carriers have increased, and

24     crimes like mail fishing, for example, would be a -- our blue

25     collection boxes, folks are finding ways to stick lines with

1    glue, with hooks, with other implements, and pull mail out of

2    the boxes.

3              THE COURT:  That's one I haven't seen yet.

4              THE WITNESS:  Oh, it's a very significant problem.

5    Having that visible uniformed presence on the street is very

6    effective in combatting that.  So PPOs' role is to respond to

7    emergency and contain those situations until additional

8    resources, postal inspectors, local P.D., fire department can

9    respond to the events with a postal nexus.  Does that address

10   your question?

11             MS. WRIGHT:  It does.

12             THE COURT:  So we're going to try and get him on this

13   plane.  Are you pretty much wrapping up now?

14             MS. WRIGHT:  Yes.  I have maybe five more minutes, if

15   I can just --

16             THE COURT:  Great.

17   Q.   Does the Postal Service use contract employees as guards

18   or supplements to the PPO?

19   A.   Yes, we do.

20   Q.   And in what circumstances would the Postal Service use

21   contract employees?

22   A.   Contract employees are used where there's a need for eyes

23   and ears to watch for security violations, unauthorized access,

24   where there's little likelihood of them having to go hands on

25   or physically intervene.  And during a time when for financial

1  reasons we could have more PPOs, we used to have PPOs on all

2  fixed posts.  As we've been forced into reduction, it made more

3  sense to have PPOs mobile, on foot, on vehicle, at a plant and

4  away from plants; and they can respond to calls for assistance

5  or calls from guards, unarmed guards who notice something

6  amiss.

7  Q.   When did that change begin with the Postal Service?

8  A.   Beginning 2001, 2002, we went through a significant

9  reduction of some 1,500 PPOs to an authorized complement of

10 around 800.  In 2006 we went through another significant

11 reduction in numbers of PPOs from around 800 to the current 700

12 that we have now.

13 Q.   Did the reduction in force and the addition of contract

14 employees result in PPOs having more varied and more dangerous

15 duties during the day?

16 A.   Yes.

17 Q.   Can you describe for the Court, please, under what

18 circumstances the Office of Inspector General would become

19 involved in an investigation or a disciplinary action.

20 A.   The Office of the Inspector General is responsible for

21 misconduct of all inspection service employees.  So as a matter

22 of due course, any infraction of a PPO, alleged infraction,

23 would most likely make it up through the chain of command to

24 the INC, the inspector in charge of a geographic location, and

25 then be referred to our office of counsel.  And the

Case 1:20-cv-02566-PBS Document 715 Filed 08/03/20 Page 61 of 194
Case 1:14-cv-02386-PBS Document 171 Filed 08/09/17 Page 131 of 146

3-131

1    determination would then be made whether to refer to office of

2    counsel -- I'm sorry -- to the OIG, and the OIG could either

3    accept the case and investigate it or decline it, refer it back

4    to the inspection service for whatever action they deemed

5    appropriate.

6    Q.    And if the OIG accepted a case for investigation, what

7    would be the role of the Postal Police officer management?

8    A.    In most cases, it would be to wait for the report.

9    Q.    You say "in most cases." Are there exceptions to that

10   general rule?

11   A.    I can imagine some. I'm not aware of us following up on

12   any of those exceptions.

13            THE COURT:  What did the OIG decide in this case?

14            THE WITNESS:  Well, the OIG finds facts and provides a

15   report.

16            THE COURT:  They don't decide whether a discipline is

17   appropriate?

18            THE WITNESS:  No, they don't, and, again, that report

19   would make it back to the deciding official.

20            THE COURT:  And then typically the deciding official

21   would decide what the discipline is?

22            THE WITNESS:  That's correct, based upon the facts the

23   OIG has provided.

24            THE COURT:  Thank you.

25   Q.    Now, Section 16.08 of the CBA refers to emergency

Case 1:20-cv-02566-PBC   Document 1715   Filed 08/03/20   Page 62 of 194
Case 1:14-cv-03560-PBS   Document 171   Filed 08/09/17   Page 132 of 146

3-132

1    suspension.

2    A.    Yes.

3    Q.    Can you describe for the Court what is an emergency

4    suspension.

5    A.    Is that in front of me?

6    Q.    Yes.  It is Exhibit 14, Exhibit 14 at Page 51.

7    A.    Okay, Tab 14, I don't see it.

8            MR. WEIDA:  The black binder.

9            MS. WRIGHT:  Oh, I'm sorry.  That's the wrong binder.

10   A.    Okay, Emergency Suspensions.

11   Q.    What is an emergency suspension?

12   A.    Based upon a credible observation of a representative of

13   Postal Service management, an emergency suspension would be

14   appropriate when there is concern about the safe conduct of an

15   employee, whether the employee's continued work in a facility

16   might endanger others, or a plain read of the contract, "In

17   cases of intoxication, sale, possession, or use of illegal

18   drugs or alcohol, theft or failure to observe safety rules and

19   the security force regulations, or in cases where retaining the

20   PPO on duty may result in damage to or loss of U.S. property,

21   loss of mail or funds, or where the PPO may be injurious to

22   self or others."

23   Q.    Okay, so here's my question:  Is there a time frame

24   associated with an emergency suspension?

25   A.    There is no clear time frame stated within the collective

1    bargaining agreement, though suspensions that last 14 days or

2    longer could result in additional grievance filing.

3    Q.   Would it be unusual under 16.08 for an emergency non-pay

4    status to be imposed before the conclusion of an OIG

5    investigation?

6    A.   Could you restate that one more time slowly.

7    Q.   Would it be unusual under 16.08 for an emergency non-pay

8    status to be imposed on an employee before the conclusion of an

9    OIG investigation?

10   A.   The OIG investigations tend to be somewhat long, so, no.

11          THE COURT:  What's long?  Here it was a couple of

12   weeks, I think, right?

13          THE WITNESS:  That might be optimistic sometimes.

14          THE COURT:  So what's the range?

15          THE WITNESS:  A few weeks, a month, longer.

16          MS. WRIGHT:  I'm sorry, I missed that answer.

17          THE COURT:  He said two weeks or a month, maybe

18   longer.  Is that what you said?

19          THE WITNESS:  Yes.

20   Q.   Would it be unusual for an emergency non-pay status to be

21   imposed before an OIG investigation is initiated?

22   A.   Would it be unusual for an emergency suspension to be --

23   Q.   Imposed before the formal initiation of an

24   OIG investigation?

25   A.   Well, most definitely.  The trigger for an emergency

1  suspension goes to the urgency of removing that employee from

2  the work site, and only after that removal is there time for

3  management then to make notice through the chain of command to

4  notify the OIG so they can either take the investigation or

5  refer it back to the inspection service.  So it's a clear act

6  of the agency trying to protect itself and possibly even the

7  employee from harm.

8  Q.   Last question, I promise.  Are the United States postal

9  inspectors subject to the same order of discipline under the

10 CBA as Postal Police officers?

11 A.   The protections in the collective bargaining agreement

12 only apply to PPOs.  There are similarities in that pattern,

13 meaning things go from less severe penalty to more severe, that

14 typically less severe infractions should have less severe

15 consequences, but, no, they are different patterns of

16 discipline.

17        MS. WRIGHT:  Thank you.  Nothing further.

18        MR. BRADY:  I just have a few questions on redirect,

19 your Honor.

20 REDIRECT EXAMINATION BY MR. BRADY:

21 Q.   You mentioned that you were aware of -- you mentioned that

22 misplaced keys could sometimes be more than a technical

23 violation, is that correct, that it could be more than a minor

24 infraction?

25 A.   Yes.

1    Q.   Would it make a difference whether the keys were lost --

2    whether the keys let's say to a gun room were lost inside the

3    secured police wing of a post office -- that is, inside the

4    secure access area in the gun room itself -- or versus lost

5    outside the secure area, maybe outside the post office

6    building?  Would that make a difference, in your estimation, as

7    to whether misplacing of keys was a significant versus a minor

8    infraction?

9    A.   If you identify what you're asset is, which is the

10   firearm, if the keys are lost outside of a secured area, you

11   still have a perimeter protecting an unauthorized person from

12   getting into the gun area.  While I want to think highest of

13   all our Postal Police, the folks who already have access to

14   that area have access to those keys.  So in some instance, the

15   asset is more vulnerable if the keys are lost in the secured

16   area than they would be if they were lost on the unsecured

17   side.

18            THE COURT:  I did not follow that at all.

19            THE WITNESS:  Okay, well, very simple.  There are

20   multiple levels set up to protect this weapon from unauthorized

21   access.  In this instance, let's assume there are just two

22   levels.  There's an area that all PPOs have to cross through to

23   get into the secured area, and then they have a key to get to

24   the lock.  If the keys are lost on the unsecured side, on the

25   other side of the locked door that PPOs have to go through,

Case 1:20-cv-02566-PBS   Document 1715   Filed 08/03/20   Page 66 of 194
Case 1:14-cv-23360-PBS   Document 1715   Filed 08/03/17   Page 136 of 146

3-136

 1    whoever finds those keys still have to make it through that

 2    first gateway to the secured area.  If the keys --

 3            THE COURT:  They've got the keys now.

 4            THE WITNESS:  I'm sorry?

 5            THE COURT:  I thought -- I'm really -- I'm really not

 6    following this.

 7            THE WITNESS:  Okay, well, I'll roll it back.

 8            THE COURT:  So let's assume you have an unsecured area

 9    of the postal facility and a secured area of the postal

10    facility and someone leaves their keys in the unsecured area,

11    then anybody could use the key to get into the secured area?

12            THE WITNESS:  That's right, and I made an assumption,

13    which may have been inappropriate in this fact sequence, that

14    more typically access to inspection service areas, work areas,

15    are through electronic ID cards, and that was my assumption in

16    this case.

17            THE COURT:  I'm losing the force of this line of

18    testimony.  Maybe it's just late in the day.  Maybe you can ask

19    a better follow-up question.

20            MR. BRADY:  Well, there's no allegation whatsoever in

21    this case --

22            THE COURT:  I know.  Just ask him another question, we

23    get him on this plane, because I didn't understand that.

24            MR. BRADY:  Okay, yes, that's fine.

25    Q.   The instance you mentioned of somebody disciplined for

Case 1:20-cv-02566-SBC   Document 1715   Filed 08/03/20   Page 67 of 194
Case 1:14-cv-02380-PBS   Document 171   Filed 08/09/17   Page 137 of 146

3-137

1  sleeping on duty, had that, that you were aware of, had that

2  Postal Police officer been cited for sleeping on duty

3  repeatedly before the incident that led to the last clear

4  chance agreement?

5  A.    In the instance I cited, yes.

6  Q.    Yes, it was a pattern of sleeping on duty, is that right,

7  more than once?

8  A.    There very well may have been repeated incidents.

9          THE COURT:  Are you guessing?

10          THE WITNESS:  I'm guessing.

11          THE COURT:  Okay, he doesn't know.

12  Q.    Okay.  You talked about proportionality and that

13  punishment should be proportional to the offense.  How would

14  you compare the seriousness of an officer who left a loaded gun

15  in a bathroom versus an officer who misplaced the gun room keys

16  inside the secure area of a post office?

17  A.    Extracting those from the specific facts in each case,

18  that leaving a loaded gun in a public area might be considered

19  more severe than -- what was the other option?

20  Q.    Misplacing your gun room keys inside the secure area of

21  the police wing.

22  A.    Abstracting everything else, one could be considered more

23  severe than the other.

24  Q.    Leaving the gun in a public bathroom would be more severe?

25  A.    Yes.

Case 1:20-cv-02566-PBC  Document 1715  Filed 08/03/20  Page 68 of 194
Case 1:14-cv-23388-PBS  Document 171  Filed 08/09/17  Page 138 of 146

3-138

```
 1   Q.   Are the two levels of severity close?  Is that a close
 2   call, or is it a significant difference, just looking at those
 3   two facts in isolation?
 4   A.   I don't really think that extrapolation, without the
 5   specific facts in each case, you can't make a reasonable
 6   determination.
 7            THE COURT:  Are you done?
 8            MR. BRADY:  Yes, I am.
 9            THE COURT:  Anything?
10            MS. WRIGHT:  I'd like to take a stab at having him
11   clarify the point that he was trying to make.
12   RECROSS-EXAMINATION BY MS. WRIGHT:
13   Q.   In talking about the levels of security in the
14   hypothetical about losing the keys, are you saying that once
15   somebody is in the secure facility and finds a key to the
16   weapons locker, that that could be considered more dangerous
17   than somebody outside the secure facility who can't get into
18   the weapons locker?
19   A.   Yes.
20   Q.   Is that what you're saying?
21   A.   Yes.
22            MS. WRIGHT:  Okay, does that clarify it for your
23   Honor?
24            THE COURT:  I think it did.  Good for you.
25            MR. BRADY:  Can I ask one clarifying question on that,
```

# Exhibit G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DIPING ANDERSON,                           )
                                           )
                    Plaintiff,             )
                                           )
v.                                         )        No. 14-cv-13380-PBS
                                           )
MEGAN BRENNAN,                             )
Postmaster General of the United States,   )
                                           )
                    Defendant.             )


**DEFENDANT MEGAN BRENNAN'S MEMORANDUM OF LAW IN SUPPORT
OF HER MOTION FOR RECONSIDERATION PURSUANT TO FED. R. CIV. P. 59(e)**


WILLIAM D. WEINREB
Acting U.S. Attorney

SHELBEY D. WRIGHT
Assistant U.S. Attorney

JASON C. WEIDA
Assistant U.S. Attorney

United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
Shelbey.Wright@usdoj.gov
Jason.Weida@usdoj.gov

*Attorneys for Defendant Megan J. Brennan,
Postmaster General of the United States*

Dated: April 14, 2017

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

ARGUMENT ......................................................................................................................5

    I.     THE DISTRICT COURT ERRED BY REVIVING UNTIMELY
          AND UNEXHAUSTED DISCRETE ACTS AND USING THEM
          AS PREDICATES TO IMPOSE TITLE VII LIABILTY IN THIS CASE. ........... 5

    II.    THE DISTRICT COURT ERRED BY RELYING ON
          "WHITE" COMPARATORS WHO WERE NOT SIMILARLY
          SITUATED TO PLAINTIFF IN ALL RELEVANT RESPECTS. ...................... 10

    III.   THE DISTRICT COURT ERRED BY MISAPPLYING
          THE CAUSATION STANDARD AND CONCLUDING THAT
          PLAINTIFF SATISFIED HER BURDEN TO PROVE CAUSATION.............. 13

    IV.   "REINSTATING" PLAINTIFF TO A
          CROSS-CRAFT POSITION AS A WINDOW CLERK
          WOULD CONSTITUTE AN ABUSE OF DISCRETION. ................................ 17

    V.    THE DISTRICT COURT ERRED BY FAILING TO
          EXCLUDE STUART GRASSIAN'S TESTIMONY
          ABOUT PLAINTIFF'S EMOTIONAL DISTRESS. ........................................... 19

CONCLUSION...................................................................................................................20

The Court committed a separate and independent error by finding that Healy and Pasquale were similarly situated with Plaintiff. Slip Op. 32. To be similarly situated, Healey and Pasquale must "have 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Perkins*, 78 F.3d at 751 (quoting *Smith v. Allen Health Sys.*, 302 F.3d 827, 835 (8th Cir. 2002)), *quoted in Ray v. Ropes & Gray LLP*, 799 F.3d 99, 114 (1st Cir. 2015) (rejecting comparators). That criterion was not satisfied for three reasons:

- ***First***, Healy and Pasquale did not engage in the same or similar conduct that led to Plaintiff's removal. They worked the night shift, also "known as Tour One (10:00 PM to 6:30 AM)." Slip Op. 3. One of their routine assignments—before such duties were delegated to contract security guards (discussed further below)—was to sit in a guard shack and check credentials for the few individuals that would enter the Boston GMF at night. The Court found that Sergeant Zanstuck "caught each of them sleeping . . . but did not impose any discipline at all." [3] *Id.* at 31-32. Given the Court's findings about Plaintiff's misconduct at an emergent situation and its potential impact on public safety, *see supra* pg. 2, sleepy night watchmen are not apples-to-apples comparators.

- ***Second***, their conduct occurred years before the paradigm shift in PPO expectations. By 2013, PPOs were handling more dangerous patrol and first-responder duties (i.e. responding to an emergent situation at another facility). Slip Op. 3. Routine assignments previously given to PPOs were delegated to contract security (i.e. sitting in a guard shack at night). *Id.* Around the same time, there were dramatic reductions in the size of the Postal Police force. *Id.* By 2013, the Postal Police Office was operating at about 50% of its previous size. *Id.* That reduction in force, coupled with more dangerous duties, meant that the job that Plaintiff experienced in 2013 was far different from the job that Healey and Pasquale had known years before. Thus, even for arguably similar conduct (and there is nothing similar about their conduct), a harsher penalty in 2013 is indicative of higher stakes, not improper motive.

---

[3] Sergeant Zanstuck did not testify at trial. Nor did Healey or Pasquale. The Court's finding about the conduct Zanstuck observed and how he decided to deal with that conduct is based entirely on the speculation and inadmissible hearsay testimony of Martha Barris, a former PPO who testified at trial on behalf of Plaintiff. The Court made that finding despite Barris's admission that, because she herself was never a supervisor, she would not have known whether a supervisor imposed discipline on another PPO. Moreover, the Court itself found that discipline "can be expunged if a PPO receives no further discipline for two years." Slip Op. 5. Thus, even if Healey and Pasquale did fall asleep on duty, the Court's finding that they were never disciplined is not supported by admissible evidence.

- **_Third_**, the relevant decisionmaker, Motrucinski, never supervised Healey or Pasquale. Although not necessarily dispositive in every case, the fact that Healey and Pasquale dealt with a different supervisor than Plaintiff is a material factor that cannot be ignored in this case. *See Rodriguez-Cuervos v. Wal-Mart Stores, Inc.,* 181 F.3d 15, 21 (1st Cir. 1999) (holding that an evaluation performed by a "different supervisor" was a "material" factor that, in conjunction with others, rendered a comparator not similarity situated to the plaintiff).[4] As discussed below, under the Postal Service system, discipline is a matter of discretion that lies with each PPO's supervisor. *See infra* Part III. A supervisor need not impose the same penalties for the same violations. Rather, each supervisor has the flexibility to determine, in his or her own discretion, what level of discipline under the circumstances is warranted to prompt a particular PPO to conform to expectations.

Comparing different conduct under different supervisors in different timeframes, as the March 16 Decision did here, was a manifest error under the circumstances of this particular case. Ironically, as Motrucinski testified, it was the inattentiveness and carelessness of other PPOs—characterized by Healey and Pasquale—that prompted Motrucinski to become a supervisor. Naturally, Motrucinski was a harsher disciplinarian than Zanstuck had been supervising Healey and Pasquale a decade earlier when the duties of a PPO were different. Motrucinski's no-nonsense

---

[4] While only some circuits view a different supervisor as dispositive, every circuit has considered a different supervisor to be a factor when the circumstances show that it is material, as it is here for the reasons explained in text. *See, e.g., Iuorno v. DuPont Pharm. Co.,* 129 F. App'x 637, 641 (2d Cir. 2005) (comparators not similarly situated because they did report to the "same supervisors"); *Opsatnik v. Norfolk S. Corp.,* 335 F. App'x 220, 223 (3d Cir. 2009) (examining whether "the two employees dealt with the same supervisor"); *Hurst v. D.C.,* No. 15-1410, 2017 WL 908208, at *4 (4th Cir. Mar. 7, 2017) (examining whether the employees "dealt with the same supervisor"); *Hoffman v. Baylor Health Care Sys.,* 597 F. App'x 231, 237 (5th Cir.), *cert. denied,* 136 S. Ct. 45 (2015) ("The record reveals that Zavala and Watkins did not share the same supervisor as Hoffman, a differentiation which is perhaps due to their working in entirely different departments of the hospital. Under our precedent, Hoffman's proffered comparators are insufficient for this reason alone."); *Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir.1992) (a comparator "must have dealt with the same supervisor" as the plaintiff); *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 618 (7th Cir. 2000) ("[D]ifferent employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable"); *Fields v. Shelter Mut. Ins. Co.,* 520, F.3d 859, 864 (8th Cir. 2008) ("[W]hen different decision-makers are involved, two decisions are rarely similarly situated in all relevant aspects"); *Vasquez v. Cty. of Los Angeles,* 349 F.3d 634, 641 n.17 (9th Cir. 2003) (citing cases that stand for same proportion); *MacKenzie v. City & Cty. of Denver,* 414 F.3d 1266, 1277 (10th Cir. 2005) ("Individuals are considered 'similarly-situated' when they (1) have dealt with the same supervisor . . . ."); *Foster v. Biolife Plasma Servs., LP,* 566 F. App'x 808, 812 (11th Cir. 2014) ("As for employee Christopher Pruitt who allegedly falsified a date in another instance, he did not report to Stevick, and his discipline was handed down by a different supervisor."); *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP,* 611 F.3d 1, 4 (D.C. Cir. 2010) (affirming district court that "found none of these employees was similarly situated to McFadden because each had a different supervisor").

approach corresponded with the severe reductions in compliment and higher expectations of a PPO, like Plaintiff, who had greater and more dangerous responsibilities.[5]

## III. THE DISTRICT COURT ERRED BY MISAPPLYING THE CAUSATION STANDARD AND CONCLUDING THAT PLAINTIFF SATISFIED HER BURDEN TO PROVE CAUSATION.

Plaintiff was required to prove that "a causal connection existed between the protected conduct and the adverse action." *Rivera-Colón v. Mills,* 635 F.3d 9, 12 (1st Cir. 2011). A "causal connection" requires that Plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2534 (2013). These precedents required Plaintiff to prove that Motrucinski would not have removed her "but for" her EEO activity. In other words, Plaintiff had to prove that, without her EEO activity, she would not have been removed.

The March 16 Decision misapplied that causation standard. Rather than require Plaintiff to show that she would not have been removed but for her *prior discipline*, Slip Op. 28, it should have required her to prove that she would not have been removed but for her *protected activity*. As relevant here, the only protected activity recognized under Title VII is Plaintiff's EEO activity. *See* 42 U.S.C. § 2000e-3 (describing protected activity); *see also Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." (quoting *Cruz v. Coach Stores Inc.,* 202 F.3d 560, 566 (2nd Cir. 2000))); *id.* ("An employee has engaged in activity protected by Title VII if she has either (1)

---

[5] The March 16 Decision also referenced an unnamed, out-of-state individual who "was removed for sleeping on duty" only after being "subject to a last-chance agreement." Slip Op. 43. If the Court intended to use that individual as a comparator, doing so was error. There was no evidence as to the identity of that individual, the gravity of that individual's misconduct, when that misconduct occurred, where it occurred, or under whose supervision. Moreover, the sparse record evidence regarding that individual demonstrates that he or she could not be a true comparator because, as Charles Zekan testified, the CBA applicable in this case did *not* give Plaintiff the option of a "last-chance agreement." In all events, the Brockton fire-scene incident was not the first time Plaintiff had been caught appearing as if asleep on duty. Henry Pare provided uncontroverted testimony that, when he supervised Plaintiff between 2005 and 2006, he disciplined her after finding her asleep in her cruiser while on duty and warned her not to do it again.

13

reliably apply DSM to reach diagnosis of "Major Depression with post traumatic stress disorder features").[10] Grassian's *ipse dixit* should have been excluded, not used as a basis for damages.

## CONCLUSION

For all of the foregoing reasons, Defendant respectfully requests that this Court reconsider its March 16 Decision and enter judgment in favor of Defendant on Count II of the Complaint. Alternatively, if it will not reconsider liability, the Court should reconsider its decision ordering Plaintiff's reinstatement and eliminate the award attributable to Plaintiff's emotional distress.

Respectfully submitted,

MEGAN J. BRENNAN
Postmaster General
of the United States

By her attorneys,

WILLIAM D. WEINREB
Acting U.S. Attorney

By:     /s/ Jason C. Weida
        Shelbey D. Wright (BBO No. 562180)
        Jason C. Weida (BBO No. 663097)

---

[10] *Accord United States v. Wooden*, 693 F.3d 440, 452 n.4 (4th Cir. 2012) ("The DSM is widely recognized as the authoritative reference used in diagnosing mental disorders."); *Overstreet v. Wilson*, 686 F.3d 404, 412 (7th Cir. 2012) ("The DSM is widely recognized as the authoritative source for information about various mental conditions."); *United States v. Friedlander*, 395 F. App'x 577, 581 (11th Cir. 2010) ("[T]he district court committed no error in precluding testimony about the prevalence of 'internet fantasy.' The court noted that the expert's opinion was unreliable as it was not based on the DSM IV or quantifiable scientific methodology."); *United States v. Long*, 562 F.3d 325, 334, n. 22 (5th Cir. 2009) ("We take judicial notice of [the DSM's criteria] as the DSM-IV's authoritative nature makes the criteria 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' Fed. R. Evid. 201(b)."); *Fuller v. J.P.Morgan Chase & Co.* 423 F.3d 104, 107 (2d Cir. 2005) (recognizing the DSM-IV as "an objective authority on the subject of mental disorders"); *Carradine v. Barnhart*, 360 F.3d 751, 770 (7th Cir. 2004) (describing DSM as "a definitive psychiatric authority on mental disorders."); *United States v. Cantu*, 12 F.3d 1506, 1509 n.1 (9th Cir. 1993) (taking judicial notice that a condition listed in the DSM is a recognized psychiatric condition); *United States v. Johnson*, 979 F.2d 396, 401 (6th Cir. 1993) ("We take judicial notice of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (3d ed. Rev. 1987)" regarding the definition of a particular disorder.); *Rowland v. Mad River Local School District*, 730 F.2d 444, 454 (6th Cir. 1984) ("The DSM [II] is one of the most authoritative diagnostic manuals for the conduct of psychiatric examinations in the United States."); *Buttrum v. Black*, 721 F. Supp. 1268, 1309 (N.D. Ga. 1989) (describing DSM-III as "the American Psychiatric Association's authoritative reference source for diagnosis"); *Rush v. Johnson*, 565 F. Supp. 856, 868 (N.D. Ga. 1983) (referring to the DSM as "an authoritative text which is an expression of the consensus of the professional psychiatric community as of 1980").

|  | Assistant U.S. Attorneys |
|---|---|
|  | United States Attorney's Office |
|  | John Joseph Moakley U.S. Courthouse |
|  | 1 Courthouse Way, Suite 9200 |
|  | Boston, MA 02210 |
|  | (617) 748-3100 |
|  | Shelbey.Wright@usdoj.gov |
| Dated:  April 14, 2017 | Jason.Weida@usdoj.gov |

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants via First Class Mail.

*/s/ Jason C. Weida*
Jason C. Weida
Dated:  April 14, 2017                    Assistant U.S. Attorney

# Exhibit H

Nos. 17-2162, 17-2170

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

DIPING Y. ANDERSON,

Plaintiff-Appellant/Cross-Appellee,

v.

MEGAN J. BRENNAN, Postmaster General

Defendant-Appellee/Cross-Appellant.

On Appeal from the United States District Court
for the District of Massachusetts

## BRIEF FOR APPELLEE/CROSS-APPELLANT

CHAD A. READLER
  *Acting Assistant Attorney General*

ANDREW E. LELLING
  *United States Attorney*

JASON C. WEIDA
  *Assistant United States Attorney*

MARLEIGH D. DOVER
ANDREW RHORBACH
JENNIFER UTRECHT
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7710*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9039*

# TABLE OF CONTENTS

<u>Page</u>

STATEMENT OF JURISDICTION ......................................................... 1

STATEMENT OF THE ISSUES ............................................................. 1

STATEMENT OF THE CASE ................................................................ 2

I.    Factual Background ........................................................................ 3

    A.    Anderson's Disciplinary Record.......................................... 4

    B.    The Brockton Fire............................................................... 9

    C.    Prior Proceedings ............................................................. 11

        1.    Initial Decision ........................................................ 12

        2.    Reconsideration of Liability.................................... 15

        3.    Reconsideration of Remedy..................................... 17

SUMMARY OF ARGUMENT .............................................................. 19

STANDARD OF REVIEW.................................................................... 23

ARGUMENT ....................................................................................... 24

I.    Anderson Was Properly Removed From the Postal Service............. 24

    A.    The District Court's Liability Finding Was Based in Significant Part on Its Consideration of Improper Comparative Evidence............. 28

    B.    The District Court Erred in Basing Its Finding of Retaliation on the Improper Consideration of Untimely, Unexhausted Prior Disciplinary Actions.................................................................. 35

II.    The District Court's Remedial Decisions Were a Proper Exercise of Its Discretion.................................................................................... 42

A.   The District Court's Decision to Reconsider Reinstatement Was
Based on Evidence Properly Before the Court ........................................ 42

B.   The District Court Properly Exercised Its Discretion to Not
Reopen the Record After Trial to Allow Extrinsic Evidence of
Front Pay ............................................................................................... 48

CONCLUSION ................................................................................................. 53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## STATEMENT OF THE CASE

This appeal arises out of a lawsuit under Title VII of the Civil Rights Act of 1964 asserting that the United States Postal Service's decision to terminate the employment of plaintiff Diping Anderson was racially discriminatory and retaliatory. Anderson worked for the Postal Service as a Postal Police Officer (PPO) at the General Mail Facility (GMF) in Boston, Massachusetts from 2000 until 2013. When Anderson became a PPO, the job consisted primarily of providing access security to the GMF from inside guard shacks that were positioned at the entrance and exit of the facility. Over time, however, the force took on more significant and dangerous responsibilities.

Anderson's last few years at the Boston facility were marred by a variety of misconduct for which she was disciplined. Much of this discipline was dispensed in response to her inattention to the procedures necessary to safely and competently perform her job. Anderson's inattention to her duties escalated until June 2013, when Anderson was sent, on overtime, to guard a mail processing plant that housed an employee credit union. The plant (which also housed the employee credit union) had been badly damaged by a fire which left a gaping hole in the side of the building. Despite explicit instructions to stand outside her police cruiser and provide a visible, police presence in order to prevent unauthorized access to the unsecured and heavily damaged building, Anderson was observed two separate times that day, sitting inside her police cruiser, appearing as if asleep and making personal calls on her cell phone.

2

The Postal Service investigated Anderson's conduct and ultimately removed her from her position.  After a seven-day bench trial, the district court determined that although Anderson's conduct was worthy of discipline, this punishment was disproportionately severe and motivated by retaliatory animus.

## I.    Factual Background

The Postal Police are a uniformed police force tasked with ensuring the safety of postal facilities throughout the country.[1]  The role of the Postal Police has dramatically changed since its inception.  Initially, the officers were primarily responsible for maintaining security watches at vehicular entry points and checking identification at entry posts around postal facilities.  *See, e.g.*, A.3 ("Previously, PPOs were mainly responsible for security watches at entry posts and guard posts."); App.723 ("When I first started there [in 1998] our job was to sit in a booth and push a button for a control gate, and that's all we did eight hours a day."); App.318.[2]

Beginning around 2001, the Postal Service began to contract with private security to handle the entry access work, and the size of the Postal Police force began to shrink.  A.3.  The PPOs who remained took on more significant and challenging responsibilities, including "respond[ing] to burglar alarms, robberies, assaults . . . [and] all manner of emergency situations." App.319, App.723, A.3.  With more

---

[1]  PPOs should be distinguished from Postal Inspectors, who investigate crimes involving the U.S. mail and do not wear uniforms.  App.1062.

[2]  Throughout this brief, citations to the appendix take the form "App.XX" and citations to the addendum of this brief take the form "A.XX."

responsibilities and less people on the force, the job of a PPO became "continually . . . . more challenging" and dangerous each year.  App.319, App.1005-06.

Anderson became a PPO in 2000, before the dramatic shift in PPO responsibilities.  Her superiors considered her to be a "difficult" employee; one who frequently attempted to find the "easy way out" or "take shortcuts," and someone who had issues "following the chain of command."  App.353-54.  These issues became more serious as the responsibilities of PPOs increased, and Anderson was disciplined in her last few years at the GMF for a variety of misconduct, including failing to carry her firearm in the performance of her official duties, failing to properly protect and secure her firearm upon the completion of her duties, and failing to obey direct orders from her supervisors.

## A.    Anderson's Disciplinary Record

The Postal Service uses a progressive discipline system for its PPOs with six progressively increasing levels of discipline:  (1) informal counseling or discussions, (2) formal counseling, (3) letters of warning, (4) seven-day suspensions, (5) fourteen-day suspensions, and (6) removal.  *See* A.5.  Although discipline generally begins at the more informal level and gradually increases, a first offense, if severe, need not be addressed with the lowest level of discipline.  Under the Postal Service's system, neither informal nor formal counseling is recorded in a PPO's personnel file, although the sergeant who administered the counseling may keep the notes in his filing cabinet.

Pasquale's tenure as PPOs, and that he never approved of Pasquale and Healey

sleeping on duty. App.300. Indeed, he viewed their conduct as a safety violation, and

specifically noted that as "emergency responding personnel," PPOs need to be "alert

and available to respond to various situations." App.300, 316. This was true even in

the guard shack, because their "weapon[s] could potentially be unsecured or available

to someone if you're not awake, you know, to look after it." App.316.

Motrucinski further testified that he became a supervisor partly in response to

the type of misconduct and inattentiveness engaged in by Healey and Pasquale. He

took pride in the fact that the Postal Police force had evolved from routine security

work to more dangerous police work, and he wanted to "be a part of that movement

forward" by ensuring that officers took their jobs seriously. App.317 Thus, that

Healey and Pasquale had not been disciplined by another supervisor for falling asleep

on the job does not reflect retaliatory animus by Motrucinski, but rather that

Motrucinski "had different expectations" of Anderson than Healey and Pasquale's

supervisor had of them. *Rodriguez-Cuervos*, 181 F.3d at 21.

Finally, the drastically different circumstances under which Healey and

Pasquale had been inattentive to their duties make them inappropriate comparators to

Anderson. Even after the paradigm shift in PPO responsibilities began, Healey and

Pasquale worked the night shift, between 10:00 PM and 6:30 AM, and were tasked

with sitting in a guard shack in the parking lot and checking the credentials for the few

individuals who would enter the Boston facility at night. App.155. Their

32

inattentiveness did not occur during an emergent situation where there was a significant, immediate threat to public safety. Indeed, as Motrucinski explained at trial, it is far "less dangerous" to be inattentive while at a guard post, because that is a static situation that will rarely catch someone off guard. App.321.

By contrast, Anderson's inattention to duty occurred during an emergent situation. She was specifically tasked with the duty of standing outside of her vehicle, near the gaping hole in the wall of a large mail processing plant, so that she could provide a visible, uniformed police presence and deter unauthorized access to the unsecured and unsafe building. She intentionally disregarded these instructions, even after she had been warned, and her termination for this misconduct is indicative of the higher stakes involved, not of a retaliatory motive.[6]

The court's erroneous reliance on Healey and Pasquale as comparators, moreover, was not harmless. As the court agreed, the decision to impose discipline on Anderson had an obvious "legitimate, nondiscriminatory and nonretaliatory justification." A.33. The court found fault only with the fact that the penalty chosen seemed disproportionately harsh compared to the treatment of these two PPOs years earlier, and Healey and Pasquale were the only PPOs whose conduct the court considered to be sufficiently similar to discuss. The court also noted the general fact

---

[6] Another significant difference between Anderson and the two other PPOs is her disciplinary record. By the time she was stationed at the Brockton fire, Anderson had a significant history of carelessly performing her duties. But there was no evidence presented at trial that Healey and Pasquale had any live discipline in their file.

# Exhibit I

UNITED STATES OF AMERICA

+  +  +  +  +

UNITED STATES POSTAL SERVICE

+  +  +  +  +

```
-----------------------------------
IN THE MATTER OF                    :
                                    :

THE INTEREST ARBITRATION OF:        :
                                    :
Fraternal Order of Police,          :
National Labor Council USPS No. 2   :
                                    :
       Union                        :
                                    :

and                                 :
                                    :
United States Postal Service,       :
                                    :
       Agency.                      :
-----------------------------------
```

                    Wednesday
                    March 26, 2008

                    United States Postal Service
                    Room 1-P-410
                    475 L'Enfant Plaza, SW
                    Washington, D.C. 20260


        The above-entitled matter came on for
arbitration, pursuant to notice, at
9:30 a.m.

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

BEFORE THE PANEL:

       HERBERT FISHGOLD, Chair
       2300 M Street, NW
       Suite 800

       Washington, D.C. 20037
       202-416-1837
       202-293-3083 (fax)

       RICHARD S. EDELMAN, Arbitrator
       O'Donnell, Schwartz, & Anderson, P.C.
       1300 L Street, NW

       Suite 1200
       Washington, D.C. 20005
       202-898-1707
       202-682-9276 (fax)
       REDELMAN@ODSALAW.com

       KEVIN B. RACHEL, Arbitrator

       Manager, Collective Bargaining &
          Arbitration
       Labor Relations
       United States Postal Service
       Room 9416
       475 L'Enfant Plaza, SW
       Washington, D.C. 20260
       202-268-3812


APPEARANCES:


       On Behalf of the Union:

          JOSEPH V. KAPLAN, ESQ.

          Passman & Kaplan, P.C.
          1090 Vermont Avenue, NW
          Suite 500
          Washington, D.C. 20005
          202-789-0100 ext. 105
          202-789-0101 (fax)
          Jkaplan@passmanandkaplan.com

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

On Behalf of the Agency:

      STEPHAN J. BOARDMAN, ESQ.
      Chief Counsel, Labor Relations
      Appellate Counsel

      United States Postal Service
      475 L'Enfant Plaza, SW
      Washington, D.C. 20260
      202-268-7114
      202-268-4997 (fax)
      Stephan@.j.boardman@usps.gov


      BRIAN REIMER, ESQ.
      Labor Counsel
      United States Postal Service
      Room 6446
      475 L'Enfant Plaza, SW
      Washington, D.C. 20260
      202-268-3037


      ROBERT L. SAWICKI, ESQ.

