# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

POSTAL POLICE OFFICERS
ASSOCIATION,

     Plaintiff,                          Case No. 20-cv-2566 (CRC)

vs.

UNITED STATES POSTAL
SERVICE, et al.,

     Defendants.

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (DOC. 11) AND CONDITIONAL REPLY BRIEF
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (DOC. 7)**

Arlus J. Stephens (478938)
 astephens@murphypllc.com
Roseann R. Romano (1034895)
 rromano@murphypllc.com
Charles A. Sinks (888273315)
 csinks@murphypllc.com
MURPHY ANDERSON PLLC
1401 K Street NW, Suite 300
Washington, DC 20005
tel: (202) 223-2620
fax: (202) 296-9600

Counsel for Postal Police Officers
Association

# TABLE OF CONTENTS

**INTRODUCTION AND SUMMARY** .............................................................................1

**RESPONSE TO ASSERTED BACKGROUND FACTS** ...........................................3

    A.    The Postal Service falsely states that the Bowers Memo was not a change of its position regarding PPOs' jurisdiction. .....................................................................3

    B.    The Postal Service falsely claims that the Bowers memo has not affected PPOs' off-site law-enforcement efforts. .................................................................5

        1.    The Postal Service reduced PPOs' offsite patrols in advance of the interest-arbitration hearing but certainly did not eliminate them.................5

        2.    The Bowers Memo has completely ended PPO offsite activity and it is unlikely to resume while the Bowers Memo remains in place. ..................8

    C.    The Postal Service has publicly stated that mail security is its Number 1 concern, while at the same time it is sidelining its police officers. .........................................9

**ARGUMENT** ...........................................................................................................10

**I.**    **The Court should reject the Postal Service's *ultra vires* arguments** ...........................10

    A.    The Postal Service's rewrite of 18 U.S.C. §3061 was an *ultra vires* act. ..............10

        1.    Congress set forth a mandate ....................................................................10

        2.    The Postal Service's insertion of the word "real" to modify the word "property" in Section 3061 was unauthorized. .........................................11

            a.    The whole-act rule forbids the Postal Service's inconsistent interpretation of "property" in Section 3061. ................................11

            b.    The Court should reject the Postal Service's argument regarding the legislative history of PAEA ....................................................13

            c.    The Postal Service acted *ultra vires* by ignoring the effect of its "regulations." .....................................................................14

    B.    The Postal Service acted *ultra vires* by failing to comply with 39 U.S.C. § 3661..........................................................................................16

**II.**    **The Court should reject the Postal Service's arguments with respect to the alternate request for an injunction pending arbitration** ...............................................19

    A.    Plaintiff has shown a likelihood of success on the merits of its grievance...........19

B.     Plaintiff has shown irreparable injury to the union, its members, and the entire bargaining unit of Postal Police officers .................................................................20

C.     An injunction is in the public interest ....................................................................22

D.     The balance of equities clearly supports an injunction ..........................................23

**CONCLUSION** ....................................................................................................................**24**

The Postal Police Officers Association respectfully submits this memorandum in opposition to the Postal Service's motion to dismiss (Doc. 11) and as a conditional reply in support of the PPOA's motion for preliminary injunction (Doc. 7).[1]

## INTRODUCTION AND SUMMARY

The Postal Service's arguments are without merit. Many of the factual assertions the Postal Service reported to the Court are false. Given the number of federal injunctions issued against the Postal Service in recent weeks by federal courts from across the country, it is notable that the Postal Service's witnesses chose to be so cavalier with the facts.

The Postal Service fails even to respond to many of the factual and legal points the PPOA raised in its memorandum in support of its motion for preliminary injunction, filed on September 23 (Doc. 7). The Postal Service's silence in the face of those issues should be taken as a tacit concession to their truth.

The Postal Service has a losing argument because the Postal Service's actions and legal positions in this case are devoid of merit. It cannot get around the fact that Congress granted PPOs federal law-enforcement authority "[w]ith respect to" Postal Service "property" and that official Postal Service "regulations" have always recognized (and/or provided PPOs with) law-enforcement authority to act offsite with respect to postal property. The sudden change on August 25 is indefensible.

---

[1] The PPOA filed its motion for preliminary injunction on September 23, 2020 (Doc. 7). The Postal Service makes the same arguments in its response to the preliminary-injunction motion (Doc. 10) that it uses to support its motion to dismiss (Doc. 11-1). Because the Postal Service bases its motion to dismiss under both Rules 12(b)(1) and 12(b)(6), it relies on outside evidentiary materials, Doc. 11-1 at 10, and uses the same evidence to support both its opposition brief and its motion to dismiss. *See* Docs. 13 and 14. The Union similarly intends to use the same brief and exhibits to respond to the Postal Service's motion (Doc. 11) and to reply to the Postal Service's opposition (Doc. 10). Consistent with the Court's Local Rules, the PPOA is filing a motion asking for leave to use the declarations in support of its preliminary-injunction motion.

1

The Court should reject the Postal Service's arguments regarding the PPOA's *ultra vires* claims. *First*, the Postal Service acted *ultra vires* by rewriting the language of 18 U.S.C. § 3061 to change the legal meaning of the word "property" in one subsection of the statute but not in the other subsections. That is absurd and unsupportable. Congress prescribed mandatory jurisdiction to PPOs over postal "property." 18 U.S.C. § 3061(c)(1). Congress's statutory command is fully enforceable.

