**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **POSTAL POLICE OFFICERS ASSOCIATON**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES POSTAL SERVICE**, *et al.*, <br><br> Defendants. | Case No. 20-cv-2566 (CRC) |

## <u>MEMORANDUM OPINION</u>

This case is the latest proceeding to raise a long-debated question:  What, exactly, is the lawful role of Postal Police Officers ("PPOs") employed by the United States Postal Service?  USPS recently declared that PPOs may exercise law-enforcement functions only when they are protecting Postal Service real estate.  Plaintiff Postal Police Officers Association ("PPOA" or "the Union") disagrees, arguing that Congress also authorized PPOs to enforce the law away from Postal Service premises to protect chattel property, such as in-transit mail and delivery trucks.  The Union sued the Postal Service and Postmaster General Louis DeJoy (together, "USPS"), claiming that USPS exceeded its statutory authority by unduly restricting PPOs' law-enforcement jurisdiction.  The Complaint asks the Court to set aside the USPS policy limiting PPOs' authority or, alternatively, temporarily enjoin the policy while the parties arbitrate their dispute.  The Union has also moved for a preliminary injunction or temporary restraining order granting PPOs off-premises authority during this litigation.  USPS has moved to dismiss the Complaint.

The Court concludes that USPS did not exceed its statutory authority by interpreting the Postal Accountability and Enhancement Act to either require or permit USPS to restrict PPOs'

law-enforcement activities to contexts related to postal real estate.  The agency's reading of the statute is reasonable and therefore entitled to deference.  The Court is also persuaded that it lacks jurisdiction to enter a temporary injunction pending arbitration.  Accordingly, the Court will dismiss the Complaint and deny the Union's request for preliminary relief.

## I.   Background

### A.   Facts

The following facts are alleged in the Complaint or drawn from declarations in the record that are not disputed in relevant part, except where otherwise noted.  USPS has employed PPOs since 1971.  Compl. ¶ 15.  PPOs are part of the agency's Inspection Service, which also includes a separate group of employees called Postal Inspectors.  Id. ¶¶ 15, 30.  Today, about 534 PPOs work for USPS, stationed in 20 major metropolitan areas around the country.  Brubaker Decl. ¶ 7, ECF No. 14-1; First Bjork Decl. ¶ 3, ECF No. 7-2.  PPOA is the labor union that represents most PPOs in collective bargaining with USPS.  Compl. ¶ 12; First Bjork Decl. ¶ 3.

Prior to 2006, Congress periodically granted law enforcement authority to PPOs through appropriations bills.  Compl. ¶ 17.  During this period, PPOs were assigned to various duties.  Some of these duties took place on premises owned, occupied, or controlled by USPS, but other duties occurred away from such premises.  For example, armed PPOs sometimes accompanied high-value mail shipments in transit to provide protection.  Id. ¶ 19.

In 2006, Congress enacted the Postal Accountability and Enhancement Act, which permanently authorized USPS to employ PPOs "for duty in connection with the protection of property owned or occupied by the Postal Service or under the charge and control of the Postal Service, and persons on that property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property."  18 U.S.C. § 3061.

Since 2006, PPOs have continued to perform some law-enforcement duties away from USPS premises, although the parties dispute the extent of this off-premises work.  Compare Brubaker Decl. ¶¶ 8-9 (describing limited off-premises law-enforcement work by PPOs in ten cities) with Albergo Decl. ¶¶ 4-9, ECF No. 15-2 (disputing Mr. Brubaker's account and describing more widespread off-premises law-enforcement work).  According to the Union, USPS expanded its off-premises use of PPOs after 2006, increasingly sending PPOs on mobile patrols, assigning them to protect letter carriers and in-transit mail, and relying on them to deter mail theft.  Compl. ¶ 29.  During this period (and even before 2006), USPS officials have sometimes taken steps to limit PPOs' off-premises work and suggested that PPOs' authority to engage in law enforcement was confined to postal premises.  The Union, however, claims that these episodes usually coincided with contract negotiations and were strategically designed by USPS to justify paying PPOs less than they would otherwise earn.  Suppl. Bjork Decl. ¶ 3, ECF No. 15-3.

USPS and the Union are currently operating under a collective bargaining agreement ("CBA") that went into effect in 2012.  First Bjork Decl. ¶ 4.  The CBA prohibits USPS from unilaterally making certain changes to PPOs' terms and conditions of employment.  Compl. ¶ 36. It also provides that USPS handbooks, manuals, and regulations directly related to PPOs' wages, hours, and working conditions must be consistent with the CBA, and it establishes a process for the Union to object to any proposed change that might conflict with the CBA.  Id. ¶¶ 39-40.  In the event of a dispute about the interpretation of the CBA, the Union may file a grievance, which is subject to arbitration.  Id. ¶ 35.

The current CBA is due to be replaced by a new one, but the terms of the forthcoming CBA will depend on the outcome of a currently pending arbitration ("the Interest Arbitration").