      Deputy Managing Counsel

      Law Department-Philadelphia

      Field Office

      United States Postal Service

      P.O. Box 40595

      Philadelphia, PA 19197


      215-931-5070

      215-931-5092 (fax)

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

Page 411

I-N-D-E-X

WITNESSES          DIRECT CROSS REDIRECT RECROSS

Peter Bernstein    419   474

Zane Hill, Jr.     491   509   551      556

Albert Jenkins     582

E-X-H-I-B-I-T-S

Union

Exhibit No./Document              MARK RECD

1    U.S. Postal Inspection Service   544  544

     Locality Pay 2007

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

Page 491

1                    (Whereupon, the foregoing matter

2                    went off the record at 11:21 a.m.

3                    and went back on the record at

4                    11:37 a.m.)

5                    MR. SAWICKI:  Mr. Chairman, I'd

6        like to the postal service's next witness.

7                    CHAIRMAN FISHGOLD:  Yes.

8                    MR. SAWICKI:  Zane Hill.

9                      DIRECT EXAMINATION

10                   BY MR. SAWICKI:

11       Q     Mr. Hill, could you state your

12       complete name for the record, please?

13       A     Yes.  Zane Morrison Hill, Jr., I'm

14       the Deputy Chief Postal Inspector.

15       Q     And could you give us a brief

16       description of your postal employment history?

17       A     I joined the postal inspection

18       service out of law school in 1979.  I was

19       assigned as a field inspector, Fort Worth

20       Division until 1987.  Came to headquarters to

21       the inspection service counsel's office from

22       '87 to 2000.  In 1999 I was promoted to our

Page 492

1          deputy counsel position.  Move to Memphis as

2          inspector in charge of our Memphis field

3          office in 2000.  In '02 came back to the newly

4          created position for inspector in charge of

5          dangerous mail investigations following the

6          anthrax mailings and 9/11.  In 2006 was

7          promoted to the assistant chief inspector

8          position for investigations in security.  In

9          January of 2007 was promoted to deputy chief

10         inspector.

11              Q    And could you give us your full

12         title?

13              A    Deputy Chief Postal Inspector for

14         Homeland Security.

15              Q    And how long have you held this

16         particular position?

17              A    Fifteen months.

18              Q    And to whom do you report?

19              A    Director to the Chief Postal

20         Inspector.

21              Q    I'd like to turn your attention to

22         a document that's in the binder in front of

Page 524

1        situation where a carrier is on route and a

2        postal police officer is directed to report to

3        the carrier.  They would leave their station,

4        get in the patrol car, drive whatever the

5        distance is and meet up with the carrier or do

6        whatever needs to be done?

7             A     If they were directed to do so,

8        yes.

9             Q     Okay.

10                  CHAIRMAN FISHGOLD:  Can I just

11       give an example?  I want to think on the

12       ladder if I could to try to flesh this out a

13       little bit more.

14                  Assume for the moment that a PPO

15       is directed to respond to a call from a

16       carrier who feels threatened or being

17       assaulted, or whatever, and upon arrive, PPO's

18       arrival, the individual or individuals who

19       caused this carrier to make that phone call

20       are still there.  What authority does the PPO

21       have vis-a-vis those individuals?

22                  THE WITNESS:  The people that are

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

Page 525

1        there in his presence?

2                    CHAIRMAN FISHGOLD:  Yes.

3                    THE WITNESS:  He could apprehend

4        them.

5                    CHAIRMAN FISHGOLD:  Okay.

6                    THE WITNESS:  In fact, the carrier

7        says, that's the one that assaulted me, then

8        he can make that apprehension.

9                    CHAIRMAN FISHGOLD:  So he could

10       restrain him and, in effect, initiate an

11       arrest if it were?

12                   THE WITNESS:  He would contain him

13       there and then it would be a 911 response or

14       postal inspectors would respond at that point.

15       It's control the situation --

16                   CHAIRMAN FISHGOLD:  Until someone

17       else arrives?

18                   THE WITNESS:  Secure and control,

19       yes, sir.

20                   CHAIRMAN FISHGOLD:  Okay.

21                   BY MR. KAPLAN:

22           Q     And the postal police officers,

8d0b39f0-574d-4918-bdd0-2e19ba6235c0

1        within the scope of their duties, can be

2        responsible for transporting suspects to local

3        jail facilities, correct?

4            A    At the direction of the inspectors

5        that would be with them, yes.

6            Q    To your knowledge, are there

7        situations when postal police officers arrive

8        on a scene before an inspector does?

9            A    Yes.  There are situations where

10       that does occur.

11           Q    And the postal police officer

12       would be expected to subdue a violent

13       situation if that was going on?

14           A    Based on their training, they

15       could most certainly do that, yes.

16           Q    And that would include, for

17       example, having restrain a suspect by

18       handcuffing them?

19           A    By handcuffing them, yes.

20           Q    Effecting an arrest as well?

21           A    As necessary, yes.

22           Q    And that would also involve

1        providing the suspect their constitutional

2        rights, commonly known as Miranda rights?

3            A     There would be no reason for them

4        to do that because they would not be

5        questioning the suspect.  That would be beyond

6        the scope of their response.

7            Q     So is it your testimony the PPOs

8        do not mirandize suspects?

9            A     I can't say that they don't

10       mirandize.  The incident that you described,

11       they would not be required to do Miranda

12       because they're not to interrogate the

13       suspect.

14           Q     And to your knowledge are there

15       situations where the postal police officer

16       arriving at a scene will have a discussion

17       with the inspector and the inspector will say

18       -- I'm just paraphrasing it -- I'm not showing

19       up, but here's what you are to do?

20           A     Could that happen?

21           Q     Yes.  Does that happen?

22           A     I don't know if it does happen.

# Exhibit J

414

```
        BEFORE THE BOARD OF INTEREST ARBITRATION

------------------------------:
In the Matter of:             :
                              :
  UNITED STATES POSTAL SERVICE :
                              : Volume 3
          and                 : (Pgs. 414 to 613)
                              :
  POSTAL POLICE OFFICERS       :
     ASSOCIATION               :
------------------------------:
```

                              Washington, D.C.
                    Thursday, January 16, 2014


The following pages constitute the proceedings

held in the above-captioned matter at the

United States Postal Service, 475 L'Enfant Plaza,

Southwest, Washington, D.C. before Erick M.

Thacker, RPR, of Capital Reporting Company, a

Notary Public in and for the District of Columbia,

commencing at 9:39 a.m., when were present on

behalf of the respective parties:

## Capital Reporting Company
### Postal Police Officers  Association Arbitration 01-16-2014 Volume III

415

1          A P P E A R A N C E S
2  Before Arbitrators:
3      James C. Oldham, Impartial Chair
4      Robert A. Dufek, USPS Member
5      James Bjork, PPOA Member
6  On behalf of the PPOA:
7      ARLUS J. STEPHENS, ESQUIRE
          DONNA MCKINNON, ESQUIRE
8      MURPHY ANDERSON, PLLC
          1701 K Street, Northwest
9      Suite 210
          Washington, D.C. 20006
10     (202) 223-2620
11  On behalf of the U.S. Postal Service:
12     TERESA A. GONSALVES, ESQUIRE
          JULIENNE BRAMESCO, ESQUIRE
13     United States Postal Service
          475 L'Enfant Plaza, Southwest
14     Washington, D.C. 20260
          (202) 268-6704
15
     ALSO PRESENT:
16
          Chris Vitolo, PPOA
17     Eric Freeman, PPOA
          Joshua Pierce, PPOA
18     Mike Plaugher, PPOA
          Shawn Fletcher, PPOA
19     Joe Alexandrovich, USPS
          Sonya J. Penn, USPS
20     Katherine P. Sullivan, USPS
          Janet Peterson, USPS
21
22          * * * * *

416

1          C O N T E N T S
2  WITNESS:     DIRECT  CROSS  REDIRECT
  RECROSS
3  ERIC FREEMAN     417   446   452   454
4  DERRICK FREEMAN  455   485   495    --
5  RONALD HRUBEC    500   521    --    --
6  ERIC JORDAN      532   550    --    --
7  WILLIAM SCARPELLO  565  572   --    --
8  BRIAN FERRETTI   592   604    --    --
9
10
11
12
13
14
15
16
17  (Exhibit books were tendered to the arbitrator.)
18
19
20
21
22

417

1          P R O C E E D I N G S
2          ARBITRATOR OLDHAM:  Folks, I think
3  we're ready to get underway.  Okay.  Arlus,
4  proceed.
5          MR. STEPHENS:  Okay.  Thank you.
6          ARBITRATOR OLDHAM:  You'll need to be
7  sworn in by the court reporter.
8  WHEREUPON,
9               ERIC FREEMAN
10  called as a witness, and having been first duly
11  sworn, was examined and testified as follows:
12          THE WITNESS:  Yes.
13          DIRECT EXAMINATION BY COUNSEL FOR
  THE
14          UNION
15  BY MR. STEPHENS:
16     Q    Can you please state your name for the
17  record?
18     A    Eric Freeman.
19     Q    And by what agency are you employed?
20     A    United States Postal Inspection
21  Service.
22     Q    And what position do you hold?

418

1     A    Postal Police Officer.
2     Q    When were you hired as a police
3  officer?
4     A    In February of 2002.
5     Q    And where did -- where did you do your
6  police academy training?
7     A    At the Federal Law Enforcement Training
8  Center in Glynco, Georgia.
9     Q    And, Officer Freeman, to what -- what
10  Postal Police Officer division have you been
11  assigned?
12     A    Washington Division.
13     Q    And to what facility within the
14  Washington Division are you presently assigned?
15     A    I'm presently at the Brentwood
16  facility, Washington, D.C.
17     Q    Okay.  Have you worked in other
18  facilities --
19          ARBITRATOR OLDHAM:  Arlus, excuse me.
20  We were fumbling with this table for a moment.
21          MR. STEPHENS:  Sure.
22          ARBITRATOR OLDHAM:  We're getting it

531

1  of the United States.  So it's still the same
2  company, but it's just run differently.
3        ARBITRATOR DUFEK:  And similarly, going
4  west, if you're the Norfolk Southern or the C&O
5  --
6        THE WITNESS:  Missouri Pacific.
7        ARBITRATOR DUFEK:  -- you're -- you're
8  stopping at that -- at those yards?
9        THE WITNESS:  All -- all -- all the
10  freights doesn't come through the station.  Only
11  the passenger trains.  Ever since we took over in
12  1976, they gave up all the passenger trains, and
13  we took them.
14        ARBITRATOR DUFEK:  Thanks.
15        THE WITNESS:  You're welcome.
16        ARBITRATOR DUFEK:  I appreciate it.
17        THE WITNESS:  You're welcome.
18        ARBITRATOR OLDHAM:  Thank you.
19        (Witness excused.)
20        ARBITRATOR DUFEK:  Can't let those
21  moments pass.
22

533

1  facility in New York to which you're assigned?
2        A   I'm assigned currently at JFK
3  International Airport.
4        Q   Okay.
5        ARBITRATOR OLDHAM:  Date of hire?
6        THE WITNESS:  February 2nd, 1996.
7  BY MR. STEPHENS
8        Q   And, Officer Jordan, where did you do
9  your police academy training?
10        A   At the Federal Law Enforcement Training
11  Center in Glynco, Georgia.
12        Q   And, Officer Jordan, did you hold a
13  position with the Postal Service before you
14  became a police officer?
15        A   No, I did not.
16        Q   I want to ask you about JFK.  What --
17  what do you do -- what are -- what is your -- do
18  you guard a fixed post at JFK?
19        A   We only have one officer that's
20  responsible for a fixed post at JFK.
21        Q   And --
22        A   We have foot and mobile patrols through

532

1  WHEREUPON,
2              ERIC JORDAN
3  called as a witness, and having been first duly
4  sworn, was examined and testified as follows:
5        THE WITNESS:  I do.
6        DIRECT EXAMINATION BY COUNSEL FOR
THE
7        UNION
8  BY MR. STEPHENS
9        Q   Please state your name for the record,
10  please.
11        A   Eric Jordan.
12        Q   And by what agency are you employed?
13        A   United States Postal Inspection
14  Service.
15        Q   And in what position are you employed?
16        A   I'm a Postal Police Officer.
17        Q   And, Officer Jordan, in what -- what
18  division of the -- which geographic juris- --
19  which geographic division of the Postal Police
20  Officer are you with at the time?
21        A   New York.
22        Q   Okay.  And is there a particular

534

1  the facility, and we have ramp patrols out in the
2  sterile -- the sterile AOA area of the airport.
3        Q   Now, the -- the officer who's assigned
4  to guard the fixed post, what -- who comes
5  through that particular post?
6        A   Postal employees, airline employees,
7  airline contract employees, United States
8  Customs, United States Fish and Wildlife.  About
9  12 to 14 other agencies also come through there.
10        Q   Okay.  What do -- when you're on a
11  mobile patrol at JFK, are you on the tarmac?
12        Do you -- let me ask you this:  Where
13  do you do your mobile patrol at JFK?
14        A   The mobile patrol is the facility that
15  we're stationed at, Building 250 at JFK.  Up
16  until last year, we had a second facility at the
17  airport, which has been closed.  There was a
18  third facility we rented occasionally to handle
19  Christmas mail, and now it's -- we're down to one
20  facility and renting a second one to handle the
21  overflow for Christmas.
22        Q   Okay.  And when you are on a -- a

# Capital Reporting Company
## Postal Police Officers  Association Arbitration 01-16-2014 Volume III

535

1  patrol, a vehicle patrol at JFK, what are you
2  charged with looking for?
3      A   Well, what we're trained to do is make
4  sure that postal equipment is secured, the mail
5  is secured, the mail is being delivered timely
6  and it's not being misappropriated or rifled.
7      Q   Do you know -- I didn't ask you about
8  this when we -- but do you know how much mail
9  comes through JFK?  Do you have any way --
10     A   I --
11     Q   -- of describing --
12     A   I guess if I had a piece of paper, I
13 could make some sort of rough estimate, but at --
14 during my tour of duty, it would be -- at least
15 several hundred cargo cans of mail would be --
16 would just go through the post office, not even
17 through the airport, because there's a lot of
18 transfer mail in the airport that doesn't even
19 come into our facility, and each one of them
20 would contain 40 or 60 bags of mail apiece.
21     Q   Is it fair to say there's a lot of mail
22 that moves through JFK?

536

1      A   Yes, there is.
2      Q   So tell me about the types of mail
3  crimes that can occur at JFK that you run across
4  in your -- in your daily duties.
5      A   Well, unfortunately, we run across a
6  lot of mail theft at JFK due to the fact that
7  the -- the mail actually leaves the post office's
8  hands at JFK.  Career employees with the Postal
9  Service actually happen to take very good care of
10 the mail as they're processing it, as a general
11 rule of thumb.
12         The mail is passed on to the airlines
13 to be handled.  The airlines want to make as much
14 money as possible, and now, since they've gotten
15 rid of a lot of their union, they hire contract
16 employees.  The -- the contract employees are
17 actually employed by outside agencies.  There's
18 Jetway.  There's Evergreen, this -- this entire
19 slew of them based at JFK airport.  And,
20 unfortunately, they have a lot of turnover,
21 because the employees, since they're working for
22 minimum wage, a lot of them actually don't pass

537

1  the background checks.  So in 60 days, when the
2  background check clears, they're -- they quit and
3  go on to another agency.
4      Q   They're --
5      A   They tend to supplement their salaries
6  with stealing from the airport.  And,
7  unfortunately, with a lot of -- in an
8  international airport, we require people to put
9  customs stickers on their mail.  So we have a big
10 sign on their mail saying, guess what's in this
11 box?  It's an iPod I'm sending to grandma or it's
12 a laptop being sent home from --
13     Q   And that --
14     A   -- a military person --
15     Q   And those stickers appear on the
16 outside of --
17     A   Yes.
18     Q   Okay.  So the -- describe how the mail
19 actually moves when it -- when it -- after it has
20 left the custody of the post office and before
21 it's being placed onto a plane.
22     A   All right.  When it's still on the

538

1  property at the post office, these -- the
2  contract employees of the service companies that
3  work for the airlines will load the mail into
4  either a luggage cart, which is a large
5  rectangular cart, four wheels, and both sides are
6  secured with curtains, or a cargo container,
7  which would be a U or half a U, inverted U-shaped
8  metal or plexiglass container that fits into the
9  cargo area of an airplane.
10     Q   Are those curtains always closed?
11     A   No, unfortunately.  They -- the airline
12 police get lazy.  They'll overfill the -- the
13 containers so that you can't physically close the
14 curtain.  They'll just not close the curtain,
15 because that's too much work, or they might end
16 up with too much mail and just start piling it on
17 top of the container on top of the cart.
18     Q   But all of the mail remains inside of
19 the cart when it's transferred?
20     A   No.
21     Q   What happens to it?
22     A   The second the cart moves, the mail --

Capital Reporting Company
Postal Police Officers  Association Arbitration 01-16-2014 Volume III

539

1 the mail bags shift and tend to start falling out
2 of the container.  One of the pictures I
3 forwarded to your office was a trail of -- of
4 destroyed mail because a bag of mail fell out and
5 was dragged along by all the vehicles moving
6 along the roadway.
7     Q    That exhibit, alas, did not make it
8 into the exhibit book.  There were -- we had to
9 claim credit for editorial reduction of the
10 number of photographs, but I do want to direct
11 your attention to a couple of photographs.
12         ARBITRATOR OLDHAM:  It's not Exhibit
13 40?  No, that's an automobile.  Sorry.
14         MR. STEPHENS:  It's just before that.
15 It's Exhibits 38 and 39.  Oh, not 38.  I'm sorry.
16 It is Exhibit 40.  I'm sorry.  You were correct.
17         So turning to Exhibit 40, the -- I
18 assure the panel the color photograph
19 actually was -- showed a little bit more.
20 BY MR. STEPHENS
21     Q    But can you tell us -- describe,
22 Officer Jordan, what we're seeing here?

540

1     A    What you're seeing is that, one night,
2 I had been on a ramp patrol, and I discovered a
3 container of mail inside an unused, abandoned
4 building in the airport.
5     Q    Can I ask you why -- how did you come
6 to discover it?  What -- what led you to visit
7 that abandoned building?
8     A    Since I knew the building -- the
9 building itself wasn't being used, but it was
10 adjacent to one of the companies that handles
11 mail in the airport.  I -- once I was done
12 walking around the property of the -- the -- MSN
13 is the company -- name of the company.  Their
14 building, I felt -- I would walk around the
15 connected building just to make sure there was
16 nothing -- no evidence of any crimes there, and
17 that's --
18     Q    And why would you think there would
19 be -- why would you think there might be evidence
20 of a crime near that -- near MSN?
21     A    If -- if one of the airline employees
22 decides to have a crime of opportunity, they see

541

1 one piece of mail, and that's the one piece of
2 mail that they want to take.  The problem is, it
3 isn't the contents of the mail, because once they
4 have the contents of the mail, they're pretty
5 much home free.  It's the actual wrapper of the
6 mail itself that's going to lead it back to them
7 and get them caught, so that's the part that they
8 have to get rid of.
9         So while I'm out on my patrol, I'll
10 make sure to get out of the car, walk through
11 abandoned buildings, look in dumpsters, look in
12 garbage cans, look in empty contains to see if
13 there is any evidence that someone is rifling
14 mail.
15     Q    And when you're looking in a dumpster
16 do you use like a -- like a telescopic mirror to
17 try and see what's inside a dumpster?
18     A    No.  I climb in the dumpster.
19     Q    And what have we -- in Union Exhibit
20 40, what -- are we looking at something that was
21 found in a dumpster?
22     A    This was found -- No. 40 and 41, this

542

1 was actually found inside of a container --
2     Q    Okay.
3     A    -- in the empty building.
4     Q    When you say container, what kind of --
5     A    It's a --
6     Q    -- container?
7     A    It's an inverted U metal tube -- it's
8 usually made of aluminum or aluminum and
9 plexiglass -- that is filled with cargo or mail.
10 That way, they can slide it directly inside the
11 body of a plane when they're loading it.
12     Q    I see.
13     A    That way, it saves time, and it
14 supposedly keeps airline workers from actually
15 having to physically contact the mail since it's
16 sealed in a box, and that box fits right in the
17 plane.
18     Q    So this mail --
19     A    I saw equipment inside the building.
20 So I just walked in, just looked inside to see
21 what was in the equipment, and I found that this
22 container was still filled with mail that had

Capital Reporting Company
Postal Police Officers  Association Arbitration 01-16-2014 Volume III

543

1  been sitting out on the tarmac for several weeks.
2      Q   Now, how were you -- how were you able
3  to identify it as mail?
4      A   The -- the sacks say -- these sacks,
5  since this is domestic mail, these sacks actually
6  say U.S. mail.  We can also -- we've been taught
7  to read the codes on -- there's a flight tag on
8  each bag that contains the information on
9  where -- what the contents of the bag is, the
10  weight of the bag, where the bag came from and
11  its destination, the time, the flight it's
12  supposed to take.
13      Q   Now, how many bags of -- by the way,
14  how many vehicles were -- are in this photograph?
15      A   There's -- there's two vehicles covered
16  with mail in this photograph, because I had asked
17  another officer to come out on the ramp to help
18  me transport this mail back.  He came from the
19  other direction of the building, and he found a
20  container full of mail.
21      Q   And so these were -- and who called to
22  tell you that the mail was in these --

544

1      A   No one called to tell me.  This is
2  while I was patrolling the building.  I saw
3  unused equipment, and I went to see if -- make
4  sure it was empty unused equipment.
5      Q   And how many bags of mail ultimately
6  did you recover, you and your partner?
7      A   I believe there was 17 in total.
8      Q   Okay.  Is it unusual to recover bags of
9  mail like this?
10      A   It's --
11      Q   Let me -- is it unusual to recover this
12  much mail?
13      A   No.
14      Q   Okay.  How -- how often do you come
15  across in your daily patrol?
16      A   If I'm assigned to the ramp, I will
17  usually have two to three incidents a day of
18  recovered intact mail, recovered rifled mail,
19  delayed Express Mail.
20      Q   That you run across?
21      A   Yes.
22      Q   Let me direct your attention two

545

1  photographs later.  What are we looking at here?
2  This is -- along the left side of this
3  photograph, the top, it says waste.
4      A   This is a -- a 33-yard dumpster that
5  was -- happened to be in front of the same
6  building that the mail from the last one came
7  from.
8      Q   And where did you find this mail?
9      A   This mail -- this is some of the mail
10  that was in that dumpster.
11      Q   So how -- how did you locate this mail?
12      A   I climbed -- I had climbed in the
13  dumpster.  On the top of the dumpster was a
14  couple of empty shipping pallets.  I lift them
15  up, and I saw mail under the shipping pallet.  So
16  I moved the first shipping pallet, and I started
17  unloading the mail from the dumpster.
18      Q   Now, the mail that's recovered here,
19  was this mail rifled or just abandoned?
20      A   Both.
21      Q   Both.  What do you do with that mail
22  after you -- after you retrieve it?  Where does

546

1  that mail then go?
2      A   If the -- if the mail is rifled or if
3  the mail looks as if it was staged to be rifled
4  or even this, which is abandoned and thrown out,
5  it's disposed of, it's mishandled, this mail and
6  all of it and any evidence I can recover are
7  recovered for the -- for the Postal Inspectors to
8  investigate.
9      Q   Okay.  Let me ask you this:  This final
10  document, what are we looking at here?
11      A   What we're looking at here is mail
12  lying in the grass along the side of the road.
13  It's registered -- registered mail lying along
14  the side of the road --
15      Q   And why --
16      A   -- at the --
17      Q   And how do you -- how do you believe it
18  came to be there?
19      A   I believe it came to be there because
20  somebody opened a tray of registered mail to see
21  what was inside the tray.  There was -- it was
22  envelopes, so they didn't really look with a

Capital Reporting Company
Postal Police Officers  Association Arbitration 01-16-2014 Volume III

547

1   light, so they got rid -- they tossed it.  And
2   when it got tossed, all 500, 750 envelopes that
3   were in the tray were strewn across a
4   several-mile stretch of the airport.
5       Q   And how common is it to run across
6   sites like this?
7       A   Daily.
8       Q   Okay.  And, Officer Jordan, how many
9   hours a week would you guess you spend pursuing
10  stolen, rifled or abandoned mail?
11      A   16 to 24, probably, depending on the
12  rotation.
13      Q   Let me ask you about -- you're in -- in
14  New York.  In New York, have officers received
15  training on what to do in the event of an active
16  shooter?
17      A   Yes, we have.
18      Q   And for how long -- how have you been
19  receiving training on that?
20      A   It's -- we received training -- I
21  believe it started about two or three years ago,
22  but it's -- it's a lot more intense and

548

1   time-intensive training now than it was even when
2   I started.
3       Q   Do you get simulation training on how
4   to handle, like --
5       A   We got --
6       Q   Can you explain that?
7       A   We've had training on the fax machine,
8   going through scenarios of the active shooter,
9   and we've had the -- the range instructors in New
10  York did a wonderful job of actually setting
11  up -- taking over the entire floor of a building
12  and setting up a simulation of responding to an
13  active shooter.
14      Q   Okay.  Now, have -- are you aware if
15  there's been active shooter training given to
16  general post office employees?
17      A   Yes, I am aware of that.
18      Q   And can you explain what -- to your
19  understanding, what is the training that's been
20  given to post office employees in general?
21      A   The post office employees were shown a
22  movie where they were given their -- if -- if

549

1   something happened and if there was an active
2   shooter incident in the post office, they were
3   told to -- to -- that they should shout out to
4   let the responding police know that this person
5   isn't the threat, where the threat is and what's
6   going on, get out, to remove themselves from the
7   situation, hide out, if they're unable to get out
8   of the building, and fight it out, which is, for
9   the postal employees, a last-chance resort to
10  save their lives.
11      Q   Okay.  Now, Officer Jordan, do you
12  remember -- how many Postal Police Officers were
13  in your class at -- at FLETC; do you recall?
14      A   There was 46 or 48 officers in the
15  entire class, and there was, I believe, 16 from
16  New York.
17      Q   And if -- if you know, do you -- how
18  many of those officers have left to go to other
19  agencies?
20      A   From the whole entire class?  Probably
21  half.
22          MR. STEPHENS:  I have no further

550

1   questions.  Thank you very much.
2           CROSS-EXAMINATION BY COUNSEL FOR
    THE
3           POSTAL SERVICE
4   BY MS. GONSALVES:
5       Q   You've been with the Postal Service 18
6   years?
7       A   It is going on 18 years, correct.
8       Q   And you've been working at the airport
9   that entire time?
10      A   No, I'm not.  I finally was able to --
11  actually, I'd been trying to work at the airport
12  the entire time.  I was finally able to get a bid
13  there after 2001.  We had a reorg.  Up until --
14  unfortunately, from the time I started until --
15  it was just the beginning of 2002, I believe --
16  several officers on -- on the midnight tour would
17  actually change their days off if there was an
18  opening to make sure there was still overtime
19  available for them.
20      Q   So since 2001, you've been working at
21  the airport?
22      A   Yes.

Capital Reporting Company
Postal Police Officers  Association Arbitration 01-16-2014 Volume III

551

1    Q    And when you've been working at the
2    airport, your job has been to secure the mail,
3    correct?
4    A    To secure the mail, to protect the
5    safety of the postal employees and other
6    employees that are on postal property and to
7    safeguard postal interests and infrastructure.
8    Q    Okay.  So postal property and assets?
9    A    Yes.
10   Q    Okay.  Just to clarify something, when
11   we talk about mobile patrols, we're talking about
12   foot patrols, correct?
13   A    Foot patrol is one, correct.
14   Q    Yeah.  And we're also talking about
15   mobile --
16   A    Vehicle patrol.
17   Q    -- within a vehicle?
18   A    Yes.
19        MS. GONSALVES:  Okay.  Those are all
20   the questions I have for you.  Thank you.
21        THE WITNESS:  Okay.
22        MR. STEPHENS:  Thank you very much.

552

1    Unless the panel has questions.
2         ARBITRATOR DUFEK:  I do.  Again,
3    curiosity kills the cat here.
4         THE WITNESS:  No problem.
5         ARBITRATOR DUFEK:  When you're talking
6    about the airlines, I take it, at JFK, that
7    you're talking about commercial international
8    airlines or --
9         THE WITNESS:  There's domestic and
10   international, yes.
11        ARBITRATOR DUFEK:  And what -- what
12   would the procedure -- how would the procedure --
13   and I understand these are the -- those are the
14   entities that are using these contract personnel
15   to --
16        THE WITNESS:  Yes.  The --
17        ARBITRATOR DUFEK:  -- handle the
18   mail --
19        THE WITNESS:  They --
20        ARBITRATOR DUFEK:  -- once it leaves.
21        THE WITNESS:  Up until -- for example,
22   up until last year, Delta had their own -- their

553

1    career employees doing -- for example, it's just
2    like handling baggage.  You're handling mail.
3    You take the mail off the plane, and it's
4    delivered to the post office or it's delivered to
5    another gate because it's going out on another
6    plane.
7         The Delta employees, they had a problem
8    with their union last year, and they lost that
9    job at JFK.  Delta now has the right to hire an
10   outside agency to handle such things such as
11   baggage handling.  The outside -- so they
12   contracted with a company called Swissport.
13   They're not only airline; they're apparently one
14   of the largest companies in the world handling
15   out -- for outsourcing mechanics on airplanes,
16   the baggage handling, servicing the airplane, so
17   stocking it, and that's -- so a Swissport
18   employee will normally now transfer the mail.
19        Unfortunately, Swissport doesn't have
20   enough employees, so they'll have a contract
21   employee, which normally is -- from what I am
22   told, was created to be a second job for another

554

1    airline employee.  But it's turned out now that,
2    unfortunately, they just have a turnover of these
3    temporary minimum wage workers until they're,
4    unfortunately, unable to work at the airline
5    anymore.
6         ARBITRATOR DUFEK:  And I got that part.
7    But the thing that I'm curious about is:  How
8    does it differ when you interface with FedEx or
9    UPS?
10        THE WITNESS:  Well, FedEx, right now,
11   they have their own handlers working on that.
12   And when -- if they come -- if it's a FedEx
13   flight that's handling mail, across -- carrying
14   between the two agencies, they treat the mail a
15   lot differently than a minimum wage worker would.
16   You see that inside the post office as well when
17   we have casual workers as opposed to full-time
18   career workers.
19        When I worked -- when I worked in the
20   city, which was mostly postal workers, we -- I
21   cannot remember -- someone had asked me.  I could
22   not remember a single instance of physical

# Capital Reporting Company
## Postal Police Officers  Association Arbitration 01-16-2014 Volume III

555

1  violence between two postal workers.  We had them
2  where one or both is a casual, but I never
3  actually -- I couldn't -- I actually had to go to
4  my book and look.  I couldn't, off the top of my
5  head, recall responding to a physical incident
6  of -- of violence.  And it's -- unfortunately,
7  it's the same ethic with -- ethic and standards
8  with handling the mail with them.
9      ARBITRATOR DUFEK:  So I guess the
10  point -- I mean, I just -- I was just curious,
11  but I guess the point you're making is that when
12  you're dealing with FedEx and UPS and their own
13  employees, they handle the mail -- the mail with
14  a greater degree of care and concern and
15  attention than you're experiencing with these
16  other contractors that --
17      THE WITNESS:  Yes.  Unfortunately,
18  they're so removed from --
19      ARBITRATOR DUFEK:  Yeah.
20      THE WITNESS:  -- what it is they're
21  handling.
22      ARBITRATOR DUFEK:  And that was the

556

1  point I was making.
2      THE WITNESS:  Yeah.
3      ARBITRATOR DUFEK:  Thank you.
4      ARBITRATOR OLDHAM:  Thank you very
5  much.
6      THE WITNESS:  Thank you.
7      (Witness excused.)
8      ARBITRATOR OLDHAM:  I think it's that
9  time of day.
10      MR. STEPHENS:  Yes, sir.
11      ARBITRATOR OLDHAM:  Let's break for
12  lunch.  And we'll resume at 1:00?
13      MR. STEPHENS:  I think 1:00 or -- we
14  could go a little bit later if -- the reason
15  being that our principal witnesses are both
16  testifying -- two of our principal witnesses are
17  testifying by telephone, and neither of them are
18  available until about 1:30 or 2:00.
19      ARBITRATOR OLDHAM:  Fine.  So let's
20  carry on for a while then and break later.  Is
21  that the point?
22      MR. STEPHENS:  Well, I think --

557

1      ARBITRATOR OLDHAM:  Or do you want to
2  just --
3      MR. STEPHENS:  Yeah, if we could go a
4  little bit later on lunch.  I don't want to -- if
5  we can take maybe five or ten minutes now, a
6  break, and then come back.  I -- I want to make
7  sure -- I don't want to waste the panel's time.
8  We moved a little bit quicker this morning than I
9  thought we would.
10      ARBITRATOR OLDHAM:  Okay.  I can do
11  whatever we need, but what's your -- tell me
12  exactly what you're proposing.  Do you have
13  another witness to put on live here?
14      MR. STEPHENS:  I don't believe so right
15  now, but we may after lunch.
16      ARBITRATOR OLDHAM:  So advise me.
17      MR. STEPHENS:  Well, I would like -- if
18  I could do this, if we could take a five-minute
19  break now, so we can come back with our -- a full
20  plan for the afternoon and advise the panel.
21      ARBITRATOR OLDHAM:  Fine.  Let's make
22  it ten minutes right now.