*Second*, the Postal Service acted *ultra vires* by purporting to strip PPOs of their jurisdiction without satisfying 39 U.S.C. § 3661. Just in the past month, four other U.S. District Courts have held that the Postal Service's failure to comply with this mandatory course of action with the PRC stated an ultra vires claim against the Postal Service and warranted the issuance of injunctions. The same analysis applies here to the Postal Service's purported change to PPOs' jurisdiction. The Postal Service unilaterally changed PPOs' jurisdiction to strip them of authority over mail-theft and carrier protection on August 25, *just hours after the Postmaster General testified before the House Government Reform Committee about mail security.* The Postal Service's insistence to the Court that this change did not concern mail security is patently false.

The Court should also reject the Postal Service's arguments regarding the PPOA's alternative claim for an injunction pending arbitration over the Union's grievance over the Bowers Memo. *First*, as set forth below, the Union has shown a likelihood of success on the merits of its grievance. *Second,* if the Court does not grant an injunction, the Postal Police bargaining unit will be destroyed, the experienced and trained workforce will be laid off and scattered, and it will likely be gone forever. This constitutes irreparable injury that only an injunction can avoid. *Third,* the public interest in safe and secure mail delivery, and the interest

that postal letter carriers have in reducing or criminal attacks upon them and the mail, also support an injunction. *Fourth*, the balance of equities clearly supports an injunction.

## RESPONSE TO ASSERTED BACKGROUND FACTS

The PPOA incorporates by reference the facts (and evidentiary support) it set forth in its memorandum in support of a preliminary injunction. Doc. 7. It also sets forth its response to certain factual assertions made by the Postal Service in its brief.

### A.     The Postal Service falsely states that the Bowers Memo was not a change of its position regarding PPOs' jurisdiction.

The Bowers Memo is the first time the Postal Service has taken the official position that PPOs only possess statutory law-enforcement jurisdiction when they are situated on postal real estate and acted upon it. Bjork supp. decl. ¶2.

For decades, usually around the time for collective bargaining negotiations or interest arbitration, representatives of the Postal Service have occasionally stated that they believe PPOs should be limited to building-security functions and lacked the authority or training or some other attribute of police officers. Bjork supp. decl. ¶3. Despite occasionally making statements of this variety, the Postal Service never changed its official position about PPOs' offsite jurisdiction and it continued to assign PPOs to offsite law-enforcement duties. *Id.*

PPOs have long resented managers' mischaracterizations of them as "security guards" and management's dishonesty in describing their roles and duties. In 2005, a union official in Washington filed a grievance demanding that management stop assigning PPOs off site if management was going to deny their offsite legal authority during bargaining. Bjork supp. decl. ¶5. Predictably, management denied the grievance and continued assigning PPOs to offsite duties, irrespective of management statements during bargaining. Bjork supp. decl. ¶6 Exh. A.

Similarly, in 2014, Postal Service managers testified under oath at interest arbitration that PPOs performed building security and should not be performing all the offsite functions that PPOs at the hearing testified that they regularly performed.  Bjork supp. decl. ¶7.

But as soon as the 2014 hearing was over, the Postal Service went back to assigning PPOs to those same offsite patrols. *Id.*  Later that year, the Inspection Service agreed with the PPOA, in writing, that PPOs had law-enforcement jurisdiction under Section 3061(c)(1) and (c)(2) to act offsite in connection with postal chattels.  Doc. 7-2 at ¶20 and at 292-298.

The Postal Service issued a revised job description in 2017.  Contrary to Ms. Peterson's representation, that job description does not limit PPOs to postal real estate.  It merely states that PPOs will work within their jurisdictional authority, which is in connection with Postal Service "property."  Bjork supp. decl. ¶21.

The PPOA was unaware of any manager questioning PPOs' offsite jurisdiction again until late in 2017, when the union and management commenced bargaining for a successor agreement to the 2012-2017 CBA.  Bjork supp. decl. ¶10. After the PPOA learned of the manager's questioning, it requested the Postal Service in Washington to state a clear position. Bjork supp. decl. ¶11.

The Postal Service responded as follows: "The determination of Postal Police jurisdiction is an ongoing legal research issue for the Postal Service.  No final determination has yet been made.  The union will be provided the Postal Service's position on jurisdiction once a determination has been made."  Bjork supp. decl. ¶11. Notably, this was forty-seven (47) years after the PPO position was created and eleven (11) years after Congress passed the PAEA.

In the years since, different Inspection Service managers have stated varying views about what they think is the scope of PPOs' statutory jurisdiction.  Bjork supp. decl. ¶¶12-16.  Indeed,

4

at the interest arbitration hearing in February 2020, Postal Service witness (and Deputy Chief Inspector) Goldberg testified that he did not know what was the jurisdiction of PPOs.  Bjork supp. decl. ¶17.

At no time until the August 25, 2020 Bowers Memo, however, did the Postal Service announce an official position, let alone communicate that official position to the PPOA.  Despite this policy's obvious effects on the security of the mail, the Postal Service did not submit this change to the Postal Regulatory Commission.  Moreover, until August 2020 the Postal Service continued to assign PPOs to offsite functions, which is obviously contrary to the notion that the Postal Service had previously decided they lacked offsite authority.  Bjork supp. decl. ¶¶19-20.

The Bowers Memo is the first time in fifty years that the Postal Service has officially adopted the position that PPOs lack authority off of postal real estate, let alone acted on it.  Bjork supp. decl. ¶¶19-20.  Until then, it had always left itself enough leeway to argue in collective bargaining that PPOs are effectively security guards while, away from bargaining, used PPOs offsite as the highly trained police force that they are.  *Id.*  Now, however, it has foreclosed its options by making this legal pronouncement.  Bjork supp. decl. ¶22.