First Bjork Decl. ¶ 4.  At a February 2020 hearing in the Interest Arbitration, the Union sought to prove that PPOs are fully functioning police officers who do much of their work off-premises. Id. ¶ 5.  In the same proceeding, Craig Goldberg, Deputy Chief Inspector of the Postal Service, testified that he did not know whether PPOs' law-enforcement authority was limited to USPS real estate.  Compl. ¶ 44.

In August 2020, Deputy Chief Inspector David Bowers issued a management communication to all divisions of the Inspection Service ("the Bowers Memo").  Id. ¶ 45.  The Bowers Memo declares that "PPOs may not exercise [their] law enforcement authority in contexts unrelated to Postal Service premises."  First Bjork Decl., Ex. K, ECF No. 7-2. Accordingly, it states that, "[e]ffective immediately," any utilization of PPOs away from USPS premises requires approval from a Deputy Chief Inspector.  Id.  It further clarifies that PPOs may travel off USPS premises on their way to assignments, but "during this travel they are not to be placed into situations in which it would be reasonably likely that they would be compelled to exercise law enforcement activity[.]"  Id.

Since the Bowers Memo was issued, PPOs have been assigned mostly to duties at postal facilities.  Compl. ¶ 46.  The Union alleges that "in many places, the U.S. mail and postal personnel are receiving less protection" due to this change.  Id. ¶ 47.  In September 2020, the Union filed a grievance challenging the Bowers Memo, which will be heard by an arbitrator.  Id. ¶ 1.

B.  Proceedings in this Case

Days after filing its grievance against the Bowers Memo, the Union filed this lawsuit.  In the Complaint, the Union alleges that USPS acted in excess of its statutory authority by purporting to limit PPOs' law-enforcement authority to postal premises.  Id. ¶ 60.  It also alleges

that, regardless of whether the Bowers Memo can be reconciled with the governing statute, the Union is likely to succeed on the merits of its grievance challenging the Bowers Memo as a violation of the CBA.  Id. ¶ 50.  However, the Union contends that by the time it wins the grievance arbitration, its members will have already suffered irreparable harm.  Id. ¶ 49.  The Complaint therefore seeks either a permanent injunction striking down the Bowers Memo or, alternatively, an injunction prohibiting the Memo's enforcement pending the grievance arbitration.  Id. 15.

The Union then filed the present Motion for a Temporary Restraining Order and/or a Preliminary Injunction ("PI Motion"), seeking temporary relief requiring USPS to rescind the Bowers Memo and recognize PPOs' "authority to protect the U.S. Mail and other postal property away from postal real estate."  PI Mot. 1.

USPS responded in opposition to the PI Motion and, simultaneously, moved to dismiss the Complaint.  USPS argues that the Union's statutory-authority claim should be dismissed for failure to state a claim on which relief can be granted, and that the Court lacks jurisdiction to enter an injunction pending arbitration of the Union's grievance.  Defs.' Mem. 15, 21.

The Union filed a combined reply in support of its PI Motion and response in opposition to USPS's Motion to Dismiss.  USPS replied in support of its Motion.  The PI Motion and the Motion to Dismiss are now fully briefed and ripe for decision.

**II.   Legal Standards**

A.  Motion to Dismiss for Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) requires the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  In analyzing a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint "contain[s] sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v.</u>
<u>Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).
"The Court takes all of the factual allegations in the complaint as true and construes those facts
'liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the
facts alleged.'" <u>Johnson v. United States</u>, No. 17-cv-2411 (CRC), 2019 WL 2424039, at *3
(D.D.C. June 10, 2019) (quoting <u>Stewart v. Nat'l Educ. Ass'n</u>, 471 F.3d 169, 173 (D.C. Cir.
2006)).

    B.  <u>Motion to Dismiss for Lack of Subject Matter Jurisdiction</u>

      The Court must dismiss any claim over which it lacks subject matter jurisdiction.  <u>Auster</u>
<u>v. Ghana Airways Ltd.</u>, 514 F.3d 44, 48 (D.C. Cir. 2008).  The plaintiff bears the burden of
establishing jurisdiction.  <u>Knapp Med. Ctr. v. Hargan</u>, 875 F.3d 1125, 1128 (D.C. Cir. 2017).  On
a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure
12(b)(1), the Court must "accept all well-pleaded factual allegations as true and draw all
reasonable inferences from those allegations in the plaintiff's favor," but need not "assume the
truth of legal conclusions" in the complaint.  <u>Williams v. Lew</u>, 819 F.3d 466, 472 (D.C. Cir.
2016) (internal quotation marks omitted).  The Court also "may consider materials outside the
pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  <u>Jerome</u>
<u>Stevens Pharm., Inc. v. FDA</u>, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

    C.  <u>Motion for Temporary Restraining Order or Preliminary Injunction</u>

      A preliminary injunction or temporary restraining order "is an extraordinary remedy that
should be granted only when the party seeking the relief, by a clear showing, carries the burden
of persuasion."  <u>Cobell v. Norton</u>, 391 F.3d 251, 258 (D.C. Cir. 2004).  The same standard
governs both types of preliminary relief.  <u>Hall v. Johnson</u>, 599 F. Supp. 2d 1, 3 n.2 (D.D.C.