558

1      MR. STEPHENS:  Okay.  Okay.  Thank you.
2      (Brief recess.)
3      MR. STEPHENS:  Okay.  I guess two
4  things we'd like to do -- we would -- we would
5  propose for the -- for this.  First of all, our
6  first witness, we understand, will be available
7  to testify at two o'clock Eastern, and he'll be
8  testifying by telephone.  And then there will be
9  a second witness also testifying by telephone who
10  becomes available after 2:30 Eastern.
11      So I guess we would propose, with the
12  panel's consent, to break until about
13  two o'clock, if that's okay, or a little bit
14  before that to set up the --
15      ARBITRATOR OLDHAM:  Telephone
16  connection.
17      MR. STEPHENS:  -- telephone connection.
18  The only other matter we wanted to raise with the
19  panel and with Teresa is, when Officer Pierce
20  testified yesterday, counsel for the post office
21  asked if he had a copy of a letter of removal
22  that was referenced by Officer Pierce during his

# Exhibit K

Page 259

1        BEFORE THE BOARD OF INTEREST ARBITRATION

2

    ------------------------------:

3   POSTAL POLICE OFFICERS        :

    ASSOCIATION (PPOA)            :

4                                 : Volume 2

          and                    : (Pgs. 259 to 514)

5                                 :

    UNITED STATES POSTAL SERVICE  :

6   ------------------------------:

7

8

9                   ARBITRATION

10

11  DATE:          Tuesday, February 4, 2020

12  TIME:          9:44 a.m.

13  LOCATION:      United States Postal Service

                   475 L'Enfant Plaza, S.W.

14                 Washington, D.C. 20260

15

16  REPORTED BY:   Erick M. Thacker, RPR

                   Reporter, Notary

17

18

19

    Job No. CS3854156

20

21

22                 Washington, D.C. 20005

1          A P P E A R A N C E S
2  Before Arbitrators:
3      David M. Gaba, Neutral Chair
4      Frank Albergo, PPOA Member
5      Robert A. Dufek, USPS Member
6  On behalf of Postal Police Officers Association:
7      ARLUS J. STEPHENS, ESQUIRE
           ROSEANN R. ROMANO, ESQUIRE
8      CALEB JACKSON, ESQUIRE
           Murphy Anderson, PLLC
9      1401 K Street, Northwest, Suite 300
           Washington, D.C. 20005
10     (202) 223-2620
11  On behalf of the United States Postal Service:
12     KATHERINE S. ATTRIDGE, ESQUIRE
           ERIN E. LYNCH, ESQUIRE
13     JAMES R. STELLABOTTE, ESQUIRE
           United States Postal Service
14     475 L'Enfant Plaza, Southwest
           Washington, D.C. 20260
15     (202) 268-6704
16  ALSO PRESENT:
17     Eric Freeman, PPOA
18     Humphrey Rutherford, PPOA
19     Janet Peterson, USPS
20              * * * * *
21
22

1          C O N T E N T S
2  WITNESS:      DIRECT    CROSS    REDIRECT
3  STEPHEN NICKERSON    264    320    324
4  DAVID G. BOWERS      328    417    --
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

1          P R O C E E D I N G S
2      ARBITRATOR GABA:  Any witnesses?
3      MS. ATTRIDGE:  Yes.  The Postal Service
4  will call its next witness this morning.  Stephen
5  Nickerson is our director of strategic business
6  and financial planning.
7      I'm going to go ahead and turn the
8  microphone over to Erin Lynch, our chief counsel
9  of labor law, who will present the witness.
10     ARBITRATOR GABA:  Mr. Nickerson, can
11  you please raise your right hand?
12  WHEREUPON,
13          STEPHEN NICKERSON
14  called as a witness, and having been first duly
15  sworn, was examined and testified as follows:
16     ARBITRATOR GABA:  Thank you, sir.
17     MS. LYNCH:  Good morning to the panel
18  and to members of the Postal Police Officers
19  Union.  My name is Erin Lynch.  I'm attorney for
20  the Postal Service.
21     As Ms. Attridge mentioned, we will be
22  presenting testimony about the Postal Service's

1  financial situation that will come through
2  Mr. Stephen Nickerson.
3      I'll note at the outset that the
4  presentation that appears before you on the
5  screen can be found at Postal Service Exhibit C2,
6  and that is the only exhibit we will be referring
7  to through Mr. Nickerson's testimony.
8      And that's in Volume 2 of the Postal
9  Service's exhibit book.
10     ARBITRATOR GABA:  Ma'am, did you say C2
11  or --
12     MS. LYNCH:  Yes.
13     ARBITRATOR GABA:  Off.
14     (Brief off-the-record discussion.)
15     ARBITRATOR GABA: Okay.  Sorry, ma'am.
16  You were saying?
17     MS. LYNCH:  To clarify, the exhibit is
18  C1.
19     ARBITRATOR GABA:  Thank you.  Let's
20  continue, ma'am.
21     MS. LYNCH: Sure.  Thank you.
22

2 (Pages 260 - 263)

Arbitration Vol. 2                                    February 4, 2020

Page 328

1  in red. I'll point it out to you when we get to
2  that slide.
3      ARBITRATOR GABA:  Thank you, sir.
4      MR. STELLABOTTE:  Okay.  And with that,
5  we can begin.
6      DIRECT EXAMINATION BY COUNSEL FOR THE
7      POSTAL SERVICE
8  BY MR. STELLABOTTE:
9    Q   Mr. Bowers, please state your name and
10 spell it for the record.
11   A   Sure.  Good afternoon.  David Bowers.
12 Last name, B as in boy -- sorry.  Good afternoon.
13 David Bowers.  Last name, B as in boy, O-W-E-R-S.
14   Q   Sir, where are you currently employed?
15   A   Here in this building, National
16 Headquarters.
17   Q   Okay.  And what is your title?
18   A   Deputy chief inspector, Security,
19 Forensics, and Development.
20   Q   Okay.  What are your responsibilities
21 as the deputy chief inspector?
22   A   Sure.  I'm responsible for the Security

Page 329

1  Group, which is here at National Headquarters,
2  the Forensic Laboratory, which is located in
3  Dulles, Virginia, and the Career Development
4  Unit, which is located in Potomac, Maryland.  The
5  Career Development Unit is where we train new
6  postal police officers and new inspectors.
7  Actually, there's two classes going on right now
8  of new inspectors and new PPOs.
9    Q   Prior to becoming the deputy chief,
10 what positions did you hold in the Postal
11 Service?
12   A   I've worked for the Postal Service for
13 the last 32-and-a-half years.  Prior to becoming
14 a postal inspector, I started as an industrial
15 engineer.  Then I went to become a manager of
16 in-plant support.  And then right before I became
17 an inspector, I was an acting manager of a
18 large -- a medium-sized processing and
19 distribution center in Edison, New Jersey.
20     I became a postal inspector in '98.  So
21 I was a field postal inspector from 1998 to 2003.
22 I was then promoted to a program manager

Page 330

1  position, which is now the Security Group, did
2  that for two years from 2003 to 2005.  I was then
3  promoted to assistant inspector in charge in New
4  York Division, which was New York City, and then
5  that was from 2005 to 2007.
6     In 2007, I had the opportunity to work
7  overseas at the Universal Postal Union as a
8  program manager of postal security.  So I
9  performed that job for five years from 2007 to
10 2012.
11     Shortly after that, I came back to
12 Washington, D.C. and was promoted to inspector in
13 charge of the Security Group and held that
14 position for over five years, and then in
15 November of 2018, I was promoted to the position
16 I'm in right now, deputy chief.
17   Q   Thank you, sir.  Turning to your second
18 slide, could you provide an overview of the
19 topics you intend to cover this afternoon?
20   A   Sure.  So four main topics that -- that
21 I want to go through.  The first is the mission
22 and makeup of the Inspection Service.  I think

Page 331

1  it's important to understand what the
2  organizational chart of the Inspection Service
3  looks like.  The Inspection Service is not an
4  agency that's well-known to the general public,
5  but is well-known to other law enforcement
6  agencies and U.S. Attorney's Offices.
7     I will go into -- the second point is
8  the statutory authority of PPOs and inspectors.
9  We'll go into that.  Thirdly, recent statistical
10 data related to PPO activities, and we'll end
11 with PPO recruiting and training.
12   Q   Okay.  Thank you.  As a result of your
13 approximately 22 years of service within the
14 Postal Inspection Service, have you become
15 familiar with the mission, structure and function
16 of the Inspection Service?
17   A   I have.
18   Q   Move to the next slide.  What is this
19 slide, sir?
20   A   So it's the Postal Inspection Service
21 mission statement.  I'll read it.  It's the first
22 bullet point from the last slide.

19 (Pages 328 - 331)

Page 332

1    "To support and protect the U.S. Postal
2  Service and its employees, infrastructure, and
3  customers; enforce the laws that defend the
4  nation's mail system from illegal or dangerous
5  use; and ensure public trust in the mail."
6    Q   Great.  Thank you.  Let's move on to
7  that workforce.  Mr. Bowers, could you please
8  tell us what this slide illustrates?
9    A   Sure.  So, broadly speaking, there's
10  three basic entities that comprise the Inspection
11  Service.  We'll start -- I'll start at the top
12  and move through the presentation.
13      So the first in the green box are
14  postal inspectors.  We currently have
15  approximately 1,280 postal inspectors at 190 work
16  sites.  That's -- on board is they're physically
17  in the position.  Those numbers will change when
18  we have graduation of the two classes that we
19  have at the Career Development Unit.
20      Second will be postal police officers.
21  You'll note two different colors within the box
22  to the right.  There on the top, approximately

Page 333

1  105 supervisors -- so those are sergeants,
2  lieutenant, captain, and we have one colonel --
3  they're non-bargaining, and 455 officers which
4  are bargaining unit at approximately 35 work
5  sites.
6      Just to go back on responsibilities of
7  postal inspectors, criminal investigators for the
8  Inspection Service serve warrants, serve
9  subpoenas, work with U.S. Attorney's Offices,
10  conduct covert surveillance.
11      Postal police are responsible for
12  postal personnel, property and assets.
13      And then in the third, which is a third
14  entity we call PTA, professional technical
15  administrative, on board we have approximately
16  589 professional technical administrative
17  employees.  An example of those would be general
18  analyst, intel analyst, administrative assistant,
19  lab personnel.  That's not an exhaustive list,
20  but that's just an example of some of the
21  responsibilities within that category.
22    Q   Thank you, sir.  We can move on to the

Page 334

1  next slide.  What is this slide?
2    A   So in the last slide, I talked about
3  three -- three basic entities that the comprise
4  the Inspection Service.  This is a fourth entity,
5  contract guards.  The company that currently has
6  the contract is a company called Prosegur.  I'll
7  spell that.  P as in Peter, R-O-S-E-G-U-R.  It's
8  a private independent company that the Postal
9  Service contracts with.
10      When you came into this building and
11  got your ID at the fixed post, whether it's here
12  on this level or upstairs in the south lobby,
13  those would have been Prosegur guards that you
14  would have encountered.  The primary role is
15  perimeter and entrance security.  They're unarmed
16  guards at -- that's about 600 guards at 53 work
17  sites around the country.
18      You're going to hear more from Dane
19  Dodd.  He's a senior vice president with U.S.
20  Security Systems, and I know he's going to go in
21  detail into this contract that he has with us.
22    Q   Mr. Bowers, to the best of your

Page 335

1  knowledge, do you know if Prosegur provides armed
2  security to postal facilities?
3    A   They do.
4    Q   Okay.  And can you give us a recent
5  example of when the Postal Service used armed
6  security guards?
7    A   Sure.  In 2018, there was an event that
8  happened.  There was a postal employee in
9  Indianapolis that posted a picture of himself
10  with a semiautomatic weapon, and he made a
11  credible threat to a supervisor at a post office.
12  And we utilized the armed contract provision
13  within Prosegur to provide armed security to that
14  post office.
15    Q   And why didn't we use PPOs in that
16  particular event?
17    A   No, there's no PPOs in Indianapolis.
18    Q   Was that the only reason we didn't use
19  PPOs?
20    A   No.  I mean, it's an option in the
21  contract.  It's definitely cost-effective to --
22  to utilize that contract.  It's an option.  They

20 (Pages 332 - 335)

Page 336

1  performed -- they performed well.  They performed
2  what we needed from them.
3     Q   And to the best of your knowledge,
4  overall, has the use of contract personnel
5  increased over the years?
6     A   It has.
7     Q   And why do you think contract personnel
8  has increased over the years?
9     A   Well, I think two reasons.  So going
10  back, historically speaking, there's the
11  Hallcrest report, which was in 1997, a private
12  entity that we contracted with to evaluate the
13  security force.
14     Q   And I'm not going to ask you to recite
15  the 200 pages in the Hallcrest report, but for
16  the record, the Hallcrest report is located at D,
17  as in delta, 6 in the record.  Please continue --
18     A   Okay.
19     Q   -- Mr. Bowers.
20     A   So for -- for this question, one of
21  their recommendations -- they made a number of
22  recommendations.  One of their recommendations

Page 337

1  was increase the use of unarmed contract guards.
2  More recently, the Postal Office of Inspector
3  General, in 2011, published an audit.  And I
4  don't know if we want to reference that.
5     Q   Yeah.  Great.  Thank you, Mr. Bowers.
6  And if you can see at the bottom of the slide,
7  the OIG report can be found in Postal Exhibit A9
8  for the record.  Thank you, Mr. Bowers.
9        ARBITRATOR GABA:  Off.
10        (Brief off-the-record discussion.)
11        ARBITRATOR GABA:  Mr. Bowers, I
12  apologize for the oversight.  Will you please
13  raise your right hand?
14  WHEREUPON,
15           DAVID G. BOWERS
16  called as a witness, and having been duly
17  sworn, was examined and testified as follows:
18        ARBITRATOR GABA:  Mr. Bowers, you have
19  previously testified.  Was your prior testimony
20  all true and correct?
21        THE WITNESS:  It was.
22        ARBITRATOR GABA:  Okay.  Thank you,

Page 338

1  sir.  Counsel, I'm sorry.
2        MR. STELLABOTTE:  No problem,
3  Arbitrator Gaba.
4  BY MR. STELLABOTTE:
5     Q   Mr. Bowers, we were talking about --
6  you had mentioned the hallmark -- or the
7  Hallcrest report, and then you had sort of
8  transitioned into the OIG report, which is
9  located at A9 in the record.
10        Can you please pick up where you left
11  off as it relates to the OIG report?
12     A   Sure.  So they came to a similar
13  conclusion, slightly different.  Their -- their
14  recommendation actually was to hire more armed
15  security guards.  We, the Inspection Service,
16  opted not to do that, but we've increased our use
17  of unarmed contract guards.
18     Q   Sir, I want to direct your attention to
19  page 5 of that OIG report.  And if you wouldn't
20  mind, Mr. Bowers, could you read the paragraph
21  which you just referenced?
22     A   Hold on one second.

Page 339

1     Q   Volume 1, A9.
2     A   Which is it?
3     Q   Volume 1, A9.
4     A   Okay.  Okay.  Let me just get situated
5  here.  Okay.  So on page 5, I'm at the heading
6  where it says, reduce security force costs
7  through contracting.  Postal Service can reduce
8  costs by contracting --
9        ARBITRATOR GABA:  Slow down, sir.
10        THE WITNESS:  Oh, I'm sorry.
11        ARBITRATOR GABA:  A9, page 5.  Can you
12  give me a hint as to which paragraph you're
13  looking at?
14        THE WITNESS:  It's the first blue
15  heading, reduce security force costs through
16  contracting.  It's in the middle of the page.
17        ARBITRATOR GABA:  So I -- I apologize.
18  I didn't read the paragraph heading.  Go ahead.
19        THE WITNESS:  Go ahead?  You sure?
20        ARBITRATOR GABA:  Yeah, I'm sure.
21        THE WITNESS:  Okay.  So I'll start --
22  the heading is reduce -- page 5 of the OIG

21 (Pages 336 - 339)

Page 340

1  report, dated -- it's dated 2011.  The Postal
2  Service can reduce costs by contracting for armed
3  security guards.
4        Do you want me to read the whole thing
5  or just that --
6  BY MR. STELLABOTTE
7     Q   Read the whole thing --
8     A   Read --
9     Q   -- Mr. Bowers.
10    A   Okay.  Thank you.  Currently, postal
11 police officers fulfill those duties.  Although
12 the background and training requirements for
13 contract security guards are similar to those for
14 PPOs, the average hourly rate for armed contract
15 security guards is approximately $19.12 less than
16 Postal Service supervisor and PPOs' fully-loaded
17 rates respectively.  Using armed security,
18 contract security services, would allow the
19 Postal Service to reduce security force costs as
20 much as 9.5 million annually or 80 million over
21 the next 10 years while not comprising --
22 compromising employee security.

Page 341

1     Q   Thank you, Mr. Bowers.  And
2  notwithstanding the Hallcrest report or the OIG
3  report, has the Postal Service overall made
4  changes in reference to the actual PPOs over the
5  years?
6     A   No.
7     Q   Has it changed as the volume of PPOs
8  that we've used in the past --
9     A   Oh, I'm sorry.  I misunderstood your
10 question.  Well, in Hallcrest, when they -- when
11 they did Hallcrest, the number of PPOs at the
12 time, which was '97, was approximately 1,400
13 PPOs.  As you saw from a prior slide, we're --
14 we're at 455.
15       If you recall in -- in Hallcrest, they
16 stated that if you make all the recommendations
17 that are in Hallcrest, I think the number is
18 around 470 as -- as a general number, which we're
19 about there right now.
20    Q   Thank you, Mr. Bowers.  Moving on to
21 the next slide, what does this slide show?
22    A   Oh, okay.  So this is the -- again,

Page 342

1  referencing the main topics in the beginning, the
2  general hierarchy of the Postal Inspection
3  Service, not in -- I'm going to -- I have another
4  slide that goes into a more granular level, but
5  for the purposes of this one, I'll work top to
6  bottom.
7        So at the top in the bright green box
8  is chief postal inspector.  Our chief is Gary
9  Barksdale, and he's a direct report to the
10 postmaster general.
11       Then if you move over to the right of
12 the slide, it says in the -- in the next set of
13 bright green boxes, it says deputy chief
14 inspector SFD, Security Forensics Development.
15 That's me.  Below that, I don't have all the
16 direct reports under me, but for the purpose of
17 this slide, I do have the Security Group INC,
18 which INC is inspector in charge.  It's the
19 executives over these particular groups and
20 divisions.
21       You'll see a blue box under Security
22 Group INC.  You'll have noted when you walked in,

Page 343

1  you see PPOs in this building.  There's a
2  captain, two sergeants and police officers here
3  at National Headquarters that reports up through
4  the INC of the Security Group.  In addition, I
5  have a program manager of postal security that's
6  part of that Security Group.
7        Moving over to now again staying on
8  that second level of boxes, deputy chief
9  inspector headquarters, ASCI, Analytic -- that
10 stands for Analytics Strategy Communication
11 Investigations.  In that group are criminal
12 programs, so fraud, workplace violence, mail
13 theft, narcotics, cyber.  Those are functional
14 responsibilities of that deputy chief, and
15 there's INCs under that deputy that report up
16 that are not shown.
17       In the middle, you'll see DCI West and
18 DCI East.  We'll go to the left for DCI West.
19 There are nine divisions.  The whole country
20 comprises of 17 field divisions to, you know,
21 make up the United States.  The west has nine
22 divisions.  The east has eight.

22 (Pages 340 - 343)

Page 344

1    If you look, there's nine divisions
2 that report up to the deputy chief west, and
3 you'll note that there's six green boxes with
4 blue boxes underneath.  Those are all divisions
5 that have postal police officers.  So if you look
6 to Chicago Division INC, inspector in charge,
7 underneath there's Chicago PPOs and St. Louis
8 PPOs.  That means there's PPOs in Chicago at a
9 facility and PPOs in St. Louis at a facility.
10 And then that goes through all the other blocks.
11    You'll note that there's three
12 divisions that are grayed out, Denver, Phoenix
13 and Seattle.  Those are divisions that do not
14 have PPOs.  So 14 of the 17 divisions have PPOs,
15 some more than others.  New York has the most
16 number of PPOs, but they're every -- you'll see
17 some have just one location, Dallas and Fort
18 Worth.  It's fairly -- it's pretty evident on --
19 on what -- what it is.  East, eight divisions in
20 the east.  All eight divisions have PPOs in the
21 east.  So, again, 17 divisions, 14 with PPOs, and
22 I'll go into a more granular view of one of those

Page 345

1 divisions.  Actually, we're going to go into
2 Chicago.
3    Q   Okay.  Let's go into that right now,
4 Mr. Bowers.  What we looking at here?
5    A   Okay.  This is Chicago Division postal
6 police hierarchy.  It basically shows the PPO
7 hierarchy through the AIC and INC.  I'll walk
8 through it.  It's not the entire Chicago
9 Division.  If you note, to the left, it says
10 inspectors and PTAs.  There are field inspectors
11 and administrative people that are not shown, but
12 we want to show the PPO hierarchy for the
13 purposes of this -- for the purposes of my
14 testimony.
15    Q   Okay.
16    A   I'll walk -- again, I'll walk top to
17 bottom.  So Craig Goldberg is currently the
18 inspector in charge of the Chicago Division.
19 Just recall that I was an inspector in charge for
20 over five years here in the Security Group.
21    Kenneth Miller is the assistant
22 inspector in charge.  It says DHQ.  DHQ means

Page 346

1 division headquarters, so in this case, it's
2 Chicago.  And also recall that I -- I held a
3 similar -- I held the same position in New York
4 from 2005 to 2007, as AIC in the New York
5 Division.
6    And you'll have Captain Williams.
7 Captain Doug Williams, he works at division
8 headquarters in Chicago.
9    And I'm going to move over to the
10 right.  If you recall, the last slide, you had
11 two blue boxes, Chicago and St. Louis.  The St.
12 Louis block, there you'll note that James Nieters
13 is the lieutenant in St. Louis, and then
14 underneath Lieutenant Nieters is three sergeants,
15 Sergeant Tour 1, Sergeant Tour 2, Sergeant Tour
16 3.  I'll pause there to explain tours.
17    Tours in the Postal Service are a
18 little different than private industry.  Tour 1
19 for the Postal Service is the beginning of the
20 day, so midnight to 8:00 a.m., typically; Tour 2,
21 8:00 a.m. to 4:00 p.m.; Tour 3, 4:00 p.m. to
22 midnight, typically.  There are some adjustments,

Page 347

1 but just so -- it's not -- if you compare it to
2 private industry, it's slightly different.
3    So you have a lieutenant in St. Louis,
4 reporting to the lieutenant (sic).  You have
5 three sergeants, and then underneath each one of
6 those sergeants, you have postal police officers
7 that report up through the sergeant through the
8 lieutenant to the captain.
9    Moving over to the three columns to the
10 left, you Sergeant Tour 1, 2 and 3 at DHQ.
11 That's Chicago.  And they all have PPOs reporting
12 to each one of those sergeants, but the
13 difference is, those sergeants report directly to
14 the captain; whereas, St. Louis, the lieutenant
15 reports to the captain, so four direct reports,
16 the lieutenant from St. Louis.  Why?  Because
17 those sergeants are located in Chicago.  So the
18 captain's there in Chicago and just like the
19 captain here has two sergeants.  The captain will
20 then talk to the sergeants here just like in
21 Chicago, but in St. Louis, a little different.
22 The captain will then communicate with the

23 (Pages 344 - 347)

Page 348

1 lieutenant.

2     Q   Thank you, Mr. Bowers.  So I'm going to

3 go back a little bit.  Using this chart or using

4 this slide as a reference, you were a field

5 inspector back in the day, correct?

6     A   I was.  A long time ago.

7     Q   Could you describe the frequency and

8 the nature of your interactions with PPOs?

9     A   Yeah.  So just recall I was a field

10 inspector in 1998 to 2003.  I had a lot of

11 interaction with PPOs when I became a field

12 postal inspector.

13         At the time, the communications center

14 was in my division, so the communication center

15 in the -- it was the North Jersey/Caribbean

16 Division that I worked in.  Their communication

17 center was -- was within the division, so when I

18 went on the radio to go into service, I was

19 talking to a postal police officer.

20         Also, postal police officers were -- I

21 was domiciled at the Newark, New Jersey -- and I

22 know my New Jersey accent is coming out.  It's

Page 349

1 N-E-W-A-R-K, not N-O-R-K.  They were domiciled in

2 PPOs were domiciled in -- at the Newark P&DC, so

3 I see them every day.

4     Q   Okay.  I know we're going back, but to

5 the best of your recollection, what were the PPO

6 duties back in that time period?

7     A   Protect postal personnel, assets and

8 facilities.

9     Q   And how about, briefly, the frequency

10 and nature of your interaction with PPOs when you

11 were an AIC?

12     A   So a little different when I was an

13 AIC.  Postal police -- postal police in New York

14 is the largest postal police force in the

15 country.  Not for my whole two years there did I

16 have functional responsibility as a colonel in

17 Newark that I would interact with the -- for

18 about a year of the two years I was there, I had

19 a responsibility for the PPOs as an AIC, and I

20 would interact with the colonel and the captains

21 and lieutenants on a pretty regular basis,

22 certainly the colonel almost every day.

Page 350

1     Q   And as the AIC, what do you believe the

2 PPO duties were at that point?

3     A   Same, protect postal personnel,

4 property and facilities.

5     Q   And as an inspector in charge, would

6 you say that the PPO duties were the same?

7     A   Yes.

8     Q   Okay.  So based on your years working

9 directly with PPOs as a postal inspector, as the

10 AIC, as the INC, and now as your oversight role

11 as a deputy chief inspector, you had first-hand

12 knowledge of duties and responsibilities.

13         Overall, have those duties and

14 responsibilities changed for PPOs?

15     A   No.

16     Q   I'm going to turn to the next slide.

17 Mr. -- Mr. Bowers, what does this slide

18 represent?

19     A   So recall the mission that I -- what I

20 read, it's one mission for the entire Inspection

21 Service, but when it comes to postal police and

22 postal inspectors, there's different statutory

Page 351

1 authority.  So we both play an important role to

2 provide a safe and secure mail system for -- for

3 the American public.  And I'll -- I'll get -- so,

4 again, postal inspectors make arrests, serve

5 subpoenas, conduct covert surveillance.  Postal

6 police, as it says, you know, security of

7 facilities, assets and personnel.

8     Q   Okay.  Thank you, Mr. Bowers.  Let's

9 move on to legal authority.

10         MR. STELLABOTTE:  And, Mr. Arbitrator,

11 the joint exhibit in this particular series of

12 questions is under JE7, Joint Exhibit 7.

13 BY MR. STELLABOTTE

14     Q   Mr. Bowers, under what authority does

15 the Postal Service employ inspectors and postal

16 police officers to the best of your knowledge?

17     A   Sure.  Inspectors, 18 U.S.C. 3061(a)

18 and (b), and postal police, 18 U.S.C. 3061(c).

19     Q   And how did you become aware of that

20 statutory authority as it pertains to inspectors

21 and PPOs?

22     A   Well, when you become a new inspector,

24 (Pages 348 - 351)

Arbitration Vol. 2                                          February 4, 2020

Page 352

1  you're trained on the statutory authority. It's
2  also on my credentials.
3      Q   I'm going to move to the next slide.
4  What does this slide illustrate?
5      A   So it goes into a little more detail,
6  so I'll walk through it. As I stated before, 18
7  U.S.C. 3061(a) is the scope of authority of a
8  postal inspector. Postal inspectors are law
9  enforcement officers authorized to conduct
10 criminal investigations, again, make arrests,
11 serve warrants and subpoenas, work with the U.S.
12 Attorney's Office.
13         And (b), 18 U.S.C. 3061(b), explains
14 the powers of postal inspectors are exercised in
15 connection with the enforcement of laws regarding
16 property in the custody of the Postal Service,
17 property of the Postal Service, the use of mails
18 and other -- other postal offenses.
19         And then I'll move to (c). 18 U.S.C.
20 3061(c) was added by the -- it's called PAEA. I
21 think it was referenced in opening comments
22 yesterday, Postal Accountability and Enhancement

Page 353

1  Act in 2006. It's important to note that the
2  PAEA did not expand preexisting jurisdiction of
3  PPOs, which has always been focused on the
4  protection of postal property and persons on
5  postal property. But the PPOs have been around
6  prior to 2006, so prior to PAEA, the Postal
7  Service powers to employ guards for the
8  protection of postal premises was provided
9  through a general provision in the annual
10 appropriations act.
11     Q   Okay. Thank you, Mr. Bowers. Moving
12 on to the next slide, statutory authority, let's
13 talk about the differences in statutory authority
14 between PPOs and inspectors.
15         Could you briefly describe -- excuse
16 me -- the primary differences of statutory
17 authority between postal inspectors and postal
18 police officers?
19     A   Sure. This is not an exhaustive list,
20 but we'll work top -- again, we'll work top to
21 bottom regarding the statutory authority that I
22 just reviewed with 18 U.S.C. 3061(a), (b) and

Page 354

1  (c). So you see that both have arrest authority,
2  but you'll note with postal police, it's on -- on
3  postal property.
4          Inspectors conduct criminal
5  investigations. Inspectors serve warrants,
6  subpoenas. Postal police officers are not
7  authorized to conduct criminal investigations,
8  nor serve warrants or subpoenas.
9      Q   And, Mr. Bowers, just for the record,
10 please try to slow down --
11     A   I'm sorry.
12     Q   -- during your testimony for the court
13 reporter. Please continue.
14     A   Sure. I don't know where I -- oh, so,
15 again, I know I -- conduct -- conduct criminal
16 investigations. But for the PPOs, it's important
17 to note, preliminary fact-finding, securing
18 evidence, preserving evidence and securing crime
19 scene, that's their responsibility on postal
20 property, so criminal investigators, postal
21 police -- postal inspectors, and postal police,
22 preliminary fact-finding, preserving evidence and

Page 355

1  securing crime scenes.
2      Q   Okay. Thank you.
3          ARBITRATOR GABA: Counsel, I will let
4  you know that I am confused, and I'm confused as
5  to the statutory authority of the PPOs. And I am
6  confused when I read 103(c) where --
7          MR. STELLABOTTE: Excuse me? Did you
8  say 103(c)?
9          ARBITRATOR GABA: Yes.
10         MR. STELLABOTTE: Okay.
11         ARBITRATOR GABA: I'm sorry. I meant
12 1003(c), because I can't read because I'm old.
13 And the definition, which apparently has a typo
14 in there, postal inspector included -- I guess
15 past tense -- any agent to whom any investigative
16 powers are granted under section 3061 of Title
17 18. And I'm just letting you know I have -- I
18 have no idea where the statutory authority for
19 the PPOs comes from unless they are a subset of
20 the inspectors under 39 U.S.C. 101 and 1003(c).
21         So did that make sense?
22         MR. STELLABOTTE: So I believe under

25 (Pages 352 - 355)

Page 356

1   1003(c), that's the comparability --
2   comparability standard as it pertains to the
3   inspectors.
4        The statutory authority as it -- as it
5   pertains to PPOs is under the prior slide that
6   Mr. Bowers just went over under 18 U.S.C.
7   3061(c).
8        ARBITRATOR GABA:  Okay.  Slow down.
9   Now I've got to find where I had that tab.
10       MR. STELLABOTTE:  Okay.  So that can be
11  found at Joint Exhibit No. 7.
12       ARBITRATOR GABA:  Where I have my big
13  yellow sticky?
14       MR. STELLABOTTE:  I hope so.  So if you
15  would like, I can direct you to the -- the
16  general area under 3061(c)(1), if you'd like me
17  to recite that, sir?
18       ARBITRATOR GABA:  Please.
19       MR. STELLABOTTE:  The Postal Service
20  may employ police officers for duty in connection
21  with the protection of property owned or occupied
22  by the Postal Service under the charge and

Page 357

1   control of the Postal Service and persons on that
2   property, including duty and areas outside the
3   property to the extent necessary to protect the
4   property and persons on the property.
5        And it's important to understand that
6   under subsection 3 in respect to -- to certain
7   authorities, the Postal Service may by regulation
8   prescribe the power to do additional things, such
9   as serve warrants and subpoenas, such as conduct
10  investigations and -- and property in question.
11  However, that question whether or not that we
12  promulgated any additional duties to the PPOs
13  will be asked to the witness in a moment.
14       ARBITRATOR GABA:  Okay.  Thank you.
15  And you've been doing a spectacular job, and I
16  especially appreciate the way you're keeping the
17  record clear.
18       MR. STELLABOTTE:  Thank you.
19       ARBITRATOR GABA:  But I'm confused as
20  to 39 U.S.C. 1003(c) and whether that applies to
21  the PPOs.
22       MR. STELLABOTTE:  It does not -- sir,

Page 358

1   it does not.  It pertains directly to the
2   inspectors.
3        ARBITRATOR GABA:  Okay.
4        MR. STEPHENS:  I don't suppose I have
5   to weigh in that we disagree with that, but I'll
6   note that for the record.
7        MR. STELLABOTTE:  And again --
8        ARBITRATOR GABA:  Sir, I believe
9   everything you say because you are testifying
10  under oath.  Your counsel, I don't believe
11  anything he says --
12       MR. STELLABOTTE:  Thank you, sir.
13       ARBITRATOR GABA:  -- because it's all
14  pure argument.
15       THE WITNESS:  I trust my counsel,
16  though.
17       MR. STELLABOTTE:  And -- and understand
18  that is a contentious point here that is not
19  necessarily part of Mr. Bowers' testimony.
20  Mr. Bowers' testimony is to describe the
21  functions as it relates to PPOs and inspectors in
22  the Service, and, therefore, the appropriate

Page 359

1   authority under that evaluation is 3061, as he
2   just mentioned in the slide that we're looking
3   at, for postal inspectors, 3061(a) and (b), and
4   for postal police officers, 18 U.S.C. 3061(c).
5   The question of whether 1000 -- 1003(c) pertains
6   to both postal police officers and -- and
7   inspectors is not part of this testimony.
8        ARBITRATOR GABA:  Okay.  Well, let's --
9   let's see what his testimony is, and we'll see
10  whether your witness agrees with you.
11       MR. STELLABOTTE:  Thank you.  We'll
12  continue.
13       ARBITRATOR GABA:  Sorry.
14       MR. STELLABOTTE:  No problem, sir.
15  BY MR. STELLABOTTE:
16  Q   We're going to move on.  You just
17  talked about the statutory authority and
18  difference as it pertains to PPOs and inspectors,
19  Mr. Bowers, and I think the -- the main question
20  that we have now is whether or not the Postal
21  Service has promulgated regulation under 3061 to
22  authorize PPOs to serve warrants or conduct

26 (Pages 356 - 359)

Page 360

1  investigations either on or off property.
2     A   We haven't.
3     Q   Okay.  And do you know why the Postal
4  Service has not promulgated any type of
5  regulation?
6     A   Well, that's kind of a three-part --
7  there's liability issues if you go outside of the
8  scope of how they're trained, not trained, not
9  authorized to go outside of postal property,
10  brick and mortar.
11    Q   Are there any other reasons that -- why
12  we do not allow postal police officers to serve
13  warrants or conduct investigations?
14    A   Well, they're not statutorily required
15  to -- to do it.
16    Q   Do we authorize PPOs to do these
17  additional --
18    A   No.
19    Q   -- functions?  Okay.
20       And where does that come from?
21    A   18 U.S.C. 3061(c).
22    Q   Okay.  Thank you.  And we're going to

Page 361

1  talk about now the actual statutory duties as
2  it -- as it -- as it pertains to PPOs.
3       Can you go through this particular list
4  and tell us what this slide identifies?
5     A   Sure.  So the title is PPO statutory
6  duties.  First and foremost, PPOs protect
7  persons, property and mail on postal property.
8  I'm going to work top to bottom on this and
9  just -- every bullet point here is postal
10  property.  So access control -- I'm sorry.
11       ARBITRATOR GABA:  Off.
12       (Brief off-the-record discussion.)
13       ARBITRATOR GABA:  Please continue.
14  BY MR. STELLABOTTE
15    Q   Mr. Bowers, you were going through the
16  list of statutory duties as it pertains to postal
17  police officers.
18    A   Yeah.
19    Q   Please continue.
20    A   Thank you.  Access control.  You'll
21  note, even in this building, when you walked in,
22  you may see -- we have random fixed patrols.  If

Page 362

1  I reference this building, you may see postal
2  police going out to the promenade, or you may see
3  them up on the -- on the ground level where we
4  have our access control where Prosegur sits.
5       Also, on occasion, here or in the
6  field, there could be unruly employees.  There
7  could be unruly customers, where PPOs would
8  escort those -- those particular individuals off
9  postal premises.
10       Security patrols, there's mobile and
11  foot patrols.  So a foot patrol is -- a PPO could
12  walk this facility, or if I was in Chicago, I
13  would walk the large Cardiss Collins facility to
14  check in with management, make sure, you know,
15  doors are locked, windows, making sure that the
16  facility is secure.  But these facilities are
17  quite large, so there's postal police vehicles.
18  They could drive the facility.
19       And then, also, there are post offices
20  around -- smaller post offices that are around
21  the larger what we call processing and
22  distribution centers.  They could travel to -- to

Page 363

1  those facilities to perform the same function
2  that they're performing at their main facility.
3     Q   Mr. Bowers, let me ask you:  Going back
4  to access control and then the segue into
5  security patrols, in reference to access patrols,
6  does our contract force also engage in that type
7  of function?
8     A   They do in some locations.  Are you
9  talking -- you're talking access control or --
10    Q   Access control?
11    A   Yeah.  Access control, absolutely.
12    Q   Okay.  And what type of access control
13  is the contract force doing?
14    A   Well, like -- like here, at a fixed
15  post and checking IDs coming into the building.
16    Q   As it relates to security patrols,
17  are -- is the contract force also engaging in
18  that type of duty?
19    A   In some locations around the country.
20    Q   Okay.  Give me an example.
21    A   So, O'Hare, the Prosegur guards have a
22  vehicle.  Buffalo, where we used to have PPOs,

27 (Pages 360 - 363)

Page 364

1 there's Prosegur guards that will perform that
2 duty. And there's one other location. It's --
3 it's not coming to me. There's another location.
4 I just can't recall right now.
5    Q   But to the best of your knowledge,
6 contract personnel are -- are engaging in mobile
7 and foot patrols in various areas?
8    A   Yes.
9    Q   Okay. You can continue.
10    A   Oh, okay. Moving down, third bullet,
11 issue citations. So, typically, it would be a
12 parking citation.
13       Postal police carry firearms and have
14 arrest authority on postal property.
15       Emergency response, respond to postal
16 vehicle accidents. And what I'm referring to in
17 this slide is on postal property. There was a
18 recent pretty horrific -- actually, it was a
19 death -- accident in Chicago, where postal
20 police -- there was a -- it was an accident on
21 postal property, and postal police performed
22 heroically to try to save the individual that was

Page 365

1 in the car that crashed into the postal facility.
2 Unfortunately, that person didn't make it, but
3 that was an accident that happened in December of
4 last year.
5       ARBITRATOR GABA: Counsel, I'm going to
6 slow you down. Just a little bit of confusion
7 here. One, your slide refers to statutory
8 duties, but your footnote just refers to the job
9 description. And the witness just testified that
10 PPOs can carry firearms and have arrest authority
11 on postal property --
12       MR. STELLABOTTE: Correct.
13       ARBITRATOR GABA: -- which is different
14 than your slide. So I'm a little confused. And
15 then my skin crawls because you're missing a
16 couple semicolons, but I'll get over that.
17 BY MR. STELLABOTTE
18    Q   Okay. Mr. Bowers, can you clarify? At
19 the top of the statutory slide where it says PPO
20 statutory duties, is this on postal property?
21    A   These -- every bullet here would be on
22 postal property, so carry firearms and arrest

Page 366

1 authority on postal property. I mean, I could
2 put on postal property for each one of these
3 bullets, but --
4       ARBITRATOR GABA: And here -- here is
5 my question: Is there statutory authority for
6 these individuals to carry firearms and to have
7 arrest authority, not -- and I probably don't
8 want to use the term arrest authority, but
9 custodial authority while off Postal Service
10 property? It has me a little -- that's one of
11 the things I'm confused about.
12       MR. STELLABOTTE: So postal police
13 officers are permitted to make arrests on postal
14 property. They're not permitted to go out in the
15 community and make arrests. They're subject to a
16 regular citizen and a citizen's arrest, but
17 they're not -- their -- their main focus --
18       MR. STEPHENS: Can I interpose an
19 objection?
20       ARBITRATOR GABA: Sustained. You're
21 testifying and --
22       MR. STELLABOTTE: Oh, I thought you

Page 367

1 were asking me directly, sir.
2       ARBITRATOR GABA: No, I'm just telling
3 you what I'm confused about. So when I'm
4 confused, you can allow me to remain confused,
5 which is an ongoing state for me, or you can ask
6 the witness questions that will help resolve my
7 confusion. Does that make sense?
8       MR. STELLABOTTE: It does. If you're
9 asking -- I can ask the questions directly to
10 Mr. -- to Mr. Bowers.
11 BY MR. STELLABOTTE
12    Q   Mr. Bowers, the list that you're
13 referring to related to the PPO statutory duties
14 as it pertains to 3061, are these all on postal
15 property?
16    A   Yes.
17    Q   And are these duties also -- are
18 they -- are these duties also part of their job
19 description in Exhibit A3?
20    A   Yes.
21    Q   Okay. For -- for our purposes, please
22 refer to Exhibit A3 in the PPO job description.