### B.     The Postal Service falsely claims that the Bowers memo has not affected PPOs' off-site law-enforcement efforts.

The Postal Service's brief contends that the Bowers Memo has not materially affected PPOs' offsite law-enforcement efforts.  That is not true.

### 1.     The Postal Service reduced PPOs' offsite patrols in advance of the interest-arbitration hearing but certainly did not eliminate them.

Postal Police are familiar with the Postal Service's attempt to cast doubt on their police duties and law-enforcement status to justify paying them less.  Part of that strategy is to try to curtail their duties before the onset of collective bargaining and interest arbitration.  Bjork supp.

decl. ¶3.  Its strategy over the years has been successful, as the Postal Service currently pays its

mostly-black and Latino career police officers less than it pays its career custodians.

PPO Officer Sepulveda testified at interest arbitration that off-property surveillance for

mail theft was a common assignment in 2017 and 2018 but that it had lately been curtailed

because of interest arbitration.  Bjork supp. decl. ¶9, Exh. F; Doc. 7-7.  She testified in February

2020 that "it's not as frequent as we used to, and I believe it's because we are in a time of

interest arbitration."  *Id.*

Taking steps to try to curtail PPOs' offsite duties helps top Postal officials like

Dave Bowers when they testify in favor of continued low pay for PPOs.  Each contract cycle,

these officials testify that the Postal Service mostly uses its police officers only for building

security, as though they were security guards.  Bjork supp. decl. ¶3.  Indeed, Mr. Bowers

testified under oath in February 2020 that the Postal Service uses PPOs in exactly this manner.

Doc. 7-15, ¶10, Exh. K. He further testified that the duties and expectations of PPOs had not

changed since the 1990s.  *Id.*, Tr. at 350.

Mr. Bowers's sworn testimony to the interest arbitrator in February was false, of course.

As the Union showed earlier, Postal Inspection Service officials testified to Judge Saris in the

District of Massachusetts in 2016 that the Postal Police Officer position underwent a nationwide

"paradigm shift" in the 2000s and that PPOs rarely performed any of the building-security work

they used to perform, and instead now performed mobile street patrols to protect letter carriers

and to combat mail theft.  Doc. 7 at pp 2, 3, 8, 9*; see also* Doc. 7-15 at 31-85 (USPS testimony

and briefs).

Judge Saris agreed and she specifically found, in her written findings of fact, that the

PPO job had changed and they no longer performed building security and instead now performed

mobile street patrols. *See Anderson v. Brennan*, No. 14-CV-13380 (PBS), 2017 WL 1032502 at 2-3 (D. Mass., March 16, 2017), *affirmed as modified*, 911 F.3d 1 (1st Cir. 2018).

In other words, in February 2020, Mr. Bowers denied the truth of all the facts the Postal Service testified to and successfully argued for in federal court in 2016.  This is the type of bait-and-switch mendacity that Postal Police Officers are used to.

Postal Service witness Brubaker testifies in his declaration that the Postal Service had almost entirely ended carrier protection patrols by 2019, well before the interest arbitration started.  Doc. 14-1.

The PPOA disputes the veracity of that testimony.  PPOA President Albergo testifies in his declaration that the Postal Service continued to use PPOs to perform offsite functions like carrier patrols and mail-theft patrols well into 2020, up to the time of Bowers Memo. Albergo decl. ¶¶9 &18. He notes that Brubaker's declaration does not account for any PPO utilization in the NY Division, the country's largest.  This is glaring because the NY Division continued to use PPOs to perform offsite law enforcement functions well into 2020, and specifically instructed PPOs on mail-theft enforcement while on street patrols in New York in January 2020.  Albergo decl. ¶18.

Brubaker's statement fails to account for the already-introduced testimony of PPOs that they continued to perform offsite law-enforcement duties until recently.  For example, Brubaker testifies that the Pittsburgh division performed no offsite functions in recent years.  Doc. 14-1.  That testimony is contradicted by existing testimony in the record in this case.

PPO Brian Wilhoit of Pittsburgh testified that the Pittsburgh division continued to use PPOs to perform mobile street patrols until recently.  Doc. 7-11.  He testified that the Postal Service directed Pittsburgh PPOs to travel to Canton, Ohio to perform offsite carrier protection

patrols because of a gang war in that city.  Doc. 7-11, ¶¶5-7.  Wilhoit testified that Pittsburgh and Cleveland PPOs were assigned to those street patrols for two weeks in May and June 2019.  *Id.* Postal Service managers explained that Chief Postal Inspector Barksdale had personally ordered the PPO street patrols in Canton.  Doc. 7-11, ¶8.

The truth is that PPOs across the country still performed offsite law-enforcement duties up until the Bowers memo issued.  Albergo decl. ¶¶ 5 & 9.

> **2.      The Bowers Memo has completely ended PPO offsite activity and it is unlikely to resume while the Bowers Memo remains in place.**

The Postal Service's historic practice of restricting postal police duties to better its collective-bargaining position is far different than the conduct the Union contests in this case. Rather than restricting duties, the Postal Service purports to amend the statutorily provided jurisdiction of PPOs.  By doing so, the Postal Service seeks to *permanently* sideline PPOs, preventing division managers from using them as needed.

Indeed, the onset of the Bowers Memo has ended PPOs' offsite law-enforcement efforts. Bjork supp. decl. ¶¶19-22.