2009).  The moving party must show: (1) that it is likely to succeed on the merits of its claim; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that a preliminary injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

An absence of irreparable injury is fatal to a motion for a preliminary injunction or temporary restraining order.  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  The D.C. Circuit has suggested, without holding, that failure to establish a likelihood of success on the merits also categorically forecloses preliminary relief.  Sherley v. Sebelius, 644 F.3d 388, 393 (D.C. Cir. 2011).

### III.   Analysis

In its Complaint and motion papers, the Union presses three claims for relief: (1) that USPS exceeded its statutory authority by giving PPOs a narrower scope of law-enforcement authority than Congress mandated; (2) that USPS also exceeded its statutory authority by failing to seek an advisory opinion from the Postal Regulatory Commission regarding the Bowers Memo; and (3) that the Court should issue a temporary injunction while the parties arbitrate their dispute.  The Court will address each claim in turn.

### A.   USPS's interpretation of PPOs' authority follows from a reasonable reading of the governing statute.

The Union claims USPS acted in excess of its statutory authority by adopting an unduly narrow view of PPOs' law-enforcement jurisdiction.  After careful consideration, the Court concludes that this claim must be dismissed under Rule 12(b)(6) because USPS's action follows from a reasonable interpretation of the governing statute, if not the only reasonable interpretation.

USPS is generally "exempt from review under the Administrative Procedure Act, but its actions are reviewable to determine whether it has acted in excess of its statutory authority." N. Air Cargo v. USPS, 674 F.3d 852, 858 (D.C. Cir. 2012). This "*ultra vires*" review "is quite narrow." Mittleman v. Postal Reg. Comm'n, 757 F.3d 300, 307 (D.C. Cir. 2014). The D.C. Circuit has applied the familiar framework of Chevron deference to determine whether USPS has acted on an impermissible interpretation of its substantive statute and thus exceeded its statutory authority. See Aid Ass'n for Lutherans v. USPS, 321 F.3d 1166, 1174 (D.C. Cir. 2003) (citing Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984)). "Under Chevron, if the intent of Congress is clear, the court must give effect to the unambiguously expressed intent of Congress." Id. at 1174 (internal quotation marks omitted). The Court should use "the normal tools of statutory construction" to determine whether the statute is unambiguous. Id. at 1177; see also Eagle Pharms., Inc. v. Azar, 952 F.3d 323, 330 (D.C. Cir. 2020) ("[W]e examine the [statute's] text, structure, purpose, and legislative history to determine if the Congress has expressed its intent unambiguously."). "If Congress has not directly addressed the precise question at issue, and the agency has acted pursuant to an express or implied delegation of authority, the agency's statutory interpretation is entitled to deference, as long as it is reasonable." Aid Ass'n for Lutherans, 321 F.3d at 1174 (internal quotation marks omitted).

The Court begins with the text of 18 U.S.C. § 3061(c), the statutory subsection at issue here. See Sierra Club v. EPA, 551 F.3d 1019, 1027 (D.C. Cir. 2008) ("Chevron step one analysis begins with the statute's text[.]"). That subsection provides in relevant part:

> (1) The Postal Service may employ police officers for duty in connection with the protection of property owned or occupied by the Postal Service or under the charge and control of the Postal Service, and persons on that property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property.

(2) With respect to such property, such officers shall have the power to—

> (A) enforce Federal laws and regulations for the protection of persons and property;
> (B) carry firearms; and
> (C) make arrests without a warrant for any offense against the Unite[d] States committed in the presence of the officer or for any felony cognizable under the laws of the United States if the officer has reasonable grounds to believe that the person to be arrested has committed or is committing a felony.

(3) With respect to such property, such officers may have, to such extent as the Postal Service may by regulations prescribe, the power to—

> (A) serve warrants and subpoenas issued under the authority of the United States; and
> (B) conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Postal Service or persons on the property.

18 U.S.C. § 3061(c).

This statutory text is ambiguous with respect to at least two material issues: (1) whether USPS *may* assign PPOs to engage in law-enforcement activities unrelated to USPS real property, and (2) if so, whether USPS *must* grant such off-premises authority to any PPOs it employs.

First, the text tends to suggest, without quite making clear, that Congress intended for PPOs to protect postal real estate rather than postal chattels. Initially, the statute uses language that does not, in isolation, seem limited to real estate: PPOs may protect "property owned or occupied by the Postal Service or under the charge and control of the Postal Service." Id. § 3061(c)(1). However, Congress later refers back to that same "property" several times, sometimes using language that suggests an exclusive focus on real property. For example, the statute authorizes PPOs to protect "persons *on* that property"; "on" would be an odd preposition to describe how persons are situated with respect to chattel property. Id. (emphasis added); see also id. § 3061(c)(3)(B) (USPS may authorize PPOs to "conduct investigations, *on and off* the

property in question" (emphasis added)).  Perhaps more tellingly, Congress adds that PPOs may engage in "duty in areas *outside* the property to the extent necessary to protect the property and persons on the property."  Id. § 3061(c)(1) (emphasis added).  By granting this limited authorization for PPO activity "outside the property," Congress suggests that all other PPO duties must take place *inside* "the property," which in turn suggests that "the property" consists of real estate.