28 (Pages 364 - 367)

Page 368

1  Just so you know, the --
2        ARBITRATOR GABA:  No, I -- I love the
3  PPO job description, but I would love to know the
4  statutory authority for the PPOs.
5        MR. STELLABOTTE:  Again, sir, the
6  statutory authority for PPOs is under 3061, and
7  their duties are explained through (c) that we
8  may give them -- we may give police officers the
9  duty in connection with the protection of the
10 property owned and occupied by the Postal
11 Service.
12       ARBITRATOR GABA:  Help me -- help me
13 out, sir.  You're obviously reading something
14 that I don't have in front of me.  Can you --
15       MR. STELLABOTTE:  Sure.
16       ARBITRATOR GABA:  -- give me an
17 exhibit --
18       MR. STELLABOTTE:  I'm referring to
19 3061, and this is exhibit --
20       ARBITRATOR GABA:  Thank you.
21       MR. STELLABOTTE:  -- Joint Exhibit 7.
22       ARBITRATOR GABA:  Slow down.  Okay.

Page 369

1  Okay.  I'm there.
2        MR. STELLABOTTE:  Okay.  So under 3061,
3  as I mentioned before, under (a), that gives
4  investigative powers of the postal personnel to
5  inspectors.  Under (b), that also is the powers
6  granted to the inspectors, and under (c), the
7  Postal Service may employ postal police officers
8  for the duty in connection with the protection of
9  property owned and occupied by the -- by the
10 Postal Service under the charge and control of
11 the Postal Service.
12       So that is giving them that authority.
13 The authority is to enforce federal laws and
14 regulations, carry firearms, make arrests without
15 a warrant for any offense that's committed in the
16 presence of an officer, for a felony.  So it goes
17 into that.
18       What's important to understand under
19 3061, sir, is that under three, we don't give
20 them the additional duties that inspectors have,
21 such as serving warrants and subpoenas, such as
22 conducting investigations --

Page 370

1        MR. STEPHENS:  I'm going to object --
2        MR. STELLABOTTE:  -- which we don't
3  allow them to do.
4        MR. STEPHENS:  Object --
5        ARBITRATOR GABA:  Sustained.
6        Any further questions --
7        MR. STELLABOTTE:  No, Your Honor --
8        ARBITRATOR GABA:  -- for the witness?
9        MR. STELLABOTTE:  -- or, sir.  Well, I
10 mean, we've just gone over the statutory
11 authority in this slide under 18 U.S.C. 3061.
12       ARBITRATOR GABA:  Okay.  Slow -- when
13 you say this slide, what are you referring to?
14       MR. STELLABOTTE:  The slide that's up
15 right now.
16       ARBITRATOR GABA:  What -- give me an
17 exhibit number --
18       MR. STELLABOTTE:  Slide --
19       ARBITRATOR GABA:  -- and a page number.
20       MR. STELLABOTTE:  -- 11, sir.
21       ARBITRATOR GABA:  I'm sorry?
22       MR. STELLABOTTE:  Slide 11, the one

Page 371

1  that you're -- that is up in this --
2        ARBITRATOR GABA:  Yes.  Does it have an
3  exhibit number?
4        MR. STELLABOTTE:  Yeah.  The exhibit
5  number is Exhibit 7, Joint Exhibit 7, and that is
6  the statute, 18 U.S.C. 3061.
7        ARBITRATOR GABA:  Okay.  Keep going,
8  sir.
9  BY MR. STELLABOTTE
10   Q   Okay.  Mr. Bowers, can you continue
11 with the PPO statutory duties in the list as it
12 pertains to PPOs?
13   A   Sure.  I think we left off on emergency
14 response.  So I'll go to medical response.  I
15 mean, there could be -- in this building, we have
16 PPOs that respond to medical incidents.  You
17 know, somebody in distress, they'll -- they'll
18 respond and then coordinate with local -- the
19 local first responders.
20       Suspicious packages, as you can
21 imagine, a large Postal Service, we have quite a
22 number of suspicious packages that will come

29 (Pages 368 - 371)

Page 372

1  into -- that we'll be made aware of in the course
2  of our duties, some of those while PPOs are
3  present.  So if that -- if that happens, PPOs'
4  role is to secure the area, meaning if they have
5  information, preliminary fact-finding, they can
6  then call postal inspectors for postal inspectors
7  to respond.
8       Of that number that I said of postal
9  inspectors, that 1,289, there's 400 postal
10  inspectors that have specialized training to --
11  about 140 hours of training to respond to
12  powders, liquids, potential IEDs.  A postal
13  inspector will respond and clear the package, you
14  know, deem it not hazardous or, you know, just
15  clear the package.
16       The next one, assaults on postal
17  property, PPOs can respond to -- PPOs can -- PPOs
18  can respond to assaults on postal property.  They
19  won't investigate -- again, preliminary
20  fact-finding -- and then postal inspectors will
21  come to do the investigation.
22       And lastly, burglar alarm response.

Page 373

1  There are a lot of facilities in the Post Office.
2  Not every one of them is alarmed.  If a PPO goes
3  out to respond to a burglar alarm and they see
4  that the facility has been breached, that they're
5  actually has been a burglary, then they'll --
6  they'll reach out to a postal inspector, and then
7  the postal inspector will come and then
8  they'll -- they'll make entry.
9       Q   So if there -- if there is any type of
10  indication that there's any forced entry or any
11  type of open door or kicked -- if the door is
12  kicked in, what is the rule of the PPO?
13       A   Well, if -- if they see that it's --
14  it's breached, then call postal inspectors, but
15  then once the postal inspector's there, they
16  would go in -- they would go in together.
17       Q   Okay.  Thank you, Mr. Bowers.  What is
18  the purpose of this next slide to end your
19  presentation?
20       A   Okay.  So I've been referencing Chicago
21  quite a bit, so this is -- to the left you'll see
22  an aerial shot of the Cardiss Collins Processing

Page 374

1  and Distribution Center.  That's the facility in
2  Chicago.  That's where the captain responds --
3  where the captain reports to, the sergeants and
4  the officers on the -- on the org chart that I
5  showed earlier, the Chicago Division postal
6  police hierarchy.  So they -- they would all
7  report and perform their duties in that facility.
8       Now, what's represented on the upper
9  right is representative of a smaller post office.
10  So you can imagine -- this is downtown Chicago --
11  there's quite a number of postal facilities like
12  the one that you see here in the upper right that
13  are around Cardiss Collins.  And they could --
14  the postal police could get in their vehicle and
15  travel to a post office and perform the same
16  function that they're performing at the P&DC, the
17  Cardiss Collins facility on the left, again,
18  securing the facility, checking in with
19  management, making sure that the facility's
20  secure.
21       Bottom right is a picture of Chicago
22  O'Hare or it's representative of Chicago O'Hare,

Page 375

1  and so PPOs in Chicago could then go to O'Hare,
2  but there's a large postal facility at O'Hare
3  where we have postal employees and, again,
4  perform the same function that they do at the
5  Cardiss Collins facility in Chicago, Downtown
6  Chicago.
7       Q   Mr. Bowers, just to be clear, are
8  PPOs -- are they protecting postal facilities?
9       A   Yes.
10       Q   Okay.  Now that we've gone through
11  3061(c), which gives the postal police their
12  authority --
13       ARBITRATOR GABA:  Slow down.  Slow
14  down.  Sorry, sir.  Give me -- give me just a
15  second.
16       MR. STELLABOTTE:  Okay.
17       ARBITRATOR GABA:  Okay.  Counsel, so
18  let me -- let me tell you a little bit about what
19  I'm confused about when we look at 3061.  When I
20  look at (a), I don't know what other agents
21  means.  Does that mean PPOs?  So that's one thing
22  I'm a little confused about.  And is it your

Page 376

1   position that the totality of authority is going
2   to be -- for the PPOs is going to be found at
3   (c)(1), (2) and (3) of 3061?
4          MR. STELLABOTTE: Yes, sir.
5          ARBITRATOR GABA: Okay. Thank you,
6   sir.
7   BY MR. STELLABOTTE
8      Q   Okay. Mr. Bowers, we left off -- I
9   know.
10     A   I thought we were going to have to
11  start again.
12     Q   We left off at the protecting
13  facilities. I believe you were talking about
14  PPOs working outside of large processing
15  facilities on occasion at airports and -- and
16  other postal facilities.
17         Do you know under what authority, if
18  any, gives the Postal Service the ability to use
19  PPOs to engage in security functions off postal
20  facilities? Now I'm just talking about security
21  functions.
22     A   Sure. It's 39 U.S.C. 401, powers of

Page 377

1   the Postal Service.
2          MR. STELLABOTTE: And for the record,
3   Mr. Arbitrator, this can be found -- the full
4   text can be found at 39 U.S.C. 401 at Bowers
5   Appendix D2. And I'll give you a moment to find
6   it.
7          ARBITRATOR GABA: You might have to
8   give me more than that, counsel.
9          MR. STELLABOTTE: There's a lot there.
10         ARBITRATOR GABA: Did you say D2 in the
11  appendix?
12         MR. STELLABOTTE: It's under Bowers
13  Appendix D2.
14         ARBITRATOR GABA: Okay. Off.
15         (Brief off-the-record discussion.)
16         ARBITRATOR GABA: Counsel, any further
17  questions?
18         MR. STELLABOTTE: I'd just like to
19  reiterate the question, just so it's clear.
20  BY MR. STELLABOTTE
21     Q   Mr. Bowers, again, the PPOs are used
22  primarily in security functions and off post of

Page 378

1   the facilities, and where can that be found?
2      A   39 U.S.C. 401, powers --
3      Q   Okay.
4      A   -- of the Postal Service.
5      Q   Okay. And is that -- is that function
6   limited?
7      A   Yes.
8      Q   Why is that limited?
9      A   Well, I mean, it's limited because -- I
10  mean, I've gone through this before that there's
11  liability issues if you go off postal property.
12         The training, which I'll get into in a
13  subsequent slide, not trained to -- to handle
14  incidents outside of -- of the area.
15         And most importantly is, we don't allow
16  them to -- to do anything other than these
17  limited that are indicated here in 39 U.S.C. 401.
18     Q   Mr. Bowers, I just want to get into a
19  couple of questions, and I think what's important
20  to understand is that -- you know, what PPOs can
21  do on post, what they can do off post.
22         And are we saying that postal police

Page 379

1   officers are engaging in activities off post on a
2   regular basis?
3      A   It's happened occasionally.
4      Q   Can you give me an example of how that
5   occurs?
6      A   Well, an example would be -- is if -- I
7   had a conversation with somebody or I talked to
8   somebody in a particular division -- and this --
9   this actually just came up recently, where postal
10  police officers are shadowing letter carriers.
11     Q   What is your position on that?
12     A   They're not allowed to shadow letter
13  carriers.
14     Q   And why is that -- why is that your
15  determination?
16     A   Again, it's -- first is liability,
17  right? So the -- the officer could be subject to
18  civil liability. You know, they're not trained.
19  They don't -- they don't have any training, which
20  we'll get into, and I know there's another
21  presentation after me that will go into detail on
22  training, and we don't authorize them to do it.

31 (Pages 376 - 379)

Page 380

1    Q   Let me be clear.  If -- if you do hear
2  via teleconference, phone call, through your
3  chain of command that an INC or an AIC captain,
4  sergeant, is allowing postal police officers to
5  work outside their scope of authority, what would
6  you do, if anything?
7    A   I would either talk to the -- the
8  respective executive, in this case, would be an
9  inspector in charge, or I'd talk to the deputy
10  that's over those executives.  And this is not a
11  new thing.  This is something that we've
12  addressed at national leadership team meetings,
13  with captains, with executives.  This is a
14  message that we constantly reinforce.
15    Q   Now, is it plausible that PPOs want to
16  contribute more and want to work outside their
17  statutory duties?
18    A   That is definitely what I've heard.
19  Absolutely.
20    Q   And what are your feelings?
21    A   Well, I mean, right now, those are --
22  those are not the -- roles that we have.  I

Page 381

1  mean, those are not the -- we're not -- we don't
2  have -- we didn't promulgate any regulations
3  under 3061(c), so we're not statutorily
4  authorized to do that.  Now, can we have that
5  discussion?  That's for a future conversation.
6    Q   And where do you get your marching
7  orders as it relates to PPOs duties?
8    A   Well, I mean, I get my marching orders
9  from the chief postal inspector, but, I mean, you
10  go higher, you've got Board of Governors down to
11  the PMG to the chief to me to the executives down
12  through the captains, sergeants, PPO, right
13  down -- right down the chain.
14    Q   Okay.  Thank you.  Moving on to the
15  next slide, Mr. Bowers, what is this -- what is
16  the purpose of this particular slide?
17    A   Okay.  So I wanted to talk about an
18  investigation, so I figured I'd give one that
19  was -- you may have heard about.  So what you see
20  on the -- on the slide here is a picture of a
21  package, mail bomb, actually, that was one of 16
22  mail bombs that transited the postal network in

Page 382

1  October of 2018.  You'll note in the upper left
2  of this -- and they all had the same return
3  address.  You'll see Representative Debbie
4  Wassermann Schultz.  The return address was in
5  Florida.  It was her office in Florida.  And it
6  was very high profile.
7       So it started on October 22nd, 2018,
8  24/7 news coverage.  We get a call from the FBI
9  special agent to a postal inspector that sits on
10  a joint terrorism task force.  We have postal
11  inspectors embedded in joint terrorism task
12  forces around the country.  The FBI runs up
13  those -- what they call JTTFs.  And we got a call
14  that there was a package going to a private
15  citizen, high profile private citizen, and it
16  looked credible.  So we immediately -- we, postal
17  inspectors, responded to that particular scene.
18  It was in Westchester, New York.
19       And subsequent mailings included very
20  high profile folks that included former President
21  Obama, former Secretary of State Hillary Clinton,
22  other high ranking members of Congress.  CNN was

Page 383

1  targeted.  And so along that way for the
2  investigation, postal inspectors collaborated
3  with the United States Secret Service, the FBI,
4  Federal Bureau of Investigation, ATF, Alcohol,
5  Tobacco and Firearms, NYPD, New York Police
6  Department.  There was the -- as I mentioned, the
7  CNN package was in New York City.  We'll get into
8  some of the -- some of the other particulars in
9  this.
10       So during the course of that
11  investigation, again, kind of touched -- the
12  mailings were -- typically, in events like this,
13  there would be a targeted increase in suspicious
14  calls.  If you recall, there was an Austin
15  bombing, FedEx, so the calls would go up in
16  Austin.  Boston Marathon bomb, the calls went up
17  in Boston.  The difference about this, the
18  novelty that's surrounding this is it increased
19  suspicious calls all over the country.
20       Actually, at one point in time --
21  because when things like this happen, people
22  panic, and then they, you know -- something that

Arbitration Vol. 2                                    February 4, 2020

Page 384

1  they wouldn't have deemed suspicious is now
2  suspicious, and then, you know, postal inspectors
3  can respond and clear.
4       So during the course of the
5  investigation, postal inspectors collaborating
6  with other federal agencies, you know, conduct
7  interviews, conduct covert surveillance, collect
8  evidence.  This evidence -- actually, the
9  evidence -- the initial evidence from this was
10  sent to a lab in Quantico, the Bureau, and the
11  case -- because the first two mailings were in
12  New York, the case is -- was being run out of New
13  York.  So postal inspectors and FBI agents worked
14  with the U.S. Attorney's Office.
15       We also didn't know -- as you note from
16  this -- this image, there's no cancellation, so
17  we didn't know where these packages came from.
18  So we had to do an investigation to determine
19  point of origin.  So that was Monday.  We move to
20  Wednesday of the same week, October 22nd, the
21  week of October 22nd in 2018, and there's a --
22  similar to Cardiss Collins, there's a facility in

Page 385

1  Miami called the Royal Palm facility.  Through
2  our investigation, we determined that all 16
3  packages -- ultimately, there were 16 packages --
4  originated in the Royal Palm Processing and
5  Distribution Center.
6       So as you can imagine, there was quite
7  a lot of media presence.  Media was outside of
8  that facility.  And postal inspectors and local
9  law enforcement wanted to do and did mail
10  screening, and what mail screening is in this
11  particular case is to try to get packages before
12  they get to their destination.  So I don't want a
13  package to go to a representative of Congress if
14  I can -- if I can prevent it from going there.
15  And that's what we did on this Wednesday.
16       So PPOs did an outstanding job in Royal
17  Palm keeping the media at bay while postal
18  inspectors were in the facility with local law
19  enforcement to try to capture additional
20  packages.  Actually, a package was found.  Going
21  on in New York, a postal employee discovered --
22  because now all these images are out on -- on

Page 386

1  cable news, and a postal employee in Times
2  Square, New York discovered a package at -- at
3  destination and big response.
4       Again, I was just in New York last week
5  for some leadership training, and Times Square
6  PPOs perform the same function that they did at
7  the Royal Palm facility in Miami, providing that
8  perimeter security -- again, huge media
9  presence -- played a critical role to make sure
10  that we could get that evidence and get it to a
11  lab and get the -- the analysis done,
12  fingerprints, DNA.
13       So there's a good ending to this story.
14  After five days, through forensic analysis at the
15  lab in Quantico, an individual by the name of
16  Cesar Sayoc was identified, and postal inspectors
17  and FBI agents arrested Mr. Sayoc in Florida.  We
18  were already there because we had determined the
19  point of origin through our investigation, and he
20  was arrested.  And then the afternoon of that
21  day, then Deputy Chief Barksdale, now Chief
22  Barksdale, gave a press conference announcing the

Page 387

1  arrest of Cesar Sayoc.
2       But it doesn't end there.  We arrested
3  him, but there's -- you know, we have to prepare
4  for trial.  So postal inspectors and FBI agents
5  worked with the U.S. Attorney's Office in New
6  York, and that went on for a number of months.
7  And, ultimately, Mr. Sayoc, last year, was
8  sentenced to ten years in federal prison.
9       Q   Thank you, Mr. Bowers.  The next slide,
10  what does this -- what does this illustrate to
11  the panel?
12       A   So in -- in this particular
13  investigation, PPOs provided in Royal Palm and --
14       Q   Mr. Bowers, just -- just for the
15  record, you're still talking about the pipe
16  bombs, correct?
17       A   I am.
18       Q   Okay.
19       A   Yeah.  So in this, it's just basically
20  a summary of my long description of -- of that
21  particular case.  I thought it would be good to
22  summarize what I'm talking about.  PPOs in this

Page 388

1  case certainly secured the facility in Royal
2  Palm, did perimeter security, did the same thing
3  in New York at Times Square.  We did other
4  screening events around the country, L.A., San
5  Francisco.
6       Inspectors, as I said, we gathered
7  evidence.  We gather -- gathered the evidence in
8  Times Square.  We gathered the evidence with the
9  letters going to former Secretary of State
10 Clinton and another private citizen.
11      Forensic analysis -- ultimately, Sayoc
12 was -- it was DNA and fingerprints that -- that
13 identified him.  Interviewed numerous witnesses.
14 As you can imagine, it was quite a large case,
15 national in scope.  We coordinated with other
16 federal agencies, ATF, FBI, U.S. Secret Service,
17 NYPD, and numerous other state and law
18 enforcement -- state and local law enforcement.
19 We conducted covert surveillance, made the
20 arrest, and assisted with prosecution.
21      Q   Okay.  So this slide -- just -- just to
22 clarify, the slide distinguishes PPOs' roles in a

Page 389

1  criminal investigation in contrast with
2  inspectors, correct?
3       A   That's correct.
4       Q   Now, overall, for inspectors, just so
5  we can make it clear what a criminal
6  investigation actually entails with criminal
7  inspectors within the Postal Inspection Service,
8  let me run through a few things that inspectors
9  investigate, and you tell me whether or not PPOs
10 actually investigate those types of scenarios.
11      Is that fair?
12      A   That's fair.
13      Q   So postal inspectors, are they engaged
14 in criminal investigations of such things like
15 child exploitation through the mail?
16      A   Yes.
17      Q   Are these situations -- are these
18 criminal investigations done by PPOs?
19      A   No.
20      Q   What about the transport and
21 distribution of narcotics through the mail and
22 postal facilities?  Are these criminal

Page 390

1  investigations that PPOs would conduct?
2       A   No.
3       Q   What about counterfeiting of stamps and
4  postal money orders?  Are these things that
5  criminal investigators do?
6       A   No.
7       Q   Excuse me.  That postal inspectors do?
8       A   Can you repeat the question?
9       Q   Counterfeiting of stamps and postal
10 money orders, are these things that postal
11 inspectors investigate?
12      A   Yes.
13      Q   Do PPOs investigate those?
14      A   No.
15      Q   So what exactly -- if we're talking
16 about criminal investigations, Mr. Bowers, are
17 PPOs actually involved in criminal
18 investigations?
19      A   They're not involved in criminal
20 investigations.  They would be -- it would be
21 preliminary fact-finding.
22      Q   Is there a distinction?

Page 391

1       A   Yeah.  It's initial -- I mean, if
2  you -- if you take the example of a suspicious
3  package, you're going to get that -- that
4  information.  You may get the addressee and
5  return address.  It's preliminary information.
6  You're securing the scene.  That information
7  probably would be documented in -- in their 5309
8  and then turned over to a postal inspector for
9  the investigation, if there is an investigation.
10      Q   You had just mentioned a 5309, and I'm
11 sure the arbitrator is not aware of --
12      A   I'm sorry.
13      Q   -- what a 5309 is.  Mr. Bowers, can you
14 explain what a 5309 is?
15      A   It's an incident report that a postal
16 police officer would fill out.
17      Q   And who fills -- a postal police
18 officer would fill those out?
19      A   Yes.
20      Q   Okay.  Do -- do postal inspectors fill
21 out 5309s?
22      A   No.

Page 392

1    Q    Is there a similar document in which
2  postal inspectors fill out information related to
3  an investigation?
4    A    Yeah.  We have our -- our own internal
5  system that we use to track all of our cases that
6  we have.
7    Q    Can you describe some of those
8  functions, some of those -- some of the
9  documentation that criminal investigators --
10  inspectors use?
11    A    We do interviews.  We would document
12  those interviews in what we call an MOI,
13  memorandum of interview, investigative case
14  details as we -- you know, if we're working an
15  identity -- identity theft case, there might be
16  documents that -- that we would encounter during
17  that case, investigative log of the -- the --
18  duties that we perform during that investigation.
19  That would all be resident in a case that's --
20  that we have internally.
21    Q    Okay.  And in reference to compiling
22  those documents, do you ever have to present

Page 393

1  those to a U.S. attorney?
2    A    Sure.  I mean, I've done it.  It's been
3  a long time.  But if we're working with a U.S.
4  attorney, we would have to present what they call
5  a U.S. attorney letter, which is basically a
6  document to the assistant U.S. attorney outlining
7  all -- basically outlining the facts of the
8  investigation on why you want to proceed with,
9  you know, an indictment, an arrest warrant for a
10  particular individual.
11    Q    Okay.  Do you know if PPOs engage in
12  that type of activity?
13    A    They do not.
14    Q    Okay.  Mr. Bowers, moving on in your
15  presentation, we're going to talk about some
16  statistics.
17         To the best of your knowledge,
18  Mr. Bowers, does the Postal Inspection Service
19  maintain statistics on criminal activity and
20  arrests made by postal inspectors and postal
21  police officers?
22    A    They do.

Page 394

1    Q    I want to turn your attention to
2  Exhibit D, as in delta, 4.  That is a 5309A.
3    A    Okay.  I'm good.
4         MR. STELLABOTTE:  Mr. Arbitrator, are
5  you there?
6         ARBITRATOR GABA:  Hopefully.
7  BY MR. STELLABOTTE
8    Q    Are you familiar with that document,
9  Mr. Bowers?
10    A    I am.
11    Q    What is that document?
12    A    It's -- it's called on the bottom left
13  IS Form 5309A.  IS stands for Inspection Service.
14  It's the quarterly security force activity
15  report.
16    Q    And what's the purpose of this
17  document?
18    A    It is basically rolling up data from
19  postal police officers on a quarterly basis up
20  through National Headquarters.
21    Q    Okay.  And -- and who actually fills
22  out this document?

Page 395

1    A    It's management at the local division.
2    Q    Is it management -- just so I
3  understand, is management the AIC or the INC, or
4  are these the postal police officer managers?
5    A    Postal police officer managers.
6    Q    And just to be clear, who do they turn
7  these -- who do they give these documents to?
8    A    So if you recall the very beginning of
9  my presentation, I said there was a program
10  manager that oversaw the postal police program.
11  It would go to that person who sits in this
12  building.
13    Q    Okay.
14    A    In the Security Group.  I'm sorry.
15    Q    Okay.  And in this document, is there a
16  column in which arrests are actually calculated
17  or tabulated?
18    A    Yes.  If you go to the second page and
19  item E, echo, number of arrest apprehensions.
20    Q    And that is on page 2 of that document?
21    A    That's correct.
22    Q    And in preparation of your testimony

35 (Pages 392 - 395)

Page 396

1  today, Mr. Bowers, did you have an opportunity --
2  opportunity to review the crime and statistics
3  for the Postal Service for, say, the last couple
4  years?
5      A   To review the 5309s?
6      Q   Yeah, just as -- did you review any of
7  the data as it pertains to arrests?
8      A   Yes.
9      Q   Okay.  Let's talk about your next
10  slide.  What is the purpose of this slide?
11      A   So this is a look-back on the last four
12  years, utilizing this form that came up through
13  our program manager here at National
14  Headquarters, and it's the number of arrests that
15  were reported to National Headquarters.
16      Q   And does this -- does this slide
17  mean anything to you as it --
18      A   Well --
19      Q   -- pertains to arrests?
20      A   Well, to me it shows that PPOs can make
21  arrests.  Certainly, I think we've -- we're clear
22  on that, but it doesn't look like it's a primary

Page 397

1  responsibility of the PPOs.
2      Q   In contrast with your next slide, what
3  is this slide?
4      A   So this is not inclusive of all the
5  arrests, but narcotics and mail theft are two
6  very large programs within the Inspection
7  Service.  So back to 2019, basically, these are
8  the arrests in the narcotics program and the mail
9  theft program.  So it totals up to, you know,
10  maybe about 4,600 arrests that were -- that were
11  effected last year.
12      Q   And you said that -- I think you
13  misspoke.  Did you say PPOs, or these are
14  inspectors?
15      A   These are inspectors.  I'm sorry.
16      Q   Okay.  And it looks like there's two
17  categories, narcotics and mail theft.  Is that --
18  is this an exhaustive list?
19      A   It is not.
20      Q   Approximately how many other categories
21  do postal inspectors -- is it calculated for
22  their arrests?

Page 398

1      A   You're testing my memory.  Probably --
2  maybe 12 to 15 other categories.  The total
3  number that we just published in our annual
4  report is over 5,700 arrests.  There's probably
5  another eight or -- eight or nine categories that
6  we -- that we have arrests in.
7      Q   Okay.  Thank you.  And in relation to
8  PPOs and their assignments, are the daily
9  assignments of PPOs tracked on a regular basis?
10      A   They are.
11      Q   Okay.  I want to turn your attention to
12  Exhibit D5, delta 5.  Are you there, Mr. Bowers?
13      A   I am.
14          MR. STELLABOTTE:  Mr. Arbitrator?
15          ARBITRATOR GABA:  Yes, sir.
16          MR. STELLABOTTE:  Thank you.
17  BY MR. STELLABOTTE
18      Q   What are we looking at here,
19  Mr. Bowers?
20      A   So it's, again, bottom left, IS Form
21  5305 -- again, IS is Inspection Service -- and
22  Security Supervisor Daily Report.

Page 399

1      Q   And what is the purpose of this
2  document?
3      A   It is to outline daily activity of the
4  postal police.
5      Q   Do you know who completes this --
6  this -- this form?
7      A   Sergeant.
8      Q   Are you -- for our purposes today -- I
9  know we're going to be hearing from Mr. Goldberg
10  tomorrow, but, basically, the 5305 data, did you
11  have a chance to review any of the 5305 data or
12  review any of the 5305 documents in the last year
13  or two?
14      A   Well, I mean, I reviewed this
15  particular slide, but you're going to hear from
16  another individual by the name of Dalton Grisham,
17  who's actually the person that created this
18  slide.
19      Q   And what is the purpose of this slide?
20      A   Basically to show over a period of
21  time -- the indications at the bottom are fixed
22  posts, mobile posts, foot patrols and other --

36 (Pages 396 - 399)

Page 400

1  2007, 2013, 2018, it was determined -- Dalton
2  Grisham, who's a labor economist, picked August
3  for each one of those time slices, and if you
4  look, so for the purposes of why we're showing
5  it, why I'm showing it, is that if you look
6  across, we are consistent across those four
7  categories across those three specific time
8  periods.
9      Q   Consistent in what respect, Mr. Bowers?
10     A   Well, consistent that -- I mean, if you
11 take the blue, the fixed posts, 23 percent in
12 2007 in fixed posts, and you move to 2013, it's
13 19.  You move to 2018, it's 21 percent.  There's
14 no significant change in -- in distribution.  You
15 actually see the same trend going up on all three
16 and then the purple, which is other, 11, 10, 10.
17 So that's what I mean by consistent.
18     Q   Okay.  And we're going to hear more
19 from Dalton Grisham regarding this -- the 5305
20 data?
21     A   We are.
22     Q   Let's move on to the training

Page 401

1  standards, Mr. Bowers.  I'm going to show you the
2  next slide, slide 23.  What are we looking at
3  here?
4      A   So, again, basically, it's a comparison
5  in PPOs training versus inspector training.
6  Again, not an exhaustive list.  It's not
7  everything that's trained.  Excuse me.  You're
8  going to hear more from INC Jennifer McDaniel on
9  maybe more particulars on the training that's
10 offered.
11     Q   And as it -- let's look at the first
12 category in relation to interviews and
13 interrogations.  It looks like inspectors receive
14 a significant amount of more training related to
15 interviews and interrogations.  Why is that?
16     A   Sure.  I mean, as -- as part of an
17 investigation, you're certainly going to conduct
18 a lot of interviews.  And it may turn into
19 interrogations, so we need to make sure that
20 postal inspectors have the proper training to do
21 that when they get out into the field.
22     The -- now, we do give that to postal

Page 402

1  police.  Obviously, it's a much smaller number,
2  but as I indicated previously that there -- there
3  is preliminary fact-finding that's done and which
4  would require, you know, talking to individuals.
5  So there is that that's offered.
6      Q   And related to evidence and labs, why
7  wasn't -- why is there is a disparity with PPOs
8  and inspectors in that particular category?
9      A   Again, you know, by -- by conducting
10 investigations, I just recall -- recall the
11 narcotics.  There's a lot of evidence, if you go
12 to the forensic lab in Dulles, that I mentioned
13 that was in my purview.  You'll find a lot of
14 narcotics that's submitted for, you know,
15 additional analysis to determine what it is or a
16 fingerprint analysis.  So there's quite a number
17 of submissions depending upon the assignment you
18 work.
19     And just recall that I, you know -- I
20 mentioned, if you're preserving evidence -- PPOs
21 preserve evidence -- there has to be some
22 training related to that, and that's -- that's in

Page 403

1  the -- in the number that's listed there.
2      Q   And for legal issues, why is there a
3  disparity in contrast with inspectors and PPOs?
4      A   You know, both -- both need -- I mean,
5  PPOs are -- are out on the street, right?  They
6  can make arrests on postal police property.
7  You -- you have to know the legal components of
8  that and what your authority is, so there is
9  training with that.  But -- and they have -- they
10 don't have broad arrest authority.  Postal
11 inspectors have broad arrest authority, so with
12 that would come additional legal training.
13     Q   And overall in these three
14 categories -- I know this isn't an exhaustive
15 list, and there will be another witness who
16 testifies in relation to the training
17 curriculum -- but overall, do PPOs need extensive
18 hours of training in these three categories?
19     A   I'll say no, but I'll give a caveat on
20 the legal issues, because we're -- we are in the
21 process of expanding our training.  And I may
22 leave this to, you know, INC McDaniel, and we are

37 (Pages 400 - 403)

Arbitration Vol. 2                                    February 4, 2020

Page 404

1  increasing the legal training within when we
2  increase from eight weeks to 12 weeks.
3      Q   So you're saying there is going to be
4  an increase in training for the PPOs?
5      A   There is.
6      Q   Okay.  And the increase in training for
7  the PPOs, can you go into a little bit of detail
8  of what that additional training entails?
9      A   Well, can I -- can I back up and say
10  that -- let me -- let me level set here.  So we
11  increased the postal inspector training from 14
12  weeks to 16 weeks.  We currently have a BIT
13  class, basic -- Basic Inspector Training class
14  that's in CDU right now, and that's the first
15  class we have at 16 weeks.
16      So -- and then, right now, a PPO class
17  just started on Monday.  That's still at eight
18  weeks.  We have two more PPO classes that will be
19  offered at CD- -- the Career Development Unit
20  later this year, and I think our plan -- I'm
21  almost positive our plan is to go to 12 weeks for
22  PPOs in June, in the June class.

Page 405

1      I can run through the -- the increase
2  in hours if you would like me to or --
3      Q   Well, I guess my main question is:  The
4  additional hours of training for -- or the
5  additional weeks of training for the PPOs, does
6  that afford any additional duties, or is that
7  training to teach them any additional duties, or
8  what exactly is that additional -- those
9  additional weeks at it relates to the PPOs?
10      A   It certainly doesn't expand their
11  duties.  A lot of the -- there's an increase in
12  firearms training.  There's an increase in
13  defensive tactics and officer survival, which are
14  skills that both postal inspectors and postal
15  police need.
16      There's simulation.  We have a
17  simulator that we put PPOs and inspectors in that
18  would simulate a scenario that -- you know, make
19  decisions and -- so, yeah, they're all related
20  to -- you know, we want you to be proficient --
21  more proficient in firearms.  There's additional
22  legal hours, defensive tactics and officer

Page 406

1  survival, but none in here are we adding
2  investigations.  We're not adding any
3  investigation blocks into the -- even though
4  we're adding four additional weeks, it's -- we're
5  not expanding their duties.
6      Q   Understood.  Okay.  Moving on to the
7  next slide, I believe early in your presentation,
8  Mr. Bowers, you briefly touched on the Hallcrest
9  Systems report.  What is the purpose of this
10  slide?
11      A   Can you give me one minute?
12      Q   Yes.
13      ARBITRATOR GABA:  Off.
14      (Brief off-the-record discussion.)
15  BY MR. STELLABOTTE
16      Q   Mr. Bowers, please proceed.
17      A   Sure.  So I had mentioned the Hallcrest
18  Systems report previously when we were on the
19  contract guard slide.  I had talked about the
20  increased use of unarmed contractors, but there
21  were -- there -- there were other findings.  I
22  think it may be beneficial to -- in my -- these

Page 407

1  are my own words -- to read through the major
2  findings, but I don't want to confuse because I
3  don't know if there's a specific reference in the
4  Hallcrest report, so --
5      Q   Mr. Bowers, I would just -- if you
6  could summarize the conclusions of the Hallcrest
7  report.  And for the record, the Hallcrest
8  report, again, is at Appendix D6 of Bowers.
9      Please proceed.
10      A   Okay.  So a report was done to analyze
11  the Postal Service security force, again, private
12  company, and the major findings -- well, first,
13  that FLETC, F-L-E-T-C, which is the Federal Law
14  Enforcement Training Center, which is located in
15  Glynco, Georgia, they deemed that training
16  excessive.  Their report deemed that training
17  excessive.
18      The second finding was the increase of
19  unarmed -- the use of unarmed contractors -- we
20  covered that in the -- in a previous slide -- and
21  consolidate facilities.  So let me -- let me stay
22  on that, consolidate facilities, for a second.

38 (Pages 404 - 407)

Arbitration Vol. 2                                    February 4, 2020

Page 408

1 If you recall, when I -- when I was a new
2 inspector and I was -- I went on to the radio,
3 and the person on the other end in 1998 through
4 2003 was a postal police officer. Hallcrest
5 recommended that we no longer have postal police
6 officers man those communication centers and that
7 we should consolidate and have less communication
8 centers.
9         So we did that, and we now have two
10 communication centers, one in Fort Worth, Texas
11 and one in Dulles, Virginia. They're called
12 NLECC, National Law Enforcement Communication
13 Center.
14        So we reduced -- I think it was 30 comm
15 centers that were done locally. There was one in
16 New York. There was one in Newark. And they
17 were around the country. Instead of utilizing
18 those 30, we're down to two. The dispatchers
19 that are taking those calls now are Prosegur
20 contractors that sit in Dulles, Virginia and Fort
21 Worth, Texas.
22        Additionally, there were six facilities

Page 409

1 where we used to have postal police officers that
2 we no longer do. We closed six postal police
3 officer facilities as was recommended in
4 Hallcrest, Birmingham, Alabama, Buffalo, New
5 York, Denver, Colorado, Hartford, Connecticut,
6 Jacksonville, Florida and Seattle, Washington.
7         Again, I think it's important to note,
8 when Hallcrest was done, there was about 1,400
9 PPOs. As you saw in one of my earlier slides,
10 we're -- we're right about 455 right now. That
11 number will go up as students graduate the -- the
12 postal police officer basic training.
13        Yeah, so -- yeah, so we moved the
14 training, and I think the training moved from --
15 so it's recommending -- it says the training is
16 excessive and that -- in the report, basically,
17 it says that we should design training specific
18 to postal police officers, which is what we did.
19        So we moved from the Federal Law
20 Enforcement Training Center in Glynco, Georgia to
21 now the Career Development Unit in Potomac,
22 Maryland, and now we offer our own training with,

Page 410

1 you know, our own mission, our statutory
2 requirements, you know, firearms, defensive
3 tactics. All of that is done in house.
4     Q   Mr. Bowers, are you -- would Hallcrest
5 suggest, in your opinion, that a change -- there
6 was a change in training -- we should change
7 training, but we need to be more focused on
8 protecting postal property?
9     A   Yes.
10    Q   Okay. Moving on to the next slide,
11 what does this slide illustrate, Mr. Bowers?
12    A   So, basically, postal inspectors,
13 postal police officers, some -- some differences.
14 I'll -- I'll go through.
15        In order to become a postal inspector,
16 you need a bachelor's degree. There is no
17 educational requirement for postal police. You
18 have to be appointed before the age of 37 because
19 we have a mandatory -- because postal inspectors
20 have a mandatory retirement age of 57. Next
21 year, in June, I have to retire. There's a
22 written examination for postal police. There's

Page 411

1 an entrance exam for postal inspectors.
2         If you go to -- postal inspectors have
3 a Single Scope Background Check, SSBI. Every
4 postal inspector has a top secret security
5 clearance. Some have higher. I have -- some
6 have higher. It's top secret, what they call
7 SCI. But all postal inspectors have top secret,
8 and in order to become a postal inspector, you
9 have to pass a polygraph examination, interviews
10 done for -- for both by -- by different people.
11        And that's the basic -- basic
12 differences. It's pretty -- pretty
13 self-explanatory.
14    Q   Okay. And I believe a witness will go
15 into more detail related to the qualifications
16 and training, correct?
17    A   That's correct.
18    Q   And in summary, Mr. Bowers, can you
19 briefly summarize your presentation today?
20    A   Sure. So, first, PPOs play an
21 important role in the protection of Postal
22 Service assets and personnel, as I indicated

39 (Pages 408 - 411)

Page 412

1  earlier, along with, you know, other entities in
2  the Inspection -- inspectors, PTAs, you know,
3  help secure the nation's mail system.
4         They have statutorily limited law
5  enforcement authority primarily restricted to
6  postal property, so recall 18 U.S.C 3061(c),
7  training focused on protection of postal
8  property/assets.  I think after me, you have INC
9  McDaniel, who's the INC of the Career Development
10 Unit, and you'll -- you'll hear more on the
11 training that's -- that's done.
12        Most PPO time is spent on access
13 control and security patrols of postal real
14 property.  Their work hour allocation has
15 remained consistent over time.  Recall the 5305
16 chart that you're going to hear more from the
17 labor economist Dalton Grisham, who prepared that
18 chart, and he'll go into more detail into his
19 analysis of 5305s.
20        And, lastly, PPOs do not conduct
21 criminal investigations, rarely effect arrests,
22 or testify in court.