The Postal Service wrongly asserts that PPOs may easily get answers to questions that arise in the field about their authority, by simply checking with their supervisor.  Doc. 11-1 at pp 29-30.  PPO Jhony Ortiz of Newark testifies in a new declaration that PPOs' supervisors have no answers.  Ortiz testifies that Newark PPOs were instructed on a new SOP in the event that a PPO needs to know whether he or she can respond to an incident.  Ortiz decl. ¶¶2-4.  Under that SOP, the PPO must first make contact with his or her supervisor and ask.  *Id. ¶*5. The supervisor, in turn, must make contact with a ranking supervisor in the relevant Inspection Service division and pass along the inquiry.  *Id.* ¶6. That official, in turn, is supposed to make contact with a high-

ranking official at the Inspection Service in Washington.  *Id.* ¶7.  Once that official has been

reached and made a decision, the message is supposed to be sent back down the tree, ultimately

to the PPO.  *Id.* ¶8.  Until the answer makes it all the way back, the PPO must remain still.  *Id.*

¶9.

The new SOP was invoked its very first day of existence, in response to a call that a letter

carrier was being assaulted.  Ortiz decl. ¶11.  The answer that came back was that they should

instead call 911 for help.  *Id.*

> **C.**     **The Postal Service has publicly stated that mail security is its Number 1**
> **concern, while at the same time it is sidelining its police officers.**

The Postal Service has stated in multiple venues that mail security in advance of the 2020

general election is its number one concern and that it is using every resource at its disposal to

protect the mail.

- On August 4, 2020, Chief Postal Inspector Barksdale asserted to Inspection Service

  employees that the Postal Service is "participating in a whole-of-government approach to

  protect the integrity of voting by mail."  Bjork supp. decl. ¶26.

- Postmaster DeJoy committed to make election mail "our number one priority between

  now and Election Day."  Bjork supp. decl. ¶29.

- On September 24, 2020, the Postal Service delivered a mandatory stand-up talk to all

  employees, in which it reiterated that its "number one priority between now and Election

  Day is the <u>secure</u>, on-time delivery of the nation's Election Mail." Bjork supp. decl. ¶27

  (emphasis added)

- On October 1, 2020, Postal Service again asserted its "number one priority between now

  and the November election is the <u>secure</u>, on time delivery of the nation's Election Mail."

  Bjork supp. decl. ¶28 (emphasis added)

*If those statements are true*, the Postal Service would be using its Postal Police on patrols now, as it did in the recent past.   But it is not using them.  The only conceivable reason that it is not using PPOs in their previous roles is because the Bowers Memo precludes it.

Despite its repeated commitments to prioritize and dedicate resources to protect election mail, Postal Service has actually reduced its resources.  There are <u>fewer</u> resources dedicated to protect mail security today than there were on August 24 when the Postmaster General recently testified before the House of Representatives because the Postal Service decided to permanently sideline its police officers.

**ARGUMENT**

**I.     The Court should reject the Postal Service's *ultra vires* arguments.**

Claims that the Postal Service has acted *ultra vires* and exceeded its statutory authority in purporting to apply a statute "clearly admit of judicial review."  *Aid Ass'n for Lutherans v. Postal Service*, 321 F.3d 1166, 1173 (D.C. Cir. 2003).  *See also New York v. Trump*, 20-CV-2340(EGS), 2020 WL 5763775 at *8 (D.D.C., Sept 27, 2020) (holding that *ultra vires* review was "clearly" available for claims that the Postal Service had exceeded its statutory authority).

**A.     The Postal Service's rewrite of 18 U.S.C. §3061 was an *ultra vires* act.**

Through the Bowers Memo, the Postal Service decreed that the statutory jurisdiction of Postal Police Officers is now confined to "**real** property" and adjacent sidewalks.  Doc. 14-2 at 205 (emphasis added) ("Per 18 U.S.C. § 3061(c)(1)-(2), Postal Police Officers may exercise certain law enforcement authority . . . . on real property owned, occupied, or otherwise controlled by the Postal Service ....").  That is not what Congress prescribed.  The Postal Service exceeded its statutory authority in promulgating the Bowers Memo.

### 1. Congress set forth a mandate.

Congress established a statutory floor for PPOs' law-enforcement jurisdiction.  Congress forbade any diminution of their jurisdiction by using the command "shall" to refer to their minimum level of jurisdiction.

Congress gave the Postal Service discretion to choose whether and where to employ postal police officers. 18 U.S.C. § 3061(c)(1) ("The Postal Service **may** employ police officers ....") (emphasis added).

But when the Postal Service employs PPOs, Congress established a mandatory floor to PPOs' law-enforcement authority.  18 U.S.C. § 3061(c)(2) ("With respect to such property, such officers **shall** have the authority ....") (emphasis added).  Because Congress did not provide the Postal Service with the ability to diminish PPOs' legal jurisdiction, Congress's command may be enforced through an *ultra vires* claim.

### 2. The Postal Service's insertion of the word "real" to modify the word "property" in Section 3061 was unauthorized.

The Postal Service's attempt to change the word "property" to "real property" was unauthorized, as shown by the language of Section 3061, the "whole act" rule, and the legislative history, and its proclamation ignores its extant regulations.

#### a. The whole-act rule forbids the Postal Service's inconsistent interpretation of "property" in Section 3061.

The word "property" in subsection (c) includes chattel property because that is how the word "property" is used in the rest of 18 U.S.C. § 3061.

Congress did not start from a blank slate when it wrote 18 U.S.C. § 3061(c). Congress added subsection (c) to an already-existing 18 U.S.C. § 3061.  The existing statute, in

subsections (a) and (b), also uses the word "property" and uses that term to describe and illustrate the law-enforcement authority of Postal Inspectors.