The Union argues that the statute must be read to authorize PPOs' protection of USPS's chattel property because otherwise, the phrase "under the charge and control of the Postal Service" would be rendered superfluous.  Pl.'s Reply 13.  Not so.  While it is true that courts should "give effect, if possible, to every clause and word" of a statute, Duncan v. Walker, 533 U.S. 167, 174 (2001) (citation omitted), that rule is not implicated here.  Subtle as the distinction may be, real property "under the charge and control of" USPS is not necessarily the same as real property "owned or occupied by" USPS.  See Gunn v. Harris Methodist Affiliated Hosps., 887 S.W. 2d 248, 251 (Tex. App. 1994) ("[A] party may occupy a premises, in whole or in part, without actually controlling it."); United States v. Fox, 60 F.2d 685, 688 (2d Cir. 1932) (bartender was "in charge" of the premises in question but not the "occupant").  Numerous other federal statutes distinguish between occupancy and charge or control with respect to real estate. See, e.g., 22 U.S.C. § 6724(b)(1) (requiring "written notice by the United States National Authority to the owner and to the operator, occupant, or agent in charge of the premises to be inspected"); 21 U.S.C. § 881(g)(2) ("The failure . . . of the person in occupancy or in control of land or premises upon which [certain] species of plants are growing or being stored, to produce an appropriate registration, or proof that he is the holder thereof, shall constitute authority for the seizure and forfeiture."); 44 U.S.C. § 317 (employees of the Government Publishing Office may

"serve as special policemen to protect persons and property in premises and adjacent areas occupied by or under the control of the Government Publishing Office.").  In this context, Congress might sensibly have wanted to make sure that PPOs would be authorized to protect real estate where USPS is in charge and control but might not be the clear legal occupant or owner— perhaps including, for example, temporary post offices set up in emergencies.[1]

Nor is the Union's interpretation compelled by the fact that Congress used the word "property" to include both real and chattel property elsewhere in the same statute.  The Union points out, for example, that the statute authorizes Postal Inspectors to "make seizures of property as provided by law."  Pl.'s Reply 12 (quoting 18 U.S.C. § 3061(a)(5)).  Pursuant to this provision, Postal Inspectors can and do seize chattel property.  See, e.g., United States v. Boutros, No. CR 19-MJ-00264, 2019 WL 6877756, at *3 (D.D.C. Dec. 17, 2019).  This is uncontroversial because none of the language Congress used in § 3061(a) even arguably implies that Postal Inspectors' seizure power is limited to real property.  The same cannot be said of § 3061(c)'s somewhat cryptic authorization for PPOs to protect certain "property."[2]

Second, even if the text of § 3061(c) did clearly contemplate PPOs protecting USPS chattels away from postal premises, it would leave a separate question open for interpretation:  If USPS employs PPOs, must those PPOs have law-enforcement authority with respect to *all* types

---

[1] In any event, "the canon [against surplusage] is not an absolute rule, because while it is generally presumed that statutes do not contain surplusage, instances of surplusage are not unknown."  Great Lakes Comnet, Inc. v. FCC, 823 F.3d 998, 1003 (D.C. Cir. 2016) (cleaned up).

[2] Even less convincing is the Union's observation that courts routinely treat USPS's chattels as "property" within the meaning of theft and robbery statutes.  See PI Mem. 30 (collecting cases).  Of course they do.  In those statutes, the context makes clear that the "property" at issue includes chattels.  Here, by contrast, surrounding language creates ambiguity about what kind of "property" Congress had in mind.

of property covered by the statute?  The relevant provision begins with permissive language:
"The Postal Service *may* employ police officers" to protect certain property and persons on that
property.  18 U.S.C. § 3061(c)(1) (emphasis added).  It then provides that, "[w]ith respect to such
property, such officers *shall* have" certain powers.  Id. § 3061(c)(2) (emphasis added).  Seizing
on that "shall," the Union argues that "Congress established a statutory floor for PPOs' law-
enforcement jurisdiction," forbidding USPS to employ any PPOs who do not have law-
enforcement authority over the full range of "property" covered by § 3061(c)(1).  Pl.'s Reply 11.