Page 413

1     Q   Thank you, Mr. Bowers.  I just have a
2  couple of follow-up questions that I think that
3  we just need to circle back on.
4         You had mentioned earlier that the
5  decision was made related to postal police
6  officer duties from the Board of Governors down
7  through the law department, through your chief,
8  and what those functions should be and what those
9  duties should be, and all those duties follow the
10 statutory authority.
11        Is there anywhere else in the contract
12 that allows or that directs us to manage or give
13 duties to our postal police officers?
14    A   Yeah.  Article -- Article 3 gives us
15 the authority to manage methods and means.
16    Q   And where is that located?  For the
17 record, that's located in Joint Exhibit 1.
18        ARBITRATOR GABA:  Counsel, I assume I'm
19 going to get a page number here in just a second.
20        MR. STELLABOTTE:  Yes.  One second,
21 sir.  And that can be located at page 5.
22        ARBITRATOR GABA:  Roman numeral 5 or

Page 414

1  Arabic 5?
2         MR. STELLABOTTE:  Arabic 5, sir.
3  Arabic 5.
4         ARBITRATOR GABA:  Thank you, sir.
5         MR. STELLABOTTE:  And just one second,
6  Mr. Arbitrator.
7         THE WITNESS:  Counsel, where -- where
8  are we?
9         MR. STELLABOTTE:  Just one second.
10        THE WITNESS:  Okay.  I'm sorry.
11 BY MR. STELLABOTTE
12    Q   Just a couple other questions,
13 Mr. Bowers.  I believe you testified earlier that
14 the Postal Service has not promulgated
15 regulations to expand the authority of postal
16 police to engage in investigations, serve
17 subpoenas, et cetera; is that correct?
18    A   That's correct.
19    Q   Who would have the authorization, then,
20 to issue such regulations?  Would that come from
21 the Board of Governors and through the chief
22 inspector?

Page 415

1     A   Yes.
2     Q   Okay.  And to the best of your
3  knowledge, has, again, the Board of Governors or
4  the Postal Service -- have they informed PPOs
5  that they've issued any type of regulations
6  authorizing the expansion of their authority?
7     A   No.
8     Q   And that is -- that is authority to
9  engage in subpoenas, the service of subpoenas or
10 warrants, and to engage in criminal
11 investigations?
12    A   That's correct.
13        ARBITRATOR GABA:  I'm not 100 percent
14 sure, but you might have had a double negative in
15 there.  I'm just going to ask you to do it again.
16        Is that okay, sir?
17        MR. STELLABOTTE:  Absolutely.
18 BY MR. STELLABOTTE
19    Q   To the best of your knowledge,
20 Mr. Bowers, has the Postal Service informed PPOs
21 that it's issued regulations authorizing the
22 expansion of their authority to engage in

40 (Pages 412 - 415)

Page 416

1  activities such as serving warrants or engaging
2  in criminal investigations?
3      A   No.
4          ARBITRATOR GABA:  Do you want a better
5  question?
6          MR. STELLABOTTE:  Please.
7          ARBITRATOR GABA:  You asked if they had
8  informed the PPOs versus are there any
9  regulations.  Sorry.
10 BY MR. STELLABOTTE
11     Q   Are there any regulations, Mr. Bowers,
12 that allow us to do that?
13     A   No.
14         MR. STELLABOTTE:  Okay.  I have nothing
15 further.
16         ARBITRATOR GABA:  Any cross?
17         MR. STEPHENS:  Yes.
18         ARBITRATOR GABA:  Do you want some
19 time, sir?
20         MR. STEPHENS:  Yes.
21         ARBITRATOR GABA:  How much time do you
22 want?

Page 417

1          MR. STEPHENS:  Maybe ten minutes.
2          ARBITRATOR GABA:  Done.
3          MR. STEPHENS:  Thank you.
4          ARBITRATOR GABA:  Off.
5          (Recess 2:26 p.m. to 2:40 p.m.)
6          ARBITRATOR GABA:  Any cross?
7          MR. STEPHENS:  Yes, sir.  Just one
8  moment, please.  Thank you.
9          CROSS-EXAMINATION BY COUNSEL FOR THE
10 PPOA
11 BY MR. STEPHENS
12     Q   Good afternoon, Mr. Bowers.
13     A   Good afternoon.
14     Q   I believe we went through this -- six
15 years ago, we were here.
16     A   We did.  And it can't be every six
17 years now, because in '26, I'll be retired.
18     Q   If I recall correctly, the last time we
19 were here, the Union presented its evidence
20 first, and management produced its evidence
21 second, correct?
22     A   That's correct.

Page 418

1      Q   And you were aware of the testimony of
2  postal police officers who testified in the 2014
3  hearing, correct?
4      A   I was.  Actually, I sat through
5  those --
6      Q   Okay.
7      A   I sat through the entire -- I'm pretty
8  sure I sat through the whole testimony, including
9  my own.
10     Q   And if I remember correctly, you
11 testified at that time -- after hearing what
12 those officers testified to, you testified that
13 they -- they shouldn't have been doing many of
14 the things that they had been assigned to do; is
15 that correct?
16     A   I didn't review my testimony, but if
17 you're saying that's what I said, then I'll go
18 with that.
19     Q   I'm going to be asking you questions
20 from, confusingly, three different binders.
21     A   Okay.
22     Q   So the first binder, I'm going to have

Page 419

1  some questions for you about your -- about your
2  evidence and which I understand is in the Postal
3  Service binders.  I'll be asking you questions,
4  for example, about Exhibit D1, I believe, which
5  is your PowerPoint presentation.
6      A   Okay.
7      Q   I'll also be asking you a few questions
8  from the Union's opening, which is in -- yes,
9  sir -- the binder on your left.
10     A   Okay.
11     Q   That would be -- it would be Exhibit
12 A2.  And then I'm also going to have some
13 questions for you regarding a couple of the joint
14 exhibits.  So no need to turn to them all --
15     A   Okay.
16     Q   -- all right now, but I just wanted to
17 give you kind of a -- give you a heads up.
18     A   So -- so I don't need Volume 1, or
19 you're going to reserve that --
20     Q   Yeah.  I --
21     A   -- for future -- okay.
22     Q   I am actually going to need Volume 1 as

41 (Pages 416 - 419)

Page 420

1 well.

2     A   Okay.

3     Q   I apologize. Sorry. I actually

4 need -- every single book you have up there, I'll

5 be asking you about.

6     A   No problem.

7     Q   Can I ask if I could turn -- start off

8 with Exhibit D1, which is your PowerPoint

9 presentation, and if I could move you to slide --

10 I believe it's slide 5. It's titled "USPIS

11 Workforce."

12     A   Okay.

13     Q   Just a couple questions about this

14 breakdown. So first of all, the -- there's been

15 some discussion in this case about the relative

16 pay for postal police officers and postal

17 inspectors.

18       Is it correct to say that the salary

19 for postal inspectors, including their base

20 salary and locality pay, is roughly twice that of

21 a postal police officer?

22     A   I don't know the exact numbers. I know

Page 421

1 it's more than postal police officers.

2     Q   Okay. And -- and there's retirement

3 after 20 years for postal inspectors, but not for

4 postal police officers, correct?

5     A   We have 20-year law enforcement

6 retirements, correct.

7     Q   Okay. And the --

8       ARBITRATOR GABA: Who's we?

9 BY MR. STEPHENS

10     Q   Who -- when you say we have 20-year --

11     A   Oh, postal inspectors. I apologize.

12     Q   Okay. Thank you. In the group at the

13 bottom, the professional, technical and

14 administrative, does that group include forensic

15 technicians?

16     A   It does.

17     Q   And does it also include what's

18 abbreviated as ISOTs, Inspection Service --

19     A   Yes. It would include that.

20     Q   And what are ISOTs?

21     A   I think the -- what it stands for is

22 Inspection Service Operation Technician, admin

Page 422

1 admin support.

2     Q   Admin support. Okay.

3     A   Yeah, basically.

4     Q   And is it correct that in the last two

5 years, the pay for ISOTs -- top step pay for

6 ISOTs increased from $56,000 a year to $72,000 a

7 year?

8     A   I know it increased. I can't give you

9 specifics. I'm not -- you know, I know that it

10 increased. We consolidated the -- or not

11 consolidated the -- I think, if I recall

12 correctly, 11s to 14s, and now they're all EAS

13 15s. I can't talk to the actual money. I just

14 know from -- from our standpoint and the

15 executive committee that this was happening, but

16 I didn't really look too hard at the -- at the

17 compensation.

18     Q   Would it be -- do you know, for

19 example, that the job description did not change

20 with that change in salary?

21     A   It's my understanding that the job

22 description didn't change. That's my

Page 423

1 understanding, but I --

2     Q   That it did --

3     A   I don't --

4     Q   -- change or did not change?

5     A   You know what? I'm not sure. I'm not

6 sure of the job -- I don't want to -- I don't

7 want to misspeak. I don't know the -- because

8 they're -- I don't know. I don't know what --

9 what change. I don't -- I didn't look into

10 that. I just know that it came down -- not -- it

11 wasn't our decision. It was a Postal Service

12 decision that decided -- it wasn't just the ISOTs

13 that were impacted, my understanding.

14     Q   Are you aware that PPOs have been taken

15 out of service as PPOs, for example, for being

16 unable to meet either the physical or mental

17 requirements and have been, as an accommodation,

18 moved to being ISOTs?

19     A   I don't know of any particular

20 instance. That doesn't mean that it hasn't

21 happened.

22     Q   Okay. With respect to the demographics

42 (Pages 420 - 423)

Arbitration Vol. 2                                    February 4, 2020

Page 424

1  here, the postal police officers are
2  overwhelmingly non-white; is that correct?
3     A   I heard your opening yesterday.  I'm
4  going off your numbers.  You indicated that
5  that's what it is.  I've never looked at it that
6  way, to be honest with you.
7     Q   Those are numbers that the Postal
8  Service supplied --
9     A   Well, understood.  I just never looked
10  at it that way.
11     Q   Those racial demographics are not
12  correct for the -- are not -- not the same for
13  these other positions; is that --
14        MR. STELLABOTTE:  And if I may -- if I
15  may interject, Your Honor, they're --
16  Mr. Arbitrator, this line of questioning is just
17  not relevant to the proceedings.  It's -- I think
18  Mr. Stephens is referring to the EEO case that's
19  under litigation right now.
20        If Mr. Stephens intends to ask a line
21  of questioning related to the EEO case, it's
22  completely not relevant and shouldn't be asked.

Page 425

1        ARBITRATOR GABA:  Okay.  Counsel, let
2  me tell you my problem with relevance objections
3  at the current time.  You know, I've reviewed all
4  the pleadings in this matter.  There aren't any.
5  I went through the pattern jury instructions, so
6  I -- I know what elements that the Union is
7  trying to prove.  There aren't any.
8        At this time, I am uncomfortable ruling
9  on relevance objections because I don't know
10  enough yet on day two as to what may be relevant.
11  And I'm also going to go and review my statutory
12  authority, so give me a second.  Sorry.  I should
13  have looked for the pink tab.
14        In looking at 1207(c)(2), I think I
15  have to give the Union an opportunity to present
16  evidence in support of their claims.
17        Counsel, are you representing to me
18  that these questions are going to produce
19  evidence in support of your claims?
20        MR. STEPHENS:  Yes, sir.  That's --
21  that's one reason.  The second reason is that the
22  Postal Service, contrary to its representation

Page 426

1  today, represented and signed pleadings with the
2  Equal Opportunity Commission that we had to raise
3  this argument here.
4        ARBITRATOR GABA:  Okay.
5        MS. ATTRIDGE:  With all due respect, I
6  feel compelled to clarify the record.  The Postal
7  Service never made such an argument in front of
8  the Equal Opportunity Employment Commission.
9        Our position is that the wages of the
10  PPOs are collectively bargained and have nothing
11  to do with discrimination; therefore, if they
12  would like wage increases, those are
13  appropriately achieved through collective
14  bargaining.
15        ARBITRATOR GABA:  Counsel, I'm going
16  to -- I'm going to cut you off and ask you to
17  send me to the exhibit where I -- I viewed that
18  language.
19        MR. STEPHENS:  We had -- in our slides,
20  we had a paragraph as a visual, but --
21        ARBITRATOR GABA:  Correct.
22        MR. STEPHENS:  -- we had not actually

Page 427

1  introduced the documents, but we intend to
2  introduce them in the hearing, not -- not through
3  this witness, but through another witness.
4        ARBITRATOR GABA:  I mean, your slide
5  deck isn't in evidence because no one -- no one
6  is moving things in evidence, but let's go --
7  could you give me a slide number of your deck,
8  sir?
9        MR. STEPHENS:  Yes, sir.  Give me one
10  moment.  It's Union Exhibit A2, and it's slide
11  54.  The Bates number is Union 188.
12        ARBITRATOR GABA:  I curse your
13  high-quality color paper.
14        MR. STEPHENS:  Our paralegal sprung for
15  the good stuff without me knowing.
16        ARBITRATOR GABA:  I commend her.  I
17  agree with the agency that you argued the proper
18  forum for complainant to raise challenges to
19  actions which involve the terms of the collective
20  bargaining agreement is within the negotiated
21  grievance process.  This is not the focused
22  grievance process.  This is a statutory

43 (Pages 424 - 427)

Page 428

1  proceeding.
2        That said, counsel, I'm -- based on
3  your representation that you're going to produce
4  evidence in support of your claim --
5        MR. STEPHENS:  Yes, sir.
6        ARBITRATOR GABA:  -- please continue.
7        MR. STEPHENS:  Thank you.
8        MR. STELLABOTTE:  Your Honor -- I
9  keep -- I apologize.  I feel like I'm always in a
10  court of law.  But, Mr. Arbitrator, just for the
11  record, I'd just like to make a general objection
12  that, you know, this is an improper forum.
13  And -- and EEOC will allow witnesses in this
14  class action if it -- if it survives a motion for
15  summary judgment.  There will be witnesses.
16        For the record, though, please
17  understand I don't want Mr. Bowers making any
18  assertions as it relates to the EEO case.  So I'm
19  just -- I would like Mr. Stephens to be careful,
20  narrow the scope of his questions so that
21  Mr. Bowers does not make any representations on
22  the record which could affect the EEOC case.

Page 429

1        ARBITRATOR GABA:  I am not going to ask
2  Mr. Stephens to be careful.  I'm going to ask you
3  to be careful and to make sure you object to any
4  of these questions that you think are improper.
5        MR. STELLABOTTE:  I will.  Thank you.
6        ARBITRATOR GABA:  All right.  Thank
7  you, sir.  Please continue.
8  BY MR. STEPHENS
9        Q   Mr. Bowers, can you tell us what is
10  the -- to the extent you know, the racial makeup
11  of the -- the group of postal inspectors?
12        MR. STELLABOTTE:  Objection.
13  Speculation.
14        ARBITRATOR GABA:  No.  He asked him if
15  he knows.
16        THE WITNESS:  I heard you mention it
17  yesterday, but I didn't write it down.  I
18  don't -- I think I recall postal inspectors,
19  75 percent white.  I think that's what I recall.
20        ARBITRATOR GABA:  Sir, I don't think
21  you were asked --
22        THE WITNESS:  I --

Page 430

1        ARBITRATOR GABA:  This isn't a test on
2  what you heard other people say or testify to or,
3  more importantly, state in their opening
4  statement.  It's a question of what you know from
5  your observations.  So let's try it again.  And
6  if you don't know, just say you don't know.
7  BY MR. STEPHENS
8        Q   Mr. Bowers, in your experience, are
9  postal inspectors, generally speaking, white
10  people?
11        A   I -- I haven't -- to be honest with
12  you, I haven't looked at it that way, so --
13        Q   Okay.
14        A   -- I don't know.
15        Q   Let me -- I want to ask you a question.
16  You started off your testimony describing your
17  own experience as an -- did you say -- were you
18  an INC in New Jersey?  Is that what you said?
19        A   No.  I was inspector in charge here in
20  the Security Group for over five years.
21        Q   Okay.  I'm sorry.  It was here.  Okay.
22  From 1998 to 2003; is that correct?

Page 431

1        A   No.  I was a field postal inspector
2  from 1998 to 2003.  I became a postal inspector
3  in charge, INC, in 2013.
4        Q   Okay.  And I'm sorry.  I thought there
5  was -- you had -- there was a question about your
6  experience working with PPOs from 1998 to 2003.
7        A   So that would be when I was a brand new
8  inspector coming out of the academy.
9        Q   Okay.  And then I believe you said that
10  in your experience, you did not believe that
11  PPOs' duties had really changed since that time?
12        A   That's correct.
13        Q   Who's Charles Zekan?
14        A   He's the program manager of postal
15  security.  He's who I was referencing when I went
16  over the organizational chart, when I went over
17  the general hierarchy.  And we can go back to
18  that slide.  It wasn't shown on the chart when I
19  talked about my responsibilities.  And I had the
20  inspector in charge of the Security Group, and
21  there was a blue box underneath postal police
22  here at National Headquarters.  I referenced that

44 (Pages 428 - 431)

Arbitration Vol. 2                                      February 4, 2020

Page 432

1  there's a program manager of postal security --
2  of the postal police. It's not indicated on that
3  chart, but I talked to it in my testimony.
4      Q   Does Mr. Zekan know what postal police
5  officers do?
6      A   Sure does.
7      Q   Are you familiar with a lawsuit that
8  the Postal Service was a party to in United
9  States District Court in Massachusetts styled
10 Anderson against Brennan, Postmaster General?
11     A   I am not.
12     Q   Are you aware that the Postal Service
13 argued in that case that the job duties of postal
14 police officers had undergone a paradigm shift
15 since 2006?
16     MR. STELLABOTTE: Objection. Again,
17 he's already answered he's not aware of the case,
18 Your Honor, and he's -- he's going into more
19 direct -- direct cross-examination related to
20 that case in which he has no knowledge.
21     ARBITRATOR GABA: Well, if he has no
22 knowledge, isn't he simply going to say, I'm not

Page 433

1  aware of it, I have no knowledge?
2      Let's go off for a second.
3      (Brief off-the-record discussion.)
4      ARBITRATOR GABA: Counsel, any further
5  questions?
6      MR. STEPHENS: Yes, sir.
7  BY MR. STEPHENS
8      Q   Mr. Bowers, are you aware that
9  Mr. Zekan testified in the case of Anderson
10 against Brennan in the United States District
11 Court for the District of Massachusetts?
12     A   I do not.
13     Q   If -- if Mr. Zekan testified under oath
14 that there had been significant changes to the
15 postal police officer position since the
16 mid-2000s, would you -- do you think he is in a
17 better position than you are to know if that is
18 correct?
19     MR. STELLABOTTE: I'm going to object.
20 Again, Your Honor, I don't know -- or
21 Mr. Arbitrator. I apologize for calling you
22 that. I'm sure at some point, you may -- but,

Page 434

1  again, he's referring -- I don't know what he's
2  referring to. I don't know if there's an exhibit
3  that we can refer to that Mr. Bowers can look at,
4  but he's already mentioned he's unaware of the
5  case. He's unaware that Mr. Zekan testified in
6  relation to this case. He has no knowledge of
7  this case whatsoever.
8      I assume Mr. Stephens, Attorney
9  Stephens, is going to give him a hypothetical
10 question related to this case. Mr. Bowers has no
11 knowledge of this case whatsoever, so he cannot
12 attest to any -- any hypothetical or any facts.
13     ARBITRATOR GABA: Okay. Counsel, I --
14 I hear you, and Mr. Bowers is either going to
15 testify that Mr. Zekan is much better qualified
16 to answer this question, which is fantastic
17 because that would end this line of inquiry, or
18 he's going to say, no, I'm better qualified to
19 answer this question, in which case we're going
20 to have some very interesting questions. So I'm
21 going to overrule your objection.
22

Page 435

1  BY MR. STEPHENS
2      Q   Mr. Bowers, do you believe that
3  Mr. Zekan is in a better position than you are to
4  know what postal police officers do?
5      MR. STELLABOTTE: Objection.
6  Speculation.
7      ARBITRATOR GABA: He's just asking for
8  his beliefs. Go ahead.
9      THE WITNESS: So can you repeat the
10 question, please?
11 BY MR. STEPHENS
12     Q   Do you believe that Mr. Zekan is in a
13 better position than you are to know what it is
14 that postal police officers actually do?
15     A   No. I know what -- I mean, does this
16 relate to the case that you mentioned, or just in
17 general?
18     Q   I guess what I'm -- I guess I wasn't
19 expecting the Postal Service to take the position
20 that the duties of postal police officers had not
21 changed, so that's why I don't have an exhibit.
22 Believe me, we'll have -- we'll have copies of

45 (Pages 432 - 435)

Page 436

1 the transcripts and copies of the briefs that the
2 Postal Service filed with the Court, but I just
3 wasn't expecting -- but is it your testimony
4 that then -- that if Mr. Zekan testified
5 there had -- that there had been significant
6 changes to the postal police officer position
7 such that the job was not even -- what postal
8 police officers did in and around the year 2000
9 was not even comparable to what they did today,
10 is it your testimony that he was not testifying
11 correctly?
12     A   I don't know what he testified to.  I
13 don't have that in front of me.  I didn't review
14 that.  I don't know what he testified to.
15        MR. STEPHENS:  Okay.  We'll talk off
16 the record afterwards about whether we need to
17 recall Mr. Bowers after we get the exhibits.
18        ARBITRATOR GABA:  Well, let's go off
19 for just a second now.
20        (Brief off-the-record discussion.)
21 BY MR. STEPHENS
22     Q   Let me turn -- if I could advance -- on

Page 437

1 the slide deck you have up here, sir, if I could
2 move you up to slide No. 9.
3        Now, in this slide, is it correct that
4 postal inspectors' typical duty is -- is during
5 business hours?  Is that correct?
6     A   Not correct.
7     Q   Is that when most postal inspectors are
8 actually at -- at work or at their office is
9 during business hours?
10     A   We do -- we do both.  You know, we're
11 available 24/7.  I'm available 24/7.  So I don't
12 want to -- I mean, we come to work, but -- you
13 know, I ran a narcotics team in New York.  They
14 were working all hours of the night, so I don't
15 think that that's fair.
16     Q   My -- my question is -- is if,
17 generally speaking, postal inspectors work from
18 9:00 to 5:00.
19     A   I don't know.  It's not the case
20 with -- with a lot of the teams that -- that work
21 workplace violence, that work narcotics, that
22 work mail theft.  So I don't know if it's a

Page 438

1 general statement.  Some assignments they're 9:00
2 to 5:00; others they're not.
3     Q   Is it correct that postal police
4 officers actually work their shifts 24 hours a
5 day that are on the street?  Is that correct?
6     A   They work a tour, and then other postal
7 police would come in to work another tour --
8     Q   Correct.
9     A   -- but no one works -- you know, they
10 don't work 24/7.
11     Q   To be clear, I wasn't meaning to
12 suggest that --
13     A   Okay.
14     Q   -- so I apologize if I left that
15 impression.  Let me go to -- if I can move you
16 up, sir, up to slide No. 11.
17        Now, to make this a little confusing,
18 I'm going to introduce -- bring in some other --
19 another exhibit, and that is -- I believe you
20 have right next to your left arm the postal
21 police officer -- yes, sir, I believe it's
22 that -- that binder, and if I can refer you to

Page 439

1 Union Exhibit A2.  And can I refer you further to
2 page 28?  It's Bates stamped Union 162.
3     A   I'm here.  I'm there.
4     Q   Okay.  And this is 18 U.S.C. 3061.  Is
5 this the statute that you are referring to on
6 your slide, D1, page 11?
7     A   It is.
8     Q   And is it -- is it titled by Congress
9 "Investigative Powers of Postal Service
10 Personnel"?
11     A   You know what?  I didn't have that, but
12 if that's what it says, yeah.  I mean, I went
13 into more of the (a), (b) and (c) statute, but if
14 that's the title, then --
15        MR. STELLABOTTE:  Mr. Arbitrator, I
16 guess if Mr. Stephens wants to direct him to the
17 actual statute that has the language, he should
18 do that, but in -- clearly, in his slide, he
19 doesn't have that.
20        ARBITRATOR GABA:  Oh, good, I've got
21 the right light now.  I can talk.  Yes, I think
22 that is a better way of doing it, but I'm not

Page 440

1  going to order him to do that.  Off.
2       (Brief off-the-record discussion.)
3  BY MR. STEPHENS
4       Q    Mr. Bowers, I apologize.  I'm going to
5  make you open another binder.
6       A    That's okay.  I think I'll open up all
7  four --
8       Q    Okay.
9       A    -- just to be -- so are we going to --
10      Q    We're going to the joint exhibit binder
11  now.
12      A    Okay.
13      Q    And it's Joint Exhibit No. 7, and it's
14  the last -- it's the last two pages in the entire
15  binder.
16      A    Okay.  I'm there.
17      Q    Okay.  And is it correct that this was
18  titled by Congress "Investigative Powers of
19  Postal Service Personnel"?
20      A    I just want to make sure I'm on the --
21  on the right -- you said Joint Exhibit 7?
22      Q    Yes, sir.  It's the last two pages.

Page 441

1       A    Oh, the last -- stand by.
2       Q    Sorry.
3            ARBITRATOR GABA:  And I'm sorry.  Could
4  the parties stipulate to the date that (c) was
5  added or the year?
6            MR. STEPHENS:  I believe it was 2006.
7            MR. STELLABOTTE:  2006.
8            THE WITNESS:  2006.
9            MR. STELLABOTTE:  Correct.
10           ARBITRATOR GABA:  So stipulated?
11           MR. STELLABOTTE:  Yes.
12           MR. STEPHENS:  Yes.
13           ARBITRATOR GABA:  Thank you.
14           THE WITNESS:  Okay.  I'm there.
15  BY MR. STEPHENS
16      Q    Okay.  So the powers in here are -- is
17  it fair to say that the powers granted -- this is
18  the grant of investigative powers to inspectors
19  and to postal police officers, correct?
20      A    Yeah.  I indicated on the slide that
21  (a) and (b) were postal inspectors and (c) were
22  postal police.

Page 442

1       Q    Right.  And the -- the jurisdiction of
2  postal inspectors is -- is limited to postal
3  matters; is that correct?
4       A    Well, it's what I -- it's what I read
5  in the powers.  I mean, do you want me to go
6  through it again?  I mean, it's (a) and (b) --
7       Q    Yes.  It's --
8       A    -- so if --
9       Q    But I'm asking about (b).
10      A    Well, (b) -- do you want me to --
11      Q    You don't need to read it, but I'm just
12  asking you if -- the postal inspectors don't have
13  just an unlimited jurisdiction; is that correct?
14      A    That's correct.
15      Q    And is it -- in your experience, that's
16  true for -- every law enforcement officer has a
17  jurisdiction?
18      A    No.  We have a mission.  Our -- our
19  mission is to support the Postal Service, so --
20      Q    I'm talking about the legal -- the
21  jurisdiction of an officer is -- is cabined by
22  law; is that correct?

Page 443

1            MR. STELLABOTTE:  Objection.  Again,
2  he's asking him to draw a legal conclusion.
3            ARBITRATOR GABA:  Yes.  The way your
4  question was phrased asks him to draw a legal
5  conclusion.
6            MR. STEPHENS:  I'll reask.  I'm sorry.
7  BY MR. STEPHENS
8       Q    Let me just ask a specific question,
9  and that is:  Is the jurisdiction, the legal
10  jurisdiction of postal inspectors, limited in
11  subsection (b)?
12      A    Well, I'll just go through it again
13  just so that we're clear, because I read it
14  before.  I'll read it again.
15      Q    There's no need to read it, sir.
16      A    Okay.
17      Q    Everyone can --
18      A    I mean, they're my notes.
19           MR. STELLABOTTE:  And, Mr. Bowers,
20  again, if you don't understand the question,
21  please just ask Attorney Stephens to rephrase the
22  question.

47 (Pages 440 - 443)

Arbitration Vol. 2                                February 4, 2020

Page 444

1        ARBITRATOR GABA:  Sir, do you
2   understand the question that was asked of you?
3        THE WITNESS:  Yeah, why don't you
4   rephrase.
5   BY MR. STEPHENS
6        Q   Let me ask this way -- ask you this
7   way:  Do postal inspectors have a limited law
8   enforcement jurisdiction?
9        A   It's limited to postal property, the
10  use of mails and other postal offenses.
11       Q   Okay.  Thank you.  Now, let's move on
12  to subsection (c).  Now, you said this is the
13  grant of authority -- a specific grant of
14  authority by Congress to postal police officers,
15  correct?
16       A   That's correct.
17       Q   And just to be clear, are -- are -- are
18  PPOs police officers?
19       A   PPOs are police officers.  They're
20  postal police officers.
21       Q   Now, all these -- looking at -- at
22  (c)(2), it says, with respect to such property,

Page 445

1   such officers shall have the power to enforce
2   federal laws and regulations -- well, it -- I
3   won't belabor the record, but it lists things
4   under (a), under (b) and under (c).
5        Do you see those?
6        A   I do.
7        Q   Is it correct that those are all things
8   that postal inspectors similarly have the
9   authority to do?
10       A   That's correct.
11       Q   Is it correct to say that postal
12  inspectors actually do exercise their law
13  enforcement authority in -- regarding those items
14  that postal police officers do?  Is that correct?
15       A   Can you ask again?  I'm sorry.
16       Q   I guess what I mean to ask is:  Is
17  there an overlap in jurisdiction granted by
18  3061(a) and 3061(c)(2)?
19       MR. STELLABOTTE:  Again,
20  Mr. Arbitrator, I'm going to object to the
21  phrasing of the question.  Is he asking is there
22  an overlap within the jurisdiction or is there an

Page 446

1   overlap --
2        ARBITRATOR GABA:  Counsel --
3        MR. STELLABOTTE:  -- within the duties?
4        ARBITRATOR GABA:  -- even though I had
5   the green light, that's kind of what we call a
6   speaking objection, but it's sustained.  You're
7   asking him what the law is.  You're not asking
8   him what his understanding is in terms of what
9   he's observed at the Postal Service.
10       MR. STEPHENS:  You're correct.  And my
11  question is a legal question.  I am asking him
12  the legal question, only because he testified
13  as -- as holding himself out as having knowledge
14  of the statute.
15       MR. STELLABOTTE:  Your Honor, he's
16  mischaracterizing Mr. Bowers' testimony.  And
17  if -- if he wants to ask him what -- what the
18  slide meant, he -- he can -- he can maybe answer
19  that question as opposed to Mr. Stephens
20  mischaracterizing his testimony.
21       ARBITRATOR GABA:  Well, this is what
22  happens when you start asking opinion questions

Page 447

1   of lay witnesses without qualifying them on the
2   basis of their opinions.
3        MR. STEPHENS:  Let me -- I can clear --
4   I can just ask specific questions if you prefer
5   that.
6        ARBITRATOR GABA:  Well, let me say
7   this:  I have little if any interest in
8   Mr. Bowers' legal opinions.  However, I see how
9   it could be relevant as to what he believes the
10  state of the law to be.  Does that make sense?
11       MR. STEPHENS:  It does.  I -- if it's
12  okay with the panel, I'm going to change this and
13  just ask him some specific questions that
14  hopefully will be -- won't -- won't lead to an
15  objection.
16       ARBITRATOR GABA:  You don't need our
17  permission --
18       MR. STEPHENS:  Okay.
19       ARBITRATOR GABA:  -- to do that, sir.
20  Please go ahead.
21  BY MR. STEPHENS
22       Q   Mr. Bowers, if I could refer you to

48 (Pages 444 - 447)

Page 448

1  (c) -- this is 3061(c)(2), and it says --

2      ARBITRATOR GABA:  Okay.  I'm going

3  to -- I'm going to start over.

4      MR. STEPHENS:  Yes, sir.

5      ARBITRATOR GABA:  Counsel, you're

6  referring us to 18 U.S.C. 3061(c)?

7      MR. STEPHENS:  Yes, sir.  That's Joint

8  Exhibit 7, and it's the last two pages of the

9  exhibit.

10      ARBITRATOR GABA:  Thank you.

11  BY MR. STEPHENS

12      Q  Mr. Bowers, is it correct that postal

13  inspectors have the power with respect to postal

14  property to enforce federal laws and regulations

15  for the protection of persons and property?

16      A  That's correct.

17      Q  I'm sorry?

18      A  That's correct.

19      Q  And is it correct that postal

20  inspectors -- with respect to such property,

21  postal inspectors have the power to carry

22  firearms?

Page 449

1      A  That's correct.

2      Q  And is it correct that with respect to

3  such property, postal inspectors have the

4  authority to make arrests without a warrant for

5  any offense against the United States committed

6  in the presence of the officer or for any felony

7  cognizable under the laws of the United States if

8  the officer has reasonable grounds to believe

9  that the person to be arrested has committed or

10  is committing a felony?

11      A  That's correct.

12      Q  Now, so -- and to be clear, (c)(2),

13  that doesn't depend on the Postal Service having

14  any kind of a regulation to authorize that; is

15  that correct?

16      MR. STELLABOTTE:  Objection.  I'm

17  sorry.  Objection again.  He's asking him to draw

18  a legal conclusion.

19      ARBITRATOR GABA:  Sustained again.

20  You're asking for a legal conclusion as opposed

21  to his understanding.

22

Page 450

1      MR. STEPHENS:  If I might, though, my

2  colleague across the table has spent a fair

3  amount of time asking the witness about

4  regulations, whether there was a regulation or

5  not a regulation authorizing power, but that

6  said, I'll withdraw the question.

7      ARBITRATOR GABA:  Yes.  And some

8  witnesses have been asked questions that are in

9  every case leading and compound, and the parties

10  chose to allow that to happen.  So I just don't

11  want to get in a situation where, well, you

12  allowed them to do it.  No, I didn't allow that.

13  Opposing counsel did by not objecting.

14      MR. STEPHENS:  Okay.

15      ARBITRATOR GABA:  And I'm sure I --

16  during some of the questions that were asked, I'm

17  sure I was visibly disturbed while those

18  questions were being asked, but proceed.

19  BY MR. STEPHENS

20      Q  Mr. Bowers, if I could draw your

21  attention to (c)(3).  It says, with respect to

22  such property, such officers may have, to such

Page 451

1  extent as the Postal Service may by regulations

2  prescribe, the power to serve warrants and

3  subpoenas issued under the authority of the

4  United States.

5      Is that a power that postal inspectors

6  have?

7      A  It is.

8      Q  And is it correct that if the Postal

9  Service chose to do so, it could have postal

10  police officers perform that function?  Is that

11  correct?

12      A  That's correct.

13      Q  And let me ask about the bottom one,

14  (b).  It says, with respect to such property,

15  such officers may have, to the extent Postal

16  Service may by regulations prescribe, the power

17  to conduct investigations, on and off the

18  property in question, of offenses that may have

19  been committed against property owned or occupied

20  by the Postal Service or persons on the property.

21      Is that an authority that postal

22  inspectors have?

49 (Pages 448 - 451)

Page 452

1    A   It is.  It is.

2    Q   And is it a power that postal police

3  officers could have if the Postal Service chose

4  to give it to them?

5    A   Well, we went over that if we

6  promulgated regulations, which we haven't, so...

7    Q   I know you were here for my

8  presentation.  Are you aware of court decisions

9  saying that employment -- USPS employment

10  handbooks are regulations?

11       MR. STELLABOTTE:  Objection again, Your

12  Honor.  I apologize for calling you Your Honor,

13  Mr. Arbitrator, but, again, he's asking him if he

14  engaged in any -- I'll -- you know what?  I'm

15  going to ask him -- I'm going to allow him to

16  answer that question if he -- if he can.