For example, subsection 3061(a)(5) empowers Postal Inspectors to "make seizures of *property* as provided by law."  18 U.S.C. § 3061(a)(5) (emphasis added). The courts have recognized and blessed postal inspectors seizing chattel property.  *See, e.g., United States v. Boutros*, No. CR 19-MJ-00264, 2019 WL 6877756, at *3 (D.D.C. Dec. 17, 2019) (involving Postal Inspectors' seizure of a package containing a controlled substance); *United States v. Miller*, No. CR 17-195-01 (TSC), 2018 WL 10373742, at *1 (D.D.C. Feb. 23, 2018) (same); *United States v. Barret*, 848 F.3d 524, 527 (2d Cir. 2017) (same).

 Subsection 3061(b)(1) provides that Postal Inspector powers may be exercised only "in the enforcement of laws regarding *property in the custody of the Postal Service, property of the Postal Service*, the use of the mails, and other postal offenses."  18 U.S.C. § 3061(b)(1) (emphasis added).  As we showed previously, the courts have consistently interpreted Postal Service "property" to include chattels like trucks and equipment and the mail.  *See* Doc. 7 at pp 29-30 (collecting cases).

The Supreme Court holds that it should be presumed that "identical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (cit. om.).  *See also Hall v. United States*, 566 U.S. 506, 519 (2012) ("[I]dentical words and phrases within the same statute should normally be given the same meaning.") (cit. om.).

This is especially important in Section 3061 because the term "property" is used in all these subsections to describe the authority of law-enforcement officers of the same agency.  The

Court should reject the Postal Service's effort to give the *same* word—property—different legal meanings in the exact *same* statute.

The fallacy of the Postal Service's action is also revealed by the fact that the alternate reading of "property" renders redundant an entire clause of subsection (c). Subsection (c)(1) describes PPOs having authority over "property owned or occupied by the Postal Service" and also property "under the charge and control of the Postal Service." 18 U.S.C. § 3061(c). If the word "property" only means real estate, the "charge and control" language is redundant and becomes surplusage.

Title 18 U.S.C. § 3061 sets forth the law-enforcement jurisdiction of both postal inspectors and postal police officers. Just as with postal police, postal inspectors' jurisdiction is connected to postal "property." The Postal Service effort to ascribe different legal meanings to the same word—which is used to describe the jurisdiction of both positions and in the very same statutory section—is absurd and indefensible.

> **b.    The Court should reject the Postal Service's argument regarding the legislative history of PAEA.**

The D.C. Circuit holds that courts may properly consider a statute's legislative history when determining whether an agency acted *ultra vires*. *Aid Ass'n for Lutherans v. Postal Service*, 321 F.3d 1166, 1175-78 (D.C. Cir. 2003).

The PPOA showed earlier that Congress was expressly aware in 2006 that Postal Police Officers' duties were <u>not</u> tied to postal real estate and that PPOs exercised law-enforcement authority with respect to postal property on public roads. *See* Doc. 7 at pp. 28-29.

Knowing this, Congress established a permanent basis for PPOs' jurisdiction in subsection (c) with a nexus to postal "property." *Id.* Because nothing in the legislative history suggests Congress intended to reduce PPOs' jurisdiction, it is clear that Congress meant for

PPOs to continue to have law-enforcement jurisdiction over postal chattels on public roads. Indeed, the Postal Service thought so at the time, since it issued an updated regulation in May 2007 stating that PPOs' authority offsite had not been diminished at all.  Doc. 7-3, Exh. B.

The Postal Service now disagrees.  It argues the legislative history "stops short" of showing that Congress thought the word "property" included chattel property.  Doc. 11-1 at p. 16.  Its "argument" consists of a citation to *Physicians Nat. House Staff v. Fanning*, 642 F.2d 492, 498 (D.C. Cir. 1980).

The *Fanning* decision did not concern "property" or the Postal Service.  If anything, the *Fanning* decision supports the PPOA's argument.  The court in *Fanning* ruled that Congress is presumed to act in concert with existing agency procedures and activities and is not presumed to be changing an agency's operations unless it says so.  *Fanning*, 642 F.2d at 498 ("At the very least, one would expect that if Congress were enacting a change in the Board's operations, the committees would have said so.").

If Congress intended to impose a new limit on PPO's authority to postal real estate, it would have said so.  Congress was fully aware that PPOs exercised law-enforcement authority with respect to postal property both on postal real estate and away from postal real estate.  Doc. 7 at pp 28-29. Nothing in the legislative history shows any intent to limit PPOs' existing authority. Congress used the term "property" as a basis for PPOs' jurisdiction, just as it had already done for postal inspectors in the same statute.  Accordingly, the Court should reject the Postal Service's argument that Congress intended to impose new restrictions on PPOs' authority.

> c. **The Postal Service acted *ultra vires* by ignoring the effect of its "regulations."**

Congress, in subsection (c)(3), provided even more law-enforcement jurisdiction to PPOs if Postal Service "regulations" would allow for it.  *See* 18 U.S.C. § 3061(c)(3).  Indeed, Congress

authorized the Postal Service to invoke full-fledged investigatory authority for PPOs—just like postal inspectors—and to use that investigatory authority wherever they wished.  The Postal Service need only invoke some or all of those powers by way of "regulation."  *Id.  See also* Doc. 14-2 at 240 (testimony of Postal Service witness at interest arbitration describing the special "investigative" authority granted to postal inspectors in Section 3061(a)).