It is far from clear that § 3061(c) should be interpreted to leave USPS with so little
discretion.  A plausible alternative reading is that § 3061(c)(2) grants PPOs law-enforcement
powers with respect to "such property" as USPS has actually assigned them to protect, not as to
every piece of property to which USPS lawfully *could* assign PPOs.  Indeed, that is the most
commonsense reading of the statute, if not the most literal one.  As the Union concedes, the
statute does not compel USPS to assign PPOs to protect every piece of postal property; USPS
has "discretion to choose whether *and where* to employ" PPOs.  Pl.'s Reply 11 (emphasis
added).  Given this discretion, one would think that USPS could adopt a policy of assigning
PPOs to the locations of some, but not all, categories of property covered by § 3061(c)(1).  And
if PPOs are ultimately answerable to USPS—as the word "employ" suggests, see 18 U.S.C. §
3061(c)(1)—then USPS presumably has the authority to instruct PPOs to refrain from law-
enforcement activities outside the geographic scope of their assignments.  Insofar as the Union
argues that the text of § 3061(c)(1) clearly deprives USPS of discretion to restrict the powers of
its off-duty PPOs, it reads too much into a single use of "shall."

Because the isolated text of § 3061(c) contains ambiguities, the Court next considers the
Union's argument regarding the legislative history behind the statute.  "Legislative history can

serve to inform the court's reading of an otherwise ambiguous text[.]"  Recording Industry Ass'n of Am., Inc. v. Verizon Internet Servs., Inc., 351 F.3d 1229, 1237 (D.C. Cir. 2003).  However, absent a "clear indication" that Congress intended a specific result, courts should be wary of relying on legislative history materials such as committee reports to conclude that a statute has an unambiguous meaning.  S. Pac. Pipe Lines Inc. v. Dep't of Transp., 796 F.2d 539, 543 (D.C. Cir. 1986).

Here, the Union points to the House Committee on Government Reform's 2004 report on the Postal Accountability and Enhancement Act.  That report states, "The Postal Service currently employs more than one thousand uniformed Postal Police Officers who are assigned to critical postal facilities throughout the country. The officers provide perimeter security, escort high-value mail shipments, and perform other essential protective functions."  H.R. Rep. No. 108-672, pt. 1, at 24 (2004).  The Union quotes the second of those sentences, touting it as proof that Congress (or at least the relevant House committee's staff) was aware of, and approved of, PPOs escorting mail shipments in transit.  PI Mem. 7.  But the reference goes only so far.  While escorting mail shipments does offer a degree of protection, it does not inherently require the exercise of police power; it is conceivable that USPS might have sent PPOs on mail routes to provide a uniformed presence and deter potential crime, without authorizing PPOs to give orders, carry guns, or make arrests during those assignments.  Therefore, even if Congress was aware that PPOs escorted mail, it does not necessarily follow that Congress shared the Union's understanding of the historical scope of PPO's law-enforcement authority.  Moreover, the Union ignores the committee report's remark that PPOs "are assigned to critical postal *facilities* throughout the country," which suggests an understanding that PPOs' primary function was to protect USPS premises.  H.R. Rep. No. 108-672, pt. 1, at 24 (emphasis added).  Assuming the

Union is correct that Congress meant to ratify and build on the historical responsibilities of PPOs, it is not clear what law-enforcement role, if any, Congress wanted PPOs to play with respect to chattel property.  Nor does the legislative history cited by the Union shed any light on whether Congress intended to give USPS discretion to limit the types of property over which PPOs would have law-enforcement power.  The Court "would be very hesitant to overrule" USPS's reading of the statute "on the basis of a single, and rather ambiguous, passage from a committee report."  Gen. Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1570 (D.C. Cir. 1984).

In short, § 3061(c) is ambiguous with respect to the issues at the heart of this case.  Faced with these ambiguities, USPS did not act unreasonably by interpreting the statute to limit PPOs' law-enforcement jurisdiction to the protection of postal real property or, alternatively, to leave the question of PPOs' off-premises policing authority to USPS's discretion.  As already discussed, these conclusions follow from what is probably the most natural reading of the statute, if not the sole permissible reading.

The Union argues that USPS's interpretation of § 3061(c) is nevertheless *ultra vires* because it conflicts with existing postal regulations.  Pl.'s Reply 14-15.  But a conflict between the Bowers Memo and postal regulations would not, by itself, mean that USPS "acted in excess of its statutory authority," which is the sole basis for relief on an *ultra vires* claim.  N. Air Cargo, 674 F.3d at 858.  As the D.C. Circuit recently noted, "none of [its] decisions have placed an agency's failure to follow its own regulations in the 'ultra vires' category[.]"  Eagle Trust Fund v. USPS, 811 F. App'x 669, 670 (D.C. Cir. 2020) (mem.); see also Aid Ass'n for Lutherans, 321 F.3d at 1172 (noting that 39 U.S.C. § 410(a) "exempts the Postal Service from the strictures of the APA in cases involving the APA's procedural requirements").

USPS did not exceed its statutory authority by reading § 3061(c) to either require or permit the policy choice embodied in the Bowers Memo.  Accordingly, the Court will dismiss the Union's claim that USPS violated § 3061(c) and thus acted *ultra vires*.

B. The Union has not pled a plausible claim that USPS acted *ultra vires* by failing to seek an advisory opinion from the Postal Regulatory Commission.