17       THE WITNESS:  I'm sorry.  Can you ask

18  again?

19  BY MR. STEPHENS

20    Q   Of course.  Mr. Bowers, are you aware

21  of court decisions holding that Postal Service

22  employment handbooks are, quote, regulations?

Page 453

1    A   I am aware of that.

2    Q   And are you aware of court decisions

3  holding that the Inspection Service Manual is a

4  regulation?

5    A   I am.

6    Q   Okay.  Let me ask you:  Are you

7  familiar with a document called the Inspection

8  Service Handbook 701?

9    A   I am.

10    Q   That -- I'll represent that there is a

11  copy of that in the joint exhibits.  It should be

12  Joint Exhibit No. 5.

13    A   Okay.  I'm there.

14       ARBITRATOR GABA:  I'm not.  Hang tight.

15  Off.

16       (Brief off-the-record discussion.)

17  BY MR. STEPHENS

18    Q   Mr. Bowers, what is the Handbook 701?

19    A   So it's -- I'm just going -- I'm on the

20  cover page, Security Force Operations Handbook,

21  IS-701, Inspection Service 701.  This

22  particular -- this is -- this is signed by Chief

Page 454

1  Inspector Heath.  He was the inspector in June of

2  2006.

3    Q   And to your knowledge, what is this

4  document?

5    A   It goes through our security force

6  operations.

7    Q   Does it describe what's expected of

8  postal police officers?

9       MR. STELLABOTTE:  Objection to the

10  phrase of the question.

11       ARBITRATOR GABA:  I'm sorry, sir.  I

12  couldn't hear you.

13       MR. STELLABOTTE:  Objection.  I'm

14  objecting to the phrase of the question.  I

15  didn't -- there really wasn't any question there.

16       ARBITRATOR GABA:  I can't remember,

17  counsel.  Sir, could you restate the question?

18       MR. STEPHENS:  Sure.

19  BY MR. STEPHENS

20    Q   What is your understanding of what the

21  701 is?

22    A   Well, it's -- it's fairly comprehensive

Page 455

1  on security force operations.  It goes through

2  training and personnel actions and arrest

3  procedures, mobile patrols and foot patrols and

4  access control.  It talks about the interviews

5  and handcuff policy, Miranda rights, et cetera,

6  report formats, incident reports.  So the 53 --

7  the PS Form 5309, the incident report, it goes

8  through that.  It goes through the PS Form 5305,

9  which I talked about on the one slide that Dalton

10  Grisham is going to talk more about.

11    Q   Now, I'm just going to -- I'm going to

12  go through here and just ask you a few questions.

13       ARBITRATOR GABA:  Joint 5?

14       MR. STEPHENS:  Yes, sir.  Joint 5.

15  BY MR. STEPHENS

16    Q   If I can refer you to page 9 of that

17  document, in paragraph 135.

18       Is it -- is it correct that the PPO --

19  it's required that PPOs be capable of performing

20  strenuous activities and that PPOs are subject to

21  medical examinations to ensure that they're able

22  to perform that?

Page 456

1    A   Well, there's medical -- there's not
2  ongoing medical evaluations.  I mean, I have to
3  go through -- as a postal inspector, I have to go
4  through a medical examination while I'm on duty
5  as a postal inspector.  That's not the same
6  requirement for postal police.
7    Q   If a PPO is no longer able to
8  physically perform his or her job, they're not
9  allowed to remain as a PPO, though, are they?
10   A   I'm not personally familiar with any
11  PPO that's been, but I'm sure it's -- I'm sure
12  it's happened, but I don't have personal
13  knowledge of PPOs being relieved of their duties
14  based on physical requirements.
15   Q   Is it correct that PPOs are -- well,
16  let me ask this.  If I can refer you to page 21,
17  the bottom of the page, it would be a paragraph
18  entitled "Emergency Conditions."
19       Are you familiar with that?
20   A   Well, I see it right now.
21   Q   Okay.  Let me just ask:  Is it correct
22  that in the event of hazardous weather conditions

Page 457

1  that PPOs are still expected to report to work as
2  emergency personnel?
3    A   We've had that in the past.  When I was
4  in Newark, we had an MTA strike, and postal
5  police were to come in, but there were issues at
6  the time because they didn't have the right
7  credentials, but we've since resolved that -- you
8  know, that issue.  You know, if -- if available.
9  I mean, it depends on the incident.
10       You know, if you have a Hurricane Maria
11  like we had in Puerto Rico, I mean, the whole
12  island was devastated.  I mean, the primary
13  concerns there were to get people -- you know,
14  take care of their personal needs.  That's why we
15  sent additional resources down to Puerto Rico.
16  So it's -- it's incident specific.  If they can
17  come in and get there to -- to perform their
18  duties, then -- then great, but they may not be
19  able to make it in.
20   Q   But as a general matter, is it correct
21  that other employees are often told to stay home
22  in the event of a snowstorm or some other event?

Page 458

1  but postal police are expected to report to work?
2    A   Again, I think it's -- it's hard to
3  answer because it's a general question.  I think
4  if you gave me a specific, I could answer that.
5    Q   That's fair.  I'll refer you to page
6  23.  And I'm not going to make you go through
7  this whole document, but is it correct that
8  postal police officers start their day with a
9  roll call?
10   A   It is.
11   Q   And what in your experience happens at
12  that roll call?
13   A   They just give out their daily
14  assignments.  The sergeant will -- will run roll
15  call and give out the daily assignments for the
16  day.
17   Q   So PPOs perform work that they've been
18  assigned by the sergeant?
19   A   That's correct.
20   Q   I'll refer you to page 26.
21       ARBITRATOR GABA:  Joint 5?
22       MR. STEPHENS:  Yes, sir.

Page 459

1  BY MR. STEPHENS
2    Q   And I guess specifically paragraph
3  214.2, vehicle patrols.
4    A   Okay.  I'm there.
5    Q   Is it correct that -- that postal
6  police officers do have jurisdiction to perform
7  what we've -- what have been called mobile
8  patrols, that is, to drive law enforcement
9  vehicles off of postal property?
10   A   Maybe define it maybe a little more
11  specifically.  Mobile patrol from -- if you
12  recall the picture that we had of the Chicago
13  facility, the aerial shot, they're going to go to
14  a post office, a surrounding post office, and
15  perform the same duties at that post office.
16       MR. STEPHENS:  I'm going to introduce
17  an exhibit and mark it as Union Exhibit X2.  I'll
18  hand these around.  Why don't you hand those to
19  Jim and then to the panel.
20  BY MR. STEPHENS
21   Q   Mr. Bowers, are you familiar with this
22  document?

51 (Pages 456 - 459)

Page 460

1       MR. STELLABOTTE:  One second,
2   Mr. Arbitrator.  We don't have a copy.
3       MR. STEPHENS:  Oh, I'm sorry.  I
4   apologize.
5       ARBITRATOR GABA:  Off.
6       (Brief off-the-record discussion.)
7       ARBITRATOR GABA:  I have a document in
8   front of me that's been marked Union X2.
9   BY MR. STEPHENS
10   Q   Mr. Bowers, are you -- Mr. Bowers, are
11   you familiar with this document, Union X2?
12   A   I -- I actually had not seen this, but
13   I'm familiar with the content.
14   Q   Okay.  So is it correct that -- that
15   the -- this document 701 is about 15 years old?
16   Is that correct?  I'll represent it's dated --
17   A   Yeah.
18   Q   -- 2006.
19   A   It's June of 2006, so, yeah, about
20   14 --
21   Q   Right.  So it --
22   A   -- 14 years.

Page 461

1   Q   -- was issued before the passage of 18
2   U.S.C. 3061; is that correct?
3       MR. STELLABOTTE:  One second.  Don't
4   answer, Mr. Bowers.
5       Mr. Arbitrator, I'm going to object to
6   this document for authentication purposes.  Of
7   course, we didn't get a copy of this prior -- to
8   the best of my knowledge, we didn't get a copy of
9   this document prior to this arbitration.  I
10   believe --
11       ARBITRATOR GABA:  Stop talking.  Sorry.
12   I needed my red light on.  Sustained.
13       Counsel, the witness has testified that
14   he's never seen this document before, so you're
15   going to have to lay a little foundation for the
16   document in some way.  I mean, for all I know --
17       MR. STEPHENS:  Sure.
18       ARBITRATOR GABA:  -- you were up busy
19   photoshopping this last night.
20       MR. STEPHENS:  Sure.
21   BY MR. STEPHENS
22   Q   Mr. Bowers, are you familiar with who

Page 462

1   John Covel is?
2   A   If I recall -- it's testing my memory,
3   but John Covel worked for labor relations, I'm
4   fairly sure, but --
5       MR. STELLABOTTE:  For the record,
6   Mr. Bowers, please do not look at me.  If you
7   don't know the answer to the question, please
8   just answer Mr. Stephens.
9       THE WITNESS:  Yes.
10       ARBITRATOR GABA:  Let's go off for just
11   a second.
12       (Recess 3:33 p.m. to 3:43 p.m.)
13       ARBITRATOR GABA:  Counsel, you've had a
14   chance to examine Union X2?
15       MR. STELLABOTTE:  Yes, we have.  Our
16   team reviewed X2, sir, and we are willing to
17   stipulate -- or we will stipulate to the fact of
18   the four corners of the document and that
19   Mr. Covel, John Covel, the contact name in the
20   top right of the document, issued this policy
21   update that is essentially issued to conform with
22   the PAEA, which was established in 2006.  So it's

Page 463

1   merely, you know, trying --
2       ARBITRATOR GABA:  You're testifying.
3       MR. STELLABOTTE:  Understood.
4       ARBITRATOR GABA:  Okay.
5       MR. STELLABOTTE:  Perhaps we need to
6   have an off-the-record --
7       ARBITRATOR GABA:  No, but I -- I mean,
8   you're not testifying.  You're attempting to
9   testify, but you're not.  What you're doing is
10   arguing because you're not under oath, so --
11       MR. STELLABOTTE:  I certainly can't
12   have my witness testify to this.  Is there -- is
13   there a possibility that we could off the record
14   with you --
15       ARBITRATOR GABA:  Well, you could
16   propose --
17       MR. STELLABOTTE:  -- explain and
18   then --
19       ARBITRATOR GABA:  -- a stipulation as
20   to what this document is.
21       MR. STELLABOTTE:  So we are posing the
22   following stipulation that this document, again,

52 (Pages 460 - 463)

Page 464

1 is merely a policy update. So -- and this --
2 that it was issued by this John Covel, who was
3 allegedly a labor specialist, to conform with the
4 PAEA. We are not, however, stipulating that this
5 policy update is in any way a regulation or that
6 promulgates any statute that gives any additional
7 duties as it pertains to 3061.
8        So this is not a regulation. It's
9 merely a policy update. That's what we're
10 stipulating to, if you can do that as well.
11       MR. STEPHENS: No.
12       ARBITRATOR GABA: Can the parties --
13       MR. STEPHENS: I can state my grounds,
14 but we're unwilling to accept that stipulation.
15       ARBITRATOR GABA: Can the parties
16 stipulate that Union X2 is a policy update that
17 is still in force and is maintained in the
18 regular business records of the United States
19 Post Office?
20       MR. STEPHENS: Yes.
21       MR. STELLABOTTE: So we are willing to
22 say that it is -- it is considered a business

Page 465

1 record, however, with a caveat. If this -- if
2 this is being posed as a document that
3 promulgates some additional authority or duties
4 under 3061, we are not stipulating to that, but
5 we can stipulate that this is a policy update.
6 Policy updates are in the normal course of
7 business back in 2007.
8        ARBITRATOR GABA: Okay. What I heard
9 you say is objection, that my proposed
10 stipulation was compound, and I sustain your
11 objection.
12       Let's try it this way: Can the parties
13 stipulate that Union X2 is a true and correct
14 copy of a policy update that was published on
15 May 22nd, 2007?
16       MR. STEPHENS: Yes.
17       MR. STELLABOTTE: Yes.
18       ARBITRATOR GABA: Can the parties
19 stipulate that this policy update is still in
20 effect?
21       MR. STEPHENS: Yes.
22       MR. STELLABOTTE: Again, I don't -- I

Page 466

1 don't want to belabor this.
2        ARBITRATOR GABA: No, that's okay.
3        MR. STELLABOTTE: We didn't have the
4 opportunity to review this and ask questions. We
5 just merely --
6        ARBITRATOR GABA: If you say no, you
7 can't stipulate, that's fine.
8        MR. STELLABOTTE: Yeah. So I'm going
9 to say no.
10       ARBITRATOR GABA: Okay. Well, we -- we
11 know where we stand.
12       MS. ATTRIDGE: Mr. Arbitrator, may I
13 interject? I may be able to solve this problem.
14       We can stipulate this was a policy
15 update issued in 2007 that updates -- that
16 summarizes an update to Handbook IS-701. We
17 haven't had the opportunity to compare it to the
18 current language in IS-701. However, IS-701 is a
19 Joint Exhibit. We will stipulate that the joint
20 exhibit is the current language of IS-701. If
21 this comports with the current language, then,
22 presumably, it's still in effect. If it does

Page 467

1 not, then it's no longer in effect.
2        ARBITRATOR GABA: One moment. You said
3 Exhibit 7. Are you referring to Employer Exhibit
4 7?
5        MS. ATTRIDGE: I apologize. It's joint
6 exhibit -- I believe it's either Joint Exhibit 5
7 or 6.
8        MR. STEPHENS: Five.
9        MS. ATTRIDGE: Thanks. Thanks, Arlus.
10       ARBITRATOR GABA: Ma'am, I note that
11 Joint Exhibit 5 was apparently promulgated on
12 June 1, 2006, and that Union X2 on the face of it
13 appears to be promulgated on May 22nd, 2007.
14       Do you want a minute? Let's go off.
15       (Recess 3:49 p.m. to 3:56 p.m.)
16       ARBITRATOR GABA: Counsel?
17       MR. STELLABOTTE: After conferring with
18 the team, Mr. Arbitrator, we're going to --
19 rather than have Mr. Bowers come back tomorrow,
20 we're going to allow some direct -- some
21 cross-examination by Mr. Stephens, but, again, I
22 think overall -- you know, I'd like him to be

53 (Pages 464 - 467)

Page 468

1 careful with his cross-examination because he
2 anticipates some -- anticipates some objections
3 as it relates to the -- to the document itself
4 and that, you know, we had limited time to review
5 it.
6        ARBITRATOR GABA:  Well, thank you for
7 that glimpse into the future.  Mr. Stephens, any
8 further questions for the witness?
9        MR. STEPHENS:  Yes, sir.
10 BY MR. STEPHENS
11    Q    Mr. Bowers, referring you to Union
12 Exhibit X2, who is the chief postal inspector?
13    A    Now?
14    Q    No.  What is the position of chief
15 postal inspector?
16    A    Oh, chief postal inspector -- I mean,
17 the -- counsel, if we can go back to the slide
18 that shows the general hierarchy, that would be
19 helpful.  Thank you.  So --
20        ARBITRATOR GABA:  And the exhibit
21 number of this, sir, is?
22        THE WITNESS:  It's in D -- stand by.

Page 469

1 Volume 2, D6, David 6.
2        ARBITRATOR GABA:  Thank you.
3        THE WITNESS:  Slide 7.  So recall -- so
4 the chief postal inspector is responsible for --
5 he's a security officer for the Inspection
6 Service, so he has responsibility for all postal
7 inspectors, all postal police, all PTAs that I
8 had gone over in the three basic entities that I
9 talked about.
10 BY MR. STEPHENS
11    Q    And does the chief postal inspector
12 have authority to make a policy update to the 701
13 handbook?
14        ARBITRATOR GABA:  Stop.  Off.
15        (Brief off-the-record discussion.)
16        ARBITRATOR GABA:  Counsel, can you
17 reask your question?
18        MR. STEPHENS:  Yes, sir.
19 BY MR. STEPHENS
20    Q    Mr. Bowers, does the position of chief
21 postal inspector have authority to make changes
22 to Handbook 701, which can be found at Joint

Page 470

1 Exhibit 5?
2    A    Okay.  If you go to Joint Exhibit 5 and
3 the very first page that you see is Security
4 Force Operations Handbook IS-701, you go to item
5 D as in David.  It states that any deviation from
6 these policies and procedures must be approved by
7 the chief postal inspector, and, B, in compliance
8 with the collective bargaining agreement between
9 the Postal Service and the Fraternal Order of
10 Police National Labor Council, U.S. Postal
11 Service, number 2.  Such deviations will be
12 communicated at the national level to the union.
13        So the answer to your question is yes.
14    Q    Okay.  Thank you.  And if I can refer
15 you to page 2 of that document under
16 limitations -- well, let me ask you this -- well,
17 I'm --
18        ARBITRATOR GABA:  Slow down.
19        MR. STEPHENS:  Yeah.  Sorry.
20        ARBITRATOR GABA:  Of course, my exhibit
21 Joint 5 begins on Roman numeral 3.  Is that
22 correct?  Because I've got a blank page.  Is that

Page 471

1 how it should read?  Off.
2        (Brief off-the-record discussion.)
3        ARBITRATOR GABA:  Okay.  I am now
4 looking at Joint Exhibit 5.  Are the parties
5 willing to stipulate that this is often referred
6 to as Handbook 701?
7        MR. STEPHENS:  Yes, sir.
8        MR. STELLABOTTE:  Yes.
9        ARBITRATOR GABA:  Okay.  Please
10 continue with your questions, sir.
11 BY MR. STEPHENS
12    Q    Mr. Bowers, referring to Union Exhibit
13 X2, is there a description, sir, on page 2 of the
14 jurisdiction of the postal police on -- on page
15 2?
16    A    Are you referring to the top of the
17 page where it says postal police powers?
18    Q    Yes, sir, that paragraph and the next
19 paragraph.
20    A    Yeah.  On the second paragraph, I don't
21 know if it was the copy, but under what says
22 limitations, it's kind of whited out.  I don't

Arbitration Vol. 2 February 4, 2020

Page 472

1 know if -- I think I can still read it, but -- I
2 can still read it. I don't know if everyone's
3 copy is like that or just mine.
4    Q    They all -- rather than being white, I
5 think it's actually --
6    A    I'm not saying it's whited out. I
7 didn't mean --
8    Q    No, I --
9    A    -- to represent that.
10    Q    No, no, no. No offense taken. It was
11 a -- it was a -- it was a highlighter. That's
12 what caused -- I'll represent for everyone that
13 that's what caused it to look different.
14       But is it correct that this says
15 that -- that postal police officers do have
16 jurisdiction off postal property, quote, in
17 situations requiring mobile patrol or escort
18 protection, end quote? Is that correct?
19    A    Are you referring to under limitations?
20    Q    Yes, sir.
21    A    Is that where you are?
22    Q    Yes, sir.

Page 473

1    A    Can you give me one minute?
2       ARBITRATOR GABA: Off.
3       (Brief off-the-record discussion.)
4       THE WITNESS: It does say -- do you
5 want me to read it or -- it does give an
6 exception for hot pursuit and in situations
7 requiring mobile patrol or escort protection. I
8 think I covered escort protection under 39 U.S.C.
9 401.
10 BY MR. STEPHENS
11    Q    Yeah. Well, if -- well, I don't want
12 to cut you off. I have a question about --
13    A    I guess my question is -- and in
14 situations requiring mobile patrol. Now, we've
15 talked about mobile patrol, right, from station
16 to station, so I guess what we need -- in my
17 mind, where we need some clarity is, what are you
18 defining as mobile -- what is this document
19 referring to as mobile patrol? Is it --
20    Q    Let's --
21    A    You know, I -- I see mobile patrol, and
22 it's facility, processing and distribution center

Page 474

1 to station and other stations to perform that
2 duty, not mobile patrol in another sense, which
3 would be, you know, carrier protection.
4    Q    Okay. Let me -- you mentioned your --
5 it's slide 15 of your presentation. D1 is
6 your -- your -- your deck of slides, and if I
7 could direct you, sir, to page 15 of that -- that
8 exhibit, D1.
9       ARBITRATOR DUFEK: Is this the slides
10 now?
11       MR. STEPHENS: Yes, sir.
12       ARBITRATOR DUFEK: Could you get the
13 slides changed?
14       THE WITNESS: Okay. I'm there.
15 BY MR. STEPHENS
16    Q    This -- you mentioned when you -- in
17 your testimony, I believe, that under this
18 statute, the Postal Service has -- has PPOs do
19 things that aren't on -- aren't connected to
20 postal property, postal real property, like
21 escorting high-value mail and mobile facilities
22 at natural disaster sites.

Page 475

1       Is it correct, sir, that those -- those
2 situations are not enumerated in 49 U.S.C.
3 401.10? Is that correct?
4       I guess what I'm driving at is: The
5 words "escort high-value mail" don't appear in
6 the statute; is that correct?
7    A    Yeah. This is ten -- this is --
8 there's actually ten subsections in here, so it
9 does not appear in the statute.
10    Q    But, rather, is it correct that under
11 subsection 10, this, generally speaking, gives
12 the Postal -- the Postal Service the power to
13 grant -- to -- it gives it incidental power, is
14 that right, to add to the -- add to its otherwise
15 existing powers; is that correct?
16    A    So let me clarify. So on postal
17 property, you make arrests, you know, do all the
18 things that I stated in my presentation. With
19 this, it's more operating as a security function,
20 not -- it doesn't have the same law enforcement
21 powers that -- that you would have on postal
22 property.

55 (Pages 472 - 475)

Page 476

1   Q   So they escort high-value mail, but
2   they have no authority to do so?
3   A   Well, if you recall the incident that I
4   mentioned, I said Philadelphia's doing it.  New
5   York's doing it.  If you go to the Diamond
6   District in Philadelphia, FedEx and UPS also have
7   security that performs the same operation that
8   postal police do.
9   Q   Let me move you, sir, if I could, to
10  slide No. 20.  This is titled "Report of PPO
11  Arrests."  I'm sorry.  It's the one before that.
12  There you go.
13      MR. STELLABOTTE:  Just for the record,
14  this is slide 19 of Bowers Appendix D4.
15      MR. STEPHENS:  It also says 20 on it.
16  It says 19 and 20.
17      MR. STELLABOTTE:  Slide No. 20.
18      MR. BJORK:  That's the date.
19      MR. STEPHENS:  Oh, I'm sorry.
20      MR. BJORK:  It's interposed on there.
21      MR. STEPHENS:  I apologize.  I
22  misunderstood something.

Page 477

1   BY MR. STEPHENS
2   Q   What's an arrest?  The definition of
3   the -- in the inspection -- let me ask you a
4   question.  Is there something called the
5   Inspection Service Manual?
6   A   There is.
7   Q   Does the Inspection Service Manual
8   contain a chapter describing various legal --
9   making -- setting forth various legal
10  considerations?
11  A   It does.  I haven't referenced it in
12  quite a while, so...
13  Q   Knowing that you don't have it in front
14  of you, what is your understanding of what an
15  arrest is?
16  A   Well, you have probable cause that
17  somebody committed a crime, and you -- you know,
18  they're -- they're arrested, and depending upon
19  whether it's local, federal or state.
20  Q   You said that they're arrested.  I'm
21  asking you:  What does it mean to make an arrest?
22  What is an arrest?

Page 478

1       MR. STELLABOTTE:  Objection again.
2   He's asking for a legal conclusion.
3       MR. STEPHENS:  I'm asking based on his
4   knowledge.
5       ARBITRATOR GABA:  Overruled.
6       THE WITNESS:  So, I mean, there's
7   different ways to -- to make an arrest.  So
8   there's one where you go hands on and put cuffs
9   on somebody and arrest them.
10      There's also -- you can have an
11  indictment and somebody can, you know -- you're
12  not putting hands on somebody, and then they come
13  in for -- for their arraignment.  There's
14  different types of arrests.  So I don't want to
15  quantify it just as putting hands on somebody and
16  putting cuffs on somebody.
17  BY MR. STEPHENS
18  Q   But that is a form of an arrest is to
19  physically detain someone, prevent them from
20  leaving and placing them under the authority of
21  the law enforcement personnel?
22  A   That's correct.

Page 479

1   Q   Okay.  And let me refer you to this
2   document right here.
3       ARBITRATOR GABA:  What is this
4   document?
5       MR. STEPHENS:  This document is slide
6   No. 20.
7       MR. BJORK:  Nineteen.
8       MR. STEPHENS:  I'm sorry.  Slide No.
9   19, Exhibit D1, titled "Reported PPO Arrests."
10      THE WITNESS:  Is that what we're on
11  right now, right?
12      MR. STEPHENS:  Yes, sir.
13      THE WITNESS:  Okay.  I just wanted to
14  make sure.
15  BY MR. STEPHENS
16  Q   Did you say -- was it your testimony
17  that these numbers came from 5309A reports?
18  A   That's correct.
19  Q   Are -- are -- do you know that the
20  Inspection Service sends to the Union 5309A
21  reports for every quarter?
22  A   Well, it's actually twice a year is the

56 (Pages 476 - 479)

Page 480

1  requirement.
2      Q   Twice a year?
3      A   Yeah.  I'm aware of that.
4      Q   And are you aware that the 5309 reports
5  that the Union received indicate a different
6  number of arrests?
7      A   I --
8          MR. STELLABOTTE:  Objection.
9  Objection.  He'd have to --
10         ARBITRATOR GABA:  Basis?
11         MR. STELLABOTTE:  -- speculate.
12         ARBITRATOR GABA:  Basis for your
13  objection?
14         MR. STELLABOTTE:  Speculation.
15         ARBITRATOR GABA:  No, he asked if
16  you're aware.  It's either yes or no.  Go ahead.
17  BY MR. STEPHENS
18     Q   Are you aware that the 5309A reports
19  that the Postal Inspection Service sent to us
20  actually show 159 arrests during this exact same
21  time period?
22         ARBITRATOR GABA:  What is this exact

Page 481

1  same time period?  Sorry.
2          MR. STEPHENS:  Sorry.
3  BY MR. STEPHENS
4      Q   The -- the -- this slide, am I correct,
5  is suggesting that it covers 2019, 2018, 2017 and
6  2016?
7      A   That's correct.  It's actually fiscal
8  year, if that makes a difference.  Our fiscal
9  year runs October 1 to September 30th.  I don't
10  think it's relevant for this, but these were the
11  actual recorded arrests that were listed on the
12  5309A.
13         There might be -- there are other
14  numbers on those -- on that rollout,
15  apprehensions.  I don't know if that -- I know
16  when I put this slide together, there was an
17  apprehension.  There was arrest and apprehension,
18  and I recall there were nine arrests and 47
19  apprehensions in -- in prep for -- you know, in
20  preparing this slide.  We went with actually the
21  physical arrests.
22     Q   What -- I'm sorry.  Number E, you --

Page 482

1  did you say that the box was number E --
2      A   That --
3      Q   -- on the 5309A reports that --
4      A   Well, let's -- can we go back to
5  that --
6      Q   Sure.
7      A   -- exhibit so that everyone can follow
8  along?
9          ARBITRATOR GABA:  Okay.  We're now
10  going to Employer Exhibit D4?
11         MS. ATTRIDGE:  Four.
12         ARBITRATOR GABA:  Page --
13         MR. STEPHENS:  Page 2.
14         THE WITNESS:  Page 2.
15         ARBITRATOR GABA:  Off.
16         (Brief off-the-record discussion.)
17  BY MR. STEPHENS
18     Q   I'm asking -- well, the 5309A reports
19  that we reviewed show 159 arrests during these
20  four fiscal years, but the number that's on the
21  slide is 44.  I'm trying to understand why
22  there's such a large discrepancy.

Page 483

1      A   And this would be speculation.  You
2  know, I haven't -- don't have the 5309As in front
3  of me.  We can go back and -- I know that these
4  are actually arrests that were listed in the
5  5309As.
6          ARBITRATOR GABA:  What are these?
7          THE WITNESS:  I'm sorry.  The -- this
8  rollup, this slide here, slide 19 that counsel
9  just said there's four years of arrests for
10  postal police officers, you're -- you're all --
11  you're rolling all of those up, correct?
12         You're saying the 15, 12, 8 and 9
13  arrests, and you're comparing that to a number
14  that you have for the same four-year period as
15  being 157, correct?
16         MR. STEPHENS:  159, correct.
17         THE WITNESS:  159.  I'd have to go back
18  and look.  I know in preparing these, these were
19  the actual arrests that were reported.
20         MR. STEPHENS:  Okay.
21         THE WITNESS:  So we just have a
22  discrepancy.

57 (Pages 480 - 483)

Arbitration Vol. 2                                         February 4, 2020

Page 484

BY MR. STEPHENS

1

2    Q   Now, I'll represent -- and I guess if

3   you know from having looked at these, is it

4   correct that -- is it correct that those 5309As

5   indicated that there were zero arrests by PPOs in

6   Miami, if -- if you remember?

7    A   I don't know that level of detail.

8       MR. STEPHENS:  Okay.  Understood.  So

9   can we go off the record for a second?

10      ARBITRATOR GABA:  Off.

11      (Brief off-the-record discussion.)

12      ARBITRATOR GABA:  Counsel, do you have

13  further questions for this witness?

14      MR. STEPHENS:  I do.

15  BY MR. STEPHENS

16   Q   Mr. Bowers, can you tell us what an

17  ISCOM is?

18   A   It's communication internal to the

19  Inspection Service that outlines a significant

20  case.  I can't give you the -- I don't know --

21  recalling what ISCOM stands for, Inspection

22  Service Communication, but I'm -- I'm not

Page 485

1   100 percent sure.

2    Q   Are you familiar, sir, with the arrest

3   of Ricardo Phong for mail theft in Miami, Florida

4   in -- on December the 31st, 2017?

5    A   I am not.

6    Q   Are you aware that he was arrested by a

7   postal police officers on that day?

8    A   I'm not familiar with the case.

9    Q   Are you aware that the 5307A (sic)

10  report from Miami revealed no arrests for that

11  same period despite the arrest of Mr. Phong?

12   A   As I indicated previously, I didn't go

13  into that level of detail in the 5309As.  I just

14  had the rollup.

15      MR. STEPHENS:  I'm going to refrain

16  from introducing these exhibits through this

17  witness, and I'm happy to share them with --

18  with -- with the Postal Service.

19      ARBITRATOR GABA:  Please do.

20  BY MR. STEPHENS

21   Q   I'm going to switch gears a little bit

22  and hopefully wrap this up.  You testified at the

Page 486

1   start of your testimony about an inspector

2   general report.

3       Do you recall that testimony?

4    A   I do.

5    Q   And this would be exhibit -- sorry.

6       MR. STELLABOTTE:  It's A9.

7       MR. STEPHENS:  A9?

8       MR. STELLABOTTE:  Correct.

9   BY MR. STEPHENS

10   Q   Oh, before I do that, one final

11  question.  Are you aware of a 2019 report by the

12  Office of Inspector General regarding Inspection

13  Service processes in the Dallas/Fort Worth area?

14   A   Can you be a little more specific?

15   Q   It's -- I can give you -- I can give

16  you the report.  I can give you the date of it.

17  It pertains to the number of arrests that the

18  Inspection Service was claiming for inspectors in

19  the Dallas Division or Fort Worth Division.

20   A   I think you're referencing an audit

21  that the OIG did in Fort Worth Division.

22   Q   Yes.

Page 487

1    A   The numbers, just to clarify, if we can

2   go to the next slide here, on slide 20, the

3   numbers that are represented in the Inspection

4   Service slide were pulled from our annual report.

5   So I haven't seen what you're referring to.  If

6   you want to show it to me, I can --

7       MR. STEPHENS:  Of course.  We'll mark

8   this as Union Exhibit X3.  Give that to the

9   witness and hand copies to Jim and the panel.

10      MR. STELLABOTTE:  Mr. Arbitrator, may I

11  have an opportunity to review that document as

12  well?

13      ARBITRATOR GABA:  You have an absolute

14  right to review the document before it's handed

15  to the witness, sir.

16      MR. STELLABOTTE:  Thank you.

17      ARBITRATOR GABA:  Or to me.  Off.

18      (Brief off-the-record discussion.)

19      MR. STELLABOTTE:  Mr. Arbitrator,

20  before we start further cross on this document,

21  do you mind if I have one minute to inquire with

22  my team about this document?

58 (Pages 484 - 487)

Page 488

1     ARBITRATOR GABA:  You can have more
2  than one minute if you choose.
3     MR. STELLABOTTE:  Just a few minutes.
4     ARBITRATOR GABA:  Okay.
5     MR. STEPHENS:  And I can -- I can refer
6  you to where I'm going to ask questions if that's
7  helpful.
8     MR. STELLABOTTE:  That would be very
9  helpful.  Thank you.
10    ARBITRATOR GABA:  Why don't -- why
11 don't you do that off the record --
12    MR. STELLABOTTE:  Thank you.
13    ARBITRATOR GABA:  -- so counsel can
14 meet and confer with your team.
15    MR. STELLABOTTE:  Will do.  Thank you.
16    ARBITRATOR GABA:  Off.
17    (Recess 4:27 p.m. to 4:32 p.m.)
18    ARBITRATOR GABA:  Counsel, do you
19 have -- you handed me a document.  Would you like
20 that document marked as Union Exhibit 3?
21    MR. STEPHENS:  Union Exhibit X3.  Yes,
22 sir.

Page 489

1     ARBITRATOR GABA:  X3.  I'm sorry, sir.
2  It's been so marked.
3  BY MR. STEPHENS
4     Q   Mr. Bowers, are you familiar with this
5  document?
6     A   I am.
7     Q   Is it correct that on page 5 of the
8  document, the Office of Inspector General found
9  that the number of arrests claimed by inspectors
10 was inflated by 60 percent and did not account
11 for arrests actually made by other law
12 enforcement agencies?  Is that a correct --
13    A   Well --
14    Q   -- description of their --
15    A   -- actually --
16    Q   -- finding?
17    A   I'm not sure where you're getting
18 60 percent.  What it does say is that four of the
19 58 -- four of the 58 arrests, 7 percent, made by
20 other law enforcement agencies, postal inspectors
21 claimed arrest without documentation to support
22 that they made a material contribution or

Page 490

1  developed significant evidence as required.
2     So I'm not sure where you're getting
3  60 percent from.
4     Q   Sure.  It's on page 5.  It's under
5  arrest details.  It's the second paragraph --
6     ARBITRATOR GABA:  When you say page 5,
7  it is what is numbered page 5, but is actually
8  page 7.
9     MR. STEPHENS:  That's a fair statement,
10 yes.
11    ARBITRATOR GABA:  Okay.
12    THE WITNESS:  Where are you again?  I'm
13 sorry.
14 BY MR. STEPHENS
15    Q   I'm sorry.  It's the second -- there's
16 a -- there's a title, arrest details, and in the
17 second paragraph, it starts, in the 42 cases.
18    A   Okay.  Just give me -- oh, I see where
19 you are.  Just give me one minute, please.
20    Q   Sure.
21    ARBITRATOR GABA:  Off.
22    (Brief off-the-record discussion.)

Page 491

1     ARBITRATOR GABA:  Mr. Stephens, proceed
2  once the witness is done reviewing the document.
3     THE WITNESS:  I'm -- I'm good.  I'm --
4  so you're -- you're at the -- in 42 cases
5  reviewed with arrests, postal inspectors claim 96
6  arrests?
7     MR. STEPHENS:  Yes, sir.
8     THE WITNESS:  38, 40 percent, were made
9  by postal inspectors, and 58 were made by other
10 law enforcement personnel.
11    MR. STEPHENS:  Yes, sir.
12    THE WITNESS:  But that conflicts with
13 what I read.  They're saying that only four of
14 the 58 were made by other law enforcement
15 agencies.  So I'm not sure I -- I know
16 where you're driving, where you're going.  I'm on
17 page 7, last paragraph.  So I'm -- I'm in a
18 different place, arrest reporting and
19 documentation.
20    MR. STEPHENS:  I'm sorry.  I'm
21 referring, just to be --
22    THE WITNESS:  I know where you are.

59 (Pages 488 - 491)

Page 492

1      MR. STEPHENS: Yeah. Okay. All right.
2      THE WITNESS: I'm referring to a
3  different place, because it's saying one thing
4  there, and then on page 7, that last paragraph,
5  far right, we identify that four of the 58,
6  7 percent, made by other law enforcement
7  agencies, postal inspectors claim without
8  documentation to support that they made a
9  material contributions, and then there's a
10 recommendation to the INC on recommendation 5.
11     MR. STEPHENS: Well, I don't think
12 it's -- it's conflicting. I think it's further
13 modifying what's already previously found, that
14 there were 58 arrests actually made by other law
15 enforcement personnel that the Inspection Service
16 was claiming and that this is a description --
17 this is a further description of those 58.
18     THE WITNESS: Well --
19     MR. STEPHENS: In any event, I --
20     MR. STELLABOTTE: Again -- again, I
21 don't know if he's testifying --
22     ARBITRATOR GABA: Sustained.