If the term "property" is to be ascribed a different legal meaning in subsections (c)(1) and (c)(2) than in the rest of the statute, it has always been within the authority of the Postal Service to authorize additional PPO powers under subsection (c)(3).

The Postal Service's August 25 proclamation that PPOs' statutory jurisdiction is limited to "real property" ignores that many postal "regulations" already authorize PPOs to engage in law-enforcement duties off of postal real estate.  *See* Doc. 7 at pp. 27-28 (citing to 39 CFR § 211.2(a) and court decisions holding that postal handbooks and manuals are deemed to be Postal Service "regulations").

Since the Postal Service has not rescinded any of those regulations, they are still in effect. If the Postal Service sought to change any of them, it would first have to satisfy Article 19 of the CBA as well as satisfy all internal USPS procedures.

The Postal Service's brief does not say a single word about these regulations.  It is safe to assume that is because there is nothing that the Postal Service can say.  If PPOs now lack authority under (c)(1) and (c)(2) because "property" now only means "real property," the Postal Service's own regulations constitute an authorization of some of the authority allowed by subsection (c)(3).

Accordingly, even if the Postal Service were allowed to change the term "property" to "real property" in subsections (c)(1) and (c)(2), the Court should still find an *ultra vires* violation because the Bowers Memo would still be legally incorrect under subsection (c)(3).

**B.   The Postal Service acted *ultra vires* by failing to comply with 39 U.S.C. § 3661.**

The Postal Service effectively concedes that it did not bother to comply with 39 U.S.C. § 3661 in making this change to PPOs' nationwide jurisdiction. Doc. 11-1. The Court should rule, as at least four other federal courts have with respect to other recent changes, that the Postal Service's failure to do so was an *ultra vires* act.[2]

Section 3661(b) requires the Postal Service to submit for Postal Regulatory Commission review any policy change affecting postal services on a nationwide or substantially nationwide basis "within a reasonable time prior to the effective date of such proposal." 39 U.S.C. § 3661; *accord Buchanan v. Postal Service*, 508 F.2d 259, 263 (5th Cir. 1975).

It is undisputed here that the Postal Service failed to submit its nationwide restriction to PPO jurisdiction for Postal Regulatory Commission review before putting it into effect. Moreover, it is clear that this change affects postal services on a nationwide basis by eliminating carrier patrols and mail-theft patrols and other off-premises PPO patrols—which were, until recently, common in cities throughout the country—thereby reducing the protection that mail receives *en route* to its destination.

---

[2] The PPOA's complaint pleads a claim against the Postal Service for acting *ultra vires* but did not specifically reference Section 3661. The PPOA's motion for preliminary injunction, filed days later, does reference Section 3661 and complains of a violation. Doc. 7 at pp 25-28. To the extent the original complaint does not encompass this, the Court may construe the P.I. motion as an amendment. *Coleman v. Potomac Elec. Power Co.*, 310 F.Supp.2d 154, 161 (D.D.C. 2004) (construing preliminary injunction motion as an amendment to the complaint). This is especially proper here because the PPOA filed its motion within the period that the PPOA could amend as of right under Rule 15(a)(1), so the Postal Service cannot claim any prejudice.

The Postal Service's argument on the merits of the Section 3661 argument is essentially that the sole remedy is to bring a complaint to the PRC. In effect, the Postal Service argues that all the other District Courts were wrong to enjoin its actions as *ultra vires*. Under the Postal Service's theory, the remedy for all the plaintiffs in those other cases was to file complaints about the impaired service with the PRC.

Several courts have recently addressed these issues, and none have agreed with the Postal Service's bold assertions of immunity from review. For instance, Judge Sullivan of this Court recently found that Section 3662's use of the permissive "may" when setting out the procedure for filing complaints with the Postal Regulatory Commission coupled with the statute's use of the mandatory "shall" elsewhere suggests that Congress did not intend to make the Postal Regulatory Commission the exclusive avenue for bringing a procedural challenge to the Postal Service's failure to comply with Section 3661. *New York v. Trump*, No. 20-CV-2340(EGS), 2020 WL 5763775, at *7 (D.D.C. Sept. 27, 2020). Judge Sullivan reviewed the PRA's legislative history and observed that it is consistent with finding that judicial review is available where the Postal Service has failed to comply with Section 3661's procedural requirements. *Id*. Judge Sullivan found that any administrative remedy would deny meaningful review in light of the immediate irreparable injuries caused by the Postal Service's policy changes. *Id.* Finally, Judge Sullivan found that the plaintiffs' claim that the Postal Service had acted unlawfully by failing to comply with 3661 was "clearly" reviewable. *Id*. at *8; *see also Am. Postal Workers Union v. Postal Service*, No. CIV. 06-726 CKK, 2007 WL 2007578, at *7 (D.D.C. July 6, 2007) (finding that judicial review of USPS policy change was appropriate where USPS failed to submit the change to the PRC for an advisory opinion within a reasonable time prior to the implementation of the policy).

Likewise, Judge McHugh of the Eastern District of Pennsylvania recently held that district courts have jurisdiction over claims the Postal Service has acted *ultra vires*. Judge McHugh observed that he had "not found, nor have the Defendants cited, any case in which a court denied jurisdiction over a claim that the Postal Services acted outside of its authority with regard to the process required under section 3661(b)." *Pennsylvania v. DeJoy*, No. CV 20-4096, 2020 WL 5763553, at *14 (E.D. Pa. Sept. 28, 2020).  Judge McHugh found that courts had routinely rejected the Postal Service's arguments that its *ultra vires* conduct should evade review. Id. (collecting cases).  Moreover, citing the D.C. Circuit and other courts, Judge McHugh found that ultra vires review is favored for claims that the Postal Service has acted unlawfully in promulgating regulations or by failing to follow procedures prescribed by the PRA. *Id*. at *29 (citing *Aid Ass'n for Lutherans v. Postal Service*, 321 F.3d 1166 (D.C. Cir. 2003) and others).