In addition to its claim that USPS misinterpreted § 3061(c), the Union makes a second argument for *ultra vires* relief.  It contends that USPS was required under 39 U.S.C. § 3661(b) to seek approval from the Postal Regulatory Commission ("PRC") before limiting PPOs' law-enforcement jurisdiction to the protection of postal real estate.  PI Mem. 25.  However, the Union raised this theory for the first time in its PI Motion; nowhere in the Complaint did it cite § 3661 or otherwise put USPS on notice that it was accused of violating that statute.  The Union has not formally amended its Complaint to include this claim, and only after USPS moved to dismiss did the Union suggest that the Court should deem the Complaint amended.  Pl.'s Reply 16.  Thus, the Union has failed to plead *any* claim based on § 3661, let alone one upon which relief can be granted.  See Gaines v. District of Columbia, 961 F. Supp. 2d 218, 225 (D.D.C. 2013) ("A plaintiff cannot amend [its] Complaint via an opposition brief to a motion to dismiss.").[3]

Even if the § 3661 claim were properly before the Court, it would fail because it does not plausibly show that USPS acted *ultra vires*.  Section 3661(b) provides:

> When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.

---

[3] The Union cites Coleman v. Potomac Elec. Power Co., 310 F. Supp. 2d 154 (D.D.C. 2004), for the proposition that "the Court may construe the P.I. motion as an amendment" to the Complaint.  Pl.'s Reply 16.  But in Coleman, unlike here, the plaintiff was proceeding *pro se*, so the Court was obliged to "grant him leeway when construing his complaint and other papers." 310 F. Supp. 2d at 156.

The Fifth Circuit has explained that before USPS's obligation to seek an advisory opinion from

the PRC is triggered, three conditions must be satisfied.

> *First*, there must be a 'change.' This implies that a quantitative determination is
> necessary. There must be some meaningful impact on service. Minor alterations
> which have a minimal effect on the general class of postal users do not fall within
> [§] 3661. *Second*, the change must be 'in the nature of postal services.' This
> involves a qualitative examination of the manner in which postal services
> available to the user will be altered. *Third*, the change must affect service 'on a
> nationwide or substantially nationwide basis.' A broad geographical area must be
> involved.

Buchanan v. USPS, 508 F.2d 259, 262-63 (5th Cir. 1975) (emphases added); accord New York

v. Trump, No. 20-cv-2340 (EGS), 2020 WL 5763775, at *9 (D.D.C. Sept. 27, 2020) (quoting

and applying the Buchanan factors).

The Union has not pled sufficient facts to state a plausible claim that the Bowers Memo

will cause more than a "[m]inor alteration[]" to "the nature of postal services" that USPS offers

its users.  Buchanan, 508 F.2d at 262-63.  The allegations in the Complaint, if proven, would

show that the recent alteration of PPOs' duties would result in *some* marginal increase in the risk

of mail theft and similar crimes.  See Compl. ¶ 29-32 (describing aspects of PPOs' pre-Bowers

Memo duties that involved protection of in-transit mail), id. ¶ 47 (alleging that PPOs' former

"off-site mobile patrols are going undone" and that "in many places, the U.S. mail and postal

personnel are receiving less protection").  However, the Complaint lacks allegations suggesting

that this is a change of sufficient scale and scope to have more than a *de minimis* effect on the

nature of postal services available to ordinary USPS users.  The Union does not allege even

roughly how many PPOs are employed nationwide, let alone how many regularly engaged in off-

site law enforcement activities before the Bowers Memo.  This omission makes it impossible to

infer from the Complaint whether deploying PPOs off-premises would significantly affect the

reliability of postal service from the perspective of mine-run USPS customers.[4]  Moreover, while

the Union alleges that the "presence [of PPOs] on high-value shipments was once expressly

warranted to customers by the Postal Service in regulations issued in the early 1990s," Compl. ¶

19, there is no allegation that any such guarantee was in effect immediately before the Bowers

Memo.  Overall, the Union's allegations show only an attenuated link between the Bowers

Memo and the services provided to postal users:  Some shipments that *might* have otherwise

received PPO protection are going without it, and individual pieces of mail within those

shipments therefore *might* be stolen or damaged due to crimes that PPOs *might* have been able to

prevent.  This is not "a change in the nature of postal services which will generally affect service

on a nationwide or substantially nationwide basis."  39 U.S.C. § 3661(b).

Therefore, to the extent the Union seeks to plead an *ultra vires* claim based on § 3661(b),

the Court will dismiss that claim under Rule 12(b)(6).[5]

---

[4] On the record now before the Court, it appears undisputed that about 534 PPOs work for USPS.  Brubaker Decl. ¶ 7.  This fact, if alleged in the Complaint, would not support an inference that there are enough PPOs to affect the nature of postal services nationwide.  As of 2019, USPS operated 231,807 delivery routes and managed 31,322 retail post offices throughout the country.  U.S. POSTAL SERV., POSTAL FACTS 2020 COMPANION 3, https://facts.usps.com/wp-content/uploads/pf20_interior_book_508_ALL.pdf.  It therefore appears that USPS employs approximately one PPO for every 434 delivery routes and every 59 retail post offices—hardly ratios that suggest a strong link between PPOs' duties and the nature of postal service nationwide, even assuming that every PPO would be regularly engaged in off-premises law enforcement if not for the Bowers Memo.