Page 493

1      MR. STEPHENS: That's fine.
2  BY MR. STEPHENS
3    Q   I'm going to ask you about another OIG
4  report you testified about, and that is Exhibit
5  A9, Postal Service Exhibit A9.
6    A   I'm there.
7    Q   Okay. I believe you said that the --
8  the OIG report said that there would be a savings
9  if the postal police were -- you got rid of the
10 postal police and replaced them with armed
11 security guards; is that correct?
12   A   That was their -- that's what they
13 said.
14   Q   And is it correct that the Postal
15 Service responded to that by saying that the
16 reported cost savings was exaggerated because the
17 OIG compared postal police to Guard II and that
18 the postal police are not Guard II?
19   A   So if you go into the management
20 comments, it does say that. However, management
21 disagreed -- I'm in the last paragraph, page 5,
22 management comments in the OIG report. It

Page 494

1  does -- however, management disagreed with the
2  savings methodology, questioning the accuracy of
3  the hourly rate for craft and supervisor postal
4  police officers and the number of work hours the
5  Postal Service could save by contracting out
6  armed security services. But I'd also note
7  that we didn't -- we didn't take that option. We
8  didn't take their recommendation --
9    Q   I understand.
10   A   -- to use armed --
11   Q   Right.
12   A   -- security guards.
13     ARBITRATOR GABA: Mr. Stephens?
14     MR. STEPHENS: Yes.
15     ARBITRATOR GABA: Sorry. I don't have
16 the right page number at the top.
17     MR. STEPHENS: Sure. I'm sorry. This
18 is -- this would be page No. 5 of that document
19 is what we're referring -- well --
20     ARBITRATOR GABA: Page No. 5 of A9?
21     MR. STEPHENS: Yes, sir. And I believe
22 what Mr. Bowers was testifying to was

Page 495

1  management's comments on the proposal to replace
2  postal police officers with armed security
3  guards.
4      ARBITRATOR GABA: Got it, sir. Thank
5  you. Please continue.
6  BY MR. STEPHENS
7    Q   And, Mr. Bowers, if I could -- that was
8  management's comments. And did OIG respond that
9  they understand that they actually used the wrong
10 cost methodology on the following page?
11   A   I didn't -- I'd have to read it. I
12 didn't --
13   Q   Okay.
14   A   I didn't see that.
15   Q   Okay. I'm --
16   A   But if they say it, I --
17   Q   Don't --
18   A   -- trust you.
19   Q   But going back, it -- is it correct
20 that -- is it not, that the actual bulk of this
21 OIG report didn't concern postal police officers?
22 Isn't that right? And I guess --

60 (Pages 492 - 495)

Page 496

1    A   Yeah.

2    Q   -- I'll refer you to page 2.

3    A   Yeah.  More than just postal police,

4 correct.

5    Q   Is it correct that the actual -- the --

6 the big money savings they were proposing was to

7 eliminate the inspector position?  Is that

8 correct?

9    A   If you can just point me to where you

10 are.

11    Q   Sure.  It's page 2, and it's the -- the

12 paragraph under reduced Postal Service costs for

13 investigative activities.

14    A   And which -- which paragraph are you --

15 where are you at?

16    Q   That first -- the first paragraph

17 before the bullet points.

18    A   Just give me a second, please.

19       ARBITRATOR GABA:  Mr. Stephens, I'm

20 lost as far as finding any prose in this document

21 that indicates that the OIG made mistakes in

22 calculating for contractors.

Page 497

1       MR. STEPHENS:  Sure.  If -- this is on

2 page 6.  So if I may -- and, counsel, correct me

3 if I'm misstating this -- the OIG -- the way

4 these reports often work is the OIG, Inspector

5 General's Office, makes a finding and a

6 recommendation.  Management then has an

7 opportunity to comment on that finding or

8 recommendation, and then, you know, in an

9 abundance of due process, the OIG then responds

10 to management's comments.

11       And, again, I don't want to

12 mischaracterize this, but the top of page 6, I

13 believe, is intended to be OIG's response to

14 management's response --

15       MR. STELLABOTTE:  What I would say --

16 and not to -- not to interrupt you, Mr. Stephens,

17 but what I would say is, I'm not the subject

18 matter expert on the process related to OIG

19 reports; however, perhaps Mr. Bowers can answer

20 that question.

21       ARBITRATOR GABA:  Gentlemen, you're

22 both engaging in argument, and all I'm asking for

Page 498

1 is, point me to the language that you wanted me

2 to see that apparently I missed.  So it's on

3 page --

4       MR. STEPHENS:  It's basically -- yes.

5 It's basically to combine the --

6       ARBITRATOR GABA:  Which --

7       MR. STEPHENS:  It's the bottom of page

8 5.

9       ARBITRATOR GABA:  Okay.  Which

10 paragraph of page 6 do you want me to look at?

11       MR. STEPHENS:  It would be the second

12 full paragraph.  It's talking about the work hour

13 savings that the Inspection Service -- not the

14 inspection -- that the Inspector General's Office

15 had estimated.

16       ARBITRATOR GABA:  Okay.  If there -- if

17 there's any language in employer A9 that

18 indicates the OIG looked at the wrong

19 classification of security guard, I don't see it.

20 So --

21       MR. STEPHENS:  So the --

22       ARBITRATOR GABA:  -- is there

Page 499

1 anything --

2       MR. STEPHENS:  Sure.

3       ARBITRATOR GABA:  -- I should -- with

4 specificity, is there anything I should be

5 looking at on page 5 or 6 of this report?

6       MR. STEPHENS:  Yes, sir.  Page 5.

7       ARBITRATOR GABA:  Okay.

8       MR. STEPHENS:  Management's comments.

9 Well, first of all, the previous section, reduce

10 security force costs through contracting.  The

11 OIG --

12       ARBITRATOR GABA:  Slow down.  Slow

13 down.

14       MR. STEPHENS:  I'm sorry.

15       ARBITRATOR GABA:  Where are you?

16       MR. STEPHENS:  Reduce security force

17 costs through contracting --

18       ARBITRATOR GABA:  Okay.

19       MR. STEPHENS:  -- in the middle of the

20 page on page 5.

21       ARBITRATOR GABA:  Got it.

22       MR. STEPHENS:  The OIG proffered a

Page 500

1 savings number.

2        ARBITRATOR GABA:  Okay.

3        MR. STEPHENS:  And management, at the

4 bottom of the page, questioned that calculation

5 by saying that they believe that the -- the

6 inspector general was using the wrong -- was

7 incorrectly comparing postal police officers to a

8 Security Guard II position.

9        ARBITRATOR GABA:  Help me out.  I see

10 management's comments, and I see the first

11 sentence that doesn't appear to be probative

12 other than -- on the issue of which we're

13 addressing.  I see the second sentence on the

14 last paragraph of page 5 of this exhibit, which

15 indicates management disagreed with the savings

16 methodology.  Okay.

17        MR. STEPHENS:  Questioning the accuracy

18 of the hourly rate.

19        ARBITRATOR GABA:  For craft and

20 supervisory postal police officers.

21        MR. STEPHENS:  Correct.

22        ARBITRATOR GABA:  So that -- isn't that

Page 501

1 saying, no, your numbers for the PPOs is wrong,

2 not your numbers for the people who are going to

3 replace the PPOs are inaccurate?

4        MR. STEPHENS:  Right.  I -- my

5 understanding of this is that OIG compared what

6 the Postal Service was spending versus what they

7 would spend if they hired another position, if

8 they hired guard -- guards to do these jobs.

9        And the Postal Service is saying, we

10 don't believe there's the savings you claim

11 because you compared postal police officers with

12 security guards.  Does that make sense?

13        ARBITRATOR GABA:  No, but we'll see if

14 it makes sense 120 days from now when I'm

15 reviewing the transcript.

16        MR. STEPHENS:  Fair enough.  Fair

17 enough.

18        ARBITRATOR GABA:  Okay.  Please

19 continue, sir.

20        MR. STEPHENS:  Just -- just to be

21 clear, though, going back on page 2, I believe

22 the original testimony was that this report

Page 502

1 concerned savings --

2        MR. STELLABOTTE:  Page 2?  I'm sorry.

3        MR. STEPHENS:  Page 2 of A9.

4        ARBITRATOR GABA:  Is this a question

5 for the witness?

6 BY MR. STEPHENS

7    Q   I don't know if we got an answer, and

8 I -- I don't mean to belabor this if he did, but

9 that the -- the general thrust of the report

10 didn't concern savings to be attained by

11 contracting out postal police officers.  It

12 concerned savings to be obtained by contracting

13 out other functions of the Inspection Service.

14    A   Well, what I testified to was that page

15 5, which I think is where I read the first

16 sentence, that reduce -- on page 5 of A9 -- A9?

17    Q   Yes, sir.

18    A   A9.  One of their recommendations, can

19 reduce costs by contracting for armed security

20 guards.  Now if you go to where you were

21 before -- I think you were on page 2 -- it's --

22 the report wasn't just for postal police.  They

Page 503

1 recommended combining the Inspection Service

2 investigative -- investigations with the Office

3 of Inspector General.

4        Now, recall, before the Office of

5 Inspector General, postal inspectors had

6 everything until the OIG came -- came about.

7 Now, I'm not an expert in this area.  I mean, it

8 happened during the time that I was a postal

9 inspector, but they're saying that there could be

10 savings if you bring everything back together

11 again.  That's what they're saying.

12    Q   Right.  They're --

13    A   It's a similar argument to -- but

14 different, you know, talking about postal

15 inspectors versus postal police.

16    Q   Right.  They're saying you could save

17 $766 million over ten years by eliminating or

18 combining --

19    A   That's what --

20    Q   -- correct?

21    A   -- they're saying.

22    Q   Yeah.  Okay.  I don't have any further

62 (Pages 500 - 503)

Page 504

1  questions about this document. One -- I just
2  have one final question, and I'll leave you be.
3  And that's going back to your slides, and this
4  will be D -- D1. And it's --
5      ARBITRATOR GABA: Okay. Agency D1,
6  page?
7      MR. STEPHENS: One second, sir. 24.
8  BY MR. STEPHENS
9      Q   Now, I believe you testified that --
10 that this Hallcrest report, this is what led to
11 the advent of the contract security guards.
12     Would that be a fair statement?
13     A   That's a fair statement.
14     Q   Okay. You said that the FLETC training
15 was excessive. Do you know how much -- how many
16 weeks of training people were receiving at that
17 time?
18     A   I don't know.
19     Q   If I said it was 12 weeks, would that
20 be -- would you object to that?
21     A   I don't -- I'm not going to object.
22 I -- I think it was more the content of the

Page 505

1  training than the length of training.
2      Q   The content. But the -- the content
3  is -- it's -- FLETC is FLETA's certified academy,
4  correct?
5      A   Yeah. And our academy is FLETA
6  certified, also.
7      Q   Right. And inspectors are trained at
8  the same academy where postal police officers are
9  trained, correct?
10     A   That's correct.
11     Q   And I believe you testified that the
12 amount of training postal police officers receive
13 is going to increase to 12 weeks?
14     A   That's correct. In June of this year.
15     Q   And that the delta -- going to the
16 previous slide, number 45.
17     A   Which slide are you referring to? I'm
18 sorry.
19     Q   Slide 45. It's the previous page.
20     MR. STELLABOTTE: For the record, just
21 so the record's clear, I don't know what 45 is.
22 Are you referring to slide number --

Page 506

1      ARBITRATOR GABA: To the extent that's
2  an objection, it's sustained.
3      MR. STEPHENS: Oh, I'm sorry. I'm
4  looking at -- 45 is the number of hours. I
5  mistakenly thought it was a page number. I'm
6  sorry. It's page 23.
7      ARBITRATOR GABA: All right. Let's --
8  let's start this again.
9      MR. STEPHENS: On this slide, it --
10     ARBITRATOR GABA: Okay. This slide
11 being?
12     MR. STEPHENS: This slide is slide 23.
13     ARBITRATOR GABA: Of exhibit?
14     MR. STEPHENS: Of D1.
15     ARBITRATOR GABA: Okay. Can we go back
16 to slide 23?
17     MR. STEPHENS: Yes, sir.
18 BY MR. STEPHENS
19     Q   On the training, is it correct that the
20 difference -- the different amount of training
21 for inspectors versus PPOs is only two days of
22 training? Is that correct?

Page 507

1      A   What are you referring to?
2      Q   I'm referring to the bar graphs here,
3  19 hours for inspectors and three-and-a-half
4  hours for PPOs.
5      A   Are you breaking it down to days? Is
6  that what you're -- it's going to go up.
7      ARBITRATOR GABA: Your math's --
8      THE WITNESS: I mean, I don't know what
9  the -- it is what it is.
10 BY MR. STEPHENS
11     Q   This is 19 hours, correct?
12     A   That's where it is right now, correct.
13     Q   Versus three-and-a-half hours?
14     A   That's correct.
15     Q   So if PPOs got an additional
16 14-and-a-half hours -- 15-and-a-half hours, that
17 would be equal to what inspectors get as far as
18 training for interviews and interrogations; is
19 that correct?
20     A   If we're going to play this out, but
21 it -- it affects other areas.
22     Q   I'm just asking about the -- the number

63 (Pages 504 - 507)

Page 508

1  of hours.
2      A   I mean, yeah, if you increased it, it
3  would --
4      Q   If you increased it by two more days of
5  training, that would be equal to what inspectors
6  get?
7          ARBITRATOR GABA:  It's hours, sir,
8  not --
9          MR. STEPHENS:  I understand.  But
10  it's --
11          ARBITRATOR GABA:  Okay.
12          MR. STEPHENS:  -- two days of training,
13  assuming -- assuming it's eight hours of
14  training -- eight hours a day.
15          ARBITRATOR GABA:  I -- I'm completely
16  lost.
17  BY MR. STEPHENS
18      Q   Okay.  I'll just ask this way:  Is it
19  correct that there's a difference in training of
20  15-and-a-half days for PPOs versus inspectors on
21  interviews and interrogation?
22      A   Fifteen-and-a-half hours.

Page 509

1      Q   Correct.  Fifteen-and-a-half hours?
2      A   Yes.
3      Q   And in evidence handling and lab --
4  lab -- labs, there is a difference in 14 hours of
5  training; is that correct?
6      A   That's correct.
7      Q   And on legal issues, PPOs receive 16
8  hours of training, but inspectors receive 41
9  hours.  So there's a difference -- whatever that
10  math is, that's the difference; is that correct?
11      A   That's correct.  25 and a half.
12          MR. STEPHENS:  No further questions.
13          ARBITRATOR GABA:  Any redirect?
14          MR. STELLABOTTE:  No redirect.
15          ARBITRATOR GABA:  Anything from the
16  panel?
17          ARBITRATOR DUFEK:  No.
18          ARBITRATOR ALBERGO:  I have a question.
19  In the Postal Service's Exhibit A9, page 35 --
20          THE WITNESS:  Okay.  I'm there.
21          ARBITRATOR ALBERGO:  -- response, third
22  paragraph down, the last sentence, starting with

Page 510

1  "additionally," can you read that?
2          THE WITNESS:  Are you in the paragraph
3  which starts -- under response, you're in the
4  third paragraph and --
5          ARBITRATOR ALBERGO:  Right.
6          THE WITNESS:  -- you want me to read
7  the last sentence?
8          ARBITRATOR ALBERGO:  Right.  Starting
9  with "additionally."
10          THE WITNESS:  And this is --
11  "Additionally, we do not at this point agree with
12  the comparison to a Department of Labor Guard II
13  accurately reflects all of the duties performed
14  by PPOs."
15          ARBITRATOR ALBERGO:  So the Postal
16  Service said we have additional duties than
17  guards?
18          THE WITNESS:  Well --
19          MR. STELLABOTTE:  Objection --
20  objection to the characterization of the
21  document.  We don't even know --
22          ARBITRATOR GABA:  I'll -- counsel,

Page 511

1  sustained.  I'm going to lay a little foundation
2  here.
3          Sir, other than what is contained in
4  exhibit agency A9, do you have any personal
5  knowledge other than what you have read in this
6  document?
7          THE WITNESS:  I do have knowledge of my
8  prior testimony in 2014.  OPM and MSPB -- I think
9  this is what you're referring to.  I could be
10  wrong.
11          ARBITRATOR GABA:  No.  Let's try it
12  another way.
13          THE WITNESS:  Okay.
14          ARBITRATOR GABA:  If there is anything
15  in agency A9 that is false, do you have -- do you
16  have personal knowledge of the falsity of the
17  prose in the document?
18          THE WITNESS:  No.
19          ARBITRATOR GABA:  Okay.  So, counsel,
20  is -- is there any reason that this document
21  shouldn't just speak for itself?
22          MR. STEPHENS:  That's fine.

64 (Pages 508 - 511)

Arbitration Vol. 2                                    February 4, 2020

Page 512

1        MR. STELLABOTTE:  No objection.

2        ARBITRATOR GABA:  Okay.  Frank, keep

3    going.  Do you have any more questions?

4        ARBITRATOR ALBERGO:  No.  That's it.

5        ARBITRATOR GABA:  All right.  Anything

6    in response to the panel's questions?

7        THE WITNESS:  From me?

8        ARBITRATOR GABA:  No, from counsel.  I

9    know you don't, Mr. Bowers, because I know you

10   want to go home.  All right.

11       ARBITRATOR DUFEK:  He's not the only

12   one.

13       ARBITRATOR GABA:  Mr. Bowers, your long

14   national nightmare is over.  Thank you very much,

15   sir.

16       MR. STEPHENS:  Thank you.

17       THE WITNESS:  Thank you, sir.

18       (Witness excused.)

19       ARBITRATOR GABA:  Any further

20   witnesses?

21       MS. ATTRIDGE:  Not for today.

22       ARBITRATOR GABA:  The parties agree we

Page 513

1    should adjourn and reconvene tomorrow at 9:30?

2        MS. ATTRIDGE:  Yes.

3        MR. STEPHENS:  Yes.  It would be

4    helpful to talk about cross-examination, though.

5        ARBITRATOR GABA:  Okay.  Let's go off.

6        (Whereupon, the proceedings were

7        recessed at 4:55 p.m.)

8

9        * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 514

1        CERTIFICATE OF NOTARY PUBLIC

2    I, ERICK M. THACKER, the officer before whom

3    the foregoing arbitration was taken, do hereby

4    certify that the testimony appearing in the

5    foregoing arbitration was taken by me in

6    stenotype and thereafter reduced to typewriting

7    by me; that said transcription is a true record

8    of the proceedings; that I am neither counsel

9    for, related to, nor employed by any of the

10   parties to the action in which this was taken;

11   and, further, that I am not a relative or

12   employee of any counsel or attorney employed by

13   the parties hereto, nor financially or otherwise

14   interested in the outcome of this action.

15

16

17

18

     ERICK M. THACKER

19   Notary Public in and for the

     District of Columbia

20   My commission expires:

21   June 30, 2024

22

# Exhibit L

Page 1422

1          BEFORE THE BOARD OF INTEREST ARBITRATION

2

         ----------------------------:

3    POSTAL POLICE OFFICERS        :

     ASSOCIATION (PPOA)            :

4                                  : Volume 7

           and                     : (Pgs. 1422 to 1649)

5                                  :

     UNITED STATES POSTAL SERVICE  :

6    ----------------------------:

7

8

9                     ARBITRATION

10

11   DATE:             Wednesday, February 26, 2020

12   TIME:             10:07 a.m.

13   LOCATION:         United States Postal Service

                       475 L'Enfant Plaza, S.W.

14                     Washington, D.C. 20260

15

16   REPORTED BY:     Erick M. Thacker, RPR

                      Reporter, Notary

17

18

19

20

21          Capital Reporting Company

          1250 Eye Street, NW, Suite 350

22            Washington, D.C. 20005

Page 1423

1           A P P E A R A N C E S
2 Before Arbitrators:
3      David M. Gaba, Neutral Chair
4      Frank Albergo, PPOA Member
5      Robert A. Dufek, USPS Member
6 On behalf of Postal Police Officers Association:
7      ARLUS J. STEPHENS, ESQUIRE
       ROSEANN R. ROMANO, ESQUIRE
8      CALEB JACKSON, ESQUIRE
       Murphy Anderson, PLLC
9      1401 K Street, Northwest, Suite 300
       Washington, D.C. 20005
10     (202) 223-2620
11 On behalf of the United States Postal Service:
12     ERIN E. LYNCH, ESQUIRE
       KELLY ANN TADDONIO, ESQUIRE
13     United States Postal Service
       475 L'Enfant Plaza, Southwest
14     Washington, D.C. 20260
       (202) 268-6704
15
   ALSO PRESENT:
16
       Eric Freeman, PPOA
17
       Humphrey Rutherford, PPOA
18
       Janet Peterson, USPS
19
            * * * * *
20
21
22

Page 1424

1           C O N T E N T S
2 WITNESS:      DIRECT  CROSS  REDIRECT  RECROSS
3 STEPHEN SALTZBURG  1425  1452    --     --
4 JEFF DELINSKI      1479  1538   1547    --
5 JAMES BJORK        1549    --    --     --
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 1425

1        P R O C E E D I N G S
2      ARBITRATOR GABA:  Mr. Stephens, any
3 witnesses today?
4      MS. ROMANO:  Yes, we do.
5      ARBITRATOR GABA:  And who do you have?
6      MS. ROMANO:  Our first witness today is
7 Professor Stephen Saltzburg.  He's the Wallace
8 and Beverley Woodbury University Professor of Law
9 at George Washington University Law School.  His
10 slides are at J1, and his resume is at J2.
11     ARBITRATOR GABA:  Thank you, ma'am.
12 Sir, would you mind raising your right hand?
13 WHEREUPON,
14      STEPHEN SALTZBURG, PH.D.
15 called as a witness, and having been first duly
16 sworn, was examined and testified as follows:
17     ARBITRATOR GABA:  Thank you, Professor.
18     DIRECT EXAMINATION BY COUNSEL FOR THE
19     PPOA
20 BY MS. ROMANO:
21   Q   Now, Professor Saltzburg, I'm just
22 going to let you present your slides as you would

Page 1426

1 like.  First start with a little bit about your
2 background and experience.
3   A   Okay.  So I graduated Dickinson College
4 in 1967, University of Pennsylvania Law School in
5 1970.  I went to work for a federal district
6 judge in San Francisco after law school, where we
7 had a lot of law enforcement cases.
8      And then I clerked for the Honorable
9 Thurgood Marshall at the United States Supreme
10 Court in the 1971 term.
11     I joined University of Virginia faculty
12 in the fall of 1972, and either at the University
13 of Virginia or at George Washington University,
14 I've been teaching criminal procedure and
15 criminal law since 1972.
16     The -- my law enforcement experience
17 is, I've handled a lot of criminal cases.  And in
18 1987, I was associate independent counsel in the
19 Iran-Contra investigation.  1988 and '89, I was
20 deputy assistant attorney general in the United
21 States Department of Justice Criminal Division,
22 where I had a lot of experience dealing with the

2 (Pages 1423 - 1426)

Page 1427

1 FBI.

2         In 1994, I was named by the secretary
3 of the Treasury as the head of the Tax Refund
4 Fraud Task Force, where I had to work with
5 criminal investigators at the Internal Revenue
6 Service to examine fraud in the earned income tax
7 credit. I have been invited to teach at the law
8 enforcement academy at Glynco, and I have
9 interacted with law enforcement throughout most
10 of my teaching career. I've always had
11 representatives of Fairfax Police come to my
12 class and talk to my students about what
13 real-life police work is all about.

14         So a little bit -- just a little bit
15 about my progression, at the University of
16 Virginia, I was given endowed chair in 1987. It
17 was named after the class of -- that had
18 graduated 25 years earlier. I was recruited by
19 George Washington University to leave Virginia
20 and come to GW in 1990. In 2004, I was named
21 university professor. I'm one of eight or nine
22 such university professors. The title means I am

Page 1428

1 allowed to teach any course in the university,
2 and I do teach an undergraduate course on
3 criminal justice and the Bill of Rights.

4         I have chaired the American Bar
5 Association Criminal Justice Section. I still am
6 on the council of the Criminal Justice Section of
7 the ABA, and I represent it in the ABA governing
8 body, the House of Delegates.

9         I know a little bit about the postal
10 police. Some years ago, I gave -- 15 years ago,
11 I gave them a little bit of advice, and here I am
12 15 years later representing -- not representing
13 them, but testifying for them. So the slides I
14 have basically begin with the fact that there's
15 no doubt in my mind that postal police are given
16 law enforcement powers. They are police
17 officers.

18         The postal police occupation code
19 specifically says that among their duties and
20 responsibilities are to carry a firearm and other
21 law enforcement equipment while on duty, perform
22 patrol duty as assigned, on foot or by motor

Page 1429

1 vehicle. These are what police officers do.
2 Make arrests in accordance with jurisdictional
3 authority, conduct preliminary fact-finding in
4 connection with emergency response and use
5 accepted law enforcement tactics to respond to
6 active shooter incidents. So the Postal Service
7 itself recognizes that the postal police are law
8 enforcement officers.

9         Postal police officers identify
10 themselves as police. The Postal Service issued
11 police badges to the postal police, much like the
12 badges that law enforcement officers carry
13 throughout the United States. Postal police
14 display those badges and identify themselves to
15 suspects and individuals as police officers.

16         And it would be illegal in just about
17 every jurisdiction in the United States for
18 postal police to identify themselves as police
19 officers if they were not actually police. It
20 would be misleading. It would be fraudulent.
21 For example, the California penal code -- I just
22 picked a couple of examples -- makes it a crime

Page 1430

1 for any person who falsely represents himself or
2 herself to be a public officer and to arrest,
3 detain or threaten to arrest or detain any
4 person.

5         Postal police are authorized to arrest.
6 They are authorized to use their badges. They
7 are authorized to represent themselves as police
8 officers, and they do.

9         The New York penal code says a person
10 is guilty of criminal impersonation in the first
11 degree if he pretends to be a police officer, and
12 New York goes on to actually identify who are
13 police officers. And the New York penal code
14 says the following law enforcement officers have
15 the power of police officers, and No. 8 on the
16 list, United States Postal Service police
17 officers and inspectors.

18         ARBITRATOR GABA: Professor --

19         THE WITNESS: Yes.

20         ARBITRATOR GABA: -- I'm going to ask
21 you to do me a favor --

22         THE WITNESS: Yes.

3 (Pages 1427 - 1430)

Page 1431

1        ARBITRATOR GABA:  -- if you don't mind.
2   As you move through your slide deck, every time
3   you go to a new slide, if you'd just state the
4   number for the record.
5        THE WITNESS:  Oh, okay.
6        ARBITRATOR GABA:  It will help us all
7   out 90 days from now.
8        THE WITNESS:  Let me see if I -- I
9   think I can do that.  This is slide 7.
10        ARBITRATOR GABA:  Thank you, sir.
11        THE WITNESS:  And I'm going to go to
12   the next slide, which is 8.
13        D.C. Code, just like California, just
14   like New York, it is illegal in D.C., a
15   misdemeanor, for any person not a member of the
16   police force to falsely represent himself as such
17   a member.
18        We'll move to slide 9.  Postal police
19   are trained similarly to federal law enforcement
20   counterparts.  Federal law enforcement training
21   accreditation includes among learning objectives
22   a number of things.  I just picked some.

Page 1432

1   Identifying basic characteristics of chemical,
2   biological nuclear and explosive threats;
3   identifying criminal risk to facility; explaining
4   the postal police officer's role in mobile patrol
5   and their role in community-oriented policing;
6   explaining the postal police officer's role in
7   perimeter security and in community-oriented
8   policing.  They're specifically trained in
9   policing, working with other police departments
10   so that there can be a coordinated law
11   enforcement response to criminal activity and
12   threats.
13        Moving to slide 10, postal police are
14   trained in law enforcement measures that security
15   guards are not trained in and generally are not
16   permitted to use.  Some of them are crowd control
17   techniques, knee strikes as a distraction
18   technique, effective angle kicks.  Postal police
19   have to have the ability to apply handcuffs to a
20   suspect in various circumstances.  They have to
21   demonstrate the use of the escort position to
22   control a subject, and they have to be able to

Page 1433

1   demonstrate the ability to do a thorough field
2   search of a handcuffed suspect and properly
3   handle weapons found during a field search.  They
4   have to be able to explain the chain of custody.
5   They have to be able to identify a crime scene
6   and take measures to preserve it.
7        Security guards are trained in none of
8   this.  They're not permitted to use ankle kicks
9   and knee strikes.  Generally, they can't apply
10   handcuffs.  Generally, they don't commit field
11   searches and seize weapons from people.  They
12   don't take control of crime scenes and take
13   measures to preserve crime scenes.  They call
14   police to do that.
15        Moving to the next slide, which is No.
16   11, postal police receive the same legal training
17   as other federal police.  They're trained in
18   Terry stops.  And I assume everybody knows that a
19   Terry stop is a stop where an officer has
20   reasonable suspicion that criminal activity has
21   occurred or may be occurring and is entitled to
22   take action to determine whether or not the

Page 1434

1   officer should make an arrest.  The officer is
2   permitted, if the officer has a reasonable belief
3   the suspect is armed and dangerous, to do a
4   frisk, and we call that stop and frisk.
5        Postal police are trained in making
6   arrests based upon probable cause even if a crime
7   is not committed in their presence.  The law is
8   very clear.  Postal police can arrest for any
9   federal crime as long as they have probable
10   cause, even though they weren't there when the
11   crime was committed.  Security officers cannot do
12   that.  By the way, private citizens can't do
13   that.  They can make citizen's arrest for crimes
14   committed in their presence, but that's it.
15        Postal police are trained in making
16   searches incident to arrest, including vehicular
17   searches, searches of cars.  Security guards
18   can't do that.
19        Postal police are trained in giving
20   proper Miranda warnings and in how to interrogate
21   suspects.  That's not something security guards
22   are trained to do.  It's not something they do.

Page 1435

1    Postal police are trained in Fourth
2 Amendment standards.  They have to apply the
3 standards and obey the standards.  Generally
4 speaking, security guards are not bound by the
5 Fourth Amendment because they're not -- they're
6 not given the police power of the federal or
7 state government.
8    Moving to slide 15, postal police, like
9 all police, have to know what a Terry stop is,
10 will have to know what reasonable suspicion is.
11 They have to know the limits of a frisk.
12 BY MS. ROMANO
13   Q  Professor, I'm sorry.  I just need to
14 interrupt you for one second.  I think we're
15 actually on slide 12.
16   A  Oh, you're right.  I misspoke.  It
17 is slide -- it is slide 12.  I'm sorry.
18   Q  Sorry about that.  Go ahead.
19   A  Thank you for correcting me.
20    Postal police officers, like all police
21 officers, have to know why they're given
22 permission to do Terry stops, what the purpose of

Page 1436

1 a Terry stop is, how long a Terry stop is
2 permitted to detain a suspect and what happens at
3 the end of a Terry stop.  And they have to be
4 able to differentiate a Terry stop and the
5 process associated with it from an arrest and
6 what happens during an arrest.
7    The failure to get this right means you
8 commit Fourth Amendment violations, and when you
9 understand the law and do it right, you comply
10 with the Fourth Amendment and carry out your law
11 enforcement responsibilities in the way they're
12 supposed to be carried out.
13    Moving to 13, postal police are trained
14 on what constitutes an arrest.  And the word
15 "arrest" has a specialized meaning in criminal
16 law.  It is different from a detention.  Terry
17 stops are detentions.  When people talk about
18 apprehension, they usually mean arrest.  An
19 arrest is taking someone into custody for
20 purposes of essentially taking them to the
21 station house or the equivalent for processing.
22    The arrest is a significant power under

Page 1437

1 the Fourth Amendment, and law enforcement
2 officers have to be sure that they understand
3 probable cause, what constitutes probable cause,
4 which is the minimum standard for an arrest and
5 how to carry out an arrest, what you're allowed
6 to do in the course of arresting a suspect.  How
7 much force can you use?  These are all things
8 that law enforcement officers are trained in.
9 Security guards are not.
10    Moving to the next slide, which is 14,
11 my old boss, Justice Marshall, wrote about the
12 power of arrest and what it does to most people,
13 and he wrote that being arrested and held by the
14 police, even if only for a few hours, is for most
15 persons awesome and frightening.
16    It is an enormous power.  We sometimes
17 take it for granted because of the movies and
18 television shows that show people getting
19 arrested, but when you talk to an individual who
20 actually has been arrested, the process is the
21 same pretty much throughout the United States.
22 The person who's arrested is handcuffed,

Page 1438

1 handcuffed hands behind the back, usually put in
2 some kind of a patrol car, taken to the station
3 house, booked.  That means photographed,
4 fingerprinted and, in some jurisdictions, have a
5 DNA sample taken.
6    Then within -- the Supreme Court has
7 said, presumptively, within 48 hours, they have
8 to be taken before a magistrate, but for 48
9 hours, they can be kept in jail, and they're not
10 guaranteed a private jail cell.  It can be an
11 enormous burden on someone's freedom and an
12 enormously frightening experience, and that's the
13 power of arrest that postal police are given.
14    Moving to -- to slide 15, one of the
15 reasons training is so important is, the Supreme
16 Court in Florida versus Royer recognized that a
17 Terry stop can actually become a search for
18 Fourth Amendment purposes even if an officer
19 didn't intend to make an arrest.
20    That case involved an airport stop.
21 Plain clothes officers walked up to Royer in an
22 airport in Miami, Miami-Dade, and identified

5 (Pages 1435 - 1438)

Page 1439

1  themselves.  And he had a name tag on his luggage
2  which was different from his ticket, and they had
3  reasonable suspicion to ask him questions about
4  what he was doing.  They suspected he might be
5  doing drug trafficking.
6        But they moved him from the main area
7  where people were walking in the airport into a
8  very small room, which the Supreme Court
9  described as once was a closet, and they asked
10  him for consent to search.  And the Supreme Court
11  held, once they put him in that room, he'd been
12  arrested.  It didn't matter whether the police
13  intended to arrest him, that they had cut him off
14  from normal traffic.  They had isolated him.
15  They had taken him into custody and he was
16  arrested, and they didn't have probable cause at
17  that time to arrest.
18        And since that case, law enforcement
19  officers have learned that they have to be sure
20  to know when a Terry stop is over and when they
21  have moved into the area of arrest.  Intending it
22  or not, law enforcement officers who arrest

Page 1440

1  someone without probable cause violate the Fourth
2  Amendment.  No security guard has a clue as to
3  any of these matters.  And they're difficult, and
4  they require constant training to make sure that
5  law enforcement officers are aware of
6  developments in Fourth Amendment law.
7        And that training is the kind that the
8  law enforcement officers at Glynco and elsewhere,
9  they get.  I mean, it's important training, and
10  it's one of the reasons that we have strong law
11  enforcement consistent with our Bill of Rights in
12  the United States.
13        Moving to slide 16, the arrest power of
14  postal police is explicitly set forth.  In 2007,
15  the -- the Postal Service put out an update.
16  Instead of doing this year by year setting forth
17  police powers, they set out a policy update
18  which, going forward, established the powers of
19  the postal police.  And that update said the
20  Postal Service is authorized to employ postal
21  police officers for duty in connection with the
22  protection of property owned or occupied by the

Page 1441

1  Postal Service or under its charge and control
2  and persons on that property, including duty in
3  areas outside the property to the extent
4  necessary to protect the property and persons
5  thereon.
6        With respect to such property, postal
7  police officers are empowered to enforce federal
8  laws and regulations for the protection of
9  persons and property, to carry firearms and to
10  make arrests without a warrant for any offense
11  against the United States committed in their
12  presence or for any felony cognizable under the
13  laws of the United States if the postal police
14  officer has reasonable grounds to believe the
15  person to be arrested has committed or is
16  committing a felony.
17        That is exactly the same power given to
18  the Federal Bureau of Investigation.  It is
19  exactly the same power given to law enforcement
20  officers throughout the federal government.
21        ARBITRATOR GABA:  Professor, excuse me
22  for interrupting.

Page 1442

1        THE WITNESS:  Yes.
2        ARBITRATOR GABA:  Counsel, can you
3  stipulate to the exhibit number of policy update
4  5/22/2007?
5        MS. ROMANO:  Yes.  I believe that's the
6  Union Exhibit X2.
7        ARBITRATOR GABA:  Do you agree, ma'am?
8        MS. LYNCH:  Yes.
9        ARBITRATOR GABA:  Thank you.  Thank
10  you, Professor.  Sorry about that.
11        THE WITNESS:  Moving to -- so moving to
12  slide 17, the policing powers of the same
13  document of the security force are restricted to
14  Postal Service-controlled property, except for
15  hot pursuit and in situations requiring mobile
16  patrol or escort protection.  We have three
17  things there, hot pursuit, mobile patrol and
18  escort protection.  That's not what security
19  guards do.
20        The powers explicitly recognize that
21  postal police may engage and exercise this
22  authority, and these are the same tasks

Page 1443

1 undertaken daily by local police in jurisdictions
2 throughout the country. They engage in hot
3 pursuit and engage in mobile patrol, and to a
4 lesser extent, they engage in escort protection,
5 but they do it.
6      United States Code, federal law,
7 authorizes the Postal Service to -- I'm sorry. I
8 should have just said slide 18. Sorry about
9 that -- the Postal Service to, quote, Employ
10 police officers for duty in connection with the
11 protection of property owned or occupied by the
12 Postal Service or under the charge and control of
13 the Postal Service, and persons on that property,
14 including duty in areas outside the property to
15 the extent necessary to protect the property and
16 persons on the property.
17      With respect to that property, the
18 officers will have the power to enforce federal
19 laws and regulation for the protection of persons
20 and property. You won't find Congress giving
21 that authority to anybody who is a security
22 guard.

Page 1444

1      They have the authority to carry
2 firearms because Congress gave the Postal Service
3 the power to let postal police officers carry
4 firearms, and they have the power that Congress
5 authorized to make arrests without a warrant for
6 any offense against the United States committed
7 in the presence of the officer or for any felony
8 cognizable under the laws of the United States.
9      Take a look at what powers Congress has
10 conferred upon other federal law enforcement
11 officers like the FBI. This is coextensive.
12 Postal police officers can do what other federal
13 law enforcement officers can do.
14      Moving to slide 19, many law
15 enforcement officers throughout the United States
16 have assigned physical territory which they --
17 which they work. The Secret Service Police --
18 you probably know the Secret Service as the
19 uniformed service and the non-uniformed service.
20 Secret Service Police may be assigned the White
21 House grounds. That's where they work. They may
22 be assigned to the vice president's residence.