Both Judge Sullivan and Judge McHugh granted injunctions against the Postal Service, finding that its sudden policy changes in each case were *ultra vires*. *Pennsylvania v. DeJoy*, 2020 WL 5763553, at *39 (finding it reasonably likely that plaintiffs would prevail in demonstrating "Defendants were required to seek an advisory opinion from the Commission under section 3661(b) and acted *ultra vires* by failing to do so"); *New York v. Trump*, 2020 WL 5763775, at *10 ("While it is clear that Congress did not intend for the courts to micromanage the operations of the USPS, . . .  the Court is not micro-managing; it is requiring the USPS to act within its statutory authority."). *See also Vote Forward v. DeJoy*, No. CV 20-2405 (EGS), 2020 WL 5763869, at *13 (D.D.C. Sept. 28, 2020); *Washington v. Trump*, No. 1:20-CV-03127-SAB, 2020 WL 5568557, at *5 (E.D. Wash. Sept. 17, 2020); *Jones v. Postal Service*, No. 20 CIV. 6516 (VM), 2020 WL 5627002, at *27 (S.D.N.Y. Sept. 21, 2020).

Accordingly, the Court can and should hear and grant PPOA's prayer for injunctive relief from the Postal Service's unlawful conduct.

## II.   The Court should reject the Postal Service's arguments with respect to the alternate request for an injunction pending arbitration.

In the alternative, the Plaintiff has asked this Court for an injunction maintaining the status quo pending the outcome of a labor arbitration protesting the Postal Service's unilateral change.  The Court should reject the Postal Service's arguments and should grant the injunction.

### A.   Plaintiff has shown a likelihood of success on the merits of its grievance.

Plaintiff has not only stated a claim for relief but has produced evidence showing a likelihood of success on its grievance.  Doc. 7 at pp. 32-35.

The Postal Service has a muddled response.  For example, it cannot decide—even within its own brief—whether arbitration of the Union's grievance is even proper!  In one section it writes "it is clear" that the grievance is arbitrable.  Doc. 11-1 at p. 23.  In another section, however, it asserts its position on arbitrability is "[f]or purposes of this motion only," suggesting it will later argue that the grievance is actually not arbitrable.  Doc. 11-1 at p. 26.

The bulk of the Postal Service's argument rests on a different hand of facts than reality dealt it.  For example, the Peterson declaration asserts that the Bowers Memo does not even represent a change in postal policies.  She also asserts that the Postal Service actually adopted the tenets of the Bowers Memo long ago and that the Union blew its time limit to complain.  See Doc. 14-2.

The "facts" to which Ms. Peterson testifies are false.  The Union has supplied the Court with declarations from PPOA President Albergo and PPOA National Business Agent Bjork. They carefully go through and debunk the false claims proffered by the Postal Service.

The strength of the Union's argument may be measured by the lengths to which the Postal Service has been forced to go to counter it.

**B.      Plaintiff has shown irreparable injury to the union, its members, and the entire bargaining unit of Postal Police officers.**

The Bowers Memo gives the Postal Service the tool to destroy the Postal Police bargaining unit.  By limiting PPOs to postal real estate (allegedly by legal mandate), the Postal Service seeks to win the victory it sought in interest arbitration, namely to declare PPOs as having the same utility and authority as contract security guards.  It will avoid the forthcoming obligations to be ordered by the interest arbitrator and will instead proceed to close PPO divisions and lay off its PPO workforce.  It will waste money on a bloated contract with Prosegur, the security-guard company it arranged to testify at the interest arbitration in February. Unless the Court enjoins the Bowers Memo, the Postal Service's labor-relations office and Prosegur will be among the vanishingly few winners of this charade.  Bjork supp. decl. ¶30.

The chief losers will be the men and women in the PPO workforce.  With PPOs now being deemed to lack jurisdictional authority away from postal real estate, the Postal Service will eliminate them.  The Bowers Memo will likely help it avoid criticism as it destroys the 50-year-old bargaining unit of PPOs and lays off the hundreds of PPOs, most of them black and Latino. Bjork supp. decl. ¶31.

The Postal Service acknowledges that "courts have found irreparable injury in the context of threatened permanent job loss," Doc. 11-1, p. 32, but argues that this is not such a case.

The Postal Service is wrong.  First, economic loss caused by federal agency action is an exception to the general rule that economic harm is not irreparable, because of the difficulty in undoing the action of a federal agency. *See District of Columbia v. U.S. Department of Agriculture*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020). Even where the Arbitrator might be able to

award back pay, the Arbitrator faces a much more daunting task in "unscrambling the egg" where the entire bargaining unit has been effectively abolished. *See Dep't of Agric.*, 444 F. Supp. 3d at 35 (finding state plaintiffs demonstrated that "absent an injunction or stay they will suffer immediate, irreparable injury in the form of significant regulatory and administrative burdens" such as "training new and existing staff").