[5] USPS also argues that the exclusive remedy for a claimed violation of § 3661(b) is to complain to the PRC, with subsequent judicial review available in the D.C. Circuit.  Defs.' Mem. 17.  Because the Court dismisses the § 3661(b) claim on other grounds, it does not reach this argument.

C.  <u>The Court lacks jurisdiction to enter an injunction pending arbitration of the
    underlying labor dispute.</u>

As an alternative to its *ultra vires* claims seeking to invalidate the Bowers Memo, the

Union brings a narrower claim for an injunction pending the arbitration of its grievance.  The

Court concludes that it lacks jurisdiction to enter such an injunction.

The Norris-LaGuardia Act provides that "[n]o court of the United States . . . shall have

jurisdiction to issue any restraining order or temporary or permanent injunction in a case

involving or growing out of a labor dispute, except in a strict conformity with the provisions of

this chapter[.]"  29 U.S.C. § 101.  The statute thus "establishes a strong federal policy against the

issuance of labor injunctions, except in very narrowly prescribed circumstances."  <u>In re Dist. No.

1-Pac. Coast Dist., Marine Engineers' Beneficial Ass'n (AFL-CIO)</u>, 723 F.2d 70, 77 (D.C. Cir.

1983).  However, there is also a "strong congressional preference" for resolving labor disputes

through "the private dispute settlement mechanisms agreed upon by the parties."  <u>Buffalo Forge

Co. v. United Steelworkers of Am., AFL-CIO</u>, 428 U.S. 397, 407 (1976).  The Supreme Court

has therefore recognized that in certain situations where the parties are bound by an agreement to

arbitrate disputes, a court may issue an injunction against an action that goes against the

arbitration agreement itself.  <u>Id.</u> at 406 (citing <u>Boys Markets, Inc. v. Retail Clerks Union, Local

770</u>, 398 U.S. 235 (1970)).  This exception to the Norris-LaGuardia Act's general anti-injunction

rule "is a narrow one."  <u>Boys Markets</u>, 398 U.S. at 253.  "When a court is deciding whether to

issue an injunction against an employer, its focus must be on preserving the arbitration process."

<u>Nat'l Ass'n of Letter Carriers, AFL-CIO v. USPS</u>, 419 F. Supp. 3d 127, 133 (D.D.C. 2019).

Assuming the underlying labor dispute is arbitrable, "the court may interfere only when an

injunction is 'necessary to prevent arbitration from being rendered a meaningless ritual.'"  <u>Id.</u>

(quoting <u>Niagara Hooker Emps. Union v. Occidental Chem. Corp.</u>, 935 F.2d 1370, 1377 (2d Cir. 1991)) (further internal quotation marks omitted).

Some courts have noted that the inquiry into whether an injunction is necessary to make arbitration meaningful dovetails with the question of whether the moving party has demonstrated irreparable injury.  <u>See</u>, <u>e.g.</u>, <u>Local Lodge No. 1266, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Panoramic Corp.</u>, 668 F.2d 276, 286 (7th Cir. 1981).  However, on a request for an injunction pending labor arbitration, "[i]rreparable injury means not simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award, but rather 'injury so irreparable that a decision of the [arbitrator] in the [union's] favor would be but an empty victory.'"  <u>Id.</u> at 285-86 (quoting <u>Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R.R. Co.</u>, 363 U.S. 528, 534 (1960)).  And, regardless of whether the issue arises in a labor dispute or another context, "the degree of proof required for irreparable harm is high[.]"  <u>Olu-Cole v. E.L. Haynes Pub. Charter Sch.</u>, 930 F.3d 519, 529 (D.C. Cir. 2019) (internal quotation marks omitted).  "The injury must be both certain and great; it must be actual and not theoretical and of such imminence that there is a clear and present need for equitable relief."  <u>Id.</u> (cleaned up).

Here, the parties agree that the dispute over whether the Bowers Memo violates the CBA is arbitrable.  The Union argues that the Court nevertheless has jurisdiction to enter an injunction pending arbitration because such relief is necessary to protect the Union and its members from several forms of irreparable harm.  After considering each of the Union's arguments, the Court is not persuaded that the Union has satisfied the ordinary standard for irreparable harm, let alone the heightened standard required for an injunction pending labor arbitration.

First, the Union contends that before the parties can finish arbitrating their dispute over the Bowers Memo, USPS will "proceed to close PPO divisions and lay off its PPO workforce" unless this Court blocks USPS from doing so.  Pl.'s Reply 20.  As the Union observes, courts have sometimes found that an injunction pending arbitration is appropriate where an employer's actions, if not enjoined, would eliminate a bargaining unit and thus eviscerate any opportunity to arbitrate.  See Panoramic, 668 F.2d at 286; see also Pl.'s Reply 21 (collecting cases).  However, these cases do not authorize courts to issue an injunction based on a speculative *possibility* of such harm.  See Local 715, United Rubber, Cork, Linoleum & Plastic Workers of Am. v. Michelin Am. Small Tire, 840 F. Supp. 598, 604 (N.D. Ind. 1993) (denying injunction where "the loss of jobs [was] merely speculative"); Olu-Cole, 930 F.3d at 529 (irreparable harm must be actual, not theoretical).