Page 1445

1 That's where they work. They may be assigned to
2 Blair House, and if -- they may rotate and be
3 assigned the White House one year and to the vice
4 president's property the next year. But the fact
5 that they have assigned territory doesn't mean
6 they're not law enforcement officers. They have
7 the power to carry their weapons. They have the
8 power to arrest. They have the power to protect
9 on this property.
10      Local police might be given airport
11 patrol duty. If you've been out to Dulles or
12 National or BWI recently, you're going to see
13 county police. You're going to see there are
14 county police cars sitting out there. They're
15 law enforcement officers given the authority to
16 move people along, but also while they're there
17 to check for suspicious things, to make sure that
18 people aren't parking cars, you know, with
19 explosives to the extent they can. They carry
20 their -- bring their dogs to the airports so that
21 the dogs can assist them in trying to make sure
22 that we don't run the risk of having explosives

Page 1446

1 set off near an airport.
2      Park Police may be given specific
3 territorial assignments, and we know the Capitol
4 Police have specific territory which they cover.
5 And all law enforcement agents have a
6 jurisdiction in which they work, whether it's the
7 county or the city that hired them, and whether
8 they are assigned to a particular place is up to
9 the chief of that police agency working in
10 conjunction with the legislative authorities who
11 help the police do their jobs.
12      Moving to slide 20, I came upon this
13 case -- it wasn't for purposes of this
14 proceeding, but it was a case that caught my eye
15 because it involved TSA. And many -- many of us
16 who have been through airports, particularly if
17 you have knee replacements, hip replacements, and
18 you have to deal with TSA, know that it can --
19 that agency can be an irritant. That's why I
20 guess I paid attention to this case.
21      But the interesting part of it was --
22 the federal government is typically immune from

7 (Pages 1443 - 1446)

Page 1447

1  suit.  The doctrine of sovereign immunity means
2  you can't sue the federal government or its
3  employees unless the federal government waives
4  sovereign immunity.  The Federal Tort Claims Act
5  does waive sovereign immunity for certain torts
6  committed by its employees, and it does so for
7  specific intentional torts committed by, quote,
8  investigative or law enforcement officers.
9        And the Federal Tort Claims Act defines
10  law enforcement officers as, quote, any officer
11  of the United States who is empowered by law to
12  execute searches, to seize evidence or to make
13  arrests for violations of federal law.  And if a
14  federal official fits the definition, a plaintiff
15  can sue that official if that official commits an
16  intentional tort.
17        Well, the TSA argued that its officers
18  weren't law enforcement officers.  They're
19  guards.  And the United States Court of Appeals
20  en banc, the entire Court of Federal Appeals,
21  said that TSA's argument was wrong.  TSA said,
22  well, these are just screeners who do

Page 1448

1  administrative inspections of passengers and
2  property.  And the Third Circuit said, we
3  disagree.  And this is a quote:  We disagree.
4  The words of the proviso dictate the result here.
5  Because TSOs, transportation service officers,
6  are officers of the United States empowered to
7  execute searches for violations of federal law,
8  Pelligrino, the plaintiff's suit, may proceed.
9        And the last slide I have is 21, and it
10  leads me to these conclusions.  The postal police
11  position description describes a police officer.
12  Postal police officers are trained like police
13  officers.  The Postal Service holds the postal
14  police officers out to the public as police
15  officers.  The Postal Service gives them a badge
16  to flash to the public to convince the public
17  they are true police officers.
18        Congress labeled postal police officers
19  as police officers.  I didn't put a year, but New
20  York specifically lists postal police officers as
21  police when it defines who it is that can
22  identify himself or herself as a police officer.

Page 1449

1  Congress endowed postal police with law
2  enforcement powers of arrest and investigation.
3        Postal police have an assigned
4  jurisdiction, which may change from time to time,
5  like all law enforcement officers, and the bottom
6  line is, in my judgment, postal police officers
7  are police officers.
8        ARBITRATOR GABA:  Any further
9  questions?
10  BY MS. ROMANO
11    Q   Professor, just a couple follow-up
12  questions.  You mentioned probable cause several
13  times.  Can you tell us just briefly what is
14  probable cause and how does an officer get to the
15  point where they know they have probable cause?
16    A   The -- it's an interesting question
17  because the Supreme Court of the United States
18  has never defined probable cause in -- in terms
19  of a percentage or certainty.  The Supreme Court
20  has said probable cause is a less demanding
21  standard than a preponderance of the evidence,
22  which is anything greater than 50 percent.

Page 1450

1        So probable cause, an officer doesn't
2  have to be more likely than not sure that
3  somebody may have committed a crime or is in the
4  process of committing a crime.  The definition
5  the Court has given is a reasonably prudent
6  officer would believe taking all facts into
7  consideration that it appears that the person who
8  the officer is going to arrest has engaged in
9  criminal activity.  It doesn't mean the officer
10  has to be certain.
11        And one of the reasons training is so
12  important is, the test as I've described it is
13  not a bright line.  It requires training with a
14  lot of examples of is this enough, is that
15  enough, and it requires judgment based on both
16  training and experience.
17        And even the best officers sometimes
18  find that they're very close calls.  Fortunately,
19  courts will defer to the police because they have
20  to make split-second judgments, but they're not
21  always easy ones, and the probable cause standard
22  is not always a simple standard to apply.

8 (Pages 1447 - 1450)

Page 1451

1   Q   And so to even reach the probable cause
2   standard, is some investigation required in some
3   circumstances?
4   A   Well, obviously, in some circumstances.
5   The -- one of the reasons we have Terry stops
6   is -- the Supreme Court has explained the purpose
7   of a Terry stop is to permit an officer who
8   doesn't have probable cause at the time to stop a
9   person, detain a person and sometimes frisk a
10  person in order to gather more information to
11  decide whether the officer wants to make an
12  arrest or decides that he or she must release the
13  person.
14      And so, yes, I mean, the -- it's not
15  unusual for law enforcement officers to see
16  something that gets their attention. Sometimes
17  they don't even have reasonable suspicion, but
18  they approach because somebody's engaged in
19  something that catches their eye that doesn't
20  seem to fit routine circumstances.
21      During the course of sometimes
22  conversing with an individual, they may decide

Page 1452

1   they've got reasonable suspicion, and during
2   further detention and further investigation, they
3   may then decide they have probable cause. Each
4   step they have to -- they don't ever have to
5   justify walking up to somebody and saying, may I
6   talk to you? They can always do that, but they
7   can't detain somebody without reasonable
8   suspicion, and they can't arrest without probable
9   cause.
10      MS. ROMANO:  I don't have anything
11  further. Thank you.
12      ARBITRATOR GABA:  Any cross?
13      MS. LYNCH:  Yes.  We'd like ten
14  minutes.
15      ARBITRATOR GABA:  Done.
16      (Recess 10:38 a.m. to 10:49 a.m.)
17      ARBITRATOR GABA:  Any cross, counsel?
18      MS. LYNCH:  Yes.
19      CROSS-EXAMINATION BY COUNSEL FOR THE
20      POSTAL SERVICE
21  BY MS. LYNCH
22      Q   Good morning, Professor Saltzburg.  My

Page 1453

1   name is Erin Lynch.  I'm an attorney with the
2   Postal Service.
3       I want to start by talking a bit about
4   your background, and I did review all 22 pages of
5   your resume.  It is quite impressive.  I don't
6   think anyone here would argue that you -- you
7   have a lot of experience in the area of criminal
8   procedure and evidence and the like.
9       Would you say yourself that it's fair
10  to characterize you as an expert in criminal
11  procedure?
12      A   I think so.
13      Q   And would you describe yourself as an
14  expert in the laws governing criminal justice
15  generally?
16      A   I think so.
17      Q   And you mentioned that you've taught
18  police as part of your career?
19      A   I don't do much of it, but I have
20  taught police and I've had police teach with me.
21      Q   And the majority of your career,
22  beginning in 1972, has been spent as a professor

Page 1454

1   in academia, correct?
2       A   Well, I've been -- all the time I've
3   been a professor, I've tried cases, so I've been
4   a professor, and I've been a trial lawyer and I
5   still am.
6       Q   How many courses have you taught with
7   police?
8       A   With police?  Every year, every
9   criminal procedure course, I've had police come
10  in in my undergraduate course except for this
11  fall, where my police -- the officer's schedule
12  didn't work.  I've had police in my undergraduate
13  class since 2005.
14      Q   And I take it those police are either
15  municipal, state or federal police?
16      A   Fairfax County.
17      Q   County police?
18      A   Fairfax County.  And, actually, my best
19  co-teacher is now a retired 23-year veteran of
20  the Fairfax County Police.
21      Q   But all public sector police?
22      A   Yes.

9 (Pages 1451 - 1454)

Page 1455

1    Q    Thank you.  And your personal
2  definition of police is informed by interaction
3  with those individuals and the decades you've
4  spent studying law enforcement and criminal
5  procedure?
6    A    I think that's fair to say.
7    Q    Correct me if I'm wrong.  You haven't
8  been at the rest of this proceeding, have you?
9  You haven't sat in on the hearings or the
10 testimony?
11   A    No, I have not.
12   Q    Have you reviewed the transcripts?
13   A    I have not.
14   Q    So would it surprise you to hear that
15 the Postal Service doesn't, in fact, dispute that
16 postal police are police?
17   A    It doesn't -- it wouldn't surprise me.
18 The -- what I've been led to believe is that the
19 Postal Service doesn't fully appreciate just how
20 much alike the postal police powers are to the
21 police authority given to federal and state
22 police officers.

Page 1456

1    Q    And you spent a fair amount of your
2  time today and in your presentation materials
3  comparing and contrasting police training and
4  abilities with that of guards, security guards?
5    A    Security guards, correctional
6  officials, people who aren't police.
7    Q    Are you familiar with police that -- or
8  the term "police" as it's used in the private
9  sector?  For example, are you familiar with
10 campus police?
11   A    I am familiar with campus police.
12   Q    Have you heard the term "special
13 police"?
14   A    I have heard the term "special police."
15   Q    Is it fair to say that those positions
16 in your view -- when you're -- when you're
17 referring to guards, would those positions fall
18 into that category?
19   A    Again, I answered that as a general
20 matter.  Campus police, we have campus police at
21 George Washington University.  They don't have
22 the authority of -- that the postal police

Page 1457

1  officers have.  Generally, when they believe an
2  arrest should be made, they'll call the
3  Metropolitan Police.  They may detain someone
4  while the police come, but they always defer.
5    Q    So postal police, then, you've said --
6  you're saying, as you've indicated in your
7  presentation, are not the same as guards and have
8  greater responsibilities and capabilities than
9  guards?
10   A    They do.
11   Q    Okay.
12       ARBITRATOR GABA:  And, ma'am, I know
13 you're going to hate me for saying this, but I
14 want to use a fair amount of precision in the
15 words we choose to use.
16       So when you say something like guards,
17 that could mean a guard at either a federal or a
18 state facility who has a limited commission, or
19 in the alternative, it can mean someone who's
20 private security that has no commission.  So
21 I'm -- I'm just concerned about we're using the
22 right words and there's no ambiguity.

Page 1458

1       MS. LYNCH:  Sure.
2  BY MS. LYNCH
3    Q    Professor Saltzburg, when you referred
4  repeatedly to security guards throughout your
5  presentation and in distinguishing them from
6  PPOs, what security guards did you have in mind?
7    A    I had in mind the kind of private --
8  private security personnel that are hired by
9  malls, that are hired by various businesses,
10 basically to provide some security, hired by
11 banks to be in the lobby of the banks, basically,
12 to try to deter bank robbers.
13   Q    And those guards very often are armed,
14 are they not?
15   A    Some are; some aren't.
16   Q    And you're aware that other federal
17 agencies have contract guards of the kind you
18 just described; it's not just limited to the
19 private sector?
20   A    It's true.  I mean, you go up on
21 Capitol Hill, Congress has a number of security
22 individuals.  I don't believe -- sometimes

10 (Pages 1455 - 1458)

Page 1459

1  they're Capitol Police, but a lot of them, I
2  think, are not.
3      Q   And in Washington, D.C. in particular
4  and I believe in New York as well, they might
5  wear something that actually says the term
6  police, special police specifically, but, in
7  fact, they are private contract security guards?
8      A   If the law in the jurisdiction permits
9  them, they might, but they don't carry badges
10  saying police.
11      MS. LYNCH:  At this point, I'd like to
12  provide the witness with an exhibit, which I
13  would like to have marked as Agency Exhibit X2.
14      ARBITRATOR GABA:  It is so marked.
15      MS. LYNCH:  And I'll represent that
16  counsel for the PPOA has been previously provided
17  a copy.  I'll also at this point supply copies to
18  the panel.
19      ARBITRATOR GABA:  Thank you, sir.
20  BY MS. LYNCH
21      Q   Professor Saltzburg, I know you've not
22  had an opportunity to read this entirely, but if

Page 1460

1  you would like the opportunity to do so, you may.
2  I'll represent that this is a 36-page document
3  dated 2019.  The title is "Armed Contract
4  Security Officers in Federal Facilities:  An
5  Interagency Security Committee Best Practice."
6      I'll also represent that this document
7  is compiled by the Interagency Security
8  Committee, which is one of the Department of
9  Homeland Security's -- it's an interagency group
10  backed by the Department of Homeland Security.
11      Would you like a moment to
12  continue reviewing the document?
13      A   Let me skim it.  Okay.
14      Q   And to orient everyone, if you turn to
15  page 2 of this document, which again has been
16  marked as Agency Exhibit 2, I'm looking at the
17  second paragraph, final sentence, which reads,
18  "This document provides a recommended set of
19  minimum criteria for hiring, issuing uniforms and
20  equipment, training, and staffing levels for an
21  armed contract security force in federal
22  facilities."

Page 1461

1      Professor Saltzburg, are you familiar
2  with the Interagency Security Committee?
3      A   I'm not.
4      Q   I want to turn now back to Union
5  Exhibit J1, which is Professor Saltzburg's
6  presentation.  I'm looking specifically at slide
7  10, titled "PPOs trained in law enforcement
8  measures that security guards neither trained in
9  nor generally permitted to use."
10      A   Okay.
11      Q   Professor Saltzburg, I'll represent at
12  the end of the Armed Contract Security Officers
13  Interagency Security Committee Best Practices
14  document --
15      ARBITRATOR GABA:  Agency X2.
16  BY MS. LYNCH
17      Q   -- Agency X2, there is an Appendix A
18  beginning on page 24.  That appendix describes
19  what agency contract security officers -- the
20  tasks that they should be able to perform.
21      Going back to slide 10 of your
22  presentation, that is, Union J1, I want to point

Page 1462

1  out a couple of the -- the items there that
2  you've claimed security guards are not trained in
3  or permitted to use.  Bullet 2 or the second
4  bullet there refers to knee strikes; third
5  bullet, ankle kicks; fifth bullet, use of escort
6  position to control a subject.
7      Are these -- do these bullets refer
8  generally to defensive tactics?
9      A   Well, not necessarily.  They can be
10  defensive, but in the course of making an arrest,
11  some of the same techniques may have to be used,
12  that is, a knee strike, an ankle kick for
13  somebody who's resisting arrest.  You could call
14  that defensive or you can call it offensive.  I'm
15  not sure which is the best word.
16      Q   Could you please -- looking back
17  again -- I apologize to have to toggle back and
18  forth here.  Looking back again at the -- I'll
19  call it the ACSO, armed security -- Armed
20  Contract Security Officers document, and that --
21      ARBITRATOR GABA:  Agency X2.
22

11 (Pages 1459 - 1462)

Page 1463

1 BY MS. LYNCH
2    Q   -- Agency X2 and that appendix at the
3 back.  And please read for me from those list of
4 items that are -- that ACSOs should be able to
5 perform, items 6.38, 6.39 and 6.40.
6    A   Six-point --
7       ARBITRATOR GABA:  Okay.  We're now
8 on -- slow down -- page 27?
9       MS. LYNCH:  I believe it's 28.
10      ARBITRATOR GABA:  Okay.
11      THE WITNESS:  And I'm sorry.  Which
12 would you like me to read?
13 BY MS. LYNCH
14   Q   It's actually the last three, so
15 6.38 --
16   A   "Use defensive tactics to prevent or
17 control movements of individuals.  Defend against
18 violent combative persons to prevent injury to
19 self or others.  Physically control individuals
20 displaying disruptive or violent behavior,
21 including applying handcuffs."
22   Q   Thank you.  And again going back to

Page 1464

1 your slide 10, Union Exhibit J1, among those
2 items that you claim security guards are not
3 trained in or permitted to use, I see
4 "demonstrate the ability to apply handcuffs to a
5 suspect."  Correct?
6    A   Yes.
7    Q   Moving down the list there, you've also
8 included "demonstrate the ability to conduct a
9 thorough field search of a handcuffed suspect
10 during training exercises and properly handle
11 weapons found during a field search."
12      What does weapons refer to there?
13   A   Weapons could be anything that can be
14 used.  It can be a gun.  It can be a knife.  It
15 could be a club.  It could be a razor.  It could
16 be a wire cutter.
17   Q   Okay.  And again going back to the list
18 on this ACSO document that is Agency Exhibit X2,
19 page 25, among those tasks that armed security
20 guards should be able to perform, would you
21 please read task 2.05?
22   A   Page 25?

Page 1465

1    Q   Yes.
2    A   Oh, okay.  "Conduct frisks or pat-downs
3 for weapons or other unauthorized items."
4    Q   And, finally, the final bullet on your
5 list of items that security guards are not
6 trained in or permitted to -- to use, that is,
7 Union Exhibit J1, looking at the last bullet
8 there, it says "identify a crime scene and take
9 measures to preserve it."
10      Would you please turn to page 13 of
11 that ACSO document?
12   A   Okay.
13   Q   And I'll represent that this is a chart
14 of recommended training for armed security
15 guards.  The chart actually begins on the
16 previous page, page 12, but if you look to page
17 13, there is a column labeled "Law Enforcement
18 Support."
19      Could you please read the criteria to
20 meet critical tasks listed in that corresponding
21 column, beginning with "should require"?
22   A   "Should require a minimum of 16 hours

Page 1466

1 of training in following subjects, with
2 20 percent practical application:  The Law, Legal
3 Authorities, Jurisdiction, and Responsibilities;
4 Crimes and Offenses; Search and Seizure;
5 Authority to Detain; Crime Scene Protection;
6 Rules of Evidence; and Crime Detection,
7 Assessment, and Response."
8    Q   Thank you.  Turning back to your
9 presentation -- and I'm now looking at slide 11
10 of Union Exhibit J1 --
11   A   Okay.
12   Q   -- these again were items you listed as
13 security guards not having training in, looking
14 at the third bullet, which reads "trained in
15 making searches incident to arrest, including
16 vehicular searches."
17   A   Yes.
18   Q   When you say "incident to arrest
19 there," what -- what do you mean by arrest in
20 that situation?
21   A   I mean arrest as I defined it earlier.
22 It means taking somebody into custody, and the

Page 1467

1  question is:  Can the officer who makes an arrest
2  search a vehicle incident to that arrest?  And
3  the Supreme Court has developed the law, which is
4  actually quite complicated and requires training
5  on when you can search a vehicle incident to
6  arrest and when you can't.
7      Q   Now, I understand that that definition
8  of arrest that you just mentioned requires
9  booking, but might there also be a more
10  colloquial sense of arrest that simply means
11  detaining someone?  I think you used that word at
12  some point in the presentation as well.
13     A   Maybe I wasn't clear.  Arrest is a term
14  that has special meaning in the law.  When you
15  arrest someone, you take them into custody in a
16  very special way, and you can only do a search
17  incident to arrest legally when you make a valid
18  arrest under the Fourth Amendment.  There's no
19  such thing as a detention that's not an arrest
20  that allows you to do a search incident to
21  detention.
22     Q   So you're suggesting a police officer

Page 1468

1  could not do a search incident to a detention?
2      A   A police officer could always do a
3  search.  Whether it's legal is another matter.
4  No, a police officer is not authorized under the
5  law to search a vehicle incident to a detention,
6  only authorized to search incident to an arrest,
7  and then, according to the most recent Supreme
8  Court, only under the most limited circumstances.
9          The Supreme Court has -- the Supreme
10  Court overruled a 27-year-old opinion called New
11  York versus Belton, which permitted police
12  officers every time they made an arrest near --
13  of someone near or in an automobile to
14  automatically search the passenger compartment of
15  the automobile, and the Supreme Court overruled
16  that 27 years later.
17     Q   Is every search of a vehicle a
18  detention?
19     A   I don't understand that question.
20     Q   If -- if -- so can a police officer
21  ever search a vehicle if it's not incident to an
22  arrest?

Page 1469

1      A   Yes.  A police officer can search a
2  vehicle if the officer has probable cause to
3  believe the vehicle has evidence.
4      Q   A security guard could, of course,
5  search a vehicle, correct?
6      A   It depends.  A security guard has no
7  authority to make a search of a vehicle incident
8  to arrest, no authority to make a general
9  probable cause search of a vehicle, but as we all
10  know, there are certain circumstances.  For
11  example, if you go up on Capitol Hill and the
12  Capitol Police want to look in your car as a
13  condition of your going forward, you either let
14  them look in your car or you don't get in.
15          And that's true in a number of
16  regulated areas, which is you have -- just as you
17  have to go through a magnetometer here in order
18  to get in the building if you want to get in,
19  there's certain places, if you want to take your
20  car in, you have to have your car subject to
21  inspection.  It's a condition of entry.
22     Q   I want to turn back to your

Page 1470

1  presentation, Union Exhibit J1, slide 17.
2      A   Okay.  Let me get there.  Okay.
3      Q   In that first bullet there, you refer
4  to policing powers of the security force, and you
5  noted, as written in the Postal Service's policy
6  document that is Union Exhibit X2, and you
7  included that phrase "except for hot pursuit and
8  in situations requiring mobile patrol or escort
9  protection," and you noted yet again that that's
10  not something that security guards can do,
11  correct?
12     A   It's not something they're typically
13  allowed to do, yes, correct.
14     Q   I want to point you back to the Armed
15  Contract Security Officers in Federal Facilities
16  document, again to the appendix toward the back
17  of that document that is --
18          ARBITRATOR GABA:  Agency --
19  BY MS. LYNCH
20     Q   -- Agency Exhibit X2.  Could you look
21  again to that list of tasks that armed security
22  officers should be able to perform and read for

Page 1471

1 me --
2    A    Which page?
3    Q    It will be on page 26.
4    A    Okay.
5    Q    4.22.
6    A    "Pursue fleeing individuals."
7    Q    Would you please also read 4.23?
8    A    "Escort money, valuables, or people to
9 provide security."
10    Q    And 4.24?
11    A    "Escort facility tenants and visitors
12 to and from their vehicles before and after
13 hours."
14        MR. STEPHENS:  Can I make an objection?
15 If the witness is being kept here simply to read
16 from this document, it seems like a waste of his
17 time.
18        MS. LYNCH:  I think it goes to the
19 witness's credibility.  He was pretty clear that
20 he said that armed -- or I'll use his -- his
21 words -- security guards don't perform the
22 functions that he's listed throughout his

Page 1472

1 presentation, and this document establishes
2 otherwise.
3        MR. STEPHENS:  Well, first of all, we
4 don't know anything about the document.  The
5 witness hasn't said he knows anything about it.
6        ARBITRATOR GABA:  I'm going to cut you
7 off.
8        MS. LYNCH:  And I -- by the way, I'm
9 wrapping this up, so if that's -- if his time is
10 a concern, it won't go much longer.
11        ARBITRATOR GABA:  It's like Jeopardy.
12 It has to be kind of phrased like a question.
13        I will sustain the objection, and it
14 just goes to the manner in which you asked the
15 question.  You know how to do it, counsel.
16        MS. LYNCH:  Fair enough.
17 BY MS. LYNCH
18    Q    Going back to that slide, that is,
19 slide 17 of Union Exhibit J1, again, that bullet
20 at the top of the page, you mention mobile patrol
21 as something security guards do not typically
22 perform.

Page 1473

1        If we look at the ACSO document and
2 this list of required skills, same page, 25 --
3 this is again Postal Exhibit or Agency Exhibit
4 X2 -- I note that among the list of tasks that
5 security guards should be able to perform --
6        MR. STEPHENS:  I'm going to object.
7 BY MS. LYNCH
8    Q    -- that it includes conduct patrols --
9        ARBITRATOR GABA:  You've got to wait
10 till she finishes the question.
11 BY MS. LYNCH
12    Q    -- "conduct patrols in accordance with
13 routes and schedules contained in post orders."
14        Do you believe that that is something
15 different than mobile patrol?
16    A    Again, the -- the postal police
17 officers are specifically authorized to
18 participate in community policing, that is, to
19 cooperate with state and local police in carrying
20 out their police functions.  Maybe there's
21 something in here about that community policing,
22 but I didn't -- just skimming it, I didn't see

Page 1474

1 it.
2    Q    Last question.  On your conclusions
3 page, that is Union Exhibit J1, slide 21, you
4 note that Congress endowed the postal police with
5 law enforcement powers of arrest and
6 investigation.
7        Can you please identify the authority
8 for Congress endowing powers of investigation
9 upon postal police?
10    A    It's that same -- 3061, I believe, is
11 -- 3061(c), enforce federal laws and regulations
12 and make arrests.  That, in my judgment, assumes
13 the police officers are doing investigation;
14 postal police officers are doing investigations.
15    Q    I want to be specific.  Which -- and I
16 know I'm asking you to repeat yourself.
17        Which language were you referring to
18 that you said gives them the power of
19 investigation?
20    A    Enforcing federal laws and regulations
21 for the protection of persons and property has to
22 include investigations.  That's -- I don't know

14 (Pages 1471 - 1474)

Page 1475

1  how else you enforce the law.

2      Q   Well, you could observe something

3  without investigating it, correct?

4      A   Observing is -- is investigating. It's

5  part of investigating.

6      Q   So it's your testimony today that

7  observation is tantamount to investigation?

8      A   Observation is a form of investigation.

9  You can observe something without doing an

10  investigation, and when you observe, you are

11  gathering information. It is -- as I said

12  before, often observations of things that seem

13  unusual lead to Terry stops.

14      Q   Do you believe there is a distinction

15  between gathering information and performing a

16  criminal investigation?

17      A   Of course. Anyone can gather

18  information about anything. It may have nothing

19  to do with a criminal investigation. Generally

20  speaking, police officers, when they are

21  gathering information, are generally doing it

22  because their job is to enforce criminal law, and

Page 1476

1  they're gathering information for that purpose.

2      MS. LYNCH: We can leave it at that.

3  No further questions at this time.

4      THE WITNESS: Could I add one thing

5  about this document that struck me? I only read

6  this thing quickly, but it does seem to me that

7  one of the things that is --

8      ARBITRATOR GABA: When you say "this

9  document" --

10      THE WITNESS: Yeah. I'm sorry.

11      ARBITRATOR GABA: -- you're talking

12  about Agency X2?

13      THE WITNESS: X2. I should have said

14  that. I apologize. There may be something in

15  here. But one of the most important powers given

16  to postal police officers and other federal law

17  enforcement officers is the power to make arrest

18  and to enforce all federal law and to make arrest

19  for any crime they have probable cause, whether

20  it's committed in their presence or not. It's a

21  mighty important power. I didn't see that here.

22  Maybe it's there.

Page 1477

1      MS. LYNCH: May I respond? Or I guess

2  I can phrase it as a question.

3      ARBITRATOR GABA: Let the record

4  reflect that I lost control of this hearing at

5  approximately 11:20 today. Sure. Go ahead,

6  counsel.

7  BY MS. LYNCH

8      Q   I asked you earlier whether it would

9  surprise you to hear that the Postal Service has

10  not, in fact, taken the position that postal

11  police are not police.

12      Would it also surprise you to hear that

13  the Postal Service has not taken the position

14  that postal police do not ever engage in law

15  enforcement activity?

16      A   I -- I wouldn't be surprised that the

17  Postal Service doesn't take that position because

18  that would be a ridiculous position for the

19  Postal Service to take.

20      MS. LYNCH: That's all I have.

21      ARBITRATOR GABA: Anything further?

22  Any redirect?

Page 1478

1      MS. ROMANO: No.

2      ARBITRATOR GABA: Any questions from

3  the panel?

4      ARBITRATOR DUFEK: None from me.

5      ARBITRATOR ALBERGO: No.

6      ARBITRATOR GABA: Professor, thank you

7  very much.

8      THE WITNESS: Thank you.

9      (Witness excused.)

10      MR. STEPHENS: Can we take five

11  minutes?

12      ARBITRATOR GABA: Yeah.

13      (Recess 11:18 a.m. to 11:26 a.m.)

14      ARBITRATOR GABA: Mr. Stephens, any

15  further witnesses?

16      MR. STEPHENS: Yes, sir. The Union

17  would call Professor Jeff Delinski.

18      ARBITRATOR GABA: Professor, could you

19  please raise your right hand?

20  WHEREUPON,

21          JEFF DELINSKI

22  called as a witness, and having been first duly

15 (Pages 1475 - 1478)

# Exhibit M

Interest Arbitration Between
# Postal Police Officers Association
and
# U.S. Postal Service

## February 2020

# **Testimony of**
# **Stephen A. Saltzburg**

Wallace and Beverley Woodbury
University Professor of Law
George Washington University Law School
Washington, D.C.

# Experience and Qualifications

- CV (Exhibit J-2)

- Professional teaching

- Academic research and books

- Governmental service — Executive branch

- Governmental service — Judiciary

- Non-Governmental Public Service

# Postal Police Are Given Law Enforcement Powers

- Postal Police Occupation Code 2335-24XX

- Duties and Responsibilities include:
  - Carries a firearm and other **law enforcement** equipment while on duty; uses reasonable force when necessary (emphasis added)
  - Performs patrol duty, as assigned, on foot or by motor vehicle within jurisdictional authority in connection with property owned or occupied by the Postal Service
  - Makes arrests in accordance with jurisdictional authority
  - Conducts preliminary fact finding in connection with emergency response
  - Utilizes accepted **law enforcement** tactics to respond to active shooter incidents

# PPOs Identify Themselves as Police

- The Postal Service issues police badges to Postal Police.

- Postal Police display those badges and identify themselves to suspects and individuals as police officers.

- It would be illegal for Postal Police to identify themselves as police officers if they were not actually police.

4

# California Penal Code §146a(b)

(b) Any person who falsely represents himself or herself to be a public officer, investigator, or inspector in any state department and who, in that assumed character, does any of the following shall be punished by imprisonment in a county jail not exceeding one year, by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that fine and imprisonment, or by imprisonment pursuant to subdivision (h) of Section 1170:

(1) Arrests, detains, or threatens to arrest or detain any person.

(2) Otherwise intimidates any person.

(3) Searches any person, building, or other property of any person.

(4) Obtains money, property, or other thing of value.

# Other Jurisdictions Are Similar

New York Penal Code § 190.26:

A person is guilty of criminal impersonation in the first degree when he:

Pretends to be a police officer or a federal law enforcement officer as enumerated in section 2.15 of the criminal procedure law, or wears or displays without authority, any uniform, badge or other insignia or facsimile thereof, by which such police officer or federal law enforcement officer is lawfully distinguished or expresses by his or her words or actions that he or she is acting with the approval or authority of any police department or acting as a federal law enforcement officer with the approval of any agency that employs federal law enforcement officers as enumerated in section 2.15 of the criminal procedure law; . . . .

# New York Law Identifies Postal Police as Law Enforcement

New York Penal Code § 2.15:

The following federal law enforcement officers shall have the powers set forth in paragraphs (a) (with the exception of the powers provided by paragraph (b) of subdivision one and paragraph (b) of subdivision three of section 140.25 of this chapter), (b), (c) and (h) of subdivision one of section 2.20 of this article:

* * *

8. United States Postal Service police officers and inspectors.

7

# D.C. Code: Unlawful to falsely identify as a police officer

§ 22-1406:

It shall be a misdemeanor, punishable by imprisonment in the District jail or penitentiary not exceeding 180 days, or by a fine not more than the amount set forth in § 22-3571.01, for any person, not a member of the police force, to falsely represent himself as being such member, with a fraudulent design.

# Postal Police Are Trained Similarly to Federal Law Enforcement Counterparts

- Federal Law Enforcement Training Accreditation includes among Learning Objectives:
  - Identify basic characteristics of chemical, biological, nuclear and explosive threats, sufficient to make a basic threat assessment
  - Identify criminal risk at the facility
  - Explain the PPO's role in mobile patrol and their role in Community Oriented Policing (COP)
  - Explain the PPO's role in perimeter security and in COP

# PPOs Trained in Law-Enforcement Measures That Security Guards Neither Trained in Nor Generally Permitted to Use

Learning objectives include:

- Describe and explain four crowd control techniques
- Demonstrate how to use knee strikes as a distraction technique
- Demonstrate effective angle kicks
- Demonstrate the ability to apply handcuffs to a suspect * * * [in various circumstances]
- Demonstrate the use of the escort position to control a subject
- Demonstrate the ability to conduct a thorough field search of a handcuffed suspect during training exercises and properly handle weapons found during a field search
- Explain the chain of custody
- Identify a crime scene and take measures to preserve it

10

# Postal Police Receive the Same Legal Training as Other Federal Police

- Trained in *Terry* Stops
- Trained in making arrests based upon probable cause even if a crime is not committed in their presence (something security officers cannot do)
- Trained in making searches incident to arrest, including vehicular searches (something security guards cannot do)
- Trained in *Miranda* warnings and interrogation (something security guards cannot do)
- Trained that they must abide by the Fourth Amendment (which is generally inapplicable to security guards)

11

# Terry stop (investigative detention)

- What is a Terry stop/investigative detention?

- Why is it a power reserved to law-enforcement agents?

- How is it different than an arrest?

# What is an "arrest"?

- Definition of an arrest

- Is an arrest different than an "apprehension" or a "detention"?

- Significance of arrest power

13

# Significance of arrest power: <u>Watson</u>

<u>United States v. Watson</u>, 423 U.S. 411 (1976)

Opinion of Marshall, J.: "Being arrested and held by the police, even if only for a few hours, is, for most persons, awesome and frightening. . . . [T]his exercise of control over the person depends not just on his willingness to comply with an impersonal directive, such as a summons or subpoena, but on an order which a policeman issues on the spot and stands ready then and there to back up with force. The security of the individual requires that so abrupt and intrusive an authority be granted to public officials only on a guarded basis."

# <u>Florida v. Royer</u>, 460 U.S. 491 (1983)

1. A Terry stop can become a search for 4th Amendment purposes without an officer's intending to arrest

2. It is vital that officers know when Terry stops end and arrests begin

3. No security guard has any idea of these matters

4. They require training of the type that only police and law enforcement officers receive

# PPOs' Arrest Power is Explicit

US Postal Inspection Service Policy Update (5/22/2007) regarding Section 112.2 Postal Police Powers:

"The Postal Service is authorized to employ PPOs for duty in connection with the protection of property owned or occupied by the Postal Service or under its charge and control, and persons on that property, including duty in areas outside the property to the extent necessary to protect the property and persons thereon. With respect to such property, PPOs are empowered to enforce federal laws and regulations for the protection of persons and property, to carry firearms, and to make arrests without a warrant for any offense against the United States committed in their presence or for any felony cognizable under the laws of the United States if the PPO has reasonable grounds to believe the person to be arrested has committed or is committing a felony."

16

# Section 112.2 Postal Police Powers, continued

- * * *"The policing powers of the Security Force are restricted to Postal Service-controlled property, except for 'hot pursuit' and in situations requiring mobile patrol or escort protection."

- Thus, the powers explicitly recognize that Postal Police may engage in mobile patrol, may engage in hot pursuit, and may engage in escort protection

- These tasks are similar to those undertaken by local police in jurisdictions throughout the country

# 18 United States Code § 3061(c)

(1) Authorizes the Postal Service to "employ police officers for duty in connection with the protection of property owned or occupied by the Postal Service or under the charge and control of the Postal Service, and persons on that property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property."

(2) "With respect to such property such officers shall have the power to –

(A) Enforce Federal laws and regulations for the protection of persons and property;

(B) Carry firearms; and

(C) make arrests without a warrant for any offense against the United States committed in the presence of the officer or for any felony cognizable under the laws of the United States * * *."

# Many Law Enforcement Officers Have Assigned Physical Territory

- Secret Service Police may be assigned to the White House grounds, to the Vice President's residence or to other specific areas
- Local police might be given airport patrol duty
- Park Police may be given specific territorial assignments
- Capitol Police may be assigned specific territory
- All law-enforcement agents have a jurisdiction

19

# *Pelligrino v. U.S. Transportation Administration*
937 F.3d 164, 167-68 (3d Cir. 2019) (en banc)

- "The Federal Government is typically immune from suit. The Federal Tort Claims Act waives the Government's immunity for certain torts committed by its employees. 28 U.S.C. § 2680(h) does so for specific intentional torts committed by 'investigative or law enforcement officers,' which it defines as 'any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.' If a federal official fits this definition, plaintiffs may sue for certain intentional torts."

- "The underlying theme was that the subsection's waiver of immunity covers only criminal law enforcement officers, and TSOs, though nominally officers, are nothing more than screeners who perform routine, administrative inspections of passengers and property on commercial aircraft."

- "We disagree. The words of the proviso dictate the result here. Because TSOs are 'officer[s] of the United States' empowered to 'execute searches' for 'violations of Federal law,' Pellegrino's lawsuit may proceed."

20

# Conclusions

- Postal Police position description describes a police officer.

- PPOs are trained like police officers

- Postal Service holds PPOs out to public as police officers

- Congress labeled Postal Police Officers as "police officers" in 18 U.S.C. §3061(c)

- Congress endowed Postal Police with law-enforcement powers of arrest and investigation.

- Postal Police have an assigned jurisdiction, like all law enforcement

- Postal Police Officers are police officers.