This is also the very context in which courts have found irreparable harm from employer actions that eliminate bargaining units wholesale. *See Local Lodge 1266, Int'l Ass'n of Machinists v. Panoramic Corp.*, 668 F.2d 276, 285-286 (7th Cir. 1981) (irreparable harm from proposed sale that "would have resulted in the immediate loss of employment by 113 Panoramic workers represented by the Union," citing "a wide range of cases holding that similar employer actions threatened irreparable injury or resulted in a frustration of arbitration."); *Teamsters Local 71 v. Akers Motor Lines*, 582 F.2d 1336 (4th Cir. 1978) (partial liquidation of business); *Lever Brothers Co. v. International Chemical Workers Local 217*, 554 F.2d 115 (4th Cir. 1976) (relocation of plant); *Bakery Drivers Local 802 v. S.B. Thomas Inc.*, 99 L.R.R.M. 2253 (E.D.N.Y.1978) (subcontracting of union work); *Columbia Typographical Union No. 101 v. Evening Star Newspaper Co.*, 100 L.R.R.M. 2394 (D.D.C. 1978) (termination of business).

This is why employer actions to circumvent collective bargaining, including the pending interest arbitration and the pending grievance over the elimination of jurisdiction, constitute irreparable harm warranting an injunction. *See Eisenberg v. Wellington Hall Nursing Home*, 651 F.2d 902, 907 (3d Cir. 1981) (finding irreparable harm to bargaining unit by elimination of employees' jobs); *Hubbel v. Patrish LLC*, 903 F.Supp.2d 813, 817 (E.D. Mo. 2012) (finding a threat of irreparable harm to the collective bargaining process existed where a "respondent completely eliminated the bargaining unit and replaced the union workers with non-union

21

members"); *Frankl v. Adams & Associates*, 74 F.Supp.3d 1318, 1330  (E.D. Cal. 2015) (irreparable harm shown where "the number of confirmed members in the bargaining unit has decreased to only two from about twenty or so").

Aside from the bare assertion that this case is not as severe, the Postal Service does not rebut the Plaintiff's case that the challenged action will inflict the same irreparable harm as shown in all those decisions.  Once the trained PPOs have been laid off and displaced, it will be effectively impossible to recreate a trained bargaining unit of Postal Police Officers.  The loss of the experienced and impeccably trained workforce is irreparable.

### C.      An injunction is in the public interest.

The PPOA's requested injunction is clearly in the public interest.  Numerous federal courts have recently held that the public's interest in the safe and secure delivery of the mail is a public interest strong enough to warrant the issuance of injunctive relief.  This interest is especially pronounced during a prolonged pandemic, when the public's need for reliable mail service—both coming and going—is crucial to ensure reliable civic participation in the elections, as well as delivery of packages, medicine, and other deliverables.  The Postal Police force is an entire trained unit of the Postal Service that could be deployed—right now—to aid mail security. It is appalling that the Postal Service has chosen this time to sideline PPOs and end their patrols.

Another key stakeholder here are other postal employees, especially letter carriers.  The National Association of Letter Carriers is the union that represents the country's 200,000 letter carriers.  Its Executive Vice President, Brian Renfroe, has testified in favor of this injunction. Doc. 7-14.

Mr. Renfroe testified to the ongoing criminal activity to which letter carriers are subjected today.  Those crimes include crimes of violence, such as physical attacks on carriers,

as well as property crimes against the mail.  Doc. 7-14 ¶¶4-6.   He testified to the important role

that Postal Police Officers play in combatting and deterring that crime, including by conducting

carrier protection patrols.  *Id.* ¶7.

Mr. Renfroe testified that the presence of PPOs on those patrols reduces crimes against

postal property and postal personnel.  Renfroe decl., Doc. 7-14 ¶¶7-8.  He testified that the

elimination of all these street patrols by the Bowers Memo "puts letter carriers at greater risk of

violent crime and the mail they carry at greater risk of tampering and theft."  *Id.*

In sum, there should be no question that the public interest supports this injunction.

**D.     The balance of equities clearly supports an injunction.**

The Postal Service asserts that its managerial prerogatives would be harmed if the Court

were to "usurp the control of the Postal Service over management considerations with respect to

its employees."  This argument is without merit.  The injunction would simply return the Postal

Service to where it was before the unlawful Bowers Memo issued in August 2020, i.e., to an

earlier management prerogative.

Any possible harm to the Postal Service's managerial prerogatives is far outweighed by

all the other considerations.  For example, the public interest in the Postal Service following the

law, including its compliance with its procedural obligations under 3661 has been found to

outweigh management's prerogatives. *See Vote Forward v. DeJoy*, No. CV 20-2405 (EGS),

2020 WL 5763869, at \*13 ("There is generally no public interest in the perpetuation of unlawful

agency action.") (cit. om.); *New York v. Trump*, 2020 WL 5763775, at \*13 ("It is clearly in the

public interest to mitigate the spread of COVID-19, to ensure safe alternatives to in-person

voting, and to require that the USPS comply with the law. The equities balance in favor of

Plaintiffs because the relief sought is a targeted preliminary injunction that prohibits Defendants

from continuing to implement the Postal Service Policies with respect to which an advisory opinion from the PRC should have been obtained prior to implementation.").

## CONCLUSION

For all these reasons, the Court should grant the Postal Police Officers Association's motion for a preliminary injunction and deny the Postal Service's motion to dismiss.

Dated October 7, 2020                Respectfully submitted,

s/ Arlus J. Stephens
Arlus J. Stephens (478938)
 astephens@murphypllc.com
Roseann R. Romano (1034895)
 rromano@murphypllc.com
Charles A. Sinks (888273315)
 csinks@murphypllc.com
MURPHY ANDERSON PLLC
1401 K Street NW, Suite 300
Washington, DC 20005
tel: (202) 223-2620
fax: (202) 296-9600

Counsel for Postal Police Officers
Association