Here, the Union's prediction that USPS will lay off its PPOs and thus avoid meaningful arbitration is speculative.  According to the Union's own former president James Bjork, USPS representatives have repeatedly, though inconsistently, taken the position that PPOs lack off-premises law-enforcement authority for decades.  Suppl. Bjork Decl. ¶ 3.  If none of these past episodes have led to USPS eliminating its PPO workforce, it is not apparent why the Court should draw the inference that this time will be different.  Moreover, Mr. Bowers testified at the recent Interest Arbitration that "PPOs play an important role in the protection of Postal Service assets and personnel," suggesting that USPS has no immediate plan to eliminate them.  Stephens Decl., Ex. K at 411, ECF No. 7-15.  Perhaps recognizing this, Mr. Bjork stops short of definitively asserting in his declaration that USPS is about to fire its PPOs.  See First Bjork Decl. ¶ 33 ("Under the August 2020 policy change, it is likely that PPOA will have to dedicate its limited resources to mutual aid and job training as PPOs face *likely* layoffs *or other disruptions*

*to their jobs*." (emphases added)); id. ¶ 41 ("It is *possible* that [Postal Inspection Service leaders] want to prioritize preserving the jobs of postal inspectors over preserving the jobs of PPOs." (emphasis added)).  The Court cannot find irreparable harm based on the mere possibility of forthcoming PPO layoffs.

Second, the Union claims the Bowers Memo "puts Postal Police at increased risk of physical harm, discipline, and legal liability."  PI Mem. 35.  Although its brief is less than perfectly clear, the Union's theory seems to be that two types of harm are likely: (1) PPOs will encounter violent criminals during the limited time they now spend away from USPS premises and will be unauthorized to protect themselves with force; and (2) PPOs will take law-enforcement action on the mistaken belief that they are authorized to do so under the circumstances (e.g., incorrectly believing they are on postal premises), causing them to be disciplined or sued.  See id. at 35-36.  In support of this argument, PPO Danny Simpson explains in a declaration that despite the Bowers Memo, USPS managers continue to suggest to PPOs in New York that they have "moral obligations" to intervene to stop some off-premises crimes.  Simpson Decl. ¶ 6, ECF No. 7-8.  Officer Simpson states that this inconsistent guidance puts him "in a very dangerous situation" because if he encounters off-premises crime, he must make a quick decision that could put him at risk of physical harm, liability, or both.  Id. ¶ 7.  While the Court agrees that USPS should avoid communications that could potentially lead to the predicament Simpson describes, nothing in the record shows that it is likely, rather than merely possible, that PPOs who make a good-faith effort to stay within their assigned duties will face such harm.  This possibility is therefore too speculative to constitute irreparable harm, and certainly too speculative to support a conclusion that the arbitration process will become an empty ritual without an injunction.

Third, the Union argues that the Bowers Memo "threatens irreparable harm to letter carriers and the U.S. mail" by removing PPO protection from locations other than postal premises.  PI Mem. 37.  However, the Union's burden is to show irreparable harm to itself or its members.  See Winter, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish . . . that *he* is likely to suffer irreparable harm[.]" (emphasis added)).  The Union "provides no authority under which the Court may consider irreparable harm to third parties in lieu of or in addition to irreparable harm to" the Union and its members.  Nutrition Distrib., LLC v. Enhanced Athlete, Inc., No. 2:17-cv-2069-JAM-CKD, 2017 WL 5467252, at *2 (E.D. Cal. Nov. 14, 2017).  Nor does it show that the potential for harm to letter carriers and mail in the interim would somehow interfere with the opportunity for meaningful arbitration.

The Court therefore concludes that it lacks jurisdiction to enter an injunction pending arbitration of the Union's grievance.  See Nat'l Ass'n of Letter Carriers, 419 F. Supp. 3d at 137 ("[B]ecause injunctive relief is unnecessary to preserve the arbitral process, the Court concludes that it lacks the jurisdiction to grant such relief in this case." (internal citation omitted)).  Alternatively, because the Complaint does not allege facts that would justify an injunction pending arbitration, that claim is also subject to dismissal under Rule 12(b)(6).

* * *

Because the Union fails to state an *ultra vires* claim and the Court lacks jurisdiction to issue an injunction pending arbitration, the Complaint must be dismissed in full.  It necessarily follows that the Union's motion for a preliminary injunction or temporary restraining order must be denied, both for failure to show a likelihood of success on the merits and for failure to demonstrate irreparable harm.

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss, deny Plaintiff's Motion for Temporary Restraining Order or Preliminary Injunction, and dismiss the case.  A separate Order shall accompany this Memorandum Opinion.

_____

CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>November 24, 2020</u>